New York State Education Department

Office of State Review

Halia Chudyk-Francis and Cliff Francis on behalf of Rex Francis,  Petitioner

SRO No. 24-011

IHO No. 249622

v

New York City Department of Education,  Respondent

# Index

## SD: SRO Decision

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| SD1 - SD16 | SRO Decision 24-011 issued March 25, 2024 by SRO Steven Krolak | 26 March 2024 | | | |

## I: IHO Decisions

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| I1 - I27 | Findings of Fact and Decision dated December 8, 2023 | 17 January 2024 | | | |
| I28 | Order Denying Consolidation, dated July 4, 2023 | 17 January 2024 | | | |
| I29 | Order of Extension (1) | 17 January 2024 | | | |

## P: Pleadings

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| P1 - P33 | Notice of Intention to Seek Review with attachments (Cover letter and IHO Decision) and Affidavit of Service with Email confirmation | 16 January 2024 | | | |
| P34 - P48 | Notice of Request for Review, Request for Review, Affidavit of Verification: Halia Ghudyk-Francis, Affidavit of Verification: Cliff Francis and Affidavit of Service with Email confirmation | 16 January 2024 | | | |
| P49 - P61 | Proposed Exhibit 1 to Request for Review: P-1 IHO McKeever's 08-15-23 Decision | 16 January 2024 | | | |
| P62 - P70 | Proposed Exhibit 2 to Request for Review: P-2 Emails with IHO Babbitt 11-28-23 through 12-01-23 | 16 January 2024 | | | |

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| P71 - P99 | Petitioners' Memorandum of Law (in Support of Request for Review) | 16 January 2024 | | | |
| P100 - P111 | Answer, Affidavit of Verification, and Affidavit of Service | 06 February 2024 | | | |
| P112 - P125 | Petitioners' Reply Memorandum of Law, Affidavit of Verification (Cliff Francis), Affidavit of Verification (Halia Chudyk-Francis) and Affidavit of Servicer with email confirmation | 22 February 2024 | | | |

## C: Certifications

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| C1 | Impartial Hearing Officer's Certification of the Record dated December 29, 2023 | 17 January 2024 | | | |
| C2 - C3 | District's Certification of the Record dated January 8, 2024 | 17 January 2024 | | | |

## S: Supplemental Documents

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| S1 - S12 | Amended Due Process Complaint, dated August 22, 2023 | 17 January 2024 | | | |
| S13 - S27 | Due Process Complaint, dated June 30, 2023 | 17 January 2024 | | | |
| S28 - S30 | Due Process Response, dated July 07, 2023 | 17 January 2024 | | | |
| S31 | Notice of Appearance, Eli Koppel, dated July 7, 2023 | 17 January 2024 | | | |
| S32 | Notice of Appearance, Christina Mure, Esq., Undated | 17 January 2024 | | | |
| S33 | Notice of Appearance, John Hobbs, Esq., Undated | 17 January 2024 | | | |
| S34 | Notice of Appearance, Gary S. Mayerson, Esq., Undated | 17 January 2024 | | | |
| S35 - S36 | Pendency Implementation Form, dated September 13, 2023 | 17 January 2024 | | | |

| S37 | Written Clarification by OATH Administrator dated December 29, 2023 regarding clarifications to Record | 17 January 2024 | | | |

## PE: Parent Exhibits

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| PE1 - PE4 | Parent Exhibit List | 17 January 2024 | | | |
| PE5 - PE19 | A | 17 January 2024 | | | |
| PE20 - PE31 | B | 17 January 2024 | | | |
| PE32 - PE34 | C | 17 January 2024 | | | |
| PE35 - PE97 | D | 17 January 2024 | | | |
| PE98 - PE116 | E | 17 January 2024 | | | |
| PE117 | F | 17 January 2024 | | | |
| PE118 - PE134 | G | 17 January 2024 | | | |
| PE135 - PE136 | H | 17 January 2024 | | | |
| PE137 | I | 17 January 2024 | | | |
| PE138 - PE143 | J | 17 January 2024 | | | |
| PE144 - PE149 | K | 17 January 2024 | | | |
| PE150 | L | 17 January 2024 | | | |
| PE151 - PE179 | M | 17 January 2024 | | | |
| PE180 | N | 17 January 2024 | | | |
| PE181 - PE190 | O | 17 January 2024 | | | |
| PE191 | P | 17 January 2024 | | | |
| PE192 - PE195 | Q | 17 January 2024 | | | |
| PE196 - PE198 | R | 17 January 2024 | | | |
| PE199 - PE202 | S | 17 January 2024 | | | |

| | | | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| PE203 | T | 17 January 2024 | | | |
| PE204 - PE221 | U | 17 January 2024 | | | |
| PE222 - PE229 | V | 17 January 2024 | | | |
| PE230 - PE238 | W | 17 January 2024 | | | |
| PE239 - PE245 | X | 17 January 2024 | | | |
| PE246 - PE256 | Y | 17 January 2024 | | | |
| PE257 - PE259 | Z | 17 January 2024 | | | |
| PE260 - PE263 | AA | 17 January 2024 | | | |
| PE264 - PE265 | BB | 17 January 2024 | | | |

DE: District Exhibits

IE: IHO Exhibits

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| IE1 - IE10 | IHO I | 17 January 2024 | | | |
| IE11 - IE19 | IHO II | 17 January 2024 | | | |
| IE20 - IE44 | IHO III | 17 January 2024 | | | |

JE: Joint Exhibits

AE: Additional Documentary Evidence

T: Transcripts

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|---|---|---|---|---|---|
| T1 - T20 | Transcript dated August 2, 2023 Pgs. 1-20 | 17 January 2024 | | | |
| T21 - T210 | Transcript dated October 13, 2023 Pgs. 21-210 | 17 January 2024 | | | |

CO: Correspondence

| Page | Document | Date | Admitted | Shown to Jury | Exhibit |
|------|----------|------|----------|---------------|---------|
| CO1 | Cover letter from Gary S. Mayerson dated 01-16-24 forwarding Request for Review documents to OSR for filing | 16 January 2024 | | | |
| CO2 | Letter to OSR from Toni L. Mincieli dated 01-22-24 requesting extension to answer from 01-23-24 to 02-06-24 | 22 January 2024 | | | |
| CO3 - CO4 | OSR Letter to Toni L. Mincieli dated 01-22-24 granting extension to answer from 01-23-24 to 02-06-24 | 22 January 2024 | | | |
| CO5 | Letter to OSR from Gary S. Mayerson dated 02-06-24 requesting extension to Reply from 02-08-24 to 02-22-24 | 06 February 2024 | | | |
| CO6 | OSR Letter to Gary S. Mayerson dated 02-06-24 granting extension to Reply from 02-08-24 to 02-22-24 | 06 February 2024 | | | |
| CO7 | OSR Cover letter to Parties (Gary S. Mayerson, Esq. Law Offices of Mayerson & Associates, LLP [for petitioner] and Toni L. Mincieli, Esq., NYC DOE [for respondent]) dated 03-25-24 forwarding SRO Decision 24-011 | 25 March 2024 | | | |
| CO8 | OSR Cover letter to NYC Impartial Hearing Office dated 03-25-24 forwarding courtesy copy of SRO Decision 24-011 | 25 March 2024 | | | |
| CO9 | OSR Cover letter to Impartial Hearing Officer, Michelle S. Babbitt, Esq., dated 03-27-24 forwarding courtesy copy of SRO Decision 24-011 | 25 March 2024 | | | |
| CO10 | Request for Certified Copy of the Administrative Record by Gary S. Mayerson, Esq., Mayerson & Associates, received 08-06-24 (USDC SDNY 24-cv-03117 - USDJ Hon. Mary Kay Vyskocil) | 06 August 2024 | | | |

SD1



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 24-011

**Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Mayerson and Associates, attorneys for petitioners, by Gary S. Mayerson, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Toni L. Mincieli, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law.  Petitioners (the parents) appeal from the decision of an impartial hearing officer (IHO) which denied their request for funding for their son's after-school applied behavioral analysis (ABA), speech-language therapy, and occupational therapy (OT) services for the 2023-24 school year.  The appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]).  If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C.

SD1

§§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

## III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited here in detail. Briefly, according to the parents, the CSE convened on January 17, 2023, to formulate the student's IEP for the 2023-24 school year (Parent Ex. C at p. 1).[1] In a letter dated June 15, 2023, the parents disagreed with

---

[1] The parties did not attempt to enter a copy of the January 2023 IEP into the hearing record. In fact, the district

the recommendations contained in the January 2023 IEP, and alleged that the district failed to notify the parents of the particular public school site to which the student would be assigned to attend for the 2023-24 school year and, as a result, notified the district of their intent to unilaterally place the student at The Titus School (Titus) (id. At pp. 1-2).[2]  In a due process complaint notice, dated June 30, 2023, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2023-24 school year and, as relief, sought reimbursement for the student's tuition at Titus and the costs of afterschool services, monthly meetings, and transportation (see Parent Ex. A).  On August 15, 2023, in a prior proceeding involving the 2022-23 school year, a different IHO issued a decision awarding the parents relief, including reimbursement for the cost of the student's tuition at Titus, as well as reimbursement for up to 10 hours per week of ABA services, two hours per week of speech-language therapy, one hour per week of physical therapy (PT), a social skills group for one day a week, two hours per week of OT, two hours per week of parent counseling and training, two hours per week of ABA supervision, one hour of monthly ABA meetings, one hour of monthly interdisciplinary team meetings, and transportation for the student (SRO Ex. 1).[3]  The parents amended their due process complaint notice on August 22, 2023 to reflect the student's updated pendency  and to request funding for an updated neuropsychological evaluation (see Parent Ex. B).

A pre-hearing conference was held on August 2, 2023 wherein the IHO narrowed the issues to be determined as part of the impartial hearing and the parents' attorneys clarified the relief sought by the parents (Tr. pp. 1-20).[4]  An impartial hearing convened on October 13, 2023 and concluded on the same day (Tr. pp. 21-210).  In a decision dated December 8, 2023, the IHO determined that the district failed to offer the student a FAPE for the 2023-24 school year, that Titus was an appropriate unilateral placement, and that equitable considerations weighed in favor of the parents' request for an award of tuition reimbursement, but the IHO denied the parents' request for reimbursement for at-home ABA services, after-school speech-language therapy, after-school OT, parent counseling and training, an updated neuropsychological evaluation, and transportation (IHO Decision at pp. 16-21).  As relief, the IHO ordered the district to reimburse the parents for the cost of the student's tuition at Titus for the 2023-24 school year and directed the district to directly pay Titus for the remainder of the tuition due for the 2023-24 school year (id. at p. 21).

---

did not offer any exhibits into the hearing record.

[2] The parents' ten-day notice letter was dated June 15, 2023 (Parent Ex. C at p. 1).  According to the parents' due process complaint notice, the parents received a school location letter for the student's 2023-24 school year dated June 22, 2023 (Parent Ex. A at p. 3).  Neither party entered the school location letter into the hearing record.

[3] Included with the parents' request for review are two proposed exhibits.  Proposed Exhibit 1 is the August 15, 2023 IHO Decision and Proposed Exhibit 2 is a series of email exchanges between the IHO in the current matter, the parents' attorney, and the district's attorney from November 28, 2023 to December 1, 2023.  I have found both proposed exhibits to be relevant and I am therefore admitting them into the hearing record as SRO Exhibit 1 and SRO Exhibit 2 (see SRO Exs. 1-2).

[4] During the August 2, 2023 pre-hearing conference the IHO stated: "I just want to make it clear that at first blush, this is a lot of services after school... I will have to have information how those services are being used, when, and where... [s]o I can make a determination whether the educational program that you're seeking is reasonable" (Tr. p. 16).

**IV. Appeal for State-Level Review**

The parents appeal. The parties' familiarity with the particular issues for review on appeal in the parents' request for review and the district's answer thereto is also presumed and, therefore, the details of the allegations and arguments raised will not be repeated. The following issues must be resolved on appeal in order to render a decision in this case:

1. Whether the IHO exhibited bias or otherwise erred in his conduct during the impartial hearing;

2. Whether the IHO erred in denying reimbursement for home and community-based ABA, OT, and speech-language therapy; and

3. Whether the IHO erred in not addressing a request for an updated neuropsychological evaluation and whether the parent is entitled to district funding for an updated neuropsychological evaluation?

**V. Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an

4

administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak. 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[5]

---

[5] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

SD6

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

Initially, I note that neither party has appealed from the IHO's determinations that the district failed to meet its burden to prove that it offered the student a FAPE for the 2023-24 school year. In addition, neither party appealed from the IHO's finding that Titus is an appropriate unilateral placement for the student for the 2023-24 school year or the IHO's award of reimbursement for the cost of the student's tuition at Titus. Additionally, the parent's relief requested on appeal is limited to ABA, speech-language therapy, and OT services (Req. for Rev. ¶¶ 37-38). Therefore, the parent has not appealed from the IHO's findings denying reimbursement for transportation, PT, and a social skills group (IHO Decision at pp. 20, 21). Accordingly, these findings outlined above have become final and binding on the parties and will not be further discussed (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).

### A. Preliminary Matters - Conduct of the Impartial Hearing

As part of the parents' appeal, the parents object to the IHO's questioning of the parents' witnesses.

Review of the hearing record shows that the district failed to notify the parents' attorney of its intent to cross-examine the parents' witnesses and, therefore, the IHO precluded it from cross-examining any of the parents' witnesses during the impartial hearing (Tr. pp. 28-29; IHO Decision at p. 4). The IHO explained to the parties that she would ask "questions for clarification and completion [of the record]" and notified the district that it could "ask questions only as to those limited areas inquired into by [the IHO]" (Tr. p. 29; IHO Decision at p. 4).

Regarding the IHO's questioning and conduct during the hearing, the parents allege that the IHO "ask[ed] questions that were both loaded and confusing," engaged in predetermination, and displayed an "attitude, demeanor and less than respectful conduct towards the [parents], and [parents'] witnesses," and "interrupted [parents'] witnesses multiple times... thus restrict[ing] the [parents'] right to make a proper record" (Req. for Rev. ¶¶ 12, 20, 22, 24, 25).

SD6

Initially, it is well settled that an IHO must be fair and impartial and must avoid even the appearance of impropriety or prejudice (see, e.g., Application of a Student with a Disability, Appeal No. 12-066). Moreover, an IHO, like a judge, must be patient, dignified, and courteous in dealings with litigants and others with whom the IHO interacts in an official capacity and must perform all duties without bias or prejudice against or in favor of any person, according each party the right to be heard, and shall not, by words or conduct, manifest bias or prejudice (e.g., Application of a Student with a Disability, Appeal No. 12-064). An IHO may not be an employee of the district that is involved in the education or care of the child, may not have any personal or professional interest that conflicts with the IHO's objectivity, must be knowledgeable of the provisions of the IDEA and State and federal regulations and the legal interpretations of the IDEA and its implementing regulations, and must possess the knowledge and ability to conduct hearings and render and write decisions in accordance with appropriate, standard legal practice (20 U.S.C. § 1415[f][3][A]; 34 CFR 300.511[c][1]; 8 NYCRR 200.1[x]).

Having reviewed the hearing transcript, there are multiple occasions wherein the IHO's questioning focused on the topic of maximization (Tr. pp. 64, 80-81, 193). As set forth in greater detail below, after-school or home-based services provided to a student for the purpose of generalization of skills learned at school and/or the maximization of the student's potential may not warrant an award for reimbursement of such services subject to a case-by-case determination based on an analysis of the facts attendant to those services. Accordingly, the information sought by the IHO was relevant to her analysis and it was not improper for the IHO to pursue such a line of questioning.

Unless specifically prohibited by regulations, IHOs are provided with broad discretion, subject to administrative and judicial review procedures, with how they conduct an impartial hearing, in order that they may "accord each party a meaningful opportunity" to exercise their rights during the impartial hearing (Letter to Anonymous, 23 IDELR 1073 [OSEP 1995]; see Impartial Due Process Hearing, 71 Fed. Reg. 46704 [Aug. 14, 2006]). An IHO must provide all parties with an opportunity to present evidence and testimony, including the opportunity to confront and cross-examine witnesses (34 CFR 300.512[a][2]; 8 NYCRR 200.5[j][3][xii]). Furthermore, each party "shall have up to one day to present its case" (8 NYCRR 200.5[j][3][xiii]). While an IHO is required to exclude evidence and may limit the testimony of witnesses that he or she "determines to be irrelevant, immaterial, unreliable or unduly repetitious" (8 NYCRR 200.5[j][3][xii][c]-[e]), it is also an IHO's responsibility to ensure that there is an adequate and complete hearing record (see 8 NYCRR 200.5[j][3][vii]). Further, an IHO has the authority to issue a subpoena if necessary (see 8 NYCRR 200.5[j][3][iv]).

This case is relatively unique in that the district's failure to properly notify the parents' attorney of its intent to cross-examine the parents' witnesses placed a larger burden than is typical on the IHO to complete the hearing record. Nevertheless, IHOs have the authority to ask questions of witnesses for the purpose of clarification or completeness of the record (8 NYCRR 200.5[j][3][vii]). In this instance, the IHO read the affidavits and evidence entered into the hearing record and questioned the witnesses based on the testimony they provided in their affidavits and the exhibits submitted by the parents (Tr. pp. 49-50, 128-141, 145-46, 147-54, 162-63, 187-201). The questions asked were clarifying questions to complete the hearing record in accordance with what the IHO explained during the prehearing conference, in that she expected information as to how the after-school services were "being used, when, and where" (Tr. p. 16).

Additionally, while the IHO appeared brusque during portions of the impartial hearing, the hearing record does not support the parents' argument that the IHO restricted the parents' right to make a proper record. As noted above, the IHO gave the parents notice, during the pre-hearing conference, of the evidence she expected related to the requested after school services (Tr. p. 16). The record, as a whole, reflects that the IHO gave the parents and their witnesses opportunities to present their case and make arguments in favor of their requested relief. Accordingly, the evidence in the hearing record does not support the parents' claims related to the IHO's conduct during the hearing.

The parents also allege that the IHO improperly allowed the district to submit its closing brief after it was overdue and over the parents' attorney's objection (Req. for Rev. ¶ 28; SRO Ex. 2 at pp. 2-8). The district asserts that the late submission did not cause any prejudice to the parents and alleges that the IHO afforded the parents the opportunity to assert how the late submission could have prejudiced them and inquired if they wished to submit a reply to the district's late closing brief (Answer ¶ 21). A review of the email exchange between the IHO and the parties reflects that the IHO gave the parents the opportunity to present evidence that the district's late submission of its closing brief prejudiced the parents' claims and also inquired if the parents wished to "submit an addendum" (SRO Ex. 2 at pp. 3-6). The parents' attorney responded that the parents "may not have been prejudiced by the [district's] late submission" and that the parents were "not requesting additional time to respond to the [d]istrict's brief as it does not appear to reference a specific portion of [the parents'] brief" (id. at p. 4). The IHO replied that "[w]hile I do not condone late submissions [p]arent[s] ha[ve] not alleged any prejudice nor do they want additional time to submit an addendum to their post hearing submission"; therefore, the IHO denied the parent's request to exclude the district's closing brief from the hearing record (id. at p. 1). From this exchange, and my review of the closing briefs, I have determined that the parents were not prejudiced by the district's late submission. As it is the IHO's duty to ensure that there is an adequate and complete hearing record, I decline to find that the IHO erred in allowing the district to submit its closing brief late.

## B. Equitable Considerations – Funding for After School Services

The parents appeal from the IHO's finding that the student's after-school services served as maximization and generalization of skills. Additionally, the parents contend that arguments related to generalization and maximization go to equitable considerations, which the parents claim the district conceded, rather than the appropriateness of the parent's unilateral placement as it was analyzed in the IHO's decision.

The IHO found that the parents did not present any testimony or documentary evidence showing to what extent Titus could not provide the student with an educational benefit without the at-home ABA services and after-school OT and speech-language therapy, to what extent the at-home ABA services and after-school OT and speech-language therapy were responsible for the student's progress at Titus, to what extent the student required services to maintain and retain skills, or that, in the absence of the at-home and after-school services, the student was unlikely to receive educational benefits from Titus and was likely to experience regression at Titus (IHO Decision at pp. 17-18).

SD9

More specifically, the IHO found that, according to the June 2023 Titus progress report, the student had been diagnosed as having autism and exhibited delays in social/emotional development and adaptive behavior (IHO Decision at p. 5; see Parent Ex. M at p. 2), The IHO quoted the report as stating that the student had "a history of engaging in high rates of off-task behavior" as well as exhibiting emotional and physical dysregulation (id.). In addition, the IHO noted the student presented as self-directed and, due to his behavior, required consistent support to access the curriculum in both 1:1 and group activities (id.). Citing the June 2023 Titus progress report, the IHO further noted that due to the student's complex medical diagnosis he required significant support to navigate his environment and demonstrate executive functioning skills (id.). She indicated that the student's behavior also hindered his ability to develop peer relationships and participate in a less restrictive academic setting (id.). Lastly, the IHO noted that, according to the June 2023 Titus progress report, the student required a small class with a low student to staff ratio in order to participate in instruction (id.).[6]

The argument that the privately obtained home-based ABA services constituted maximization is an issue that must be examined as an equitable consideration. Among the factors that may warrant a reduction in tuition under equitable considerations is whether the frequency of the services or the rate for the services were excessive (see E.M., 758 F.3d at 461 [noting that whether the amount of the private school tuition was reasonable is one factor relevant to equitable considerations]). The IHO may consider evidence regarding whether the rate charged by the private agency was unreasonable or regarding any segregable costs charged by the private agency that exceed the level that the student required to receive a FAPE (see L.K. v. New York City Dep't of Educ., 2016 WL 899321, at *7 [S.D.N.Y. Mar. 1, 2016], aff'd in part, 674 Fed. App'x 100).

The final criterion for a reimbursement award is that the parents' claim must be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; R.E., 694 F.3d at 185, 194; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable"]; L.K. v. New York City Dep't of Educ., 674 Fed. App'x 100, 101 [2d Cir. Jan. 19, 2017]). With respect to equitable considerations, the IDEA also provides that reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; 34 CFR 300.148[d]; E.M. v. New York City Dep't of Educ., 758 F.3d 442, 461 [2d Cir. 2014] [identifying factors relevant to

---

[6] In addition to the 2021 neuropsychological report, May 2023 ABA report, and the June 2023 Titus progress report, the hearing record included an after-school August 2023 speech progress report (speech report) and an after-school September 2023 OT progress report (OT report) (Parents Exs. D at pp. 48-63; M at pp. 1-29; O at pp. 1-10; Q at pp. 1-4; S at pp. 1-4). Although the IHO discounted the evaluative information because it did not provide a picture of the student's current needs, with no witness "to explain their significance to the current school year" (IHO Decision at p. 6), the evaluation reports are included in the hearing record and they have been reviewed on appeal.

SD9

SD10

equitable considerations, including whether the withdrawal of the student from public school was justified, whether the parent provided adequate notice, whether the amount of the private school tuition was reasonable, possible scholarships or other financial aid from the private school, and any fraud or collusion on the part of the parent or private school]; C.L., 744 F.3d at 840 [noting that "[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA"]).

The parent's appeal from the IHO's determination that the after-school services were in excess of a FAPE and were not required for the student to make meaningful educational progress.

Here, the crux of the parties' dispute is whether the IHO erred by denying the parents' request for reimbursement and direct funding of the student's at-home and after-school services, including ABA, OT, and speech-language therapy services. According to the affidavit and testimony of the ABA provider/supervisor, as well as her May 2023 ABA report, the student's after-school ABA program included up to 10 hours of 1:1 ABA services per week, up to two hours per week of parent counseling and training, and up to two hours per week of supervision of ABA staff (Tr. pp. 96-98, 101-03, 106-07, 110-12; Parents Exs. O at p. 1; V ¶ 19; Y ¶¶ 37, 38). In addition, the student's after-school services included one 60-minute individual session of speech-language therapy per week, as well as one 60-minute individual session of OT per week at a sensory gym or at the student's home, one 60-minute individual session of PT per week, and up to one 90-minute session of an after-school social skills program per week (Tr. pp. 13-15; Parents Exs. Q at p. 1; S at p. 1; W ¶ 10; X ¶ 7; AA at pp. 1-4).

At the time of the impartial hearing the student was receiving these services under pendency and had been receiving similar after-school services since before June 14, 2021 (Parent Ex. A at p. 13). In her review of the appropriateness of Titus as a unilateral placement, the IHO cited the Titus program description and concluded that the parent demonstrated that the school offered "1:1 and 2:1 support in a group setting" (IHO Decision at p. 14; see Parent Ex. I). In addition, she found that the parent demonstrated the classroom at Titus was co-led by a certified special education teacher and a lead behavior therapist who was working toward licensure and board certification in ABA under the supervision of the Titus BCBA/LBAs (IHO Decision at p. 14; see Parent Exs. I; K ¶ 26). The IHO also cited the testimony of the Titus founder who reported that the student's class schedules were designed to foster development across all domains and promote generalization and that related services and mental health counseling sessions were scheduled in collaboration with the classroom team to promote regulation and provide in-class support (IHO Decision at pp. 15, 24; see Parent Ex. U ¶ 64). According to the IHO, the Titus founder reported that, in school at Titus, the student received "OT three times a week for 30 minutes individually"; speech-language therapy "three times a week for 30 minutes individually"; "PT two times a week for 30 minutes individually"; and "[c]ounseling one to two times a week for 30 minutes individually" (IHO Decision at p. 15; Parent Ex. U ¶¶ 36, 37, 40, 43, 46). The founder also reported that the student received "instruction at the late kindergarten to early first-grade level in all academic classes" and "[wa]s in a class of 7 students who present[ed] with similar needs and skills… with 1:1 instruction as needed" (IHO Decision at pp. 15-16; see Parent Ex. U ¶ 25). For these reasons, the IHO held that the parents met their burden in proving that Titus offered the student an educational program that meets his needs (id. at p. 16).

SD10

SD11

In addition to holding that Titus was an appropriate unilateral placement, the IHO noted that the parents failed to prove through testimony or documentary evidence that: (1) Titus would have been unable to provide the student with an appropriate program without the student receiving at-home ABA therapy, after-school OT, and after-school speech-language therapy; (2) that the at-home ABA therapy, after-school OT, and after-school speech-language therapy were the key to the student's progress at Titus; (3) that the student required the at-home and after-school services to "maintain and retain skills"; (4) that the student was unlikely to obtain educational benefit from Titus in the absence of at-home ABA therapy, after-school OT, and after-school speech-language therapy; or (5) that the student would likely regress at Titus without the provision of at-home and after-school services (IHO Decision at pp. 17-18).

Generally, a parent may obtain outside services for a student in addition to a private school placement as part of a unilateral placement (see C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 838-39 [2d Cir. 2014] [finding the unilateral placement appropriate because, among other reasons, parents need not show that a "'private placement furnishes every special service necessary'" and the parents had privately secured the required related services that the unilateral placement did not provide], quoting Frank G. v. Bd. of Educ. Of Hyde Park, 459 F.3d 356, 365 [2d Cir. 2006]). However, for the outside services to represent a portion of the unilateral placement, the parent must undergo the financial risk associated with unilateral placements (see Ventura de Paulino, 959 F.3d at 526 ["Parents who are dissatisfied with their child's education can unilaterally change their child's placement during the pendency of review proceedings and can, for example, pay for private services, including private schooling. They do so, however, at their own financial risk. They can obtain retroactive reimbursement from the school district after the IEP dispute is resolved, if they satisfy a three-part test that has come to be known as the Burlington-Carter test"] [first emphasis added] [internal quotations marks and footnotes omitted]; see also Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 14 [1993]). To the extent a parent cannot afford to front the costs of the services, the district may be required to directly fund the services, but only if it is shown that the parent was legally obligated to pay for the services but, due to a lack of financial resources, had not made payments (see Mr. & Mrs. A. v. New York City Dep't of Educ., 769 F. Supp.2d 403, 406 [S.D.N.Y. 2011] [finding it appropriate to order a school district to make retroactive tuition payment directly to a private school where equitable considerations favor an award of the costs of private school tuition but the parents, although legally obligated to make tuition payments, have not done so due to a lack of financial resources]).

As for home-based ABA services, the parents argue that the IHO erred in finding that the sole purpose of the recommendations for home-based services was for maximization or to encourage generalization. Several courts have held that the IDEA does not require school districts, as a matter of course, to design educational programs to address a student's difficulties in generalizing skills to other settings outside of the school environment, particularly where it is determined that the student is otherwise likely to make progress, at least in the classroom setting (see, e.g., F.L. v. New York City Dep't of Educ., 2016 WL 3211969, at *11 [S.D.N.Y. June 8, 2016]; L.K. v. New York City Dep't of Educ., 2016 WL 899321, at *8-*10 [S.D.N.Y. Mar. 1, 2016], aff'd in part, 674 Fed. App'x 100 [2d Cir. Jan. 19, 2017]; P.S. v. New York City Dep't of Educ., 2014 WL 3673603, at *13-*14 [S.D.N.Y. Jul. 24, 2014]; M.L. v. New York City Dep't of Educ., 2014 WL 1301957, at *11 [S.D.N.Y. Mar. 31, 2014]; K.L. v. New York City Dep't of Educ., 2012 WL 4017822, at *14 [S.D.N.Y. Aug. 23, 2012], aff'd, 530 Fed. App'x 81 [2d Cir. July 24, 2013]; Student X, 2008 WL 4890440, at *17; A.D. v. New York City Dep't of Educ., 2008 WL

SD11

8993558, at *7 [S.D.N.Y. Apr. 21, 2008]; see also Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143, 1152-53 [10th Cir. 2008]; Gonzalez v. Puerto Rico Dep't of Educ., 254 F.3d 350, 353 [1st Cir. 2001]; Devine v. Indian River County Sch. Bd., 249 F.3d 1289, 1293 [11th Cir. 2001]; JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1573 [11th Cir 1991]).

The private after-school services put in place by the parents were supplemental to the student's existing program at Titus for the 2023-24 school year (Parents Exs. D at pp. 48-63; M at pp. 1-29; O at pp. 1-10; Q at pp. 1-4; S at pp. 1-4).

According to the May 2023 ABA report, the student's parents placed him in a self-contained class at Titus with seven other students, "one lead teacher, one lead behavior therapist, three behavior therapists and one BCBA classroom supervisor (8:6)" (Parents Ex. O at p. 1). The founder of Titus testified that the school encouraged parents of students to attend at least two sessions per month of on-site support/training to learn about the approaches/methodology that was being used to address their children's needs and how to implement the school's ABA approach at-home (Parents Ex. U ¶ 16). In addition, she testified that Titus' teachers worked with parents collaboratively "to ensure consistency and facilitate generalization of skills and regularly utilize input from students and families to design the strategies that will most effectively motivate them to complete their tasks" (id. ¶ 15). She further noted that there was frequent communication between parents and the classroom team to ensure continuity between home and school (id.). The founder testified that parents and guardians must be accessible during the school day and be open to modifying the student's schedule when necessary (id.).

With respect to the student's after-school team and Titus being in communication on the student's behalf, there are inconsistencies in the hearing record. In her affidavit, the after-school occupational therapist stated that the student's team remained in contact with the student's other related services providers to discuss the student's program through email exchanges and calls with the school's occupational therapist, and that she remained in communication with the student's after-school ABA provider and speech-language therapist (Parents Ex. X ¶ 21).[7] According to the after-school occupational therapist's September 2023 OT report, the student had "an extremely collaborative team approach" and supportive family who ensured consistent attendance and carryover of his OT sessions (Parents Ex. S at p. 1). Her affidavit stated that she regularly spoke with the student's parents, as well as the rest of his team of related service providers and instructors at Titus, to discuss goals and gather clinical information from testing and therapist observations (Parents Ex. X ¶ 14). In addition, the after-school ABA provider testified that she shared session notes with Titus, via the parents and sometimes directly, and that Titus reached out to her directly or by email or with questions forwarded by the parents, and she may respond directly with the parents "always cc'd on those emails" (Tr. pp. 105-06). She also testified that she participated in periodic team meetings with the student's teachers and therapists at Titus (id. at p. 105). In a January 16, 2023 email, the parents forwarded the after-school OT, ABA, and speech therapy reports to the school district and Titus the day before the January 2023 CSE meeting (Parents Ex. E at pp. 1-19).However, it should be noted that the after-school ABA provider testified that she was working on a bathing/showering program with the student at-home, and that Titus was not

---

[7] Some of the paragraph numbers of Parent Exhibit X are repetitious, but there is only one paragraph numbered 21 (Parent Ex. X).

SD13

working on showering at school, and, to the contrary, the founder of Titus stated that the student was working on showering at Titus (Tr. pp. 103-05, 116, 147-48; Parents Ex. U ¶ 42).

With respect to the IHO's finding that the after-school services were for maximization and generalization of the student's program at Titus, the after-school ABA provider testified that the amount of supplemental ABA instruction that the student received was not only an appropriate level of intervention for him, but that he needed this level of instruction in order to make meaningful progress, maintain learned skills and transfer them to different environments, and so that he would not regress (Parents Ex. V ¶¶ 22, 24). According to the ABA provider, while the student's in school ABA focused on academics, the home ABA services focused on "independence, adaptive living skills, psychological flexibilit[]y, adaptation to various environments and settings, and generalization and practical application of [the student's] skills in all settings" (id. at ¶ 23).

The after-school speech therapist's progress report and affidavit stated that therapy sessions should continue to address acquisition and generalization of skills across domains of receptive/expressive language, and that without the 1:1 instruction the student would ultimately be less available to learn, generalize, and maintain newly acquired skills (Parents Exs. Q at p. 3; W ¶ 25). The speech therapist testified that in her sessions she addressed the student's deficits in expressive and receptive language, as well as pragmatic language and play skills and agreed that he was working on these same skills at Titus (Tr. p. 58). In response to questioning by the IHO the afterschool speech-language pathologist acknowledged that the one hour of speech-language therapy she provided was to "maximize [the student's] speech and language" (Tr. p. 64); however, she also testified that the after-school services were necessary for the student to make meaningful progress in addition to the services he received at Titus (Tr. p. 70).

In her affidavit, as well as her September 2023 OT report, the after-school occupational therapist stated that she recommended two to three sessions of OT at school and two sessions per week outside of school, noting that this recommendation was based on past testimonials/reports, and that the student required a sensory gym and skilled services to address sensory integration and motor skill delays (Parents Exs. S at p. 3; X ¶ 20 at p. 6). Although, the occupational therapist testified she was not aware of how often the student received OT at Titus, she also testified that she did not believe there were enough OT services at school for the student and the student required more (Tr. pp. 80-81). According to the OT provider, the student did not require after school OT for the purpose of maximization, but for "carryover of his skills to make meaningful progress (Tr. p. 80). The after-school OT report indicated that skills were beginning to be addressed in OT sessions to carry over to the home environment to ensure carryover and that direct parent education and training was provided at sessions (Parents Ex. S at p. 3).

Finally, the student's mother testified that Titus met the student's needs but also testified that the after-school services were necessary for the student to make meaningful progress (Tr. pp. 192-98; Parents Ex. Y ¶¶ 43, 44).

In considering the above evidence, the IHO determined that the after-school services were not necessary in order for the student to make meaningful educational progress. As noted above, an appropriate amount of reimbursement bears a relationship to the services the district would have been required to furnish and "parents are not entitled to reimbursement for services provided in excess of a FAPE" (L.K., 674 Fed. App'x at 101). Although it is difficult to parse out whether the

SD13

SD14

program at Titus met the student's needs in the absence of the after-school services because the after-school services were running simultaneously with the student's programming at Titus, the hearing record includes sufficient evidence to support the IHO's findings.

Overall, the hearing record supports the IHO's conclusion that the after-school services, although beneficial to the student and understandably desired by the parents to be continued, were not necessary for the student to receive educational benefits from the Titus School (C.G. v. New York City Dep't of Educ., 752 F. Supp. 2d 355, 359-60 [S.D.N.Y. 2010]; see Rowley, 458 U.S. at 189, 199-200; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).

## C. Funding for an Updated Neuropsychological Evaluation

The parents' argue that the IHO erred in denying the parents' request for funding for an updated neuropsychological evaluation, especially in light of the fact that the IHO determined that the parents failed to produce "sufficient, up to date evaluative information" regarding the student's need for after-school services. The student's most recent neuropsychological evaluation was dated May 3, 2021 (Parent Ex. D at pp. 48-63).

The IDEA and State and federal regulations guarantee parents the right to obtain an IEE (see 20 U.S.C. § 1415[b][1]; 34 CFR 300.502; 8 NYCRR 200.5[g]), which is defined by State regulation as "an individual evaluation of a student with a disability or a student thought to have a disability, conducted by a qualified examiner who is not employed by the public agency responsible for the education of the student" (8 NYCRR 200.1[z]; see 34 CFR 300.502[a][3][i]). Parents have the right to have an IEE conducted at public expense if the parent expresses disagreement with an evaluation conducted by the district and requests that an IEE be conducted at public expense (34 CFR 300.502[b]; 8 NYCRR 200.5[g][1]; see K.B. v Pearl Riv. Union Free Sch. Dist., 2012 WL 234392, at *5 [S.D.N.Y. Jan. 13, 2012] [noting that "a prerequisite for an IEE is a disagreement with a specific evaluation conducted by the district"]; R.L. v. Plainville Bd. of Educ., 363 F. Supp. 2d 222, 234-35 [D. Conn. 2005] [finding parental failure to disagree with an evaluation obtained by a public agency defeated a parent's claim for an IEE at public expense]).

If a parent requests an IEE at public expense, the school district must, without unnecessary delay, either (1) ensure that an IEE is provided at public expense; or (2) initiate an impartial hearing to establish that its evaluation is appropriate or that the evaluation obtained by the parent does not meet the school district criteria (34 CFR 300.502[b][2][i]-[ii]; 8 NYCRR 200.5[g][1][iv]). If a school district's evaluation is determined to be appropriate by an IHO, the parent may still obtain an IEE, although not at public expense (34 CFR 300.502[b][3]; 8 NYCRR 200.5[g][1][v]). Additionally, both federal and State regulations provide that "[a] parent is entitled to only one [IEE] at public expense each time the public agency conducts an evaluation with which the parent disagrees" (34 CFR 300.502[b][5]; 8 NYCRR 200.5[g][1]). The Second Circuit Court of Appeals has recently found that, if a district and a parent agree that a student should be evaluated before the required triennial evaluation "the parent must disagree with any given evaluation before the child's next regularly scheduled evaluation occurs" or "[o]therwise, the parent's disagreement will be rendered irrelevant by the subsequent evaluation" (D.S. v. Trumbull Bd. of Educ., 975 F.3d 152, 170 [2d Cir. 2020]). The parents' original due process complaint notice did not request funding for an updated neuropsychological evaluation; then in an amended due process complaint notice, the parents first requested this relief (compare Parent Ex. A, with Parent Ex. B at p. 11). As set

SD14

SD15

forth in greater detail above, the district conceded that it failed to offer the student a FAPE for the 2023-24 school year and the district failed to enter the student's most recent IEP into the hearing record or any of the evaluations the January 2023 CSE reviewed in creating the student's most recent IEP.

In past decisions SROs have permitted a parent to request a district-funded IEE in a due process complaint notice in the first instance (see, e.g. Application of the Dep't of Educ., Appeal No. 21-135); however, SROs have also expressed reservations that this is not the process contemplated by the IDEA and its implementing regulations (Application of the Dep't of Educ., Appeal No. 23-034; Application of a Student with a Disability, Appeal No. 22-150) and observed that the approach has caused more problems than it resolves (34 CFR 300.502[b]; 8 NYCRR 200.5[g][1]). The statute clearly indicates that a district is required to either grant the IEE at public expense or initiate due process to defend its own evaluation of the student, but a district need only do so "without unnecessary delay" (34 CFR 502[b][2]). The process envisions that a district has an opportunity to engage with the parent on the request for an IEE at public expense outside of due process litigation, and if a delay should occur as a result, one of the fact-specific inquiries to be addressed is whether the IEE at public expense should be granted because the district's delay in filing for due process was unnecessary under the circumstances (see Cruz v. Alta Loma Sch. Dist., 849 F. App'x 678, 679-80 [9th Cir. 2021] [discussing the reasons for the delay and degree to which there was an impasse and finding that the 84-day delay was not an unnecessary delay under the fact specific circumstances]; Pajaro Valley Unified Sch. Dist. v. J.S., 2006 WL 3734289, at *2 [N.D. Cal. Dec. 15, 2006] [finding that an unexplained 82-day delay for commencing due process was unnecessary]; Alex W. v. Poudre Sch. Dist. R-1, 2022 WL 2763464, at *14 [D. Colo. July 15, 2022] [holding that simply refusing a parent's request for an IEE at public expense is not among the district's permissible options]; MP v. Parkland School District, 2021 WL 3771814, at *18 [E.D. Pa. Aug. 25, 2021] [finding that the school district failed to file a due process complaint altogether and granting IEE at public expense];[8] Jefferson Cnty. Bd. of Educ. v. Lolita S., 581 F. App'x 760, 765-66 [11th Cir. 2014]; Evans v. Dist. No. 17 of Douglas Cnty., Neb., 841 F.2d 824, 830 [8th Cir. 1988]). As the Second Circuit observed, at no point does a parent need to file a due process complaint notice to obtain an IEE at public expense (Trumbull, 975 F.3d 152, 168-69 [2d Cir. 2020]).[9]

Accordingly, based on the continued study of the judicial and administrative guidance on the topic, other SROs have changed the previous approach of allowing the parent to initially disagree with a district evaluation and request an IEE in a due process complaint notice without attempting to raise such disagreement with the district first (see, e.g., Application of a Student with a Disability, Appeal No. 23-260; Application of a Student with a Disability, Appeal No. 23-081).

---

[8] The Parkland case also discussed caselaw with different factual circumstances in which the district's failure to file for due process had been excused such as incomplete district evaluations or agreements between the district and parent that the district would conduct further evaluations.

[9] The Second Circuit, in Trumbull, speculated that a "hypothetical scenario in which a parent might need to file a due process complaint for a hearing to seek an IEE at public expense is if the school unnecessarily withheld a requested IEE or failed to file its own due process complaint to defend its challenged evaluation as appropriate" (975 F.3d at 169).

SD15

SD16

I see no reason to depart from this trend and will not grant the parents an IEE based on the request made for the first time in the amended due process complaint notice.

## VII. Conclusion

Having determined that the evidence in the hearing record supports the IHO's order denying the parents' requests for at-home ABA therapy, after-school speech language therapy, after-school OT, at-home parent training and counseling and interdisciplinary team meetings was a rational and well-thought out determination based on her careful reading of the due process complaint notices and consideration of the evidence in the hearing record, I decline to disturb the IHO's order.

I have considered the remaining contentions and find it is unnecessary to address them in light of my determinations above.

### THE APPEAL IS DISMISSED.

Dated:       Albany, New York
             March 25ᵗʰ, 2024

                                          STEVEN KROLAK
                                          STATE REVIEW OFFICER

SD16

I1

## FINDINGS OF FACT AND DECISION

Case Number:                 249622
Student's Name:              Rex Francis
School District:             Service District # 88, Home District # 2
Impartial Hearing Officer:   Michelle S. Babbitt
Date of Filing:              06/30/2023, amended DPC filed 8/28/2023
Hearing Requested by:        Parent
Dates of Hearing:            10/13/2023
Record Close Date:           12/1/2023

I1

Received Office of State Review
01/09/2024

**NAMES AND TITLES OF PERSONS WHO APPEARED ON 10.13.2023:**

For the Student:

John Hobbs, Esq., Attorney (hereinafter referred to as "Parent's Representative")

Gary S. Mayerson, Esq., Attorney

Kaitlyn Simon, Speech-Language Pathologist (hereinafter referred to as "Witness #1")

Jessica Zambito, Occupational Therapist (hereinafter referred to as "Witness #2")

Stephanie Koh, BCBA, Little Green Tugboat (hereinafter referred to as "Witness #3")

Natalie Brandefine, Head of School, The Titus School (hereinafter referred to as "Witness #4")

Halia Francis, Parent (hereinafter referred to as "Witness #5")


For the Department of Education ("DOE"):

Eli Koppel, Esq., Agency Attorney (hereinafter referred to as "District's representative")

I2

Date of Decision:                    12/8/2023


**BACKGROUND AND LIMITED PROCEDURAL HISTORY**

The Parent, through counsel, filed a Due Process Complaint on 6/30/23 and then filed their amended due process complaint on 08/28/2023 (together, "DPC") against the New York City Department of Education ("NYC DOE" or "DOE" or "District") pursuant to the Individuals with Disabilities Education Act ("IDEA"). Alleging a deprivation of FAPE, the Parent sought reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

a) tuition and costs at the Private School
b) up to 10 hours per week of after-school ABA
c) up to 2 hours per week of after-school Speech and Language Therapy (SLT) (including feeding therapy)
d) 1 hour per week of after-school Physical Therapy (PT)
e) Social Skills group one day a week after-school
f) up to 2 hours per week of after-school Occupational Therapy (OT)
g) up to 2 hours per week of parent training and counseling (PTC)
h) up to 2 hours per week of after-school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (l hour per service provider)
k) transportation costs to and from the school (Exhibit A-11).

The undersigned Hearing Officer was appointed to preside over this case on 7/7/2023.

On 8/2/2023, I held a pre-hearing conference in this matter. The parties selected a hearing date of 9/11/2023. The parties also agreed to this date for a hearing on the issue of pendency, if such is being requested. At the PHC, Parent represented that pendency is based on an unappealed FOFD dated 6/14/2021, which provided for placement at Manhattan Children's Center (MCC) and after-school services, including ABA, PT, SL, OT, PTC, and various meetings between/among providers and parents. The District stated that it would not sign the pendency form submitted by the Parent as the relief sought (the unilateral placement) is not in accord with the FOFD. Parent argues that the Private School, the present unilateral placement, is substantially similar to MCC, and MCC is no longer available as a placement for the Student. Parent did not provide information as to why MCC was no longer available. On or before 8/25/2023 Parent was directed to advise if the prior unilateral placement became unavailable to the Student and if parent will be withdrawing its pendency request (IHO Exhibit 1). On 9/13/2023, the District signed a pendency form.

Parents requested an adjournment of the hearing date, which was rescheduled to 10/13/2023. Participating in the hearing were Petitioner's representative, and an attorney from the DOE.

## HEARING

At the hearing, I confirmed that the District was conceding Prong I (Tr. 26).[1] The DOE did not submit any disclosure (Tr. 27). The District, however, challenged the appropriateness of the unilateral educational placement by the Parent (Tr. 26-27).

At the inception of the hearing, Parent's representative noted that the District representative had not advised the Parent that they wanted to cross-examine any of the witnesses for which affidavits had been submitted in lieu of direct testimony. Accordingly, Parent's representative objected to any cross-examination by the District. The District representative stated at the hearing that he was seeking cross-examination of two witnesses. Since the District representative did not have a viable basis for the District failing to notify the Parent of its intention to cross-examine witnesses, I confirmed my directive in the PHC (IHO Exhibit 1-2) and sustained Parent's objection precluding the District from cross-examination of witnesses. However, I advised that since I had notified the Parent that I would have questions for the witnesses to clarify and complete their testimonial affidavits, the District could ask questions only as to those limited areas inquired into by this tribunal (Tr. 28-30).

The District waived making an opening statement (Tr. 30-31) and did not disclose any documents or call witnesses (Tr. 27, 35, 46). The District was not raising any Prong III equitable issues (Tr. 34-35). Such statement and actions are a concession by DOE that it denied the student a FAPE over the period at issue, the school year 2023-2024.

The Parent made an opening statement, discussing the Student, the Private School, and the "robust" after-school program and asserted that the "record" would show that the Parent's unilateral placement was appropriate (Tr. 31-34).

The Parent offered Exhibits A-L into evidence, with no objection from the DOE (Tr. 36-39). Exhibit M is a progress report from the prior school year, 22-23. This tribunal questioned how it was germane to the 23-24 school year before me. Parent's representative stated there was no

---

[1] Tr. references the page number from the 10.13.23 hearing.

I5

progress report from the Private School for 23-24, although the Student had been in school for approximately 3½ months, and that the progress report from the prior school year would serve as a baseline for the testimony of Witness #4. I allowed Exhibit M to be admitted into evidence subject to connection by Parent's representative in their closing written summation (Tr. 39-41, 46). I made a similar inquiry as to Exhibit O, a progress report from an after-school ABA provider dated 5.23. Parent's representative asserted that since the ABA provider had not submitted an updated progress report, it would provide a baseline for testimony. Parent's representative apparently was confused and conflated the after-school ABA provider with those providers and progress reports issued by the Private School. I ruled that the document was irrelevant to the school year before me, and unless a witness connected it, Exhibit O would not be admitted into evidence (Tr. 41-43). Exhibits N- Q were admitted into evidence, with the same caveat for Exhibit M and O (Tr. 44, 46). Exhibits RR-BB were admitted into evidence with no objection from the District (Tr. 44-46).

Parent and the DOE each submitted a written closing argument and legal memorandum dated 11.28.23 and 11.29.23.[2]

## FINDINGS OF FACT AND DECISION

After a full review of the record generated at the hearing, I make the following findings of fact and determinations.

According to a progress report from the Private School for the prior school year (22-23),

> [T]he Student is diagnosed with Autism. [The Student] exhibits delays in social/emotional development and adaptive behavior. [The Student] has a history of engaging in high rates of off-task behavior; emotional dysregulation and physical dysregulation. [The Student] presents as self-directed and engages in behavior that requires consistent support to access the curriculum in both 1:1 and group activities. Due to his complex medical diagnosis, he requires significant support to navigate his environment and demonstrate executive functioning skills. These behaviors have greatly hindered [the Student's] ability to form relationships with his peers, independently navigate his environment, or participate in a less restrictive academic setting. [The Student] requires a small class size with a low student to staff ratio to participate in instruction (Exhibit M-2).

---

[2] IHO Exhibit 2 (DOE closing brief) and Exhibit 3 (Parent's closing brief).

I5

As stated during the hearing I do not find outdated progress and neuropsychological reports to provide useful information to the issues before me, especially since witnesses were not produced to explain their significance to the current school year, and therefore, are not considered in reaching my determination (See Exhibits D (only neuropsychological report not considered), E, M (not considered except for information as to Student quoted above), and O). The 2021 neuropsychological evaluation[3] spoke to the Student when he was 6 (he turned 7 during the evaluation) (Exhibit D-48). The Student was then attending a specialized private school that offered ABA-based instruction and support for children with Autism (Exhibit D-49). That report does not account for the Student's present needs, almost three years later, and reliance on such by the Parent suggests that the Student has not made progress in his educational placement and his needs remain the same (IHO Exhibit-3-5-7).

Witness #1, the Speech and Language after-school provider has been providing services since 2017, the time she graduated with a master's degree. She stated that the market rate for individuals with her experience is $280.00 per hour. Witness #1 did not determine the rate, but rather, she spoke with "her boss" to determine the reasonableness of the rate. Witness #1 has no independent knowledge of the market rate, except to testify that individuals coming right out of school charge $150.00 (Tr.49-51, Exhibit W-1-2).  Witness #1 provides one hour of speech and language therapy ("SLT") per week to the Student in a sensory gym shared with the occupational therapist who provides OT services to the Student (in fact, the OT is provided directly after SLT). Up to three other individuals are in the sensory gym receiving therapy, together with their individual therapists, while Witness #1 is administering services to the Student. Although Witness # 1 stated that the therapy has been consistent for the Student since April 2022, neither assertion is correct, as borne out by Witness #1's live testimony and contradictory statements in the affidavit of Witness #1[4] (Tr. 51-54. Exhibit W-2-3). The Student is in the sensory gym for two to three minutes to regulate, and then he can better attend to the SLT. The Student did not attend SLT over the summer, as his Parents elected to send him to camp (Tr. 54-56). The Student was seen for one session in August and only a few sessions in September 2023. Witness #1 said the Student was not in the city in July (Tr. 61-62). Witness # 1 testified that the Student "has deficits in his pragmatic

---

[3] Erroneously identified as a 2019 report by Parent's representative in Parent's Exhibit list.
[4] Witness #1 started working with the Student in September 22 and the Student did not receive SLT during the summer of 2023.

language, his play skills, his expressive and receptive language." However, these deficits are being addressed at the Private School (Tr. 58). When I asked Witness #1 what she was working on that was not provided by the Private School she responded:

> Because we -- we aren't really bound due to, like, the academic demands that a school has, like, we can -- we can do everything in a much more naturalistic way, which is, you know, more functional to be able to practice these skills that are in a way that's, like, motivating and personally relevant to him. And all of this, you know, we -- we can reinforce things that are taught at school. We can teach new skills still. And all of that, you know, extra language helps him be successful in school, as well as his, you know, community life with all of his social skills. (Tr. 58-59).

Witness # 1 was not aware of the methodology used at the Private School for SLT provided to the Student nor was she aware of how many hours the Student was in school (Tr. 59-60). Witness #1 has been providing services to the Student since 9.2022. She reads to the Student, not for literacy purposes, but to have a discussion (Tr. 60-62).

The following question and answer are instructive as to the SLT:

> HEARING OFFICER BABBITT: So isn't the one hour of speech and language therapy that you provide to the student -- isn't that to maximize his speech and language?
>
> WITNESS #1: Yes. (Tr. 64).

When asked why the one hour per week SLT was necessary for the Student to make progress at the Private School, Witness #1 responded:

> I think that the main difference between us and school is that we can use a more child-led -- you know, we aren't really -- I'm going to say, bound by any, like, we have to make X, Y, and Z progress or, like, this is our curriculum. We can just follow his lead. And yes, we have our own, you know, goals that we have set for him based off all the checklists and things that we do for what would be, like, age-appropriate and developmentally appropriate.  But [the Student] find that the, you know, one-on-one instruction is appropriate for [the Student] as well as using a more naturalistic way to -- instead of saying this is what we're going to do on this timeline and we can follow his lead and because it's more, you know, meaningful to him, that's ultimately going to be more functional to help him attain and then use this language which, you know, supports academics (Tr. 64-65; see also Exhibit W-4).

I again asked Witness #1 what the basis was for her statement that the Student could not make meaningful educational progress at the Private School without the one hour per week of after-school speech and language therapy.

> HEARING OFFICER BABBITT: What's the basis for your statement that the student would not make meaningful progress at [the Private] School without the one-hour speech and language that you provide for him?
>
> Witness #1: I think due to the differences of how we provide the therapy, it's just another way to supplement his learning and -- and try to meet him where his needs are at the moment. (Tr. 66-67)

I noted to Witness #1 that I did not think she answered my question (Tr. 67). Similarly, Witness #1's testimonial affidavit does not provide a cogent reason why SLT is necessary for the Student to make educational progress at the Private School (Exhibit W-7-8). Parent's representative attempted to get a different answer from Witness #1 on re-direct:

> PARENT'S REPRESENTATIVE: I'll ask again, based off of your information and experience with [the Student], what is his need for this supplemental after-school speech-language therapy based on?
>
> WITNESS #1: It would be based on still supporting his -- his deficits in pragmatic language, expressive and receptive language, and just doing it in a -- just taking another approach, and you know, giving additional services to, you know, give him that exposure and bombardment in just a different type of environment. (Tr. 69)

Witness #1 testified that "[d]epending on the skill being addressed, progress is determined by qualitative analysis of language sampling, by identifying cueing hierarchies (minimal/moderate/maximal), or by calculating percentages of #correct/#trials" (Exhibit W-4). No such analyses or samplings were admitted into evidence by the Parent. In describing progress made by the Student for this school year, Witness #1 detailed an example from 1.23.23, and said that the Student does not engage in that behavior now ("At the moment, the Student does not routinely use SVOPP sentences and conjunctions in his spontaneous language output"). The example was from the middle of the 22-23 school year and is not instructive as to progress made during the school year at issue, that being the 23-24 school year (Exhibit W-6-7).

Witness #2, the occupational therapist (OT), owns the agency providing services to the Student. The rate for her services is $225-$250 and depends on the session length and whether services occur in

Received Office of State Review
01/09/2024

her office or at the Student's home. Witness #2 sees the Student once weekly after the Student receives SLT (Tr. 57, 75-78). When Witness #2 was asked how long she had been providing services to the Student, she replied, "I've known [the Student] for several years. I don't know the exact number off the top of my head, but I have been working with him for some time." She then said she had worked with the Student for a "few years." I reminded Witness #2 that she had been working with the Student since he was four years old, about six years. She responded that she works with many students for long periods of time (Tr. 78-79; Exhibit X-1-2). Witness #2 stated there is an agreement between her and the Student's Parents for the services she rendered to the Student. Such agreement was not put into evidence by the Parent. Similarly, no time sheets were submitted showing when OT was provided for the 23-24 school year (Exhibit X-2). Witness #2 did not know the name of the Student's OT at the Private School, nor did she know how often the Student receives OT at the Private School (Tr. 79-80). Witness #2 is working with the Student "to address fine and visual motor, executive function, sensory processing, self-regulation, self-help, and motor skill development goals to support independence in daily routines across environments and provide parent education" (Exhibit X-4). Witness #2 opined that the Student "requires this intervention for carryover of his skills to make meaningful progress." I asked Witness #2 what she meant by her statement.

> HEARING OFFICER BABBITT: I mean, are you saying that if the student didn't come to you one time a week for 60 minutes, he would not make meaningful progress at the school? That they couldn't meet his needs?
>
> WITNESS #2: I believe that [the Student] requires the one-on-one time also in a sensory gym working with an experienced therapist to have access to a sensory gym for home and parent education, as well. I think that's very important for [the Student]. He does require significant -- because of his delays, he does require significant therapy services and I don't believe that at school there is enough OT services. I don't. He has significant and global delays.
>
> HEARING OFFICER BABBITT: Okay. So you think that he should get more physical -- I'm sorry. He should get more OT from the school, correct? That they're not providing enough is what you just said?
>
> WITNESS #2: No, I didn't -- I didn't say that. I think that he requires more OT. I don't know what is provided at [the Private School], as I said. I do believe he requires the aspect of having parent education. He has significant safety – poor safety awareness, delays in cognition, speech and language, gross and fine motor skills, and safety awareness (Tr. 80-81).

10 I10

Witness #2 admitted that she does not deal with all the above-stated deficits. Witness #2's answers were evasive. Witness stated that the Student required supervision at all times. I asked if supervision was the same as needing therapy. Witness #2 responded "no" (Tr. 81-83). Witness #2 did not provide services to the Student for either July or August (Tr. 84). Witness #2 did not know why the Student did not come for OT during the summer. She stated there was some regression, but over the summer, there was regression for neurotypical students as well (Tr. 84-87). Witness #2 did not know the methodology used to administer OT by the Private School (Tr. 88). Witness #2 works with the Student in her sensory gym. At the same time, 3 or 4 other therapists are working with other individuals in the same space (Tr. 89).

Witness #3, the after-school ABA provider, has been providing services to the Student since he was six years old. Witness #3 is the owner and founder of the Provider Agency. She does not provide direct services to the Student but is available to the Parent for training and field calls. Three different therapists provide direct ABA services to the Student. One is a licensed BCBA, and the other two providers are not licensed BCBAs (Tr. 97). Witness #3 provides PTC 8 hours each month and supervises the direct providers (Tr. 98)[5]. ABA is provided to the Student at his home for ten hours after-school each week on Tuesday, Wednesday, Friday, and either Saturday or Sunday. The ABA providers are flexible to accommodate the family's schedule (Tr. 99-100). Witness #3 testified:

> Sometimes the family is out of town. sometimes the family has events that they need support for the -- the student. Sometimes there's, you know, specific events. Other times there are play dates where we focus on social skills.  There's a lot of -- a lot of skills that are worked on during those -- during those sessions, as well as during the week (Tr. 101).

> So a therapist may start with [the Student] at his home on, like, a Saturday. There might be, like, let's say 10 to 1 where, I mean, we stay within the hours allotted. So let's say there's a three-hour session. And so maybe from 10 to 11:30 there may be, you know, working on his goals at home. And then he has to go to a school event. Let's say, like, it's a book fair at his school, so then he'll go with the therapist because he needs the support to the book fair. And they may spend half an hour, maybe an hour there, and then return home for the rest of the session. So that's, like, one example. But you know, so I mean it can change. So that's just, like, an example of one book fair event. Another one could be a birthday party where he needs the support at a birthday party.

> HEARING OFFICER BABBITT: Okay. So let me ask you this. During the week, is it pretty steady that the amount of ABA therapy's three hours? Is it one hour each day on Tuesday, Wednesday, Friday?

---

[5] Later in her testimony Witness # 3 stated she only supervises one of the 3 therapists. Two of the therapists do not require supervision (Tr. 112).

I10

WITNESS #3: It's typically two to two-and-a-half hours and then allows for us to have weekend time -- weekend sessions (Tr. 101-102).

If the family is going away for the weekend the Student has extended sessions during the week (Tr. 102-103). Witness #3 testified that the ABA providers have been working with the Student on bathing skills for two years (Tr. 104-105). Witness #3 stated that the Private School is not working on bathing skills. Witness #4 testified that the Private School is working on this life skill (Tr. 105, 148 and Exhibit U-11). Witness #3 testified that she shares session notes with the Private School and has meetings with school personnel (Tr. 105-106). No session notes were put in evidence by the Parent, which Parent received after every session (Tr.115).

Witness # 3 provides approximately 2 hours of PTC. "Sometimes it's in person at home. Sometimes it's a Zoom meeting. Some it's phone calls. There might be a week with multiple phone calls. So it's not that -- that – the parent training is not a set schedule, but it is a set amount per -- per month that I make sure that we are coordinating and communicating and training (Tr. 106). Witness #3 testified as to the nature of Parent training:

> With [the Student's] development, he's -- he's very aware at this point of when we are talking about him. So we try to schedule their training and discussions about him when he's not present. If it entails implementing a protocol like, for example, you know, just within his family's life functioning, like, one of the -- one of the skills -- one of the issues or problematic behaviors that was presenting pretty consistently with the family but not with us was when if the family were to sit down and watch a show together on TV, he would incessantly scream or be disruptive so that it couldn't happen. And so that's an example of when I went in person and created a protocol with a visual -- with a visual schedule for him and we implemented the visual together with the family. And then I believe it was two weeks later, I followed up with another in-person visit to further that training with the parents, coaching them, making sure and -- you know, and it was successful (Tr. 107-108).

I asked about the significant hours sought for Parent training. Witness #3 stated:

> There are a lot of skills that we're working on, parent skills that are not the student's skills, right. So the student has his list of goals and we've got parent goals that we're specifically targeting. And they -- while they have made a lot of progress in many areas, they're you know, he -- so the student presents with pretty high behavior contrast where -- when the therapist is there and they are working, you know, successfully on the goals that we've written for him that we're working on. They are not automatically -- they're not automatically generalized with the parents. And so there is typically a period of training the parents, coaching the parents to implement this protocol.

Received Office of State Review
01/09/2024

> HEARING OFFICER BABBITT: Well, so I'm confused. Do you have set training that you give to the parents? Or it's responsive to the parents' questions about behavioral issues with the student?
>
> WITNESS #3: Both. And with all of our families, there's, you know, it depends on what the -- what the -- what the needs just like our program is designed for, you know, to target the individual needs of every individual student, the parent's needs and learning styles are also taken into account (Tr.108-109 ) .

There is no set schedule for Parent training. Nor are there set lengths for the session. Instead, Witness #3 uses the "bank" of eight hours per month to respond to the Parent's requests (Tr. 109-111). Witness #3 stated they are working on community safety skills- when it is safe to cross the street, bathing, basic home chores, functional daily living skills, peer social skills, putting his clothes in the hamper, dressing himself, brushing his teeth (Tr. 117-118, 120.) Witness #3 further testified:

> In terms of chores in the -- in the home, you know, for -- as part of, kind of, like his functioning within the family life and routines, you know, putting his plate in the sink, helping with preparing dinner, helping with setting tables, setting the table. I'm trying to think of some other. Oh, like making his bed, things of that nature (Tr. 122) .

The DOE did not elicit any testimony or produce any evidence that refuted or otherwise called into question the appropriateness of the Private School for the Student.

Considering the foregoing and as more fully discussed below, I find that a) the DOE conceded that it did not offer the Student a FAPE for the 2023-2024 school year, the b) Private School offers Student specially designed instruction sufficient to meet Student's needs, c) there was no showing that after-school SLT, OT and at-home ABA and PCT is a necessary component of the educational program, and d) the equities support the Parent's requested relief for tuition reimbursement.

_Burden_

School districts have the burden of proof, including the burden of persuasion and burden of production, in IDEA due process hearings, except that a parent or person in a parental relationship seeking tuition reimbursement for a unilateral parental placement has the burden of persuasion and burden of production on the appropriateness of such placement.[6]

---

[6] NYS Educ. Law § 4404(1)(c); _R.E. v. N.Y.C. Dept. of Educ._, 694 F.3d 167, 184-185 (2d Cir. 2012), _C.L. v. Scarsdale Union Free Sch. Dist._, 744 F.3d 826, 835-836 (2d Cir. 2014).

Received Office of State Review
01/09/2024

_Prong I_

The IDEA provides that children with disabilities are entitled to a Free Appropriate Public Education ("FAPE").[7] A FAPE consists of specialized education and related services designed to meet a student's unique needs, provided in conformity with a comprehensive written Individualized Education Program ("IEP").[8] A school district has offered a student a FAPE when (a) the board of education complies with the procedural requirements set forth in the IDEA; and (b) the IEP is developed through the IDEA's procedures and is reasonably calculated to enable the student to receive educational benefits.[9] In order to meet its substantive FAPE obligations, a district must offer a student an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[10]

As to Prong I of the _Burlington/Carter_ standard, the DOE failed to meet its burden at the hearing. Instead, the DOE Representative indicated on the record that DOE was not introducing any documents or presenting any witnesses. The District representative affirmatively conceded Prong 1(Tr. 26-27,35, 46). Therefore, I am constrained to find that the DOE failed to offer the Student FAPE for the 2023-2024 school year.

_Prong II_

A private school placement must be "proper under the Act."[11] This means that the private school must offer an educational program that meets the student's special education needs.[12] Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate."[13] Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement."[14]

---

[7] 20 U.S.C. § 1400 (d)(1) (A)
[8] 34 C.F.R. § 300.13
[9] _Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley_, 458 U.S. 176, 206-07 (1982).
[10] _Endrew F. v. Douglas County Sch. Dist. RE-1_, 137 S.Ct. 988, 999 (2017).
[11] _Florence County Sch. Dist. Four v. Carter_, 510 U.S. 7, 12, 15 (1993); _Sch. Comm. Of Burlington v. Dept. of Educ._, 471 U.S. 359, 370 (1985).
[12] See _Gagliardo v. Arlington Cent. Sch. Dist._, 489 F.3d 105, 112, 115 (2d Cir. 2007); _Walczak v. Fla. Union Free Sch. Dist._, 142 F.3d 119, 129 (2d Cir. 1998).
[13] _Gagliardo_, 489 F.3d at 112
[14] _Gagliardo_, 489 F.3d at 112, quoting _Frank G. v. Bd. of Educ. of Hyde Park_, 459 F.3d 356, 364 (2d Cir. 2006)

Received Office of State Review
01/09/2024

Parents need not show that the placement provides every special service necessary to maximize the student's potential.[15] When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits."[16] A private placement is appropriate if it provides instruction specially designed to meet the student's unique needs. The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement. No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefits, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.[17]

Here, Parent has demonstrated that the Private School:

offers 1:1 and 2:1 support in a group setting. Group sizes vary, with most groups ranging from 6-8 students. Cohorts are established based on age and social skills. Each student is assessed to identify his/her grade level for reading, writing, and math. Students are then grouped with academic peers for math, English language arts (ELA), science, and history/social studies to facilitate targeted learning in small groups, dyads, and or 1:1 instruction based on learning style and needs. Our academic curriculum adheres to the NYS Common Core and is modified as needed. Each student has the opportunity to work with a NYS certified special education teacher that can modify work to meet his/her learning needs and style while still challenging and supporting intellectual and cognitive development. In addition to reading, writing, math, science, social studies/history, current events, art, music, STEAM, and adaptive physical education, [the Private School] offers daily social skills groups. Utilizing programs like *Social Thinking Curriculum* and *Everyday Speech* lessons target: executive functioning, theory of mind, organization, emotional vocabulary, self-advocacy, transitioning, accepting no, listening, and following directions the first time, relationships, etc.

Every classroom team is a co-leading model, one NYS certified special education teacher and one lead behavior therapist. Our lead behavior therapists are professionals that are working toward licensure and board certification in Applied Behavior Analysis (ABA) under the guidance and supervision of our BCBA/LBAs. At [the Private School], in addition to the classroom staff we have a full-time school nurse, mental health services, occupational therapy, speech and language therapy, and physical therapy. We feel an important component of teaching and treating the whole student

---

[15] *Frank G.*, 459 F.3d at 364-65.

[16] *Frank G.*, 459 F.3d at 364; see *Gagliardo*, 489 F.3d at 115.

[17] *Gagliardo*, 489 F.3d at 112, quoting *Frank G.*, 459 F.3d at 364-65.

is meeting all physical, developmental, and social emotional needs. Therefore, our related services and mental health services include individual and group sessions, in and out of the classroom, with our NYS certified and licensed providers (Exhibit I-1).

Witness #4 testified that the Student's Parent will receive three comprehensive progress reports a year, completed by the Student's entire team, and discusses his progress across all domains (Exhibit U-15). Again, I note that although the Student had attended the Private School since July 2023, Parent did not provide any progress reports from the current 23-24 school year (Exhibits G-1 and L-1). Parent provided weekly emails from the Private School to the Parent only for July and the first week in August (Exhibit Z).

The Student's class schedules are designed to foster development across all domains without interfering with classroom activities and to promote generalization across settings. Related services and mental health counseling sessions are scheduled in collaboration with the classroom team to promote regulation and provide in-class support during activities related to each domain (e.g. OT could be provided during the Student's writing assignments) (Exhibit U-16). The Student receives OT three times a week for 30 minutes individually (Exhibit K and U-11). In OT, the Student is working on bike riding skills, his ability to shower independently[18], tying a knot, and his handwriting skills. Additionally, the Student continues to practice independent activities of daily living, personal hygiene, and self-care to increase his independence (Exhibit U-11).

The Student receives the following:

1) SLT three times a week for 30 minutes individually**.** So far this school year, the Student has been working on receptive, expressive, and pragmatic language. He is working on problems and solutions within social scenarios and picture scenes for receptive language. For expressive language, the Student has been working on sequencing and retelling a story (via picture cards/sequencing cards) and including a salient detail within the retelling (i.e., characters, location, descriptive words like colors and size) (Exhibit U-10-11).

2) PT two times per week for 30 minutes individually and is working on increasing his strength to improve his posture, body awareness, and balance, which has led to increased safety during environmental negotiation and gross motor play (Exhibits J, K, and U-12).

3) Counseling one to two times a week for 30 minutes individually and is working on increasing his strength to promote improved posture and further improve his body awareness and balance. The Student is also working on bilateral coordination, core strength, and bike riding (Exhibit U-12).

During the 2023-2024 school year, the Student receives instruction at the late kindergarten to early first-grade level in all academic classes (Tr. 185). The Student is in a class of 7 students who present with

---

[18] I note that Witness #3 erroneously stated that the Student was not working on bathing/showering at the Private School (See Tr. 148 and Exhibit U-11).

Received Office of State Review
01/09/2024

similar needs and skills and, developmentally, socially, and academically, are on similar functional levels to the Student (Exhibit U- 7 and Tr.133), with 1:1 instruction as needed (Exhibit U-16).

According to Witness #4, for the 23-24 school year, the Student relies on teacher prompting and redirection to focus his attention and enable him to be available for learning (Exhibit U-10). He has demonstrated improvements in his ability to attend and focus in class, effectively communicate, comply with directions, follow classroom routines, and maintain emotional and physical regulation throughout the day (Exhibit U-14).

Witness # 4 testified that the Student made progress as follows:

- Ability to self-regulate and listen to numbers being called in math class during game of number identification bingo
- Understand direction during math game
- Ability to stay on task
- Moved up a grade level in instruction to the second part of the Wilson's Curriculum in ELA
- Improved listening and reading comprehension
- In science class, understanding different phases of matter
- Greater understanding and connections in new subject matter (Tr. 149-152).

I find that based on the testimony of Witness #4 and Parent's exhibits, Parent has met their burden in proving that the Private School offers an educational program that meets Student's needs under Prong II of the *Burlington/Carter* standard. In reviewing the record, the weight of the evidence establishes that the Private School addressed Student's individual special education needs and that the instruction offered was "reasonably calculated to enable the child to receive educational benefits."[19] The Private School is an appropriate educational placement for the Student for the 2023-2024 school year as it can meet his academic, communication, behavioral, social, self-management, and emotional needs.

_Parent has Not Met its Burden concerning that Relief which seeks After-School Supplemental SLT, OT, ABA and PCT_

The DOE is not required to design an educational program to address a student's difficulties in generalizing skills to other environments outside of the school environment, i.e., at-home ABA, particularly where the student is progressing in the classroom.[20]

---

[19] *Frank G.*, 459 F.3d at 364.
[20] *See Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1152-53 [10th Cir. 2008]; Gonzalez *v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 353 [1st Cir. 2001]; Devine *v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1293 [11th Cir. 2001]; *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1573 [11th Cir 991]. *Application of a Child with a Disability*, Appeal No. 11-068.

Received Office of State Review
01/09/2024

Findings of Fact and Decision
Case No. 249622

Courts have generally disfavored services intended to generalize skills outside of the school environment. Several courts have held that the IDEA does not require school districts, as a matter of course, to design educational programs to address a student's difficulties in generalizing skills to other environments outside of the school environment, particularly in cases in which it is determined that the student is otherwise likely to make progress in the classroom.[21] The District is required to provide an appropriate education, not one that maximizes the student's potential.[22]

Here, the Student attends a Private School that provides ABA services and/or utilizes ABA methodology throughout the school day. The DOE has no obligation to provide for additional at-home ABA unless the service is required for the Student to maintain/retain skills. Parent did not show that the at-home ABA services were responsible for the Student's progress observed in the Private School. Similarly, no evidence was adduced that supported the claim that the Student is unlikely to receive educational benefits from his schooling in the absence of home-based ABA services or the Student is likely to experience regression in the school setting in the absence of home-based ABA services.[23] The fact that the Student may benefit from at-home services in and of itself is not enough to entitle reimbursement for services provided in excess of a FAPE. The same is true of the afterschool SLT and OT; there was no objective evidence showing that absent these services, the Student would not progress in the Private School.

Parent did not present any testimony or documentary evidence showing:

(i)  To what extent the Private School could not service the student without the at-home ABA services and after-school OT and SLT.

(ii)  That the at-home ABA services and after-school OT and SLT were responsible for the Student's progress in the Private School.

(iii)  The Student required services to maintain and retain skills.

---

[21] *(see, e.g., F.L. v. New York City Dep't of Educ.,* 2016 WL 3211969, at *11 [S.D.N.Y. June 8, 2016]; *L.K. v. New York City Dep't of Educ.,* 2016 WL 899321, at *8-*10 [S.D.N.Y. Mar. 1, 2016], *aff'd in part,* 674 Fed. App'x 100 [2d Cir. Jan. 19, 2017]; *P.S. v. New York City Dep't of Educ.,* 2014 WL 3673603, at *13-*14 [S.D.N.Y. Jul. 24, 2014]; *M.L. v. New York City Dep't of Educ.,* 2014 WL 1301957, at *11 [S.D.N.Y. Mar. 31, 2014]; *see also Thompson R2-J Sch. Dist. v. Luke P.,* 540 F.3d 1143, 1152-53 [10th Cir. 2008]; *Gonzalez v. Puerto Rico Dep't of Educ.,* 254 F.3d 350, 353 [1st Cir. 2001]; *Devine v. Indian River County Sch. Bd.,* 249 F.3d 1289, 1293 [11th Cir. 2001]; *JSK v. Hendry County Sch. Bd.,* 941 F.2d 1563, 1573 [11th Cir 1991]).

[22] *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998)), *Rowley,* 458 U.S.176.t 189, 553 IDELR 656 (1982). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132, *quoting Tucker v. Bay Shore Union Free Sch. Dist.,* 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted], *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 379 (2d Cir. 2003). School districts are not required to "maximize" the potential of students with disabilities. *Bd. of Educ. v. Rowley,* 458 U.S. 176, at 189,199,553 IDELR 656 (1982); *Grim,* 346 F.3d at 379, *Walczak,* 142 F.3d at 132.

[23] See *Application of a Child with a Disability*, Appeal No 20-125.

Received Office of State Review
01/09/2024

     (iv)  The Student is unlikely to receive educational benefits from the Private School in the absence of home-based ABA services and after-school OT and SLT.

     (v)  The Student is likely to experience regression in the Private School setting in the absence of home-based ABA services and after-school OT and SLT.

The testimony introduced at the hearing concerning the Private School showed the independence and sufficiency of its educational program with ABA throughout the entire day. The Private School provides instruction and training to Parents to enable them to address the Student's behaviors and skills while at home. The eight hours per month of Parent training are tantamount to the Parent having a "personal trainer" to call when she wants assistance and fortification. Witness #3 testified she was available to the Parent when needed. Parent training might be a Zoom meeting, a telephone call, or a PowerPoint presentation. Witness #3 might come to the family home and observe the Student with the family while they are watching a movie (Tr. 107-109). There is no set schedule for Parent training. Nor are there set lengths for the session. Rather, Witness #3 uses the "bank" of eight hours per month to respond to the Parent's requests (Tr. 109-111). The training was used to improve matters at home, i.e., chores, bed making, watching television as a family.

The Private School offers "on-site support/training groups to the parents of each student to learn about the approaches/methodology used to address their children's needs. The School strongly encourages parent(s)/guardian(s) to attend these sessions at least twice per month [implication is that there are more than two sessions per month]. In these sessions, parents also learn how to implement the ABA approach at home." (Exhibit U-4). The Private School provides ample training for the Parent. The at-home ABA services would be redundant or duplicative of the parental support offered by the Private School.

Similarly, the direct ABA providers are working on the Student's "functioning within the family life and routines, you know, putting his plate in the sink, helping with preparing dinner, helping with setting tables, setting the table. I'm trying to think of some other. Oh, like making his bed, things of that nature" (Tr. 122). These services are not the type contemplated under the IDEA that are necessary for the Student to make educational progress. Clearly, the afterschool ABA may benefit the Student, but not for educational purposes. Although, according to the Parent, the Student may need constant supervision or help in tying his shoes, fastening buttons, taking a shower, or tying his bathrobe (Exhibit Y-4), after-school ABA therapy is not to be used for childcare. It is also not intended to relieve parents of their parental duties. Life skills are being worked on in the Private School. There was no showing

that they need to be duplicated by the ABA providers for the child to make educational progress in the
Private School.

Witnesses #1, #2, and #3 did not coordinate efforts with the Private School. Witness # 1
was not aware of the methodology used at the Private School for SLT provided to the Student, nor
was she aware of how many hours the Student was in school (Tr. 59-60). Witness #1 admitted that
the SLT she provided to the Student was to maximize his speech and language (Tr. 64). When I
asked Witness #1 why the after-school therapy was necessary for the Student to make progress at
the Private School she failed to answer responsively but rather discussed how she was flexible to let
the Student lead the therapy, rather than to succumb to any academic rigors imposed by the Private
School. Similarly, Witness #1's testimonial affidavit does not provide a cogent reason why SLT is
necessary for the Student to make educational progress at the Private School (Tr. 64-67, 69 and
Exhibit W-7-8).

Witness #2 said she was in contact with the providers at the Private School, but in neither
her affidavit nor her testimony did she state the name of that provider or when she spoke with
him/her. Witness #2 opined that the Student was not receiving enough OT at the Private School,
but yet, when she testified, Witness #2 did not know the name of the Student's therapy at the
Private School, nor did she know how often the Student receives OT at the Private School (Tr. 79-
81). Witness #2 did not know the methodology used by the Private School to administer OT to the
Student (Tr. 88). There was testimony that the Student receives OT three times each week at the
Private School (Exhibit K and U-11). The Private School and Witness #2 provide services to the
Student for substantially the same challenges.

Witness #2 did not provide services to the Student for either July or August (Tr. 84).
Witness #2 did not know why the Student did not come for OT during the summer. In the
absence of the Student not receiving OT during the summer, which apparently was the decision of
the Parent to have the Student engage in some other activity, I question the necessity of both the
OT and SLT after-school services. Notably, the Parent's affidavit does not address the related
services for the summer months (Exhibit Y-8).

I do not fully credit the testimony and opinion of Witness #2 as to the Student's needs.

Most notably, Witness #4 did not testify that the Student needed after-school SLT, OT, and at-
home ABA services to progress at the Private School. The services provided by the afterschool SLT, OT,
and at-home ABA are to maximize the Student's potential. Although I understand the Parent's desire to

provide the Student with the best education, that is not the mandate under the IDEA. I also question the ability of the Student to sustain such a full schedule, especially since the Parent stated that the Student "struggles to maintain focus on non-preferred activities in and out of school" (Exhibit Y-3). Furthermore, Parent testified that the Student attends an afterschool social group program and afterschool PT. Reimbursement is not sought for either of these programs (Exhibit Y-7-8). Parent has not shown any basis to award the requested supplemental "robust" services. They are not required for the Student to make meaningful educational progress.

*Equities*

Even if a parent establishes a right to reimbursement under the IDEA, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."[24] In making that equitable determination, a hearing officer may consider many factors, including, *inter alia*, whether a parent's unilateral withdrawal of her child from the public school was justified, whether the parent provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether the parent should have availed herself of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department, or whether the arrangement with the school was fraudulent or collusive in any other respect.[25]

Here, the Parent provided the necessary 10-day Notice of their concerns with the DOE's offer of FAPE to the Student for the 23-24 school year. Therein, Parent detailed specific concerns (Exhibit C). Furthermore, Parent notified the DOE of their intention to place the Student at the Private School unilaterally.

By way of relief, Parent seeks direct funding and reimbursement in the amount of $132,000.00 for the 23-24 school year (Exhibits G and H). Witness #4 admitted that the affidavit of payment incorrectly stated that the annual tuition is $138,000.00 (Tr.163).

There is no support in the record to find that the tuition associated with the Private School, although substantial, is not reasonable. Moreover, I find that the weight of the evidence establishes that Parent cooperated with the DOE and its CSE's efforts to develop an IEP and recommend a program and placement for the 23-24 school year. Overall, and after considering the record at the hearing, I find that the equities support Parent's claim for reimbursement of the tuition for the 23-24 school year.

---

[24] *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47, 129 S. Ct. 2484, 174 L. Ed. 2d 168 (2009)
[25] *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014).

Received Office of State Review
01/09/2024

Findings of Fact and Decision
Case No. 249622

**I21**

The District did not raise any Prong III equitable issues (Tr. 34-35).

Although the Parent requests DOE bussing service in its closing brief (IHO Exhibit 3-24), Parent failed to enter into the record a copy of the Student's last IEP and did not provide any independent evidence of what transportation the Student needed or was receiving. The request for medical accommodation form may or may not have been submitted to the District (Exhibit BB). Since there was no testimony concerning this document, I am unclear as to its probative value.  Accordingly, I am unable to address that component of relief.

The undersigned has reviewed the parent's remaining contentions and find them to be either unnecessary to this decision, without merit, beyond my jurisdiction, too vague to be of use or without sufficient basis in the record for a finding and award of relief. Accordingly, any relief not specifically discussed in this decision is denied, and all the Parent's remaining claims not discussed herein are dismissed.


## **ORDER**

NOW, THEREFORE, IN LIGHT OF THE ABOVE FINDINGS OF FACT, IT IS HEREBY **ORDERED THAT**:

(1)  Parent's claim for tuition reimbursement in the amount of $132,000.00 for the Student's unilateral placement, is GRANTED for the 2023-2024 school year as follows:

a.  The District shall reimburse the Parent in the amount of $7,600.00, monies paid through 6.22.23 by Parent toward the Student's tuition at the Private School.

b.  The District shall make payment directly to the Private School for the remaining $124,400.00 due for tuition, upon submission to the District of an appropriate attendance record.

(2)  The Parent's request for afterschool SLT and OT is DENIED.

(3)  The Parent's request for at-home ABA services (direct and supervisory), Parent training and counseling and interdisciplinary team meetings are DENIED.

Dated:  December 8, 2023


*Michelle S. Babbitt*

Michelle S. Babbitt
(electronically signed)
Impartial Hearing Officer

**I21**

## <u>NOTICE OF RIGHT TO APPEAL</u>

Within 40 days of the date of this decision, the parent and/or the Public School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.

If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.

An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at http://www.sro.nysed.gov.

I22

**DISTRICT EVIDENCE**

| Exhibit | Title | Date | Pages |
|---|---|---|---|
|  | None |  |  |

**PARENT EVIDENCE**

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| A | Demand for Due Process with Email Confirmation | 6.30.23 | 15 |
| B | Amended Demand for Due Process | 8.22.23 | 12 |
| C | Ten Day Notice with Email Confirmation | 6.15.23 | 3 |
| D | Parent Email to CSE sharing Reports for IEP Meeting<br>☐ 2022/2023 Titus School Functional Behavior Plan and Behavior Intervention Plan<br>☐ Titus School Progress Report, November 2022<br>☐ 2019 Pals Neuropsychological Report10 Day Letter | 1.15.23 | 63 |
| E | Parent Email to CSE sharing Additional Reports<br>☐ Occupational Therapy Progress Report from 01/04/2023<br>☐ ABA Progress Report from 12/08/2022<br>☐ Speech Language Therapy Progress Report from 12/14/2022 | 1.16.23 | 19 |
| F | Parent Email to School Placement Request a Tour | 7.10.23 | 1 |
| G | Titus Enrollment Contract | 5.1.23 | 17 |
| H | Titus Tuition Affidavit | 7.17.23 | 2 |
| I | Titus Program Description | 23-24 | 1 |
| J | Titus School Student Summer Schedule | 23-24 | 6 |
| K | Titus School Student Fall Schedule | 23-24 | 6 |
| L | Titus School Student Attendance Record | 23-24 | 1 |
| M | Titus School Progress Report (admitted only subject to connection by witness) | 6.23 | 29 |
| N | Natalie Brandefine Certification | Undated | 1 |
| O | ABA Progress Report by Little Green Tugboat (admitted only subject to connection by witness) | 5.28.23 | 10 |
| P | Stephanie Koh License | Undated | 1 |
| Q | Speech Progress Report by Happy Talk | 8.23 | 4 |
| R | Kaitlyn Simon License and Resume | Undated | 3 |
| S | Occupational Therapy Progress Report by | 9.4.23 | 4 |

Received Office of State Review
01/09/2024

Findings of Fact and Decision
Case No. 249622

24

**I24**

| | Bloom Therapy | | |
|---|---|---|---|
| T | Jessica Zambito License | Undated | 1 |
| U | Affidavit of Natalie Brandefine | 10.5.23 | 18 |
| V | Affidavit of Stephanie Koh | 10.5.23 | 8 |
| W | Affidavit of Kaitlyn Simon | 10.4.23 | 9 |
| X | Affidavit of Jessica Zambito | 10.4.23 | 7 |
| Y | Affidavit of Halia Francis | 10.5.23 | 11 |
| Z | Titus Weekly Email Updates to Parents | 7.23 | 3 |
| AA | Recess Afterschool Social Program Description | 23-24 | 4 |
| BB | Rex Francis Medical Accommodation Form | 6.22.23 | 2 |

## IHO EXHIBITS

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| 1 | Prehearing Conference Summary and Order | 8.25.23 | 10 |
| 2 | DOE Closing Brief | 11.29.23 | 9 |
| 3 | Parent's Post Hearing Brief | 11.28.23 | 24 |

## APPENDIX

| **Information** | **Term Used In FOFD** |
|---|---|
| Rex Francis | Student |
| John Hobbs, Esq. | Parent Attorney/Representative |
| Eli Koppel, Esq., Agency Attorney | District Attorney/Representative |
| Titus School | Private School |
| Kaitlyn Simon, Speech-Language Pathologist | Witness # 1 |
| Jessica Zambito, Occupational Therapist | Witness # 2 |
| Stephanie Koh, BCBA, Little Green Tugboat | Witness #3 |
| Natalie Brandefine, Head of School, The Titus School | Witness #4 |
| Halia Francis | Witness #5 |

**I24**

**L.V. v. NYC Department of Education, 03 Civ. 9917 (SDNY)**

Parents of children with Individualized Education Programs who received or who may receive an order at the conclusion of an impartial hearing should read the attached notice about possible disclosure of information and documents about their children as part of a federal court litigation. Translations in Spanish, Arabic, Bengali, Chinese, French, Haitian Creole, Korean, Russian, and Urdu are available on the DOE webpage at https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

**Notice of Potential Disclosure of Student Education Records**

**Please read this notice carefully**. This is a message about possible disclosure of documents or data that might contain information about your child, if your child has been classified as a student with a disability and has been or may be the subject of a final Impartial Hearing Order.

**I. Nature of the Lawsuit**

This lawsuit challenged the failure of the Department of Education ("DOE") of the City of New York to timely implement orders issued by impartial hearing officers in connection with impartial hearings held pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* and N.Y. Education Law § 4401, *et seq.* In 2007, the parties entered into a Stipulation of Settlement (the "Stipulation") in which the DOE agreed to timely implement these orders.

In January 2021, the Court granted plaintiffs' motion for the appointment of a special master. On April 14, 2021, the Court entered an Order appointing David Irwin of Thru-Ed as the Special Master. On May 14, 2021, the Court entered an Order detailing the duties and authority of the Special Master which include, among other things, the authority to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders a. Pursuant to this Order, the Special Master may have access to education records of students, upon DOE's compliance with the Family Education Rights and Privacy Act (20 U.S.C. § 1232g; 34 C.F.R. Part 99) ("FERPA").

2

**II. Data Ordered to Be Disclosed**

In order for the Special Master to perform his duties, the Court has directed the DOE to provide the Special Master (and employees and consultants at Thru-Ed) with access to records containing confidential student record information, including, but not limited to, documents submitted in the impartial hearing process, impartial hearing orders, data about compliance, and students' special education documents, such as individualized education programs, evaluations, authorizations, invoices, etc. The Special Master is required to keep any student documents and information confidential. No student-specific information will be shared with plaintiffs' counsel unless the student's parent specifically consents. If there is any student-specific information in the Special Master's reports to the Court, that information would not be made public.

The Special Master will use this information only for his work to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders. The disclosure of this information does not affect any of your rights as a parent to seek special education services for your child.

**IV. Objections to Disclosure**

If you agree to the disclosure of this information to the Special Master, you do not need to do anything more.

If you do not want your child's information shared with the Special Master, you must object to this disclosure by submitting an objection to DOE's attorney, addressed to:

Jeffrey S. Dantowitz NYC Law Department 100 Church Street, Room 2-121 New York NY 10007 or via email at LVObjection@law.nyc.gov. Please reference the *LV v. DOE* lawsuit (Case No. 03-9917) when writing. An Objection Form accompanies this Notice, though no written objection will be rejected if it is not submitted on this form. If you object, no records containing you and your child's personally identifiable information or other FERPA-protected information will be provided to the Special Master, although nominal and incidental disclosure of your child's name may occur. **Any objections must be received by December 3, 2021 or for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order**. **If you would like more information about this notice, please contact the attorneys for plaintiffs, Rebecca Shore, of Advocates for Children of New York, Inc. at 646-532-6078.**


**OBJECTION TO DISCLOSURE OF RECORDS LV v. DOE, 03 Civ. 9917 (SDNY)**
If you agree to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, you do not need to complete this form.

If you object to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, please compete and return this form to:
Jeffrey S. Dantowitz
NYC Law Department 100 Church Street, Room 2-121
New York, NY 10007
or via email at LVObjection@law.nyc.gov

Child's name: _____
Name: _____
Address: _____
Impartial Hearing Order Case # (if known): _____
Date of Order (if known): _____
If you object to the release of your confidential information, please check the line below:
_____ I do not agree to have my confidential records disclosed to the Special Master in *L.V. v. DOE*.
_____ _____
Date
 Please sign here

If you object to the release of information, your objection must be received by December 3, 2021 or, for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order.
**\* \* \*** If you do not notify the DOE of your objections to the documents being released, you child's information will be provided to the Special Master appointed in *LV v. DOE*, 99 Civ. 9917 (SDNY) and/or consultants and employees of Thru-Ed. The information will remain confidential and the disclosure of this information will not affect any of your rights to seek special education services for your child.

I26

Findings of Fact and Decision
Case No. 249622

هذا على الاطلاع للاطلاع https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings
المستند باللغة العربية، قُم بزيارة الموقع الإلكتروني

YgÄ sÄOxÄ tÄzÄè ná^lá, https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings ná^Ëp

若要以中文查看，請上網到 https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Pour consulter ce texte en français, allez sur https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Pou wè tèks sa a an kreyòl ayisyen, ale sou https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

본 문서를 한국어로 보시려면 다음 웹사이트를 이용하십시오:

https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Для просмотра документа на русском языке посетите
https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Para ver este contenido en español, visite https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings اس کو اردو میں
دیکھنے کے لیے پر جائیں

Received Office of State Review
01/09/2024

I28

## ORDER DENYING CONSOLIDATION

*249622, FRANCIS, REX*

**ORDER**

Case #249622 and Case #227811 are not consolidated because the respective

DPCs do not involve the same school year.

ORDERED

Case #249622 and Case #227811 are not consolidated.

DATED:   July 4, 2023

James McKeever
HEARING OFFICER

I28

I29

# Order of Extension

| | |
|---|---|
| Case Number: | 249622 |
| Student: | Rex Francis |
| Requested by: | Both |
| Extension Request Date: | October 13, 2023 |
| Reason for Request: | Post Hearing Briefs |
| *If other:* | |

Pursuant to 8 NYCRR § 200.5(j)(5)(ii)(a-d), this Order of Extension is made in consideration of:

☒ Whether the delay in the hearing will positively contribute to, or adversely affect, the child's educational interest or;

☒ Whether a party has been afforded a fair opportunity to present its case at the hearing in accordance with the requirements of due process;

☒ Any adverse financial or other detrimental consequences likely to be suffered by a party in the event of a delay; and

☒ Whether there has already been a delay in the proceeding through the actions of one of the parties.

After full consideration of the representations above and the cumulative impact of the factors enumerated in 8 NYCRR § 200.5(j)(5)(ii)(a-d), the extension request is Granted.

| | |
|---|---|
| Reason for Decision: | Post-hearing summations and briefs |
| Length of Extension: | 30 |
| Extension Grant Date: | 11/6/2023 |
| New Decision Date: | 12/11/2023 |

So Ordered

Signed: *Michelle S. Babbitt*

Dated: 11/6/2023

I29

Received Office of State Review
01/09/2024

**Form A**

<span style="color:red">P1</span>

## Notice of Intention to Seek Review

### NOTICE:

The undersigned intends to seek review of the December 08, 2023 determination (Findings of Fact and Decision") of the impartial hearing officer concerning Rex Francis, a student with a disability, that denied petitioner's claim to recover reimbursement relief for the cost of after school ABA, Occupational Therapy, and Speech Language Therapy services for the 2023-2024 school year, as well as funding for an updated neuropsychological evaluation. Petitioners do not intend to seek review of the December 8, 2023 determination to the extent that it awarded Petitioners reimbursement for the cost of the Student's attendance at The Titus School during the 2023/2024 school year. In this connection, Petitioners continue to invoke the student's automatic and unconditional pendency entitlements arising under the 11/16/23 Decision of IHO James McKeever.

The school district is required to prepare and submit a certified copy of the hearing record to the Office of State Review in accordance with section 279.9 of the regulations of the Commissioner of Education. If you wish to seek review of this determination as well, you must send to the party listed below a notice of intention to cross-appeal in accordance with Part 279 of the Regulations of the Commissioner of Education, within 30 days after the date of the decision of the impartial hearing officer. You may find this form on the website of the Office of State Review (**www.sro.nysed.gov**).

## Case Information Statement

| | |
|---|---|
| Halia Francis and Cliff Francis | December 27. 2023 |
| *Name of the party filing this notice* | *Date* |

New York City Department of Education
*Name of the other party (school district or student) involved in this matter*

| | |
|---|---|
| December 8, 2023 | 249622 |
| *Date of Impartial Hearing Officer Decision* | *Impartial Hearing Officer Case Number* |

**Issues for Review:** Please check the boxes that best apply to the issues you intend to ask a State Review Officer to address (check all that apply).

| | | |
|---|---|---|
| ☐ IDEA Eligibility | ☐ Child Find | ■ CSE Meeting Process |
| ☐ Required Notices | ■ Evaluative Information | ☐ Present Levels of Performance |
| ☐ Annual Goals | ■ Educational Placement | ☐ Least Restrictive Environment |
| ■ Related Services | ☐ Transition Services | ☐ 12-Month (ESY) Services |
| ■ Unilateral Placement | ☐ Equitable Considerations | ☐ Relief Requested |
| ■ Independent Evaluation | ■ Pendency (stay-put) | ☐ IEP Implementation |
| ☐ Prior Written Notice | | |
| ■ Other (Please Specify): <u>IHO failed to conduct the hearing in an impartial manner.</u> | | |

| | |
|---|---|
| *(Signature)* | Gary S. Mayerson |
| | *(Your Printed Name)* |

| | |
|---|---|
| 200 W 41ˢᵗ Street 17ᵗʰ Floor | New York, NY 10036 |

<span style="color:red">P1</span>

Received Office of State Review
01/16/2024

(*Your Street Address*)

(*Your City and Zip Code*)

P2

212-265-7200

(*Your Telephone Number*)

Gary@mayerslaw.com

(*Your Fax Number or Email Address*)

2

Received Office of State Review
01/16/2024

P2



Phone:(212) 265-7200
Fax: (917) 210-3075
gary@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

P3

December 27, 2023

**By Hand Delivery and Email**

Peter Farrell, Esq.
Division Chief, General Litigation Division
Office of the Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

Re:  **In the Matter of R.F., A Student with a Disability**
      **IHO Case No. 249622**

Dear Mr. Farrell:

Enclosed please find Petitioners' Notice of Intention to Seek Review of the Impartial Hearing Officer's decision in the above-referenced matter. A copy of the decision to be appealed from is also enclosed.

Sincerely,

Gary S. Mayerson

P3

P4

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 249622 |
| Student's Name: | Rex Francis |
| School District: | Service District # 88, Home District # 2 |
| Impartial Hearing Officer: | Michelle S. Babbitt |
| Date of Filing: | 06/30/2023, amended DPC filed 8/28/2023 |
| Hearing Requested by: | Parent |
| Dates of Hearing: | 10/13/2023 |
| Record Close Date: | 12/1/2023 |

P4

Findings of Fact and Decision
Case No. 249622

**NAMES AND TITLES OF PERSONS WHO APPEARED ON 10.13.2023:**

For the Student:
John Hobbs, Esq., Attorney (hereinafter referred to as "Parent's Representative")
Gary S. Mayerson, Esq., Attorney
Kaitlyn Simon, Speech-Language Pathologist (hereinafter referred to as "Witness #1")
Jessica Zambito, Occupational Therapist (hereinafter referred to as "Witness #2")
Stephanie Koh, BCBA, Little Green Tugboat (hereinafter referred to as "Witness #3")
Natalie Brandefine, Head of School, The Titus School (hereinafter referred to as "Witness #4")
Halia Francis, Parent (hereinafter referred to as "Witness #5)


For the Department of Education ("DOE"):
Eli Koppel, Esq., Agency Attorney (hereinafter referred to as "District's representative")

Received Office of State Review
01/16/2024

Date of Decision:                    12/8/2023

## BACKGROUND AND LIMITED PROCEDURAL HISTORY

The Parent, through counsel, filed a Due Process Complaint on 6/30/23 and then filed their amended due process complaint on 08/28/2023 (together, "DPC") against the New York City Department of Education ("NYC DOE" or "DOE" or "District") pursuant to the Individuals with Disabilities Education Act ("IDEA"). Alleging a deprivation of FAPE, the Parent sought reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

   a) tuition and costs at the Private School
   b) up to 10 hours per week of after-school ABA
   c) up to 2 hours per week of after-school Speech and Language Therapy (SLT) (including feeding therapy)
   d) 1 hour per week of after-school Physical Therapy (PT)
   e) Social Skills group one day a week after-school
   f) up to 2 hours per week of after-school Occupational Therapy (OT)
   g) up to 2 hours per week of parent training and counseling (PTC)
   h) up to 2 hours per week of after-school ABA supervision
   i) monthly ABA meetings (1 hour per therapist)
   j) monthly interdisciplinary team meetings (l hour per service provider)
   k) transportation costs to and from the school (Exhibit A-11).

The undersigned Hearing Officer was appointed to preside over this case on 7/7/2023.

On 8/2/2023, I held a pre-hearing conference in this matter. The parties selected a hearing date of 9/11/2023. The parties also agreed to this date for a hearing on the issue of pendency, if such is being requested. At the PHC, Parent represented that pendency is based on an unappealed FOFD dated 6/14/2021, which provided for placement at Manhattan Children's Center (MCC) and after-school services, including ABA, PT, SL, OT, PTC, and various meetings between/among providers and parents. The District stated that it would not sign the pendency form submitted by the Parent as the relief sought (the unilateral placement) is not in accord with the FOFD. Parent argues that the Private School, the present unilateral placement, is substantially similar to MCC, and MCC is no longer available as a placement for the Student. Parent did not provide information as to why MCC was no longer available. On or before 8/25/2023 Parent was directed to advise if the prior unilateral placement became unavailable to the Student and if parent will be withdrawing its pendency request (IHO Exhibit 1). On 9/13/2023, the District signed a pendency form.

Findings of Fact and Decision
Case No. 249622

4    **P7**

Parents requested an adjournment of the hearing date, which was rescheduled to 10/13/2023. Participating in the hearing were Petitioner's representative, and an attorney from the DOE.

## HEARING

At the hearing, I confirmed that the District was conceding Prong I (Tr. 26).[1] The DOE did not submit any disclosure (Tr. 27). The District, however, challenged the appropriateness of the unilateral educational placement by the Parent (Tr. 26-27).

At the inception of the hearing, Parent's representative noted that the District representative had not advised the Parent that they wanted to cross-examine any of the witnesses for which affidavits had been submitted in lieu of direct testimony. Accordingly, Parent's representative objected to any cross-examination by the District. The District representative stated at the hearing that he was seeking cross-examination of two witnesses. Since the District representative did not have a viable basis for the District failing to notify the Parent of its intention to cross-examine witnesses, I confirmed my directive in the PHC (IHO Exhibit 1-2) and sustained Parent's objection precluding the District from cross-examination of witnesses. However, I advised that since I had notified the Parent that I would have questions for the witnesses to clarify and complete their testimonial affidavits, the District could ask questions only as to those limited areas inquired into by this tribunal (Tr. 28-30).

The District waived making an opening statement (Tr. 30-31) and did not disclose any documents or call witnesses (Tr. 27, 35, 46). The District was not raising any Prong III equitable issues (Tr. 34-35). Such statement and actions are a concession by DOE that it denied the student a FAPE over the period at issue, the school year 2023-2024.

The Parent made an opening statement, discussing the Student, the Private School, and the "robust" after-school program and asserted that the "record" would show that the Parent's unilateral placement was appropriate (Tr. 31-34).

The Parent offered Exhibits A-L into evidence, with no objection from the DOE (Tr. 36-39). Exhibit M is a progress report from the prior school year, 22-23. This tribunal questioned how it was germane to the 23-24 school year before me. Parent's representative stated there was no

---

[1] Tr. references the page number from the 10.13.23 hearing.

Received Office of State Review
01/16/2024

progress report from the Private School for 23-24, although the Student had been in school for approximately 3½ months, and that the progress report from the prior school year would serve as a baseline for the testimony of Witness #4. I allowed Exhibit M to be admitted into evidence subject to connection by Parent's representative in their closing written summation (Tr. 39-41, 46). I made a similar inquiry as to Exhibit O, a progress report from an after-school ABA provider dated 5.23. Parent's representative asserted that since the ABA provider had not submitted an updated progress report, it would provide a baseline for testimony. Parent's representative apparently was confused and conflated the after-school ABA provider with those providers and progress reports issued by the Private School. I ruled that the document was irrelevant to the school year before me, and unless a witness connected it, Exhibit O would not be admitted into evidence (Tr. 41-43). Exhibits N- Q were admitted into evidence, with the same caveat for Exhibit M and O (Tr. 44, 46). Exhibits RR-BB were admitted into evidence with no objection from the District (Tr. 44-46).

Parent and the DOE each submitted a written closing argument and legal memorandum dated 11.28.23 and 11.29.23.[2]

## FINDINGS OF FACT AND DECISION

After a full review of the record generated at the hearing, I make the following findings of fact and determinations.

According to a progress report from the Private School for the prior school year (22-23),

> [T]he Student is diagnosed with Autism. [The Student] exhibits delays in social/emotional development and adaptive behavior. [The Student] has a history of engaging in high rates of off-task behavior; emotional dysregulation and physical dysregulation. [The Student] presents as self-directed and engages in behavior that requires consistent support to access the curriculum in both 1:1 and group activities. Due to his complex medical diagnosis, he requires significant support to navigate his environment and demonstrate executive functioning skills. These behaviors have greatly hindered [the Student's] ability to form relationships with his peers, independently navigate his environment, or participate in a less restrictive academic setting. [The Student] requires a small class size with a low student to staff ratio to participate in instruction (Exhibit M-2).

---
[2] IHO Exhibit 2 (DOE closing brief) and Exhibit 3 (Parent's closing brief).

Received Office of State Review
01/16/2024
**P8**

Findings of Fact and Decision
Case No. 249622

 

As stated during the hearing I do not find outdated progress and neuropsychological reports to provide useful information to the issues before me, especially since witnesses were not produced to explain their significance to the current school year, and therefore, are not considered in reaching my determination (See Exhibits D (only neuropsychological report not considered), E, M (not considered except for information as to Student quoted above), and O). The 2021 neuropsychological evaluation[3] spoke to the Student when he was 6 (he turned 7 during the evaluation) (Exhibit D-48). The Student was then attending a specialized private school that offered ABA-based instruction and support for children with Autism (Exhibit D-49). That report does not account for the Student's present needs, almost three years later, and reliance on such by the Parent suggests that the Student has not made progress in his educational placement and his needs remain the same (IHO Exhibit-3-5-7).

Witness #1, the Speech and Language after-school provider has been providing services since 2017, the time she graduated with a master's degree. She stated that the market rate for individuals with her experience is $280.00 per hour. Witness #1 did not determine the rate, but rather, she spoke with "her boss" to determine the reasonableness of the rate. Witness #1 has no independent knowledge of the market rate, except to testify that individuals coming right out of school charge $150.00 (Tr.49-51, Exhibit W-1-2). Witness #1 provides one hour of speech and language therapy ("SLT") per week to the Student in a sensory gym shared with the occupational therapist who provides OT services to the Student (in fact, the OT is provided directly after SLT). Up to three other individuals are in the sensory gym receiving therapy, together with their individual therapists, while Witness #1 is administering services to the Student. Although Witness # 1 stated that the therapy has been consistent for the Student since April 2022, neither assertion is correct, as borne out by Witness #1's live testimony and contradictory statements in the affidavit of Witness #1[4] (Tr. 51-54. Exhibit W-2-3). The Student is in the sensory gym for two to three minutes to regulate, and then he can better attend to the SLT. The Student did not attend SLT over the summer, as his Parents elected to send him to camp (Tr. 54-56). The Student was seen for one session in August and only a few sessions in September 2023. Witness #1 said the Student was not in the city in July (Tr. 61-62). Witness # 1 testified that the Student "has deficits in his pragmatic

---

[3] Erroneously identified as a 2019 report by Parent's representative in Parent's Exhibit list.
[4] Witness #1 started working with the Student in September 22 and the Student did not receive SLT during the summer of 2023.

Received Office of State Review
01/16/2024

language, his play skills, his expressive and receptive language."  However, these deficits are being

addressed at the Private School (Tr. 58). When I asked Witness #1 what she was working on that

was not provided by the Private School she responded:

> Because we -- we aren't really bound due to, like, the academic
> demands that a school has, like, we can -- we can do everything in a
> much more naturalistic way, which is, you know, more functional
> to be able to practice these skills that are in a way that's, like,
> motivating and personally relevant to him. And all of this, you
> know, we -- we can reinforce things that are taught at school. We
> can teach new skills still. And all of that, you know, extra language
> helps him be successful in school, as well as his, you know,
> community life with all of his social skills. (Tr. 58-59).

Witness # 1 was not aware of the methodology used at the Private School for SLT

provided to the Student nor was she aware of how many hours the Student was in school (Tr. 59-

60). Witness #1 has been providing services to the Student since 9.2022. She reads to the Student,

not for literacy purposes, but to have a discussion (Tr. 60-62).

The following question and answer are instructive as to the SLT:

> HEARING OFFICER BABBITT: So isn't the one hour of
> speech and language therapy that you provide to the student -
> - isn't that to maximize his speech and language?
>
> WITNESS #1: Yes. (Tr. 64).

When asked why the one hour per week SLT was necessary for the Student to make

progress at the Private School, Witness #1 responded:

> I think that the main difference between us and school is that we can use
> a more child-led -- you know, we aren't really -- I'm going to say, bound
> by any, like, we have to make X, Y, and Z progress or, like, this is our
> curriculum. We can just follow his lead. And yes, we have our own, you
> know, goals that we have set for him based off all the checklists and
> things that we do for what would be, like, age-appropriate and
> developmentally appropriate.  But [the Student] find that the, you know,
> one-on-one instruction is appropriate for [the Student] as well as using a
> more naturalistic way to -- instead of saying this is what we're going to do
> on this timeline and we can follow his lead and because it's more, you
> know, meaningful to him, that's ultimately going to be more functional to
> help him attain and then use this language which, you know, supports
> academics (Tr. 64-65; see also Exhibit W-4).

Received Office of State Review
01/16/2024

I again asked Witness #1 what the basis was for her statement that the Student could not make meaningful educational progress at the Private School without the one hour per week of after-school speech and language therapy.

> HEARING OFFICER BABBITT: What's the basis for your statement that the student would not make meaningful progress at [the Private] School without the one-hour speech and language that you provide for him?
>
> Witness #1: I think due to the differences of how we provide the therapy, it's just another way to supplement his learning and -- and try to meet him where his needs are at the moment. (Tr. 66-67)

I noted to Witness #1 that I did not think she answered my question (Tr. 67). Similarly, Witness #1's testimonial affidavit does not provide a cogent reason why SLT is necessary for the Student to make educational progress at the Private School (Exhibit W-7-8). Parent's representative attempted to get a different answer from Witness #1 on re-direct:

> PARENT'S REPRESENTATIVE: I'll ask again, based off of your information and experience with [the Student], what is his need for this supplemental after-school speech-language therapy based on?
>
> WITNESS #1: It would be based on still supporting his -- his deficits in pragmatic language, expressive and receptive language, and just doing it in a -- just taking another approach, and you know, giving additional services to, you know, give him that exposure and bombardment in just a different type of environment. (Tr. 69)

Witness #1 testified that "[d]epending on the skill being addressed, progress is determined by qualitative analysis of language sampling, by identifying cueing hierarchies (minimal/moderate/maximal), or by calculating percentages of #correct/#trials" (Exhibit W-4). No such analyses or samplings were admitted into evidence by the Parent. In describing progress made by the Student for this school year, Witness #1 detailed an example from 1.23.23, and said that the Student does not engage in that behavior now ("At the moment, the Student does not routinely use SVOPP sentences and conjunctions in his spontaneous language output"). The example was from the middle of the 22-23 school year and is not instructive as to progress made during the school year at issue, that being the 23-24 school year (Exhibit W-6-7).

Witness #2, the occupational therapist (OT), owns the agency providing services to the Student. The rate for her services is $225-$250 and depends on the session length and whether services occur in

Received Office of State Review
01/16/2024

Findings of Fact and Decision
Case No. 249622

P12

her office or at the Student's home. Witness #2 sees the Student once weekly after the Student receives SLT (Tr. 57, 75-78). When Witness #2 was asked how long she had been providing services to the Student, she replied, "I've known [the Student] for several years. I don't know the exact number off the top of my head, but I have been working with him for some time." She then said she had worked with the Student for a "few years." I reminded Witness #2 that she had been working with the Student since he was four years old, about six years. She responded that she works with many students for long periods of time (Tr. 78-79; Exhibit X-1-2). Witness #2 stated there is an agreement between her and the Student's Parents for the services she rendered to the Student. Such agreement was not put into evidence by the Parent. Similarly, no time sheets were submitted showing when OT was provided for the 23-24 school year (Exhibit X-2). Witness #2 did not know the name of the Student's OT at the Private School, nor did she know how often the Student receives OT at the Private School (Tr. 79-80). Witness #2 is working with the Student "to address fine and visual motor, executive function, sensory processing, self-regulation, self-help, and motor skill development goals to support independence in daily routines across environments and provide parent education" (Exhibit X-4). Witness #2 opined that the Student "requires this intervention for carryover of his skills to make meaningful progress." I asked Witness #2 what she meant by her statement.

> HEARING OFFICER BABBITT: I mean, are you saying that if the student didn't come to you one time a week for 60 minutes, he would not make meaningful progress at the school? That they couldn't meet his needs?
>
> WITNESS #2: I believe that [the Student] requires the one-on-one time also in a sensory gym working with an experienced therapist to have access to a sensory gym for home and parent education, as well. I think that's very important for [the Student]. He does require significant -- because of his delays, he does require significant therapy services and I don't believe that at school there is enough OT services. I don't. He has significant and global delays.
>
> HEARING OFFICER BABBITT: Okay. So you think that he should get more physical -- I'm sorry. He should get more OT from the school, correct? That they're not providing enough is what you just said?
>
> WITNESS #2: No, I didn't -- I didn't say that. I think that he requires more OT. I don't know what is provided at [the Private School], as I said. I do believe he requires the aspect of having parent education. He has significant safety – poor safety awareness, delays in cognition, speech and language, gross and fine motor skills, and safety awareness (Tr. 80-81).

Received Office of State Review
01/16/2024

Witness #2 admitted that she does not deal with all the above-stated deficits. Witness #2's answers were evasive. Witness stated that the Student required supervision at all times. I asked if supervision was the same as needing therapy. Witness #2 responded "no" (Tr. 81-83). Witness #2 did not provide services to the Student for either July or August (Tr. 84). Witness #2 did not know why the Student did not come for OT during the summer. She stated there was some regression, but over the summer, there was regression for neurotypical students as well (Tr. 84-87). Witness #2 did not know the methodology used to administer OT by the Private School (Tr. 88). Witness #2 works with the Student in her sensory gym. At the same time, 3 or 4 other therapists are working with other individuals in the same space (Tr. 89).

Witness #3, the after-school ABA provider, has been providing services to the Student since he was six years old. Witness #3 is the owner and founder of the Provider Agency. She does not provide direct services to the Student but is available to the Parent for training and field calls. Three different therapists provide direct ABA services to the Student. One is a licensed BCBA, and the other two providers are not licensed BCBAs (Tr. 97). Witness #3 provides PTC 8 hours each month and supervises the direct providers (Tr. 98)[5]. ABA is provided to the Student at his home for ten hours after-school each week on Tuesday, Wednesday, Friday, and either Saturday or Sunday. The ABA providers are flexible to accommodate the family's schedule (Tr. 99-100). Witness #3 testified:

> Sometimes the family is out of town. sometimes the family has events that they need support for the -- the student. Sometimes there's, you know, specific events. Other times there are play dates where we focus on social skills.  There's a lot of -- a lot of skills that are worked on during those -- during those sessions, as well as during the week (Tr. 101).

> So a therapist may start with [the Student] at his home on, like, a Saturday. There might be, like, let's say 10 to 1 where, I mean, we stay within the hours allotted. So let's say there's a three-hour session. And so maybe from 10 to 11:30 there may be, you know, working on his goals at home. And then he has to go to a school event. Let's say, like, it's a book fair at his school, so then he'll go with the therapist because he needs the support to the book fair. And they may spend half an hour, maybe an hour there, and then return home for the rest of the session. So that's, like, one example. But you know, so I mean it can change. So that's just, like, an example of one book fair event. Another one could be a birthday party where he needs the support at a birthday party.

> HEARING OFFICER BABBITT: Okay. So let me ask you this. During the week, is it pretty steady that the amount of ABA therapy's three hours? Is it one hour each day on Tuesday, Wednesday, Friday?

[5] Later in her testimony Witness # 3 stated she only supervises one of the 3 therapists. Two of the therapists do not require supervision (Tr. 112).

Received Office of State Review
01/16/2024

115 **P14**

WITNESS #3: It's typically two to two-and-a-half hours and then allows for us to have weekend time -- weekend sessions (Tr. 101-102).

If the family is going away for the weekend the Student has extended sessions during the week (Tr. 102-103). Witness #3 testified that the ABA providers have been working with the Student on bathing skills for two years (Tr. 104-105). Witness #3 stated that the Private School is not working on bathing skills. Witness #4 testified that the Private School is working on this life skill (Tr. 105, 148 and Exhibit U-11). Witness #3 testified that she shares session notes with the Private School and has meetings with school personnel (Tr. 105-106). No session notes were put in evidence by the Parent, which Parent received after every session (Tr.115).

Witness # 3 provides approximately 2 hours of PTC. "Sometimes it's in person at home. Sometimes it's a Zoom meeting. Some it's phone calls. There might be a week with multiple phone calls. So it's not that -- that – the parent training is not a set schedule, but it is a set amount per -- per month that I make sure that we are coordinating and communicating and training (Tr. 106). Witness #3 testified as to the nature of Parent training:

> With [the Student's] development, he's -- he's very aware at this point of when we are talking about him. So we try to schedule their training and discussions about him when he's not present. If it entails implementing a protocol like, for example, you know, just within his family's life functioning, like, one of the -- one of the skills -- one of the issues or problematic behaviors that was presenting pretty consistently with the family but not with us was when if the family were to sit down and watch a show together on TV, he would incessantly scream or be disruptive so that it couldn't happen. And so that's an example of when I went in person and created a protocol with a visual -- with a visual schedule for him and we implemented the visual together with the family. And then I believe it was two weeks later, I followed up with another in-person visit to further that training with the parents, coaching them, making sure and -- you know, and it was successful (Tr. 107-108).

I asked about the significant hours sought for Parent training. Witness #3 stated:

> There are a lot of skills that we're working on, parent skills that are not the student's skills, right. So the student has his list of goals and we've got parent goals that we're specifically targeting. And they -- while they have made a lot of progress in many areas, they're you know, he -- so the student presents with pretty high behavior contrast where -- when the therapist is there and they are working, you know, successfully on the goals that we've written for him that we're working on. They are not automatically -- they're not automatically generalized with the parents. And so there is typically a period of training the parents, coaching the parents to implement this protocol.

**P14**

12 **P15**

HEARING OFFICER BABBITT: Well, so I'm confused. Do you have set training that you give to the parents? Or it's responsive to the parents' questions about behavioral issues with the student?

WITNESS #3: Both. And with all of our families, there's, you know, it depends on what the -- what the -- what the needs just like our program is designed for, you know, to target the individual needs of every individual student, the parent's needs and learning styles are also taken into account (Tr.108-109 ) .

There is no set schedule for Parent training. Nor are there set lengths for the session. Instead, Witness #3 uses the "bank" of eight hours per month to respond to the Parent's requests (Tr. 109-111). Witness #3 stated they are working on community safety skills- when it is safe to cross the street, bathing, basic home chores, functional daily living skills, peer social skills, putting his clothes in the hamper, dressing himself, brushing his teeth (Tr. 117-118, 120.) Witness #3 further testified:

In terms of chores in the -- in the home, you know, for -- as part of, kind of, like his functioning within the family life and routines, you know, putting his plate in the sink, helping with preparing dinner, helping with setting tables, setting the table. I'm trying to think of some other. Oh, like making his bed, things of that nature (Tr. 122 ) .

The DOE did not elicit any testimony or produce any evidence that refuted or otherwise called into question the appropriateness of the Private School for the Student.

Considering the foregoing and as more fully discussed below, I find that a) the DOE conceded that it did not offer the Student a FAPE for the 2023-2024 school year, the b) Private School offers Student specially designed instruction sufficient to meet Student's needs, c) there was no showing that after-school SLT, OT and at-home ABA and PCT is a necessary component of the educational program, and d) the equities support the Parent's requested relief for tuition reimbursement.

*Burden*

School districts have the burden of proof, including the burden of persuasion and burden of production, in IDEA due process hearings, except that a parent or person in a parental relationship seeking tuition reimbursement for a unilateral parental placement has the burden of persuasion and burden of production on the appropriateness of such placement.[6]

---

[6] NYS Educ. Law § 4404(1)(c); *R.E. v. N.Y.C. Dept. of Educ.*, 694 F.3d 167, 184-185 (2d Cir. 2012), *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 835-836 (2d Cir. 2014).

**P15**

Received Office of State Review
01/16/2024

13

_Prong I_

The IDEA provides that children with disabilities are entitled to a Free Appropriate Public Education ("FAPE").[7] A FAPE consists of specialized education and related services designed to meet a student's unique needs, provided in conformity with a comprehensive written Individualized Education Program ("IEP").[8] A school district has offered a student a FAPE when (a) the board of education complies with the procedural requirements set forth in the IDEA; and (b) the IEP is developed through the IDEA's procedures and is reasonably calculated to enable the student to receive educational benefits.[9] In order to meet its substantive FAPE obligations, a district must offer a student an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[10]

As to Prong I of the _Burlington/Carter_ standard, the DOE failed to meet its burden at the hearing. Instead, the DOE Representative indicated on the record that DOE was not introducing any documents or presenting any witnesses. The District representative affirmatively conceded Prong 1(Tr. 26-27,35, 46). Therefore, I am constrained to find that the DOE failed to offer the Student FAPE for the 2023-2024 school year.

_Prong II_

A private school placement must be "proper under the Act."[11] This means that the private school must offer an educational program that meets the student's special education needs.[12] Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate."[13] Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement."[14]

---

[7] 20 U.S.C. § 1400 (d)(1) (A)
[8] 34 C.F.R. § 300.13
[9] _Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley_, 458 U.S. 176, 206-07 (1982).
[10] _Endrew F. v. Douglas County Sch. Dist. RE-1_, 137 S.Ct. 988, 999 (2017).
[11] _Florence County Sch. Dist. Four v. Carter_, 510 U.S. 7, 12, 15 (1993); _Sch. Comm. Of Burlington v. Dept. of Educ._, 471 U.S. 359, 370 (1985).
[12] See _Gagliardo v. Arlington Cent. Sch. Dist._, 489 F.3d 105, 112, 115 (2d Cir. 2007); _Walczak v. Fla. Union Free Sch. Dist._, 142 F.3d 119, 129 (2d Cir. 1998).
[13] _Gagliardo_, 489 F.3d at 112
[14] _Gagliardo_, 489 F.3d at 112, quoting _Frank G. v. Bd. of Educ. of Hyde Park_, 459 F.3d 356, 364 (2d Cir. 2006)

Parents need not show that the placement provides every special service necessary to maximize the student's potential.[15] When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits."[16] A private placement is appropriate if it provides instruction specially designed to meet the student's unique needs. The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement. No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefits, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.[17]

Here, Parent has demonstrated that the Private School:

offers 1:1 and 2:1 support in a group setting. Group sizes vary, with most groups ranging from 6-8 students. Cohorts are established based on age and social skills. Each student is assessed to identify his/her grade level for reading, writing, and math. Students are then grouped with academic peers for math, English language arts (ELA), science, and history/social studies to facilitate targeted learning in small groups, dyads, and or 1:1 instruction based on learning style and needs. Our academic curriculum adheres to the NYS Common Core and is modified as needed. Each student has the opportunity to work with a NYS certified special education teacher that can modify work to meet his/her learning needs and style while still challenging and supporting intellectual and cognitive development. In addition to reading, writing, math, science, social studies/history, current events, art, music, STEAM, and adaptive physical education, [the Private School] offers daily social skills groups. Utilizing programs like *Social Thinking Curriculum* and *Everyday Speech* lessons target: executive functioning, theory of mind, organization, emotional vocabulary, self-advocacy, transitioning, accepting no, listening, and following directions the first time, relationships, etc.

Every classroom team is a co-leading model, one NYS certified special education teacher and one lead behavior therapist. Our lead behavior therapists are professionals that are working toward licensure and board certification in Applied Behavior Analysis (ABA) under the guidance and supervision of our BCBA/LBAs. At [the Private School], in addition to the classroom staff we have a full-time school nurse, mental health services, occupational therapy, speech and language therapy, and physical therapy. We feel an important component of teaching and treating the whole student

---

[15] *Frank G.*, 459 F.3d at 364-65.
[16] *Frank G.*, 459 F.3d at 364; see *Gagliardo*, 489 F.3d at 115.
[17] *Gagliardo*, 489 F.3d at 112, quoting *Frank G.*, 459 F.3d at 364-65.

Received Office of State Review
01/16/2024

is meeting all physical, developmental, and social emotional needs. Therefore, our related services and mental health services include individual and group sessions, in and out of the classroom, with our NYS certified and licensed providers (Exhibit I-1).

Witness #4 testified that the Student's Parent will receive three comprehensive progress reports a year, completed by the Student's entire team, and discusses his progress across all domains (Exhibit U-15). Again, I note that although the Student had attended the Private School since July 2023, Parent did not provide any progress reports from the current 23-24 school year (Exhibits G-1 and L-1). Parent provided weekly emails from the Private School to the Parent only for July and the first week in August (Exhibit Z).

The Student's class schedules are designed to foster development across all domains without interfering with classroom activities and to promote generalization across settings. Related services and mental health counseling sessions are scheduled in collaboration with the classroom team to promote regulation and provide in-class support during activities related to each domain (e.g. OT could be provided during the Student's writing assignments) (Exhibit U-16). The Student receives OT three times a week for 30 minutes individually (Exhibit K and U-11). In OT, the Student is working on bike riding skills, his ability to shower independently[18], tying a knot, and his handwriting skills. Additionally, the Student continues to practice independent activities of daily living, personal hygiene, and self-care to increase his independence (Exhibit U-11).

The Student receives the following:

1) SLT three times a week for 30 minutes individually. So far this school year, the Student has been working on receptive, expressive, and pragmatic language. He is working on problems and solutions within social scenarios and picture scenes for receptive language. For expressive language, the Student has been working on sequencing and retelling a story (via picture cards/sequencing cards) and including a salient detail within the retelling (i.e., characters, location, descriptive words like colors and size) (Exhibit U-10-11).

2) PT two times per week for 30 minutes individually and is working on increasing his strength to improve his posture, body awareness, and balance, which has led to increased safety during environmental negotiation and gross motor play (Exhibits J, K, and U-12).

3) Counseling one to two times a week for 30 minutes individually and is working on increasing his strength to promote improved posture and further improve his body awareness and balance. The Student is also working on bilateral coordination, core strength, and bike riding (Exhibit U-12).

During the 2023-2024 school year, the Student receives instruction at the late kindergarten to early first-grade level in all academic classes (Tr. 185). The Student is in a class of 7 students who present with

---

[18] I note that Witness #3 erroneously stated that the Student was not working on bathing/showering at the Private School (See Tr. 148 and Exhibit U-11).

Received Office of State Review
01/16/2024

similar needs and skills and, developmentally, socially, and academically, are on similar functional levels to the Student (Exhibit U- 7 and Tr.133), with 1:1 instruction as needed (Exhibit U-16).

According to Witness #4, for the 23-24 school year, the Student relies on teacher prompting and redirection to focus his attention and enable him to be available for learning (Exhibit U-10). He has demonstrated improvements in his ability to attend and focus in class, effectively communicate, comply with directions, follow classroom routines, and maintain emotional and physical regulation throughout the day (Exhibit U-14).

Witness # 4 testified that the Student made progress as follows:

- Ability to self-regulate and listen to numbers being called in math class during game of number identification bingo
- Understand direction during math game
- Ability to stay on task
- Moved up a grade level in instruction to the second part of the Wilson's Curriculum in ELA
- Improved listening and reading comprehension
- In science class, understanding different phases of matter
- Greater understanding and connections in new subject matter (Tr. 149-152).

I find that based on the testimony of Witness #4 and Parent's exhibits, Parent has met their burden in proving that the Private School offers an educational program that meets Student's needs under Prong II of the *Burlington/Carter* standard. In reviewing the record, the weight of the evidence establishes that the Private School addressed Student's individual special education needs and that the instruction offered was "reasonably calculated to enable the child to receive educational benefits."[19] The Private School is an appropriate educational placement for the Student for the 2023-2024 school year as it can meet his academic, communication, behavioral, social, self-management, and emotional needs.

*Parent has Not Met its Burden concerning that Relief which seeks After-School Supplemental SLT, OT, ABA and PCT*

The DOE is not required to design an educational program to address a student's difficulties in generalizing skills to other environments outside of the school environment, i.e., at-home ABA, particularly where the student is progressing in the classroom.[20]

---

[19] *Frank G.*, 459 F.3d at 364.
[20] *See Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1152-53 [10th Cir. 2008]; Gonzalez *v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 353 [1st Cir. 2001]; Devine *v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1293 [11th Cir. 2001]; *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1573 [11th Cir 991]. *Application of a Child with a Disability*, Appeal No. 11-068.

Received Office of State Review
01/16/2024

Courts have generally disfavored services intended to generalize skills outside of the school environment. Several courts have held that the IDEA does not require school districts, as a matter of course, to design educational programs to address a student's difficulties in generalizing skills to other environments outside of the school environment, particularly in cases in which it is determined that the student is otherwise likely to make progress in the classroom.[21] The District is required to provide an appropriate education, not one that maximizes the student's potential.[22]

Here, the Student attends a Private School that provides ABA services and/or utilizes ABA methodology throughout the school day. The DOE has no obligation to provide for additional at-home ABA unless the service is required for the Student to maintain/retain skills. Parent did not show that the at-home ABA services were responsible for the Student's progress observed in the Private School. Similarly, no evidence was adduced that supported the claim that the Student is unlikely to receive educational benefits from his schooling in the absence of home-based ABA services or the Student is likely to experience regression in the school setting in the absence of home-based ABA services.[23] The fact that the Student may benefit from at-home services in and of itself is not enough to entitle reimbursement for services provided in excess of a FAPE. The same is true of the afterschool SLT and OT; there was no objective evidence showing that absent these services, the Student would not progress in the Private School.

Parent did not present any testimony or documentary evidence showing:

   (i)   To what extent the Private School could not service the student without the at-home ABA services and after-school OT and SLT.

   (ii)  That the at-home ABA services and after-school OT and SLT were responsible for the Student's progress in the Private School.

   (iii)  The Student required services to maintain and retain skills.

---

[21] *(see, e.g., F.L. v. New York City Dep't of Educ.,* 2016 WL 3211969, at *11 [S.D.N.Y. June 8, 2016]; *L.K. v. New York City Dep't of Educ.,* 2016 WL 899321, at *8-*10 [S.D.N.Y. Mar. 1, 2016], *aff'd in part,* 674 Fed. App'x 100 [2d Cir. Jan. 19, 2017]; *P.S. v. New York City Dep't of Educ.,* 2014 WL 3673603, at *13-*14 [S.D.N.Y. Jul. 24, 2014]; *M.L. v. New York City Dep't of Educ.,* 2014 WL 1301957, at *11 [S.D.N.Y. Mar. 31, 2014]; *see also Thompson R2-J Sch. Dist. v. Luke P.,* 540 F.3d 1143, 1152-53 [10th Cir. 2008]; *Gonzalez v. Puerto Rico Dep't of Educ.,* 254 F.3d 350, 353 [1st Cir. 2001]; *Devine v. Indian River County Sch. Bd.,* 249 F.3d 1289, 1293 [11th Cir. 2001]; *JSK v. Hendry County Sch. Bd.,* 941 F.2d 1563, 1573 [11th Cir 1991]).
[22] *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998)), *Rowley,* 458 U.S.176.t 189, 553 IDELR 656 (1982). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132, *quoting Tucker v. Bay Shore Union Free Sch. Dist.,* 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted], *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 379 (2d Cir. 2003). School districts are not required to "maximize" the potential of students with disabilities. *Bd. of Educ. v. Rowley,* 458 U.S. 176, at 189,199,553 IDELR 656 (1982); *Grim,* 346 F.3d at 379, *Walczak,* 142 F.3d at 132.
[23] See *Application of a Child with a Disability,* Appeal No 20-125.

Received Office of State Review
01/16/2024

Findings of Fact and Decision
Case No. 249622

18

     (iv)  The Student is unlikely to receive educational benefits from the Private School in the absence of home-based ABA services and after-school OT and SLT.

     (v)   The Student is likely to experience regression in the Private School setting in the absence of home-based ABA services and after-school OT and SLT.

     The testimony introduced at the hearing concerning the Private School showed the independence and sufficiency of its educational program with ABA throughout the entire day. The Private School provides instruction and training to Parents to enable them to address the Student's behaviors and skills while at home. The eight hours per month of Parent training are tantamount to the Parent having a "personal trainer" to call when she wants assistance and fortification. Witness #3 testified she was available to the Parent when needed. Parent training might be a Zoom meeting, a telephone call, or a PowerPoint presentation. Witness #3 might come to the family home and observe the Student with the family while they are watching a movie (Tr. 107-109). There is no set schedule for Parent training. Nor are there set lengths for the session. Rather, Witness #3 uses the "bank" of eight hours per month to respond to the Parent's requests (Tr. 109-111). The training was used to improve matters at home, i.e., chores, bed making, watching television as a family.

     The Private School offers "on-site support/training groups to the parents of each student to learn about the approaches/methodology used to address their children's needs. The School strongly encourages parent(s)/guardian(s) to attend these sessions at least twice per month [implication is that there are more than two sessions per month]. In these sessions, parents also learn how to implement the ABA approach at home." (Exhibit U-4). The Private School provides ample training for the Parent.  The at-home ABA services would be redundant or duplicative of the parental support offered by the Private School.

     Similarly, the direct ABA providers are working on the Student's "functioning within the family life and routines, you know, putting his plate in the sink, helping with preparing dinner, helping with setting tables, setting the table. I'm trying to think of some other. Oh, like making his bed, things of that nature" (Tr. 122). These services are not the type contemplated under the IDEA that are necessary for the Student to make educational progress. Clearly, the afterschool ABA may benefit the Student, but not for educational purposes. Although, according to the Parent, the Student may need constant supervision or help in tying his shoes, fastening buttons, taking a shower, or tying his bathrobe (Exhibit Y-4), after-school ABA therapy is not to be used for childcare. It is also not intended to relieve parents of their parental duties. Life skills are being worked on in the Private School. There was no showing

Received Office of State Review
01/16/2024

Findings of Fact and Decision
Case No. 249622

<span style="color:red">19</span> **<span style="color:red">P22</span>**

that they need to be duplicated by the ABA providers for the child to make educational progress in the Private School.

   Witnesses #1, #2, and #3 did not coordinate efforts with the Private School.  Witness # 1 was not aware of the methodology used at the Private School for SLT provided to the Student, nor was she aware of how many hours the Student was in school (Tr. 59-60). Witness #1 admitted that the SLT she provided to the Student was to maximize his speech and language (Tr. 64). When I asked Witness #1 why the after-school therapy was necessary for the Student to make progress at the Private School she failed to answer responsively but rather discussed how she was flexible to let the Student lead the therapy, rather than to succumb to any academic rigors imposed by the Private School. Similarly, Witness #1's testimonial affidavit does not provide a cogent reason why SLT is necessary for the Student to make educational progress at the Private School (Tr. 64-67, 69 and Exhibit W-7-8).

   Witness #2 said she was in contact with the providers at the Private School, but in neither her affidavit nor her testimony did she state the name of that provider or when she spoke with him/her. Witness #2 opined that the Student was not receiving enough OT at the Private School, but yet, when she testified, Witness #2 did not know the name of the Student's therapy at the Private School, nor did she know how often the Student receives OT at the Private School (Tr. 79-81). Witness #2 did not know the methodology used by the Private School to administer OT to the Student (Tr. 88). There was testimony that the Student receives OT three times each week at the Private School (Exhibit K and U-11). The Private School and Witness #2 provide services to the Student for substantially the same challenges.

   Witness #2 did not provide services to the Student for either July or August (Tr. 84). Witness #2 did not know why the Student did not come for OT during the summer.  In the absence of the Student not receiving OT during the summer, which apparently was the decision of the Parent to have the Student engage in some other activity, I question the necessity of both the OT and SLT after-school services. Notably, the Parent's affidavit does not address the related services for the summer months (Exhibit Y-8).

   I do not fully credit the testimony and opinion of Witness #2 as to the Student's needs.

   Most notably, Witness #4 did not testify that the Student needed after-school SLT, OT, and at-home ABA services to progress at the Private School. The services provided by the afterschool SLT, OT, and at-home ABA are to maximize the Student's potential. Although I understand the Parent's desire to

**<span style="color:red">P22</span>**

<span style="color:red">Received Office of State Review
01/16/2024</span>

20 **P23**

provide the Student with the best education, that is not the mandate under the IDEA. I also question the ability of the Student to sustain such a full schedule, especially since the Parent stated that the Student "struggles to maintain focus on non-preferred activities in and out of school" (Exhibit Y-3). Furthermore, Parent testified that the Student attends an afterschool social group program and afterschool PT. Reimbursement is not sought for either of these programs (Exhibit Y-7-8). Parent has not shown any basis to award the requested supplemental "robust" services. They are not required for the Student to make meaningful educational progress.

*Equities*

Even if a parent establishes a right to reimbursement under the IDEA, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."[24] In making that equitable determination, a hearing officer may consider many factors, including, *inter alia*, whether a parent's unilateral withdrawal of her child from the public school was justified, whether the parent provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether the parent should have availed herself of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department, or whether the arrangement with the school was fraudulent or collusive in any other respect.[25]

Here, the Parent provided the necessary 10-day Notice of their concerns with the DOE's offer of FAPE to the Student for the 23-24 school year. Therein, Parent detailed specific concerns (Exhibit C). Furthermore, Parent notified the DOE of their intention to place the Student at the Private School unilaterally.

By way of relief, Parent seeks direct funding and reimbursement in the amount of $132,000.00 for the 23-24 school year (Exhibits G and H). Witness #4 admitted that the affidavit of payment incorrectly stated that the annual tuition is $138,000.00 (Tr.163).

There is no support in the record to find that the tuition associated with the Private School, although substantial, is not reasonable. Moreover, I find that the weight of the evidence establishes that Parent cooperated with the DOE and its CSE's efforts to develop an IEP and recommend a program and placement for the 23-24 school year. Overall, and after considering the record at the hearing, I find that the equities support Parent's claim for reimbursement of the tuition for the 23-24 school year.

---

[24] *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47, 129 S. Ct. 2484, 174 L. Ed. 2d 168 (2009)
[25] *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014).

**P23**

The District did not raise any Prong III equitable issues (Tr. 34-35).

Although the Parent requests DOE bussing service in its closing brief (IHO Exhibit 3-24), Parent failed to enter into the record a copy of the Student's last IEP and did not provide any independent evidence of what transportation the Student needed or was receiving. The request for medical accommodation form may or may not have been submitted to the District (Exhibit BB). Since there was no testimony concerning this document, I am unclear as to its probative value. Accordingly, I am unable to address that component of relief.

The undersigned has reviewed the parent's remaining contentions and find them to be either unnecessary to this decision, without merit, beyond my jurisdiction, too vague to be of use or without sufficient basis in the record for a finding and award of relief. Accordingly, any relief not specifically discussed in this decision is denied, and all the Parent's remaining claims not discussed herein are dismissed.

**ORDER**

NOW, THEREFORE, IN LIGHT OF THE ABOVE FINDINGS OF FACT, IT IS HEREBY **ORDERED THAT**:

(1)  Parent's claim for tuition reimbursement in the amount of $132,000.00 for the Student's unilateral placement, is GRANTED for the 2023-2024 school year as follows:

      a.  The District shall reimburse the Parent in the amount of $7,600.00, monies paid through 6.22.23 by Parent toward the Student's tuition at the Private School.

      b.  The District shall make payment directly to the Private School for the remaining $124,400.00 due for tuition, upon submission to the District of an appropriate attendance record.

(2)  The Parent's request for afterschool SLT and OT is DENIED.

(3)  The Parent's request for at-home ABA services (direct and supervisory), Parent training and counseling and interdisciplinary team meetings are DENIED.

Dated:  December 8, 2023

*Michelle S. Babbitt*

Michelle S. Babbitt
(electronically signed)
Impartial Hearing Officer

## <u>NOTICE OF RIGHT TO APPEAL</u>

Within 40 days of the date of this decision, the parent and/or the Public School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.

If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.

An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at http://www.sro.nysed.gov.

Received Office of State Review
01/16/2024

Findings of Fact and Decision
Case No. 249622

**P26**

## DISTRICT EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| | None | | |

## PARENT EVIDENCE

| Exhibit | Title | Date | Pages |
|---------|-------|------|-------|
| A | Demand for Due Process with Email Confirmation | 6.30.23 | 15 |
| B | Amended Demand for Due Process | 8.22.23 | 12 |
| C | Ten Day Notice with Email Confirmation | 6.15.23 | 3 |
| D | Parent Email to CSE sharing Reports for IEP Meeting<br>☐ 2022/2023 Titus School Functional Behavior Plan and Behavior Intervention Plan<br>☐ Titus School Progress Report, November 2022<br>☐ 2019 Pals Neuropsychological Report10 Day Letter | 1.15.23 | 63 |
| E | Parent Email to CSE sharing Additional Reports<br>☐ Occupational Therapy Progress Report from 01/04/2023<br>☐ ABA Progress Report from 12/08/2022<br>☐ Speech Language Therapy Progress Report from 12/14/2022 | 1.16.23 | 19 |
| F | Parent Email to School Placement Request a Tour | 7.10.23 | 1 |
| G | Titus Enrollment Contract | 5.1.23 | 17 |
| H | Titus Tuition Affidavit | 7.17.23 | 2 |
| I | Titus Program Description | 23-24 | 1 |
| J | Titus School Student Summer Schedule | 23-24 | 6 |
| K | Titus School Student Fall Schedule | 23-24 | 6 |
| L | Titus School Student Attendance Record | 23-24 | 1 |
| M | Titus School Progress Report (admitted only subject to connection by witness) | 6.23 | 29 |
| N | Natalie Brandefine Certification | Undated | 1 |
| O | ABA Progress Report by Little Green Tugboat (admitted only subject to connection by witness) | 5.28.23 | 10 |
| P | Stephanie Koh License | Undated | 1 |
| Q | Speech Progress Report by Happy Talk | 8.23 | 4 |
| R | Kaitlyn Simon License and Resume | Undated | 3 |
| S | Occupational Therapy Progress Report by | 9.4.23 | 4 |

**P26**

| | Bloom Therapy | | |
|---|---|---|---|
| T | Jessica Zambito License | Undated | 1 |
| U | Affidavit of Natalie Brandefine | 10.5.23 | 18 |
| V | Affidavit of Stephanie Koh | 10.5.23 | 8 |
| W | Affidavit of Kaitlyn Simon | 10.4.23 | 9 |
| X | Affidavit of Jessica Zambito | 10.4.23 | 7 |
| Y | Affidavit of Halia Francis | 10.5.23 | 11 |
| Z | Titus Weekly Email Updates to Parents | 7.23 | 3 |
| AA | Recess Afterschool Social Program Description | 23-24 | 4 |
| BB | Rex Francis Medical Accommodation Form | 6.22.23 | 2 |

**IHO EXHIBITS**

| Exhibit | Title | Date | Pages |
|---|---|---|---|
| 1 | Prehearing Conference Summary and Order | 8.25.23 | 10 |
| 2 | DOE Closing Brief | 11.29.23 | 9 |
| 3 | Parent's Post Hearing Brief | 11.28.23 | 24 |

**APPENDIX**

| **Information** | **Term Used In FOFD** |
|---|---|
| Rex Francis | Student |
| John Hobbs, Esq. | Parent Attorney/Representative |
| Eli Koppel, Esq., Agency Attorney | District Attorney/Representative |
| Titus School | Private School |
| Kaitlyn Simon, Speech-Language Pathologist | Witness # 1 |
| Jessica Zambito, Occupational Therapist | Witness # 2 |
| Stephanie Koh, BCBA, Little Green Tugboat | Witness #3 |
| Natalie Brandefine, Head of School, The Titus School | Witness #4 |
| Halia Francis | Witness #5 |

Received Office of State Review
01/16/2024

**L.V. v. NYC Department of Education, 03 Civ. 9917 (SDNY)**

Parents of children with Individualized Education Programs who received or who may receive an order at the conclusion of an impartial hearing should read the attached notice about possible disclosure of information and documents about their children as part of a federal court litigation. Translations in Spanish, Arabic, Bengali, Chinese, French, Haitian Creole, Korean, Russian, and Urdu are available on the DOE webpage at https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

**Notice of Potential Disclosure of Student Education Records**

**Please read this notice carefully**. This is a message about possible disclosure of documents or data that might contain information about your child, if your child has been classified as a student with a disability and has been or may be the subject of a final Impartial Hearing Order.

**I. Nature of the Lawsuit**

This lawsuit challenged the failure of the Department of Education ("DOE") of the City of New York to timely implement orders issued by impartial hearing officers in connection with impartial hearings held pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* and N.Y. Education Law § 4401, *et seq.* In 2007, the parties entered into a Stipulation of Settlement (the "Stipulation") in which the DOE agreed to timely implement these orders.

In January 2021, the Court granted plaintiffs' motion for the appointment of a special master. On April 14, 2021, the Court entered an Order appointing David Irwin of Thru-Ed as the Special Master. On May 14, 2021, the Court entered an Order detailing the duties and authority of the Special Master which include, among other things, the authority to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders a. Pursuant to this Order, the Special Master may have access to education records of students, upon DOE's compliance with the Family Education Rights and Privacy Act (20 U.S.C. § 1232g; 34 C.F.R. Part 99) ("FERPA").

2

**II. Data Ordered to Be Disclosed**

In order for the Special Master to perform his duties, the Court has directed the DOE to provide the Special Master (and employees and consultants at Thru-Ed) with access to records containing confidential student record information, including, but not limited to, documents submitted in the impartial hearing process, impartial hearing orders, data about compliance, and students' special education documents, such as individualized education programs, evaluations, authorizations, invoices, etc. The Special Master is required to keep any student documents and information confidential. No student-specific information will be shared with plaintiffs' counsel unless the student's parent specifically consents. If there is any student-specific information in the Special Master's reports to the Court, that information would not be made public.

The Special Master will use this information only for his work to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders. The disclosure of this information does not affect any of your rights as a parent to seek special education services for your child.

**IV. Objections to Disclosure**

If you agree to the disclosure of this information to the Special Master, you do not need to do anything more.

If you do not want your child's information shared with the Special Master, you must object to this disclosure by submitting an objection to DOE's attorney, addressed to:

**P28**

Jeffrey S. Dantowitz NYC Law Department 100 Church Street, Room 2-121 New York NY 10007 or via email at LVObjection@law.nyc.gov. Please reference the *LV v. DOE* lawsuit (Case No. 03-9917) when writing. An Objection Form accompanies this Notice, though no written objection will be rejected if it is not submitted on this form. If you object, no records containing you and your child's personally identifiable information or other FERPA-protected information will be provided to the Special Master, although nominal and incidental disclosure of your child's name may occur. **Any objections must be received by December 3, 2021 or for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order**. **If you would like more information about this notice, please contact the attorneys for plaintiffs, Rebecca Shore, of Advocates for Children of New York, Inc. at 646-532-6078.**

**OBJECTION TO DISCLOSURE OF RECORDS LV v. DOE, 03 Civ. 9917 (SDNY)**
If you agree to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, you do not need to complete this form.

If you object to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, please compete and return this form to:
Jeffrey S. Dantowitz
NYC Law Department 100 Church Street, Room 2-121
New York, NY 10007
or via email at LVObjection@law.nyc.gov

Child's name: _____
Name: _____
Address: _____
Impartial Hearing Order Case # (if known): _____
Date of Order (if known): _____
If you object to the release of your confidential information, please check the line below:
_____ I do not agree to have my confidential records disclosed to the Special Master in *L.V. v. DOE.*
_____  _____
Date
 Please sign here

If you object to the release of information, your objection must be received by December 3, 2021 or, for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order.
**\* \* \*** If you do not notify the DOE of your objections to the documents being released, you child's information will be provided to the Special Master appointed in *LV v. DOE*, 99 Civ. 9917 (SDNY) and/or consultants and employees of Thru-Ed. The information will remain confidential and the disclosure of this information will not affect any of your rights to seek special education services for your child.

Received Office of State Review
01/16/2024

Findings of Fact and Decision
Case No. 249622

للاطلاع على هذا https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings
المستند باللغة العربية، قُم بزيارة الموقع الإلكتروني

YgÄ sÄOxÄ tÄzÄè ná^lá, https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings ná^Ép

若要以中文查看，請上網到 https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Pour consulter ce texte en français, allez sur https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Pou wè tèks sa a an kreyòl ayisyen, ale sou https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

본 문서를 한국어로 보시려면 다음 웹사이트를 이용하십시오:

https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Для просмотра документа на русском языке посетите
https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

Para ver este contenido en español, visite https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings اس کو اردو میں
دیکھنے کے لیے پر جائیں

Received Office of State Review
01/16/2024

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

## IN THE MATTER OF THE APPEAL OF

Halia Chudyk-Francis and Cliff Francis, on
behalf of Rex Francis, a student with a disability,

**AFFIDAVIT OF SERVICE**
IHO Case No. 249622

Petitioners,

-against-

New York City Department of Education,

Respondent.

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

GARY MAYERSON, being duly sworn, and deposes, says:

That I am over the age of 18 years; that on December 27, 2023 I served, Petitioners'
Notice of Intention to Seek Review of the Impartial Hearing Officer's decision.

TO:    **Corporation Counsel of the City of New York**
       **100 Church Street**
       **New York, NY 10007**
       **ATTN: Peter Farrell, Division Chief, General Litigation Division**

Via the designated email provided for service during Executive Orders 202.8, 202.14,
202.28, 202.38, 202.48, 202.55 and 202.79: ServiceECF@law.nyc.gov with proof of receipt
attached.

Gary Mayerson

Subscribed and sworn to before me this
27th day of December, 2023

Notary Public

SAMANTHA HASTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HAS6107 01
Qualified in New York County
Commission Expires November 02, 2024

| | |
|---|---|
| **From:** | ServiceECF (Law) |
| **To:** | Samantha Hartman |
| **Subject:** | Proof of service receipt |
| **Date:** | Wednesday, December 27, 2023 2:19:06 PM |

This email confirms receipt of email and constitutes proof of service at the Office of the Corporation Counsel for the City of New York.  Please retain it for your records.  Please note that the Office of the Corporation Counsel has accepted service only for the City of New York and entities for which the Law Department is authorized to accept service, including  the Mayor and City Agency Heads named in their official capacities.  Service of process on any individually named parties has not been accepted.

<u>Documents must be submitted as attachments; linked documents will not be accessed and will not be considered as proper service on the New York City Law Department. All documents submitted after 5:00PM will be considered served on the next business day.</u>

Please be reminded that the Law Department Service Window remains open to accept service of papers on Tuesdays and Thursdays from 9:00 am until 5:00 pm.

Service of process on individuals should continue to proceed in a manner required by applicable law.

**This mailbox is only monitored for service. Please call (212) 356-1140** with any questions or concerns.

Form 62 - SUITABLE WITH MILITARY, MAILING

P20605220

**P33**

| **MAYERSON & ASSOCIATES**   SAMANTHA HARTMAN |
|---|
| IMPARTIAL HEARING OFFICER |

| HALIA FRANCIS AND CLIFF FRANCIS IN THE MATER OF R.F., A | Index No. **249622** |
| STUDENT WITH A DISABILITY | |
| | Date Filed |
| PLAINTIFF | Office No. **249622** |
| - vs - | Court Date. |
| NEW YORK CITY DEPARTMENT OF EDUCATION | |
| DEFENDANT | |

STATE OF **NEW YORK**, COUNTY OF **NEW YORK**        :SS:

**DONDRE DENNIS** being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **28th day of December, 2023 at 2:40PM at**
**GENERAL LITIGATION DIVISION, OFFICE OF THE CORPORATION COUNSEL OF THE CITY OF NEW YORK**
**100 CHURCH STREET**
**NEW YORK NY 10007**
I served the **LETTER, NOTICE OF INTENTION TO SEEK REVIEW, CASE INFORMATION STATEMENT AND FINDINGS OF FACT AND DECISION**
Upon **PETER FARRELL, ESQ., DIVISION CHIEF the DEFENDANT** therein named by delivering and leaving a true copy or copies of the aforementioned documents with **Jerry Bradshaw UNIT CHIEF** a person of suitable age and discretion.

Deponent describes the person served as aforesaid to the best of deponent's ability at the time and circumstances of the service as follows:
SEX: **MALE**        COLOR: **BLACK**        HAIR: **BALD/GREY**
AGE: **55-65**        HEIGHT: **5'9**        WEIGHT: **170**
OTHER IDENTIFYING FEATURES:
**Glasses**
That at the time of service as aforesaid, I asked person spoken to whether DEFENDANT was in the military service of the State of New York or United States and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid
I aver that the DEFENDANT is not in the military service, and is not dependent on anyone in the military service of the State of New York or the United States as that term is defined in the statutes of the State of New York or the Federal Soldiers and Sailors Civil Relief Act.

Sworn to before me this
29TH day of DECEMBER, 2023

_____
SELENA INES ADAMES
Notary Public, State of New York
No. 01AD6365042
Qualified in QUEENS COUNTY
Commission Expires 09/25/2025

DONDRE DENNIS 2082979
Lexitas
1235 BROADWAY 2ND FLOOR
NEW YORK, NY 10001
Reference No: 7-MA7-20605220

---

STATE OF NEW YORK, COUNTY OF NEW YORK
**ROBERT BONNET** being duly affirmed, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on **29th day of December, 2023**
I deposited in the United States mail a true copy of aforementioned documents properly enclosed and sealed in a post-paid wrapper addressed to the said DEFENDANT(s) at the above address **AS EVIDENCED BY CERTIFICATE OF MAILING HEREWITH ATTACHED.** That address being
**the place of business of the DEFENDANT(s).**
Copy mailed 1st class mail marked personal & confidential not indicating on the outside thereof by return address or otherwise that said notice is from an attorney or concerns action against the person to be served.

Affirmed before me this
29TH day of DECEMBER, 2023

_____
SELENA INES ADAMES
Notary Public, State of New York
No. 01AD6365042
Qualified in QUEENS COUNTY
Commission Expires 09/25/2025

ROBERT BONNET Lic # 2109591
Lexitas
1235 BROADWAY 2ND FLOOR
NEW YORK, NY 10001
Reference No: 7-MA7-20605220

**2a**

**P33**

Received Office of State Review
01/16/2024

P34

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

**IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis, on
behalf of Rex Francis, a student with a disability,

**NOTICE OF REQUEST FOR**
**REVIEW**
IHO Case No. 249622

                        Petitioners,

-against-

New York City Department of Education,

                        Respondent.

**NOTICE:**

You are hereby required to appear in this review and may answer the allegations contained in
this request for review. Your answer must conform with the provisions of the regulations of the
Commissioner of Education relating to reviews of this nature, copied of which are available at
www.sro.nysed.gov or from the Office of State Review of the New York State Education
Department, 80 Wolf Road, Suite 203, Albany, NY 12205.

Please take notice that such regulations provide that an answer to the request for review may be
served upon the petitioner, or if the petitioner is represented by counsel, upon such counsel,
within 5 business days after the service of the request for review, and a copy of such answer
must, within two days after such service, be filed with the Office of State Review of the New
York State Education Department, 80 Wolf Road, Suite 203, Albany, NY 12205. Extensions of
time to serve the answer may be granted upon a request that complies with the provisions of
section 279.10(e) of the Regulations of the Commissioner.

The decision of the State Review Officer shall be based solely on the record before the State
Review Officer and shall be final, unless an aggrieved party seeks judicial review.

Dated: New York, New York
       January 16, 2024

Gary S. Mayerson
Mayerson and Associates
*Attorneys for Petitioners*
Ph: (212) 265-7200
Fax: (917) 210-3075
E: Gary@mayerslaw.com

P34

P35

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**
_____

 **IN THE MAT R OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis, on behalf of       **REQUEST FOR REVIEW**
Rex Francis, a student with a disability,                              IHO Case No. 249622

                                        Petitioners,

 -against-

 New York City Department of Education,

                                        Respondent.
_____

1.        Petitioner, Rex Francis, is diagnosed with Autism and was born on 04/14/2014.

The additional petitioners are Rex's parents, Halia Francis and Cliff Francis.

2.        On June 30, 2023, after the provision of a "10 day notice" letter, petitioners requested an

impartial, due process hearing to adjudicate funding claims relevant to the 2023-2024 school year and

Rex's dual education program. (Ex. P-A, P-C) Petitioners then filed an amended claim. (Ex. P-B)

3.        The hearing, on the merits, took place on October 13, 2023. Thereafter, the parties submitted

post-hearing memoranda. However, only petitioners' brief was filed on time.

4.        By Decision dated December 8, 2023, the IHO properly awarded petitioners tuition

reimbursement for Rex's attendance at the Titus School during the 2023-2024 school year.  However,

the IHO erroneously denied any funding for Rex's home and community based ABA services,

occupational therapy ("OT") and speech language therapy ("SLT"). Petitioners thus seek a partial

reversal in order to obtain funding for the above supplemental services.

5.        On this limited appeal, there already is ample, if not compelling, Prong II and other related

evidence showing that the SRO should reverse the IHO's Decision and award funding for Rex's home

and community-based services. Such claims expressly appear in petition.  (_See_ Ex. P-A and P-B).

P35

Received Office of State Review
01/16/2024

P36

Further, petitioners request that the SRO address their request for funding of an updated neuropsychological evaluation—a matter unaddressed in the IHO's decision.  Such claims are amply supported by the evidence and the applicable Prong II standard.  *See Frank G. v. Bd. Of Educ. Of Hyde Park*, 459 F.3d 356 (2d Cir. 2006); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993). Further, petitioners contend that Rex was denied a FAPE in that his parent were denied a fair, impartial hearing to the way in which the IHO conducted the hearing on the merits.

6.      In the alternative, pursuant to the 2nd Circuit's decision and directives in *L.K. v. New York* City Dep't of Educ., 674 Fed. Appx. 100 (2d Cir. 2017) (a matter in which Rex's counsel represented L.K. and his parents), petitioners request that the SRO direct a remand to a different IHO with instructions to hear and determine the level of supplemental, home and community based ABA services, SLT, and OT that is needed to enable Rex to receive a FAPE as that standard has been explained by a unanimous Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017).

7.      In order to preserve Rex's educational *status quo* until there is a final adjudication, petitioners continue to invoke Rex's automatic and unconditional pendency entitlements as per IHO James McKeever's now final and non-appealable August 15, 2023 Decision (Ex. P-1) awarding petitioners tuition reimbursement at the Titus School, plus funding for up to 10 hours per week of  home based ABA, up to 2 hours per week of SLT, up to 1 hour per week of PT, Social Skills group one day per week, up to 2 hours per week of OT, up to 2 hours per week of parent training and counseling, up to 2 hours per week of ABA supervision, monthly ABA meetings (up to 1 hour per therapist), monthly interdisciplinary meetings (1 hour per service provider), and the cost of transportation to and from school.  Significantly, the DOE never took an appeal from IHO McKeever's August 15, 2023 Decision; accordingly, that decision is now final and non-appealable.

P36

Received Office of State Review
01/16/2024

8.     Rex currently receives 10 hours per week of home and community-based ABA, 1 hour per week of home and community-based OT, and 1 hour per week of home and community based SLT in addition to Rex's attendance at the not-for-profit Titus School ("Titus"). (*See* Ex. P-V, P-W, P-X, and P-W.) Rex's parents receive 2 hours per week of ABA-based parent training and counseling, and his home services team receives up to two hours per week of afterschool ABA supervision, up to one hour per month per therapist of ABA team meetings, and up to two hours per month of interdisciplinary team meetings. Rex's home-based service hours are needed by Rex as *reasonably calculated* services to ensure that Rex continues to make meaningful, educational progress in an educational program that is sufficiently ambitious and challenging.

9.     The IHO's operative findings of fact and conclusions of law regarding Rex's home and community-based services are demonstrably erroneous and should be reversed. By all appearances (*see* infra), the IHO conduct demonstrates a partiality against petitioner's claims that deprived petitioners of due process.

10.    On the record, the DOE conceded Prong I, admitting that it failed to provide Rex with a FAPE for the 2023-2024 school year. (Tr. 27).  The DOE also conceded Prong III, admitting that there were no equitable considerations militating against the full relief requested by petitioners. (Tr. 35). Accordingly, the hearing focused on Prong II and the DOE was estopped to invoke any Prong III arguments.

11.    At the hearing, the DOE did not call a single witness, nor did it offer a single exhibit into evidence. Petitioners, on the other hand, presented numerous exhibits and compelling sworn testimony from Rex's mother, school representative, SLT provider, OT provider, and ABA provider.

12.    Prior to the hearing, the DOE failed to notify petitioners' counsel of its intent to cross-examine any of parents' witnesses, despite the IHO's order that such intent must be disclosed two days prior to the hearing. (*See* IHO Ex. 1). At the hearing, the IHO noted the DOE's failure to timely disclose its

Received Office of State Review
01/16/2024

intent to cross examine any of petitioners' witnesses, but nevertheless allowed the DOE to cross examine petitioners' witness based on the IHO's "clarifying questions" over petitioners' counsel's objection. (Tr. 29). As shown below, the IHO's questions were not for purposes of clarification.  In actuality, the IHO went on a Prong II and Prong III assault, asking questions that were both loaded and confusing. The IHO's questions were inconsistent with her role as an *impartial* hearing officer.

13.    Petitioners urge that the IHO's argumentative questioning went well beyond the purpose of clarifying the record, and were for the sole purposes of (1) attacking Parent's Prong II position that Titus was an appropriate placement and (2) creating Prong III equity issues where none existed.

14.    Such conduct goes against the well settled standard that an IHO must be fair and impartial and must avoid even the appearance of impropriety or prejudice. (*See, Application of a Student with a Disability,* Appeal No.12-066.) Rex and his parents were entitled to expect impartiality.

15.    The IHO's beliefs about Rex's after school services were first revealed during her questioning of Kaitlyn Simon, Rex's SLT provider, wherein she asked, "So isn't the one hour of speech and language therapy that you provide to the student -- isn't that to maximize his speech and language?" (Tr. 64:16-19)

16.    The IHO's question was improperly framed. If the IHO wanted to clarify Rex's need for afterschool SLT, she simply would have asked a question to that effect.  As such the IHO's query about "maximizing his speech and language" was particularly confusing.

17.    While Ms. Simon responded "Yes" to the IHO's question, petitioners contend that Ms. Simon was testifying to the fact that she renders her services to the best of her ability with the goal of providing Rex with high quality speech and language services. This is supported by Ms. Simon's subsequent testimony on why her services are necessary in addition to the speech services Rex receives at Titus to

Received Office of State Review
01/16/2024

address his extensive speech and language deficits, provide him additional opportunities to reinforce his speech skills, and strengthen his pragmatic speech skills using child led methodology. (Tr. 69-71).

18.     The IHO posed a similar question to Jessica Zambito, Rex's OT Provider: "Okay. So wouldn't you say that the -- your provision of occupational therapy to the student is to maximize his skills, correct?" (Tr. 80-82). After Ms. Zambito answer, "No" and explained how her services address Rex's OT needs, the IHO continued to press the issue in asking, "I mean, are you saying that if the student didn't come to you one time a week for 60 minutes, he would not make meaningful progress at the school? That they couldn't meet his needs?" (Tr. 81)

19.     The IHO continued: "Okay. So you think that he should actually get more physical -- I'm sorry. He should get more OT from the school, correct? That they're (Titus) not providing enough is what you just said?" (Tr. 81).

20.     It should be noted the IHO in her decision did not credit Ms. Zambito's testimony and opinion as to Rex's needs, but provided no reason for that finding. (Decision Pg. 19). Petitioners contend that the IHO's refusal to credit Ms. Zambito's testimony was the result of Ms. Zambito not capitulating to the IHO's question regarding maximization. The IHO seemingly predetermined that issue.

21.     The IHO posed similar questions regarding "maximization" to Rex's mother, Halia Francis. (Tr. 193). The IHO had a negative reaction when she did not get the response she wanted:

- IHO:  Yes. Is it your testimony that the student could not make meaningful progress at Titus without him having afterschool speech and language therapy?
- Ms. Francis: Yes. It helps him generalize things, and it helps support what he's learning at school.
- IH: That's not my question. Are you saying he couldn't make meaningful progress? That he needs this in order to make meaningful progress?
- Ms. Francis: No. not specifically speech and OT.
- IHO: But this maximizes the student's potential ---

Received Office of State Review
01/16/2024

22.    The IHO then continued to apply pressure to try to get Rex's mother to agree with her maximization argument: "If you feel that the student must have these sessions in order to make progress, then Titus is not providing what he needs, correct?" (Tr. 197). After Ms. Francis attempted to explain her perspective that Rex requires both Titus and his afterschool services, the IHO went on to say, "But in order to make meaningful progress is one thing. And another thing is maximizing the student's potential." (*Id.*) The problem is that the IHO had already made up her mind.

23.    As a matter of law, it does not necessarily follow that if a student with autism receives after school services that this means that the student's school is not an appropriate component of the student's program. *See L.K.,* 674 F. App'x 100 (2d Cir. 2017); *See Frank G.,* 459 F.3d at 365.  The Second Circuit does not embrace a "one school fits all" approach---it utilizes a case by case analysis that was absent here. (*Id.*).

24.    Outside of the IHO's improper questioning, the IHO's partiality was also seen in her attitude, demeanor and less than respectful conduct towards the petitioners, and petitioners' witnesses. The IHO, adding insult to injury, posited that Rex's parents were seeking Rex's afterschool service to "relieve their parental duties" and as a form of childcare. (Decision, Pg. 18)

25.    During the hearing, the IHO interrupted petitioners' witnesses multiple times when they were simply attempting to answer the IHO's questions. (*See, e.g.* Tr. 40:5-20, 42:9-20, 52:22-53:7, 56:1-8, 65:20-66:6, 83:18-84:12, 127:1-12, 135:6-23, 136:1-11, 144:6-145:1, 168:2-13, 171:1-15, 175:3-25, 192:8-18, 198:1-15). The IHO thus restricted the right to make a proper record. We invite the SRO to review the video record to see firsthand the manner in which the hearing was conducted.

26.    The IHO's numerous and unhelpful interruptions occurred when petitioners' witnesses did not immediately acquiesce and bow down to the IHO's loaded questions. The IHO took offense if her questions were challenged. The IHO even seemed to blame Rex's providers for the fact that Rex was not

Received Office of State Review
01/16/2024

cured of his autism. For example, the following argumentative exchange occurred when the IHO questioned Ms. Zambito, Rex's occupational therapist, about the progress Rex has made over the years:

- IHO: Okay. But Ms. Zambito, you've been working with the student for six years. All right? So how has he become more independent? Because it sounds like if he needs supervision all the time, how has… how has he become more independent with your services?"
- Jessica Zambito: To clarify, I did not say that I need to supervise him. My role as an occupational therapist is to improve his motor skills, his sensory processing skills, his safety awareness, his strength, his endurance. For example, when I began with Rex, he was not able to…
- IHO: (Interposing) No, no, no, no. Okay. I have to stop you there… "I have to stop you because I'm not -- unfortunately, I don't go back six years, so it doesn't matter."
- Parent's Counsel: IHO, I'm sorry. The question was how has he improved since she's been working with him.
- IHO: "Okay. So one moment, Mr. Hobbs. Okay? Because it's my questions and I'm the IHO. This is for the '23/'24 school year. So for this -- school year, did you -- well, let me ask you, did you provide the student with OT in July and August?
  (Tr. 83-84)

27.    At the conclusion of the hearing, the DOE again confirmed that it was conceding Prong I and Prong III. (Tr. 204). The IHO ordered both parties to submit their post hearing briefs on or before November 28, 2023, by the close of business (Tr. 207).

28.    Petitioners' counsel submitted their closing brief on November 28, 2023. On November 29, 2023, the IHO emailed both parties requesting that the DOE submit a post hearing brief. (Ex. P-2). The DOE submitted its post hearing brief late on November 29, 2023, after the close of business. Parent's counsel objected the DOE's tardy submission, as no extension had been requested by the DOE nor was one given by the IHO. The IHO overruled Parent's counsel's objection and allowed the DOE's tardy closing brief.

Received Office of State Review
01/16/2024

29.    The same DOE that had waived Prong III argued in its brief that Rex's after school services should be denied as purely for generalization of skills and maximization of Rex's potential as a student. (IHO Ex. 2). Petitioners urge, however, that the record amply shows that Rex's services were needed to address his challenges in speech, regulation, and ability to carry out activities of daily living. Petitioners further maintain that the DOE's contentions of generalization and maximization go to Prong III equitable considerations, which the DOE conceded. *See, Application of a Student with a Disability,* Appeal No. 23-134, *citing C.B. v. Garden Grove Unified Sch. Dist.*, 635 F. 3d 1155, 1160 [9th Cir. 2011]; *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 [5th Cir. 1986].

30.    Further, while the DOE stated its only position was that the unilateral school placement, Titus, was inappropriate, it only briefly mentioned this point in its closing brief. The vast majority of the DOE's nine-page closing brief echoed the IHO's sentiments that Rex's home program was solely for maximization and generalization of skills.

31.    The IHO in denying Rex's relief for his afterschool service erroneously held that the parent failed to show why Rex needs these services in addition to his placement at Titus. (Decision, Pg. 16)

32.    Pursuant to the *Burlington/Carter* standard the Parent's burden is whether the unilateral program was reasonably calculated to provide an educational benefit. The parent's burden under prong II is a somewhat less stringent one than the DOE would need to prove on prong I. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *Frank G.*, 459 F.3d at 364-65. However, the IHO formulated her own unduly elevated test in demanding evaluative reports and information made during the 2023-2024 school year and providing specific examples of how Rex's home services were responsible for his progress in school.

33.    Further, while the IHO demanded an elevated level of proof to justify Rex's home services, she failed to consider evidence that showed Rex's need for after school services and the benefit he has

Received Office of State Review
01/16/2024

historically received from such services. Such documents included Rex's most recent

Neuropsychological Evaluation from 2021 (Ex. P-D), his ABA progress from May 2023 (Ex. P-O), his

Titus School year report from June 2023 (Ex. P-M), and previous reports from his afterschool services

providers (Ex. P-E). Each of these documents were accepted into evidence without objection from the

DOE. While the IHO ruled that these reports were irrelevant since they were not made during the 2023-

2024 School Year, petitioners urge that they are relevant in showing Rex's educational and clinical

history.

34.     In her decision, the IHO also "questioned the necessity" of Rex's OT and SLT home services

since he did not receive them over the summer and the gap in services was not addressed by his parents.

This finding is clearly erroneous as Rex's mother testified that Rex's gap in SLT and OT services was

due to scheduling conflicts during the summer. (Tr. 190).

35.     Petitioners further contend that the IHO erred in holding the parents responsible for any deficit of

evaluative information regarding Rex's needs for after school services. Where the district concedes that

it failed to offer the student a FAPE for the school year and elects not to submit any evaluative

information of the student as evidence of the district's view of the student's special education needs, it is

unfair to fault the parent for a deficiency in the record (*See*, *Application of a Student with a Disability,*

Appeal No. 19-131).

36.     Moreover, while the IHO held that Rex lacked sufficient, up to date evaluative information, her

decision makes no mention of Parent's requested relief of funding for an updated Neuropsychological

Evaluation as requested in their Amended Demand for Due Process (Ex. P-B).

37.     As petitioners' exhibits and sworn affidavits show, Rex needs supplemental ABA, SLT, and OT

services over and above his Titus school program in order to work on pervasive ADL challenges,

address his interfering behaviors, address his challenges with mobility and regulation, address his

Received Office of State Review
01/16/2024

pervasive speech challenges, as well as to promote generalization and greater independence. These additional services are needed so that Rex can engage and keep up with his program at Titus. Many of Rex's ADL challenges (e.g. personal hygiene matters, toileting, dressing and bathing safely, etc.) cannot easily be addressed in a school setting and require teaching time in the home and surrounding community. ( *See* Tr. 103-104, 118-120; *See also* Ex. P-V, P-W, P-X)

38.     Rex's need to generalize his skills is but *one* of the reasons why he needs some level of supplemental services over and above what he is receiving at Titus. No school, no matter how excellent, should be looked at as, or presumed to be a "one size fits all" environment. Generalization is not a dirty word. Many students with autism have difficulty generalizing the skills they are learning. We respectfully urge that promoting generalization is a legitimate reason among a number of other reasons supporting Rex's need for supplemental ABA, OT, and SLT services. *See Mayerson, Generalization After Endrew F.: Shrinking The Gap Between Access And Outcome for Students Diagnosed With Autism*, Vol. 63, New York Law School Law Review, pp. 51-59 (2018).

39.     The SRO should reverse the IHO and award Rex the reimbursement relief being requested. The SRO should also direct the DOE to fund an updated Neuropsychological Evaluation. In the alternative, the SRO should direct a remand before an impartial hearing officer.

Dated: New York, New York
     January 16, 2024

 

                                          Gary S. Mayerson
                                          John Hobbs
                                          Mayerson & Associates
                                        *Attorneys for Petitioners*

Received Office of State Review
01/16/2024

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

---

**IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis, on behalf of Rex Francis, a student with a disability,

**AFFIDAVIT OF VERIFICATION**
IHO Case No. 249622

Petitioners,

-against-

New York City Department of Education,

Respondent.

---

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

Halia Chudyk-Francis, being duly sworn, deposes and says that she is a Petitioner in this proceeding; and she has read the annexed Request for Review, knows the contents thereof, and that the same is true to the knowledge of the deponent.

*Halia Francis*

Signed by: Halia Francis
Date & Time: Jan 16, 2024 11:09:38 EST

Halia Chudyk-Francis

Subscribed and sworn to before me this

16 day of January, 2024

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires  November 02, 2024

Notary Public

This remote online notarization involved the use of audio/visual communication technology

Received Office of State Review
01/16/2024

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

IN THE MATTER OF THE APPEAL OF

Halia Chudyk-Francis and Cliff Francis, on
behalf of Rex Francis, a student with a disability,

                Petitioners,

-against-

     New York City Department of Education,

              Respondent.

**AFFIDAVIT OF**
**VERIFICATION**
IHO Case No. 249622

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

Cliff Francis, being duly sworn, deposes and says that he is a Petitioner in this proceeding; and
he has read the annexed Request for Review, knows the contents thereof, and that the same is
true to the knowledge of the deponent.

*Cliff Francis*

Signed by: Cliff Francis
Date & Time: Jan 16, 2024 11:12:32 EST

Cliff Francis

Subscribed and sworn to before me this

16 day of January, 2024

Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual
communication technology

Received Office of State Review
01/16/2024

P47

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

---

**IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis on behalf of          **AFFIDAVIT OF SERVICE**
Rex Francis, a student with a disability,                              IHO Case No. 249622

                                    Petitioners,

-against-

              New York City Department of Education,

                                    Respondent.

---

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

GARY MAYERSON, being duly sworn, and deposes, says:

        That I am over the age of 18 years; that on January 16, 2024 I served, Notice of Request
for Review, dated January 16, 2024, Request for Review, dated January 16, 2024 with Exhibits
P-1 (IHO McKeever's 08/15/23 decision) and P-2 (Emails with IHO), Affidavit of Verification
of Halia Chudyk-Francis, sworn to on January 16, 2024, Affidavit of Verification of Cliff
Francis, sworn to January 16, 2024 and Memorandum of Law, dated January 16, 2024.

TO:     **Corporation Counsel of the City of New York**
        **100 Church Street**
        **New York, NY 10007**
        **ATTN: Peter Farrell, Division Chief, General Litigation Division**

        Via the designated email provided for service during Executive Orders 202.8, 202.14,
202.28, 202.38, 202.48, 202.55 and 202.79: ServiceECF@law.nyc.gov with proof of receipt
attached.

                                                    _____
                                                    Gary Mayerson

Subscribed and sworn to before me this
16th day of January, 2024

_____
Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

P47

P48

| | |
|---|---|
| **From:** | ServiceECF (Law) |
| **To:** | Samantha Hartman |
| **Subject:** | Proof of service receipt |
| **Date:** | Tuesday, January 16, 2024 12:11:52 PM |

This email confirms receipt of email and constitutes proof of service at the Office of the Corporation Counsel for the City of New York.  Please retain it for your records.  Please note that the Office of the Corporation Counsel has accepted service only for the City of New York and entities for which the Law Department is authorized to accept service, including  the Mayor and City Agency Heads named in their official capacities.  Service of process on any individually named parties has not been accepted.

Documents must be submitted as attachments; linked documents will not be accessed and will not be considered as proper service on the New York City Law Department. All documents submitted after 5:00PM will be considered served on the next business day.

Please be reminded that the Law Department Service Window remains open to accept service of papers on Tuesdays and Thursdays from 9:00 am until 5:00 pm.

Service of process on individuals should continue to proceed in a manner required by applicable law.

**This mailbox is only monitored for service. Please call (212) 356-1140** with any questions or concerns.

P48

Received Office of State Review
01/16/2024

<u>FINDINGS OF FACT AND DECISION</u>

227811, FRANCIS, REX

Hearing Requested By:    Parent

Date of Hearings:        8/8/22, 9/9/23, 10/18/22, 11/30/22, 12/5/22, 1/24/23,

                         3/13/23, 4/19/23, 5/24/23, 6/28/23 and 7/24/23.

Record Close date:       August 12, 2023

Hearing Officer:         James McKeever, Esq.


A P P E A R A N C E S:
Christina Mure, ESQ., Attorney

For the Department of Education:
None.

<u>PROCDURAL BACKGROUND</u>

On July 1, 2022, the parent filed the within Due Process Complaint

(DPC) alleging that the student was denied a free and appropriate public

education (FAPE) by the Department of Education (DOE) during the 2022-

2023 school year because the DOE's proposed program did not meet the

student's academic and social-emotional needs, *inter alia* (Exhibit A, Tr. 51).

I accepted this case at the request for SED and the New York City

Hearing Office in order to assist with the backlog of cases.

Based on the alleged denial of FAPE, the parent is seeking tuition

reimbursement and/or direct payment for the student's unilateral placement

at the Titus School, which is a private school ("Private School"), as well as

ABA services, OT, SLT, social skills, PT, and transportation.

Received Office of State Review
01/16/2024

The DOE did not present a prong I case (Tr. 51).

The DOE did not cross-examine the parent's witnesses with respect to prong II (Record).

The DOE did not raise any issue with respect to prong III (Record).

<u>Extensions of the Compliance date</u>:

The parties requested extensions of the compliance date in order to initially pursue settlement and then to complete the hearing process, which were confirmed on the record. The orders of extension were served on the parties and sent to the hearing office.

<u>FINDINGS OF FACT</u>

Based upon the evidence adduced at the Due Process Hearing, I make the following findings of fact:

The student is classified as a student with a disability under the IDEA (Exhibit A).

The student has been diagnosed with an Autism Spectrum Disorder ("ASD") and with a PTEN Genetic Mutation (Exhibits W and DD).

During the 2022-2023 school year, the student displayed multiple, interfering behaviors that inhibited his ability to engage in the classroom and interact with his peers (Exhibit Y).

The student struggles with communication, especially expressive and receptive language. Exhibits N and DD.

The student requires 1:1 ABA instruction (Exhibit DD).

Received Office of State Review
01/16/2024

On June 1, 2022, and June 15, 2022, the parent wrote to the CSE to reiterate her concerns with the program recommended at the IEP meeting (Exhibits B, E and DD). The parent also informed the CSE that she had not received a copy of the IEP or a recommended school placement (Exhibits B, E and DD).

The curriculum at the Private School was modified to meet the student's needs (Exhibits H and Y).

There are 6-8 students in each class at the Private School (Exhibits H and Y).

The Private School provided individualized and small group instruction (Exhibit Y).

The Private School utilized an ABA approach as its core teaching methodology (Exhibits Y).

All teachers, assistants, therapists, and staff members receive ABA training and supervision at that the Private School (Exhibit Y). All related service providers and staff are certified and/or licensed in their practice area and receive ABA supervision. The staff are also required to participate in weekly training sessions and receive intensive training on ASD and ABA (Exhibit Y).

The student obtained an educational benefit at the Private School and made academic progress from the instruction at the Private School (Exhibits H, N and Y).

Received Office of State Review
01/16/2024

The parent cooperated with the CSE process and provided the Department with notice of the student's placement at the Private School before the student attended the school (Exhibits B).

CONCULSION OF LAW

Two purposes of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).

The DOE bears the burden of proof in due process hearings brought under the IDEA in New York State (See, N.Y. Educ. Law Section 4404).

FAPE:

Received Office of State Review
01/16/2024

I find that the Department failed to offer the student a FAPE for the subject school year because the Department failed to offer any witnesses or documentary evidence at the hearing to defend the student's IEP and placement.

Private School Placement:

The evidence presented by the parent with respect to the student's unilateral placement at the Private School demonstrates that the Private School was appropriate. Specifically, the evidence shows that the Private School provided direct and specialized educational instruction that was specifically designed to meet the student's unique educational needs. (Gagliardo, 489 F.3d at 112; see Frank G., 459 F.3d at 364-65). Thus, I find that the parent's unilateral placement of the student at the Private School was appropriate (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]).

Equities:

A "major consideration in deciding whether [equity] is satisfied is whether the parents have cooperated with the [school district] throughout the process to ensure that their child receives a FAPE." See N.R., on behalf of T.R., v. The Dept. of Educ. of the City Sch. Dist. Of the City of New York, 2009 WL 874061 (S.D.N.Y. March 2009). The Court looks at whether the parents obstructed the Department's placement process or its ability to provide the student with a FAPE. See id. at 16. "In the absence of evidence

Received Office of State Review
01/16/2024

demonstrating that the parents failed to cooperate in the development of the IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement." See SRO Decisions 05-030, 04-091, 04-049.

Here, the evidence shows that the parent provided the DOE with the requisite notice of the student's placement at the Private School at least 10 days prior to actually enrolling the student at the Private school. The evidence also shows that the parent cooperated with the CSE process. Thus, I find that the equities do not warrant a denial of tuition reimbursement in this matter (20 U.S.C. § 1412[a][10][C][iii][I]; see 34 C.F.R. § 300.148[d][1]).

Accordingly, the parent's request for tuition reimbursement is granted.

I also find that based on the evidence presented by the parents, which was not rebutted by DOE, funding for the student's ABA and related services is necessary and appropriate (Exhibits Y, Z, AA, BB, CC, DD and EE).

ORDERED

The DOE shall reimburse the parents and/or directly pay the Private School for the total cost of the tuition at the Private School for the 2022-2023 school year.

The DOE shall be responsible for door-to-door transportation.

The DOE shall reimburse and/or directly fund the following:

a. up to 10 hours per week of ABA services;
b. up to 2 hours per week of SLT;
c. 1 hour per week of PT
d. Social Skills group one day a week

Received Office of State Review
01/16/2024

  e. up to 2 hours per week of OT;
  f. up to 2 hours per week of parent training and counseling;
  g. up to 2 hours per week of ABA supervision;
  h. monthly ABA meetings (1 hour per therapist);
  i. monthly interdisciplinary team meetings (l hour per service provider); and
  j. costs of transportation to and from the school.


Dated:  New York New York
     August 15, 2023

           <u>James McKeever</u>
           James McKeever, Esq.
           Impartial Hearing Officer


<u>PLEASE TAKE NOTICE</u>

  Within 40 days of the receipt of this decision, the parent and/or Board of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

  The notice of intention to see review shall be served upon the school district not less than 10 days before service of a copy of the petitioner for review upon such school district, and within 25 days from the date from the date of the decision sought to be reviewed.  The petition for review shall be served upon the school district within 35 days from the dated of the decision sought to be review. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period. (8NYCRR279.2[b]). Failure to file the notice of intention to seek review is a waiver of the rights to appeal this decision.

Received Office of State Review
01/16/2024

8   <span style="color:red">P56</span>

Directions and sample forms can be found in the Office of State Review

website:  www.sro.nysed.gov/appeals.htm.

Office of State Review website:  www.sro.nysed.gov/appeals.htm.

<u>Parent's</u>:

    a.    Demand for due process with email confirmation, 7/12/22, 12 pages
    b.    Ten-day letter with email confirmation, 6/15/22, three pages
    c.    Parent email to CSE requesting new IEP date, 2/8/22, two pages
    d.    Parent email to CSE sharing additional reports, 2/25/22, two pages
    e.    Parent post-IEP meeting email to CSE, 6/1/22, one page
    f.    enrollment contract 2022/2023 unidentified date, 18 pages
    g.    School tuition affidavit, 10/25/22, two pages
    h.    program description 2022/2023, unidentified date, one page
    i.    schedule for the 2022/2023 unidentified date, five pages
    j.    attendance 2022/2023 school year, unidentified date, one page
    k.    School functional behavior plan and BIP, 10/24/22, 23 pages
    l.    School progress report, 11/2022, 22 pages
    m.    School progress report, 2/17/23, 24 pages
    n.    School progress report, 6/16/23, 23 pages
    o.    certification, unidentified date, one page
    p.    ABA progress report 5/28/23, ten pages
    q.    ABA progress report 5/28/23, ten pages
    r.    license, unidentified date, one page
    s.    Speech progress, 12/14/22, four pages
    t.    license   and resume, unidentified date,3 pages
    u.    Occupational therapy progress report 1/4/23, five pages
    v.    license, unidentified date, one page
    w.    Neuropsychological evaluation 2/24/21, 16 pages
    x.    license, unidentified date, one page
    y.    affidavit, 7/14/23, nine pages
    z.    affidavit, 7/17/23, three pages
    aa.    affidavit, 7/17/23 three pages
    bb.    affidavit, 7/17/23, three pages
    cc.    affidavit, 7/17/23, two pages
    dd.    affidavit, 7/14/23, five pages
    ee.    Recess program statement 2022/2023, unidentified date, two pages

<span style="color:red">P56</span>

**<ins>L.V. v. NYC Department of Education, 03 Civ. 9917 (SDNY)</ins>**

Parents of children with Individualized Education Programs who received or who may receive an order at the conclusion of an impartial hearing should read the attached notice about possible disclosure of information and documents about their children as part of a federal court litigation.

Translations in Spanish, Arabic, Bengali, Chinese, French, Haitian Creole, Korean, Russian, and Urdu are available on the DOE webpage at https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

**Notice of Potential Disclosure of Student Education Records**

**Please read this notice carefully**. This is a message about possible disclosure of documents or data that might contain information about your child, if your child has been classified as a student with a disability and has been or may be the subject of a final Impartial Hearing Order.

**I.     Nature of the Lawsuit**

This lawsuit challenged the failure of the Department of Education ("DOE") of the City of New York to timely implement orders issued by impartial hearing officers in connection with impartial hearings held pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* and N.Y. Education Law § 4401, *et seq.* In 2007, the parties entered into a Stipulation of Settlement (the "Stipulation") in which the DOE agreed to timely implement these orders.

In January 2021, the Court granted plaintiffs' motion for the appointment of a special master. On April 14, 2021, the Court entered an Order appointing David Irwin of Thru-Ed as the Special Master.  On May 14, 2021, the Court entered an Order detailing the duties and authority of the Special Master which include, among other things, the authority to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders a. Pursuant to this Order, the Special Master may have access to education records of students, upon DOE's compliance with the Family Education Rights and Privacy Act (20 U.S.C. § 1232g; 34 C.F.R. Part 99) ("FERPA").

Received Office of State Review
01/16/2024

## II.    Data Ordered to Be Disclosed

In order for the Special Master to perform his duties, the Court has directed the DOE to provide the Special Master (and employees and consultants at Thru-Ed) with access to records containing confidential student record information, including, but not limited to, documents submitted in the impartial hearing process, impartial hearing orders, data about compliance, and students' special education documents, such as individualized education programs, evaluations, authorizations, invoices, etc. The Special Master is required to keep any student documents and information confidential. No student-specific information will be shared with plaintiffs' counsel unless the student's parent specifically consents. If there is any student-specific information in the Special Master's reports to the Court, that information would not be made public.

The Special Master will use this information only for his work to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders.  The disclosure of this information <u>does not</u> affect any of your rights as a parent to seek special education services for your child.

## IV.    Objections to Disclosure

If you agree to the disclosure of this information to the Special Master, you do not need to do anything more.

If you do not want your child's information shared with the Special Master, you must object to this disclosure by submitting an objection to DOE's attorney, addressed to:

> Jeffrey S. Dantowitz
> NYC Law Department
> 100 Church Street, Room 2-121
> New York  NY  10007

or via email at LVObjection@law.nyc.gov.  Please reference the *LV v. DOE* lawsuit (Case No. 03-9917) when writing.  An Objection Form accompanies this Notice, though no written objection will be rejected if it is not submitted on this form.  If you object, no records containing you and your child's personally identifiable information or other FERPA-protected information will be provided to the Special Master, although nominal and incidental disclosure of your child's name may occur.  **Any objections must be received by December 3, 2021 or for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order**.

**If you would like more information about this notice, please contact the attorneys for plaintiffs**, **Rebecca Shore, of Advocates for Children of New York, Inc. at 646-532-6078.**

Received Office of State Review
01/16/2024

## OBJECTION TO DISCLOSURE OF RECORDS
### LV v. DOE, 03 Civ. 9917 (SDNY)

If you agree to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, you do not need to complete this form.

If you object to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, please compete and return this form to:

> Jeffrey S. Dantowitz
> NYC Law Department
> 100 Church Street, Room 2-121
> New York, NY  10007

or via email at LVObjection@law.nyc.gov

Child's name: _____

Name: _____

Address: _____

Impartial Hearing Order Case # (if known): _____

Date of Order (if known): _____

If you object to the release of your confidential information, please check the line below:

_____    I do not agree to have my confidential records disclosed to the Special Master in *L.V. v. DOE*.

_____                    _____
Date                                                              Please sign here

Received Office of State Review
01/16/2024

P60

If you object to the release of information, your objection must be received by December 3, 2021 or, for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order.

     \*   \*   \*  If you do not notify the DOE of your objections to the documents being released, you child's information will be provided to the Special Master appointed in *LV v. DOE*, 99 Civ. 9917 (SDNY) and/or consultants and employees of Thru-Ed.  The information will remain confidential and the disclosure of this information will not affect any of your rights to seek special education services for your child.

P60

Received Office of State Review
01/16/2024

P61

| |
|---|
| للاطلاع على هذا المستند باللغة العربية، قُم بزيارة الموقع الإلكتروني [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| YgÄs Äà Ät Äà å ná^l á̦ [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) ná^p̧̆ |
| 若要以中文查看，請上網到 [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| Pour consulter ce texte en français, allez sur [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| Pou wè tèks sa a an kreyòl ayisyen, ale sou [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| 본 문서를 한국어로 보시려면 다음 웹사이트를 이용하십시오: [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| Для просмотра документа на русском языке посетите [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| Para ver este contenido en español, visite [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) |
| اس کو اردو میں دیکھنے کے لیے [https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings](https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings) پر جائیں |

P61

Received Office of State Review
01/16/2024

| | |
|---|---|
| **From:** | Babbitt, Michelle (OATH) |
| **To:** | Koppel Eli; John Hobbs |
| **Cc:** | Gary Mayerson; Christina Mure; Samantha Hartman |
| **Subject:** | RE: Francis - Case 249622 - 23/24 Parent Post Hearing Brief |
| **Date:** | Friday, December 1, 2023 9:30:52 AM |
| **Attachments:** | image001.png |

Good morning: thank you for your candor. If a party requires additional time for its post-hearing written summation it is preferable to request an extension; I am generally amenable to such request. While I do not condone late submissions Parent has not alleged any prejudice nor do they want additional time to submit an addendum to their post hearing submission. Accordingly, Parent's request to not consider the District's summation and exclude it from the record is denied. Thank you.

Michelle S. Babbitt, Esq.
Impartial Hearing Officer
NYC Office of Administrative Trials and Hearings (OATH)
Special Education Hearings Division

66 John Street, 10th Floor
New York, NY 10038
MBabbitt@oath.nyc.gov
212-436-0665



**CONFIDENTIALITY NOTICE:** This email message is intended only for the person or entity to which it is addressed and may contain **CONFIDENTIAL** and/or **PRIVILEGED** material or information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy the original message and any copies. If you are the intended recipient and do not wish to receive email communications from the sender, please advise the sender immediately.

**From:** Koppel Eli <EKoppel@schools.nyc.gov>
**Sent:** Friday, December 1, 2023 8:39 AM
**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; John Hobbs <john@mayerslaw.com>; Samantha Hartman <samantha@mayerslaw.com>
**Subject:** RE: Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good morning –

The District's brief was late. That's on me and I have no reasonable excuse for it. We have simply too many cases and too little time to handle them. The fact that we are in a triage state here is not

P62

anyone's problem but ours.

I did not review the Parent's brief prior to drafting mine. The arguments I raised in the brief are neither new or unexpected given the facts and circumstances of this case. While there is no prejudice to the parent's counsel in connection with my late submission, I completely acknowledge that the brief was late and will have delayed the drafting of the IHO's FOFD – which arguably could prejudice the parent.

Eli Koppel, Esq.
Consultant Impartial Hearing Representative
Special Education Unit
Office of the General Counsel
NYC Department of Education

**********************************************************************

NOTE: The information in this e-mail message and any attachments thereto have been sent by an attorney or his/her agent, and is or are intended to be confidential and for the use of only the individual or entity named above. The information may be protected by attorney/client privilege, work product immunity or other legal rules. If the reader of this message and any attachments thereto is not the intended recipient, you are notified that retention, dissemination, distribution or copying of this e-mail message and any attachments is strictly prohibited. Please delete any and all copies received in error. Although this e-mail message (and any attachments) is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, the intended recipient is responsible to ensure that it is virus free.

---

**From:** John Hobbs <john@mayerslaw.com>
**Sent:** Thursday, November 30, 2023 4:40 PM
**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Samantha Hartman <samantha@mayerslaw.com>
**Subject:** RE: Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good afternoon,

Yes to both your questions IHO. Have a good day.

Sincerely,

John Hobbs

John Hobbs, Attorney
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075
www.mayerslaw.com

PERSONAL & CONFIDENTIAL

Received Office of State Review
01/16/2024

**P64**

The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

---

**From:** Babbitt, Michelle (OATH) [mailto:MBabbitt@oath.nyc.gov]
**Sent:** Thursday, November 30, 2023 2:33 PM
**To:** John Hobbs <john@mayerslaw.com>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Samantha Hartman <samantha@mayerslaw.com>
**Subject:** Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good afternoon: just to be clear, the sole basis for Parent objecting to the inclusion of the District's closing summation in the record is that it was late, correct? Parent has not requested additional time to submit an addendum, has not identified a portion of the District's brief that "responds" to the parent's brief, and has not demonstrated any prejudice, correct? Mr. Koppel: kindly respond as to the District's position, as requested earlier. Thank you.

Michelle S. Babbitt, Esq.
Impartial Hearing Officer
NYC Office of Administrative Trials and Hearings (OATH)
Special Education Hearings Division
66 John Street, 10th Floor
New York, NY 10038
MBabbitt@oath.nyc.gov
212-436-0665



**CONFIDENTIALITY NOTICE:** This email message is intended only for the person or entity to which it is addressed and may contain **CONFIDENTIAL** and/or **PRIVILEGED** material or information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy the original message and any copies. If you are the intended recipient and do not wish to receive email communications from the sender, please advise the sender immediately.

---

**From:** John Hobbs <john@mayerslaw.com>
**Sent:** Thursday, November 30, 2023 2:28 PM

**P64**

P65

**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>;
Samantha Hartman <samantha@mayerslaw.com>
**Subject:** RE: [EXTERNAL] RE: ] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good afternoon,

Parent is not requesting additional time to respond to the District's brief as it does not appear to
reference a specific portion of our brief.

While Parent may not have been prejudiced by the DOE's late submission we still object to their
brief being included in the record for the reasons stated in previous correspondence.

John Hobbs, Attorney
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075
www.mayerslaw.com

PERSONAL & CONFIDENTIAL
The Information transmitted herein may contain privileged and/or confidential material. Any review,
retransmission, dissemination or other use of, or taking of any action in reliance upon information
herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or
other error in the transmission of this information is not and shall not be considered a waiver of any
applicable privileges.

---

**From:** Babbitt, Michelle (OATH) [mailto:MBabbitt@oath.nyc.gov]
**Sent:** Thursday, November 30, 2023 1:34 PM
**To:** John Hobbs <john@mayerslaw.com>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>;
Samantha Hartman <samantha@mayerslaw.com>
**Subject:** RE: [EXTERNAL] RE: ] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good afternoon: I responded to your objection, and asked for specific information, which you
did not provide. I asked you if you required additional time to respond to  the District's brief,
based on your position that the District's untimely submission provided them with an unfair
advantage. Similarly, you did not respond, but restated your initial position. Kindly respond to my
inquiries and tell me how the parent is prejudiced by the untimely submission. My task is to
obtain/receive all relevant information, documents, etc. in a fair manner. I am seeking  to afford
that to parent. Thank you.

Michelle S. Babbitt, Esq.
Impartial Hearing Officer
NYC Office of Administrative Trials and Hearings (OATH)
Special Education Hearings Division

P65

Received Office of State Review
01/16/2024

P66

66 John Street, 10th Floor
New York, NY 10038
MBabbitt@oath.nyc.gov
212-436-0665



**CONFIDENTIALITY NOTICE:** This email message is intended only for the person or entity to which it is addressed and may contain **CONFIDENTIAL** and/or **PRIVILEGED** material or information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy the original message and any copies. If you are the intended recipient and do not wish to receive email communications from the sender, please advise the sender immediately.

---

**From:** John Hobbs <john@mayerslaw.com>
**Sent:** Thursday, November 30, 2023 1:15 PM
**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Samantha Hartman <samantha@mayerslaw.com>
**Subject:** [EXTERNAL] RE: ] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Forward suspect email to phish@oti.nyc.gov as an attachment (Click the More button, then forward as attachment).

Good afternoon IHO,

We are not asserting that the district specifically referenced and rebutted specific points from our brief. Rather, their late submission without notice created the potential for them to do so which is why the late submission without a prior request for an extension, in part, is inappropriate.

Best,

John Hobbs

John Hobbs, Attorney
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075

P66

Received Office of State Review
01/16/2024

[www.mayerslaw.com](www.mayerslaw.com)

**PERSONAL & CONFIDENTIAL**
The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

---

**From:** Babbitt, Michelle (OATH) [mailto:MBabbitt@oath.nyc.gov]
**Sent:** Thursday, November 30, 2023 1:03 PM
**To:** John Hobbs <john@mayerslaw.com>; Koppel Eli <EKoppel@schools.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Samantha Hartman <samantha@mayerslaw.com>
**Subject:** ] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good afternoon: Mr. Hobbs: please state the basic  for Parent's assertion that the District took the extra time to "review and respond to Parent's post hearing brief." If such section is identified and parent's require additional time to respond please let me know. My inquiry in no way condones the tardy submission by District, and I await their response (and yours) before ruling on your application. Thank you.

Michelle S. Babbitt, Esq.
Impartial Hearing Officer
NYC Office of Administrative Trials and Hearings (OATH)
Special Education Hearings Division
66 John Street, 10th Floor
New York, NY 10038
MBabbitt@oath.nyc.gov
212-436-0665



**CONFIDENTIALITY NOTICE:** This email message is intended only for the person or entity to which it is addressed and may contain **CONFIDENTIAL** and/or **PRIVILEGED** material or information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy the original message and any copies. If you are the intended recipient and do not wish to receive email communications from the sender, please advise the sender immediately.

**From:** John Hobbs <john@mayerslaw.com>
**Sent:** Thursday, November 30, 2023 9:31 AM
**To:** Koppel Eli <EKoppel@schools.nyc.gov>; Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>;
Samantha Hartman <samantha@mayerslaw.com>
**Subject:** RE: [EXTERNAL] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good morning,

Parent objects to the DOE's late submission of its post hearing brief. It was agreed upon at the 10/13/23 hearing that the parties would submit their post hearing briefs by the close of business on 11/28/23.

Neither Parent's counsel nor the DOE requested an extension of this deadline, nor was one formally given by the IHO. Moreover,  the DOE provided no explanation for their tardy submission, and essentially gave themselves additional time to draft their brief, and potentially review and respond to Parent's post hearing brief.

Respectfully,

John Hobbs


John Hobbs, Attorney
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075
www.mayerslaw.com


PERSONAL & CONFIDENTIAL
The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.


**From:** Koppel Eli [mailto:EKoppel@schools.nyc.gov]
**Sent:** Wednesday, November 29, 2023 6:04 PM
**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>; Samantha Hartman
<samantha@mayerslaw.com>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; John Hobbs <john@mayerslaw.com>; Christina Mure
<Christina@mayerslaw.com>
**Subject:** RE: [EXTERNAL] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

P69

Attached is the DOE Closing Brief.

Thank you.

Eli Koppel, Esq.
Consultant Impartial Hearing Representative
Special Education Unit
Office of the General Counsel
NYC Department of Education

*********************************************************************

NOTE: The information in this e-mail message and any attachments thereto have been sent by an attorney or his/her agent, and is or are intended to be confidential and for the use of only the individual or entity named above. The information may be protected by attorney/client privilege, work product immunity or other legal rules. If the reader of this message and any attachments thereto is not the intended recipient, you are notified that retention, dissemination, distribution or copying of this e-mail message and any attachments is strictly prohibited. Please delete any and all copies received in error.  Although this e-mail message (and any attachments) is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, the intended recipient is responsible to ensure that it is virus free.

---

**From:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>
**Sent:** Wednesday, November 29, 2023 8:48 AM
**To:** Samantha Hartman <samantha@mayerslaw.com>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; John Hobbs <john@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Koppel Eli <EKoppel@schools.nyc.gov>
**Subject:** Re: [EXTERNAL] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

Good morning: Mr. Koppel: kindly provide the District's  written summation and Memorandum. Thank you.

Get Outlook for Android

---

**From:** Samantha Hartman <samantha@mayerslaw.com>
**Sent:** Tuesday, November 28, 2023 3:59:25 PM
**To:** Babbitt, Michelle (OATH) <MBabbitt@oath.nyc.gov>
**Cc:** Gary Mayerson <Gary@mayerslaw.com>; John Hobbs <john@mayerslaw.com>; Christina Mure <Christina@mayerslaw.com>; Koppel Eli <EKoppel@schools.nyc.gov>
**Subject:** [EXTERNAL] Francis - Case 249622 - 23/24 Parent Post Hearing Brief

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Forward suspect email to phish@oti.nyc.gov as an attachment (Click the More button, then forward as attachment).

Good afternoon IHO Babbitt,

Please see the attached for Parents' Post Hearing Brief in the above named matter.

P69

P70

Thank you.

Respectfully,
Samantha Hartman



Samantha Hartman, Paralegal

Mayerson & Associates

*Please check with us for the best address before mailing documents to our office.*

Office: 212-265-7200

Fax: 917-210-3075

[samantha@mayerslaw.com](mailto:samantha@mayerslaw.com)


PERSONAL & CONFIDENTIAL

The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

P70

P71

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

_____

 **IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis, on behalf of          IHO Case No. 249622
Rex Francis, a student with a disability,

                                        Petitioners,

 -against-

 New York City Department of Education,

                                        Respondent.


_____

### PETITIONERS' MEMORANDUM OF LAW

        This memorandum of law is respectfully submitted on behalf of Rex Francis and his

parents in support of their limited appeal to the SRO from the IHO's December 8, 2023, decision

to the extent that the IHO's Decision denied Rex's claim for supplemental home and community

based services. No appeal is being taken to the extent that the IHO awarded tuition funding for

Rex's school placement at The Titus School ("Titus").  The IHO decided that part of the case

correctly.

        This limited appeal is being taken because while Titus is an appropriate school placement

for Rex, it is not, nor is it required to be, a "one size fits all" program that addresses all of Rex's

deficits and needs. As petitioners contend, Rex has a unique learning profile with extensive and

global deficits that affect his availability and ability to learn. As the record shows, Rex needs his

home-based services to continue to make meaningful progress in school. This appeal will

document and demonstrate the IHO's beliefs concerning the appropriateness of supplemental

home-based services and the lengths that the IHO went to "enforce" those beliefs. As discussed

P71

Received Office of State Review
01/16/2024

below in detail, the IHO's conduct ultimately resulted in a deprivation of due process on the issue of Rex's home-based services.

Despite the IHO's findings, this appeal is not about "maximizing" Rex's potential, nor is it about "generalizing" his skills. The hearing record shows otherwise. The supplemental services at issue are extremely important because they have to do with Rex's basic ability to function safely in the world, become more independent, and make meaningful progress at Titus.

As shown below, the IHO's Findings of Fact and Conclusions of Law regarding Rex's after-school services are demonstrably erroneous and should be reversed. Petitioners contend that the partial manner in which the IHO conducted the impartial hearing, coupled with her arbitrary refusal to consider relevant evidence pertinent to the "reasonably calculated" test, denied Rex and his parents due process. In essence, as documented below, the record shows that the IHO came to the hearing with a predisposition, if not predetermination, against Rex's home-based services. The IHO did not hear the case with an open mind, but instead she took steps to establish her view that Rex's afterschool services were solely for maximization and generalization.

On this limited appeal, there already is ample, if not compelling, Prong II and other related evidence showing that the SRO should reverse the IHO's Decision and award funding for Rex's home and community-based services. Such claims expressly appear in the petition. (*See* Ex. P-A and P-B). Further, petitioners request that the SRO address their request for funding of an updated neuropsychological evaluation—a matter unaddressed in the IHO's decision.  Such claims are amply supported by the evidence and the applicable Prong II standard.  *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006). In the alternative, pursuant to the Second Circuit's decision and directives in *L.K. v. N.Y.C. Dep't*

2

P73

*of Educ.*, 674 Fed. Appx. 100 (2d Cir. 2017) (a matter in which Rex's counsel represented L.K. and his parents), petitioners request that the SRO direct a remand to a different IHO with instructions to hear and determine the levels of supplemental home and community based Applied Behavior Analysis ("ABA") Therapy, Speech and Language Therapy ("SLT"), and Occupational Therapy ("OT") that are needed to enable Rex to receive a FAPE, as that standard has been explained by the unanimous Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017).

In order to preserve Rex's educational *status quo* until there is a final adjudication, petitioners continue to invoke Rex's automatic and unconditional pendency entitlements as per IHO James McKeever's now final and non-appealable August 15, 2023 Decision (Ex. P-1) awarding petitioners tuition reimbursement at the Titus School, plus funding for up to 10 hours per week of home based ABA, up to 2 hours per week of SLT, up to 1 hour per week of PT, Social Skills group one day per week, up to 2 hours per week of OT, up to 2 hours per week of parent training and counseling, up to 2 hours per week of ABA supervision, monthly ABA meetings (up to 1 hour per therapist), monthly interdisciplinary meetings (1 hour per service provider), and the cost of transportation to and from school. Significantly, the DOE never took an appeal from IHO McKeever's August 15, 2023 Decision; accordingly, that decision is now final and non-appealable.

Rex currently receives 10 hours per week of home and community-based ABA, 1 hour per week of home and community-based OT, and 1 hour per week of home and community based SLT in addition to Rex's attendance at the not-for-profit Titus School ("Titus"). (*See* Ex. P-V, P-W, P-X, and P-W). Rex's parents receive 2 hours per week of ABA-based parent training and counseling, and his home services team receives up to two hours per week of afterschool

P73

ABA supervision, up to one hour per month per therapist of ABA team meetings, and up to two hours per month of interdisciplinary team meetings. Rex's home-based service hours are needed by Rex as *reasonably calculated* services to ensure that he continues to make meaningful, educational progress in an educational program that is sufficiently ambitious and challenging.

## Petitioners' Claims

Petitioners filed their due process complaint on June 30, 2023. (Ex. P-A). Petitioners subsequently filed their amended demand for due process on August 23, 2023. (Ex.P-B). Petitioners seek reimbursement relief for their unilateral program for the 2023-2024 school year. Whereas the DOE had recommended a 6:1:1 classroom program with limited related services, Rex's unilateral program consisted of 1:1 instruction in an ABA driven school, Titus, along with afterschool services for SLT, OT, and Home ABA services, including direct ABA therapy, parent training, ABA supervision, ABA team meetings, and Interdisciplinary Team meetings. (Ex. P-B). Among petitioners' claims are claims alleging that:

(a) No "appropriately ambitious" program was offered to Rex for purposes of the 2023-2024 school year (Ex. P-B p.3);

(b) By reason of the Supreme Court's unanimous decision in *Endrew F.*, Rex was entitled to a "challenging" and "ambitious" educational program (Ex. A, p. 8);

(c) Despite the fact that Rex presented with interfering behaviors, the DOE took no steps to conduct an FBA or develop a BIP (Ex. P-B, p.4);

(d) Despite the fact that the DOE accepted Rex's autism diagnosis, the DOE failed to offer Rex's parents any individualized parent training and counseling (Ex. P-B, p. 6);

(e) The DOE failed to develop timely assessments reflecting Rex's "present levels". Ex. P-B, p. 5);

Received Office of State Review
01/16/2024

(f)  The DOE failed to develop appropriate annual goals for Rex (Ex. P-B, p. 5);

(g)  The DOE failed to recommend 1:1 teaching despite being aware of his need for that level of instruction (Ex. P-B, p. 9);

(h)  The DOE failed to recommend a program that utilizes ABA methodology despite being aware of Rex's need for this type of instruction (Ex. P-B, p. 10).

**The Underlying Hearing**

Prior to hearing, a pre-hearing conference was held where the DOE stated it was still investigating whether the matter could be referred for settlement. (IHO Ex. 1; Tr. 3). The IHO issued a subsequent PHC Summary and Order wherein, amongst other things, she ordered the DOE to state its position regarding Prong I, and its position regarding the appropriateness of Rex's unilateral placement. The IHO's PHC summary ordered the parties to disclose their witnesses and documentary evidence to each other and the IHO five business days before the scheduled hearing. Additionally, the IHO's order directed the parties to disclose their intent to cross examine any of the disclosed witnesses two days prior to the scheduled hearing date. (IHO Ex. 1, pg. 3).

The underlying impartial hearing spanned one day, lasting about four hours. Prior to, and at the outset of the hearing, the DOE conceded Prong I, admitting that it failed to provide Rex with a FAPE for the 2023-2024 school year. (Tr. 26). The DOE also conceded Prong III, admitting that there were no equitable considerations militating against the full relief requested by petitioners. (Tr. 35). Accordingly, the hearing focused on Prong II and the DOE was therefore judicially estopped from invoking any Prong III arguments.

Received Office of State Review
01/16/2024

Prior to the hearing, the DOE failed to notify petitioners' counsel of its intent to cross-examine any of parents' witnesses, despite the IHO's order that such intent must be disclosed two days prior to the hearing. (*See* IHO Ex. 1). The IHO noted the DOE's failure to timely disclose its intent to cross examine any of petitioners' witnesses. Nevertheless, the IHO allowed the DOE to cross examine petitioners' witness based on the IHO's "clarifying questions" over petitioners' counsel's objection. (Tr. 29).

The DOE did not call a single witness, nor did it offer a single exhibit into evidence. Petitioners, on the other hand, presented numerous exhibits and compelling sworn affidavit testimony from Rex's mother, school representative, SLT provider, OT provider, and ABA provider. As such, a vast majority of the hearing was dedicated to the IHO's "clarifying questions."

At the conclusion of the hearing, the DOE again confirmed that it was conceding Prong I and Prong III. (Tr. 204). The IHO ordered the parties to submit their post hearing briefs on or before November 28, 2023, by the close of business. (Tr. 207). Petitioners' counsel submitted their closing brief on November 28, 2023. On November 29, 2023, the IHO emailed both parties requesting that the DOE submit a post hearing brief. (Ex. P-2). The DOE submitted its post hearing brief late on November 29, 2023, after the close of business. Petitioners' counsel objected to the DOE's untimely submission, as no extension had been timely requested by the DOE nor was one given by the IHO. The IHO overruled parents' counsel's objection and allowed the DOE's tardy closing brief. (*Id.*).

Received Office of State Review
01/16/2024

P77

**The IHO's Findings of Fact and Decision**

The IHO issued her Findings of Fact and Decision on December 8, 2023. Therein, the IHO found that the DOE had conceded that it failed to offer Rex a FAPE for the 2023-2024 school year; that Titus was an appropriate placement for Rex; and that there were no equitable considerations against awarding Rex's parent's full tuition reimbursement. However, the IHO denied any relief relating to Rex's after school ABA (including parent training, supervision, ABA team meeting, and interdisciplinary meets), SLT, and OT services. In doing so, the IHO reasoned that petitioners failed to meet their burden concerning the relief requested for Rex's after-school SLT, OT, and ABA services. The IHO did not, however, state the "burden" she was relying on in making this determination. This fact is crucial, as the section in which the IHO discussed Rex's afterschool services seems to be separate from her Prong II analysis, (i.e. whether Rex's placement and program is reasonably calculated to provide him an educational benefit), and her Prong III analysis, where she notes there are no equitable considerations against the parent's full tuition reimbursement. (IHO Decision, pg. 16).

Moreover, while the IHO made reference to pre-*Endrew F.* case law that disfavored awarding supplemental services that are for the sole purpose of generalization, and that the DOE is not responsible for the maximization of a student's potential, she does not cite any case law stating the burden a parent was required to meet for the student's supplemental services that is distinct from their Prong II burden. Rather, the IHO formulated her own, unduly elevated Prong II standard, where she stated that Parent failed to show why Rex's home ABA, SLT, and OT services were: 1) **necessary** for him to make progress, 2) failed to show evaluative information and progress reports from the current school showing why his services were **necessary**, 3) failed to show evidence that Rex would have regressed without these services, and 4) failed to show

Received Office of State Review
01/16/2024

evidence specifically showing causation between Rex's home services and his progress in school.

As discussed below, the ad-hoc standard, which seems to be a melding of Prong II and Prong III, unduly elevated the well settled Prong II burden that a parent shows that the unilateral program and placement was ***reasonably calculated*** to provide a student with a meaningful educational benefit. For their Prong II burden, Petitioners' ample documentary evidence and sworn affidavit testimony speak to Rex's needs for these after school services, the important support they provide to him, and the slow and steady progress he has made with them.

## Summary of the Argument

Petitioners urge that the record before the IHO sufficiently established Rex's need for at least some meaningful level of after school services in ABA, SLT, and OT. Pursuant to *Burlington/Carter,* as well as *Frank G.*, Petitioner's burden was to show that these services were "reasonably calculated" to provide Rex with a meaningful educational benefit. *Burlington*, 471 U.S. 359; *Carter*, 510 U.S. 7; *Frank G.*, 459 F.3d 356. The standard of proof required to meet this burden is a somewhat less stringent one than the DOE would need meet in order to establish it provide a student with FAPE. *Frank G.*, 459 F.3d at 364. In this case, the IHO unduly and arbitrarily elevated the standard of what Rex's parents needed to show in order to convince her that Rex's home and community based services are appropriately fundable under IDEA. The IHO elected to ignore relevant testimony and documentary evidence showing Rex's clinical and educational history, all of which spoke to his need for these services, the support they provide to him, and the slow and steady progress he has made with them. Such conduct, as well as the manner in which the IHO engaged with petitioners and their witnesses, evidences a hearing officer who does not appear to be impartial.

Received Office of State Review
01/16/2024

**The IHO Was Not Impartial, and Thus Deprived Petitioners of Due Process.**

Given the significance and relevance of the "reasonably calculated" test for Prong II, Petitioners contend that the IHO's arbitrary refusal to recognize and give consideration to Rex's clinical and educational history shows that the IHO came to the hearing with a predetermined and closed mind. This notion is further supported by the way in which the IHO usurped the DOE's role by attacking Rex's need for these afterschool services, and the appropriateness of Rex's placement at Titus. Moreover, during the hearing the IHO interrupted petitioners' witnesses multiple times when they were simply attempting to answer the IHO's questions. (*See, e.g.* Tr. 40:5-20, 42:9-20, 52:22-53:7, 56:1-8, 65:20-66:6, 83:18-84:12, 127:1-12, 135:6-23, 136:1-11, 144:6-145:1, 168:2-13, 171:1-15, 175:3-25, 192:8-18, 198:1-15). The IHO thus restricted the right to make a proper record, impairing petitioners' right to be heard. The IHO's loaded, argumentative, and confusing questions and interruptions deprived the petitioners of a fair and impartial hearing where the testimony and documentary evidence could be genuinely taken into consideration.

It is a well settled standard that an IHO must be fair and impartial and must avoid even the appearance of impropriety or prejudice. (*See Application of a Student with a Disability,* Appeal No. 12-066; *Application of a Student with a Disability,* Appeal No. 22-070). Further, the IHO must perform all duties without bias or prejudice against or in favor of any person, according each party the right to be heard, and shall not, by words or conduct, manifest bias or prejudice. (*See Application of a Student with a Disability,* Appeal No.12-064). It would be expected that an IHO, serving in a judicial or quasi-judicial capacity, should be patient, dignified,

Received Office of State Review
01/16/2024

and courteous in dealings with the parties and others with whom the IHO interacts with in an official capacity.

Here, the IHO represented that her questions were to "clarify the record." However, as shown below, the IHO's questions were not for purposes of clarification. Instead, the IHO took up the role and responsibility of the DOE's counsel, asking loaded and confusing questions which were for the purposes of (1) attacking Parent's Prong II position that Titus was an appropriate placement and (2) creating Prong III equity issues where none existed, as conceded by the DOE.

**Testimony of Kaitlyn Simon**

Kaitlyn Simon is employed by Happy Talk Speech and Language Therapy PC and provides Rex's supplemental SLT, for 1 hour per week. Ex. P-W. Ms. Simon provided sworn affidavit testimony (Ex. P-W) regarding Rex's need for after school SLT, as well as how her services seek to strengthen his speech and language skills. Ms. Simon testified that Rex significantly struggles with communication, especially with pragmatic, expressive, and receptive language. (Ex. P-W; Tr. 69). As such, Rex has difficulty understanding and processing what is being asked of him, as he responds to demands with linguistic errors and has difficulty following instructions. (Ex. P-W). To address these deficits, Ms. Simon's services focus on strengthening Rex's pragmatic language, receptive language, and expressive language skills. (*Id,* at para 29).

At the hearing, Ms. Simon made herself available to answer the IHO's "clarifying questions." However, the IHO's beliefs about Rex's after school services were first revealed during what became an interrogation of Ms. Simon, wherein the IHO asked, "So isn't the one hour of speech and language therapy that you provide to the student -- isn't that to maximize his speech and language?" (Tr. 64:16-19). Petitioner contends the IHO's question was improperly

Received Office of State Review
01/16/2024

framed. While the IHO clearly was attempting to establish that the purpose of the additional one hour of SLT was to maximize Rex's potential as a student, the IHO's query about "maximizing his speech and language" was confusing. If the IHO's question was truly to clarify the record, it would have been framed in such a way as to inquire about Rex's need for afterschool SLT, instead of a pointed question that only sought to confirm the IHO's belief regarding Rex's afterschool services.

Further, while Ms. Simon responded "Yes" to the IHO's question, petitioners contend that Ms. Simon was testifying to the fact that she renders her services to the best of her ability with the goal of providing Rex with high quality speech and language services. This is supported by Ms. Simon's subsequent testimony on why her services are necessary in addition to the speech services Rex receives at Titus to address his extensive speech and language deficits, provide him additional opportunities to reinforce his speech skills, and strengthen his pragmatic speech skills using child led methodology. (Tr. 69-71).

**Testimony of Jessica Zambito**

The IHO posed similar loaded questions to Jessica Zambito, Rex's OT Provider: "Okay. So wouldn't you say that the -- your provision of occupational therapy to the student is to maximize his skills, correct?" (Tr. 80-82). After Ms. Zambito answered, "No" and explained how her services address Rex's needs, the IHO continued to press the issue in asking, "I mean, are you saying that if the student didn't come to you one time a week for 60 minutes, he would not make meaningful progress at the school? That they couldn't meet his needs?" (Tr. 81). The IHO continued down this line of questioning with Ms. Zambito, attempting to have her concede that because Rex's is provided with additional OT outside of school, his placement at Titus must therefore be inappropriate. As shown in Ms. Zambito's response and the exchange below, the

Received Office of State Review
01/16/2024

IHO's questions were not posed to clarify, but were an attempt to punch holes in Ms. Zambito's testimony regarding Rex's need for after school OT and Ms. Zambito's ability to provide those services:

- IHO: Okay. So you think that he should actually get more physical -- I'm sorry. He should get more OT from the school, correct? That they're not providing enough is what you just said?

- Ms. Zambito: No, I didn't -- I didn't say that. I think that he requires more OT. I don't know what is provided at Titus, as I said. I do believe he requires the aspect of having parent education. He has significant safety – poor safety awareness, delays in cognition, speech and language, gross and fine motor skills, and safety awareness.

- IHO: But you don't deal with all that. You don't deal with that, correct?

- Ms. Zambito: Yes.

- IHO:  You don't deal with speech and language, do you?

- Ms. Zambito: No, I don't. But as an occupational therapist, we do -- of course, we're working with the student and talking to them and I am collaborating with other providers. Of course, we're working on speech. We're not working on speech and language skills, but we are targeting sensory processing, his fine and gross motor skills, his self-help skills, his safety awareness. I mean, Rex is a child that requires supervision at all times, going to the bathroom, crossing the street, opening into a door. He requires -- I really do feel that he requires this external support at this time because he has significant delays.

- IHO: Right. But I mean, providing supervision to a student is not the same as providing therapy to the student, correct?

- Ms. Zambito: No

- IHO: I'm not correct? You're saying supervision and therapy are the same skills? (Tr. 81-82)

Petitioners contends that it is clear from this exchange that the IHO was not attempting to clarify the record. Rather the IHO's questions were only confusing Ms. Zambito's testimony and the record. Ms. Zambito clearly explained that Rex has extensive delays that effect every part of

Received Office of State Review
01/16/2024

his life, and as such he needs constant supervision. Because of this need, Ms. Zambito services are necessary to help Rex become independent. Instead the IHO focused on non-germane semantics regarding the difference between teaching skills and supervision, even though Ms. Zambito had just testified that Rex's need for constant supervision due to his OT deficits is the very reason he is receiving the additional hour of OT per week.

When Ms. Zambito failed to acquiesce to the IHO loaded and leading questions, the IHO became argumentative and began interrupting Ms. Zambito's testimony, and even seemed to blame her for the fact that Rex was not cured of his Autism after years of receiving OT:

- IHO: Okay. But Ms. Zambito, you've been working with the student for six years. All right? So how has he become more independent? Because it sounds like if he needs supervision all the time, how has… how has he become more independent with your services?"
- Jessica Zambito: To clarify, I did not say that I need to supervise him. My role as an occupational therapist is to improve his motor skills, his sensory processing skills, his safety awareness, his strength, his endurance. For example, when I began with Rex, he was not able to…
- IHO: (Interposing) No, no, no, no. Okay. I have to stop you there… "I have to stop you because I'm not -- unfortunately, I don't go back six years, so it doesn't matter."
- Parent's Counsel: IHO, I'm sorry. The question was how has he improved since she's been working with him.
- IHO: "Okay. So one moment, Mr. Hobbs. Okay? Because it's my questions and I'm the IHO. This is for the '23/'24 school year. So for this -- school year, did you -- well, let me ask you, did you provide the student with OT in July and August?

(Tr. 83-84)

It should be noted the IHO in her decision did not credit Ms. Zambito's testimony and opinion as to Rex's needs, but provided no reason for that determination. (Decision Pg. 19).

Received Office of State Review
01/16/2024

P84

Petitioners contend that the IHO's convenient refusal to credit Ms. Zambito's testimony was the result of Ms. Zambito not capitulating to the IHO's question regarding maximization. The IHO's decision to not credit Ms. Zambito's testimony, without reason, strongly suggests the issue of Rex's after school OT services were predetermined. Ms. Zambito's affidavit testimony amply shows Rex's extensive deficits necessitate his additional hour of OT services. As shown in Ms. Zambito's affidavit and OT progress report, Rex has poor fine motor skills and requires visual cues and prompts to complete tasks and maintain attention. (Ex. P-S, P-X). Additionally he struggles to independently write all letters and numbers, as well as to maintain a sustained grasp of items. (Ex. P-S).  Further, Rex needs support with activities of daily living skills, including unfastening buttons, putting on his shoes and socks, brushing his teeth, combing his hair, toileting, and washing his hands. (Tr. 117:13; Tr. 118:16-24).

Ms. Zambito's testimony also provided information on Rex's sensory deficits. (Tr. 82:6-12; P-X, at para. 3). For example, Rex demonstrates decreased interoceptive awareness that impacts his body temperature, hunger/thirst, toileting needs, and emotional regulation. He often overheats and needs prompting to use the bathroom and to determine thirst/hunger cues, satiety, and emotional regulation needs. (Ex. P-X, at para 3). He demonstrates significant safety and body awareness challenges and as noted above, can engage in unsafe behaviors and requires close supervision and skilled sensory integrative therapy support. (*Id.*). He also has poor spatial awareness, delayed motor planning, and poor balance. (*Id.*).

Because of Rex's extensive deficits, he receives supplemental OT services from Ms. Zambito with Bloom LLC, for 1 hour per week. (Ex. P-X, at para. 8). She further testified in her affidavit that Rex's sessions focus on addressing his fine and visual motor skills, executive functioning, sensory processing, self-regulation, self-help, and motor skill development goals to

P84

support independence in daily routines across environments. (Ex. P-X, at para. 15: Ex. P-S).

**Testimony of Stephanie Koh**

Rex receives supplemental, home-based ABA services from Stephanie Koh from Little Green Tugboat ("LGT"). (Ex. P-V). Ms. Koh provided affidavit testimony discussing the services her office provides Rex and his family and why Rex's supplemental ABA is needed to ensure he makes meaningful gains with his cognitive and social development, and to reinforce the instruction he receives at Titus. (Ex. P-V, at para. 22; Ex. P-D, at pg. 58-59). Ms. Koh's services focus on addressing Rex's interfering behaviors, developing his safety awareness, strengthening his pragmatic language skills, strengthening Rex's adaptive living skills, and developing his play skills. (Ex. P-V, at para. 21). This testimony is crucial, as it shows that contrary to the IHO's finding that Rex's ABA services are for the sole purpose of generalization of skills, the direct ABA that Rex's receives at home goes primarily to addressing his cognitive delays, interfering behaviors, and ability to appropriately socialize with peers.

Ms. Koh also testified to the parent training she provides Rex's parents for up to two hours per week. (Ex. P-Y, at para. 38). The parent training provided by Ms. Koh and her office is necessary to ensure that Rex's parents can address his interfering behaviors as they appear in the home and in new environments. (Ex. P-V, at para. 23; Ex. P-D, at pg. 58-59). Ms. Koh further testified to how she is able to provide a flexible schedule for Rex's parents, which includes multiple phone and Zoom calls throughout the week. (Tr. 106). These advisory calls are used for Rex's parents to inform and update Ms. Koh of Rex's interfering behaviors and for Ms. Koh to provide protocols and strategies for Rex's parents to address his problematic behaviors. (Tr. 107:11 – 108:6). The two hours of parent training is necessary for Rex's parents to work with Rex on his problematic behaviors and ensure the work that is being done to address his behaviors

Received Office of State Review
01/16/2024

is applied even when his ABA therapist is not present. (Tr. 108:12 – 110:3).

**Testimony of Halia Francis (Rex's Mother)**

Halia Francis's affidavit testimony provides ample additional evidence supporting Rex's need for his afterschool OT, SLT, and ABA services. (Ex. P-Y, at para. 44). Ms. Francis also provided testimony regarding her and husband's need for parent training through Rex's ABA provider, LGT, to address Rex's interfering behaviors. (Tr. 188-189; 202-203).

Despite Ms. Francis compelling affidavit testimony, the IHO confronted her as well with loaded and confusing questions. Again, it is clear by the IHO's questions that she was not interested in clarifying the record, but rather in building her own record so she could deny Rex's afterschool services. For example, the IHO posed similar questions regarding Prong III issues of "maximization" to Ms. Francis. (Tr. 193). The IHO had a negative reaction when she did not get the response she wanted:

- IHO:  Yes. Is it your testimony that the student could not make meaningful progress at Titus without him having afterschool speech and language therapy?
- Ms. Francis: Yes. It helps him generalize things, and it helps support what he's learning at school.
- IHO: That's not my question. Are you saying he couldn't make meaningful progress? That he needs this in order to make meaningful progress?
- Ms. Francis: No. not specifically speech and OT.
- IHO: But this maximizes the student's potential ---
  (Tr. 193)

The IHO then continued to apply pressure to try to get Rex's mother to agree with her maximization argument:

- IHO: …. Is it your testimony that this student needs after school OT to make meaningful progress at Titus?

Received Office of State Review
01/16/2024

- Ms. Francis: Yes. (Indiscernible).
- IHO: So he could not make meaningful progress at the school with the therapy that they're providing, correct?
- Ms. Francis: No, I don't think I would agree with that.
- IHO: Well, you can't have it both ways.
- Ms. Francis: (Interposing) Because it's a bigger issue, and you're trying to corner me into saying something that isn't true.
- IHO: (Interposing) No, no, no, no.

(Tr. 196-197).

However, Ms. Francis's perception of the IHO's intent was spot on. As the IHO subsequently asked Ms. Francis a series of questions to confirm her view that either Titus was an inappropriate setting for Rex because he receives after school services, or that the services are only for the purposes of maximization:

- IHO: Okay. If you feel that the student must have these sessions in order to make progress, then Titus is not providing what he needs, correct?
- Ms. Francis: No, that's not correct.
- Mr. Hobbs: Objection. That's misconstruing the testimony.
- IHO: But are you trying to –
- Ms. Francis: No, I think you're nitpicking that.
- IHO: But in order to make meaningful progress is one thing. And another thing is maximizing the student's potential.
  (Tr. 197).

The IHO's predetermined view was clear, she believed when it comes to unilateral placements with afterschool services, it's one or the other, "you can't have it both ways." Moreover, if the IHO truly wanted to clarify the record, she would have taken the time to explain to the witnesses her confusing questions and statements. Instead, as seen in the exchange below,

P87

17

the IHO disregarded Ms. Francis' statements that she did not understand the IHO's "maximizing" questions:

- Ms Francis: What does maximizing mean? I don't understand that.
- IHO: Okay. So excuse me.
- Ms. Francis: Yeah. I asked what does maximizing –
- IHO: (Interposing) No, no, I understand what you ask me, but you're not the one here to ask questions. You're to answer questions to the best of your –
- Ms. Francis: (Interposing) No, but you said. That's why I'm trying to understand it.
- IHO: To the best that you can answer questions, I ask you to do so. If you can't, all you have to say is, I can't answer that question, all right?

(Tr. 198-199).

Rex and his parents were reasonable and entitled to expect impartiality. However, they were not afforded such impartiality at the hearing. Instead, they were confronted with an IHO who repeatedly put her thumb on the scale via confusing and intimidating questions, and who disregarded any testimony or documentary evidence that did not align with her view regarding Rex's afterschool services. For example, in her decision, the IHO "questioned the necessity" of Rex's OT and SLT home services since he did not receive them over the summer and the gap in services was not addressed by his parents. This finding is clearly erroneous, as well as patently unfair, as Rex's mother testified that Rex's gap in SLT and OT services was due to scheduling conflicts during the summer. (Tr. 190). The IHO, adding insult to injury, even went as far as to insinuate that Rex's parent were seeking afterschool services to abdicate their parental duties. (IHO Decision, pg. 18).

While it is of course well within an IHO's right to ask questions to maintain a clear and complete record, an IHO preparing and asking loaded, argumentative, and intimidating questions

Received Office of State Review
01/16/2024

P89

exceeded even what the most aggressive DOE attorney would be permitted to do at the hearing. Here, the petitioners contend that the record shows a pattern of partial questioning and numerous interruptions from the IHO, the totality of which shows the IHO crossed the line of impartiality.

### Petitioners Met Their Burden of Showing That Rex's After School Services are Reasonably Calculated to Provide Him with an Educational Benefit.

The IHO, in denying Rex's parents relief for his after school services, erroneously held that the parent failed to show why Rex needed these services in addition to his placement at Titus. (Decision, Pg. 16). As discussed above, it is unclear what "burden" the IHO was referring too, and it appears her analysis of Rex's afterschool services was a melding of Prong II and Prong III. For the purposes of the IHO's Prong II contention that petitioners failed to meet their "burden," Second Circuit authorities such as *R.E* and *Frank G.*, have held the Parent's burden is whether the unilateral program and placement are reasonably calculated to provide an educational benefit. *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 179 (2d Cir. 2012); *Frank G.*, 459 F.3d at 364. The parent's burden under Prong II is a somewhat less stringent one than the DOE would need to prove on Prong I. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *Frank G.*, 459 F.3d at 364-65.

Here, however, the IHO formulated her own unduly elevated test for Prong II in refusing to consider multiple document exhibits (e.g. Ex. P-D, P-E, P-E, and P-O), in demanding evaluative reports and information made only during the 2023-2024 school year for a hearing that took place in October 2023, and demanding specific examples of causation between Rex's home services and his progress in school. Petitioner argues that such an extensive burden is not required by the parent under Prong II. As the Second Circuit explained in *Frank G.*, the parent's burden is whether their unilateral program and placement is "reasonably calculated" and does not call for perfection. *Frank G.*, 459 F.3d at 365; *See also T.K., v. N.Y.C. Dep't of Educ.*, 810 F.3d

P89

869, 877-78 (2d Cir. 2016). The SRO has recently reiterated this standard in Decision No. 23-237. (*Application of a Student with a Disability,* Appeal No. 23-237). There, in determining the whether the student's unilateral school placement and afterschool services were appropriate, the SRO held that while evidence of progress can be relevant, it is not dispositive or required for the parent to be successful on Prong II. (*Id., citing, Scarsdale Union Free Sch. Dist. v. R.C.*, 2013 WL 563377, at *9-*10 [S.D.N.Y. Feb. 4, 2013] [noting that evidence of academic progress is not dispositive in determining whether a unilateral placement is appropriate]; see *M.B. v. Minisink Valley Cent.Sch. Dist.*, 523 Fed. App'x 76, 78 [2d Cir. Mar. 29, 2013]; *D.D-S. v. Southold Union Free Sch. Dist.*, 506 Fed. App'x 80, 81 [2d Cir. Dec. 26, 2012]; L.K. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 486-87 [S.D.N.Y. 2013]; *C.L. v. Scarsdale Union Free Sch. Dist.*, 913 F. Supp. 2d 26, 34, 39 [S.D.N.Y. 2012]; *G.R. v. New York City Dep't of Educ.*, 2009 WL 2432369, at *3 [S.D.N.Y. Aug. 7, 2009]; *Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist.*, 2009 WL 904077, at *22-*23 [N.D.N.Y. Mar. 31, 2009]; see also *Frank G.*, 459 F.3d at 364).

Furthermore, while the IHO demanded an unduly elevated level of proof to justify Rex's home services, she failed to consider evidence that showed Rex's need for after school services and the progress he has made, and continues to make, from such services. (Decision, pg. 6). Such documents included Rex's most recent Neuropsychological Evaluation from 2021 (Ex. P-D), his ABA progress from May 2023 (Ex. P-O), his Titus School year report from June 2023 (Ex. P-M), and previous reports from his afterschool services providers (Ex. P-E). Each of these documents was accepted into evidence without objection from the DOE. The IHO, however, ruled in her decision that these reports were irrelevant since they were not made during the 2023-2024 School Year. (Decision, pg. 6). Petitioners argue, however, that these documents are relevant in showing Rex's educational and clinical history---matters that are pertinent to the

"reasonably calculated" test. For example, according to Rex's neuropsychological evaluation administered by Dr. David H. Salsberg, because of Rex's complex needs, he requires a small, structured, and supportive class and school setting with one-to-one instructional support throughout the school day. (Ex. P-D, at pg. 58). He requires opportunities for direct instruction utilizing ABA to address his difficulties and make him available for learning. (*Id*). Importantly, this report also discussed Rex's need for ABA services at home and in the community to help Rex learn how to carryover skills learned at school, safely navigate his environment, promote independence, and develop his attention, self-regulation, and communication skills. (*Id*).

Additionally, Petitioners contend the IHO erred in solely holding Petitioners responsible for any deficit in evaluative information. As the State Review Officer has held, where the school district concedes that it failed to offer the student a FAPE for the school year and elects not to submit any evaluative information of the student as evidence of the district's view of the student's special education needs, it is unfair to fault the parent for a deficiency in the record. (*See Application of a Student with a Disability,* Appeal No. 19-131, citing, *A.D. v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010)).

Similarly, here, the DOE conceded Prong I, and elected not to add any evaluative information to the record. Petitioners, on the other hand, provided the most up to date progress reports and evaluations they had available, along with affidavit testimony from Rex's providers speaking to his current needs and progress. The affidavit testimony of Stephanie Koh, Kaitlin Simon, and Jessica Zambito support the conclusion that Rex's unique learning profile requires him to receive robust after-school services. (Ex. P-V, P-W, and P-X).  As such, Rex's parents contracted and paid for supplemental services in ABA, OT, SLT, and after school skills. (Ex. P-Y).

Received Office of State Review
01/16/2024

P92

Ms. Koh testified at the hearing about how LGT works with Rex's parents' schedule to provide 10 hours a week of individual ABA therapy for Rex at a rate of $285.00 an hour. Tr. 99; (Ex. P-V, at para. 8). Ms. Koh further discussed how LGT has worked with Rex on developing his adaptive skills, executive functioning skills, following multi-step instruction, initiating and maintaining conversation, as well as emotional and behavioral regulation, psychological flexibility, independence, and social skills. (Ex P-V at para. 20; Tr. 103-105). Ms. Koh further testified why Rex needs after school ABA in addition to the instruction he receives at Titus:

> [F]or Rex, skills need to be directly taught in different environments and/or with different people so that the skill is actually "learned" and Rex has the skill in his general repertoire. Moreover, Rex continues to demonstrate significant delays within all areas of development. He has only made gains with teaching that is done in highly structured, 1:1 settings, with continuous high rates of reinforcement and repetition of tasks. It is because of the 1:1 instruction and the application of the principles and tactics used in ABA therapy that Rex has made steady progress.

(Ex. P-V, at para. 22)

With Ms. Koh's services and collaborative efforts, Rex continues to make steady progress addressing his interfering behaviors, improving his safety awareness, improving his ability to maintain his hygiene, and overall social development. (Tr. 117:13 – Tr. 118:9). For example, Rex has made significant improvements in his ability to ability to carry out daily living skills (e.g. washing his hands without *physical* prompting). (Tr. 120:19 —121:16). Ms. Koh further testified that due to Rex's deficits, many skills such as bathing and dressing need to be broken down step by step, taking time for Rex to master each step independently. *Id.* Such a piecemeal form of learning further supports Rex's need for after school ABA therapy. Moreover, Rex's social skills continue to improve, with the goal being for him to engage with his classmates and initiate conversations with familiar peers. (*Id*). While Rex has made meaningful progress with Ms. Koh, he still requires intensive, 1:1 supplemental ABA services to reinforce skills he learns at Titus,

P92

while providing additional time to further focus on his cognitive and social development. (Ex. P-V, at para. 24).

As such, the services provided by Ms. Koh's office are essential for Rex to continue to make meaningful progress at school. LGT's services allow Rex multiple opportunities to strengthen his executive functions skills, physical and emotional regulation, and ability to carry out ADL skills, without unnecessarily impeding his academic instruction at Titus.

Similarly, Ms. Simon testified as to why Rex requires afterschool sessions of SLT to provide further opportunities for individualized and scaffolded speech and language support. (Ex. P-W, at para. 25). Ms. Simon has known Rex since September 2022, when she began providing Rex's supplemental SLT. (Ex. P-W; Tr. 54:8-17). The supplemental SLT sessions utilize preferred play schemas and joint book reading, as well as movement and sensory activities, to increase motivation, regulation, engagement/reciprocal interactions, and availability for learning. (Ex. P-W, at para. 29). Ms. Simon's affidavit further detailed her use of the Checklists of the Affect-Based Language Curriculum – Second Edition (ABLC-2) when evaluating Rex's communication and language skills. (Ex. P-W, at para. 16). Rex's SLT sessions are 1:1 and take place in a sensory gym. (Ex. P-W, at para. 15; Tr. 51:20-24).

Ms. Simon works with Rex 1:1 in a sensory gym to ensure the speech and language skills he learns at Titus are reinforced and can be carried over to other environments, ultimately making Rex more available to learn and maintain newly acquired skills. (*Id*; Tr. 58-59). Moreover, Ms. Simon is well aware of Rex's speech and language needs, and how to best ensure he is available for instruction. At the hearing, Ms. Simon testified how she takes time at the beginning of each session to ensure Rex is physically and emotionally regulated so that he is actually in the mindset to learn. (Tr. 52:11-21).

Further, Ms. Simon's affidavit testimony details that sessions work to address Rex's auditory attention/memory/comprehension, functional communication skills, expressive language, and receptive language. (Ex. P-W, at para. 21-22). Ms. Simon utilizes "child-led therapy," which promotes Rex's engagement in instruction and allows him to approach new information with increased complexities in a naturalistic, self-motivated way. (Ex. P-W, at para. 19). Ms. Simon regularly collaborates with Rex's OT provider, Ms. Jessica Zambito, due to their long-standing professional relationship and shared office space. They communicate regularly regarding strategies to address sensory processing and receptive/expressive language development to facilitate Rex's availability for learning new skills. (Ex. P-W, at para. 14)**.**

According to Ms. Simon, Rex continues to make steady progress in the development of his speech and language skills. (Ex. P-W, at para. 24.) For example, Rex has improved his ability to report past events with increased complexity and specificity in his language. (*Id.*) The child-led, play-based therapy has allowed Rex to reinforce the skills he acquires through Titus's SLT services while allowing Rex additional time and space to explore and expand on his ideas, encourage his logical thinking and creativity, and build upon his specific interests. (Ex. P-W, at para. 25-26). With these additional services, Rex continues to make progress in improving his speech and language abilities. (Ex. P-Q and Ex. P-W, at para. 24).

Ms. Zambito testified by affidavit to Rex's need for additional OT outside of Titus. (Ex. P-X). Her testimony shows that Rex has serious delays in his fine, gross, and visual motor skills, sensory processing and regulation, strength, motor planning and coordination, and has elevated sensory sensitivity to noise and visual stimuli. (Ex. P-X, at para. 11-13). Moreover, Rex has extensive delays in his self-help skills including using utensils, and clothing management skills (buttons, shoe tying, utensil use, dressing, hygiene/grooming tasks). (*Id*). To address these

Received Office of State Review
01/16/2024

extensive deficits, Ms. Zambito is currently working with Rex on improving his independence with self-help skills (e.g. using utensils, buttoning his clothes, dressing/undressing, toilet and hygiene skills), improving his fine and visual motor skills for greater stamina and independence with handwriting, and improving his safety awareness. (*Id.* at para. 16; Tr. 87-88). Specifically, Rex works to improve his independence with self-help skills (e.g. using a fork and knife, buttoning, tying a knot, donning/doffing socks and shoes, dressing/undressing, toileting independently, and bathing himself); improve his fine and visual motor skills for greater stamina and independence with handwriting skills; improve his letter formation including upper and lowercase; and improve self-regulation and safety awareness using a sensory diet with unlimited access to sensory supports. (Ex. P-X, at para. 16).

Ms. Zambito's hearing and affidavit testimony also show her collaborative efforts with Rex's parents, Titus, and Ms. Simon with Happy Talk. (Ex. P-X, at para 21; Tr. 79-80). Further, she provides Rex's parents with reports throughout the year and regularly communicates with them to keep them up to date on Rex's progress toward his OT goals. (Ex. P-X, at para. 19 and 21). With the services and support provided by Ms. Zambito, Rex continues to make progress in addressing his OT deficits. (See supra, pg. 15, discussing Rex's progress with Ms. Zambito's OT services). Rex's OT sessions are 1:1 and take place at Bloom's sensory gym. (Id., at para. 19). Ms. Zambito's reports show Rex continues to make progress during the 2023-2024 school year. For example, as a baseline at the beginning of 2023, Rex was writing 50% of uppercase letters. Rex is now able to write his first and last name and 100% of his uppercase letters. (Ex. P-X, at para. 18). Moreover, Rex is beginning to write lowercase letters, and can now copy 1-2 sentences with support. (Id.). Overall, Rex continues to make steady progress in reaching his OT goals. (Id.; see also Ex. P-S).

Rex's neuropsychological evaluation, as well as the testimony of his afterschool providers,

support the conclusion that Rex is a child with extensive needs across the board. The additional services he receives in OT, SLT, and ABA serve the purpose of ensuring he can meaningfully engage in school and in his community life. Furthermore, while the petitioners need not show retrospective evidence proving that Rex made actual progress in his program, the witness testimony and progress reports provided to the record unequivocally demonstrate that Rex has in fact made meaningful progress in his educational program during the 2023-2024 school year. (See Ex. P-V, P-W, P-X, P-S, and P-Q). Lastly, while the IHO held that Petitioners lacked sufficient, up to date evaluative information, her decision makes no mention of Parents' requested relief of funding for an updated Neuropsychological Evaluation as requested in their Amended Demand for Due Process (Ex. P-B).

### The Prong III Equities Favors a Full Reimbursement Relief

In regard to Prong III, petitioners urge that there are no equitable considerations that would prevent Rex's parents from receiving a full award for the home and community ABA services, OT, SLT, and funding/reimbursement for an updated neuropsychological evaluation. The DOE itself, conceded at multiple points during the hearing that it could not identify any equitable considerations against awarding Rex's parent's requested relief. (Tr. 35, 204).

However, the same DOE that had waived Prong III at the hearing argued in its brief that Rex's after school services should be denied as purely for generalization of skills and maximization of Rex's potential as a student. (IHO Ex. 2). Petitioners urge, however, that the record amply shows that Rex's services were reasonably calculated to address his challenges in speech, regulation, and ability to carry out activities of daily living, and not for the purposes of maximizing his potential a student. Petitioners further maintain that the DOE's contentions of

Received Office of State Review
01/16/2024

generalization and maximization, even if framed as Prong II issues, go to Prong III equitable

considerations, which the DOE conceded. (*See  Application of Student with a Disability,* Appeal

No. 23-237, *Application of a Student with a Disability,* Appeal No. 23-134, *citing C.B. v. Garden*

*Grove Unified Sch. Dist*., 635 F. 3d 1155, 1160 (9th Cir. 2011); *Alamo Heights Indep. Sch. Dist.*

*v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986)). The DOE stated its only position was

that the unilateral school placement, Titus, was inappropriate, however, it only briefly mentioned

this point in its closing brief. (See IHO Ex. 2). The vast majority of the DOE's nine-page closing

brief echoed the IHO's apparent predetermined sentiment that Rex's home program was solely

for maximization and generalization of skills. The IHO would go on to re-state these sentiments

in her Decision denying Rex's home programing.

      Regarding the IHO's maximization and generalization contentions, the IHO relied on

case law such as *L.K. v. New York City Dep't of Educ.*, 2016 WL 899321, (S.D.N.Y. May 1,

2016), <u>*aff'd in part*, 674 Fed. App'x 100 (2d Cir. Jan. 19, 2017)</u>, in holding that the IDEA does

not require school districts to design educational programs to address a student's difficulties in

generalizing skills to other environments outside of the school environment, or the maximization

of a student's skills. Petitioners contend, however, that 2nd Circuit authority has held that a case

by case analysis is needed in determining whether the equities favor reimbursement of a

student's after school program. See, *L.K.*, 674 F. App'x at 102 . In *L.K.*, the 2nd Circuit remanded

the matter the IHO relied on in her decision for the tribunal to determine the extent to which the

student's afterschool services were appropriate and necessary in conjunction with his unilateral

placement. *Id*.

      In regards to generalization, the IHO's reliance on the 10th Circuit decision on *Thompson*

*R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1152-53 (10th Cir. 2008), and similar case law, is

Received Office of State Review
01/16/2024

misplaced. Such cases utilized the "some benefit" standard in determining the benefit owed a

student under the IDEA, and in addressing the value and necessity of skill generalization. The

Supreme Court replaced the inadequate "some benefit" and "more than de minimis" standards in

their 2017 unanimous and landmark decision *Endrew F.*, with the more appropriate standard,

whether the student's academic program and goals are "appropriately ambitious in light of [their]

circumstances." 580 U.S. at 388.

As discussed above, the testimony provided by Rex's home ABA, OT, and SLT

providers, as well as documented progress reports (*see*, Ex. P-O, P-Q, P-S) and evaluations (Ex.

P-D) show that these home services served the purpose of addressing his extensive deficits so

that he can keep pace with his program at the Titus school. Simply put, if Rex were to receive all

the OT, SLT, and ABA services during the school day, he would have little to no time to actually

engage with his academic coursework.

While some aspects of Rex's home programing may have *resulted* in the generalization

of some skills, it was not the sole or even primary reason that Rex received these services. As the

SRO held in their recent Decision No. 23-237, the fact that home based services (including ABA

therapy) addresses a student's ADL skills, does not, without more, show that the services were

for the sole purpose of generalizing skills. (*Application of a Student with a Disability,* Appeal

No. 23-237). Here, as testified to by Rex's mother, Rex needs both his home programing and the

instruction he receives at Titus to appropriately address his extensive deficits in speech, sensory

regulation, cognitive delays, and ability to become more independent with his ADL skills. (Ex.

P-Y). Many students with autism, like Rex, have difficulty generalizing the skills they are

learning. We respectfully urge that generalization as an ancillary result is a reason, amongst all

the other legitimate reasons discussed above, that supports Rex's need for supplemental ABA,

P99

OT, and SLT services. *See Mayerson, Generalization After Endrew F.: Shrinking The Gap Between Access And Outcome for Students Diagnosed With Autism*, Vol. 63, New York Law School Law Review, pp. 51-59 (2018).

## CONCLUSION

For all the foregoing reasons, on this record, the SRO should reverse the IHO's Decision on the issue of Rex's home-based services and award Rex and his parents the full reimbursement relief being requested, subject to crediting the DOE for any portion of the award that has been paid, including any payments paid under pendency. Finally, to the extent within the SRO's power, jurisdiction, and discretion, the SRO should direct the DOE to provide Rex's parents reimbursement for an updated neuropsychological evaluation.

Dated: New York, New York
       January 16, 2024

Gary S. Mayerson
John Hobbs
Christina Mure
Mayerson & Associates
*Attorneys for Petitioners*

Received Office of State Review
01/16/2024

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
--------------------------------------------------------------------X
In the Matter of the Appeal of H.C.F. and C.F. on behalf of
their minor child R.F.,

                                    Petitioners,          **VERIFIED ANSWER**

                    -against-                             IHO Case No. 249622
                                                          SRO Appeal No.  24-011
The New York City Department of Education,
                                    Respondent.
--------------------------------------------------------------------X

Respondent, the New York City Department of Education ("DOE"), by its attorneys, Liz Vladeck, General Counsel of the DOE (Toni L. Mincieli, of Counsel), as and for its Verified Answer to the Request for Review dated January 16, 2024 ("RFR") filed by Mayerson & Associates ("Parents' Counsel"), counsel for H.C.F. ("Mother") and C.F. ("Father"), parents ("Parents") of  R.F. ("Student") (collectively, "Petitioners"), respectfully requests that the State Review Officer ("SRO") deny Petitioners' appeal of the Impartial Hearing Officer Michelle Babbitt Esq.'s ("IHO") Findings of Fact and Decision dated December 8, 2023 ("FOFD") and dismiss Petitioners' appeal with prejudice. Respondent thus responds as follows:

1.      Denies every allegation set forth in the RFR and respectfully refers the SRO to the hearing record for a complete and accurate statement of the Student's abilities, to the hearing record and exhibits cited for a complete and accurate statement of their contents, to the Amended Due Process Complaint ("Amended DPC" or "DPC") dated August 22, 2023 (Ex. B), for its true content and meaning, the FOFD for its true content and meaning, and the law cited therein for a complete and accurate statement of their contents.

## AS AND FOR A STATEMENT OF MATERIAL FACTS, THE DOE RESPECTFULLY ALLEGES:

Received Office of State Review
02/06/2024

2.      Parents' counsel filed an initial due process complaint and commenced this proceeding on June 30, 2023, alleging the DOE denied a free and appropriate public education ("FAPE") for the 2023-2024 school year (Ex. A). Parents then filed the Amended DPC dated August 22, 2023 (Ex. B).  Parents sought pendency and tuition at the Titus School ("Titus"), up to 10 hours per week of after school ABA, up to two hours per week of after school speech-language therapy (including feeding therapy), one hour per week of after school physical therapy, social skills group one day per week after school, up to two hours per week of after school occupational therapy ("OT"), up to two hours per week of parent training and counseling, up to two hours per week of after school ABA supervision, monthly ABA meetings, and funding for an independent neuropsychological evaluation and transportation. *See* Ex. B.

3.      The merits hearing was held on October 13, 2023. The DOE did not seek to admit documents into evidence, did not call any witnesses, waived its opening statement, and did not present a case (Tr. pp. 26, 27, 31, 46). The IHO admitted Parents Exhibit A-L (Tr.37-39). The IHO admitted Parents' Exhibit M subject to connection by Parents' representative in their closing statement. (Tr. 41). Exhibits N, O, P and Q were admitted into evidence, but O was also admitted subject to connection by the Parents' representative in their closing brief. Tr. 44. Exhibits R through BB were also admitted into evidence. Tr.46.

4.      The IHO issued her FOFD on December 8, 2023 (FOFD, at 21). The IHO found that the DOE denied the Student a FAPE and Titus was appropriate. The IHO awarded the Parents' tuition funding at Titus. (FOFD, at 21). The DOE does not cross-appeal from this award of relief. The IHO found the Parents were not entitled to funding for the after-school OT, speech-language therapy and ABA services[1]. According to the IHO:

---

[1] The IHO's denial of funding for at-home after-school ABA was a denial of both the direct and supervisory ABA, parent training and counseling and interdisciplinary meetings.  FOFD, at 21.

2

Received Office of State Review
02/06/2024

P102

> No evidence was adduced that supported the claim that the Student is unlikely to receive educational benefits from his schooling in the absence of home-based ABA services or the Student is likely to experience regression in the school setting in the absence of home-based ABA services. The fact that the Student may benefit from at-home services in and of itself is not enough to entitle reimbursement for services provided in excess of a FAPE. The same is true of the afterschool SLT and OT; there was no objective evidence showing that absent these services, the Student would not progress in the Private School. FOFD, at 17.

5.     To the extent there is an argument regarding the Student's pendency entitlement (RFR, at 7), the record reflects there is no dispute as to pendency.

## AND AS AND FOR A FIRST DEFENSE: THE IHO'S FOFD SHOULD BE AFFIRMED

6.     Petitioners, in this Appeal, argue that the Student is entitled to home and community based ABA services, OT and Speech-Language Therapy. RFR at 1-4. However, there is clear evidence that the Student's special education program at Titus sufficiently addresses the Student's needs such that these after-school services are not required. Despite Petitioners' claims, the IHO engaged in a thoughtful, impartial and thorough analysis of the record in determining that the Parents were not entitled to funding for the after-school services.

7.     Courts have repeatedly held that whereas "a school district must provide an IEP that is likely to produce progress, not regression, and ... affords the student with an opportunity greater than mere trivial advancement," Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d. Cir. 2005) (internal quotes omitted), school districts are not required to "maximize" the potential of students with disabilities.  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 199 (1982).  As expressed by the Second Circuit on numerous occasions, the Individuals with Disabilities Education Act ("IDEA") "guarantees an appropriate education, not one that provides everything that might be thought desirable by loving parents."  Walczak v. Fla. Union

P102

Received Office of State Review
02/06/2024

Free Sch. Dist., 142 F.3d 119, 132 (quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d

563, 567 (2d Cir. 1989) (emphasis added) (internal quotation marks removed). Moreover, the SRO

recently upheld the proposition that the "IDEA does not require school districts as a matter of

course to design educational programs to address a student's difficulties in generalizing skills to

other environments outside of the school environment, particularly in cases in which it is

determined that the student is otherwise likely to make progress in the classroom." *See* Appeal No.

18-039 (internal citations omitted); Appeal No. 23-019 (citations omitted).

  8. Based on testimony of the Student's providers, it is clear the IHO correctly ruled

that these after-school services were primarily designed to maximize the Student's education and

generalize skills to the home or community. They were for maintenance of skills, not to prevent

regression, and not necessary to ensure educational progress at school.

  9. Titus provided speech-language therapy to the Student during the twelve-month

2023-2024 school year. (*See* Exs. J-1, K-1, U-36). The Student also received speech-language

therapy after-school from Kaitlyn Simon of Happy Talk Speech and Language Therapy P.C.

("Happy Talk"), a private agency. Tr.57, Ex. W.  Ms. Simon provided one session of speech-

language therapy per week for one hour. Tr.57., Ex. W-2.  She has been providing this service

since September 2022. Tr.61, Ex. W-2. Despite the Parents' assertion that this program is

necessary, the Student only received a couple of sessions of speech-language therapy during the

summer months. Tr.192. Ms. Simon explained that the after-school speech-language therapy is

"just another way to supplement his learning and try to meet him where his needs are at the

moment." Tr.66. Most significantly, Ms. Simon expressly admitted, when asked by the IHO, that

the speech-language therapy provided after school to the Student is to maximize his speech and

language (Tr.64) and for generalization of skills (Ex. W-7).  In her testimonial affidavit, when

Received Office of State Review
02/06/2024

P104

asked why the Student needs after-school speech-language therapy, Ms. Simon stated "Rex would ultimately be less available to learn, *generalize*, and maintain newly acquired skills that facilitate his ability to attend, interact, and communicate in the real-world environment." Ex. W-7 (emphasis added).    She stated that speech-language therapy sessions "should continue to address the acquisition and *generalization* of skills across domains of receptive/expressive language to support Rex's ability to effectively communicate his needs, wants, thoughts, and ideas with others." Ex. W-7 (emphasis added). Ms. Simon could not answer why her service is necessary for the Student to make meaningful progress at Titus. Tr. 66.

10.    Titus provided OT to the Student during the school day for the twelve-month 2023-2024 school year. Ex. J-1, K-1., P-U 36. The Student was also receiving after-school OT from Bloom Occupational Therapy. Tr.74. The Student's after-school occupational therapist, Jessica Zambito, provided the service one time per week for one hour. Tr.76.   Despite the Parents'¶ assertion that this service is necessary, the Student did not receive OT during the summer months. Tr. 84. According to Ms. Zambito, Titus is not providing enough OT to the Student (Tr .81); yet, Ms. Zambito does not know how often Titus is providing OT. Tr. 80. According to Ms. Zambito, the Student needs her service "for carryover of his skills to make meaningful progress." (Tr.81). However, Ms. Zambito admitted she does not know what Titus is providing in terms of OT or the methodology used. Tr. 81, 88.  If Ms. Zambito does not how Titus is addressing the Student's OT needs, she cannot assert, with any basis, that her service is necessary for this Student to make progress and she cannot assert, with any basis, that without her service the Student would not make educational progress notwithstanding what he receives at Titus.

11.    Titus uses Applied Behavioral Analysis (ABA) methodology in its teaching. Ex. U-3, at pgh. 11. All teachers, staff members and related service providers are trained in ABA. Ex.

P104

Received Office of State Review
02/06/2024

P105

U-3, at pgh. 11, 18. The Student made "steady progress in all domains" at Titus (Ex. U-14, at pgh. 56), including with speech-language therapy, OT and physical therapy. *See* Ex. M-17-25. Despite the Student's progress during the school day, the Student received an additional ten hours per week of ABA after school from a private agency, Little Green Tugboat ("LGT"). Tr.103; Ex. V at phg. 19.[2] An ABA session includes "activities within the community settings, including the park or group classes in order to target social skills and generalization of skills into the community settings." Ex. V at pgh.20.

12.     In Appeal No. 23-019, the SRO upheld the denial of home-based ABA, finding it was for the purpose of generalizing skills where the recommendation by the student's teacher for home-based ABA was " 'to carry-over skills, aid generalization and ensure maintenance' of skills" (SRO Appeal No. 23-019 at 19) and the recommendation for home-based ABA by the neuropsychologist was without considering the student's progress in the absence of the home-based program or how the home-based program would help the student receive educational benefit from his school program (*id.* at 20). In Appeal No. 22-095, the SRO upheld the denial of home-based ABA where the hearing record was devoid of any evidence or testimony as to how the student would regress behaviorally or academically at school without the home-based services or that home-based services were necessary in light of the student's programming at the unilateral placement which utilized ABA. *See* Appeal No. 22-095 (finding "hearing record supports a finding that the student received home-based ABA services primarily for the purpose of generalizing the student's skills to the home and community setting, and home-based ABA was not integral to the student's progress at [the unilateral placement] where he also received ABA services"). In Appeal No. 14-121, the home-based ABA program targeted independent problem-solving skills, leisure

---

[2] LGT provided 1:1 ABA instruction to the Student at home as well as ABA monthly meetings, parent training and counseling and interdisciplinary meetings. Ex. V-3.

P105

Received Office of State Review
02/06/2024

P106

skills at home, chores, making his bed, organizing clothing, showering, toileting, and attending

dental visits. In finding the after-school ABA was for the generalization of skills to outside

environments and not necessary to make progress at school, the IHO considered that the unilateral

placement testified that the home program provided an opportunity to generalize skills learned at

school, the behavior consultant and parent testified that the home program was needed because of

the student's difficulty with generalization and maintenance of skills, and the behavior analyst

stated the home program was necessary because the student was not able to generalize things. SRO

Appeal 14-121 at p. 19.

13.     The Founder/Director of LGT, Stephanie Koh, explained the differences between

ABA provided by Titus and LGT, and in doing so, she made clear that the after-school ABA

services were to carry-over skills to non-educational settings and had nothing to do with improving

or ensuring progress in the school environment, as in Appeal No. 14-121.

> LGT primarily focuses on independence, adaptive living skills,
> psychological flexibility, adaptation to various environments and
> settings, and generalization and practical application of Rex's skills
> in all settings. LGT has and continues to target Rex's behavioral and
> emotional regulation within his family. . . LGT focuses on
> implementing ABA treatment strategies through heavy parent
> training, generalizing, and adapting skills within Rex's natural
> environment. Ex. V-7, at pgh.23.

14.     Ms. Koh also testified that LGT works on "functioning within the family life and

routines" such as chores like "putting his plate in the sink, helping with preparing dinner, helping

with setting tables, setting the table" and "making his bed". Tr.121. As in Appeal No. 23-019, the

after-school ABA services are to carry-over skills, aid generalization and ensure maintenance of

skills. Ms. Koh expressly stated that ABA sessions work on generalization of skills. Ex. B at pgh.

20. Ms. Koh stated that the Student has difficulty "maintaining learned skills without ongoing

P106

Received Office of State Review
02/06/2024

P107

maintenance programs" when asked why the service is necessary. *Id*. at pgh. 22. Ms. Koh did not explain how the after-school ABA services would help the Student to receive educational benefit at Titus and seemed to ignore that he was reportedly making progress at Titus. *See id.* at pgh. 22-23. As in Appeal No. 22-095, there was no testimony as to how the Student would regress at school absent after-school ABA.

15.    LGT provides parent training, but the schedule is not consistent and in part for when the Parents have questions or issues for which they need assistance. *See* Tr. 109-111. Parent counseling and training is defined as "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program. 8 NYCRR 200.1(kk); 34 CFR 300.34(c)(8).  When asked why approximately two hours per week of parent training is necessary, the Student's mother explained:

> You know, it has a lot to do with how I as a parent can help him maneuver his life in my house, you know, without disrupting the general household. How to, you know, deal with things -- inappropriate comments he makes to strangers. It adds up because these things will happen as -- as we're walking down the street. Tr. 188-189.

16.    It is clear from the testimony that parent training is unrelated to the Student's educational program or education generally.  Parents have not presented any basis on Appeal to disrupt the IHO's finding denying funding for this service or funding for ABA supervision.

## AS AND FOR A SECOND DEFENSE: PARENTS' REQUEST FOR A NEUROPSYCHOLOGICAL EXAMINATION SHOULD BE DENIED

17.    Parents requested funding for an updated neuropsychological examination. Exhibit B. "Parents have the right to have an IEE conducted at public expense if the parent expresses disagreement with an evaluation conducted by the district and requests that an IEE be conducted

P107

Received Office of State Review
02/06/2024

P108

at public expense." Appeal No. 23-181, at p. 17, (referencing 34 CFR 300.502(b); 8 NYCRR 200.5(g)(1); *see K.B. v Pearl Riv. Union Free Sch. Dist*., 2012 WL 234392, at *5 [S.D.N.Y. Jan. 13, 2012]). If parents and the district agree to evaluate a student before a triennial evaluation, the parents must first disagree with an evaluation before the student's next evaluation occurs (Appeal No. 23-181, at p. 17; *D.S. v. Trumbull Bd. of Educ*., 975 F.3d 152, 170 [2d Cir. 2020].

18.    The Parents proffered no evidence or testimony to show they disagreed with any DOE evaluation or requested funding for a private evaluation prior to filing this DPC. They do not even allege they did so in the DPC. *See* Ex. B. The Parents did not disagree with any specific DOE evaluation in their DPC[3] (Ex. B). The Parents provided no evidence that they previously requested funding for a neuropsychological examination prior to commencing the hearing.

### AS AND FOR A THIRD DEFENSE: THE IHO WAS FAIR AND IMPARTIAL

19.    It is well settled that an IHO must be fair and impartial and must avoid even the appearance of impropriety or prejudice. *See e.g.,* Appeal No. 12-066. An IHO must render a decision based on the hearing record. *See id.* "Moreover, an IHO, like a judge, must be patient, dignified and courteous in dealings with litigants and others with whom the IHO interacts in an official capacity and must perform all duties without bias or prejudice against or in favor of any person, and shall not, by words or conduct, manifest bias or prejudice, according each party the right to be heard." *Id.* Adverse rulings alone are not enough to find IHO bias. Appeal No. 19-059.

20.    A review of the record reveals that Parents' claims that the IHO acted anything but impartial and fair are baseless and unfounded.  The Parents object to the IHO's questioning of their witnesses. The IHO acted reasonable and fair, asking questions that directly pertained to the

---

[3] While the SRO has been clear that disagreeing with an evaluation for the first time in a DPC is an improper use of due process, the record shows the Parents did not express any disagreement with any DOE evaluation, even in the DPC (Appeal No. 23-181, p. 18).

P108

Received Office of State Review
02/06/2024

P109

testimony provided via affidavit.  Parents' cannot claim bias merely because the IHO elicited testimony that adversely affected their case. Parents' allege the IHO's questioning of the Student's speech-language therapy provider was "improperly framed" and "confusing". RFR-4, pgh. 16. Parents' make similar allegations with respect to the questioning of the OT provider.  RFR-5, pgh. 18-19 (citing Tr. 81). Notably, there was no objection by Parents to this alleged improper questioning at the time of hearing. *See* Tr. 64, 81.

21.	The Parents object to the IHO allowing the DOE to submit its closing brief late (RFR-7, P. 28), not because the late submission caused them prejudice, but simply because it was late. Parents Ex. 2. The IHO repeatedly gave Parents the opportunity to explain how the late submission is prejudicial to their case and to assert if they needed additional time to submit a response to the DOE's closing brief. *See* Parents Ex. 2; *see* Appeal No. 12-066 at P. 9(IHO did not demonstrate bias by admitting district's late due process response where the IHO "provided both parties the opportunity to weigh in on the matter").  Parents, in response, acknowledged, "Parent may not have been prejudiced by the DOE's late submission" and asserted they did not need additional time to respond because the DOE's brief did not reference any portion of the Parents' brief. *See* Parents Ex. 2.  Thus, there was no basis to object to the allowance of the late submission.

22.	**WHEREFORE**, the DOE respectfully requests that the Office of State Review dismiss Petitioners' appeal.

Dated:   February 5, 2024

Respectfully submitted,

*Toni Mincieli*

Toni L. Mincieli, Of Counsel
NYC Department of Education
415 89th Street
Brooklyn, New York 11219
(718) 238-6240

P109

Received Office of State Review
02/06/2024

**STATE OF NEW YORK**      )

                                    :SS.:

**COUNTY OF RICHMOND**    )

Toni L. Mincieli, Esq., being duly sworn, deposes and says that she is counsel for the Respondent, the New York City Department of Education, is familiar with the facts underlying this appeal, and has read the annexed Answer. That the statements in the foregoing Answer are true to her knowledge and belief, and as to the matters she believes to be true are based on her review of the documents in the hearing record and discussions with Department of Education personnel. Deponent further states that the reason why this verification is not made by Respondent is that it is a corporation.

_____

Toni L. Mincieli

Sworn to before me, this

5th day of February, 2024

_____

Notary Public

**JOAN PERRETTI**
Notary Public, State of New York
No. 43-4040870
Qualified in Richmond County
Commission Expires August 8, 20 26

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
-------------------------------------------------------------------X
In the Matter of the Appeal of H.C.F. and C.F. on behalf of
their minor child R.F.,

                         Petitioners,                       **DECLARATION**
                                                             **OF EMAIL SERVICE**

                -against-                       IHO No. 249622
                                                  SRO No. 24-011

The New York City Department of Education,
                             Respondent.
-------------------------------------------------------------------X

     I, Toni L. Mincieli, an attorney with the New York City Department of Education, duly licensed to practice in the State of New York, declare under penalty of perjury that on February 5, 2024 at approximately 4:53 P.M., I served the annexed Verified Answer, dated February 5, 2024, upon Gary Mayerson, Esq. of Mayerson & Associates, attorney for Petitioners, by emailing Mr. Mayerson at gary@mayerslaw.com. Prior to my service upon Mr. Mayerson, he consented on behalf of Petitioners to said email service of the Verified Answer.

Dated: February 6, 2024

                                       *Toni Mincieli*
                                    _____

                                     Toni L. Mincieli, Esq.

Received Office of State Review
02/06/2024

P112

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**
_____

**IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis on behalf of        **SRO: 24-011**
Rex Francis, a student with a disability,                  IHO Case No. 249622

                                           Petitioners,

-against-

New York City Department of Education,

                                           Respondent.
_____

**PETITIONERS' REPLY MEMORANDUM OF LAW**

This reply memorandum of law is respectfully submitted on behalf of Rex Francis and his

parents in further support of their limited appeal from the IHO's December 08, 2023 Decision

denying Rex's reimbursement claim for his home and community-based programming and his

request for funding for an updated neuropsychological evaluation.

Respondent's Answer fails to accurately present the record and the controlling caselaw.

Everyone may be entitled to their own opinion but certainly, no one is entitled to their own facts.

Further, Respondent's Answer is far more significant for what it does *not* say rather than what it

does say. As shown below, at the end of the day, Respondent has failed to grapple with the

demonstrable grounds upon which this appeal is based.

**Respondent's Failure to Accurately Depict and Understand Rex's Home And**
**Community-Based Programming**

Respondent, in its Answer, misstates that the IHO "correctly ruled that these after-school

services were primarily designed to maximize the Student's education and generalize skills to the

home or community. They were for maintenance of skills, not to prevent regression, and not

Received Office of State Review
02/22/2024

necessary to ensure educational progress at school." Verified Answer, pg. 4. In making this

assertion, the Respondent ignores the documentary and testimonial evidence regarding Rex's

need for his home and community services to make progress in school. *See* Ex. P-U, at para. 68;

Ex. P-V, at para. 22; P-W, at para. 25; Tr. 129-130, Tr. 108:12 – 110:3; Tr. 117:13 – Tr. 118:9;

Tr. 120:19 —121:16. At the hearing, and on this appeal, there is ample evidence describing

Rex's significant cognitive, behavioral, physical, and communicative deficits and his need for

repetition to meaningfully learn and retain the skills he is taught in school. *See* Ex. P-D, at pg.

57-59, P-Y, Ex. P-W; Tr. 69, Tr. 82:6-12; P-X, at para 3.

       In arguing that Rex's after school speech language therapy ("SLT") with Kaitlyn Simon

is primarily for generalization, Respondent points to one line of hearing testimony where she

states her services, "supplement his learning and try to meet him where his needs are at the

moment." Tr.66. Respondent argues that Ms. Simon's use of the word "supplement"

unequivocally shows the purpose of Rex's home SLT was to maximize his potential as a student.

The argument is misconstrued as Respondent, as well as the IHO, failed to consider *why* Rex's

school SLT needed to be supplemented with Ms. Simon's additional 1:1 SLT sessions. In her

affidavit, Ms. Simon clearly details Rex's extensive speech and language deficits and his

continuing need for supplementary SLT:

> Rex requires this supplemental 1:1 instruction to learn and maintain new skills.
> Without this 1:1 instruction, therapy would not be individualized and scaffolded
> to meet him at his current level of functioning. Therefore, Rex would ultimately
> be less available to learn, generalize, and maintain newly acquired skills that
> facilitate his ability to attend, interact, and communicate in the real-world
> environment.
>
> Ex. P-W at Para. 25.

Received Office of State Review
02/22/2024

P114

Respondent's selective attention to Ms. Simon's inclusion of the word *generalization* ignore the portions of Ms. Simon's services that are clearly in place to enable and support Rex's ability and availability to learn. As Ms. Simon further details in her affidavit, Rex "continues to work on improving his auditory attention while reading books to be able to hold information in memory to process and answer concrete WH- questions (e.g., who, what, where) throughout the story or at the end, and continues to work on his auditory attention, auditory memory, and auditory comprehension through structured reading activities." Ex. P-W at Para. 23. Ms. Simon's activities during her SLT sessions are clearly for the primary purpose of reinforcing the skills Rex is learning at Titus, *in addition to teaching him new skills,* and ensuring that all skills are actually maintained. While the Respondent may feel the contrary, maintenance of skills and preventing regression go hand in hand.

Respondent thus misstates that Ms. Simon failed to answer why her services are needed in addition to Titus.  The record, however, is to the contrary.  Respondent ignores Ms. Simon's sworn affidavit testimony where she states her opinion that Rex needs the use of child-led speech therapy to explore and expand upon Rex's ideas; encourage logical thinking, creativity, and spontaneity; and build upon Rex's individual strengths and interests. Ex. P-W at para 26. Ms. Simon's also details the speech deficits Rex currently faces, and why these deficits necessitate additional speech language therapy. *Id.* at para 11.  Ms. Simon's affidavit further states, "Rex's appropriate education program includes Happy Talk Speech and Language Therapy PC because we follow Rex's lead to meet him at his current level of functioning and flexibly address our goals by switching set to more engagement or motivating tasks, increasing/decreasing task complexity as appropriate, and more." *Id.* at para 26.

Received Office of State Review
02/22/2024

P115

Regarding Respondent's assertions against Rex's after school OT services, they begin by stating, "According to Ms. Zambito, Titus is not providing enough OT to the Student (Tr .81); yet Ms. Zambito does not know how often Titus is providing OT. Tr. 80." Verified Answer, Pg. 5. Respondent, like the IHO, clearly misconstrued Ms. Jessica Zambito's testimony. Respondent refers to a portion of the hearing where the IHO tried to put words into Ms. Zambito's mouth to claim that Ms. Zambito believes that Titus is not providing Rex with enough OT. Tr. 81. Ms. Zambito responded to and directly refuted the IHO's assertion by stating:

> No, I didn't -- I didn't say that. I think that he requires more OT. I don't know what is provided at Titus, as I said. I do believe he requires the aspect of having parent education. He has significant safety – poor safety awareness, delays in cognition, speech and language, gross and fine motor skills, and safety awareness.
>
> Tr. 81

Moreover, while Respondent states that Ms. Zambito has no basis for stating Rex's need for supplementary OT services, they ignore the fact Ms. Zambito has based this opinion on her four years of working with Rex and her consistent evaluations of Rex's OT deficit and progress. Ex. P-X at Para. 6, 11, 13, and 18; *see also*, P-S.

Respondent additionally argues that Rex's need for afterschool SLT and OT is diminished by the fact that he did not receive these services during the summer. However, in doing so, Respondent ignores the testimony of Rex's mother, Halia Francis, who explained that this was due to scheduling conflicts with Rex's summer program at Titus, not because he did not need the services. Tr. 190-191. While Respondent and the IHO may have demanded that Rex's parent put together a perfect schedule to evidence Rex need for afterschool services, such a standard does not exist under the law. As the Second Circuit explained in *Frank G*., the parent's burden is whether their unilateral program and placement is "reasonably calculated" and does not

Received Office of State Review
02/22/2024

call for perfection. *Frank G.*, 459 F.3d at 365; See also *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877-78 (2d Cir. 2016).

Regarding Rex's home and community ABA instruction, Respondent argues that Stephanie Koh's services are primarily for the generalization of skills. Verified Answer, pgs. 6-8. However, this is simply not the case as Ms. Koh stated in her affidavit that Rex is currently working on independently following multi-step instructions and routines, adaptive living skills, pragmatic language skills (e.g., initiating and maintaining conversation), executive functioning skills, emotional regulation (e.g., accepting "no," waiting for desired request), behavioral regulation. Ex. P-V at para. 21. Moreover, Ms. Francis testified at the hearing that Rex's ABA instructors also work with Rex in reviewing and completing his homework from Titus. Tr. 186-187.

Further, while Respondent points to only the portions of Ms. Koh's testimony that mention the word "generalization," they ignore the portions in which her testimony shows that generalization is not the sole or even primary reason for the LGT's programming. (*See* Ex. P-V at Para 23, "The ABA that LGT provides in the home and community settings is complementary and compatible with the program targets of Titus. However, LGT primarily focuses on independence, adaptive living skills, psychological flexibility..."). Further, Respondents rely on SRO Appeal Decision 14-121, arguing that certain activities, such as ADL skills, fall out of the scope of relief intended for the IDEA. However, SRO Appeal 14-121 is inapplicable to Rex's case as it relies on and cites the former "some benefit" standard in determining the benefit owed a student under the IDEA and in addressing the value and necessity of skill generalization. The Supreme Court replaced the inadequate "some benefit" and "more than de minimis" standards in their 2017 unanimous and landmark decision *Endrew F.*, with the more appropriate standard,

Received Office of State Review
02/22/2024

whether the student's academic program and goals are "appropriately ambitious in light of [their] circumstances." 580 U.S. at 388.

While some aspects of Rex's home programming may have resulted in the generalization of some skills, it was not the sole or even primary reason that Rex received these services. As the SRO held in their recent Decision No. 23-237, the fact that home-based services (including ABA therapy) addresses a student's ADL skills, does not, without more, show that the services were for the sole purpose of generalizing skills. (*Application of a Student with a Disability,* Appeal No. 23-237).

**Respondent's Failure to Timely Raise Prong III Equitable Considerations**

The DOE, at several points in the hearing, conceded Prong III and that they "couldn't identify any. We reviewed the record and at this time we are not going be raising any Prong III." Tr. 35 and 204. The IHO herself stated at the hearing the parties' briefs would be limited to Prong II. Tr. 204-05. However, despite the IHO's representation and instruction, the DOE's closing brief and the IHO's subsequent decision focused on Prong III issues of maximization and generalization. Respondents, in their answer, echo the IHO determination that Rex's home and community services were for the purposes of maximization and generalization but fail to address that such claims go to Prong III equitable considerations and were conceded at the hearing.

Petitioners continue to maintain that the IHO and DOE's contentions of generalization and maximization, even if framed as Prong II issues, go to Prong III equitable considerations, which the DOE conceded and the IHO expressly limited the hearing issue to Prong II. Tr. 204-205; *See Application of Student with a Disability*, Appeal No. 23-237, *Application of a Student with a Disability*, Appeal No. 23-134, citing *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F. 3d

Received Office of State Review
02/22/2024

P118

1155, 1160 (9th Cir. 2011); *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d

1153, 1161 (5th Cir. 1986)). Respondent, in writing to affirm the IHO's prong III findings, has

failed to state why such arguments should have been considered at the hearing after such claims

were essentially estopped and why they should be considered now on appeal.

**The DOE's Failure to Be Accountable for Lack of Evaluative Information Regarding Rex**

Respondent argues that the Petitioners' requested relief for funding for an updated

neuropsychological evaluation should be denied as their DPC did not allege any disagreement

with the DOE evaluations. In doing so, they blatantly ignore the Petitioners' allegations that the

DOE had failed to conduct any evaluations, including a psychoeducational or any triannual

assessments, in their DPC. Ex. P-B. The Respondent's reliance on SRO decisions ruling on the

parent's right to avail themselves of the IEE process is misplaced. In SRO Appeal No. 23-181,

the record included past evaluations the district had conducted for the students and referenced the

Parent's failure to note any disagreement with such evaluations prior to filing their DPC.

The present facts are explicitly distinct in that that Petitioners, here, could not have

alleged any disagreements with the District's evaluations, as the district had failed to conduct

any evaluations for Rex. The District's continual failure to properly evaluate Rex to accurately

assess his present levels of performance is evidenced by the District's failure to submit any

evaluative information for the hearing.

As previously stated in Petitioners' Memorandum of Law, when the school district

concedes that it failed to offer the student a FAPE for the school year and elects not to submit

any evaluative information of the student as evidence of the district's view of the student's special

education needs, it is unfair to fault the parent where there is an assessment-related deficiency in

Received Office of State Review
02/22/2024

P119

the record. (*See Application of a Student with a Disability*, Appeal No. 19-131, citing, *A.D. v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010)).

**The Record Shows That Petitioners Were Not Afforded an Impartial Hearing Consistent With Due Process**

In their Answer, Respondent grossly understates the partiality that took place during the hearing. Petitioners do not raise these claims of partiality lightly. It is one thing for a hearing officer to ask clarifying questions that, as a result, elicit damaging testimony, but it is quite another for the hearing officer to take up the role of the DOE's advocate and ask cross-examination questions for the sole purpose of attacking Petitioners Prong II and Prong III claims. Petitioners have meticulously laid out in the memorandum of law the IHO's numerous questions that went well beyond the purpose of "clarifying the record". (Pet. MOL pg. 9, 12-13, 15-17). Petitioners provided numerous examples of the IHO asking cross-examination questions that went directly to Prong III issues, which the district had conceded, pressuring the Parent's witnesses when they would not acquiesce to the IHO's loaded and confusing questions and interrupting the Petitioner's witnesses when they were attempting to answer the IHO's questions.

The lack of impartiality during the hearing process is further evidenced by the IHO's excusing the DOE's untimeliness. While Respondent argues that DOE's late submission of its closing brief is harmless and thus is not evidence of partiality, the Petitioner submits the IHO's request and acceptance of the DOE's closing brief after the assigned due date displayed a pattern of partiality for the DOE. As previously discussed in Petitioners' MOL, the IHO had previously ordered in her Pre-Hearing Conference Summary and Order for the parties to disclose their intent to cross-examine witnesses two days prior to the hearing. IHO Ex. 1. Even though the DOE failed to disclose its intention to cross-examine Petitioners' witness, the IHO nevertheless allowed the DOE to ride the coattails of her cross-examination questions over Parent counsel's

P119

Received Office of State Review
02/22/2024

P120

objection. The DOE provided no reason for failing to abide by the IHO's set timelines or request

an extension if needed. The IHO allowing the DOE to disregard her deadlines and process

without consequence begs the question, why order such explicit deadlines in the first place?

The Respondent has attempted to minimize the way in which the hearing was conducted.

The DOE conceded its case in chief and conceded it could not identify any equitable

consideration against the parent. Tr. 35 and 204. Further, the DOE failed to call a single witness,

failed to disclose its intent to participate in cross-examination, and failed to submit any

documentary evidence to the record. In response, the IHO conducted her own cross-examination

of the Parent's witness, interrupted their testimony, and allowed the DOE to reap the benefit of

her questioning in submitting a late post-hearing brief that echoed many of the arguments the

IHO brought up during the hearing. Petitioners maintain their position that such conduct does not

amount to an impartial due process hearing. We invite the SRO to review both the hearing

transcript and the video record to see firsthand the way that the hearing was conducted.

## CONCLUSION

Petitioners respectfully urge that the IHO's determination of Rex's home ABA, SLT, and

OT programming be reversed.  Reimbursement and funding for an updated neuropsychological

evaluation should have been awarded as requested.

Dated: New York, New York
February 21, 2024

_/s/ *John Hobbs*_____

Gary S. Mayerson
John Hobbs
Christina Mure
Mayerson & Associates
*Attorneys for Petitioners*
200 W 41St Street, 17th Floor

P120

Received Office of State Review
02/22/2024

P121

New York NY 10036
Ph: (212) 265-7200
E: Gary@mayerslaw.com

P121

Received Office of State Review
02/22/2024

P122

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

---

IN THE MATTER OF THE APPEAL OF

| | |
|---|---|
| Halia Chudyk-Francis and Cliff Francis, on behalf of Rex Francis, a student with a disability, | **AFFIDAVIT OF VERIFICATION** |
| Petitioners, | IHO Case No. 249622 |
| | SRO: 24-011 |
| -against- | |
| New York City Department of Education, | |
| Respondent. | |

---

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

Cliff Francis, being duly sworn, deposes and says that he is a Petitioner in this proceeding; and he has read Petitioner's Verified Response to the Answer, knows the contents thereof, and that the same is true to the knowledge of the deponent.

*Cliff Francis*
Signed by: Cliff Francis
Date & Time: Feb 21, 2024 14:12:57 EST

Cliff Francis

Subscribed and sworn to before me this

21 day of February, 2024

Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual communication technology

P122

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

IN THE MATTER OF THE APPEAL OF

Halia Chudyk-Francis and Cliff Francis, on
behalf of Rex Francis, a student with a disability,

Petitioners,

-against-

New York City Department of Education,

Respondent.

**AFFIDAVIT OF**
**VERIFICATION**
IHO Case No. 249622

SRO: 24-011

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

Halia Chudyk-Francis, being duly sworn, deposes and says that she is a Petitioner in this
proceeding; and she has read Petitioner's Verified Response to the Answer, knows the
contents thereof, and that the same is true to the knowledge of the deponent.

*Halia Chudyk-Francis*

Signed by: Halia Chudyk-Francis
Date & Time: Feb 21, 2024 14:16:44 EST

Halia Chudyk-Francis

Subscribed and sworn to before me this

21 day of February, 2024

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual
communication technology

Notary Public

**NEW YORK STATE EDUCATION DEPARTMENT**
**OFFICE OF STATE REVIEW**

**IN THE MATTER OF THE APPEAL OF**

Halia Chudyk-Francis and Cliff Francis on behalf of     **AFFIDAVIT OF SERVICE**
Rex Francis, a student with a disability,                         IHO Case No. 249622

                                        Petitioners,

-against-

              New York City Department of Education,

                                        Respondent.

STATE OF NEW YORK

COUNTY OF NEW YORK ss.

GARY MAYERSON, being duly sworn, and deposes, says:

          That I am over the age of 18 years; that on February 21, 2024 I served Petitioners' Reply
dated 02/21/24

TO:     **Corporation Counsel of the City of New York**
        **Toni Mincielli, Esq.**
        **Agency Attorney, Appeals – Special Education Unit**

          Via the designated email provided for service during Executive Orders 202.8, 202.14,
202.28, 202.38, 202.48, 202.55 and 202.79: ServiceECF@law.nyc.gov with proof of receipt
attached.

                                                            Gary Mayerson

Subscribed and sworn to before me this
21st day of February, 2024

Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

**P125**

| | |
|---|---|
| **From:** | ServiceECF (Law) |
| **To:** | Samantha Hartman |
| **Subject:** | Proof of service receipt |
| **Date:** | Wednesday, February 21, 2024 4:27:37 PM |

This email confirms receipt of email and constitutes proof of service at the Office of the Corporation Counsel for the City of New York.  Please retain it for your records.  Please note that the Office of the Corporation Counsel has accepted service only for the City of New York and entities for which the Law Department is authorized to accept service, including  the Mayor and City Agency Heads named in their official capacities.  Service of process on any individually named parties has not been accepted.

Documents must be submitted as attachments; linked documents will not be accessed and will not be considered as proper service on the New York City Law Department. All documents submitted after 5:00PM will be considered served on the next business day.

Please be reminded that the Law Department Service Window remains open to accept service of papers on Tuesdays and Thursdays from 9:00 am until 5:00 pm.

Service of process on individuals should continue to proceed in a manner required by applicable law.

**This mailbox is only monitored for service. Please call (212) 356-1140** with any questions or concerns.

Received Office of State Review
02/22/2024

C1

## <u>IMPARTIAL HEARING OFFICER'S CERTIFICATION OF THE RECORD</u>

In the Matter of: Rex Francis _____ (Name of Student)

Hearing Dates: 10/13/2023 _____

Case Number: 249622 _____

I, Michelle S. Babbitt _____, Impartial Hearing Officer in this matter DO HEREBY CERTIFY that the attached Evidence and attached Index of Exhibits itemize the entire record before me in the above entitled matter as of this date.

I FURTHER CERTIFY that the materials submitted herewith are either the original or true copy of the original documents submitted in this matter.

*Michelle S. Babbitt* _____        12/29/2023 _____

Signature of Impartial Hearing Officer                Date Signed

Comments/Notes:

C1

**C2**



Impartial Hearing Office
131 Livingston Street, Room 201,
Brooklyn, NY 11201
(718) 935-2681

January 8, 2024

CERTIFICATION
IN THE MATTER OF REX FRANCIS
CASE #249622

This is to certify that the documents enclosed herein constitute the hearing record on file submitted to the Impartial Hearing Office by OATH Administrator, Emma Wong, pertaining to the above-named matter.

| DECISIONS AND ORDERS | | |
|---|---|---|
| Document Name | Date | |
| 1 Findings of Fact and Decision | December 8, 2023 | |
| 2 Order Denying Consolidation | July 4, 2023 | |
| 3 Case Follow Up Sheet – Extension Order | Request Date: October 13, 2023 | |
| **TRANSCRIPTS** | **TOTAL PAGES: 210** | |
| Document Name | Date | Page Count |
| 4 Transcript and Keyword Indexes | a) August 2, 2023 | 20 |
| | b) October 13, 2023 | 190 |
| **EXHIBITS** | **TOTAL EXHIBITS: 31** | |
| Document Name | Date | Page Count |
| 5 Parent Exhibits A-Z, AA-BB | Various | 282 |
| 6 IHO Exhibits 1-3 | Various | 44 |
| **CERTIFICATION OF RECORD** | | |
| 7 Certification of Impartial Hearing Officer re: Record | December 29, 2023 | |
| **SUPPLEMENTARY DOCUMENTS REQUIRED BY STATE REGULATIONS** | | |
| Document Name | Date | |
| 8 Notice of Appearance, Eli Koppel, Esq. | July 7, 2023 | |
| 9 Notice of Appearance, Christina Mure, Esq. | Undated | |
| 10 Notice of Appearance, John Hobbs, Esq. | Undated | |
| 11 Notice of Appearance, Gary S. Mayerson, Esq. | Undated | |
| 12 Amended Due Process Complaint | Received August 28, 2023 | |
| 13 Due Process Complaint | Received June 30, 2023 | |
| 14 Due Process Response | July 7, 2023 | |
| 15 Pendency Implementation Form | September 13, 2023 | |

**C2**

Received Office of State Review
01/09/2024

C3

| 16 | Written Clarification by Impartial OATH Administrator re: Record | December 29, 2023 |

**Additional Clarification**:

1 **DOE Closing Brief**: IHO Exhibit II.

2 **Parent Closing Brief**: IHO Exhibit III.

3 **Uncontested Pendency Form:** This is an administrative form submitted by the District to the Impartial Hearing Office.

4 **IHO Exhibit 3:** Findings of Fact and Decision listed 24 pages but the correct number of pages is 25. See Written Clarification by OATH Administrator.

5 **Page Counts:** Page counts provided in this document were calculated based on the number of pages within each exhibit, excluding cover pages, blank pages, indexes, etc. and thus may not align exactly with the page counts of the total document.

6 **Exhibits**: We have transmitted the exhibits exactly as submitted and certified by the Hearing Officer.

*/s/ Abimbola Ogunleye, Esq.*
_____

**Abimbola Ogunleye, Esq.**
Agency Attorney
Impartial Hearing Office

*Brian Davenport*
_____

**Brian Davenport, Esq.**
Managing Attorney
Office of the General Counsel

C3

S1

# MAYERSON & ASSOCIATES

Phone:(212) 265-7200
Fax: (917) 210-3075
samantha@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

August 22, 2023

**VIA E-MAIL**

| | |
|---|---|
| Impartial Hearing Office | IHO Michelle Babbitt |
| 131 Livingston Street, Room 201 | Office of Adminstrative Trials and Hearings |
| Brooklyn, New York 11201 | MBabbitt@oath.nyc.gov |
| E-mail: IHOQuest@Schools.nyc.gov | |

Re:    **AMENDED Demand for Due Process: 2023-2024 Twelve-Month School Year[1]**
       **Rex Francis D.O.B. 04/14/2014 - NYC ID# 243-995-479 v. NYCDOE**

Dear Sir or Madam:

We represent Rex Francis, a 9 year old boy classified with an autism spectrum disorder. Rex resides with his parents, Halia Chudyk-Francis and Cliff Francis, at 25 East End Ave., Apt 7E New York, New York 10028. Rex's date of birth is 04/14/2014. For the 2022-2023 school year, Rex attended The Titus School, together with supplemental supports and services. For the 2023-2024 school year, Rex will be attending The Titus School, located at 90 John Street New York, NY 10038, together with supplemental supports and services.

**This matter is being amended to update Rex's pendency entitlements and the proposed solution.**

On behalf of Rex and his parents, we respectfully request a due process hearing pursuant to the federal IDEA statute and its implementing regulations, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the New York Education Law and its regulations and guidelines, in order to adjudicate pendency, declaratory, prospective, reimbursement, compensatory and all other relief that the hearing officer deems appropriate pertaining to or arising out of the 2023-2024 school year.

At the hearing, among other things, the evidence will establish that, both substantively and procedurally, the New York City Department of Education ("DOE") failed to provide Rex with a "free appropriate public education" ("FAPE"), thereby establishing Prong I of the *Burlington/Carter*[2] test for

---

[1] The student requires a twelve-month (52-week) school year that begins on July 1, 2023. The New York Education Law mandates that the school year begins on July 1 and runs through June 30. N.Y. EDUC. L. § 2(15); *In re Kiesha BB.*, 815 N.Y.S.2d 800 (3d Dep't 2006). In order to preserve the student's pendency entitlements effective as of Saturday July 1, 2023, this demand is being filed on Friday June 30, 2023.

[2] *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

Received Office of State Review
01/09/2024

S1

S2

reimbursement in Rex's favor.[3] In contrast, for Prong II purposes, the evidence will show that the placement, program, and interventions that Rex's parents have secured for Rex are appropriate and "reasonably calculated" to provide meaningful educational benefits and are thus reimbursable or otherwise fundable under the more relaxed *Frank G.*[4] standards. Finally, for purposes of Prong III, the evidence will show that Rex's parents acted reasonably and in good faith. There are no equitable circumstances that would operate to preclude or diminish a reimbursement or prospective funding award. We give notice that in light of applicable legislation, the DOE must proceed to meet its Prong I evidentiary burden.

## PENDENCY

In the interim, and until there has been a final order, we invoke Rex's pendency entitlements according to Impartial Hearing Officer McKeaver's "Findings of Fact and Decision," dated 8/15/23. According to this decision and order, Rex's pendency entitlements include:
1. Total cost of tuition at the Titus School;
2. Up to ten (10) hours per week of Speech and Language Therapy;
3. One (1) hour per week of Physical Therapy;
4. Social Skill group one day per week;
5. Up to (2) hours per week of Occupational Therapy;
6. Up to 2 hours per week of parent training and counseling;
7. Up to 2 hours per week of ABA supervision;
8. Monthly ABA meetings (1 hour per therapist);
9. Monthly interdisciplinary team meetings (l hour per service provider); and
10. Costs of door-to-door transportation to and from the school.

As per 20 U.S.C. § 1415(j), Rex's pendency entitlements are automatic and unconditional upon the filing of this demand (and are not contingent on the conclusion of the 30 day Resolution Period) and are required to be implemented and performed by the DOE as a matter of law and statute, without the necessity of any application, motion or other showing by Rex's counsel until there is a final order. In the event, however, that the DOE fails or refuses to implement Rex's pendency and insists upon the issuance of an interlocutory decision from the impartial hearing officer ("IHO"), we respectfully request an *immediate* hearing on pendency, or in the alternative, a brief pendency submission by both parties with the IHO issuing an interim order based on such submissions. The whole purpose of pendency is to preserve the educational *status quo ante*. Without the implementation and honoring of the statutory entitlement of pendency, there would be a lapse in funding of Rex's services and program.

## THE PROBLEM

Rex is diagnosed with an autism spectrum disorder. Rex presents with a variety of significant deficits and interfering behaviors. Rex's deficits are pervasive and "global," and they transcend behavioral, communication, social and physical domains. Rex continues to need special education services on a twelve-month basis. As a student with a disability, Rex is entitled to a FAPE, and based on the Supreme Court's unanimous decision in *Endrew F.*, that educational program must be adequately ambitious and

---

[3] The student's parents' statutory entitlements were also seriously violated. Under *Winkelman v. Parma City Sch. Dist.*, 127 U.S. 1994 (2007), the "IDEA includes provisions conveying rights to *parents* as well as to children" (emphasis added). See also *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U. S. ____ ;137 S. Ct. 988 (2017).
[4] *See Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006).

Received Office of State Review
01/09/2024

S2

S3

provide for appropriately challenging objectives. Rex's rights include both procedural and substantive safeguards. As the parents of a student with autism, Rex's parents are entitled to special statutory protections.

On 01/17/2023, the DOE convened an IEP meeting ostensibly to develop an educational program for Rex for the 2023-2024 school year.[5] Rex's parents received a School Location Letter, dated 6/22/23, for 75M811: P.S. M811 – Mickey Mantle School, located at 466 West End Avenue, Manhattan, NY 10024. The DOE failed, both procedurally and substantively, to offer Rex a FAPE. At the hearing, among other deficits and violations, the evidence will establish the following as part of the Prong I presentation:

1. The DOE's IEP program is not "reasonably calculated" to provide Rex with a FAPE;

2. The DOE's proposed placement is not reasonably calculated to provide Rex with meaningful educational benefit;

3. While the DOE's failures and omissions may each amount to a denial of a FAPE on their own, certainly the cumulative and combined effect of the DOE's multiple failures results in a FAPE deprivation for Rex;

4. The proposed IEP program and placement, as written, is calculated to (a) produce regression and (b) work against independence and self-sufficiency;

5. As of the start of Rex's 2023-2024 twelve-month school year, Rex's parents only had the written IEP, the School Location Letter, and Prior Written Notice document, to rely upon with respect to what the DOE is actually offering Rex for his 2023-2024 twelve-month school year, and Rex's parents rejected the program and placement based on what information they had received from the IEP, School Location Letter, and Prior Written Notice document;

## NOTICE

6. The DOE failed to provide Rex's parents with a Prior Written Notice document which conformed with 8 N.Y.C.R.R. § 200.5(a);

## THE IEP TEAM WAS NOT DULY CONSTITUTED

7. The DOE failed to include any DOE related service providers, despite the fact that the DOE ostensibly determined related service mandates before or during the IEP meeting;

8. The DOE failed to include the participation of the student's home-based providers at the IEP meeting despite Rex's parents informing the CSE in advance of the meeting that Rex received home-based services;

---

[5] If the DOE develops and delivers another IEP for the student for the 2023-2024 school year, we reserve the right to challenge it.

Received Office of State Review
01/09/2024

S3

S4

## THE DOE FAILED TO DEVELOP AN APPROPRIATE FBA

9. The DOE failed to develop a Functional Behavior Assessment ("FBA"), despite Rex's interfering behaviors;

10. With respect to Rex's FBA claim, the DOE failed to comply with the New York State's Education Department's requirements,[6] the Commissioner's Regulations, the DOE's own policy regarding administering FBAs;[7] and the DOE's own Standard Operating Procedures Manual[8] ("SOPM");

## THE DOE FAILED TO DEVELOP AN APPROPRIATE BIP

11. The DOE failed to develop any Behavior Intervention Plan ("BIP"), despite Rex's interfering behaviors;

12. The DOE failed to develop a BIP, despite acknowledging Rex's interfering behaviors elsewhere in the IEP;

## THE DOE FAILED TO GATHER SUFFICIENT INFORMATION PRIOR TO THE IEP MEETING

13. The DOE failed to observe Rex prior to the IEP meeting and the DOE representatives at the IEP meeting did not have sufficient first-hand information to rely upon when making a recommendation for Rex's program. The DOE personnel who attended Rex's IEP and who were charged with developing the DOE's program recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate program recommendation;

14. Similarly, the DOE personnel charged with selecting a placement (school site) recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate placement recommendation;

## THE DOE FAILED TO SUFFICIENTLY INDIVIDUALIZE THE IEP

15. The DOE failed to develop an IEP tailored to Rex's individual and unique needs, and instead, adhered to DOE policy, custom, practices, and/or its own program and placement limitations;

---

[6] *Functional Behavioral Assessments*, NYSED.GOV (May 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.doc (last visited on June 18, 2018).

[7] N.Y. COMP. CODES R. & REGS. tit. 8, §§ 200.1(r), 200.5(b)(1), 200.22(a) and 201.3.; *Special Education: Functional Behavior Assessments*, NYSED.GOV (May 23, 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.htm (last visited on June 18, 2018).

[8] Dr. Marcia V. Lyles and Linda Wernikoff, *Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities*, NEW YORK CITY DEPARTMENT OF EDUCATION, Updated March 23, 2018, *available at* http://schools.nyc.gov/nr/rdonlyres/5f3a5562-563c-4870-871f-bb9156eee60b/0/03062009sopm.pdf. (last visited on June 18, 2018).

Received Office of State Review
01/09/2024

S4

16. The DOE's IEP-related computer software (i.e., SESIS) improperly restricts the "inputting" of appropriate and individualized supports that Rex requires;

17. The DOE engaged in impermissible "predetermination" in the IEP development process, precluding any meaningful participation from Rex's parents and/or other team members;

18. The DOE's recommended levels of related services and supports for Rex are not individualized to reflect his individual needs;

19. Upon information and belief, union contracts and agency agreements preclude or restrict collaboration and communication between and among teachers and service providers as well as the duration of related services and the times they may be available and these agreements precluded Rex's IEP from being sufficiently individualized;

## EVALUATION AND ASSESSMENT CLAIMS

20. The DOE failed to timely develop critical *assessment* reports that should have been used as the basis for establishing "present levels" as part of the fundamental development of the IEP, including but not limited to a meaningful base-lining of Rex's then-existing functional and skill levels, (including but not limited to his interfering behaviors) and this failure, among other problems, precluded the IEP from being sufficiently individualized and thus "reasonably calculated";

21. The DOE did not conduct any of its own evaluations and/or assessments of Rex prior to the IEP meeting;

22. The DOE failed to reimburse or otherwise fund Rex's parents for the independent and private evaluations they had done;

23. The DOE ostensibly relied heavily on private non-DOE reports and documentation school documents and "input" from Rex's teaching staff from the Titus school, but failed to meaningfully consider the *recommendations* made in those documents and made by those participating in Rex's IEP meeting;

24. The DOE failed to meaningfully consider Rex's private evaluations and the recommendations of professionals who know and/or work with Rex;

25. At the IEP meeting, no one from the DOE disputed the contents of Rex's private reports and documentation, or the input from Rex's teachers and providers, yet the DOE failed to meaningfully consider the recommendations in those reports andinformation offered by Rex's teachers and providers;

26. The DOE failed to timely provide evaluation(s) and other documentation to Rex's parents;

27. The DOE failed to conduct a triennial evaluation;

Received Office of State Review
01/09/2024

S6

28. The DOE failed to have any meaningful discussion about any classroom observations, much less actually conduct one;

29. The DOE failed to conduct evaluations and assessments that consider the factors and considerations required to be considered for approval of one-to-one classroom aide support, as adopted by the Board of Regents in June, 2016;

## THE DOE'S FAILURES AFTER THE IEP MEETING

30. The DOE failed to timely provide a copy of the IEP to Rex's parents; and thus Rex's parents did not have sufficient written notice about the DOE's proposed program;

31. The DOE failed to provide any minutes of the IEP meeting to Rex's parents at the conclusion of the IEP meeting or any time thereafter;

32. We reserve the right to challenge the IEP minutes.

33. The DOE failed to reconvene Rex's IEP meeting to discuss Rex's parents' concerns;

## THE DOE FAILED TO MEANINGFULLY COMMUNICATE WITH THE STUDENT'S PARENTS AND THEN-CURRENT PROVIDERS PRIOR TO, DURING AND AFTER THE IEP MEETING

34. The DOE failed to meaningfully respond to Rex's parents' communications to the DOE expressing their concerns about the proposed educational program and/or placement for Rex and the DOE failed to take appropriate steps to attempt to rectify the problems;

35. The DOE failed to appropriately communicate with Rex's teachers and related service providers as part of developing Rex's program and placement;

36. The DOE failed to meaningfully include Rex's parents in the IEP development and placement selection process, as required by statute and *Winkelman*;

37. The DOE failed to remediate <u>any</u> of its deficiencies after the IEP meeting and even after Rex's parents' "10-day" letter;

## THE DOE FAILED TO MAKE PROVISION FOR APPROPRIATE PARENT COUNSELING AND TRAINING

38. The DOE failed to honor the New York State and federal mandates that "provision" be expressly made in Rex's IEP for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum;[9]

Received Office of State Review
01/09/2024

S6

S7

39.   The DOE failed to provide any IEP goals for parent training and counseling;

40.   The DOE failed to offer *individualized* parent training and counseling which is not only in contravention of the Commissioner's regulations, but also wholly inconsistent with the privacy mandates of the IDEA and the Family Educational Rights Privacy Act ("FERPA").[10] It is inappropriate to offer parents parent training only in a *public* setting where their privacy is subjected to being "outed" or otherwise compromised;

## THE IEP, AS WRITTEN, CONTAINS MISINFORMATION, ERRORS, OMISSIONS AND/OR OTHER INACCURACIES THAT DEPRIVE THE STUDENT OF A FAPE

41.   The DOE failed to timely conduct an IEP for the 2023-2024 school year that included the proper assessment of Rex's "present levels,"

42.   The DOE failed to adequately consider Rex's need for consistency in programming given his transition and generalization deficits – no plan to transition the student to a new educational setting, appropriate or otherwise, was discussed, recommended or developed by the DOE;

43.   The DOE failed to provide the requisite *consistency* in programming and supports;

44.   The proposed program offers no or inadequate supports for school personnel on behalf of Rex;

45.   Whereas Rex has difficulty with generalization, the DOE failed to properly promote generalization;

46.   The DOE failed to identify the current school and/or home programming Rex had in place at the time of the IEP meeting and therefore failed to give notice to anyone who would be working with and/or responsible for educating Rex of the type of programming and methodology used for Rex with which his was making progress and instead leaving new providers and teachers "in the dark" with respect to what Rex requires to make progress and not regress;

## THE DOE FAILED TO OFFER AN APPROPRIATE CLASS SIZE, AN APPROPRIATELY GROUPED CLASS, AN APPROPRIATE STAFFING RATIO AND/OR APPROPRIATE INSTRUCTIONAL SUPPORT

47.   The DOE failed to adequately address and accommodate Rex's need for intensive 1:1 teaching and failed to offer Rex consistent 1:1 *teaching* and instruction throughout the school day;

48.   The DOE's proposed class size, functioning-levels, and staffing ratio are not appropriate to meet Rex's needs;

---

[10] 34 C.F.R. § 300.34(c)(8); N.Y. COMP. CODES R. & REGS. tit. 8 § 200.13(d); 20 U.S.C. § 1232(g), *et seq.*

Received Office of State Review
01/09/2024

S7

S8

49. The DOE's proposed program fails to provide adequate instructional support for Rex;

## THE DOE FAILED TO OFFER APPROPRIATE RELATED SERVICES AND SUPPORTS

50. The DOE failed to offer adequate levels and frequencies of related services;

51. The DOE failed to recommend any "extended-day" services for Rex, despite the fact that such services are needed for Rex's acquisition of skills, prevention of regression and continued progress;

52. The DOE's proposed IEP provides for unhelpful "pullouts," resulting in impairment of Rex's entitlement to be educated with non-disabled peers to the "maximum extent appropriate";

53. To the extent that the IEP plan and service mandates cannot be met at the DOE's proposed placement and would require RSAs: (a) the provision of RSAs would not be timely, (b) the provision of RSAs that Rex's parents would need to fulfill is not tantamount to the provision of a FAPE, and (c) the provision and mechanism of RSAs works against Rex's need for consistency, regular communication and collaboration between and among Rex's teachers, providers and home-based team;

54. The DOE failed to develop a plan that adequately addresses Rex's sensory needs (e.g., a sensory diet) and use of a sensory gym and suspended equipment;

## IEP GOALS AND OBJECTIVES CLAIMS

55. Based on the Supreme Court's unanimous decision in *Endrew F.*, as a student with a disability, Rex is entitled to a program that is "appropriately ambitious" in light of Rex's circumstances that provides for "challenging objectives." *Endrew F.*, 580 U. S. ____ (2017). An educational program "providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all." *Id.* The DOE failed to provide Rex with a program that is "appropriately ambitious" in light of Rex's circumstances and that provides for "challenging objectives" for Rex;

56. The DOE failed to develop measurable annual goals to meet each of Rex's educational needs related to his disability and failed to adequately address all of Rex's unique and individualized needs;

57. The DOE failed to meaningfully develop goals and objectives at the IEP meeting, with the participation of Rex's parents;

58. Despite the presence of interfering behaviors, the proposed IEP lacks adequate goals and objectives to address and remediate such behaviors and includes no method of measuring behavioral progress;

Received Office of State Review
01/09/2024

S8

S9

59.   Despite Rex's issues with transitioning, the DOE failed to develop any goals or objectives, measured or otherwise, to address the numerous transitions Rex would necessarily endure;

60.   The DOE's goals and objectives are not appropriate for a program that is less structured and intensive than a 1:1 teaching program;

61.   The DOE failed to indicate objective "Methods of Measurement" for Rex's goals, and the DOE failed to develop appropriate mechanisms for measuring progress toward goals;

62.   Although the IEP purports to include "short term" objectives, the IEP does not specify the length of the "term" and thus, there are no intermediate points built into the IEP to assess and measure Rex's progress;

63.   The DOE failed to develop IEP goals that were clear, unambiguous, adequate, sufficiently challenging, and individualized for Rex;

64.   The DOE failed to develop adequate and appropriate IEP short-term objectives with respect to each listed goal;

65.   The goals and objectives are not appropriately tailored and individualized and are largely generic because, among other things, they are not based on proper assessments and evaluations of the student's "present levels" of performance;

66.   The DOE incorporated goals and objectives developed by Rex's private providers and school, which reference a specific methodology (e.g. ABA ) that the DOE's proposed placement and its personnel are not ready, willing and able to implement so that Rex will receive a meaningful education ;

67.   The DOE failed to develop any goals to address how Rex would generalize skills from school to home and community environments and vice versa;

68.   Specifically, the DOE incorporated goals and objectives by the Titus School and Rex's Private Providers that were specifically designed to be implemented in a ***1:1 ABA teaching program***;

### THE DOE FAILED TO MEANINGFULLY DISCUSS AND CONSIDER METHODOLOGY IMPLICATIONS

69.   Rex is entitled to an educational program wherein the content, methodology, or delivery of instruction must be narrowly tailored to address the unique needs of the child that result from the child's disability. 34 C.F.R. § 300.39(b)(3)(i); *A.M. v. N.Y. City Dep't of Educ.,* 845 F.3d 523 (2d Cir. N.Y. Jan. 10, 2017); see also *T.Y. v. New York City Dep't of Educ.*, 213 F. Supp. 3d 446 (E.D.N.Y. Aug. 26, 2016);

S9

Received Office of State Review
01/09/2024

S10

70. The IEP team failed to assess and/or otherwise meaningfully consider what, if any, educational methodologies and approaches are researched-based and "reasonably calculated" to promote Rex's meaningful educational progress;

71. The core "methodology" employed at the DOE's proposed placement is inappropriate and inadequate to meet Rex's needs;

72. The CSE did not dispute that Rex is making progress in a research-based ABA program, but did not recommend ABA intervention for Rex;

73. The CSE failed to advise Rex's parents that a 1:1 teaching program utilizing the scientifically validated ABA method of instruction may be available to Rex at the New York Center for Autism Charter School, which is a publicly funded school and would be free for Rex to attend;[11]

## PLACEMENT CLAIMS

74. The DOE's chosen placement was not based on a fully developed IEP or on appropriate information to guide the placement selection decision;[12]

75. The DOE unilaterally chose the school site without opportunity for Rex's parents' input and participation in contravention of *Florence County School District Four v. Carter,* 510 U.S. 7, 12 (1993) ("free appropriate public education" required by the IDEA entails education in "public schools or in private schools chosen jointly by school officials and parents") and/or reasonable opportunity to evaluate the school;

76. The DOE impermissibly abdicated the school "placement" decision to an inadequately informed administrator who was not even present at Rex's IEP meeting;

## CLAIMS SPECIFIC TO INFORMATION THE STUDENT'S PARENTS LEARNED FROM DOE PERSONNEL AT 75M811: P.S. M811 – Mickey Mantle School [13]

77. Upon information and belief, the proposed placement is unable to implement the DOE's IEP for Rex;

78. Rex's parents did not receive a SLL until June 23, 2023, five months after the IEP meeting was held. As such, they have not been able to physically tour the recommmneded school ;

79. We reserve the right further allege deficiencies with the recommended placement once Rex's parents have visited the recommended placement.

---

[12] 34 C.F.R. § 300.116(b)(2).

[13] In addition to incorporating specific allegations from the school visit in this demand, we are reserving our right to challenge the proposed placement location for any of the numerous reasons illustrated in the student's parents' correspondence with the DOE prior to this filing. We are expressly putting the DOE on notice that we are incorporating all of those allegations (including those in the 10 day letter) by reference hereto.

Received Office of State Review
01/09/2024

S10

S11

## OTHER CLAIMS

80. In the event that the DOE raises any Prong III claim or defense (equities), Rex's parents cooperated in the IEP development process;

81. The DOE fails to provide adequate training and supervision of its DOE staff;

82. Upon information and belief, the DOE and its employees intentionally or negligently concealed or otherwise failed to disclose information that it had a duty to disclose to the student and the student's parents which, if timely disclosed, would be the basis for additional claims; and

83. Upon information and belief, the DOE failed to respond to the parents' questions and requests for information and had such information been timely supplied, that information would have been pleaded by the student as part of the hearing request.

Procedurally and substantively, the foregoing deprived Rex of a FAPE, establishing Prong I of the *Burlington/Carter* and *D.A./Connors* tests in Rex's favor for the 2023-2024 school year. In contrast, for Prong II purposes, the evidence will show that Rex's unilateral program and recommendations are "reasonably calculated" to provide meaningful educational benefits to Rex, and thus are reimbursable and otherwise fundable under the more relaxed *Frank G.* and *R.E.*[14] standards. Finally, for purposes of Prong III, the evidence will show that (a) appropriate notice was given by Rex's parents, (b) they have cooperated in good faith, and (c) there are no equitable circumstances that would operate to preclude or otherwise diminish a prospective or reimbursement award.

## PROPOSED SOLUTION

We will be seeking reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

a) tuition and costs at Titus School
b) up to 10 hours per week of after school ABA
c) up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy)
d) 1 hour per week of after school Physical Therapy
e) Social Skills group one day a week after school
f) up to 2 hours per week of after school Occupational Therapy
g) up to 2 hours per week of parent training and counseling
h) up to 2 hours per week of after school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (l hour per service provider)
k) Funding for an updated Neuropsycholigcal Examination
l) costs of transportation to and from the school

---

[14] *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189-90 (2d Cir. 2012).

Received Office of State Review
01/09/2024

S11

S12

Such services and additional supports are appropriate for Rex and are consistent with evaluations that Rex's parents have previously shared. Rex will also seek a compensatory education claim for any and all educational services Rex is entitled to that the DOE failed to provide, including his pendency entitlements.

Rex's needs are constantly changing over time. We reserve the right to further amend Rex's demand upon further notice as additional components of Rex's program may fall into place. The award should be a reimbursement award to the extent Rex's parents have paid out money, and it should be a prospective and/or direct funding award for any unpaid amounts, including but not limited to amounts payable under statutory pendency.

## RESOLUTION MEETING

Although we have requested an impartial hearing, Rex's parents certainly are prepared to meet with the DOE in the context of a resolution meeting, and hope that the DOE can cure the violations alleged above.

## CLOSED HEARING

Rex's parents request a closed hearing.

## ATTORNEYS' FEES AND OTHER COSTS AND EXPENDITURES

To the extent that Rex "substantially prevails," Rex and his parents intend to seek an award of attorneys' fees and the recovery of all related costs and disbursements.

## ATTORNEY AND STAFF TO BE NOTICED ON CORRESPONDENCE

Attorney Gary Mayerson (gary@mayerslaw.com), Attorney Christina Mure (christina@mayerslaw.com), Attorney John Hobbs (John@mayerslaw.com), Paralegal Sean Levan (sean@mayerslaw.com), and Paralegal Samantha Hartman (samantha@mayerslaw.com).

Sincerely,

*s/ Mayerson & Associates*
Mayerson & Associates


cc:    Mariama Sandi, CSE Chairperson
       msandi@schools.nyc.gov

       Halia Chudyk-Francis and Cliff Francis (Via E-mail)

S12

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622



**S13**

Phone:(212) 265-7200
Fax: (917) 210-3075
samantha@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

June 30, 2023

<u>**VIA E-MAIL**</u>

Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, New York 11201
E-mail: IHOQuest@Schools.nyc.gov

Re:     <u>**Demand for Due Process: 2023-2024 Twelve-Month School Year**[1]</u>
        <u>**Rex Francis D.O.B. 04/14/2014 - NYC ID# 243-995-479 v. NYCDOE**</u>

Dear Sir or Madam:

We represent Rex Francis, a 9 year old boy classified with an autism spectrum disorder.  Rex resides with his parents, Halia Chudyk-Francis and Cliff Francis, at 25 East End Ave., Apt 7E New York, New York 10028.  Rex's date of birth is 04/14/2014.  For the 2022-2023 school year, Rex attended The Titus School, together with supplemental supports and services.  For the 2023-2024 school year, Rex will be attending The Titus School, located at 90 John Street New York, NY 10038, together with supplemental supports and services.

On behalf of Rex and his parents, we respectfully request a due process hearing pursuant to the federal IDEA statute and its implementing regulations, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the New York Education Law and its regulations and guidelines, in order to adjudicate pendency, declaratory, prospective, reimbursement, compensatory and all other relief that the hearing officer deems appropriate pertaining to or arising out of the 2023-2024 school year.

At the hearing, among other things, the evidence will establish that, both substantively and procedurally, the New York City Department of Education ("DOE") failed to provide Rex with a "free appropriate public education" ("FAPE"), thereby establishing Prong I of the *Burlington/Carter*[2] test for reimbursement in Rex's favor.[3]  In contrast, for Prong II purposes, the evidence will show that the

---

[1] The student requires a twelve-month (52-week) school year that begins on July 1, 2023.  The New York Education Law mandates that the school year begins on July 1 and runs through June 30.  N.Y. EDUC. L. § 2(15); *In re Kiesha BB.*, 815 N.Y.S.2d 800 (3d Dep't 2006).  In order to preserve the student's pendency entitlements effective as of Saturday July 1, 2023, this demand is being filed on Friday June 30, 2023.
[2] *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).
[3] The student's parents' statutory entitlements were also seriously violated.  Under *Winkelman v. Parma City Sch. Dist.*, 127 U.S. 1994 (2007), the "IDEA includes provisions conveying rights to *parents* as well as to children" (emphasis added). See also *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U. S. ____ ;137 S. Ct. 988 (2017).

**S13**

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S14

placement, program, and interventions that Rex's parents have secured for Rex are appropriate and "reasonably calculated" to provide meaningful educational benefits and are thus reimbursable or otherwise fundable under the more relaxed *Frank G.*[4] standards. Finally, for purposes of Prong III, the evidence will show that Rex's parents acted reasonably and in good faith. There are no equitable circumstances that would operate to preclude or diminish a reimbursement or prospective funding award. We give notice that in light of applicable legislation, the DOE must proceed to meet its Prong I evidentiary burden.

## PENDENCY

In the interim, and until there has been a final order, we invoke Rex's pendency entitlements according to Impartial Hearing Officer Wolman's "Findings of Fact and Decision," dated 6/14/21. According to this decision and order, Rex's pendency entitlements include:

1. Tuition at Private School;
2. Up to ten (10) hours per week of home and community-based ABA behavioral therapy and up to two (2) hours per week of ABA Supervision;
3. Up to two (2) hours per week of Parent Training;
4. Up to two (2) hours per week of additional Speech and Language Therapy;
5. Up to two (2) hours per week of home/community-based and gym-based Occupational Therapy;
6. Monthly ABA meetings (one hour per therapist); and
7. Monthly interdisciplinary team meetings (one hour per service provider);
8. Transportation costs.

As per 20 U.S.C. § 1415(j), Rex's pendency entitlements are automatic and unconditional upon the filing of this demand (and are not contingent on the conclusion of the 30 day Resolution Period) and are required to be implemented and performed by the DOE as a matter of law and statute, without the necessity of any application, motion or other showing by Rex's counsel until there is a final order. In the event, however, that the DOE fails or refuses to implement Rex's pendency and insists upon the issuance of an interlocutory decision from the impartial hearing officer ("IHO"), we respectfully request an *immediate* hearing on pendency, or in the alternative, a brief pendency submission by both parties with the IHO issuing an interim order based on such submissions. The whole purpose of pendency is to preserve the educational *status quo ante*. Without the implementation and honoring of the statutory entitlement of pendency, there would be a lapse in funding of Rex's services and program.

## THE PROBLEM

Rex is diagnosed with an autism spectrum disorder. Rex presents with a variety of significant deficits and interfering behaviors. Rex's deficits are pervasive and "global," and they transcend behavioral, communication, social and physical domains. Rex continues to need special education services on a twelve-month basis. As a student with a disability, Rex is entitled to a FAPE, and based on the Supreme Court's unanimous decision in *Endrew F.*, that educational program must be adequately ambitious and provide for appropriately challenging objectives. Rex's rights include both procedural and substantive safeguards. As the parents of a student with autism, Rex's parents are entitled to special statutory protections.

---

[4] *See Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006).

Received Office of State Review
01/09/2024

S14

D. Jones, Case Coordinator IHO# 249622

S15

On 01/17/2023, the DOE convened an IEP meeting ostensibly to develop an educational program for Rex for the 2023-2024 school year.[5] Rex's parents received a School Location Letter, dated 6/22/23, for 75M811: P.S. M811 – Mickey Mantle School, located at 466 West End Avenue, Manhattan, NY 10024. The DOE failed, both procedurally and substantively, to offer Rex a FAPE. At the hearing, among other deficits and violations, the evidence will establish the following as part of the Prong I presentation:

1.  The DOE's IEP program is not "reasonably calculated" to provide Rex with a FAPE;

2.  The DOE's proposed placement is not reasonably calculated to provide Rex with meaningful educational benefit;

3.  While the DOE's failures and omissions may each amount to a denial of a FAPE on their own, certainly the cumulative and combined effect of the DOE's multiple failures results in a FAPE deprivation for Rex;

4.  The proposed IEP program and placement, as written, is calculated to (a) produce regression and (b) work against independence and self-sufficiency;

5.  As of the start of Rex's 2023-2024 twelve-month school year, Rex's parents only had the written IEP, the School Location Letter, and Prior Written Notice document, to rely upon with respect to what the DOE is actually offering Rex for his 2023-2024 twelve-month school year, and Rex's parents rejected the program and placement based on what information they had received from the IEP, School Location Letter, and Prior Written Notice document;

## NOTICE

6.  The DOE failed to provide Rex's parents with a Prior Written Notice document which conformed with 8 N.Y.C.R.R. § 200.5(a);

## THE IEP TEAM WAS NOT DULY CONSTITUTED

7.  The DOE failed to include any DOE related service providers, despite the fact that the DOE ostensibly determined related service mandates before or during the IEP meeting;

8.  The DOE failed to include the participation of the student's home-based providers at the IEP meeting despite Rex's parents informing the CSE in advance of the meeting that Rex received home-based services;

## THE DOE FAILED TO DEVELOP AN APPROPRIATE FBA

9.  The DOE failed to develop a Functional Behavior Assessment ("FBA"), despite Rex's interfering behaviors;

---

[5] If the DOE develops and delivers another IEP for the student for the 2023-2024 school year, we reserve the right to challenge it.

S15

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S16

10. With respect to Rex's FBA claim, the DOE failed to comply with the New York State's Education Department's requirements,[6] the Commissioner's Regulations, the DOE's own policy regarding administering FBAs;[7] and the DOE's own Standard Operating Procedures Manual[8] ("SOPM");

## THE DOE FAILED TO DEVELOP AN APPROPRIATE BIP

11. The DOE failed to develop any Behavior Intervention Plan ("BIP"), despite Rex's interfering behaviors;

12. The DOE failed to develop a BIP, despite acknowledging Rex's interfering behaviors elsewhere in the IEP;

## THE DOE FAILED TO GATHER SUFFICIENT INFORMATION PRIOR TO THE IEP MEETING

13. The DOE failed to observe Rex prior to the IEP meeting and the DOE representatives at the IEP meeting did not have sufficient first-hand information to rely upon when making a recommendation for Rex's program. The DOE personnel who attended Rex's IEP and who were charged with developing the DOE's program recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate program recommendation;

14. Similarly, the DOE personnel charged with selecting a placement (school site) recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate placement recommendation;

## THE DOE FAILED TO SUFFICIENTLY INDIVIDUALIZE THE IEP

15. The DOE failed to develop an IEP tailored to Rex's individual and unique needs, and instead, adhered to DOE policy, custom, practices, and/or its own program and placement limitations;

16. The DOE's IEP-related computer software (i.e., SESIS) improperly restricts the "inputting" of appropriate and individualized supports that Rex requires;

17. The DOE engaged in impermissible "predetermination" in the IEP development process, precluding any meaningful participation from Rex's parents and/or other team members;

---

[6] *Functional Behavioral Assessments*, NYSED.GOV (May 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.doc (last visited on June 18, 2018).
[7] N.Y. COMP. CODES R. & REGS. tit. 8, §§ 200.1(r), 200.5(b)(1), 200.22(a) and 201.3.; *Special Education: Functional Behavior Assessments*, NYSED.GOV (May 23, 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.htm (last visited on June 18, 2018).
[8] Dr. Marcia V. Lyles and Linda Wernikoff, *Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities*, NEW YORK CITY DEPARTMENT OF EDUCATION, Updated March 23, 2018, *available at* http://schools.nyc.gov/nr/rdonlyres/5f3a5562-563c-4870-871f-bb9156eee60b/0/03062009sopm.pdf. (last visited on June 18, 2018).

S16

18.  The DOE's recommended levels of related services and supports for Rex are not individualized to reflect his individual needs;

19.  Upon information and belief, union contracts and agency agreements preclude or restrict collaboration and communication between and among teachers and service providers as well as the duration of related services and the times they may be available and these agreements precluded Rex's IEP from being sufficiently individualized;

## EVALUATION AND ASSESSMENT CLAIMS

20.  The DOE failed to timely develop critical *assessment* reports that should have been used as the basis for establishing "present levels" as part of the fundamental development of the IEP, including but not limited to a meaningful base-lining of Rex's then-existing functional and skill levels, (including but not limited to his interfering behaviors) and this failure, among other problems, precluded the IEP from being sufficiently individualized and thus "reasonably calculated";

21.  The DOE did not conduct any of its own evaluations and/or assessments of Rex prior to the IEP meeting;

22.  The DOE failed to reimburse or otherwise fund Rex's parents for the independent and private evaluations they had done;

23.  The DOE ostensibly relied heavily on private non-DOE reports and documentation school documents and "input" from Rex's teaching staff from the Titus school, but failed to meaningfully consider the *recommendations* made in those documents and made by those participating in Rex's IEP meeting;

24.  The DOE failed to meaningfully consider Rex's private evaluations and the recommendations of professionals who know and/or work with Rex;

25.  At the IEP meeting, no one from the DOE disputed the contents of Rex's private reports and documentation, or the input from Rex's teachers and providers, yet the DOE failed to meaningfully consider the recommendations in those reports andinformation offered by Rex's teachers and providers;

26.  The DOE failed to timely provide evaluation(s) and other documentation to Rex's parents;

27.  The DOE failed to conduct a triennial evaluation;

28.  The DOE failed to have any meaningful discussion about any classroom observations, much less actually conduct one;

29.  The DOE failed to conduct evaluations and assessments that consider the factors and considerations required to be considered for approval of one-to-one classroom aide support, as adopted by the Board of Regents in June, 2016;

S17

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S18

**THE DOE'S FAILURES AFTER THE IEP MEETING**

30.  The DOE failed to timely provide a copy of the IEP to Rex's parents; and thus Rex's parents did not have sufficient written notice about the DOE's proposed program;

31.  The DOE failed to provide any minutes of the IEP meeting to Rex's parents at the conclusion of the IEP meeting or any time thereafter;

32.  We reserve the right to challenge the IEP minutes.

33.  The DOE failed to reconvene Rex's IEP meeting to discuss Rex's parents' concerns;

**THE DOE FAILED TO MEANINGFULLY COMMUNICATE WITH THE STUDENT'S PARENTS AND THEN-CURRENT PROVIDERS PRIOR TO, DURING AND AFTER THE IEP MEETING**

34.  The DOE failed to meaningfully respond to Rex's parents' communications to the DOE expressing their concerns about the proposed educational program and/or placement for Rex and the DOE failed to take appropriate steps to attempt to rectify the problems;

35.  The DOE failed to appropriately communicate with Rex's teachers and related service providers as part of developing Rex's program and placement;

36.  The DOE failed to meaningfully include Rex's parents in the IEP development and placement selection process, as required by statute and *Winkelman*;

37.  The DOE failed to remediate any of its deficiencies after the IEP meeting and even after Rex's parents' "10-day" letter;

**THE DOE FAILED TO MAKE PROVISION FOR APPROPRIATE PARENT COUNSELING AND TRAINING**

38.  The DOE failed to honor the New York State and federal mandates that "provision" be expressly made in Rex's IEP for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum;[9]

39.  The DOE failed to provide any IEP goals for parent training and counseling;

40.  The DOE failed to offer *individualized* parent training and counseling which is not only in contravention of the Commissioner's regulations, but also wholly inconsistent with the privacy mandates of the IDEA and the Family Educational Rights Privacy Act ("FERPA").[10]

---

[10] 34 C.F.R. § 300.34(c)(8); N.Y. COMP. CODES R. & REGS. tit. 8 § 200.13(d); 20 U.S.C. § 1232(g), *et seq.*

S18

Received Office of State Review
01/09/2024

It is inappropriate to offer parents parent training only in a *public* setting where their privacy is subjected to being "outed" or otherwise compromised;

## THE IEP, AS WRITTEN, CONTAINS MISINFORMATION, ERRORS, OMISSIONS AND/OR OTHER INACCURACIES THAT DEPRIVE THE STUDENT OF A FAPE

41. The DOE failed to timely conduct an IEP for the 2023-2024 school year that included the proper assessment of Rex's "present levels,"

42. The DOE failed to adequately consider Rex's need for consistency in programming given his transition and generalization deficits – no plan to transition the student to a new educational setting, appropriate or otherwise, was discussed, recommended or developed by the DOE;

43. The DOE failed to provide the requisite *consistency* in programming and supports;

44. The proposed program offers no or inadequate supports for school personnel on behalf of Rex;

45. Whereas Rex has difficulty with generalization, the DOE failed to properly promote generalization;

46. The DOE failed to identify the current school and/or home programming Rex had in place at the time of the IEP meeting and therefore failed to give notice to anyone who would be working with and/or responsible for educating Rex of the type of programming and methodology used for Rex with which his was making progress and instead leaving new providers and teachers "in the dark" with respect to what Rex requires to make progress and not regress;

## THE DOE FAILED TO OFFER AN APPROPRIATE CLASS SIZE, AN APPROPRIATELY GROUPED CLASS, AN APPROPRIATE STAFFING RATIO AND/OR APPROPRIATE INSTRUCTIONAL SUPPORT

47. The DOE failed to adequately address and accommodate Rex's need for intensive 1:1 teaching and failed to offer Rex consistent 1:1 *teaching* and instruction throughout the school day;

48. The DOE's proposed class size, functioning-levels, and staffing ratio are not appropriate to meet Rex's needs;

49. The DOE's proposed program fails to provide adequate instructional support for Rex;

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S20

### THE DOE FAILED TO OFFER APPROPRIATE RELATED SERVICES AND SUPPORTS

50.    The DOE failed to offer adequate levels and frequencies of related services;

51.    The DOE failed to recommend any "extended-day" services for Rex, despite the fact that such services are needed for Rex's acquisition of skills, prevention of regression and continued progress;

52.    The DOE's proposed IEP provides for unhelpful "pullouts," resulting in impairment of Rex's entitlement to be educated with non-disabled peers to the "maximum extent appropriate";

53.    To the extent that the IEP plan and service mandates cannot be met at the DOE's proposed placement and would require RSAs: (a) the provision of RSAs would not be timely, (b) the provision of RSAs that Rex's parents would need to fulfill is not tantamount to the provision of a FAPE, and (c) the provision and mechanism of RSAs works against Rex's need for consistency, regular communication and collaboration between and among Rex's teachers, providers and home-based team;

54.    The DOE failed to develop a plan that adequately addresses Rex's sensory needs (e.g., a sensory diet) and use of a sensory gym and suspended equipment;

### IEP GOALS AND OBJECTIVES CLAIMS

55.    Based on the Supreme Court's unanimous decision in *Endrew F.*, as a student with a disability, Rex is entitled to a program that is "appropriately ambitious" in light of Rex's circumstances that provides for "challenging objectives." *Endrew F.*, 580 U. S. ____ (2017). An educational program "providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all." *Id.* The DOE failed to provide Rex with a program that is "appropriately ambitious" in light of Rex's circumstances and that provides for "challenging objectives" for Rex;

56.    The DOE failed to develop measurable annual goals to meet each of Rex's educational needs related to his disability and failed to adequately address all of Rex's unique and individualized needs;

57.    The DOE failed to meaningfully develop goals and objectives at the IEP meeting, with the participation of Rex's parents;

58.    Despite the presence of interfering behaviors, the proposed IEP lacks adequate goals and objectives to address and remediate such behaviors and includes no method of measuring behavioral progress;

59.    Despite Rex's issues with transitioning, the DOE failed to develop any goals or objectives, measured or otherwise, to address the numerous transitions Rex would necessarily endure;

S20

Received Office of State Review
01/09/2024

60. The DOE's goals and objectives are not appropriate for a program that is less structured and intensive than a 1:1 teaching program;

61. The DOE failed to indicate objective "Methods of Measurement" for Rex's goals, and the DOE failed to develop appropriate mechanisms for measuring progress toward goals;

62. Although the IEP purports to include "short term" objectives, the IEP does not specify the length of the "term" and thus, there are no intermediate points built into the IEP to assess and measure Rex's progress;

63. The DOE failed to develop IEP goals that were clear, unambiguous, adequate, sufficiently challenging, and individualized for Rex;

64. The DOE failed to develop adequate and appropriate IEP short-term objectives with respect to each listed goal;

65. The goals and objectives are not appropriately tailored and individualized and are largely generic because, among other things, they are not based on proper assessments and evaluations of the student's "present levels" of performance;

66. The DOE incorporated goals and objectives developed by Rex's private providers and school, which reference a specific methodology (e.g. ABA ) that the DOE's proposed placement and its personnel are not ready, willing and able to implement so that Rex will receive a meaningful education ;

67. The DOE failed to develop any goals to address how Rex would generalize skills from school to home and community environments and vice versa;

68. Specifically, the DOE incorporated goals and objectives by the Titus School and Rex's Private Providers that were specifically designed to be implemented in a ***1:1 ABA teaching program***;

## THE DOE FAILED TO MEANINGFULLY DISCUSS AND CONSIDER METHODOLOGY IMPLICATIONS

69. Rex is entitled to an educational program wherein the content, methodology, or delivery of instruction must be narrowly tailored to address the unique needs of the child that result from the child's disability. 34 C.F.R. § 300.39(b)(3)(i); *A.M. v. N.Y. City Dep't of Educ.,* 845 F.3d 523 (2d Cir. N.Y. Jan. 10, 2017);  see also *T.Y. v. New York City Dep't of Educ.*, 213 F. Supp. 3d 446 (E.D.N.Y. Aug. 26, 2016);

70. The IEP team failed to assess and/or otherwise meaningfully consider what, if any, educational methodologies and approaches are researched-based and "reasonably calculated" to promote Rex's meaningful educational progress;

Received Office of State Review
01/09/2024

S22

71.  The core "methodology" employed at the DOE's proposed placement is inappropriate and inadequate to meet Rex's needs;

72.  The CSE did not dispute that Rex is making progress in a research-based ABA program, but did not recommend ABA intervention for Rex;

73.  The CSE failed to advise Rex's parents that a 1:1 teaching program utilizing the scientifically validated ABA method of instruction may be available to Rex at the New York Center for Autism Charter School, which is a publicly funded school and would be free for Rex to attend;[11]

## PLACEMENT CLAIMS

74.  The DOE's chosen placement was not based on a fully developed IEP or on appropriate information to guide the placement selection decision;[12]

75.  The DOE unilaterally chose the school site without opportunity for Rex's parents' input and participation in contravention of *Florence County School District Four v. Carter,* 510 U.S. 7, 12 (1993) ("free appropriate public education" required by the IDEA entails education in "public schools or in private schools chosen jointly by school officials and parents") and/or reasonable opportunity to evaluate the school;

76.  The DOE impermissibly abdicated the school "placement" decision to an inadequately informed administrator who was not even present at Rex's IEP meeting;

## CLAIMS SPECIFIC TO INFORMATION THE STUDENT'S PARENTS LEARNED FROM DOE PERSONNEL AT  75M811: P.S. M811 – Mickey Mantle School [13]

77.  Upon information and belief, the proposed placement is unable to implement the DOE's IEP for Rex;

78.  Rex's parents did not receive a SLL until June 23, 2023, five months after the IEP meeting was held. As such, they have not been able to physically tour the recommmneded school ;

79.  We reserve the right further allege deficiencies with the recommended placement once Rex's parents have visited the recommended placement.

## OTHER CLAIMS

80.  In the event that the DOE raises any Prong III claim or defense (equities), Rex's parents cooperated in the IEP development process;

---

[12] 34 C.F.R. § 300.116(b)(2).

[13] In addition to incorporating specific allegations from the school visit in this demand, we are reserving our right to challenge the proposed placement location for any of the numerous reasons illustrated in the student's parents' correspondence with the DOE prior to this filing. We are expressly putting the DOE on notice that we are incorporating all of those allegations (including those in the 10 day letter) by reference hereto.

S22

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S23

81. The DOE fails to provide adequate training and supervision of its DOE staff;

82. Upon information and belief, the DOE and its employees intentionally or negligently concealed or otherwise failed to disclose information that it had a duty to disclose to the student and the student's parents which, if timely disclosed, would be the basis for additional claims; and

83. Upon information and belief, the DOE failed to respond to the parents' questions and requests for information and had such information been timely supplied, that information would have been pleaded by the student as part of the hearing request.

Procedurally and substantively, the foregoing deprived Rex of a FAPE, establishing Prong I of the *Burlington/Carter* and *D.A./Connors* tests in Rex's favor for the 2023-2024 school year. In contrast, for Prong II purposes, the evidence will show that Rex's unilateral program and recommendations are "reasonably calculated" to provide meaningful educational benefits to Rex, and thus are reimbursable and otherwise fundable under the more relaxed *Frank G.* and *R.E.*[14] standards. Finally, for purposes of Prong III, the evidence will show that (a) appropriate notice was given by Rex's parents, (b) they have cooperated in good faith, and (c) there are no equitable circumstances that would operate to preclude or otherwise diminish a prospective or reimbursement award.

## **PROPOSED SOLUTION**

We will be seeking reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

a) tuition and costs at Titus School
b) up to 10 hours per week of after school ABA
c) up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy)
d) 1 hour per week of after school Physical Therapy
e) Social Skills group one day a week after school
f) up to 2 hours per week of after school Occupational Therapy
g) up to 2 hours per week of parent training and counseling
h) up to 2 hours per week of after school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (1 hour per service provider)
k) costs of transportation to and from the school

Such services and additional supports are appropriate for Rex and are consistent with evaluations that Rex's parents have previously shared. Rex will also seek a compensatory education claim for any and all educational services Rex is entitled to that the DOE failed to provide, including his pendency entitlements.

---

[14] *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189-90 (2d Cir. 2012).

S23

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622

S24

Rex's needs are constantly changing over time.  We reserve the right to further amend Rex's demand upon further notice as additional components of Rex's program may fall into place.  The award should be a reimbursement award to the extent Rex's parents have paid out money, and it should be a prospective and/or direct funding award for any unpaid amounts, including but not limited to amounts payable under statutory pendency.

## RESOLUTION MEETING

Although we have requested an impartial hearing, Rex's parents certainly are prepared to meet with the DOE in the context of a resolution meeting, and hope that the DOE can cure the violations alleged above.

## CLOSED HEARING

 Rex's parents request a closed hearing.

## ATTORNEYS' FEES AND OTHER COSTS AND EXPENDITURES

To the extent that Rex "substantially prevails," Rex and his parents intend to seek an award of attorneys' fees and the recovery of all related costs and disbursements.

## ATTORNEY AND STAFF TO BE NOTICED ON CORRESPONDENCE

Attorney Gary Mayerson (gary@mayerslaw.com), Attorney Christina Mure (christina@mayerslaw.com), Attorney John Hobbs (John@mayerslaw.com), Paralegal Sean Levan (sean@mayerslaw.com), and Paralegal Samantha Hartman (samantha@mayerslaw.com).

Sincerely,

*s/ Mayerson & Associates*
Mayerson & Associates


cc:    Mariama Sandi, CSE Chairperson
        msandi@schools.nyc.gov

        Halia Chudyk-Francis and Cliff Francis (Via E-mail)

S24

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO# 249622    S25

## Pendency Implementation Form

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| Rex Francis | 243-995-479 | |

1. The basis for pendency is:

    ☐ IEP dated:

    ☒ Unappealed FOFD (case number and date):    06/14/21 – Case #195182

    ☐ Other (explain):

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| School Name | 10- or 12-Month Program | Other Notes |
| MCC Crossbridge (NOT SEEKING) | 12 | |

| Services | | | | |
|---|---|---|---|---|
| Service or Item | Ratio and Frequency | 10- or 12-Month Program | DOE or Private Provider | Private Provider Name and Rate |
| ABA Behavioral Therapy | 10 hours per week | 12 month | Private | |
| ABA Supervision | 2 hours per week | 12 month | Private | |
| Occupational Therapy | 2 hours per week | 12 month | Private | |
| Speech Language Therapy | 2 hours per week | 12 month | Private | |
| Parent Training and Counseling | 2 hours per week | 12 month | Private | |
| Monthly Interdisciplinary Team Meeting | One hour per service provider | 12 month | Private | |
| Monthly ABA meetings | One hour per service provider | 12 month | | |
| Transportation Costs | | 12 month | | |

Form submitted by: Gary Mayerson, Counsel for Parent, 06/30/23

---

**For DOE use only:**

☐        The above program should be implemented as pendency.

Pendency starts on:

        ☐        The date the DPC was filed:

        ☐        Other (explain):

June 2023 version
Received Office of State Review
01/09/2024

S25

D. Jones, Case Coordinator IHO# 249622    S26

## **Pendency Implementation Form**

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

Click or tap to enter a date.

_____    _____
DOE Reviewer                                Date

June 2023 version
Received Office of State Review
01/09/2024

S26

S27

**Tanner Ashley**

| | |
|---|---|
| **From:** | Samantha Hartman <samantha@mayerslaw.com> |
| **Sent:** | Friday, June 30, 2023 3:44 PM |
| **To:** | Impartial Hearing Office; Jones Derrick |
| **Cc:** | Sandi Mariama; Christina Mure; John Hobbs; Gary Mayerson |
| **Subject:** | Rex Francis - NYC ID: 243-995-479 - 2023/2024 Demand for Due Process |
| **Attachments:** | 06-30-23 Demand for Due Process.pdf; 06-30-23 Pendency Form and basis of pendency.pdf |

Dear IHO Team:

Please see attached Demand for Due Process and Pendency Form in the above matter that we are filing on behalf of our clients.

Please forward all future communications in this matter to attorneys Gary Mayerson Gary@mayerslaw.com, Christina Mure Christina@mayerslaw.com, John Hobbs John@mayerslaw.com and kindly copy my email Samantha@mayerslaw.com as well.

Please do not hesitate to contact us if you have any questions.

Thank you,

Samantha



Samantha Hartman, Paralegal
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075
[www.mayerslaw.com]www.mayerslaw.com
PERSONAL & CONFIDENTIAL

The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

S27

Received Office of State Review
01/09/2024

S28

**NEW YORK CITY DEPARTMENT OF EDUCATION**

---------------------------------------------------------------X

In the matter of

FRANCIS, REX

IHO Case No.249622

**<u>DUE PROCESS RESPONSE</u>**

---------------------------------------------------------------X

      PLEASE TAKE NOTICE, that the New York City Department of Education provides the following response to the due process complaint filed June 30, 2023 as required by 20 USC §1415(c)(2)(B)(i)(I):

1.    The New York City Department of Education (hereinafter the "DOE") denies each and every allegation contained in the due process complaint herein, except to admit that:

    a.  On 1/17/2023, the IEP team met and held a review for FRANCIS, REX ("student").

    b.  The team classified the student as a child with autism

    c.  Classification (applicable statement as indicated.)

        i.   ☐  This was an initial evaluation and the student was classified with  .

        ii.  ☐  The student had previously been classified with   and the team had no reason to change this classification.

        iii.  ☐  The classification was changed to   based upon the following documentation as indicated:

            1.  ☐  Social history/social history update;

            2.  ☐  Psychoeducational evaluation;

            3.  ☐  Classroom observation(s);

            4.  ☐  Related service progress reports/evaluations;

            5.  ☐  Teacher progress reports;

            6.  ☐  Disciplinary reports;

July 2011

S28

Received Office of State Review
01/09/2024

S29

7.   ☐ Other:

d.  The team recommended the following educational program *(choose one)*:

    i.   ☐ General education with related services:

    ii.  ☐ General education with Special Education Teacher Support Services:

    iii. ☐ Collaborative Team Teaching / Integrated Co-Teaching:

    iv.  ☐ Special Class:

    v.   ☒ Special Class in a Specialized School (D 75): $8{:}1{:}1$ and Related Services

    vi.  ☐ Other:

e.  Upon information and belief, the team relied upon the following materials (as indicated) in making its decision:

    1.   ☐ Social history/social history update;

Description: Social history means a report of information gathered and prepared by qualified school district personnel pertaining to the interpersonal, familial and environmental variables which influence a student's general adaptation to school, including but not limited to data on family composition, family history, developmental history of the student, health of the student, family interaction and school adjustment of the student.

    2.   ☐ Psychoeducational evaluation;

Description: A process by which a New York State certified school psychologist or licensed psychologist uses, to the extent deemed necessary for purposes of educational planning, a variety of psychological and educational techniques and examinations in the student's native language, to study and describe a student's developmental, learning, behavioral and other personality characteristics.

    3.   ☐ Classroom observation(s);

Description: An observation of the student in the student's learning environment (including the regular classroom setting) or, in the case of a student of less than school-age or out of school, an environment appropriate for a student of that age, to document the student's academic performance and behavior in the areas of difficulty.

    4.   ☐ Related service progress reports/evaluations;

July 2011

S29

Received Office of State Review
01/09/2024

S30

Description: Reports of student's progress in individual related service areas, for example Speech and Language therapy; Occupational therapy; Physical therapy; Counseling

5. ☐ Teacher progress reports;

6. ☐ Disciplinary reports;

7. ☐Other:

f.  The team considered the following programs (as indicated) but rejected them for the stated reason(s.) *(page 8 of the IEP)*:

    i.  ☐ General education with related services

    ii.  ☐ General education with Special Education Teacher Support Services

    iii.  ☐ Collaborative Team Teaching / Integrated Co-Teaching

    iv.  ☐ Special Class

    v.  ☐ Special Class in a Specialized School (D 75)

    vi.  ☐ Other :

g.  Additional factors relevant to the team's recommendation:

h.  On    , a final notice of recommendation ("FNR") was issued to the parent, in which placement at    was offered.

    i.  This placement is reasonably calculated to enable the child to obtain meaningful educational benefits.

2.    ADDITIONALLY,

**The New York City Department of Education reserves the right to amend and/or supplement this Due Process Response.**

Dated: <u>7-7-2023</u>                    <u>SHARIQ MOHAMMAD</u>

July 2011

S30



**S31**

Chancellor David C. Banks

**Liz Vladeck**
General Counsel

7/7/2023

<u>**Re: DPC 249622**</u>

Dear Impartial Hearing Officer:

Please take notice that Eli Koppel will be representing the Department of Education in this matter. Please contact Eli Koppel at EKoppel@schools.nyc.gov for scheduling purposes. The best way to reach this representative is by email.

Please take notice that the DOE respectfully demands that the Parent appear at the next scheduled appearance in this matter. Please take notice that the DOE hereby objects to any unverified representative of the Parent appearing unless they **accompany** the Parent as required by 8 NYCRR 200.5(j)(3)(vii).

Please take notice that the DOE intends to cross examine all witnesses presented by Parent, whether direct testimony is provided live or via affidavit. Additionally, DOE requests that the Impartial Hearing Officer provide a copy of their unique rules, if any, that will apply to these proceedings.

Sincerely,


Eli Koppel
*Consultant Impartial Hearing Representative*
Appearing on behalf of Liz Vladeck, General Counsel

52 Chambers St.
New York, NY 10007

(e) EKoppel@schools.nyc.gov
(p) *Contact via email

**S31**

Received Office of State Review
01/09/2024

S32

NEW YORK CITY
DEPARTMENT  OF EDUCAITON
-------------------------------------------------X
Rex Francis
NYC ID# 243-995-479

*Plaintiff*

v.

**<u>NOTICE OF APPERANCE</u>**

IHO Case No. 249622 2023-2024

New York City Department  of Education

*Respondent*

-------------------------------------------------X

**PLEASE  TAKE  NOTICE** that Mayerson & Associates represents the student and family in the above-referenced matter. Christina Mure is the attorney responsible for this matter and will  appear as counsel.

Please  forward  all  future  communications  directly to: Christina@mayerslaw.com and copy Samantha@mayerslaw.com,  the paralegal assisting  in this matter.

Please do not hesitate  to contact us if you have any questions.

*s/ Christina Mure*

Christina  Mure
Mayerson & Associates
200 W 41st Street 17th Floor
New York, NY 10036
Office:  212-265-7200
Fax:    917-210-3075
www.mayerslaw.com

cc:    Impartial  Hearing Officer: Michelle Babbitt
       DOE Attorney:  Eli Koppel (EKoppel@schools.nyc.gov)

S32

Received Office of State Review
01/09/2024

S33

NEW YORK CITY
DEPARTMENT OF EDUCAITON
-------------------------------------------------X
Rex Francis
NYC ID# 243-995-479

                *Plaintiff*

v.                            **<u>NOTICE OF APPERANCE</u>**

                              IHO Case No. 249622 2023-2024

New York City Department of Education

                *Respondent*
-------------------------------------------------X

**PLEASE TAKE NOTICE** that Mayerson & Associates represents the student and family in the above-referenced matter. John Hobbs is the attorney responsible for this matter and will appear as counsel.

Please forward all future communications directly to: <u>John@mayerslaw.com</u> and copy Samantha@mayerslaw.com, the paralegal assisting in this matter.

Please do not hesitate to contact us if you have any questions.

                          *s/ John Hobbs*
                          _____

                          John Hobbs
                          Mayerson & Associates
                          200 W 41st Street 17th Floor
                          New York, NY 10036
                          Office: 212-265-7200
                          Fax:   917-210-3075
                          <u>www.mayerslaw.com</u>

cc:     Impartial Hearing Officer: Michelle Babbitt
          DOE Attorney: Eli Koppel (EKoppel@schools.nyc.gov)

S33

Received Office of State Review
01/09/2024

S34

NEW YORK CITY
DEPARTMENT OF EDUCAITON
---------------------------------------------------X
Rex Francis
NYC ID# 243-995-479

              *Plaintiff*

v.                                                    **NOTICE OF APPERANCE**

                         IHO Case No. 249622 2023-2024

New York City Department of Education

              *Respondent*
---------------------------------------------------X

**PLEASE TAKE NOTICE** that Mayerson & Associates represents the student and family in the above-referenced matter. Gary Mayerson is the attorney responsible for this matter and will appear as counsel.

Please forward all future communications directly to: Gary@mayerslaw.com and copy Samantha@mayerslaw.com, the paralegal assisting in this matter.

Please do not hesitate to contact us if you have any questions.

                        *s/ Gary S. Mayerson*

                        Gary S. Mayerson
                        Mayerson & Associates
                        200 W 41st Street 17th Floor
                        New York, NY 10036
                        Office: 212-265-7200
                        Fax:   917-210-3075
                        www.mayerslaw.com

cc:     Impartial Hearing Officer: Michelle Babbitt
        DOE Attorney: Eli Koppel (EKoppel@schools.nyc.gov)

S34

## Pendency Implementation Form          S35

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| Rex Francis | 243-995-479 | 249622 |

1. The basis for pendency is:

   ☐ IEP dated:

   ☒ Unappealed FOFD (case number and date):  08/15/23– Case #227811

   ☐ Other (explain):

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| School Name | 10- or 12-Month Program | Other Notes |
| Titus School | 12 | |

| Services | | | | |
|---|---|---|---|---|
| Service or Item | Ratio and Frequency | 10- or 12-Month Program | DOE or Private Provider | Private Provider Name and Rate |
| ABA Behavioral Therapy | 10 hours per week | 12 month | Private | |
| ABA Supervision | 2 hours per week | 12 month | Private | |
| Occupational Therapy | 2 hours per week | 12 month | Private | |
| Physical Therapy | 1 hour per week | 12 month | Private | |
| Speech Language Therapy | 2 hours per week | 12 month | Private | |
| Parent Training and Counseling | 2 hours per week | 12 month | Private | |
| Monthly Interdisciplinary Team Meeting | One hour per service provider | 12 month | Private | |
| Monthly ABA meetings | One hour per service provider | 12 month | | |
| Transportation Costs | | 12 month | | |

Form submitted by: Gary Mayerson, Counsel for Parent, 08/22/23

___

**For DOE use only:**

☒  The above program should be implemented as pendency.

Pendency starts on:

☒    The date the ~~DPC~~ was ~~filed~~: 8/15/2023
         FOFD        issued

Received Office of State Review
01/09/2024

S35

# Pendency Implementation Form

<span style="color:red">S36</span>

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

☐      Other (explain):



Click or tap to enter a date.

/s/Samantha Labossiere                    9/13/2023
DOE Reviewer                              Date

June 2023 version
Received Office of State Review
01/09/2024

<span style="color:red">S36</span>

S37

| From: | Wong, Emma (OATH) |
|---|---|
| To: | Jackson Teshema; Reimels Brian; Barrett Mark; Dillon Laura; Layne Erika; Stovall Trudy; Ogunleye Abimbola |
| Cc: | Davenport Brian; Feng Frances; Mincieli Toni; Stewart, William (OATH) |
| Subject: | RE: APPEAL: Rex Francis - IHO Case #249622 |
| Date: | Friday, December 29, 2023 2:14:00 PM |

Good Afternoon,

The record in IHS is complete and closing brief submitted. Please find the specific clarification below. Thank you

1. IHO Exhibits 3- FOFD listed 24 pages but the correct number of pages is 25

**From:** Jackson Teshema <TJackson59@schools.nyc.gov>
**Sent:** Thursday, December 28, 2023 5:17 PM
**To:** Reimels Brian <BReimels@schools.nyc.gov>; Barrett Mark <MBarrett12@schools.nyc.gov>; Dillon Laura <LDillon7@schools.nyc.gov>; Layne Erika <ELayne3@schools.nyc.gov>; Stovall Trudy <TStovall3@schools.nyc.gov>; Ogunleye Abimbola <AOgunleye3@schools.nyc.gov>
**Cc:** Davenport Brian <BDavenport@schools.nyc.gov>; Feng Frances <FFeng2@schools.nyc.gov>; Mincieli Toni <TMincieli@schools.nyc.gov>; Wong, Emma (OATH) <EWong2@oath.nyc.gov>; Stewart, William (OATH) <WStewart@oath.nyc.gov>
**Subject:** RE: APPEAL: Rex Francis - IHO Case #249622

+OATH

Hello,

We will have the record prepared by deadline, 1/8.

Best Regards,

Teshema Jackson
Paralegal Consultant
Impartial Hearing Office
TJackson59@schools.nyc.gov

NYC Department of Education

**From:** Reimels Brian <BReimels@schools.nyc.gov>
**Sent:** Thursday, December 28, 2023 4:37 PM
**To:** Barrett Mark <MBarrett12@schools.nyc.gov>; Dillon Laura <LDillon7@schools.nyc.gov>; Jackson Teshema <TJackson59@schools.nyc.gov>; Layne Erika <ELayne3@schools.nyc.gov>; Stovall Trudy <TStovall3@schools.nyc.gov>; Ogunleye Abimbola <AOgunleye3@schools.nyc.gov>
**Cc:** Davenport Brian <BDavenport@schools.nyc.gov>; Feng Frances <FFeng2@schools.nyc.gov>;

S37

PE1

| Student's Name: Rex Francis | Case No. 249622 |
| --- | --- |

**Date of Hearing**: October 13, 2023

**PARENT DISCLOSURE INDEX**

| Seq: | EVIDENCE DESCRIPTION | Date of Evidence | # of Pages | Date Disclosed |
| --- | --- | --- | --- | --- |
| P-A | Demand for Due Process with Email Confirmation | 06/30/2023 | 15 | 10/05/2023 |
| P-B | Amended Demand for Due Process | 08/22/2023 | 12 | 10/05/2023 |
| P-C | Ten Day Notice with Email Confirmation | 06/15/2023 | 03 | 10/05/2023 |
| P-D | Parent Email to CSE sharing Reports for IEP Meeting<br>• 2022/2023 Titus School Functional Behavior Plan and Behavior Intervention Plan<br>• Titus School Progress Report, November 2022<br>• 2019 Pals Neuropsychological Report | 01/15/2023 | 63 | 10/05/2023 |
| P-E | Parent Email to CSE sharing Additional Reports<br>• Occupational Therapy Progress Report from 01/04/2023<br>• ABA Progress Report from 12/08/2022<br>• Speech Language Therapy Progress Report from 12/14/2022 | 01/16/2023 | 19 | 10/05/2023 |
| P-F | Parent Email to School Placement Request a Tour | 07/10/2023 | 01 | 10/05/2023 |
| P-G | Titus Enrollment Contract | 05/01/2023 | 17 | 10/05/2023 |
| P-H | Titus Tuition Affidavit | 07/17/2023 | 02 | 10/05/2023 |
| P-I | Titus Program Description | 2023/2024 | 01 | 10/05/2023 |
| P-J | Titus School Student Summer Schedule | 2023/2024 | 06 | 10/05/2023 |
| P-K | Titus School Student Fall Schedule | 2023/2024 | 06 | 10/05/2023 |
| P-L | Titus School Student Attendance Record | 2023/2024 | 01 | 10/05/2023 |
| P-M | Titus School Progress Report | 06/2023 | 29 | 10/05/2023 |
| P-N | Natalie Brandefine Certification | Undated | 01 | 10/05/2023 |
| P-O | ABA Progress Report by Little Green Tugboat | 05/28/2023 | 10 | 10/05/2023 |
| P-P | Stephanie Koh License | Undated | 01 | 10/05/2023 |
| P-Q | Speech Progress Report by Happy Talk | August 2023 | 04 | 10/05/2023 |
| P-R | Kaitlyn Simon License and Resume | Undated | 03 | 10/05/2023 |
| P-S | Occupational Therapy Progress Report by Bloom Therapy | 09/04/2023 | 04 | 10/05/2023 |

PE1

PE2

| P-T | Jessica Zambito License | Undated | 01 | 10/05/2023 |
|-----|-------------------------|---------|----|------------|
| P-U | Affidavit of Natalie Brandefine | 10/05/2023 | 18 | 10/05/2023 |
| P-V | Affidavit of Stephanie Koh | 10/05/2023 | 08 | 10/05/2023 |
| P-W | Affidavit of Kaitlyn Simon | 10/04/2023 | 09 | 10/05/2023 |
| P-X | Affidavit of Jessica Zambito | 10/04/2023 | 07 | 10/05/2023 |
| P-Y | Affidavit of Halia Francis | 10/05/2023 | 11 | 10/05/2023 |
| P-Z | Titus Weekly Email Updates to Parents | 07/2023 | 03 | 10/05/2023 |
| P-AA | Recess Afterschool Social Program Description | 2023/2024 | 04 | 10/05/2023 |
| P-BB | Rex Francis Medical Accommodation Form | 06/22/2023 | 02 | 10/05/2023 |

PE2

Received Office of State Review
01/09/2024

<span style="color:red">PE3</span>



**Phone:(212) 265-7200**
**Fax: 917-210-3075**
**samantha@mayerslaw.com**

200 W 41st Street 17th Floor
NEW YORK, NY 10036

October 05, 2023

**VIA E-MAIL**

Eli Koppel, Esq.
DOE Representative
Email: EKoppel@schools.nyc.gov

      Re: **Rex Francis v. New York City Dept. of Education**
         IHO Michelle Babbitt, Esq. – 23/24 School Year – Case No. 249622

Dear Mr. Koppel and IHO Babbitt:

The following list represents the Parent witnesses for the hearing in the matter of Rex Francis 2023/2024 School Year:

**Halia Francis**, Parent: Phone number: 917-856-4256. Halia Francis is the parent of Rex Francis and will testify via affidavit to her Prong III burden as the parent, as well to her son's background and current needs.

**Natalie Brandefine**, Founder of The Titus School: Email: nbrandefine@thetitusschool.com. Natalie Brandefine will testify via affidavit to the appropriateness of The Titus School program for Rex's 23/24 School Year.

**Stephanie Koh**, ABA Provider at Little Green Tugboat. Email: steph@littlegreentugboat.com. Stephanie Koh will testify via affidavit to the appropriateness of the after school ABA Program and Rex's progress for the 23/24 School Year.

**Kaitlyn Simon**, Speech Provider at Happy Talk Speech LLC. Email: kaitlyn.s@happytalknyc.com. Kaitlyn will testify via affidavit to the appropriateness of the after school Speech Program and Rex's progress for the 23/24 School Year

**Jessica Zambito**, Occupational Therapy Director/Owner at Bloom Occupational therapy. Email: grow@bloomoccupationaltherapy.com. Jess will testify via affidavit to the appropriateness of the after school Occupational Therapy Program and Rex's progress for the 23/24 School Year.

Please advise if you have any additional questions. Thank you.

<span style="color:red">PE3</span>

Received Office of State Review
01/09/2024

PE4

Sincerely,

s/ **Gary S. Mayerson**
Gary S. Mayerson

PE4

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE5



Phone:(212) 265-7200
Fax: (917) 210-3075
samantha@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

June 30, 2023

**VIA E-MAIL**

Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, New York 11201
E-mail: IHOQuest@Schools.nyc.gov

Re:    **Demand for Due Process: 2023-2024 Twelve-Month School Year[1]**
       **Rex Francis D.O.B. 04/14/2014 - NYC ID# 243-995-479 v. NYCDOE**

Dear Sir or Madam:

We represent Rex Francis, a 9 year old boy classified with an autism spectrum disorder.  Rex resides with his parents, Halia Chudyk-Francis and Cliff Francis, at 25 East End Ave., Apt 7E New York, New York 10028.  Rex's date of birth is 04/14/2014.  For the 2022-2023 school year, Rex attended The Titus School, together with supplemental supports and services.  For the 2023-2024 school year, Rex will be attending The Titus School, located at 90 John Street New York, NY 10038, together with supplemental supports and services.

On behalf of Rex and his parents, we respectfully request a due process hearing pursuant to the federal IDEA statute and its implementing regulations, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the New York Education Law and its regulations and guidelines, in order to adjudicate pendency, declaratory, prospective, reimbursement, compensatory and all other relief that the hearing officer deems appropriate pertaining to or arising out of the 2023-2024 school year.

At the hearing, among other things, the evidence will establish that, both substantively and procedurally, the New York City Department of Education ("DOE") failed to provide Rex with a "free appropriate public education" ("FAPE"), thereby establishing Prong I of the *Burlington*/*Carter*[2] test for reimbursement in Rex's favor.[3]  In contrast, for Prong II purposes, the evidence will show that the

---

[1] The student requires a twelve-month (52-week) school year that begins on July 1, 2023.  The New York Education Law mandates that the school year begins on July 1 and runs through June 30.  N.Y. EDUC. L. § 2(15); *In re Kiesha BB.*, 815 N.Y.S.2d 800 (3d Dep't 2006).  In order to preserve the student's pendency entitlements effective as of Saturday July 1, 2023, this demand is being filed on Friday June 30, 2023.

[2] *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

[3] The student's parents' statutory entitlements were also seriously violated.  Under *Winkelman v. Parma City Sch. Dist.*, 127 U.S. 1994 (2007), the "IDEA includes provisions conveying rights to *parents* as well as to children" (emphasis added). See also *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U. S. ____ ;137 S. Ct. 988 (2017).

Received Office of State Review
01/09/2024

PE5

placement, program, and interventions that Rex's parents have secured for Rex are appropriate and "reasonably calculated" to provide meaningful educational benefits and are thus reimbursable or otherwise fundable under the more relaxed *Frank G.*[4] standards.  Finally, for purposes of Prong III, the evidence will show that Rex's parents acted reasonably and in good faith.  There are no equitable circumstances that would operate to preclude or diminish a reimbursement or prospective funding award.  We give notice that in light of applicable legislation, the DOE must proceed to meet its Prong I evidentiary burden.

## PENDENCY

In the interim, and until there has been a final order, we invoke Rex's pendency entitlements according to Impartial Hearing Officer Wolman's "Findings of Fact and Decision," dated 6/14/21. According to this decision and order, Rex's pendency entitlements include:
1. Tuition at Private School;
2. Up to ten (10) hours per week of home and community-based ABA behavioral therapy and up to two (2) hours per week of ABA Supervision;
3. Up to two (2) hours per week of Parent Training;
4. Up to two (2) hours per week of additional Speech and Language Therapy;
5. Up to two (2) hours per week of home/community-based and gym-based Occupational Therapy;
6. Monthly ABA meetings (one hour per therapist); and
7. Monthly interdisciplinary team meetings (one hour per service provider);
8. Transportation costs.

As per 20 U.S.C. § 1415(j), Rex's pendency entitlements are automatic and unconditional upon the filing of this demand (and are not contingent on the conclusion of the 30 day Resolution Period) and are required to be implemented and performed by the DOE as a matter of law and statute, without the necessity of any application, motion or other showing by Rex's counsel until there is a final order. In the event, however, that the DOE fails or refuses to implement Rex's pendency and insists upon the issuance of an interlocutory decision from the impartial hearing officer ("IHO"), we respectfully request an *immediate* hearing on pendency, or in the alternative, a brief pendency submission by both parties with the IHO issuing an interim order based on such submissions.  The whole purpose of pendency is to preserve the educational *status quo ante*. Without the implementation and honoring of the statutory entitlement of pendency, there would be a lapse in funding of Rex's services and program.

## THE PROBLEM

Rex is diagnosed with an autism spectrum disorder.  Rex presents with a variety of significant deficits and interfering behaviors.  Rex's deficits are pervasive and "global," and they transcend behavioral, communication, social and physical domains.  Rex continues to need special education services on a twelve-month basis.  As a student with a disability, Rex is entitled to a FAPE, and based on the Supreme Court's unanimous decision in *Endrew F.*, that educational program must be adequately ambitious and provide for appropriately challenging objectives. Rex's rights include both procedural and substantive safeguards. As the parents of a student with autism, Rex's parents are entitled to special statutory protections.

---

[4] *See Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006).

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE7

On 01/17/2023, the DOE convened an IEP meeting ostensibly to develop an educational program for Rex for the 2023-2024  school year.[5]  Rex's parents received a School Location Letter, dated 6/22/23, for 75M811: P.S. M811 – Mickey Mantle School, located at 466 West End Avenue, Manhattan, NY 10024.  The DOE failed, both procedurally and substantively, to offer Rex a FAPE.  At the hearing, among other deficits and violations, the evidence will establish the following as part of the Prong I presentation:

1.  The DOE's IEP program is not "reasonably calculated" to provide Rex with a FAPE;

2.  The DOE's proposed placement is not reasonably calculated to provide Rex with meaningful educational benefit;

3.  While the DOE's failures and omissions may each amount to a denial of a FAPE on their own, certainly the cumulative and combined effect of the DOE's multiple failures results in a FAPE deprivation for Rex;

4.  The proposed IEP program and placement, as written, is calculated to (a) produce regression and (b) work against independence and self-sufficiency;

5.  As of the start of Rex's 2023-2024 twelve-month school year, Rex's parents only had the written IEP, the School Location Letter, and Prior Written Notice document, to rely upon with respect to what the DOE is actually offering Rex for his 2023-2024 twelve-month school year, and Rex's parents rejected the program and placement based on what information they had received from the IEP, School Location Letter, and Prior Written Notice document;

**NOTICE**

6.  The DOE failed to provide Rex's parents with a Prior Written Notice document which conformed with 8 N.Y.C.R.R. § 200.5(a);

**THE IEP TEAM WAS NOT DULY CONSTITUTED**

7.  The DOE failed to include any DOE related service providers, despite the fact that the   DOE ostensibly determined related service mandates before or during the IEP meeting;

8.  The DOE failed to include the participation of the student's home-based providers at the IEP meeting despite Rex's parents informing the CSE in advance of the meeting that Rex received home-based services;

**THE DOE FAILED TO DEVELOP AN APPROPRIATE FBA**

9.  The DOE failed to develop a Functional Behavior Assessment ("FBA"), despite Rex's interfering behaviors;

---

[5] If the DOE develops and delivers another IEP for the student for the 2023-2024 school year, we reserve the right to challenge it.

Received Office of State Review
01/09/2024

PE7

D. Jones, Case Coordinator IHO  249622

PE8

10. With respect to Rex's FBA claim, the DOE failed to comply with the New York State's Education Department's requirements,[6] the Commissioner's Regulations, the DOE's own policy regarding administering FBAs;[7] and the DOE's own Standard Operating Procedures Manual[8] ("SOPM");

## THE DOE FAILED TO DEVELOP AN APPROPRIATE BIP

11. The DOE failed to develop any Behavior Intervention Plan ("BIP"), despite Rex's interfering behaviors;

12. The DOE failed to develop a BIP, despite acknowledging Rex's interfering behaviors elsewhere in the IEP;

## THE DOE FAILED TO GATHER SUFFICIENT INFORMATION PRIOR TO THE IEP MEETING

13. The DOE failed to observe Rex prior to the IEP meeting and the DOE representatives at the IEP meeting did not have sufficient first-hand information to rely upon when making a recommendation for Rex's program. The DOE personnel who attended Rex's IEP and who were charged with developing the DOE's program recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate program recommendation;

14. Similarly, the DOE personnel charged with selecting a placement (school site) recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate placement recommendation;

## THE DOE FAILED TO SUFFICIENTLY INDIVIDUALIZE THE IEP

15. The DOE failed to develop an IEP tailored to Rex's individual and unique needs, and instead, adhered to DOE policy, custom, practices, and/or its own program and placement limitations;

16. The DOE's IEP-related computer software (i.e., SESIS) improperly restricts the "inputting" of appropriate and individualized supports that Rex requires;

17. The DOE engaged in impermissible "predetermination" in the IEP development process, precluding any meaningful participation from Rex's parents and/or other team members;

---

[6] *Functional Behavioral Assessments*, NYSED.GOV (May 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.doc (last visited on June 18, 2018).

[7] N.Y. COMP. CODES R. & REGS. tit. 8, §§ 200.1(r), 200.5(b)(1), 200.22(a) and 201.3.; *Special Education: Functional Behavior Assessments*, NYSED.GOV (May 23, 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.htm (last visited on June 18, 2018).

[8] Dr. Marcia V. Lyles and Linda Wernikoff, *Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities*, NEW YORK CITY DEPARTMENT OF EDUCATION, Updated March 23, 2018, *available at* http://schools.nyc.gov/nr/rdonlyres/5f3a5562-563c-4870-871f-bb9156eee60b/0/03062009sopm.pdf. (last visited on June 18, 2018).

PE8

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE9

18.  The DOE's recommended levels of related services and supports for Rex are not individualized to reflect his individual needs;

19.  Upon information and belief, union contracts and agency agreements preclude or restrict collaboration and communication between and among teachers and service providers as well as the duration of related services and the times they may be available and these agreements precluded Rex's IEP from being sufficiently individualized;

## EVALUATION AND ASSESSMENT CLAIMS

20.  The DOE failed to timely develop critical *assessment* reports that should have been used as the basis for establishing "present levels" as part of the fundamental development of the IEP, including but not limited to a meaningful base-lining of Rex's then-existing functional and skill levels, (including but not limited to his interfering behaviors) and this failure, among other problems, precluded the IEP from being sufficiently individualized and thus "reasonably calculated";

21.  The DOE did not conduct any of its own evaluations and/or assessments of Rex prior to the IEP meeting;

22.  The DOE failed to reimburse or otherwise fund Rex's parents for the independent and private evaluations they had done;

23.  The DOE ostensibly relied heavily on private non-DOE reports and documentation school documents and "input" from Rex's teaching staff from the Titus school, but failed to meaningfully consider the *recommendations* made in those documents and made by those participating in Rex's IEP meeting;

24.  The DOE failed to meaningfully consider Rex's private evaluations and the recommendations of professionals who know and/or work with Rex;

25.  At the IEP meeting, no one from the DOE disputed the contents of Rex's private reports and documentation, or the input from Rex's teachers and providers, yet the DOE failed to meaningfully consider the recommendations in those reports andinformation offered by Rex's teachers and providers;

26.  The DOE failed to timely provide evaluation(s) and other documentation to Rex's parents;

27.  The DOE failed to conduct a triennial evaluation;

28.  The DOE failed to have any meaningful discussion about any classroom observations, much less actually conduct one;

29.  The DOE failed to conduct evaluations and assessments that consider the factors and considerations required to be considered for approval of one-to-one classroom aide support, as adopted by the Board of Regents in June, 2016;

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE10

**THE DOE'S FAILURES AFTER THE IEP MEETING**

30.  The DOE failed to timely provide a copy of the IEP to Rex's parents; and thus Rex's parents did not have  sufficient written notice about the DOE's  proposed program;

31.  The DOE failed to provide any minutes of the IEP meeting to Rex's parents at the conclusion of the IEP meeting or any time thereafter;

32.  We reserve the right to challenge the IEP minutes.

33.  The DOE failed to reconvene Rex's IEP meeting to discuss Rex's parents' concerns;

**THE DOE FAILED TO MEANINGFULLY COMMUNICATE WITH THE STUDENT'S PARENTS AND THEN-CURRENT PROVIDERS PRIOR TO, DURING AND AFTER THE IEP MEETING**

34.  The DOE failed to meaningfully respond to Rex's parents' communications to the DOE expressing their concerns about the proposed educational program and/or placement for Rex and the DOE failed to take appropriate steps to attempt to rectify the problems;

35.  The DOE failed to appropriately communicate with Rex's teachers and related service providers as part of developing Rex's program and placement;

36.  The DOE failed to meaningfully include Rex's parents in the IEP development and placement selection process, as required by statute and *Winkelman*;

37.  The DOE failed to remediate any of its deficiencies after the IEP meeting and even after Rex's parents' "10-day" letter;

**THE DOE FAILED TO MAKE PROVISION FOR APPROPRIATE PARENT COUNSELING AND TRAINING**

38.  The DOE failed to honor the New York State and federal mandates that "provision" be expressly made in Rex's IEP for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum;[9]

39.  The DOE failed to provide any IEP goals for parent training and counseling;

40.  The DOE failed to offer *individualized* parent training and counseling which is not only in contravention of the Commissioner's regulations, but also wholly inconsistent with the privacy mandates of the IDEA and the Family Educational Rights Privacy Act ("FERPA").[10]

---

[10] 34 C.F.R. § 300.34(c)(8); N.Y. COMP. CODES R. & REGS. tit. 8 § 200.13(d); 20 U.S.C. § 1232(g), *et seq.*

Received Office of State Review
01/09/2024

PE10

D. Jones, Case Coordinator IHO  249622
PE11

It is inappropriate to offer parents parent training only in a *public* setting where their privacy is subjected to being "outed" or otherwise compromised;

### THE IEP, AS WRITTEN, CONTAINS MISINFORMATION, ERRORS, OMISSIONS AND/OR OTHER INACCURACIES THAT DEPRIVE THE STUDENT OF A FAPE

41.  The DOE failed to timely conduct an IEP for the 2023-2024 school year that included the proper assessment of Rex's "present levels,"

42.  The DOE failed to adequately consider Rex's need for consistency in programming given his transition and generalization deficits – no plan to transition the student to a new educational setting, appropriate or otherwise, was discussed, recommended or developed by the DOE;

43.  The DOE failed to provide the requisite *consistency* in programming and supports;

44.  The proposed program offers no or inadequate supports for school personnel on behalf of Rex;

45.  Whereas Rex has difficulty with generalization, the DOE failed to properly promote generalization;

46.  The DOE failed to identify the current school and/or home programming Rex had in place at the time of the IEP meeting and therefore failed to give notice to anyone who would be working with and/or responsible for educating Rex of the type of programming and methodology used for Rex with which his was making progress and instead leaving new providers and teachers "in the dark" with respect to what Rex requires to make progress and not regress;

### THE DOE FAILED TO OFFER AN APPROPRIATE CLASS SIZE, AN APPROPRIATELY GROUPED CLASS, AN APPROPRIATE STAFFING RATIO AND/OR APPROPRIATE INSTRUCTIONAL SUPPORT

47.  The DOE failed to adequately address and accommodate Rex's need for intensive 1:1 teaching and failed to offer Rex consistent 1:1 *teaching* and instruction throughout the school day;

48.  The DOE's proposed class size, functioning-levels, and staffing ratio are not appropriate to meet Rex's needs;

49.  The DOE's proposed program fails to provide adequate instructional support for Rex;

PE11

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE12

## THE DOE FAILED TO OFFER APPROPRIATE RELATED SERVICES AND SUPPORTS

50.  The DOE failed to offer adequate levels and frequencies of related services;

51.  The DOE failed to recommend any "extended-day" services for Rex, despite the fact that such services are needed for Rex's acquisition of skills, prevention of regression and continued progress;

52.  The DOE's proposed IEP provides for unhelpful "pullouts," resulting in impairment of Rex's entitlement to be educated with non-disabled peers to the "maximum extent appropriate";

53.  To the extent that the IEP plan and service mandates cannot be met at the DOE's proposed placement and would require RSAs: (a) the provision of RSAs would not be timely, (b) the provision of RSAs that Rex's parents would need to fulfill is not tantamount to the provision of a FAPE, and (c) the provision and mechanism of RSAs works against Rex's need for consistency, regular communication and collaboration between and among Rex's teachers, providers and home-based team;

54.  The DOE failed to develop a plan that adequately addresses Rex's sensory needs (e.g., a sensory diet) and use of a sensory gym and suspended equipment;

## IEP GOALS AND OBJECTIVES CLAIMS

55.  Based on the Supreme Court's unanimous decision in *Endrew F.*, as a student with a disability, Rex is entitled to a program that is "appropriately ambitious" in light of Rex's circumstances that provides for "challenging objectives." *Endrew F.*, 580 U. S. ____ (2017). An educational program "providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all." *Id.* The DOE failed to provide Rex with a program that is "appropriately ambitious" in light of Rex's circumstances and that provides for "challenging objectives" for Rex;

56.  The DOE failed to develop measurable annual goals to meet each of Rex's educational needs related to his disability and failed to adequately address all of Rex's unique and individualized needs;

57.  The DOE failed to meaningfully develop goals and objectives at the IEP meeting, with the participation of Rex's parents;

58.  Despite the presence of interfering behaviors, the proposed IEP lacks adequate goals and objectives to address and remediate such behaviors and includes no method of measuring behavioral progress;

59.  Despite Rex's issues with transitioning, the DOE failed to develop any goals or objectives, measured or otherwise, to address the numerous transitions Rex would necessarily endure;

PE12

Received Office of State Review
01/09/2024

60.  The DOE's goals and objectives are not appropriate for a program that is less structured and intensive than a 1:1 teaching program;

61.  The DOE failed to indicate objective "Methods of Measurement" for Rex's goals, and the DOE failed to develop appropriate mechanisms for measuring progress toward goals;

62.  Although the IEP purports to include "short term" objectives, the IEP does not specify the length of the "term" and thus, there are no intermediate points built into the IEP to assess and measure Rex's progress;

63.  The DOE failed to develop IEP goals that were clear, unambiguous, adequate, sufficiently challenging, and individualized for Rex;

64.  The DOE failed to develop adequate and appropriate IEP short-term objectives with respect to each listed goal;

65.  The goals and objectives are not appropriately tailored and individualized and are largely generic because, among other things, they are not based on proper assessments and evaluations of the student's "present levels" of performance;

66.  The DOE incorporated goals and objectives developed by Rex's private providers and school, which reference a specific methodology (e.g. ABA ) that the DOE's proposed placement and its personnel are not ready, willing and able to implement so that Rex will receive a meaningful education ;

67.  The DOE failed to develop any goals to address how Rex would generalize skills from school to home and community environments and vice versa;

68.  Specifically, the DOE incorporated goals and objectives by the Titus School and Rex's Private Providers that were specifically designed to be implemented in a *1:1 ABA teaching program*;

## THE DOE FAILED TO MEANINGFULLY DISCUSS AND CONSIDER METHODOLOGY IMPLICATIONS

69.  Rex is entitled to an educational program wherein the content, methodology, or delivery of instruction must be narrowly tailored to address the unique needs of the child that result from the child's disability. 34 C.F.R. § 300.39(b)(3)(i); *A.M. v. N.Y. City Dep't of Educ.,* 845 F.3d 523 (2d Cir. N.Y. Jan. 10, 2017);  see also *T.Y. v. New York City Dep't of Educ.*, 213 F. Supp. 3d 446 (E.D.N.Y. Aug. 26, 2016);

70.  The IEP team failed to assess and/or otherwise meaningfully consider what, if any, educational methodologies and approaches are researched-based and "reasonably calculated" to promote Rex's meaningful educational progress;

Received Office of State Review
01/09/2024

71. The core "methodology" employed at the DOE's proposed placement is inappropriate and inadequate to meet Rex's needs;

72. The CSE did not dispute that Rex is making progress in a research-based ABA program, but did not recommend ABA intervention for Rex;

73. The CSE failed to advise Rex's parents that a 1:1 teaching program utilizing the scientifically validated ABA method of instruction may be available to Rex at the New York Center for Autism Charter School, which is a publicly funded school and would be free for Rex to attend;[11]

## PLACEMENT CLAIMS

74. The DOE's chosen placement was not based on a fully developed IEP or on appropriate information to guide the placement selection decision;[12]

75. The DOE unilaterally chose the school site without opportunity for Rex's parents' input and participation in contravention of *Florence County School District Four v. Carter,* 510 U.S. 7, 12 (1993) ("free appropriate public education" required by the IDEA entails education in "public schools or in private schools chosen jointly by school officials and parents") and/or reasonable opportunity to evaluate the school;

76. The DOE impermissibly abdicated the school "placement" decision to an inadequately informed administrator who was not even present at Rex's IEP meeting;

## CLAIMS SPECIFIC TO INFORMATION THE STUDENT'S PARENTS LEARNED FROM DOE PERSONNEL AT  75M811: P.S. M811 – Mickey Mantle School [13]

77. Upon information and belief, the proposed placement is unable to implement the DOE's IEP for Rex;

78. Rex's parents did not receive a SLL until June 23, 2023, five months after the IEP meeting was held. As such, they have not been able to physically tour the recommmneded school ;

79. We reserve the right further allege deficiencies with the recommended placement once Rex's parents have visited the recommended placement.

## OTHER CLAIMS

80. In the event that the DOE raises any Prong III claim or defense (equities), Rex's parents cooperated in the IEP development process;

---

[12] 34 C.F.R. § 300.116(b)(2).

[13] In addition to incorporating specific allegations from the school visit in this demand, we are reserving our right to challenge the proposed placement location for any of the numerous reasons illustrated in the student's parents' correspondence with the DOE prior to this filing. We are expressly putting the DOE on notice that we are incorporating all of those allegations (including those in the 10 day letter) by reference hereto.

Received Office of State Review
01/09/2024

81. The DOE fails to provide adequate training and supervision of its DOE staff;

82. Upon information and belief, the DOE and its employees intentionally or negligently concealed or otherwise failed to disclose information that it had a duty to disclose to the student and the student's parents which, if timely disclosed, would be the basis for additional claims; and

83. Upon information and belief, the DOE failed to respond to the parents' questions and requests for information and had such information been timely supplied, that information would have been pleaded by the student as part of the hearing request.

Procedurally and substantively, the foregoing deprived Rex of a FAPE, establishing Prong I of the *Burlington/Carter* and *D.A./Connors* tests in Rex's favor for the 2023-2024 school year. In contrast, for Prong II purposes, the evidence will show that Rex's unilateral program and recommendations are "reasonably calculated" to provide meaningful educational benefits to Rex, and thus are reimbursable and otherwise fundable under the more relaxed *Frank G.* and *R.E.*[14] standards. Finally, for purposes of Prong III, the evidence will show that (a) appropriate notice was given by Rex's parents, (b) they have cooperated in good faith, and (c) there are no equitable circumstances that would operate to preclude or otherwise diminish a prospective or reimbursement award.

## **PROPOSED SOLUTION**

We will be seeking reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

a) tuition and costs at Titus School
b) up to 10 hours per week of after school ABA
c) up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy)
d) 1 hour per week of after school Physical Therapy
e) Social Skills group one day a week after school
f) up to 2 hours per week of after school Occupational Therapy
g) up to 2 hours per week of parent training and counseling
h) up to 2 hours per week of after school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (1 hour per service provider)
k) costs of transportation to and from the school

Such services and additional supports are appropriate for Rex and are consistent with evaluations that Rex's parents have previously shared. Rex will also seek a compensatory education claim for any and all educational services Rex is entitled to that the DOE failed to provide, including his pendency entitlements.

---

[14] *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189-90 (2d Cir. 2012).

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622

PE16

Rex's needs are constantly changing over time.  We reserve the right to further amend Rex's demand upon further notice as additional components of Rex's program may fall into place.  The award should be a reimbursement award to the extent Rex's parents have paid out money, and it should be a prospective and/or direct funding award for any unpaid amounts, including but not limited to amounts payable under statutory pendency.

## RESOLUTION MEETING

Although we have requested an impartial hearing, Rex's parents certainly are prepared to meet with the DOE in the context of a resolution meeting, and hope that the DOE can cure the violations alleged above.

## CLOSED HEARING

Rex's parents request a closed hearing.

## ATTORNEYS' FEES AND OTHER COSTS AND EXPENDITURES

To the extent that Rex "substantially prevails," Rex and his parents intend to seek an award of attorneys' fees and the recovery of all related costs and disbursements.

## ATTORNEY AND STAFF TO BE NOTICED ON CORRESPONDENCE

Attorney Gary Mayerson (gary@mayerslaw.com), Attorney Christina Mure (christina@mayerslaw.com), Attorney John Hobbs (John@mayerslaw.com), Paralegal Sean Levan (sean@mayerslaw.com), and Paralegal Samantha Hartman (samantha@mayerslaw.com).

Sincerely,

*s/ Mayerson & Associates*
Mayerson & Associates


cc:     Mariama Sandi, CSE Chairperson
        msandi@schools.nyc.gov

        Halia Chudyk-Francis and Cliff Francis (Via E-mail)

PE16

Received Office of State Review
01/09/2024

D. Jones, Case Coordinator IHO  249622    PE17

## Pendency Implementation Form

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| Rex Francis | 243-995-479 | |

1. The basis for pendency is:

   ☐ IEP dated:

   ☒ Unappealed FOFD (case number and date):    06/14/21 – Case #195182

   ☐ Other (explain):

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| School Name | 10- or 12-Month Program | Other Notes |
| MCC Crossbridge (NOT SEEKING) | 12 | |

| Services | | | | |
|---|---|---|---|---|
| Service or Item | Ratio and Frequency | 10- or 12-Month Program | DOE or Private Provider | Private Provider Name and Rate |
| ABA Behavioral Therapy | 10 hours per week | 12 month | Private | |
| ABA Supervision | 2 hours per week | 12 month | Private | |
| Occupational Therapy | 2 hours per week | 12 month | Private | |
| Speech Language Therapy | 2 hours per week | 12 month | Private | |
| Parent Training and Counseling | 2 hours per week | 12 month | Private | |
| Monthly Interdisciplinary Team Meeting | One hour per service provider | 12 month | Private | |
| Monthly ABA meetings | One hour per service provider | 12 month | | |
| Transportation Costs | | 12 month | | |

Form submitted by: Gary Mayerson, Counsel for Parent, 06/30/23

---

**For DOE use only:**

☐        The above program should be implemented as pendency.

Pendency starts on:

   ☐        The date the DPC was filed:

   ☐        Other (explain):

June 2023 version

Received Office of State Review
01/09/2024

P - A 13 of 15

PE17

D. Jones, Case Coordinator IHO  249622

## Pendency Implementation Form

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

Click or tap to enter a date.

_____    _____
DOE Reviewer                                          Date

PE18

June 2023 version
Received Office of State Review
01/09/2024

P - A 14 of 15

PE18

D. Jones, Case Coordinator IHO  249622

PE19

**Tanner Ashley**

| | |
|---|---|
| **From:** | Samantha Hartman <samantha@mayerslaw.com> |
| **Sent:** | Friday, June 30, 2023 3:44 PM |
| **To:** | Impartial Hearing Office; Jones Derrick |
| **Cc:** | Sandi Mariama; Christina Mure; John Hobbs; Gary Mayerson |
| **Subject:** | Rex Francis - NYC ID: 243-995-479 - 2023/2024 Demand for Due Process |
| **Attachments:** | 06-30-23 Demand for Due Process.pdf; 06-30-23 Pendency Form and basis of pendency.pdf |

Dear IHO Team:

Please see attached Demand for Due Process and Pendency Form in the above matter that we are filing on behalf of our clients.

Please forward all future communications in this matter to attorneys Gary Mayerson Gary@mayerslaw.com, Christina Mure Christina@mayerslaw.com, John Hobbs John@mayerslaw.com and kindly copy my email Samantha@mayerslaw.com as well.

Please do not hesitate to contact us if you have any questions.

Thank you,

Samantha

Samantha Hartman, Paralegal
Mayerson & Associates
***Please check with us for the best address before mailing documents to our office.***
Office: 212-265-7200
Fax: 917-210-3075
[www.mayerslaw.com]www.mayerslaw.com
PERSONAL & CONFIDENTIAL
The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

PE19

Received Office of State Review
01/09/2024

PE20

# MAYERSON & ASSOCIATES

**Phone:**(212) 265-7200
**Fax:** (917) 210-3075
samantha@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

August 22, 2023

**VIA E-MAIL**

| Impartial Hearing Office | IHO Michelle Babbitt |
|---|---|
| 131 Livingston Street, Room 201 | Office of Adminstrative Trials and Hearings |
| Brooklyn, New York 11201 | MBabbitt@oath.nyc.gov |
| E-mail: IHOQuest@Schools.nyc.gov | |

**Re:**    **AMENDED Demand for Due Process: 2023-2024 Twelve-Month School Year[1]**
        **Rex Francis D.O.B. 04/14/2014 - NYC ID# 243-995-479 v. NYCDOE**

Dear Sir or Madam:

We represent Rex Francis, a 9 year old boy classified with an autism spectrum disorder. Rex resides with his parents, Halia Chudyk-Francis and Cliff Francis, at 25 East End Ave., Apt 7E New York, New York 10028. Rex's date of birth is 04/14/2014. For the 2022-2023 school year, Rex attended The Titus School, together with supplemental supports and services. For the 2023-2024 school year, Rex will be attending The Titus School, located at 90 John Street New York, NY 10038, together with supplemental supports and services.

==This matter is being amended to update Rex's pendency entitlements and the proposed solution.==

On behalf of Rex and his parents, we respectfully request a due process hearing pursuant to the federal IDEA statute and its implementing regulations, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the New York Education Law and its regulations and guidelines, in order to adjudicate pendency, declaratory, prospective, reimbursement, compensatory and all other relief that the hearing officer deems appropriate pertaining to or arising out of the 2023-2024 school year.

At the hearing, among other things, the evidence will establish that, both substantively and procedurally, the New York City Department of Education ("DOE") failed to provide Rex with a "free appropriate public education" ("FAPE"), thereby establishing Prong I of the *Burlington/Carter*[2] test for

---

[1] The student requires a twelve-month (52-week) school year that begins on July 1, 2023. The New York Education Law mandates that the school year begins on July 1 and runs through June 30. N.Y. EDUC. L. § 2(15); *In re Kiesha BB.*, 815 N.Y.S.2d 800 (3d Dep't 2006). In order to preserve the student's pendency entitlements effective as of Saturday July 1, 2023, this demand is being filed on Friday June 30, 2023.

[2] *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

PE20

Received Office of State Review
01/09/2024

P - B 1 of 12

PE21

reimbursement in Rex's favor.[3] In contrast, for Prong II purposes, the evidence will show that the placement, program, and interventions that Rex's parents have secured for Rex are appropriate and "reasonably calculated" to provide meaningful educational benefits and are thus reimbursable or otherwise fundable under the more relaxed *Frank G.*[4] standards. Finally, for purposes of Prong III, the evidence will show that Rex's parents acted reasonably and in good faith. There are no equitable circumstances that would operate to preclude or diminish a reimbursement or prospective funding award. We give notice that in light of applicable legislation, the DOE must proceed to meet its Prong I evidentiary burden.

## PENDENCY

In the interim, and until there has been a final order, we invoke Rex's pendency entitlements according to Impartial Hearing Officer McKeaver's "Findings of Fact and Decision," dated 8/15/23. According to this decision and order, Rex's pendency entitlements include:
1. Total cost of tuition at the Titus School;
2. Up to ten (10) hours per week of Speech and Language Therapy;
3. One (1) hour per week of Physical Therapy;
4. Social Skill group one day per week;
5. Up to (2) hours per week of Occupational Therapy;
6. Up to 2 hours per week of parent training and counseling;
7. Up to 2 hours per week of ABA supervision;
8. Monthly ABA meetings (1 hour per therapist);
9. Monthly interdisciplinary team meetings (1 hour per service provider); and
10. Costs of door-to-door transportation to and from the school.

As per 20 U.S.C. § 1415(j), Rex's pendency entitlements are automatic and unconditional upon the filing of this demand (and are not contingent on the conclusion of the 30 day Resolution Period) and are required to be implemented and performed by the DOE as a matter of law and statute, without the necessity of any application, motion or other showing by Rex's counsel until there is a final order. In the event, however, that the DOE fails or refuses to implement Rex's pendency and insists upon the issuance of an interlocutory decision from the impartial hearing officer ("IHO"), we respectfully request an *immediate* hearing on pendency, or in the alternative, a brief pendency submission by both parties with the IHO issuing an interim order based on such submissions. The whole purpose of pendency is to preserve the educational *status quo ante*. Without the implementation and honoring of the statutory entitlement of pendency, there would be a lapse in funding of Rex's services and program.

## THE PROBLEM

Rex is diagnosed with an autism spectrum disorder. Rex presents with a variety of significant deficits and interfering behaviors. Rex's deficits are pervasive and "global," and they transcend behavioral, communication, social and physical domains. Rex continues to need special education services on a twelve-month basis. As a student with a disability, Rex is entitled to a FAPE, and based on the Supreme Court's unanimous decision in *Endrew F.*, that educational program must be adequately ambitious and

---

[3] The student's parents' statutory entitlements were also seriously violated. Under *Winkelman v. Parma City Sch. Dist.*, 127 U.S. 1994 (2007), the "IDEA includes provisions conveying rights to *parents* as well as to children" (emphasis added). See also *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U. S. ____ ;137 S. Ct. 988 (2017).
[4] *See Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006).

Received Office of State Review
01/09/2024

PE21

PE22

provide for appropriately challenging objectives. Rex's rights include both procedural and substantive safeguards. As the parents of a student with autism, Rex's parents are entitled to special statutory protections.

On 01/17/2023, the DOE convened an IEP meeting ostensibly to develop an educational program for Rex for the 2023-2024 school year.[5]  Rex's parents received a School Location Letter, dated 6/22/23, for 75M811: P.S. M811 – Mickey Mantle School, located at 466 West End Avenue, Manhattan, NY 10024. The DOE failed, both procedurally and substantively, to offer Rex a FAPE. At the hearing, among other deficits and violations, the evidence will establish the following as part of the Prong I presentation:

1.   The DOE's IEP program is not "reasonably calculated" to provide Rex with a FAPE;

2.   The DOE's proposed placement is not reasonably calculated to provide Rex with meaningful educational benefit;

3.   While the DOE's failures and omissions may each amount to a denial of a FAPE on their own, certainly the cumulative and combined effect of the DOE's multiple failures results in a FAPE deprivation for Rex;

4.   The proposed IEP program and placement, as written, is calculated to (a) produce regression and (b) work against independence and self-sufficiency;

5.   As of the start of Rex's 2023-2024 twelve-month school year, Rex's parents only had the written IEP, the School Location Letter, and Prior Written Notice document, to rely upon with respect to what the DOE is actually offering Rex for his 2023-2024 twelve-month school year, and Rex's parents rejected the program and placement based on what information they had received from the IEP, School Location Letter, and Prior Written Notice document;

### NOTICE

6.   The DOE failed to provide Rex's parents with a Prior Written Notice document which conformed with 8 N.Y.C.R.R. § 200.5(a);

### THE IEP TEAM WAS NOT DULY CONSTITUTED

7.   The DOE failed to include any DOE related service providers, despite the fact that the  DOE ostensibly determined related service mandates before or during the IEP meeting;

8.   The DOE failed to include the participation of the student's home-based providers at the IEP meeting despite Rex's parents informing the CSE in advance of the meeting that Rex received home-based services;

---

[5] If the DOE develops and delivers another IEP for the student for the 2023-2024 school year, we reserve the right to challenge it.

Received Office of State Review
01/09/2024

PE22

PE23

### THE DOE FAILED TO DEVELOP AN APPROPRIATE FBA

9.  The DOE failed to develop a Functional Behavior Assessment ("FBA"), despite Rex's interfering behaviors;

10. With respect to Rex's FBA claim, the DOE failed to comply with the New York State's Education Department's requirements,[6] the Commissioner's Regulations, the DOE's own policy regarding administering FBAs;[7] and the DOE's own Standard Operating Procedures Manual[8] ("SOPM");

### THE DOE FAILED TO DEVELOP AN APPROPRIATE BIP

11. The DOE failed to develop any Behavior Intervention Plan ("BIP"), despite Rex's interfering behaviors;

12. The DOE failed to develop a BIP, despite acknowledging Rex's interfering behaviors elsewhere in the IEP;

### THE DOE FAILED TO GATHER SUFFICIENT INFORMATION PRIOR TO THE IEP MEETING

13. The DOE failed to observe Rex prior to the IEP meeting and the DOE representatives at the IEP meeting did not have sufficient first-hand information to rely upon when making a recommendation for Rex's program. The DOE personnel who attended Rex's IEP and who were charged with developing the DOE's program recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate program recommendation;

14. Similarly, the DOE personnel charged with selecting a placement (school site) recommendation for Rex had insufficient knowledge of Rex and his needs to be able to make an appropriate placement recommendation;

### THE DOE FAILED TO SUFFICIENTLY INDIVIDUALIZE THE IEP

15. The DOE failed to develop an IEP tailored to Rex's individual and unique needs, and instead, adhered to DOE policy, custom, practices, and/or its own program and placement limitations;

---

[6] *Functional Behavioral Assessments*, NYSED.GOV (May 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.doc (last visited on June 18, 2018).

[7] N.Y. COMP. CODES R. & REGS. tit. 8, §§ 200.1(r), 200.5(b)(1), 200.22(a) and 201.3.; *Special Education: Functional Behavior Assessments*, NYSED.GOV (May 23, 2011), *available at* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.htm (last visited on June 18, 2018).

[8] Dr. Marcia V. Lyles and Linda Wernikoff, *Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities*, NEW YORK CITY DEPARTMENT OF EDUCATION, Updated March 23, 2018, *available at* http://schools.nyc.gov/nr/rdonlyres/5f3a5562-563c-4870-871f-bb9156eee60b/0/03062009sopm.pdf. (last visited on June 18, 2018).

PE23

P - B 4 of 12

Received Office of State Review
01/09/2024

PE24

16. The DOE's IEP-related computer software (i.e., SESIS) improperly restricts the "inputting" of appropriate and individualized supports that Rex requires;

17. The DOE engaged in impermissible "predetermination" in the IEP development process, precluding any meaningful participation from Rex's parents and/or other team members;

18. The DOE's recommended levels of related services and supports for Rex are not individualized to reflect his individual needs;

19. Upon information and belief, union contracts and agency agreements preclude or restrict collaboration and communication between and among teachers and service providers as well as the duration of related services and the times they may be available and these agreements precluded Rex's IEP from being sufficiently individualized;

## EVALUATION AND ASSESSMENT CLAIMS

20. The DOE failed to timely develop critical *assessment* reports that should have been used as the basis for establishing "present levels" as part of the fundamental development of the IEP, including but not limited to a meaningful base-lining of Rex's then-existing functional and skill levels, (including but not limited to his interfering behaviors) and this failure, among other problems, precluded the IEP from being sufficiently individualized and thus "reasonably calculated";

21. The DOE did not conduct any of its own evaluations and/or assessments of Rex prior to the IEP meeting;

22. The DOE failed to reimburse or otherwise fund Rex's parents for the independent and private evaluations they had done;

23. The DOE ostensibly relied heavily on private non-DOE reports and documentation school documents and "input" from Rex's teaching staff from the Titus school, but failed to meaningfully consider the *recommendations* made in those documents and made by those participating in Rex's IEP meeting;

24. The DOE failed to meaningfully consider Rex's private evaluations and the recommendations of professionals who know and/or work with Rex;

25. At the IEP meeting, no one from the DOE disputed the contents of Rex's private reports and documentation, or the input from Rex's teachers and providers, yet the DOE failed to meaningfully consider the recommendations in those reports andinformation offered by Rex's teachers and providers;

26. The DOE failed to timely provide evaluation(s) and other documentation to Rex's parents;

27. The DOE failed to conduct a triennial evaluation;

PE24

Received Office of State Review
01/09/2024

PE25

28. The DOE failed to have any meaningful discussion about any classroom observations, much less actually conduct one;

29. The DOE failed to conduct evaluations and assessments that consider the factors and considerations required to be considered for approval of one-to-one classroom aide support, as adopted by the Board of Regents in June, 2016;

## THE DOE'S FAILURES AFTER THE IEP MEETING

30. The DOE failed to timely provide a copy of the IEP to Rex's parents; and thus Rex's parents did not have sufficient written notice about the DOE's proposed program;

31. The DOE failed to provide any minutes of the IEP meeting to Rex's parents at the conclusion of the IEP meeting or any time thereafter;

32. We reserve the right to challenge the IEP minutes.

33. The DOE failed to reconvene Rex's IEP meeting to discuss Rex's parents' concerns;

## THE DOE FAILED TO MEANINGFULLY COMMUNICATE WITH THE STUDENT'S PARENTS AND THEN-CURRENT PROVIDERS PRIOR TO, DURING AND AFTER THE IEP MEETING

34. The DOE failed to meaningfully respond to Rex's parents' communications to the DOE expressing their concerns about the proposed educational program and/or placement for Rex and the DOE failed to take appropriate steps to attempt to rectify the problems;

35. The DOE failed to appropriately communicate with Rex's teachers and related service providers as part of developing Rex's program and placement;

36. The DOE failed to meaningfully include Rex's parents in the IEP development and placement selection process, as required by statute and *Winkelman*;

37. The DOE failed to remediate any of its deficiencies after the IEP meeting and even after Rex's parents' "10-day" letter;

## THE DOE FAILED TO MAKE PROVISION FOR APPROPRIATE PARENT COUNSELING AND TRAINING

38. The DOE failed to honor the New York State and federal mandates that "provision" be expressly made in Rex's IEP for individualized parent counseling and training as a related service for students who have been diagnosed on the autism spectrum;[9]

Received Office of State Review
01/09/2024

PE25

PE26

39. The DOE failed to provide any IEP goals for parent training and counseling;

40. The DOE failed to offer *individualized* parent training and counseling which is not only in contravention of the Commissioner's regulations, but also wholly inconsistent with the privacy mandates of the IDEA and the Family Educational Rights Privacy Act ("FERPA").[10] It is inappropriate to offer parents parent training only in a *public* setting where their privacy is subjected to being "outed" or otherwise compromised;

## THE IEP, AS WRITTEN, CONTAINS MISINFORMATION, ERRORS, OMISSIONS AND/OR OTHER INACCURACIES THAT DEPRIVE THE STUDENT OF A FAPE

41. The DOE failed to timely conduct an IEP for the 2023-2024 school year that included the proper assessment of Rex's "present levels,"

42. The DOE failed to adequately consider Rex's need for consistency in programming given his transition and generalization deficits – no plan to transition the student to a new educational setting, appropriate or otherwise, was discussed, recommended or developed by the DOE;

43. The DOE failed to provide the requisite *consistency* in programming and supports;

44. The proposed program offers no or inadequate supports for school personnel on behalf of Rex;

45. Whereas Rex has difficulty with generalization, the DOE failed to properly promote generalization;

46. The DOE failed to identify the current school and/or home programming Rex had in place at the time of the IEP meeting and therefore failed to give notice to anyone who would be working with and/or responsible for educating Rex of the type of programming and methodology used for Rex with which his was making progress and instead leaving new providers and teachers "in the dark" with respect to what Rex requires to make progress and not regress;

## THE DOE FAILED TO OFFER AN APPROPRIATE CLASS SIZE, AN APPROPRIATELY GROUPED CLASS, AN APPROPRIATE STAFFING RATIO AND/OR APPROPRIATE INSTRUCTIONAL SUPPORT

47. The DOE failed to adequately address and accommodate Rex's need for intensive 1:1 teaching and failed to offer Rex consistent 1:1 *teaching* and instruction throughout the school day;

48. The DOE's proposed class size, functioning-levels, and staffing ratio are not appropriate to meet Rex's needs;

---

[10] 34 C.F.R. § 300.34(c)(8); N.Y. COMP. CODES R. & REGS. tit. 8 § 200.13(d); 20 U.S.C. § 1232(g), *et seq.*

Received Office of State Review
01/09/2024

PE26

PE27

49. The DOE's proposed program fails to provide adequate instructional support for Rex;

## THE DOE FAILED TO OFFER APPROPRIATE RELATED SERVICES AND SUPPORTS

50. The DOE failed to offer adequate levels and frequencies of related services;

51. The DOE failed to recommend any "extended-day" services for Rex, despite the fact that such services are needed for Rex's acquisition of skills, prevention of regression and continued progress;

52. The DOE's proposed IEP provides for unhelpful "pullouts," resulting in impairment of Rex's entitlement to be educated with non-disabled peers to the "maximum extent appropriate";

53. To the extent that the IEP plan and service mandates cannot be met at the DOE's proposed placement and would require RSAs: (a) the provision of RSAs would not be timely, (b) the provision of RSAs that Rex's parents would need to fulfill is not tantamount to the provision of a FAPE, and (c) the provision and mechanism of RSAs works against Rex's need for consistency, regular communication and collaboration between and among Rex's teachers, providers and home-based team;

54. The DOE failed to develop a plan that adequately addresses Rex's sensory needs (e.g., a sensory diet) and use of a sensory gym and suspended equipment;

## IEP GOALS AND OBJECTIVES CLAIMS

55. Based on the Supreme Court's unanimous decision in *Endrew F.*, as a student with a disability, Rex is entitled to a program that is "appropriately ambitious" in light of Rex's circumstances that provides for "challenging objectives." *Endrew F.*, 580 U. S. ____ (2017). An educational program "providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all." *Id.* The DOE failed to provide Rex with a program that is "appropriately ambitious" in light of Rex's circumstances and that provides for "challenging objectives" for Rex;

56. The DOE failed to develop measurable annual goals to meet each of Rex's educational needs related to his disability and failed to adequately address all of Rex's unique and individualized needs;

57. The DOE failed to meaningfully develop goals and objectives at the IEP meeting, with the participation of Rex's parents;

58. Despite the presence of interfering behaviors, the proposed IEP lacks adequate goals and objectives to address and remediate such behaviors and includes no method of measuring behavioral progress;

Received Office of State Review
01/09/2024

PE27

PE28

59. Despite Rex's issues with transitioning, the DOE failed to develop any goals or objectives, measured or otherwise, to address the numerous transitions Rex would necessarily endure;

60. The DOE's goals and objectives are not appropriate for a program that is less structured and intensive than a 1:1 teaching program;

61. The DOE failed to indicate objective "Methods of Measurement" for Rex's goals, and the DOE failed to develop appropriate mechanisms for measuring progress toward goals;

62. Although the IEP purports to include "short term" objectives, the IEP does not specify the length of the "term" and thus, there are no intermediate points built into the IEP to assess and measure Rex's progress;

63. The DOE failed to develop IEP goals that were clear, unambiguous, adequate, sufficiently challenging, and individualized for Rex;

64. The DOE failed to develop adequate and appropriate IEP short-term objectives with respect to each listed goal;

65. The goals and objectives are not appropriately tailored and individualized and are largely generic because, among other things, they are not based on proper assessments and evaluations of the student's "present levels" of performance;

66. The DOE incorporated goals and objectives developed by Rex's private providers and school, which reference a specific methodology (e.g. ABA ) that the DOE's proposed placement and its personnel are not ready, willing and able to implement so that Rex will receive a meaningful education ;

67. The DOE failed to develop any goals to address how Rex would generalize skills from school to home and community environments and vice versa;

68. Specifically, the DOE incorporated goals and objectives by the Titus School and Rex's Private Providers that were specifically designed to be implemented in a *1:1 ABA teaching program*;

## THE DOE FAILED TO MEANINGFULLY DISCUSS AND CONSIDER METHODOLOGY IMPLICATIONS

69. Rex is entitled to an educational program wherein the content, methodology, or delivery of instruction must be narrowly tailored to address the unique needs of the child that result from the child's disability. 34 C.F.R. § 300.39(b)(3)(i); *A.M. v. N.Y. City Dep't of Educ.,* 845 F.3d 523 (2d Cir. N.Y. Jan. 10, 2017); see also *T.Y. v. New York City Dep't of Educ.*, 213 F. Supp. 3d 446 (E.D.N.Y. Aug. 26, 2016);

Received Office of State Review
01/09/2024

PE28

PE29

70.  The IEP team failed to assess and/or otherwise meaningfully consider what, if any, educational methodologies and approaches are researched-based and "reasonably calculated" to promote Rex's meaningful educational progress;

71.  The core "methodology" employed at the DOE's proposed placement is inappropriate and inadequate to meet Rex's needs;

72.  The CSE did not dispute that Rex is making progress in a research-based ABA program, but did not recommend ABA intervention for Rex;

73.  The CSE failed to advise Rex's parents that a 1:1 teaching program utilizing the scientifically validated ABA method of instruction may be available to Rex at the New York Center for Autism Charter School, which is a publicly funded school and would be free for Rex to attend;[11]

## PLACEMENT CLAIMS

74.  The DOE's chosen placement was not based on a fully developed IEP or on appropriate information to guide the placement selection decision;[12]

75.  The DOE unilaterally chose the school site without opportunity for Rex's parents' input and participation in contravention of *Florence County School District Four v. Carter,* 510 U.S. 7, 12 (1993) ("free appropriate public education" required by the IDEA entails education in "public schools or in private schools chosen jointly by school officials and parents") and/or reasonable opportunity to evaluate the school;

76.  The DOE impermissibly abdicated the school "placement" decision to an inadequately informed administrator who was not even present at Rex's IEP meeting;

## CLAIMS SPECIFIC TO INFORMATION THE STUDENT'S PARENTS LEARNED FROM DOE PERSONNEL AT 75M811: P.S. M811 – Mickey Mantle School [13]

77.  Upon information and belief, the proposed placement is unable to implement the DOE's IEP for Rex;

78.  Rex's parents did not receive a SLL until June 23, 2023, five months after the IEP meeting was held. As such, they have not been able to physically tour the recommmneded school ;

79.  We reserve the right further allege deficiencies with the recommended placement once Rex's parents have visited the recommended placement.

---

[12] 34 C.F.R. § 300.116(b)(2).

[13] In addition to incorporating specific allegations from the school visit in this demand, we are reserving our right to challenge the proposed placement location for any of the numerous reasons illustrated in the student's parents' correspondence with the DOE prior to this filing. We are expressly putting the DOE on notice that we are incorporating all of those allegations (including those in the 10 day letter) by reference hereto.

PE29

Received Office of State Review
01/09/2024

PE30

## OTHER CLAIMS

80. In the event that the DOE raises any Prong III claim or defense (equities), Rex's parents cooperated in the IEP development process;

81. The DOE fails to provide adequate training and supervision of its DOE staff;

82. Upon information and belief, the DOE and its employees intentionally or negligently concealed or otherwise failed to disclose information that it had a duty to disclose to the student and the student's parents which, if timely disclosed, would be the basis for additional claims; and

83. Upon information and belief, the DOE failed to respond to the parents' questions and requests for information and had such information been timely supplied, that information would have been pleaded by the student as part of the hearing request.

Procedurally and substantively, the foregoing deprived Rex of a FAPE, establishing Prong I of the *Burlington/Carter* and *D.A./Connors* tests in Rex's favor for the 2023-2024 school year. In contrast, for Prong II purposes, the evidence will show that Rex's unilateral program and recommendations are "reasonably calculated" to provide meaningful educational benefits to Rex, and thus are reimbursable and otherwise fundable under the more relaxed *Frank G.* and *R.E.*[14] standards. Finally, for purposes of Prong III, the evidence will show that (a) appropriate notice was given by Rex's parents, (b) they have cooperated in good faith, and (c) there are no equitable circumstances that would operate to preclude or otherwise diminish a prospective or reimbursement award.

## PROPOSED SOLUTION

We will be seeking reimbursement and/or funding for the following costs and expenses for the 2023-2024 school year:

a) tuition and costs at Titus School
b) up to 10 hours per week of after school ABA
c) up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy)
d) 1 hour per week of after school Physical Therapy
e) Social Skills group one day a week after school
f) up to 2 hours per week of after school Occupational Therapy
g) up to 2 hours per week of parent training and counseling
h) up to 2 hours per week of after school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (l hour per service provider)
k) Funding for an updated Neuropsycholigcal Examination
l) costs of transportation to and from the school

---

[14] *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189-90 (2d Cir. 2012).

Received Office of State Review
01/09/2024

PE30

PE31

Such services and additional supports are appropriate for Rex and are consistent with evaluations that Rex's parents have previously shared. Rex will also seek a compensatory education claim for any and all educational services Rex is entitled to that the DOE failed to provide, including his pendency entitlements.

Rex's needs are constantly changing over time. We reserve the right to further amend Rex's demand upon further notice as additional components of Rex's program may fall into place. The award should be a reimbursement award to the extent Rex's parents have paid out money, and it should be a prospective and/or direct funding award for any unpaid amounts, including but not limited to amounts payable under statutory pendency.

## RESOLUTION MEETING

Although we have requested an impartial hearing, Rex's parents certainly are prepared to meet with the DOE in the context of a resolution meeting, and hope that the DOE can cure the violations alleged above.

## CLOSED HEARING

Rex's parents request a closed hearing.

## ATTORNEYS' FEES AND OTHER COSTS AND EXPENDITURES

To the extent that Rex "substantially prevails," Rex and his parents intend to seek an award of attorneys' fees and the recovery of all related costs and disbursements.

## ATTORNEY AND STAFF TO BE NOTICED ON CORRESPONDENCE

Attorney Gary Mayerson (gary@mayerslaw.com), Attorney Christina Mure (christina@mayerslaw.com), Attorney John Hobbs (John@mayerslaw.com), Paralegal Sean Levan (sean@mayerslaw.com), and Paralegal Samantha Hartman (samantha@mayerslaw.com).

Sincerely,

*s/ Mayerson & Associates*
Mayerson & Associates


cc:   Mariama Sandi, CSE Chairperson
      msandi@schools.nyc.gov

      Halia Chudyk-Francis and Cliff Francis (Via E-mail)

Received Office of State Review
01/09/2024

PE31

PE32

*Halia Chudyk-Francis and Cliff Francis*
*25 East End Ave., Apt 7E*
*New York, New York 10028*
*(646)209-6559*

June 15, 2023

**<u>VIA E-MAIL</u>**

New York City Department of Education
Committee on Special Education
Attn: Mariama Sandi, CSE Chairperson
Email: 10daynoticecse9@schools.nyc.gov

<u>Re: Rex Francis – NYC ID: 243-995-479 – 2023-2024 School Year</u>

Dear Ms. Sandi:

We are writing to advise you that we have a number of concerns regarding the DOE's proposed IEP, including but not limited to:

- Inadequate evaluations and assessments
- Inadequate transition planning and support
- Fails to meet Rex's individual needs
- Insufficient teaching intervention
- No provision for 1:1 *instruction*
- Insufficient level of services
- No individualized parent training and counseling
- Inappropriate and insufficient behavioral interventions
- Insufficient goals and/or objectives
- No methodology recommendation

The IEP Meeting took place on 01/17/2023. Prior to the meeting, we shared Rex's most updated progress reports from Titus and his after school providers with the IEP team. Rex's mother (Halia Francis) was in attendance along with the following: Jason Tannenbaum- DOE Special Education Teach/Related Service Provider, Shannon McCabe- DOE Representative, Geoffrey Gifford-Academic Coordinator at The Titus School ("Titus"), Natalie Brandefine- Titus Head of School, Naomi Parikh- Titus BCBA/LBA Supervisor, Angela Merino- Titus Math/ELA/Homeroom Teacher, Brianna Dapolito- Titus Lead Behavior Therapist, Caitlin McDonagh & Sara Goldstein/Hannah- Titus SLP, Marissa Bernstein- Titus OT, Avital Akman- Titus PT, Meghan Keena- Titus Counselor, Michelle Geisler- Titus Music Teacher.

The DOE recommended Rex be placed in a 12-month program in the District 75 School with an 8:1 + 1 class and counseling, OT, parent counseling, PT, and SLT. I, along with the professionals at Titus who work with Rex on a daily basis voiced our concerns. Mainly, an 8:1:1 class would not provide with 1:1 support he needs. He needs direct instruction and 1-1 support in a not-

PE32

overstimulating environment in order to continue to make progress. Additionally, Rex needs ABA instruction and access to a sensory gym. We also voiced our concerns that Rex will not be able to navigate the larger school setting in an 8-1+1 class. Rex needs a great deal of support, and moving him to a larger environment, without 1:1 support and ABA instruction would cause regression.

Moreover, to date, we have not received a placement recommendation from the DOE, nor have we been invited to meet to discuss possible placements that may be appropriate for Rex. Please note that we are awaiting a placement school recommendation so that we can make a fully informed decision, and we are hopeful that the DOE can address our concerns indicated above and recommend an appropriate program and placement for the 2023-2024 school year. Please also note, however, that in the ongoing absence of an appropriate and timely program and placement, Rex will continue to attend The Titus School, located at 90 John Street New York, NY 10038, for the 2023-2024 twelve-month school year, as a component of Rex's educational program. We will be seeking reimbursement and/or funding for the following costs and expenses:

a) tuition and costs at Titus School
b) up to 10 hours per week of after school ABA
c) up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy)
d) 1 hour per week of after school Physical Therapy
e) Social Skills group one day a week after school
f) up to 2 hours per week of after school Occupational Therapy
g) up to 2 hours per week of parent training and counseling
h) up to 2 hours per week of after school ABA supervision
i) monthly ABA meetings (1 hour per therapist)
j) monthly interdisciplinary team meetings (1 hour per service provider)
k) costs of transportation to and from the school

For the 2023-2024 52 week, twelve-month school year, this letter will serve as notice that we intend to provide the above and will seek to hold the DOE financially responsible for the above-referenced program.

Sincerely,

*s/ Halia Chudyk-Francis and Cliff Francis*
Halia Chudyk-Francis and Cliff Francis
(Rex's parents)

PE34

| From: | Samantha Hartman |
|---|---|
| To: | 10daynotice CSE9 |
| Cc: | Gary Mayerson; Christina Mure |
| Subject: | Rex Francis - NYC ID: 243-995-479 - 23/24 Ten Day Letter |
| Date: | Thursday, June 15, 2023 4:27:58 PM |
| Attachments: | 06-15-23 Ten Day Letter.pdf |

Dear CSE Team:

We represent the family and student in the above matter.
We are filing the student's 10-day letter with the CSE. We respectfully request that the CSE copy attorneys Gary Mayerson (Gary@mayerslaw.com) Christina Mure (Christina@mayerslaw.com) and my email (Samantha@mayerslaw.com) on any correspondence you send to the family.

Thank you,
Samantha Hartman


Samantha Hartman, Paralegal
Mayerson & Associates
*Please check with us for the best address before mailing documents to our office.*
Office: 212-265-7200
Fax: 917-210-3075
[www.mayerslaw.com]www.mayerslaw.com

PERSONAL & CONFIDENTIAL
The Information transmitted herein may contain privileged and/or confidential material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon information herein by persons or entities other than the intended recipient(s) is prohibited. Any misdirection or other error in the transmission of this information is not and shall not be considered a waiver of any applicable privileges.

PE34

P - C 3 of 3

PE35

**From:** Halia Francis <halia.francis@outlook.com>
**Sent:** Sunday, January 15, 2023 8:24 PM
**To:** Holthusen John <JHolthusen@schools.nyc.gov>
**Cc:** Mccabe Shannon <SMccabe@schools.nyc.gov>; Tannenbaum Jason <JTannenbaum@schools.nyc.gov>; Natalie Brandefine <nbrandefine@thetitusschool.com>; Cliff Francis <cliff-francis@outlook.com>
**Subject:** Re: REX FRANCIS (243995479) IEP Meeting Notice

Good afternoon,

We look forward to speaking with you on Tuesday for Rex's IEP meeting.  Attached are two reports from his current school, as well as his neuropsychological report that you may already have on file.  We are expecting his afterschool ABA, OT and speech providers to send us reports for the team's benefit as well and we will send them to you as soon as we receive them.  We are also in the process of getting (another) set of medical documentation for the bus.  As you may know, we previously submitted that documentation to the DOE in September, but apparently it was not processed, and we have been told that we need to have the forms filled out again.

Sincerely,
Halia and Cliff Francis

---

**From:** Holthusen John <JHolthusen@schools.nyc.gov>
**Sent:** Friday, December 2, 2022 9:59 AM
**To:** halia.francis@outlook.com <halia.francis@outlook.com>
**Cc:** Mccabe Shannon <SMccabe@schools.nyc.gov>; Tannenbaum Jason <JTannenbaum@schools.nyc.gov>; Natalie Brandefine <nbrandefine@thetitusschool.com>
**Subject:** REX FRANCIS (243995479) IEP Meeting Notice

Dear Parent/Guardian,

I hope this message finds your family healthy and well.

An IEP meeting has been scheduled for your child.  Please find the following documents attached to this email:

1. **IEP Meeting Notice**
2. **IEP Meeting Packet that includes**

- **Parent Request for Documentation Letter** requesting reports and other documents to be submitted for review at the IEP meeting, please submit at least 7 days before meeting date
- **Consent for use of Electronic Mail**
- **HIPAA** release authorization form (if applicable)-Must be completed every year with Medical Accommodations form if requesting bus accommodations

PE35

<span style="color:red">PE36</span>

- **Request for Medical Accommodation** (if applicable)-Must be completed every year and submitted with HIPAA form if requesting bus accommodations
- **Procedural Safeguards Parents Rights**

1. **Student Invitation** (if applicable)-For students turning aged 14 or older

All IEP meetings are being held via Microsoft Teams Teleconference due to COVID-19 pandemic until further notice.  A Microsoft Teams telephone number and conference ID number is supplied on your meeting notice to call in and participate in the meeting.  **Please reply ALL to this email with any reports, questions, or concerns.**

# Microsoft Teams meeting
**Join on your computer, mobile app or room device**
Click here to join the meeting
Meeting ID: 274 311 929 557
Passcode: QqpUVk
**Download Teams** | Join on the web
**Or call in (audio only)**
+1 347-966-4114,,909262071#   United States, New York City
Phone Conference ID: 909 262 071#
Find a local number | Reset PIN
Learn More | Meeting options

<span style="color:red">PE36</span>

PE37

# the Titus School

**Functional Behavior Assessment and Behavior Intervention Plan**

| Student's Name: | Rex Francis |
|---|---|
| Date of Birth: | 4/14/2014 |
| Date of Implementation: | 10/24/2022 |
| School Team: | Classroom Supervisor: Naomi Parikh, MED, BCBA, LBA-NY<br>Lead Teacher: Angela Merino, MS Ed<br>Lead Behavior Therapist: Brianna Dapolito, M.S., RBT<br>Behavior Therapist: Meghan Grigston, BA, RBT<br>Behavior Therapist: Brian Rodriguez, BA |

### Functional Behavior Assessment

Key:
STO: Short-Term Objective
LTO: Long-Term Objective

**Targeted behaviors to decrease**

Non-Contextual Vocalizations: Any vocalizations that are out of turn, unrelated to the conversation, perseverative, inappropriate, or at a volume that is higher than typical conversation level. This includes repeatedly asking the same question and or making the same statements more than two times in a row and imitating others. Example: Rex requests "I want lemon" more than two times in a row, Rex starts talking about Max and Ruby during math instruction. Non-examples: Rex is asked to repeat the word jump 3 times in a row during ELA, Rex yells because he fell during gym class.

Task Refusal: Any instance of Rex refusing to start and/or finish a task given by an adult or attempting to delay work (with or without whining) in an academic setting. This includes saying "No, I don't want to do it," or ignoring the person speaking. Example: During math, an adult tells Rex to start doing his math work and he says "I don't want to." Non-examples: An adult asks Rex how his OT session was and he responds with "I don't feel like talking".

Physical Dysregulation: Any instance of Rex leaving the designated area without asking an adult. This includes getting out of his seat without asking, running to touch the smartboard, dropping to

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE37

Received Office of State Review
01/09/2024

PE38



the floor, or falling out of his chair. Example: Rex runs to the smartboard without permission and touches it. Non-example: Rex moves away from his desk during lunch to through his garbage in the trash can.

**Targeted behaviors to increase**

<u>Compliance:</u> With support from an adult, utilizing ABA methodology and other therapeutic approaches (e.g. token economy, differential reinforcement procedures), Rex will follow instructions provided by staff to comply with classroom routines, complete non-preferred tasks and/or engage in non-preferred activities within 10 seconds of the initial demand across average 90% of the school day for 10 consecutive days.

- STO 1: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 60% of the school day for 10 consecutive days.
- STO 2: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 75% of the school day for 10 consecutive days.
- STO 3: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 85% of the school day for 10 consecutive days.

<u>Functional Communication:</u> With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (e.g., positive reinforcement system, visual cues), Rex will independently engage with peers and staff by using appropriate language (e.g., using "kind" words), appropriate tone (e.g., phrasing requests as a question), appropriate volume (e.g., speaking at conversational volume), while also maintaining appropriate personal space across an average of 85% of the school day for 10 consecutive days.

- STO 1: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average of 60% of the day, for 10 consecutive days.
- STO 2: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the day, for 10 consecutive days.

<u>On Task Behavior:</u> With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (such as functional communication training, differential reinforcement, frequent opportunities for breaks, non-contingent attention, and visual schedules) Rex will remain on-task (i.e., eyes on speaker, task initiation, and task completion) on an average of 90% of the school day over the course of a 1-month period.

STO 1: With fading 1:1 support Rex will remain on task (i.e., eyes on speaker, task initiation, and

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE38

Received Office of State Review
01/09/2024

PE39



task completion) across an average 60% of school day for a period of two weeks.
STO 2: With fading 1:1 support Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 75% of the school day for a period of two weeks.
STO 3: With fading 1:1 support Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 85% of the school day for a period of two weeks.

## Data Sources

Direct data:
- Antecedent – Behavior – Consequence (ABC) chart
- Partial Interval Recording

Indirect Data:
- Student Interview
- Parent Interview
- Staff Interview
- Assessment of Student Preferences
- Evaluations

## Setting Events

| Influencing factors that increase the likelihood of target behavior occurring | Notes |
|---|---|
| • History of problem behavior | Behavior is currently being reinforced by environmental factors outside of the school environment. Rex engages in disruptive commentary/perseveration, task refusal, physical dysregulation, inappropriate physical contact, and imitation at school, home, and in the community, with the hypothesized functions of escape and access to preferred attention (see data below). |
| • Diagnosis of Autism Spectrum Disorder | Consistent with ASD, Rex has difficulty communicating his wants and needs effectively. He experiences deficits in his learning and developmental profile that may exacerbate behavior (e.g. Rex struggles with sitting still, rigidity, and impulse control). |

## Data Analysis

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*

info@thetitusschool.com              *Fax 212-656-1426*              www.thetitusschool.com

PE39

Received Office of State Review
01/09/2024

PE40



Antecedent Analysis



Data were collected from July 6, 2022 to August 1, 2022. Results are shown in the graph:
Description of antecedents (what occurs immediately before the target behavior)
- Demand/request
- Withdrawn attention
- Unclear Motivating Operation
- Attention given

<u>Physical Dysregulation-</u> The highest frequency antecedents for physical dysregulation are unclear and attention given.

<u>Emotional Dysregulation-</u> The highest frequency antecedent for emotional dysregulation was a demand or request.

<u>Self Injurious Behaviors-</u> The highest frequency for self injurious behavior was unclear. The second highest was attention given.

<u>Property Destruction-</u> The highest frequency antecedent for property destruction was unclear. The second highest frequencies are demand or request and withdrawn attention.

<u>Non Contextual Vocalizations-</u> The highest frequency for non contextual vocalizations are demand or request. The second highest frequency was attention given.

These data are consistent with the hypothesis that Rex's behaviors are maintained by escape, access to preferred attention. Currently Rex may engage in physical dysregulation, task refusal,

The Titus School          90 John Street          New York, NY 10038          646-756-4103

info@thetitusschool.com          Fax 212-656-1426          www.thetitusschool.com

PE40

PE41



and non-contextual vocalizations, to escape non-preferred tasks, and to recruit attention from peers and adults.



Description of Consequences (what happens immediately after the target behavior occurs):
● Ignore behavior
● Sensory input
● Redirection
● Corrective feedback
● Escape extinction
●

Physical Dysregulation- The highest and only frequency consequence for physical dysregulation was corrective feedback.

Emotional Dysregulation- The highest frequency consequence for emotional dysregulation was ignored behavior. The second highest was to escape extinction.  Escape extinction included following through with initial demands to regain compliance.

Self Injurious Behaviors- The highest and only frequency for self injurious behavior was ignore behavior. After ignoring the behavior Rex was prompted to use a functional request and ask for attention instead. On some occasions he was given corrective feedback such as "stop hitting your leg, or hands on the desk."

Property Destruction- The highest frequency for property destruction was ignore behavior. The second highest frequency is escape extinction. Escape extinction included following through with initial demands to regain compliance.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com                    *Fax 212-656-1426*                    www.thetitusschool.com

PE41

Received Office of State Review
01/09/2024

PE42



<u>Non-contextual Vocalizations-</u> The highest frequencies for non-contextual vocalizations are ignore behavior, redirection, and escape extinction. After ignoring the behavior, Rex was prompted to use a functional request for attention instead.

**Functional Analysis Screening Tool (FAST, 2005)**



The Functional Analysis Screening Tool (FAST, 2005) was provided to caregivers to obtain additional information about the target behaviors and hypothesized consequences. Results, shown above, indicated that social attention and escape from demands were the primary reinforcing consequences for Rex's behaviors. Additionally, non-contextual vocalizations may be reinforced by sensory components.

*The Titus School*         *90 John Street*         *New York, NY 10038*         *646-756-4103*

info@thetitusschool.com         *Fax 212-656-1426*         www.thetitusschool.com PE42

Received Office of State Review
01/09/2024

P - D 8 of 63

PE43



Together, these data are consistent with the hypothesis that Rex's target behaviors are maintained by escape from demands and/or accessing attention of peers and staff, and some behaviors may include a reinforcing sensory component

**Additional Data**

The following graphs depict Rex's target behaviors and progress from the 2022-2023 school year.



*Figure 1*

**Graph Analysis**

Therapists broke the day into 10 minute intervals and recorded whether or not the target behavior (task refusal) occurred at least once during the interval. Therapists graphed the total daily occurrence of the target behaviors. Data indicate variability in Rex's ability to comply with classroom expectations. Rex engages in task refusal on average 25% of daily intervals, and complies to classroom expectations an average of 75% of daily intervals. Rex continues to

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com PE43

Received Office of State Review
01/09/2024



PE44

benefit from the interventions listed below. Due to variability in this behavior and the decreasing rend, therapists are assessing additional supports to increase task compliance behavior.



Figure 2

**Graph Analysis**

Therapists broke the day into 10 minute intervals and recorded whether or not the target behavior (non-contextual vocalizations) occurred at least once during the interval. Therapists graphed the total daily occurrence of the target behaviors. Data indicate variability in Rex's ability to maintain emotional regulation. Rex engages in non-contextual vocalizations on average 31% of daily intervals, and maintains emotional regulation an average of 69% of daily intervals. Rex continues to benefit from the interventions listed below. Due to variability in this behavior and the increasing rend, therapists are assessing additional supports to increase task compliance behavior.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE44

Received Office of State Review
01/09/2024

PE45

# The Titus School



Figure 3

**Graph Analysis**

Therapists broke the day into 10 minute intervals and recorded whether or not the target behaviors (physical dysregulation) occurred at least once during the interval. Therapists graphed the total daily occurrence of the target behaviors. Data indicate a steady decreasing trend in Rex's ability to maintain physical regulation. Rex engages in physical dysregulation on average 8% of daily intervals, and maintains physical regulation an average of 92% of daily intervals. Rex continues to benefit from the interventions listed below. Due to the steady decreasing trend in this behavior, Rex has met this goal and is able to maintain physical regulation across individuals and settings.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE45

Received Office of State Review
01/09/2024

P - D 11 of 63



PE46

Target Behaviors to Increase



*Figure 4*

**Graph Analysis**

Rex has made progress during this school year. As a result of this progress, therapists analyzed targeted behaviors to increase, which include the socially appropriate inverse of the targeted behaviors to decrease. This type of analysis ensures the interventions are effective. Therapists utilized various interventions during the school year from 8/1/22-11/28/22, discussed in further detail below, to increase socially appropriate replacement behaviors. These interventions resulted in variable results until 11/1/22. Between 11/1/22-11/28/22, therapists observed stabilized responding. To further increase these socially appropriate behaviors, and to ensure maintenance of these behaviors, therapists included an additional intervention called a "check-in self monitoring plan" (outlined in detail below) on 11/29/22. With this additional intervention in place, therapists observed an increase in all target behaviors. Therapists broke the day into 10 minute intervals and recorded whether or not the target behaviors occurred at least once during the interval. Therapists graphed the total daily occurrence of the target behaviors. Average daily occurrence for compliance/on task behavior is 84%. Average daily occurrence for emotional regulation behavior is 87%. Average daily occurrence for physical regulation behavior is 92%. Target behavior data will continue to be monitored and intervention adjustments will be made as needed.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE46

Received Office of State Review
01/09/2024

PE47



**Behavior Intervention Plan**

**Antecedent Strategies**

In these procedures, antecedent stimuli are manipulated to evoke socially appropriate behaviors so that they can be differentially reinforced. Antecedent strategies decrease the likelihood of problem behaviors to occur. Antecedent strategies are used in the absence of the targeted problem behaviors.

| **Non-Contingent Reinforcement** |
|---|
| A behavioral approach in which a student is given access to a reinforcer non-contingently, and frequently enough so that they are no longer motivated to exhibit disruptive behavior in order to obtain that same reinforcer. Non-contingent means Rex is not required to emit a response to access reinforcement. NCR is delivered on a fixed-time schedule, such as every 5 minutes. Over time and with behavior change, the interval can be increased to become more socially appropriate and to mirror natural environments. |

| **Details and Intervention Components** | <u>Non-Contingent Attention:</u> Rex should receive attention in the form of positive praise (e.g., "Nice job staying on task!" or "I like your shirt, Rex!"), redirections (e.g., reminders to stay on task), and non-verbal/proximity-based attention (e.g., tapping Rex on the shoulder if his head is down, giving a silent thumbs up when Rex raises his hand to answer a question).<br><br>Rex should receive attention non-contingently beginning on a dense schedule of reinforcement (every 5 minutes) and over time this interval will increase (10 minutes, 15 minutes, 20 minutes).<br><br>Teachers can wear an interval timer (e.g., GymBoss or MotivAider timers, cell phone apps, etc.) that is set at the interval recommended to remind teachers to provide attention to Rex at that time.<br><br>Corrective feedback/redirections are delivered in a neutral tone. Positive praise is delivered in a positive tone. NCA can be provided in front of a whole group/classroom and/or 1:1. |
|---|---|

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE47

Received Office of State Review
01/09/2024

P - D 13 of 63

PE48


# The Titus School

| | |
|---|---|
| | NCR- Sensory Diet: Rex should engage in sensory and movement based activities designed by his Occupational Therapist on a variable interval of every 30-60 minutes |
| **Considerations** | If Rex is engaging in off-task behavior at the end of the interval, the NCR can include neutral redirections or the NCR can be skipped until the next interval. |
| **Data** | Behavior data will be observed on a weekly basis to determine if and when the interval can be increased. Partial-interval recording method of data collection is used on 10 minute intervals. |
| **Goal** | Rex will receive attention non-contingently about every 10 minutes across his school day, and will receive sensory breaks/input about every 30-60 minutes across the school day. |

| **Concurrent Operant** |
|---|
| A behavioral approach in which fixed choices are provided at the onset of an activity or transition (e.g., providing the option of crayons or colored pencils at the start of an art activity) or throughout an activity to minimize problem behavior. Providing choices allows for more agency in Rex's day while minimizing escape or attention maintained behavior. |

| **Details and Intervention Components** | "Onset" choices<br>- Prior to beginning an activity, provide Rex with 2-3 choices<br>- Same choices available every day within the schedule (e.g., every day during carpet math time Rex get to choose where he sits)<br>"Within Task" choices<br>- Within a non-preferred activity (such as ELA), provide Rex with a choice within the activity (e.g., using a pencil or a crayon, doing worksheet A first or worksheet B first)<br>"When" choices |
|---|---|

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE48

Received Office of State Review
01/09/2024

PE49



| | |
|---|---|
| | - Utilizing a schedule of activities that Rex creates each day or each week where he is in control of deciding when certain tasks are completed. |
| **Considerations** | Choices are not "earned," but they may be "taken away" based on behavior |
| | Rex may use appropriate functional communication to request items or activities that were not part of the fixed choice. Depending on the situation, the staff may honor this request or may not. |
| | If presenting choice becomes antecedent to target behavior, choices will be removed from the behavior plan. |
| | Staff should monitor the amount of choices and be sure to provide structure and routine regarding the daily schedule and activities. Choices can always be reduced or modified to ensure a balance of building autonomy and providing clear expectations and predictability. |
| **Goal** | Choices will be systematically removed across the day to mirror a more traditional school setting |

| Premack Principle |
|---|
| A principle of reinforcement which states that an opportunity to engage in more probable behaviors or activities will reinforce less probable behaviors or activities. |

| | |
|---|---|
| **Details and Intervention Components** | Rex uses a "First, then" verbal prompt in conjunction with self monitoring checklist (see consequent interventions). This involves a visual or verbal cue that FIRST, he must do _____, THEN he can get _____. |
| | Example: |

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*

info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com

PE49

Received Office of State Review
01/09/2024

PE50

THE Titus School

| | |
|---|---|
| | - Prior to ELA, Rex is presented with a visual that states "First ELA, then you can listen to Life Is a Highway"<br><br>- Therapists can silently point to the visual as a cue to remind Rex of the expectations<br>- Therapists can provide verbal redirections using this language<br><br>When scheduling classroom activities and within-task activities, the Premack Principle should be considered - including opportunities for Rex to complete lower preferred tasks prior to completing higher preferred tasks as part of a series. For example, during independent work time, Rex must first complete an academic worksheet, then a puzzle, and then play with playdough. |
| **Considerations** | The Premack Principle must be used in conjunction with Rex's self monitoring checklist, which allows him to earn secondary reinforcers minutes to be later exchanged for a reinforcer. |
| **Goal** | Rex will participate in non-preferred activities without the use of the Premack Principle. |

| **Visual Schedule** | |
|---|---|
| A daily visual schedule is to be reviewed prior to each transition to allow Rex to see/know what events must happen before a specific activity (e.g., speech session) and what will occur following that activity (e.g., gym.) | |
| **Details and Intervention Components** | Rex will use a visual schedule in conjunction with spoken instructions. For example, For example, when it's time for Rex to go to Math, present the visual schedule, and say, "Rex, it's time to go to math".<br><br>Classroom staff may include a review of the visual schedule during pre-determined parts of the day, including Morning Meeting and Goodbye Meeting, to help ensure the day is |

PE51



| | |
|---|---|
| | reviewed and understood. Any changes to the schedule can be communicated during these times to decrease anxiety.<br><br>Rex should have access to a copy of his daily and weekly schedule to review at his own convenience. Rex may use appropriate functional communication to request viewing his schedule up to 1 times within a 30 minute session which is located on the back of his clipboard. Depending on the situation, the staff may honor this request or may not. |
| **Considerations** | Rex may use appropriate functional communication to request viewing his schedule up to 1 times within a 30 minute session which is located on the back of his clipboard. Depending on the situation, the staff may honor this request or may not.<br><br>If presenting the visual schedule becomes an antecedent to the target behavior, the schedule will be removed from the behavior plan. |
| **Goal** | Rex will rely on the class schedule rather than his individual schedule. |

### Consequent Strategies

Consequent strategies are used when targeted problem behaviors occur in an effort to decrease the future likelihood of the same behaviors occurring in the future. Consequent strategies utilize the hypothesized function of target behaviors to decrease the target problem behaviors and increase the socially appropriate behaviors.

| Functional Communication Training | |
|---|---|
| A differential reinforcement procedure in which Rex is taught an alternative (more functional) response that results in the same class of reinforcement identified as maintaining problem behavior. Based on observations, data indicates that Rex's target behaviors often function to get attention and to escape non-preferred activities. He is currently being prompted to use an alternative, functionally appropriate phrase and is then reinforced. | |
| **Details and Intervention Components** | Therapists observe maladaptive behavior and prompt the student to utilize appropriate replacement behavior that is functionally equivalent, and then once the appropriate behavior |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE51

Received Office of State Review
01/09/2024



| | |
|---|---|
| | is observed, therapists reinforce the behavior by honoring their request. |
| | Rex will be prompted to use short phrases that can generalize to multiple contexts such as "I need a break," "this is hard," "I need space," and "talk to me!" |
| | For example, if Rex is working on a non-preferred task (i.e. ELA) and engages in task refusal, such as yelling "NO!", a therapist models an appropriate alternative statement "I need a break" or "Can I have a minute?" When Rex repeats the statement calmly, with appropriate tone and volume, he is allowed a brief break from the activity. |
| | Social communication:<br>Therapists will provide Rex with context-specific appropriate social phrases to increase his social communication (e.g., invitations to play games such as peek-a-boo with peers, replacement phrases for common scripts). |
| **Considerations** | Rex may use appropriate functional communication to request preferred items, breaks, or attention whenever he would like. Depending on the situation, the staff may honor this request or may not.<br><br>If the request cannot be honored, therapists will provide praise to reinforce the functional communication behavior and will provide an alternative option and/or explain when the option will be available (e.g., Nice work asking for a break so calmly! Right now we have to finish this worksheet but as soon as we are done you can take a break) |
| **Goal** | Rex will use appropriate tone and volume to request items/breaks/attention.<br><br>Rex will engage in social opportunities using functional communication |

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*

info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com

PE52

Received Office of State Review
01/09/2024





| Pivotal Praise | |
|---|---|
| A behavioral tactic in which an instructor differentially ignores the maladaptive/inappropriate behaviors of the target student and praises the appropriate behavior of others in the immediate environment. As the target student engages in the appropriate behavior after pivotal praise is implemented, the student's behavior should be reinforced to increase the likelihood of this appropriate behavior occurring in the future. | |
| **Details and Intervention Components** | Pivotal praise should be implemented when Rex is in an environment that contains familiar or novel peers.<br><br>Praise should be specific to appropriate behaviors that the peer is engaging in. For example, if Rex is engaging in non contextual vocalizations/disruptive commentary, the therapist would use pivotal praise by turning to a peer in Rex's immediate environment and saying "WOW! I love the way ___ is sitting quietly waiting for directions!"<br><br>When giving praise to other children in the immediate environment, the peer must be engaging in appropriate behavior that is obvious to Rex.<br><br>As soon as Rex is engaging in the appropriate target behavior, specific praise and reinforcement should be given immediately. |
| **Considerations** | If Rex is engaging in dangerous behavior that could potentially harm himself or others in his environment, other behavioral tactics for reduction should be used to decrease the dangerous behavior first. |
| **Goal** | An increase in appropriate behaviors and a decrease in problem behavior during group times. |

| Differential Reinforcement of Incompatible Behaviors |
|---|
| Differential Reinforcement of Incompatible Behavior is a procedure in which the therapist provides reinforcement for a behavior that's incompatible with, or cannot occur at the same time as, the problem behavior. Rex is differentially reinforced for remaining upright in his seat, as this behavior is incompatible with his physical dysregulation. |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com                    *Fax 212-656-1426*                    www.thetitusschool.com

Received Office of State Review
01/09/2024

PE54



| Details and Intervention Components | Rex's physical dysregulation, inappropriate physical contact, and imitative behaviors are maintained by attention and escape from tasks. Rex will earn high energy praise (i.e. "WOW! You are sitting so nicely!) for every 2-3 minutes of engaging in the incompatible behavior (remaining upright in his seat.)<br>- If Rex engages in physical dysregulation during this variable interval, he will not be given this praise. Instead, the behavior will be blocked and ignored. |
|---|---|
| Considerations | If Rex engages in physical dysregulation during the interval in which he is expected to be seated, respond with other behavioral tactics for reduction. Once he is seated again, restart the timer. |
| Goal | Behavior data will be observed on a weekly basis to determine modifications to this intervention. |

| **Differential Reinforcement of Alternative Behaviors** | |
|---|---|
| A behavioral approach in which an instructor differentially reinforces occurrences of a behavior that provide a desirable alternative to a problem behavior. The alternative behavior is a more appropriate target behavior and will be reinforced so that it is used instead of the problem behavior. This can be used with positive reinforcement (e.g., praise, tokens) and negative reinforcement (e.g., escape from a task or demand) depending on the function of the behavior that is targeted for decrease. | |
| Details and Intervention Components | Differential reinforcement of alternative behavior should be used when Rex engages in adaptive behavior to gain staff and/or peer attention. Alternative behaviors to be reinforced include:<br><br>- Remaining in seat for the duration of an activity<br>- Functionally requesting staff or peer attention<br>- Calm and safe body<br>- Relying on provided supports (e.g., visual schedule) as an alternative to perseverative behaviors. |

PE55



| | Differential reinforcement is used in conjunction with multiple interventions such as a self-monitoring plan and extinction, both outlined in this document. |
|---|---|
| Considerations | The effectiveness of a differential reinforcement procedure depends on the instructor's ability to deliver or withhold reinforcement for the target behaviors (appropriate and problem). Delivery of reinforcement should be immediate and consistent in order to maximize the effects of differential reinforcement. |
| Goal | Differential reinforcement of alternative behaviors will increase the rate of responding for the appropriate behaviors while decreasing the frequency of problem behaviors. |

| Response Blocking |
|---|
| Response blocking is an intervention that involves physically intervening as soon as a student begins to emit a problem behavior, to prevent the completion of the response. |

| Details and Intervention Components | When Rex engages in physical dysregulation, specifically leaving his seat or designated area, a teacher or therapist will physically block him from running away from the area. Rex will then be prompted back to the task with no language or eye contact. |
|---|---|
| Considerations | Rex has an extinction protocol in place, as verbal reprimands can be reinforcing for this behavior. For this reason, staff will need to use gestural prompts and/or pointing to his desk so that he returns to his seat. However, appropriate alternative behaviors are encouraged, so staff may choose to model appropriate functional communication as well. |
| Goal | Rex's behavior data will show a decrease in physical dysregulation. |

| Self-Monitoring Plan |
|---|

PE56



A self-monitoring plan allows Rex to build awareness and accountability regarding behavioral choices. On a predetermined interval, Rex reflects and rates his own behavior. Similar to differential reinforcement, Rex is then able to access reinforcement based on certain behavior choices.

| Details and Intervention Components | At the end of each predetermined interval, Rex will assess his own behavior. He will then bring his sheet to a teacher. The teacher will assess Rex's behavior and will discuss any areas of concern and/or praise with Rex during a brief conversation before transitioning to the next interval. |
|---|---|
| | For each "yes" on the check-in sheet, Rex earns 30 seconds towards a pre-determined reinforcement break. At every interval, Rex has the option to use his minutes for an immediate, short break or he can "bank" his minutes towards a longer break at a later time. |
| | Earned reinforcement can include any activity the student indicated as their preference on the student interview, or other activities available in the classroom. It is important to ask the student what they would like to earn time towards and to discuss what is and is not available (e.g., if screen time is available, but only during certain periods of the day, the student should be able to work for screen time during those periods only unless otherwise decided by the school team). |
| | It is recommended that reinforcement for Rex include activities he can complete with adults, breaks from the classroom, GoNoodle dancing breaks, running a lap in the hallway, and other preferred activities, etc. |
| Considerations | If Rex is consistently not contacting reinforcement, we need to consider lowering the standard of reinforcement. If Rex is meeting reinforcement consistently, the mastery criteria will continue to be de-scaffolded (e.g., moving from 2 reminders to 1 reminder, etc.) |
| Goal | Fading of self-monitoring plan |

| **Extinction** |
|---|

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*

info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com

PE56

Received Office of State Review
01/09/2024

PE57

# тне Titus School

Extinction is a behavioral approach that involves withholding reinforcement when certain behaviors are emitted by Rex. Escape extinction involves requiring the completion of a task regardless of any escape-related behaviors. Planned ignoring involves withholding attention unless Rex emits a specific behavior (usually functionally appropriate communication).

| Details and Intervention Components | Extinction is utilized in conjunction with additional interventions outlined in this document. |
|---|---|
| | Rex engages in multiple behaviors to escape non-preferred tasks and to gain access to preferred items/activities and staff/peer attention. In order to place these behaviors on extinction, therapists will ignore and block physical dysregulation, and then require completion of the initial task demand. Rex will be differentially reinforced for appropriate requests for breaks and attention. If Rex engages in non-contextual vocalizations, the therapist will ignore until Rex replaces this behavior with an appropriate request for attention. |
| | Escape extinction: When Rex engages in a behavior with the hypothesized function of escape or avoidance of a non-preferred task, therapists will first ignore the behavior (e.g., look away, refrain from commenting about the behavior) and will provide the directive to complete the activity (and utilize other supports such as first/then language, reminders about reinforcement opportunities, etc.). Therapists may also use physical prompting to ensure the task is completed (such as helping Rex pick up your backpack). The original demand must be followed through before Rex can access a break or other reinforcement. Once the task is completed, therapists should also provide specific praise. |
| | Planned Ignoring: When Rex engages in a behavior with the hypothesized function of attention, therapists will ignore the behavior (e.g., look away, refrain from commenting on the behavior) and instead will wait for Rex to follow through with the initial demand. |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*

info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE57

Received Office of State Review
01/09/2024

P - D 23 of 63

PE58

 The Titus School

| Considerations | Despite the implementation of planned ignoring, it is important that Rex's team continues to follow through with the initial demand, without giving him the attention he is seeking (reprimands or preferred staff members.) This could mean bringing the work he may be avoiding to wherever he is located, and continuing to work on it there. |
|---|---|
| Data | Behavior data will be observed on a weekly basis to determine modifications to this intervention. |
| Goal | Rex's behavior data will show decreased levels of inappropriate behavior and increased levels of appropriate replacement behavior over time. |

**Protocol plan for revision/review:**

This plan and procedure will be reviewed weekly by Rex's school team. Data on the Behavior Intervention Plan will be analyzed following the data decision protocol and changes to the treatment procedure will be made accordingly.

**Use of Crisis Prevention Intervention**

If needed, Nonviolent Crisis Intervention (CPI) protocols will be used. CPI is a staff training curriculum that provides strategies and techniques for safe and effective prevention and physical management of behaviors that pose an imminent risk of harm to self or others and requires staff actions to maintain the safety of the individual and others around them. Staff shall follow all procedures as described in the CPI training for the identification of a crisis, prevention of the escalation of a crisis and the intervention once the crisis has occurred including the possible use of manual restraint.

**Potential Risks**

- **Risk of Implementing Treatment Plan:** Reduction of reinforcement for the behaviors may result in a temporary increase in the frequency, intensity, or magnitude of the target behaviors or a change in topography.
- **Risk of Not Implementing Treatment Plan:** Withholding treatment may result in an increase in the frequency or magnitude of the target behavior and limit the child's skill acquisition progress.

**Parental Consent:**

Received Office of State Review
01/09/2024



PE59

I (we), the parents and/or guardians(s), has (have) reviews the written behavior support plan and the procedure has been fully explained to me (us). I (we) give informed consent for the implementation of the program in the manner described above. I (we) may withdraw consent at any time, and if that consent is withdrawn, the program will be immediately discontinued.

Parent/Guardian Name: _____

Parent/Guardian Signature: _____

Date: _____

The behavior plan has been approved by Naomi Parikh, MEd, BCBA, LBA-NY, Assistant Clinical Supervisor, at The Titus School.

_____

Naomi Parikh, MEd, BCBA, LBA-NY

PE59

Received Office of State Review
01/09/2024

PE60

# The Titus School

### Progress Report

Child: Rex Francis                                      Date of Birth: 04/14/2014
Dates Covered: July 2022 – November 2022               Date of Report: 11/18/2022

### Treatment Team

| | |
|---|---|
| Classroom Team: | Lead Teacher: Angela Merino, M.S.Ed<br>Lead Behavior Therapist: Brianna Dapolito, M.S. (in progress), RBT<br>Behavior Therapist: Meghan Grigston, BA, RBT<br>Behavior Therapist: Brian Rodriguez, BA<br>Classroom Supervisor: Naomi Parikh, MEd, BCBA, LBA-NY |
| Math Teacher: | Angela Merino, M.S.Ed |
| ELA Teacher: | Angela Merino, M.S.Ed |
| Science/Social Studies Teacher: | Angela Merino, M.S.Ed |
| Speech-Language Pathologist: | Caitlin McDonagh MS, CF-SLP, TSSLD<br>Sara Hannah, MS Ed, CCC-SLP, TSSLD |
| Occupational Therapist: | Marissa Bernstein, MS, OTR/L, RBT |
| Physical Therapist: | Avital Akman, PT, DPT |
| Counselor: | Meghan Keenan, LMSW |
| Music Therapist: | Michelle Geisler MA, MT-BC, LCAT-LP |

### Student Profile

Rex Francis is an 8.7 year old student that has been enrolled at The Titus School (Titus) since July 2021. Titus is an ungraded special education school serving children ages 5.0 through 21.11 years old and their families. Students present with a variety of disabilities and diagnoses. In order to accommodate each student's needs, Titus offers individualized academics, social-emotional learning, targeted behavioral interventions, and therapeutic support within a group setting. Students are grouped with social peers for the majority of the day. Based on instructional history and assessments, students are assigned academic groups for math, reading, writing, social studies, and science. The academic cohorts are designed to facilitate targeted learning in small groups, dyads, and/or 1:1 instruction based on learning style and needs. Our academic curriculum adheres to the NYS Common Core and is modified as needed. Each student has the opportunity to work with a NYS-certified special education teacher that can differentiate work to meet their learning needs and style while still challenging and supporting intellectual and cognitive development. Rex's current homeroom consists of 6 other students, with a 7:4 student to teacher ratio.

### Social/Emotional Profile

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com          PE60
MP1–Francis, R Page 1

Received Office of State Review
01/09/2024          P - D 26 of 63

PE61

# The Titus School

Rex is diagnosed with Autism. Rex exhibits delays in social/emotional development and adaptive behavior. Rex has a history of engaging in high rates of off-task behavior; emotional dysregulation and physical dysregulation. Rex presents as self-directed and engages in behavior that requires consistent support to access the curriculum in both 1:1 and group activities. Due to his complex medical diagnosis, he requires significant support to navigate his environment and demonstrate executive functioning skills. These behaviors have greatly hindered Rex's ability to form relationships with his peers, independently navigate his environment, or participate in a less restrictive academic setting. Rex requires a small class size with a low student to staff ratio to participate in instruction.

| Scoring Key |
|---|
| LTG-Long Term Goal |
| STO-Short Term Objective |
| MP-Marking Period |
| Avg-Average |
| R-Range |

## Behavior Intervention Goals

Behavior goals are derived from formal and informal assessments, functional behavior assessments, observation, interviews, and data analysis. Data is recorded and analyzed daily. Behavior progress is monitored by the classroom supervisor and Board Certified Behavior Analysts/Licensed Behavior Analysts (BCBA/LBA-NY) at The Titus School.

| Behavior Interventions | | |
|---|---|---|
| Antecedent Interventions | Consequence Interventions | Data Collection Methods |
| ☑ Functional Communication Training | ☐ DRO/DRA/DRI | ☐ Frequency |
| ☑ Visual Schedule | ☐ Verbal Prompting | ☐ Rate |
| ☐ Priming | ☑ Token Economy/Point system | ☐ Duration |
| ☑ Concurrent Operant | ☐ Group contingencies | ☑ Partial Interval Data |
| ☐ Behavioral Momentum | ☑ Self-Monitoring Plan | ☐ Whole Interval Recording |
| ☑ Premack Principle | ☑ Pivotal Praise | ☐ Momentary Time Sampling |
| ☐ Visual Modeling | ☑ Response Interruption/ Redirection | ☐ Intensity Scale Rating |
| ☐ Chaining / Task Analysis | ☑ Response Blocking | ☐ Latency Recording |
| ☐ Coping Skill Task Analysis | ☐ Response Cost/Bonus | |
| ☑ Non-Contingent Reinforcement | ☐ Planned Ignoring/Escape | |
| ☐ Other: | ☑ Extinction | |
| | ☑ Other: Differential reinforcement of alternative behaviors, | |

---

**The Titus School**     **90 John Street     New York, NY 10038**          **646-756-4103**
info@thetitusschool.com          **Fax 212-656-1426**          www.thetitusschool.com     PE61
MP1–Francis, R Page 2

Received Office of State Review
01/09/2024

P - D 27 of 63

PE62


# The Titus School

| | differential reinforcement of incompatible behaviors | |
|---|---|---|

Lead Behavior Therapist: Brianna Dapolito, M.S. (in progress), RBT
Classroom Supervisor: Naomi Parikh, MED, BCBA, LBA-NY

| Goal 1 | LTG: **With support from an adult, utilizing ABA methodology and other therapeutic approaches (e.g. token economy, differential reinforcement procedures), Rex will follow instructions provided by staff to comply with classroom routines, complete non-preferred tasks and/or engage in non-preferred activities within 10 seconds of the initial demand across average 90% of the school day for 10 consecutive days.** | Intervention Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | Avg: 78% R: 61-88% | | |

STO 1:  Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 60% of the school day for 10 consecutive days. **Objective met**

STO 2: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 75% of the school day for 10 consecutive days. **Objective met**

STO 3: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished on average 85% of the school day for 10 consecutive days. **In progress**

Goal Amended: This goal was amended to further break down the skill.

| Goal 2 | LTG: **Utilizing ABA methodology and therapeutic approaches (e.g., differential reinforcement, visual cues, and response blocking), Rex will engage safe behavior and maintain physical regulation (i.e. remaining in his seat or in the designated area) across on average 90% of the school day for 10 consecutive days.** | Intervention Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | Avg: 93% R: 72-100% | | |

STO 1: With fading support, Rex will engage safe behavior and remain regulated (i.e. remaining in his seat or in the designated area) across 60% of the school day for 10 consecutive days. **Objective met**

STO 2: With fading support, Rex will engage safe behavior and remain regulated  (i.e. remaining in his seat or in the designated area) across 75% of the school day for 10 consecutive days. **Objective met**

PE63

# The Titus School

| Goal 3 | LTG: With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (e.g., positive reinforcement system, visual cues), Rex will independently engage with peers and staff by using appropriate language (e.g., using "kind" words), appropriate tone (e.g., phrasing requests as a question), appropriate volume (e.g., speaking at conversational volume), while also maintaining appropriate personal space across an average of 85% of the school day for 10 consecutive days. | Intervention Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | Avg: 72%<br>R: 48-83% | | |

| STO 1: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average of 60% of the day, for 10 consecutive days. **Objective met** |
|---|

| STO 2: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the day, for 10 consecutive days. **In progress** |
|---|

**New Goal 2:**
**LTG: With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (such as functional communication training, differential reinforcement, frequent opportunities for breaks, non-contingent attention, and visual schedules) Rex will remain on-task (i.e., eyes on speaker, task initiation, and task completion) on an average of 90% of the school day over the course of a 1-month period.**
STO 1: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 60% of school day for a period of two weeks.
STO 2: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 75% of the school day for a period of two weeks.
STO 3: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 85% of the school day for a period of two weeks.

**Comments:** With fading 1:1 support, Rex continues to make progress towards his behavior goals. Through the use of Antecedent-Behavior-Consequence (ABC) data collection, Functional Assessment Screening Tool (FAST) and direct observation, the following areas of growth have been identified: increasing compliance to classroom routines and work completion, increasing emotional regulation, decreasing physical dysregulation. With the implementation of the interventions listed above, outlined in further detail in his Behavior Intervention Plan (BIP), Rex has increased his ability to remain regulated, comply with instructions and classroom routines across the school day. Rex has mastered increasing physical regulation across the school day. Rex is currently making progress towards goals as evidenced by a decrease in the support he receives per 10 minute interval to target compliance and emotional regulation goals. Effective antecedent and consequence strategies and interventions will continue to be utilized to facilitate progress towards behavioral goals.

## Academics

Academic placement and goals are determined by formal and informal assessment, teacher observation, and permanent product data. Teachers record and analyze data weekly.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE63

Received Office of State Review
01/09/2024

PE64



| Supports Used in Classroom | |
|---|---|
| ☐ Use of Behavior Intervention Plan<br>☑ Small groups<br>☑ Kinesthetic learning<br>☐ Highlight key words<br>☑ Modify pace of instruction<br>☑ Increased opportunities to respond<br>☐ Multi-modal instruction<br>☑ Anchor charts/visual aids<br>☑ Daily review of previously taught material<br>☑ Posted agenda<br>☑ Repeated opportunities to practice skills<br>☐ Teacher/peer modeling<br>☐ Manipulatives<br>☐ Graphic organizers<br>☐ Guided Notes<br>☐ Teacher made materials<br>☐ 1:1 Instruction<br>☐ Other: | ☑ On task focusing prompts<br>☐ Preferential seating<br>☐ Separate location<br>☑ Extended time<br>☑ Movement<br>☑ Breaks /Brain breaks<br>☐ Checklists/Task lists<br>☐ Scaffolding<br>☑ Visual aids at desk<br>☐ Annotation strategies<br>☐ Access to assistive technology<br>☐ Calculator<br>☐ Scribe<br>☑ Directions read aloud and reread<br>☐ Informal Criterion Referenced Assessment<br>☐ Other: |

Math Instructor: Angela Merino M.S.Ed
Grade Level: Kindergarten

| Goal 1: | LTG 1: With fading support, Rex will be demonstrate ability to identify numbers from 11 to 20 into ten ones and some further ones, e.g., by using objects or drawings, and record each composition or decomposition by a drawing or equation (e.g., 18 = 10 + 8); understand that these numbers are composed of ten ones and one, two, three, four, five, six, seven, eight, or nine ones with 80% accuracy. (K.MATH.2) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | 40% | | |

STO 1: With fading support, Rex will demonstrate understanding of composing numbers 11–20, and count to answer "how many?" questions in varied configurations with 80% accuracy. **In progress.**

STO 2: With fading support, Rex will demonstrate understanding of decomposing numbers 11-20, and count to answer "how many?" questions in varied configurations with 80% accuracy. **In progress.**

STO 3: With fading support, Rex will represent and write teen numbers (e.g.,17 is 10 ones and 7 ones) and up to 20 in a correct number formation with 80% accuracy.**In progress.**

PE65

 THE Titus School

| Goal 2: | **LTG 2: With fading support, Rex will be able to identify and compare numbers with measurable attributes between 0 and 100 with an 80% accuracy. (K.MATH.11)** | Grade Average | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | 50% | | |
| | STO 1: With fading support, Rex will directly identify whether the number of objects in one group is greater than the number of objects from another group, e.g. by using matching and counting strategies with 80% accuracy. **In progress.** | | | |
| | STO 2: With fading support, Rex will directly identify whether the number of objects in one group is less than the number of objects from another group. e.g by using matching and counting strategies with 80% accuracy. **In progress.** | | | |
| | STO 3: With fading support, Rex will directly identify whether the number of objects in one group is equal to the number of objects from another group, e.g by using matching and counting strategies with 80% accuracy. **In progress.** | | | |
| Goal 3: | **LTG 3: With fading supports, Rex will be able to add and subtract within 10, understanding that addition is putting together and adding to, and subtraction is taking apart and taking from, with 80% accuracy. (K.MATH.13)** | Grade Average | | |
| | | **MP1** | **MP2** | **MP3** |
| | | 50% | | |
| | STO 1: With fading support, Rex will represent addition as "putting together" utilizing objects, fingers, mental images, drawings, sounds (e.g., claps), acting out situations, verbal explanations, expressions, or equations with 80% accuracy. **In progress.** | | | |
| | STO 2: With fading support, Rex will represent subtraction as "taking away" utilizing objects, finger counting, mental images, drawing, sounds (e.g. claps), acting out situations, verbal explanations, expressions or equations with 80% accuracy. **In progress.** | | | |
| | STO 3: With fading support, for any number from 1 to 9, Rex will find the number that makes 10 when added or subtracted to the given number, e.g., by using objects or drawings, and record the answer with a drawing or equation with 80% accuracy. **In progress.** | | | |

**Comments:**
Rex benefits from a small structured group learning utilizing the *Eureka Math* curriculum. Rex is currently working on Module 5 of the *Eureka Math* at a Kindergarten level. Rex's Math average for MP1 is composed of both summative and informal assessments (teacher observations) covering the content of the short term objective and long term goals.

Rex shows 40% accuracy with LTG1, respectively with STO 1 at 40%, STO 2 at 40% , and STO 3 at 30%. Rex is able to verbalize the number names in the standard order from 0 to 20, pairing each object with one and only one number when counting using manipulatives such as counting cubes, and the Rekenrek. Rex is beginning to show understanding that one tens, and some ones equal a teen number. For example, Rex's ability to identify 10 ones, and 5 ones as 15 is emerging, and when provided with one to one teacher support. This is the goal that will be targeted in the next marking period.

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com

PE65

Received Office of State Review
01/09/2024

PE66



# тне Titus School

Currently, Rex demonstrates 50% accuracy for LTG 2 targeting identifying and comparing numbers with measurable attributes. Using manipulatives and teacher-made hands-on materials, Rex is learning to directly compare two objects with a measurable attribute in common, to see which objects have "greater than" attribute with 40% accuracy. He is also learning to compare two objects with a measurable attribute in common, to see which objects have "less than" attribute and describe the difference, he is able to perform this academic skill with 40% accuracy. For example, when presented with two groups of manipulatives, he can count the number of items in each group correctly and verbally tell his teacher/therapist which group has more and which group has less. Rex is learning how to classify and sort objects into equal groups with 50% accuracy.

Rex shows 50% accuracy with LTG 3 targeting addition and subtraction within 10. Rex relies heavily on teacher prompting, and redirection to focus his attention on the task in front of him. He is learning that addition is "putting together", and subtraction is "taking away or crossing out" with both 40% accuracy meeting his STO 1 and STO 2 respectively. For STO 3, Rex shows 50% accuracy with decomposing numbers within 10 showing part-part and whole numbers. Rex will continue to build upon and target his math skills over the next math modules in the next marking period. Rex will continue utilizing differentiated instruction, and academic support available to meet his learning goals.

ELA Instructor: Angela Merino M.S.Ed
Grade Level: Kindergarten

| Goal 1: | LTG: **With fading support, Rex will identify and answer questions related to key ideas and details related to a text read aloud with 80% accuracy. (K.EL AL.7)** | Grade Average | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | 65% | | |

STO 1.1 With fading support, Rex will demonstrate ability to retell and sequence events from the beginning, middle, and end of familiar stories verbally and completing teacher made materials with 80% accuracy. **In progress.**

STO 1.2 With fading support, Rex will identify characters, settings, and major events in the read aloud story with 80% accuracy. **In progress.**

STO 1.3: With fading support, Rex will create and/or utilize existing visual supports from the book to answer "wh" questions related to the key details dung group read-aloud with 80% accuracy. **In progress.**

| Goal 2 | LTG: **With fading support, Rex will demonstrate knowledge and apply phonic and word analysis skills in decoding words with 80% accuracy. (K.ELAL.3)** | Grade Average | | |
|---|---|---|---|---|
| | | **MP1** | **MP3** | **MP3** |
| | | 70% | | |

STO 1: With fading support, Rex will demonstrate basic knowledge of one-to-one letter-sound correspondences by producing the primary sound or many of the most frequent sounds for each consonant with 80 % accuracy with 80% accuracy. **In progress.**

STO 2: With fading support, Rex will demonstrate ability to differentiate between consonant and vowel letters, as well as identifying short vowel sounds with 80% accuracy. **In progress.**

STO 3: With fading support, Rex will recognize and produce spoken rhyming words by identifying key ending sounds to establish fluency with 80% accuracy. **In progress.**

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com                    *Fax 212-656-1426*                www.thetitusschool.com

PE66

Received Office of State Review
01/09/2024

PE67



THE Titus School

| Goal 3 | LTG: With support as needed, Rex will write one complete simple sentence using appropriate punctuation, proper capitalization, and grade level phonemic awareness and spelling conventions with 80% accuracy. (K.ELAL.14) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP3 | MP3 |
| | | 50% | | |

| | STO 1: With support as needed, Rex will encode familiar and unfamiliar CVC, CCVC, and CVCC words with and without digraphs, in isolation, using grade level phonemic awareness with 80% accuracy. **In progress.** |
|---|---|
| | STO 2: With support as needed, Rex will differentiate the function of punctuation including a period, exclamation mark and question mark with 80% accuracy. **In progress.** |
| | STO 3: With support as needed, Rex will be able to create one simple sentence, with proper capitalization, punctuation and grade level phonemic awareness and spelling conventions with 80% accuracy. **In progress.** |

**Comments:** Rex benefits from a small structured group learning utilizing the *Wilson Fundations* curriculum. Rex's ELA goals are composed of phonic instruction, comprehension and early writing. Rex's grade average for MP1 includes data from both summative, formative and informal assessments (i.e. teacher observations) with materials covered meeting his short term and long term goals. Rex shows 65% accuracy with LTG 1, he benefits from extended response time, and repeated opportunities given to him. For STO 1, he shows 60% accuracy retelling and sequencing events of the story. STO 2, Rex shows 60% accuracy identifying key details of the story such as characters, setting, and problem-solution concept. For STO 3, Rex shows 50 % accuracy in his ability to answer open questions in the form of "wh" questions related to the story being read. Rex requires multiple teacher reminders to engage in read-aloud.

For LTG 2, Rex demonstrates 60 % accuracy with STOs at 70%, 60%, and 50% respectively. Rex benefits from repeated instruction, response time extended, and small group instruction meeting this goal. Currently, Rex is able to correctly identify the beginning, medial and ending sounds of a CVC word. He is learning to differentiate between consonant and vowel letters when presented using his magnet board as it shows visual highlighting of yellow tiles being the consonant letters, and red tiles being the vowel letters. He is beginning to identify rhyming words when presented with visual cues. He is learning the ending sounds of rhyming words being the same, and Rex is learning to spell them accordingly.

For LTG 3, Rex shows 50% accuracy with STOs at 60 %, 50%, and 40% for targeting writing goals. STO 1 targets his encoding skills of CVC words, and Rex benefits from repeated reminders to follow the correct formation of both capital and lowercase letters. STO 2 targets the proper use of punctuation. Rex is beginning to understand the functions of punctuation but has not shown accuracy in using them in a sentence. Lasly, for STO 3, Rex shows 30% in writing one complete sentence following with the beginning capital letter and spelling accuracy. Rex will continue to work on his target ELA skills over the next marking period utilizing differentiated instruction and academic support in order to help him meet his learning goals.

| |
|---|
| History/Science Instructor: Angela Merino M.S.Ed |
| Grade Level: First Grade |

**The Titus School**          **90 John Street**          **New York, NY 10038**          **646-756-4103**
info@thetitusschool.com          **Fax 212-656-1426**          www.thetitusschool.com

PE67

MP1–Francis, R Page 8

Received Office of State Review
01/09/2024

PE68



| History | LTG: With fading support, Rex will demonstrate an understanding of topics, such as civic participation, chronological awareness, and interpreting evidence with an 80% accuracy. (K.SOC.14) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | 50% | | |

| | STO 1: With fading support, Rex will use prior knowledge to gain understanding and make meaningful connections with personal experience to topics such as geography and community. **In progress.** |
|---|---|
| | STO 2: With fading support, Rex will use prior knowledge to gain understanding and develop a shared sense of history, community, and culture through the study of American symbols, holidays, and celebrations. **In progress.** |
| | STO 3: With fading support, Rex will demonstrate an understanding of civic participation. **In progress.** |

| Science | LTG: With fading support, Rex will be able to develop "WH" questions and conduct investigations on the following topics with an 80% accuracy. (K.SCI.5) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | 50% | | |

| | STO 1: With fading support, Rex will be able to develop "WH" questions and conduct investigations of the different types of energy such as Light energy, Sound energy, and Heat energy. **In progress.** |
|---|---|
| | STO 2: With fading support, Rex will be able to develop "WH" questions, and conduct investigations of animals, plants and their environment. **In progress.** |
| | STO 3: With fading support, Rex will be able to develop "WH" questions and conduct investigations of weather and climate. **In progress.** |

**Comments:**

**History:**

Rex's social studies instruction is being provided in the form of thematic units, as well as through the *My World Interactive (Savvas Learning Company)*. Rex has made progress in the understanding of social studies topics. He is expanding his specialty vocabulary words that directly relate to social studies. Rex is currently learning about the American symbols, traditions, and holidays celebrated in the country. With teacher support, his ability to participate during class discussion is emerging. Currently, Rex demonstrates his understanding through representational drawings, and verbally answering "WH " questions after new information is presented to him 2 out of 5 opportunities and while completing an in-class worksheet. Rex will continue to work towards this goal using anchor charts, kinesthetic movements, musical songs, and hands-on activities to deepen his understanding. Additional educational support and strategies will also be put in place to help Rex attend to the material in class.

**Science:**

Rex's science instruction is being provided in the form of thematic units, as well as through  the *Elevate Science (Savvas Learning Company)* curricula. Rex has made moderate progress in his understanding of science topics. Rex is currently learning scientific vocabulary related to the following topics: Sounds, Light, Change of Season/Weather, Living and Non-Living things. Rex demonstrates  understanding of these science concepts by correctly answering "WH" questions related to the topic 2 out 5 opportunities. He is able to show his understanding through drawing, completing in-class worksheets, and participating in a class discussion related to the topic. Rex's ability to actively

PE69



participate is emerging, he continues to require significant support from teacher/therapist to attend to and interact with the lesson and materials presented to him. It is noted that Rex benefits from hands-on activities and project based learning to support a multimodal learning opportunity.

**Assessment Results**

| Math Assessment Results | | | ELA Assessment Results | | |
|---|---|---|---|---|---|
| *Date of assessment* | *Assessment Type* | *Score Breakdown* | *Date of assessment* | *Assessment Type* | *Score Breakdown* |
| 09/30/2022<br><br>10/26/2022<br><br>11/09/2022<br><br>11/14/2022 | Eureka Math: Kindergarten Module 5 | Topic A: Count 10 Ones and Some Ones Lesson 4 and 5 Exit Ticket: 2/4= 50%<br><br>Topic B: Compose Numbers 11-20 from 10 ones and Some ones: Represent and Write Teen numbers. Lesson 8 Exit Ticket: 2/4= 50%<br><br>Topic C: Compose Numbers 11-20 from 10 ones and Some ones; Represent and Write Teen numbers. Lesson 12 Exit Ticket 2/5 40%<br><br>Topic D: Extend the Say Ten and Regular Count Sequence to 100. Lesson 15 Exit Ticket 2/5 40% | 10/18/2022 | Wilson Fundations Intervention Placement Inventory | Names Letters: 100%<br>Sound to Letter Correspondence: 90%<br>Write Letters/Words: 65%<br>Read Words: 12% |
| | | | 9/19/22-9/21/2022 | ReadyGen Kindergarten | Readiness: 4/8<br>Letter Recognition: 12/12 |

***The Titus School***      ***90 John Street***      ***New York, NY 10038***      ***646-756-4103***
info@thetitusschool.com                    ***Fax 212-656-1426***                    www.thetitusschool.com    PE69
MP1–Francis, R Page 10

Received Office of State Review
01/09/2024

PE70

# The Titus School

| | | | | Baseline Assessment | Phonemic Awareness: 9/12<br>Comprehension: 3/6<br>Vocabulary: 4/6<br>Writing: 0/2 |
|---|---|---|---|---|---|
| | | | | | |

## Related Services

Related services long term goals and short term objectives are determined by formal and informal assessment, dynamic assessment, observation, and clinical expertise. Related services providers record and analyze data as needed.

> **Key**
> **1 -0-10% accuracy or proficiency**
> **2 -11-20% accuracy or proficiency**
> **3 -21-30% accuracy or proficiency**
> **4 -31-40% accuracy or proficiency**
> **5 -41-50% accuracy or proficiency**
> **6 -51-60% accuracy or proficiency**
> **7 -61-70% accuracy or proficiency**
> **8 -71-80% accuracy or proficiency**
> **9 -81-90% accuracy or proficiency**
> **10-Skill Mastered**

**Speech and Language Therapy Goals:**

**Provider:** Caitlin McDonagh M.S., CF-SLP, TSSLD; Sara Hannah, M.S. Ed, CCC-SLP, TSSLD
**# of Sessions x Duration x Ratio:** 3x30x1:1

Rex's long term goals, short term objectives, and noted progress were determined based on informal assessments, dynamic assessment, observation, and clinical expertise in addition to collaboration with other team members.

In October 2022, Rex was informally assessed utilizing the following:

**Informal Language Assessment**  An informal language assessment was conducted to assess the following areas: understanding and naming nouns, understanding and naming actions, understanding and naming object by function, using plurals, understanding negation, understanding qualitative concepts, answering yes/no, what, and where questions, understanding spatial concepts, using possessives, understanding and using pronouns, using auxiliary verbs, and identifying and naming items in categories. The following areas were mastered: understanding and naming nouns, understanding and naming actions, understanding and naming objects by function, using plurals, understanding negation, understanding qualitative concepts, answering yes/no and what questions, using possessives, using auxiliary verbs, identifying items in categories. The following areas are emerging: where questions, spatial concepts, understanding and using pronouns.

*The Titus School*          *90 John Street*          *New York, NY 10038*          **646-756-4103**
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

PE70

MP1–Francis, R Page 11

Received Office of State Review
01/09/2024

PE71



| LTG 1: | Rex will improve his receptive language skills. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will follow simple two-step commands in structured settings and activities with no more than one repetition and one gestural prompt with 80% accuracy over two consecutive sessions. | 9 | | |
| | **STO 2:** Rex will answer concrete wh-questions (*Who, What doing, Where*) by pointing, given visual choices with no more than one repetition in 80% of opportunities. | 7 | | |
| | **STO 3:** Rex will follow one-step directions that include simple spatial concepts by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities. | 7 | | |

**Amended Goals:**
**Amended STO 3:** Rex will follow one-step directions that include the basic simple spatial concept, *in* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities.
**Amended STO 3:** Rex will follow one-step directions that include the basic simple spatial concept, *on* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities.

**Comments:** Rex is making steady progress as it pertains to his receptive language skills. Rex follows simple two-step commands (i..e, close the top and put it away) with one repetition and approximately 2 gestural prompts to 70-80% accuracy. Additionally, Rex answers *who* questions via pointing to visual choices as it pertains to familiar narratives or picture scenes given 1 repetition of the question and one verbal prompt in approximately 3 out of 5 questions. Likewise, Rex can answer *what-doing* questions to 80% accuracy by pointing to the answer choice with no more than 1 repetition of the direction, therefore, this objective has been met. However, Rex answers *where* questions by pointing when provided visual choices with 1 repetition of the question and 1-2 verbal prompts to 60-70% accuracy. Throughout answering -wh questions, Rex is prompted to use a full sentence in conjunction with pointing, in which pronouns are also incorporated. For example, when answering a *what-doing* question, Rex would correctly answer via pointing to a visual choice, and be prompted to also verbally answer in a full sentence (i.e., She+is+running.) Moving forward, due to development of syntax, semantics, and story grammar, 'wh' questions will be targeted expressively. Rex requires minimal-moderate cues to choose the correct pronoun. Additionally, Rex can follow 1-step directives containing the spatial concept *in* by manipulating different objects in 60-70% of opportunities with approximately 1 or 2 repetitions of the direction and 1 verbal cue per trial. Lastly, Rex can follow 1-step directives containing the spatial concept *on* by manipulating different objects in 4 out of 5 opportunities with 1 repetition of the direction, and 1 verbal cue per trial . Since he requires additional cues and prompts than noted within objective, therefore the skill will continue to be addressed.

| LTG 2: | Rex will improve his expressive language skills | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com          PE71
Received Office of State Review
01/09/2024

PE72

# тне Titus School

| | | | | |
|---|---|---|---|---|
| | **STO 1:** After sorting items into different categories, Rex will identify different categories that objects belong to (i.e., desserts, water animals) given no less than three choices in 80% of opportunities across three sessions. | 7 | | |
| | **STO 2:** To increase Rex's vocabulary, during sessions, Rex will use strategies (e.g. phonemic cues, semantic cues, etc.) to facilitate word retrieval from his personal lexicon given therapist support and prompting in 80% of opportunities. | 7 | | |
| | **STO 3:** Rex will retell a story using pictures (either sequencing pictures or pictures in a book) including at least one detail per picture in 80% of trials with no more than 2 verbal cues per trial over two consecutive sessions. | 6 | | |
| | **STO 4:** Rex will use the appropriate third person subjective pronoun (i.e., he, she, they) in phrases and sentences when describing a picture or video given no more than one verbal cue per trial in 4 out of 5 opportunities over three consecutive sessions. | 7 | | |

**Amended Goals:**
**Amended STO 2 (LTG 1):** Rex will answer *who* questions given visual choices with no more than one repetition in 80% of opportunities.
**Amended STO 2 (LTG 1):** Rex will answer *where* questions given visual choices with no more than one repetition in 80% of opportunities.

**Comments:** Rex is making steady progress as it pertains to his expressive language skills. At this time, Rex identifies the category that different items belong to when provided three choices (These are all: fruits, desserts or water animals) in 50-70% of opportunities with moderate verbal prompting. Additionally, Rex is increasing his vocabulary size through different strategies such as phonemic cues and semantic cues through the use of shared book-reading or short stories to introduce him to novel vocabulary to 50-70% accuracy with additional prompting from the clinician. Moreover, Rex retells a story (via either sequencing pictures or looking at the picture in a book) with 2-3 verbal cues to include salient details from the story in his retell to 60% accuracy. As he requires additional cues and prompts than noted within objective, the skill will continue to be addressed. Throughout all activities, specifically when answering *wh* questions, pronouns are incorporated. When describing or commenting on familiar narratives, Rex uses the appropriate third-person pronoun to 50-70% accuracy with approximately 1 or 2 semantic cues per trial (i.e., This is a girl, so if it's a girl we say *she*). It should also be noted that beginning next marking period 'wh' questions will be targeted expressively due to semantics, syntax, and story grammar development.

| LTG 3: | Rex will improve his pragmatic social skills. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will self-advocate (i.e. "I need help?" Can I take a break") given no more than one verbal prompt two times per session | 8 | | |

*The Titus School*     90 John Street     New York, NY 10038     *646-756-4103*
info@thetitusschool.com     *Fax 212-656-1426*     www.thetitusschool.com

PE72

Received Office of State Review
01/09/2024

PE73

# тне Titus School

| | | | | |
|---|---|---|---|---|
| | across three sessions | | | |
| | **STO 2:** Rex will participate in turn taking by requesting a turn appropriately (i.e. my turn, your turn) five times in an activity with no more than one verbal prompt per activity in 80% of opportunities during structured activities given over three consecutive sessions. | 6 | | |

**New Goal:**

**New STO 3:** Rex will engage in three appropriate conversational exchanges with no more than one verbal prompt per conversational exchange across three sessions.

**Comments:** Rex is making steady progress as it pertains to his social pragmatic skills. Rex has been observed to advocate for himself by saying, "I don't want to do this" or "I need help" with approximately 1 or 2 verbal prompts to express himself at least twice a session. Additionally, Rex participates in five turn-taking exchanges during structured activities with 2 verbal prompts to follow the turn-taking nature. During this marking period, this skill was targeted exclusively with the treating clinician. Similarly, a goal has been added to facilitate more conversational, on-topic exchanges with familiar communication partners. Rex can appropriately engage in three appropriate exchanges with approximately 1 or 2 verbal prompts to reciprocate the question or ask a follow-up question to 60% accuracy. It has been noted that Rex can spontaneously comment on different activities or topics (i.e., There's a lot of noise in here; On Friday we have no school!)

**Recommendations:** *It is recommended that Rex continues to receive speech and language therapy services at a rate of three times a week for thirty minutes, individually.*

**Occupational Therapy Goals:**

**Provider:** Marissa Bernstein, MS, OTR/L, RBT
**# of Sessions x Duration x Ratio:** 3x30x1:1

Rex's long term goals, short term objectives, and noted progress were determined based on formal assessments, informal assessments, dynamic assessment, observation, clinical expertise in addition to collaboration with other team members.

In September 2022, Rex was informally assessed utilizing clinical observation skills and a screening tool.

**Informal Occupational Therapy Assessment**  An informal occupational therapy assessment was conducted to assess the following areas: fine motor skills (pencil grasp, hand strength, finger to palm and palm to finger translation of objects), visual motor skills (imitates lines, stacks blocks, draws a recognizable person), visual perception skills (interlocking puzzles, locates items within hidden pictures, matching shapes/colors), scissor skills (maintaining thumb up grasp, cuts out shapes, cutting quality), handwriting skills (proper spacing, alignment of the letters, size/forms letters appropriately), self care skills (toileting, grooming, managing fasteners), sensory processing skills (sensitive, seeks, avoids, low registration), cognition and behavior (attention to task, following directions, sequencing, emotional regulation), and bilateral coordination skills (crosses midline spontaneously, stabilizes objects with non dominant hand, folds paper along the line). Rex's strengths include cutting simple shapes, proper scissor grasp, pincer grasp, writing uppercase letters, toileting, crossing midline, using his helper hand, and engaging in sensory motor play. The following

---

***The Titus School***        *90 John Street*        *New York, NY 10038*        ***646-756-4103***
info@thetitusschool.com                    *Fax 212-656-1426*              www.thetitusschool.com

PE73

MP1–Francis, R Page 14

Received Office of State Review
01/09/2024

PE74



areas are emerging: pencil grasp, hand strength, locating items within hidden pictures, size/form of lowercase letters, managing fasteners, attention to task, emotional regulation, sequencing, and following multi-step directions.

| LTG 1: | Rex will improve fine motor, visual motor, and bilateral coordination skills for increased independence, completing age-appropriate academic and self-care tasks. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will assume and maintain a static tripod grasp with minimal cues during a 3-minute fine motor activity across 3 OT sessions. | 4 | | |
| | **STO 2:** Rex will demonstrate the ability to assume an optimal sitting posture at a desk during fine motor tasks for 7-10 minutes with minimal cues in 2 out of 3 opportunities over 3 consecutive sessions. | 5 | | |
| | **STO 3:** Rex will demonstrate the ability to successfully manipulate clothing and fasteners (i.e., tie and untie shoelaces, fasten and unfasten small sized/small buttons, join both sides of coat to zip and unzip, buckle and unbuckle) with minimal verbal cues in across 3 OT sessions. | 6 | | |
| | **STO 4:** Rex will independently write upper and lowercase letters on 3-lined paper demonstrating 90% accuracy with letter formation, letter size, and line orientation in 3 out of 4 trials. | 3 | | |

**Comments:** At this time, Rex demonstrates a preference towards using a static quadruped grasp when writing, which he is able to maintain for greater than three minutes. With minimal verbal prompting, he is able to use a static tripod grasp for up to 30 seconds. Rex can independently assume and maintain an optimal sitting posture for up to 4 minutes, following which, evidence of compensatory strategies is observed (e.g., leaning on his left arm, pushing his chair back and leaning forward). Rex is able to independently write his uppercase letters on three-lined paper with 70-80% accuracy in regard to letter formation, letter size, and letter orientation. At this time, he benefits from moderate to maximal assistance to write his lowercase letters. On a dressing board, Rex is able to independently fasten and unfasten both snaps and buttons. On a shirt that he is wearing, Rex can independently unbutton 5 out of 5 buttons and button 1 out of 5 buttons. Rex is able to unzip his jacket zipper independently and following assistance to place the zipper on the track, he is able to also zip up his jacket. Rex benefits from moderate to maximal assistance to buckle and unbuckle three buckles and lace and unlace on a dressing board. He can independently don and doff his shirt, however, when the shirt is inside out he benefits from minimal assistance to turn it right side out.

| LTG 2: | Rex will demonstrate improved sensory processing, motor planning, and self-regulation skills in order to increase participation and independence in activities of daily living, academic learning, play, and peer interactions. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will demonstrate improved regulation following sensory input as demonstrated by the ability to sustain attention to a therapist | 10 | | |

*The Titus School*    *90 John Street*    *New York, NY 10038*    646-756-4103
info@thetitusschool.com    *Fax 212-656-1426*    www.thetitusschool.com    PE74
MP1–Francis, R Page 15
Received Office of State Review
01/09/2024
P - D 40 of 63

PE75



| | | | | |
|---|---|---|---|---|
| | directed fine motor task for 4-6 minutes with minimal verbal cueing on 2 out of 3 occasions. | | | |
| | **STO 2:** Rex will safely navigate a 3-4 step obstacle course with minimal cues for redirection across 3 OT sessions. | 10 | | |
| | **STO 3:** When becoming upset, frustrated, or angry within an OT session, Rex will request a break or calming sensory strategy with minimal prompting on 2 out of 3 occasions. | 6 | | |

**New Goals:**
**New STO:** Rex will demonstrate improved regulation following sensory input as evidenced by sustained attention to a therapist directed task for 10 minutes with no more than 3 verbal cues in 4 out of 5 trials.
**New STO:** Rex will follow a simple 3-step direction in a distracting environment with less than 2 repetitions by therapist in 3 out of 4 trials across 3 occupational therapy sessions.

**Comments:** When Rex is mildly dysregulated, he benefits from minimal to moderate verbal and visual prompts to select and implement a sensory strategy. Rex is continuing to develop his self regulation skills needed for improving his attention and following multi step directions.

| LTG 3: | Rex will demonstrate increased independence with activities of daily living. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will effectively use a knife to cut his food, spear the food with a fork and place it in his mouth without spillage independently in 3 out of 4 trials. | 3 | | |
| | **STO 2:** Rex will demonstrate the ability to manipulate and orient clothing (i.e. tags in the back, turning clothes inside out etc.) with minimal assistance in 3 out of 4 opportunities across 4 occupational therapy sessions. | 8 | | |
| | **STO 3:** Rex will display age-appropriate grasp patterns on eating utensils, and feed himself with horizontal hand-to-mouth motion and correct postural alignment while seated at table, with minimal prompts in 4 out of 5 trials. | 7 | | |

**Comments:** Currently, Rex benefits from hand-over-hand assistance to assume and maintain an appropriate grasp when holding a fork and cutting his food simultaneously. He assumes a digital pronate grasp when grasping a fork and knife 30-50% of the time, however, due to limited hand strength, he is unable to maintain these grasp patterns without compensating when sitting at a table. In regard to dressing, Rex benefits from minimal assistance to correctly orient his clothing on the majority of occasions, however, during times when Rex demonstrates decreased arousal, he benefits from moderate assistance to orient his clothing.

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com        PE75
MP1–Francis, R Page 16
Received Office of State Review
01/09/2024
P - D 41 of 63

PE76

# тне Titus School

---

**Recommendations:** *It is recommended that Rex continues to receive occupational therapy services at a rate of three times per week for 30 minutes individually.*

---

**Physical Therapy Goals:**

| | | | | |
|---|---|---|---|---|
| **Provider:** Avital Akman, PT, DPT <br> **# of Sessions x Duration x Ratio:** 2x30x1:1 | | | | |

| LTG 1: | Rex will demonstrate increased strength to promote improvements in posture and the ease and efficiency of functional mobility. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will independently utilize the mature half-kneel pattern when moving from the floor to a standing position without upper extremity support and without loss of balance in 4/5 trials. | 6 | | |
| | **STO 2:** Rex will be able to jump over an object or hurdle with a height of 6 inches independently using the proper two-footed take off and landing pattern and maintain his balance upon landing in 4/5 trials. | 10 | | |
| | **STO 3:** Rex will be able to independently hop forward 5 times consecutively on each foot with control, as established by accurately landing on floor targets positioned in a straight line 4 inches apart from one another 80% of the time in 4/5 trials. | 3 | | |

**New Goals:**
**New STO:** Rex will be able to jump over an object or hurdle with a height of 10 inches independently using the proper two-footed take off and landing pattern and maintain his balance upon landing in 4/5 trials.
**Amended STO 3:** Rex will be able to independently hop forward 4 times consecutively on each foot with control, as established by accurately landing on floor targets positioned in a straight line 3 inches apart from one another 80% of the time in 4/5 trials.

**Comments:** When transitioning from the floor to stance, Rex is able to move through the proper half-kneel pattern in 4 out of 5 attempts when provided with moderate verbal cues. He does, however, utilize compensatory strategies to execute the transition, including pushing off of his thigh. With regard to hopping, Rex is able to perform 4 single-legged hops forward on his right lower extremity and 3 on his left lower extremity, accurately landing on floor targets positioned 3-inches apart in 3 out of 5 attempts.

| LTG 2: | Rex will demonstrate improved body awareness and balance for increased safety during environmental negotiation and gross motor activity. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will be able to safely ascend and descend 2 flights of stairs while carrying a large object(s) (box, books, etc) in both of his | 9 | | |

---

PE77



THE Titus School

| | | MP1 | MP2 | MP3 |
|---|---|---|---|---|
| | hands and maintain a controlled reciprocal pattern without upper extremity support in 4/5 trials. | | | |
| | **STO 2:** Rex will be able to maintain his balance in single-limb stance on each leg for 10 seconds without upper extremity support and with no more than minimal postural sway in 4/5 trials. | 4 | | |
| | **STO 3:** Rex will be able to ambulate across a 3-inch-wide, 8-foot-long stable balance beam without upper extremity support and without stepping off or demonstrating loss of balance in 4/5 trials. | 6 | | |

**Comments:** Rex is consistently able to ascend two flights of stairs using a reciprocal pattern without external support while holding a weighted item(s) in his hands. When descending without support, he uses a reciprocal pattern with fair consistency, but moves at a slower pace and adjusts the object so that it does not interrupt his field of vision. This goal will be maintained throughout the next report period for consistency. When assuming a single-limb stance, Rex is able to maintain his balance on his right lower extremity for 5 seconds and left lower extremity for 4 seconds with moderate to maximal postural sway. When ambulating across an 8-foot-long balance beam, Rex is able to cross it in its entirety using a step-through pattern without stepping off in 3 out of 5 attempts.

| LTG 3: | Rex will demonstrate improved coordination and motor planning skills allowing greater independence in various activities throughout the day. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will be able to perform 10 jumping jacks with fair upper and lower extremity synchronization, rhythm, and fluidity with minimal verbal cues in 4/5 trials. | 3 | | |
| | **STO 2:** Rex will be able to throw a small ball (tennis ball-sized) using underhand mechanics so it travels across a distance of 7 feet to an eye-level target with fair accuracy, reaching the target 80% of the time with minimal cues for form and motor gradation in 4/5 trials. | 1 | | |
| | **STO 3:** Rex will demonstrate improved running form, as established by the emergence of mature components including increased trunk rotation, a forward truncal lean, and increased push-off, allowing him to complete a 50 foot shuttle run in 11 seconds in 4/5 trials. | 3 | | |

**New Goals:**
**Amended STO 1:** Rex will be able to perform 6 jumping jacks with fair upper and lower extremity synchronization, rhythm, and fluidity with minimal verbal cues in 4/5 trials.
**Amended STO 2:** Rex will be able to throw a small ball (tennis ball-sized) using underhand mechanics so it travels across a distance of 5 feet to an eye-level target with fair accuracy, reaching the target 80% of the time with minimal cues for form and motor gradation in 4/5 trials.

*The Titus School*       *90 John Street*       *New York, NY 10038*       *646-756-4103*
info@thetitusschool.com       *Fax 212-656-1426*       www.thetitusschool.com    PE77
MP1–Francis, R Page 18

Received Office of State Review
01/09/2024                                   P - D 43 of 63

PE78



**Amended STO 3:** Rex will demonstrate improved running form, as established by the emergence of mature components including increased trunk rotation, a forward truncal lean, and increased push-off, allowing him to complete a 50 foot shuttle run in 13 seconds in 4/5 trials.

**Comments:** Currently, Rex is able to perform 3 consecutive jumping jacks before demonstrating loss of upper/lower extremity synchronization when provided with visual modeling, self-cueing (e.g. "star, pencil"), and scaffolding (practicing the task at a reduced pace and in part-task components before performing the task as a whole and increasing his pace). When throwing a small-sized ball underhand to a target positioned 7-feet away, Rex demonstrates 10% accuracy and benefits from moderate to maximal verbal prompts to visually attend to the target and to properly grade his power output. Lastly, Rex has demonstrated the ability to consistently complete a 50-foot shuttle run in approximately 14.5 seconds. While running, he exhibits sufficient reciprocal arm swing, but decreased trunk rotation, pronounced out-toeing on his right lower extremity, and limited heel-toe progression.

**Recommendations:** *It is recommended that Rex continues to receive physical therapy services at a rate of two times per week for 30 minutes individually.*

**Mental Health Services**

Mental Health services long term goals and short term objectives are determined by formal and informal assessment, dynamic assessment, observation, and clinical expertise. Mental Health providers record and analyze data as needed.

| Key |
|---|
| 1 - Requires significant prompting |
| 2 - Requires moderate prompting |
| 3 - Requires minimal prompting |
| 4 - Occasionally performs skill independently |
| 5 - Regularly performs skill independently |

**Counseling Goals:**

| Provider: Meghan Keenan LMSW | | | |
|---|---|---|---|
| # of Sessions x Duration: 1x30 per week individually | | | |
| Rex's long term goals, short term objectives, and noted progress were determined based on assessments, observation, clinical expertise in addition to collaboration with other team members. | | | |

| Goal 1 | **LTG: Rex will build therapeutic rapport with the social worker to create a safe and trusting environment for him. This will be evidenced by his willingness to attend counseling sessions and participate in conversation along with a variety of therapeutic activities.** | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | 2 | | |
| | STO 1: Rex will transition to and from counseling sessions with verbal prompting. | 3 | | |
| | STO 2: Rex will engage in counseling activities/directives of | 2 | | |

Received Office of State Review
01/09/2024

PE79

# THE Titus School

| | | MP1 | MP2 | MP3 |
|---|---|---|---|---|
| | the Social Worker's choosing and remain on topic with verbal prompting. | | | |
| | STO 3: Rex will actively participate in counseling activities/directives of the Social Worker's choosing and remain on topic with verbal prompting. | 2 | | |

| Goal 2 | **LTG: Rex will be able to identify and express a variety of feelings as they relate to his environment across a multitude of settings, as evidenced by verbally labeling his emotions accurately while maintaining physical and emotional regulation.** | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | 2 | | |
| | STO 1: Rex will be able to accurately label feelings (e.g 'upset', 'Frustrated', 'excited' etc). | 2 | | |
| | STO 3: Rex will identify effective coping skills and relaxation techniques that may assist him in regulating his emotions while distressed. | 2 | | |

**Comments:**  Rex and the social worker started working together at the end of September 2022 and are currently working on developing a therapeutic rapport. He transitions to and from counseling without incident when provided with verbal reminders of appointment time.  Although he is compliant and engages in the activities presented, he requires consistent verbal and gestural prompting throughout the session to maintain attention to task. He appears to become easily distracted by earning a preferred activity (go noodle videos)  and will look in the direction of the computer frequently throughout the task. He has demonstrated the ability to accurately label feelings in others when shown pictures/videos but when asked to identify his own feelings regarding real or imagined scenarios, he has difficulty doing so. Rex and the social worker will begin working on identifying coping skills to assist him in managing his negative emotions effectively. In addition, Rex and the social worker will continue to work on rapport building in order to provide him with a safe space to express his thoughts and feelings.

**Recommendations:** *It is recommended that Rex continue to receive counseling services at a rate of one time a week for 30 minutes individually.*

**Music Therapy Goals:**

| Provider: Michelle Geisler, MA, MT-BC, LCAT-LP | | | | |
|---|---|---|---|---|
| **Session Ratio: 1x30 minutes individual session per week** | | | | |
| Goal 1 | **LTG: Rex will build therapeutic rapport with the music therapist in order to establish a safe and trusting therapeutic environment, as evidenced by a willingness to attend music therapy sessions and engage in music-based interventions.** | Level of Progress | | |
| | | **MP1** | **MP2** | **MP3** |
| | | 4 | | |

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com        PE79
MP1–Francis, R Page 20
P - D 45 of 63
Received Office of State Review
01/09/2024

PE80

# тнE Titus School

| | | 4 | | |
|---|---|---|---|---|
| | STO 1: Rex will transition to and from music therapy sessions with fading verbal prompts | 4 | | |
| | STO 2: Rex will engage musically and conversationally with the music therapist | 4 | | |
| | STO 3: Rex will maintain physical and emotional regulation while engaging with the music therapist | 4 | | |
| | STO 4: Rex will engage in musical experiences of the music therapist's choosing and remain engaged with fading verbal prompts | 2 | | |
| Goal 2 | **LTG: Rex will improve his ability to express himself verbally and non-verbally while exploring different instruments and music mediums during music therapy.** | **Level of Progress** | | |
| | | **MP1** | **MP2** | **MP3** |
| | | 3 | | |
| | STO 1: Rex will identify and express at least 2 emotions during music therapy sessions. | 2 | | |
| | STO 2: Rex will engage musically using at least two different music mediums (i.e. singing, playing piano, songwriting) | 4 | | |

**Comments:** Rex began working with this music therapist in September 2022. Over the course of this marking period, he has begun to develop rapport with the music therapist, as evidenced by transitioning smoothly in and out of sessions and his willingness to engage with the music therapist. He regularly expresses excitement about attending sessions and warmly greets the music therapist when he sees her throughout the week. Rex shows a strong preference for music from Moana and requests it every session. While watching Moana videos on youtube, Rex has been observed to sing, dance, and play drums. Rex has shown some resistance to listening to music that is not from Moana and listening to music without a video playing, but he has been amenable to music therapist occasionally choosing songs, sometimes indicating that it is the music therapist's "turn," and he has remained somewhat engaged as these non-preferred songs play. Rex has been observed to become slightly physically dysregulated during moments of excitement, as evidenced by redness in his face, sweating, and fast, heavy breathing. During these moments, he has responded well to the music therapist's suggestion that he sit down and take deep breaths, after which he has reported feeling "better" and "ready" to return to singing and dancing. When prompted to choose a song reflecting a particular emotion (i.e. "sad song," "happy song," "angry song"), Rex has chosen songs from Moana, and the music therapist has been unable to fully assess whether or not he is choosing songs connected to the prompts during these moments. Going forward, the music therapist will continue to build rapport with Rex, support him in deepening his relationship with music, and encourage him to utilize music as a means of emotional expression.

**Recommendations:** *It is recommended that Rex continue to receive music therapy services at a rate of 1x30 minutes individual session weekly.*

**Comments:**
Rex significantly benefits from learning in a small group setting with frequent kinesthetic breaks, visual aids, and trained behavior staff to support him during class. Rex has made continuous progress in his academic classes when material is

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com          Fax 212-656-1426          www.thetitusschool.com     PE80
MP1–Francis, R Page 21

Received Office of State Review
01/09/2024

PE81



presented at a slow pace, and new material is presented in a variety of multi-sensory ways so that he can retain the information and generalize skills across other settings. It is recommended that Rex continue within a small classroom setting, with 7:4 staff to student ratio, where he can receive support across instructional sessions, classroom routines, and lessons in order to acquire, maintain and generalize skills.

Received Office of State Review
01/09/2024

P - D 47 of 63

PE82

| | |
|---|---|
| **Name:** | Rex Francis |
| **Date of Birth:** | 4/14/2014 |
| **Dates of Testing:** | 1/25, 2/10 & 5/3/2021 |
| **Date of Observation:** | 2/24/2021 |
| **Age at Testing:** | 6 & 7 |
| **Grade:** | 1 |
| **School:** | Manhattan Childrens Center (MCC) - Crossbridge |

## NEUROPSYCHOLOGICAL EVALUATION

### Background Information and Reason for Referral

Rex Francis is a young boy who turned 7 years old over the course of this evaluation. He has a history of global developmental delays and notable impairments in speech-language, social pragmatics, self-regulation, and attention. Information about his history was obtained by history forms completed by his parents as well as prior evaluations and reports throughout his history.

Rex was born at 39 weeks gestational age and weighed 8 pounds, 6 ounces. Rex and his mother were reported to be in good health upon delivery, and as a result, both mother and child were discharged home after a routine hospital stay. While early developmental motor milestones were reportedly achieved within normal limits, his speech and language development were delayed. Due to his early delays, he qualified for support through Early Intervention (EI), where he received Special Instruction (25 hours), 15 hours per week of Applied Behavioral Analysis (ABA) therapy, and 10 hours per week of Floortime based supports. He also received Speech and Language Therapy, Occupational Therapy (OT), and Physical Therapy (PT). These supports were supplemented by private Speech/Feeding Therapy and PT. In May 2016, when he was 2 years old, Rex participated in a developmental evaluation with Dr. Jennifer Cross, a developmental pediatrician, due to concerns related to delayed language and behavioral issues, including decreased attention and eye contact and lack of response to his name; based on this evaluation, he was diagnosed with an Autism Spectrum Disorder (ASD). After aging out of EI, Rex attended Barrow Street Nursery School 6 hours/week in a 2's and 3's class, which he attended with his ABA therapist. In preschool  Rex continued to display non-compliant behaviors, he struggled with functional communication, he displayed escape/avoidant behaviors, and he engaged in stereotypic behaviors, all of which have at times hindered his availability for learning. Additional areas of concern included his eye contact, motivation, independent play, and social behavior. Although he was responding to supports, he presented with ongoing areas of difficulty.

Based on his complex profile of needs and ongoing difficulties, he then engaged in a dual school/home program, where he attended Park Pre-School for 4-6 hours/week. As part of this program, he received a total of 20 hours of weekly ABA services, speech therapy

PE82

PE83

(6.5 hours/week), OT (4 hours/week), and PT (1 hour/week). His parents further supplemented Rex's ABA services with a behavior-based social skills program in order to bolster his social and emotional development. Although he continued to respond to specialized supports, ongoing supports were required as he aged out of preschool.

Upon aging out of preschool, Rex began attending Manhattan Childrens Center (MCC) within the Crossbridge program, where he has remained. MCC is a small, full-time, specialized private school that offers ABA-based instruction and support for children with ASD's. At MCC, Rex is placed in small classes of 8 students with a teacher and ABA therapists. In addition to his specialized class and school placement, he receives Speech-Language Therapy and OT. Outside of school Rex also participates in privately provided ABA therapy in addition to OT and Speech-Language Therapy. Although he is responding to the support he has been receiving, he presents with ongoing difficulties related to cognition, language, adaptive skills, joint attention, and social skills. Additionally, Rex reportedly "zones" out and sometimes appears to be in a "haze", which is a source of concern. Additionally, he continues to struggle with delays, behavioral, and social issues. He also struggles with elopement, he is self-directed, and he has difficulty following directions. Additionally, he struggles with impulsivity, he is easily over stimulated during play, and sometimes lacks self-control.

Rex's medical history is significant for adenoidectomy, tonsillectomy, and myringotomy by age four in addition to recurrent ear infections, as well as gastrointestinal and eating issues. Review of records further reveals that Rex has a history of low muscle tone and core strength, which impacted his stability, coordination, and stamina. Per Ms. Francis, Rex received eye muscle surgery in September 2018. Hearing and vision are reportedly within normal limits. He is allergic to Penicillin, dairy, and down. More recently, genetic testing indicated the presence of PTEN mutations. PTEN mutations are associated with a number of symptoms, which include developmental delay. In addition, the presence of PTEN mutations is commonly found in individuals who also meet criteria for a diagnosis of ASD.

Regarding his social-emotional functioning, Rex has a history of struggling with social skills due to his communication difficulties and lapses in joint attention. He has historically preferred interacting with familiar adults rather than his same-age peers, although Rex has displayed increased interest in his peers. Without support he struggles to initiate and sustain social interactions, at times prefers to play alone, but he enjoys interacting and playing with familiar children. With the support of his therapists, he is reportedly able to engage more effectively with his peers. Rex enjoys gross motor activities, including soccer, swimming, riding his scooter, playing basketball, playing with his dog, as well as creative play. Rex and his family enjoy outings, including the park, beach, and restaurants. In addition, Rex is reportedly a very talented singer, and he enjoys singing very much. Behaviorally, Rex tends to be easily over-stimulated in play and requires substantial parental attention. Rex has historically displayed a short attention span, impulsive behavior, as well as difficulty remaining seated. Rex tends to become distracted easily and requires refocusing. Furthermore, Rex continues to need multi-step

Received Office of State Review
01/09/2024

PE83

PE84

directions broken down in smaller segments, as well as visual cues to remind him of the schedule and to facilitate transitions.

Overall, Rex is a young boy who has a history of developmental delays related to cognition, language, motor functioning, socialization, academics, and adaptive skills that are consistent with his prior diagnoses of ASD and PTEN genetic mutation. He has received special education supports including ABA, Speech-Language Therapy, Occupational Therapy, and Physical Therapy throughout his childhood, and now attends a specialized ABA-based school for children with Autism Spectrum Disorder (ASD). He was referred for the current evaluation to assess his current levels of functioning and to inform ongoing educational and treatment supports.

**Procedures Utilized**
Developmental History
Review Of Records
Wechsler Intelligence Scale for Children - Fifth Edition (WISC-V)
The Clinical Evaluation of Language Fundamentals - Fifth Edition (CELF-5)
Peabody Picture Vocabulary Test - Fifth Edition (PPVT-5)
Expressive Vocabulary Test - Third Edition (EVT-3)
Kaufman Test of Educational Achievement - Third Edition (KTEA-3)
Childhood Autism Rating Scale - Second Edition (CARS-2)
Vineland Adaptive Behavior Scales - Third Edition (Vineland-III), Parent Report

**Behavioral Observations**
**Testing Observations**
Rex arrived to testing sessions accompanied by his mother.  He presented as generally happy and energetic, and he transitioned easily to the assessment. When prompted, Rex made appropriate introductions to the examiner, displaying variable eye contact and a slow rate of speech. He benefited significantly from time to process what was said to him and plan his verbal responses, and he often provided simple or scripted responses to questions. Focus was variable. Rex often required repetition as well as simplification of directions, occasional prompts when it seemed as if he was distracted or internally focused, and he benefited from frequent breaks during testing to promote self-regulation. During these breaks Rex visited with his mother in the waiting room or had a snack. He also benefited from frequent positive reinforcement, having tasks presented in a rapid game-like fashion, and using visual reminders as well as "points" system for his participation. For instance, When Rex worked adaptively and responded appropriately to questions, he earned a "point", and when he received 10 "points" he received a reward. It was clear that Rex wanted to perform well, and he was eager to please, but he nonetheless required supports for his attention and language throughout. When tasks were hard for Rex, for instances tasks that assessed his efficiency or communication skills, his focus and motivation were more variable. While he wanted to perform well, at times he seemed self-conscious about his abilities, and he sullenly said "I don't know" when questions became too difficult. However, with one-to-one support and redirection he completed the majority of tasks to the best of his ability and coped more adaptively with the demands of testing.

PE84

PE85

Overall, Rex presented as an engageable young boy who was motivated to do well and earn rewards for his participation. However, he struggled with aspects of pragmatic language and communication as well as focus, and he required a high degree of one-to-one behavioral support to engaged with measures, complete tasks, and cope with the demands of testing.

**School Observation**

Rex was observed remotely during an in-person ABA therapy session at MCC on 2/24/2021. At the outset of the observation Rex was practicing writing letters with his behavioral therapist. He appeared focused, and he was earning tokens as reinforcement for positive behaviors. Although he was distractible, he was also redirectable, and he responded well to positive reinforcement and reminders that he would earn tokens for his participation. After writing several letters, Rex transitioned to a math lesson. He worked on completing simple arithmetic, and with support, he was able to apply strategies to help him add. Although he was able to perform simple addition after translating numbers into visual tallies or pictures, he didn't consistently demonstrate appropriate one-to-one correspondence when counting items in pictures, and he required support to complete problems. After completing the math portion of the session, Rex had earned enough tokens to redeem for a reward. He opted to watch a short video about Humpy Dumpty, and while watching the video he sat calmly, he sang along, and he performed the associated hand movements. Once the video was finished, he transitioned back to working without protest. Rex then resumed writing letters, before transitioning to reading and practicing his sight words. With support, Rex was able to identify a number of common sight words, earning tokens along the way. He earned enough tokens for another reward, and selected to watch a video for "Head, Shoulders, Knees and Toes". While watching the video he performed the associated movements and sang along, appearing quite happy. After the video he worked on sight words for several more minutes before transitioning to a number labeling activity. Rex was able to correctly label several double-digit numbers, then asked, "do I get a token?" He then yawned, prompting his therapist to ask how he was feeling. Rex replied by saying, "tired", shortly thereafter he earned enough tokens for another reward and opted to watch the "Head, Shoulders, Knees and Toes" video once more.

After finishing the video, Rex practiced labeling numbers for several more minutes before transitioning back to reading. He practiced sight words, then began completing worksheets where he had to connect pictures of common objects with the first letter in each of those words. At times he asked what the pictures were, but with that information he was able to appropriately identify beginning letters based on their sound. As needed, he asked for help. After this activity, Rex began working on another math activity, where he identified numbers/quantities as more or less. Rex had difficulty on this task initially, and he worked inconsistently. However, with support he was able to complete the activity and earn a reward; he opted for another sang and happily sang along. For the remainder of the observation Rex earned rewards for practicing his academic skills. He also practiced following multi-step instructions, using a laptop to select his reward for participation, and completing simple puzzles. With one-to-one support from his therapist,

Received Office of State Review
01/09/2024

PE85

PE86

he was able to engage with these tasks, he was able to be redirected, and he displayed solid motivation. Reports from Rex's therapist indicate that he responds to one-to-one ABA based instruction, positive reinforcement, and rewards for his participation. With this support he is able to appropriately engage with academic programming, he is able to cope with the demands of work, and his skills are progressing, despite areas of ongoing difficulty for which he continues to require support.

## Results

It is important to note that results were obtained in a highly structured and supportive one-to-one and at times two-to-one environment. Rex was provided frequent prompting, repetition of instructions, as well as modeling of responses and positive reinforcement to begin and persist with tasks. He was also given frequent breaks, opportunities to perform preferred activities, and chances to visit his mother in the waiting room. Absent of such supports he will not perform as well.

### Overall Cognitive Ability

The Wechsler Intelligence Scales for Children – Fifth Edition (WISC-V) was administered to provide an assessment of Rex's cognitive functioning. The WISC-V assesses skills in the domains of Verbal Comprehension, Fluid Reasoning, Visual Spatial Processing, Working Memory, and Processing Speed. In addition to providing scores for each domain, overall scores are derived from performances across multiple domains; Rex performed within the *Extremely Low* range for his age overall (Full Scale IQ [FSIQ] = 67, 1st percentile). Although he performed poorly overall, his performance across as well as within domains was variable, with performances that ranged from average to well below average for his age. Rex displayed age-appropriate overall abilities within the domain of fluid reasoning, verbal reasoning and abstract visual spatial skills were below average, and processing speed as well as working memory represented areas of significant weakness. Given his variable profile, another overall indicator known as the General Ability Index (GAI) was derived. The GAI provides an estimate of problem-solving ability that does not take into account speed or memory, both of which reflect problem solving efficiency as opposed to ability, are sensitive to fluctuations in focus, and represented areas of weakness for Rex. Rex's GAI was significantly higher than his FSIQ (GAI = 83, 13th percentile), and within the *Low Average* range. Rex requires support for his attention, speed, and memory to appropriately demonstrate his cognitive abilities. Please refer below for descriptions of tasks and performances within discrete skill areas.

### Verbal Abilities/Language

Within the domain of verbal comprehension and reasoning, Rex performed below average for his age overall (Verbal Comprehension Index [VCI] = 84, 14th percentile). He scored at the low end of the average range on a task that assessed his ability to verbalize the commonalities between two different words or concepts (Similarities = 25th percentile). He struggled more on another task that assessed his ability to label images and define words (Vocabulary = 9th percentile). Two supplemental verbal tasks were also administered to further assess his verbal skills. One of these tasks assessed his fund of school-based knowledge (Information = 5th percentile), the other task was much more difficult for Rex and assessed his knowledge of social conventions as well as his ability

Received Office of State Review
01/09/2024

PE86

PE87

to understand abstract or figurative language (Comprehension = 0.1st percentile). On all of these verbal tasks Rex required prompting, repetition, redirection, and simplification of language. He also benefited from having his responses scaffolded and the untimed test format. While he displayed a relative strength in his ability to reason with provided stimuli and respond to concrete fact-based questions, he struggled much more with verbal tasks that assessed higher order comprehension.

Language skills were assessed using the Clinical Evaluation of Language Fundamentals - Fifth Edition (CELF-5). Rex performed well below average for his age overall (Core Language Score = 59, 0.3rd percentile), and he struggled consistently across tasks. He scored at the 1st percentile on a task that assessed his ability to understand sentences that were read aloud and select appropriate corresponding images (Sentence Comprehension). On this task Rex had trouble examining all possible choices before selecting his responses, and he often selected the second-best response since he did not attend to all details within pictures. He scored at the 2nd percentile on a task that assessed his knowledge of various word forms and tenses by having him complete incomplete sentences, which were presented alongside pictures, in semantically and grammatically appropriate ways (Word Structure). His ability to generate grammatically correct sentences about picture stimuli that included a target word was also an area of weakness (Formulated Sentences = 1st percentile). On this task, he often made errors related to grammar, and he often neglected to include the target words, although the meaning of his sentences was clear in this context. Rex struggled most on a task that assessed his ability to remember and repeat sentences verbatim (Recalling Sentences = 0.4th percentile). On this task Rex often recalled the main idea of sentences but made errors related to grammar and syntax due to fluctuations in focus. Overall, results from the CELF-5 indicate significant difficulties related to higher order verbal comprehension and expression.

Rex's language skills were further assessed using two picture-based tasks that measured his receptive and expressive vocabularies. His ability to listen to a stimulus word and select the corresponding picture from among multiple choices was assessed at the 8th percentile (Peabody Picture Vocabulary Test – Fifth Edition [PPVT-5] = 79). On this task Rex sometimes responded impulsively and required prompts to take his time and examine all possible choices before selecting his responses. He worked well when selecting images of common objects but had more trouble as questions required him to identify verbs, adjectives, and categories for items. His ability to label provided images was stronger, at the 18th percentile, as assessed using the Expressive Vocabulary Test- Third Edition (EVT-3). Rex successfully labeled images of many common objects but had difficulty identifying synonyms for common words, and when asked to identify various actions or describe items in pictures he had more trouble. Results of the PPVT-5 and EVT-3 indicate that Rex's expressive and receptive vocabularies are stronger than his higher order language skills albeit still below average for his age. He has a fund of information he can effectively access when language demands are reduced.

Overall, performance across verbal problem-solving tasks indicates that Rex is capable of solving verbal problems with average ability for his age when he is provided with

PE87

PE88

structure and clear expectations, however, he struggled on more open-ended tasks due to difficulty appropriately articulating his thoughts and knowledge. His difficulties with higher order verbal comprehension and expression were noted on language assessments. He he performed much better on picture-based tasks that assessed his ability to select and/or label images that corresponded to words, albeit still below average for his age. Although Rex demonstrated average potential on certain verbal tasks, he struggled with higher order verbal comprehension and expression, and he performed better when language demands are reduced. These findings indicate that Rex knows more than he is capable of consistently expressing.

**Nonverbal Abilities**

Nonverbal abilities refer to the ability to work with pictures, shapes, and other non-language or perceptually based stimuli. The WISC-V assesses two nonverbal areas primarily, fluid reasoning and visual spatial processing.

Rex's fluid reasoning skills were within the average range for his age overall (Fluid Reasoning Index [FRI] = 91, 27th percentile), however, he performed variably across the tasks used to derive this score.  He scored at the 16th percentile on a task that assessed his ability to complete incomplete patterns and grids (Matrix Reasoning). He performed at the 50th percentile, exactly average, on a different task that assessed his ability to balance imaginary scales containing visual stimuli (Figure Weights). On both of these tasks Rex benefited from reduced language demands, prompts to double-check his responses, and chances for breaks. While he was able to deduce patterns that involved matching stimuli, he struggled more when patterns were more semantic in nature, and required more than just matching of identical shapes.

Visual-spatial processing refers to the ability to use visual information to determine the relationship between objects in space, and imagine objects in different orientations, locations, or combinations. Rex performed below average for his age in this domain overall (Visual Spatial Index [VSI] = 78, 7th percentile). One task in this domain assessed his ability to re-create a target image using colored blocks (Block Design = 0.1st percentile), the other task assessed his ability to select and mentally combine stimuli to reproduce a target image (Visual Puzzles = 5th percentile). On both of these tasks Rex had difficulty following more complex directions and working abstractly with visual information. On the former task he had difficulty quickly and efficiently manipulating small blocks, and he struggled to impose structure and double-check whether or not his responses were correct. On the latter task he benefited from being able to select his responses from among multiple choices, and he was able to effectively complete simpler questions. However, as questions became more complex, he struggled. In addition, on both tasks Rex had trouble responding to questions within time constraints.

Overall, Rex displayed variable nonverbal skills. While he displayed average potential within the domain of nonverbal fluid reasoning, he struggled more on tasks that assessed his abstract spatial skills. Rex's nonverbal fluid reasoning is an area of personal strength, and he demonstrate age-appropriate quantitative reasoning when language demands were

Received Office of State Review
01/09/2024

PE88

PE89

reduced. However, due to the increased demands on his attention and speed, as well as the complexity of verbal directions, he struggled with abstract spatial processing tasks.

**Working Memory**

Working memory refers to an individual's capacity to remember and use newly learned information before it is forgotten. Rex's working memory, as assessed using the WISC-V, was well below average for his age overall (Working Memory Index [WMI] = 59, 0.3rd percentile). It is important to note that fluctuations in focus negatively impacted performance across memory tasks. If one is not adequately focused at the time of information presentation then this information will not be encoded into memory initially. Therefore, Rex's performance in this domain also reflects his difficulties with focus and self-regulation. Contributing to the WMI are one visual and one verbal short-term memory task. The verbal task assessed his ability to remember and repeat verbally presented lists of numbers in their original order, backwards order, or sorted into a novel sequence (Digit Span = 0.4th percentile). The visual task assessed his ability to remember the order of a series of images that were shown to him for a brief period of time (Picture Span = 1st percentile). Between questions on both tasks Rex was prompted to focus, and as needed, he was offered breaks. Although he was able to recall several stimuli, he often had trouble remembering them in the correct order, and he had difficulty remaining engaged as questions became harder.

Rex's working memory is an area of significant weakness. His performance on memory tasks was adversely impacted by fluctuations in focus and distractibility.

**Processing Speed**

Processing speed reflects the speed with which one is able to perceive and respond to stimuli. It does not reflect the difficulty of problems that one may be able to solve, but rather, the time required to do so. Rex's ability to quickly perform rote tasks was below average for his age. As noted within the domain of working memory, processing speed is highly vulnerable to fluctuations in focus. In addition, he struggled to appropriately engage with tasks that required him to sustain focus and blend speed with accuracy. Rex scored consistently at the 0.1st percentile across tasks, indicating significant difficulty in this domain. One task assessed his ability to rapidly draw symbols that were associated with numbers within incomplete stimuli containing only the numbers (Coding). The other assessed his ability to rapidly determine whether or not a target was present in arrays containing multiple choices (Symbol Search). On both tasks Rex required clarification of directions and practice questions to help him understand what was expected of him, he also required prompting and redirection to remain engaged for the duration of these 2-minute tasks. Even such, Rex had difficulty balancing demands on his speed and attention, he was unable to successfully engage for the duration of these tasks, and he scored consistently poorly.

Although Rex displayed areas of age-appropriate intelligence, he struggles significantly when he has to work quickly. His ability to quickly process information is an area of significant weakness, which was adversely impacted by difficulties remaining focused

PE89

PE90

and engaged, trouble sustaining his performance for the duration, as well as difficulty adequately comprehending directions for tasks.

**Academics**
Rex's Academic abilities were assessed using select tasks from the Kaufman Test of Educational Achievement- Third Edition (KTEA-3), Form A. Across academic tasks Rex required a high degree of support for his language and attention, and he benefited from positive reinforcement as well as breaks to promote self-regulation. Rex's reading skills were assessed by a task that required him to identify letters, letter sounds, and read individual words out of context (Letter & Word Recognition = 14th percentile). Rex knows all his letters and their corresponding sounds, and he was able to read several short words as well as match them to pictures, but he had difficulty blending sounds together to read longer words. While he was able to decode letters and sight words, he struggled much more on a task that assessed his ability to understand written language (Reading Comprehension = 1st percentile). He was able to match several words with corresponding images, and he is developing a sight vocabulary, but his comprehension skills are well below average for his age. He also had trouble on a different task that assessed his ability to write and/or copy letters and words, complete incomplete sentences, and generate sentences on his own (Written Expression = 1st percentile). Rex wrote several individual letters, he copied several words, but he struggled to complete and write sentences of his own.  Math skills were assessed by two tasks.  One of these tasks involved questions that were presented verbally alongside pictures and Rex was able to respond verbally (Math Concepts & Application = 7th percentile). The other task required written responses to written calculations, and Rex struggled significantly (Math Computation = 0.1st percentile). On the former task Rex was able to count items in pictures, recognize numbers, and complete single-step word problems. On the latter task he wrote several numbers and copied target shapes the required number of times but he did not complete any arithmetic questions.

Overall, Rex's academic skills are below average. He knows his letters and their sounds and is developing a sight vocabulary, but he had trouble decoding longer and more complex words, and he struggles to comprehend what he is reading. He is able to write individual letters and copy simple words, but he struggled to write words or sentences. Regarding math, Rex knows his numbers and works best with pictures but he is not yet completing written arithmetic.

**Social, Emotional, Behavioral, & Adaptive Functioning**
To gain additional information about Rex's behavior and abilities associated with his prior diagnosis of ASD, the Childhood Autism Rating Scale – Second Edition (CARS-2) was completed. Results of the CARS-2 indicated that Rex displays severe problems with communication, emotional expression and coping, he exhibits stereotypic movements and play, he can be rigid and does not tolerate changes in routine well, and he displays high sensitivities to sensory information.  Results of CARS-2 placed Rex within the *Severe Symptoms of Autism Spectrum Disorder* severity group.  He displays severe and persistent deficits related to communication, social interaction, and adaptive skills.

PE90

PE91

The Vineland Adaptive Behavior Scales- Third Edition (Vineland III) was administered to further assess Rex's current adaptive and independent living skills. Overall, his functioning was rated to be significantly impaired for his age (Adaptive Behavior Composite = 65, 1st percentile). The content and scales of the Vineland-III are organized within a three-domain structure: Communication (<1st percentile), Daily Living Skills (2nd percentile), Socialization (1st percentile), and Motor Skills (2nd percentile). The communication domain is derived from the assessment of functioning in the areas of receptive, expressive, and written communication. Daily Living Skills encompasses functioning in the areas of self-care skills, caring for the home and living in the community. Socialization is based upon ratings related to interpersonal relationships, leisure-time, and coping skills. Based on his mother's endorsements, results revealed that Rex demonstrates underdeveloped skills across all areas of functioning (see attached table of scores). In fact, in multiple areas his functioning was rated to be equivalent to children years younger. Furthermore, Rex continues to struggle with functional communication skills and navigating social situations because his language is impaired.

Overall, results from the CAS-2 and Vineland-III indicate ongoing difficulties related to communication, socialization, attention, self-regulation, and adaptive skills. While he presents as happy and outgoing, he also experiences high levels of anxiety related to his areas of difficulty, his focus is variable, he has trouble with emotional as well as behavioral self-regulation, and he requires a high degree of adult support throughout the day.

## Summary

Rex Francis is a 7-year-old boy who has a history of developmental delays as well as difficulties related to language/communication, social pragmatics, self-regulation, and attention. Due to his delays, he began receiving supports through Early Intervention (EI), and at age 2 he was diagnosed with an Autism Spectrum Disorder (ASD). Following EI, he attended preschool with the support of therapists utilizing Applied Behavior Analysis (ABA), he also received Speech-Language Therapy, Occupational Therapy (OT), and Physical Therapy (PT). Upon aging out of preschool Rex began to attend Manhattan Childrens Center (MCC) within the Crossbridge program, where he has remained. MCC is a small, full-time, specialized private school that offers ABA-based instruction and support for children with ASD's. He is placed in classes of 8 students with a teacher and ABA therapists, he also receives ongoing related services. In addition, he participates in privately provided ABA as well as OT and Speech-Language therapy outside of school. Despite the supports he receives in school, Rex presents with ongoing difficulties related to cognition, language, joint attention, social skills, and adaptive skills.  Rex's medical history is significant for the presence of PTEN mutations, which are associated with a number of symptoms including developmental delay; PTEN mutations are commonly found in individuals who also meet criteria for a diagnosis of ASD. Rex was referred for a comprehensive neuropsychological evaluation to inform ongoing educational and treatment supports.

Cognitively, Rex demonstrated average overall nonverbal fluid reasoning, he also performed within the average range on a discrete verbal reasoning task that placed

PE91

PE92

reduced demands on higher order comprehension and expression. However, he performed variably in the verbal domain, and consistently below average in the domains of visual spatial processing, working memory, and processing speed. Rex also struggled on tasks that assessed higher order verbal comprehension and expression, but he performed better on picture-based vocabulary tasks that placed minimal demands on his language.

Academically, Rex performed consistently below average in the domains of reading, writing, and math. Regarding reading, Rex displayed stronger decoding skills than comprehension; he was able to identify letters and read several words but he struggled to understand what he was reading. Regarding writing, Rex is able to write letters and copy simple words but he struggled to write words or sentences when he was unable to copy them. Regarding math, Rex was able to identify numbers and count items in pictures but he is not yet performing arithmetic effectively.

Socially, emotionally, and behaviorally, Rex continues to struggle with language and social communication, he struggles to navigate interpersonal/social situations without support, and he has difficulty regulating his attention and energy levels. Rex also struggles within the domain of adaptive skills, and he experiences high degrees of anxiety that impact his functioning when asked to complete non-preferred activities or when tasks are experienced as hard. Results of behavior rating scales are consistent with information shared by his parents, reports from school and service providers, as well as behavioral observations during testing.

Given his complex profile containing areas of typical cognitive ability alongside deficits related to communication, attention, socialization, adaptive skills, and self-regulation, in conjunction with his history of special education supports, ongoing special education supports are clearly required. It is reasonable to assume that Rex will be able to make appropriate progress provided the recommendations cited in this report are implemented.

**Recommendations**

1. Rex displays areas of typical cognitive potential; however, he presents with significant difficulties related to language, attention, self-regulation, behavior, and adaptive skills, in addition to a complex medical history. These areas of difficulty are significantly impacting his cognitive, academic, social, and emotional functioning, and speak to the need for a more individualized educational approach with built in behavioral supports throughout the school day. Rex continues to require a small, structured, and supportive class and school setting with one-to-one instructional support throughout the day. He requires opportunities for direct instruction from highly trained special educators utilizing data-driven principles of Applied Behavior Analysis (ABA) to address his difficulties and make him more available for learning. It is essential that all adults who work with Rex are aware of his behavior plan, and supports must be provided consistently throughout the school day to promote generalization of skills across contexts.

In addition to ABA supports in school, it is imperative that Rex continue receiving ABA services in the home/community to coordinate with his school

PE92

Received Office of State Review
01/09/2024

PE93

program.  Individual parent training is also a crucial component of this home-based plan. Home based ABA and parent training are essential to help Rex learn to safely navigate his environment, promote independence, and further develop requisite skills like attention, self-regulation, and communication. Further developing these skills will promote greater availability for learning in the classroom and enable him to function appropriately in school, while also promoting carryover of skills across school, home, and community contexts.

2.  In addition to a supportive class and school placement, Rex requires ongoing related services. Ongoing Speech-Language Therapy is recommended to further support his language and communication skills. Occupational Therapy (OT) should be provided with frequency and duration as recommended by service providers to address motor and adaptive skills weaknesses. Whenever possible consideration should be given to providing supports within small groups to promote social interactions and increase generalizability of skills outside of individual therapy sessions.

3.  Given Rex's difficulties with language, attention, and self-regulation, and the negative impact on his academic performance, he requires extended time and related accommodations in school.  He needs to learn at his own pace with as much repetition as necessary, and he should be allowed to take tests and complete assignments in a distraction free environment. He should be provided with reminders for upcoming assignments and transitions, and all directions as well as test questions should be read aloud and repeated as needed. Rex should also be provided with prompting, repetition, and redirection as needed throughout the school day.  He also requires frequent breaks and positive reinforcement to promote focus and self-regulation.

4.  Rex is likely to need additional support in an academic setting with regard to the teaching style that is utilized to promote focus, comprehension, and engagement. A number of specific suggestions to be employed in the classroom are recommended:

    i)  **Delivery Style-** Educators should speak in a clear and animated voice. Gestures that enhance the message and a slower speaking rate will increase comprehension.  Instructors should be aware that instructions should be broken down into "chunks" and positive reinforcement provided that might prevent Rex from feeling overwhelmed in the face of a challenge. Additionally, repetition of material and directions should be granted when needed.

    ii) **Attention and Concentration –** Rex will benefit from frequent prompts to help him maintain focus. The provision of frequent breaks or opportunities to perform preferred activities will help prevent fatigue and frustration. He should also be prompted to double check his work and take time on activities when he feels confident in his ability to perform.

PE93

PE94

    iii) **<u>Frequent Breaks –</u>** As needed, Rex should be provided with opportunities for breaks to reduce mental fatigue and provide him with opportunities to self-regulate. He should have opportunities to move his body or complete preferred activities to promote self-regulation.

    iv) **<u>Organization and Time Management –</u>** Rex will benefit from receiving additional support during transitions between activities. He should be provided with reminders for upcoming transitions (i.e., assignment initiation, dismissal, moving between classrooms) so that he can appropriately prepare. He may require more support initially until these skills have become internalized.

    v) **<u>Positive Behavioral Supports –</u>** Rex would benefit from a behavioral system with rewards and consequences for clearly defined behaviors that he is able to understand. This will help him monitor his performance and sustain motivation if he is continually working to earn privileges or access to preferred reinforcers. It is essential that any behavioral system is implemented consistently throughout the day by all teachers and service providers who interact with Rex.

5. Rex and his family may benefit from working with a psychiatrist regarding the possibility of medication to treat symptoms of Anxiety.

6. Rex would benefit from having opportunities for structured group activities, or participation in a social skills group, to further develop his pragmatic communication and socialization skills.

7. Communication between Rex's parents, teachers, and service providers is essential to encourage consistency of supports and promote the generalization of skills across contexts.

8. Periodic follow-up assessments are recommended to assess Rex's functioning and inform ongoing educational and treatment supports.

Rex and his parents were truly a pleasure to work with. We remain available for further consultation and can be reached at (212) 481-1664.

_____          _____
Jordan Zelinger, Psy.D.                      David H. Salsberg, Psy.D., DABPS
Clinical Neuropsychologist                   Clinical Neuropsychologist
Pediatric Assessment Learning & Support      Pediatric Assessment Learning & Support
License #:021892                             License #: 012763

Received Office of State Review
01/09/2024

PE94

PE95

**Name:**                    Rex Francis
**Date of Birth:**           4/14/2014
**Dates of Testing:**        1/25, 2/10 & 5/3/2021
**Date of Observation:**     2/24/2021
**Age at Testing:**          6 & 7
**Grade:**                   1
**School:**                  Manhattan Childrens Center (MCC) - Crossbridge

**Appendix: Tests Administered and Summary of Scores**
**Wechsler Adult Intelligence Scale for Children - Fifth Edition (WISC-V)**

| Scale | Composite Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension (VCI) | 84 | 14 | Low Average |
| Visual Spatial (VSI) | 78 | 7 | Very Low |
| Fluid Reasoning (FRI) | 91 | 27 | Average |
| Working Memory (WMI) | 59 | 0.3 | Extremely Low |
| Processing Speed (PSI) | 45 | <0.1 | Extremely Low |
| Full Scale IQ (FSIQ) | 72 | 3 | Extremely Low |
| General Ability (GAI) | 83 | 13 | Low Average |

| Verbal Comprehension Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Similarities | 8 | 25 |
| Vocabulary | 6 | 9 |
| (Information) | 5 | 5 |
| (Comprehension | 1 | 0.1 |

| Visual Spatial Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Block Design | 1 | 0.1 |
| Visual Puzzles | 5 | 5 |

| Fluid Reasoning Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Matrix Reasoning | 7 | 16 |
| Figure Weights | 10 | 50 |

| Working Memory Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Digit Span | 2 | 0.4 |
| Picture Span | 3 | 1 |

| Processing Speed Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Coding | 1 | 0.1 |
| Symbol Search | 1 | 0.1 |

PE95

PE96

**The Clinical Evaluation of Language Fundamentals—Fifth Edition (CELF-5)**

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Sentence Comprehension | 3 | 1 |
| Word Structure | 4 | 2 |
| Formulated Sentences | 3 | 1 |
| Recalling Sentences | 2 | 0.4 |
| | Standard Score | Percentile Rank |
| Core Language Score | 59 | 0.3 |

**Peabody Picture Vocabulary Test, Fifth Edition (PPVT-5)**

| Standard Score | Percentile Rank | Age Equivalent |
|---|---|---|
| 79 | 8 | 4:10 |

**Expressive Vocabulary Test, Third Edition (EVT-3)**

| Standard Score | Percentile Rank | Age Equivalent |
|---|---|---|
| 86 | 18 | 5:4 |

**Kaufman Test of Educational Achievement – Third Edition (KTEA-3)**

| COMPOSITE/Subtest | Standard Score | Percentile | Age Equivalent |
|---|---|---|---|
| Letter & Word Recognition | 84 | 14 | 5:6 |
| Reading Comprehension | 66 | 1 | 4:8 |
| Written Expression | 63 | 1 | 4:10 |
| Math Concepts & Applications | 78 | 7 | 5:6 |
| Math Computation | 55 | 0.1 | <5:0 |

**Childhood Autism Rating Scale - Second Edition (CARS-2)**

| Raw Score | T-score | Percentile |
|---|---|---|
| 44 | 58 | 79 |

*Severity Group: Severe Symptoms of Autism Spectrum Disorder*

**Vineland Adaptive Behavior Scales - Third Edition (Vineland-III), Parent Report**

| Domain | Standard Score | Percentile Rank |
|---|---|---|
| Communication | 57 | <1 |
| Daily Living Skills | 68 | 2 |
| Socialization | 66 | 1 |
| Motor Skills | 68 | 2 |
| Adaptive Behavior Composite | 65 | 1 |

| Communication | v-Scale Score | Age Equivalent |
|---|---|---|
| Receptive | 3 | 1:5 |
| Expressive | 9 | 2:4 |
| Written | 9 | 4:1 |

PE96

PE97

| Daily Living Skills | v-Scale Score | Age Equivalent |
|---|---|---|
| Personal | 9 | 2:11 |
| Domestic | 9 | <3:0 |
| Community | 9 | 3:1 |
| Socialization | v-Scale Score | Age Equivalent |
| Interpersonal Relationships | 8 | 1:4 |
| Play and Leisure | 9 | 1:8 |
| Coping Skills | 9 | <2:0 |
| Motor Skills | v-Scale Score | Age Equivalent |
| Gross Motor | 9 | 2:0 |
| Fine Motor | 8 | 2:10 |

PE97

PE98

**From:** Halia Francis <halia.francis@outlook.com>
**Sent:** Monday, January 16, 2023 7:06 PM
**To:** JHolthusen@schools.nyc.gov <JHolthusen@schools.nyc.gov>; Mccabe Shannon <SMccabe@schools.nyc.gov>; jtannenbaum@schools.nyc.gov <jtannenbaum@schools.nyc.gov>
**Cc:** Natalie Brandefine <nbrandefine@thetitusschool.com>; Cliff Francis <cliff-francis@outlook.com>
**Subject:** REX FRANCIS (243995479) IEP Meeting

Good evening,

Attached please find the afterschool ABA, Speech and OT progress reports for tomorrow's meeting.

Thank you,
Halia and Cliff Francis

PE98

PE99



**Little Green Tugboat, LLC**
**Stephanie Koh, MA, BCBA, LBA**
**Progress Report**

Child's Name:        Rex Francis
Child's Age:         8.6
Child's DOB:         4/14/2014
Date of report:      12/8/2022

Supervisor:          Stephanie Koh, M.A., BCBA, LBA
BCBA Certification:  1-12-12458
NYS License:         00538-1
NPI:                 1902229107
Tax ID:              811687096
Email:               stephkoh@mac.com
Phone:               310-428-6102

Evaluator:           Maren Jacobson, M.A., BCBA
BCBA Certification:  1-22-62457
Email:               marengjacobson@gmail.com
Phone:               262-506-8061

**Background Information:**

Rex is a charming, funny, and expressive 8-year old boy who lives in Manhattan, New York with his parents, Halia and Cliff, and older brother, Freddie. Rex has no known allergies nor significant medical history, and tested normal on a hearing assessment. Rex's early development and motor milestones were all within normal range.

Rex's parents had concerns when Rex had stopped talking and sought an evaluation. In June 2016, Rex received a diagnosis of autism spectrum disorder from Dr. Jennifer Cross, MB at Weill-Cornell Medical Center. He then began speech, occupational therapy and in-home ABA therapy through the NYS Early Intervention Program shortly thereafter.

Rex currently attends a self-contained class at The Titus School in New York City for five full days per week. His classroom consists of eight students, one lead teacher, one lead behavior therapist, three behavior therapists and one BCBA classroom supervisor (8:6). During school, he receives individual speech therapy (3x30), individual occupational therapy (3x30), group occupational therapy (2x30), physical therapy (2x30) and group art therapy (1x30). At home, Rex receives up to 10 hours of applied behavior analysis therapy to target independence, social skills, adaptive skills, communication and behavior.

PE99



PE100

The home ABA program includes direct behavioral therapy, parent training and supervision. He also receives private speech therapy once per week as well as private occupational therapy twice per week.

**Current level of functioning:**
The Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) arranges skills by levels corresponding to typical performance in three age ranges: Level 1 (0 – 18 months), Level 2 (18 – 30 months) and Level 3 (30 – 48 months). Rex scored a composite score of 145 in his milestones assessment, with most of his skills falling in Level 3. While Rex has made some gains in skills across domains, particularly in listener, visual perceptual skills and matching-to-sample (VP-MTS), and listener responding by feature, function class (LRFFC), significant progress is apparent in the decrease in his barriers assessment score (34.0). The current assessment showed that Rex decreased his barriers in eight different domains: impaired tact, impaired echoic, impaired VP-MTS, impaired social skills, prompt dependency, scrolling, failure to generalize, and response requirement weakness MO.

The Social Responsiveness Scale, Second Edition (SRS-2) is a norm-referenced assessment tool consisting of a questionnaire of 65 items measuring social awareness, social cognition, social communication, social motivation and restricted interests and repetitive behavior and was utilized as an aid in Rex's progress report and development of new goals. Rex's SRS-2 results exemplify his core social deficits, which impact his ability to access meaningful social interactions and relationships. His total raw score was 102 with a T-score of 73, sitting on the high end of the moderate range and low end of the severe range. His restricted interests and repetitive behavior raw score was 22 with a T-score of 80, which is in the severe range. Individuals who score in similar ranges demonstrate deficiencies in reciprocal social behavior that are clinically significant and lead to severe interference with everyday social interactions. Scores in this range are strongly associated with a clinical diagnosis of autism spectrum disorder.

**Treatment Observations and Update:**
Rex's applied behavior analysis (ABA) treatment began in August 2020. Since the previous reporting period (February 2022), Rex continues to make improvements in all domains, namely in his social skills, conversational skills, play skills, and academics, particularly his reading skills. The spontaneity of Rex's pragmatic and functional language continues to improve and he continues to display an increase in expressive communication through comments, questions, and requests using longer phrases spontaneously and appropriately.

Rex's utterances have continued to increase in length, frequency, spontaneity and complexity. He expresses himself functionally to obtain wants and needs (e.g., "I want to look first and then go get snacks…Never mind, let's just go get snacks." "Need some space. Excuse me, can I have some space?"). Rex also spontaneously comments on others' conversations when he overhears them (e.g., "But I saw the Blue Man group too." "Mom's going to the store to buy

PE100

PE101



chicken.") and asks questions appropriately (e.g., "Stephanie, when are you going?" "Mom, are we having tacos?"). Rex is able to recall events from his day or even from another day if the event was significant enough (e.g., trip to see the Blue Man Group). He is able to provide multiple statements about the event without prompts (e.g., "I saw the Blue Man Group. They ate marbles and played the drums!" "I went to jump on the trampolines! I jumped so high!" "I just saw (peer). He was at the trampoline park."). For events without significance, Rex requires prompts or cues to help lead him to an answer. A prompt helps lead Rex directly to the answer (e.g., "I heard you had a special treat after school! It was a very cold treat. Can you tell me what it was?"). A cue will help "cue" Rex into the question to help him answer (e.g., "I heard you went to the grocery store today! What did you buy?").

Rex's ability to discriminate between questions continues to improve. Rex's initial assessment showed that he required prompts to attend to the discriminative stimulus when asked a question. His previous assessment showed that he is able to correctly respond to several consecutive and different questions regarding the same topic (e.g., "What did you make?" "Who helped you?" "Where did you make it?" "What colors did you use?").

When using pronouns, Rex occasionally requires minimal prompting, but is able to self-correct and use the correct pronoun when he is stopped and asked indirectly (e.g., "Wait — who is working for 'Go Noodle?'" "Huh? Can you say that better?"). Rex continues to make errors when using "he" vs. "she" however, the level of prompting has faded. Pronouns are continuously targeted to maintain success. Receptively, Rex continues to make improvements and is currently targeting following multi-step instructions with travel (e.g., "Go get the cup from your room and put it on the kitchen counter," "Put the book on your desk, push in your chair, and bring the microphone.").

Rex's performance in his academic skills has improved significantly. His parents have reported that Rex will come home and independently go to his desk to complete his homework. Rex has demonstrated proficiency with writing all capital letters of the alphabet independently, as well as numbers. He is currently targeting writing lowercase letters of the alphabet independently. He requires verbal and some physical prompting, for a more effective grasp, as his default is to use a palmar grasp or a light grasp with all five fingertips. Rex also uses a thicker pencil or pencil grip, as recommended by OT, to allow for a more effective grasp when writing. Another recommended strategy is to practice his writing on a slanted board, which helps with his pressure. The duration in which Rex is able to write continues to increase and he will often request to be in charge of writing when it comes to making a list or schedule.

In addition to the progress that Rex has demonstrating with writing, he has also demonstrated significant progress with his reading skills. He can sight read a number of three-letter to four-letter words (e.g., "can," "too," "and," "cat," etc.). Rex is now able to identify each phoneme of a word and blend it together to form the whole word. If Rex blends the word and it does not sound correct, he is occasionally able to guess the word using context clues when available.

PE101

tat

bxle_"g>

Case 1:24-cv-03117-MKV    Document 22-1    Filed 09/16/24    Page 318 of 745



PE102

Rex's math skills have also shown improvement. According to recent homework, Rex is currently working on 1:1 correspondence for numbers 1-20 and matching quantity to number and vice versa along with single-digit addition.

Rex continues to make significant progress in his social skills, as he engages in functional engagement with small groups (2-4) of peers. He looks forward to play dates with familiar peers and spontaneously initiates interaction by imitating them or following them. Rex has spontaneously greeted peers as well as strangers (e.g., "Hello" with eye contact) and has spontaneously initiated a conversation. During naturalistic opportunities, Rex's ability to engage in a conversation with 4+ back and forth exchanges is increasing. His current social goals target appropriate initiations and responses when interacting with peers and conversational exchanges. His play skills also continue to improve! Rex is very animated when he engages in pretend play (e.g., character toys) and he will personify the character and act out parts in detail. He also plays familiar turn-taking games (e.g., Connect 4, Candyland, Memory, etc.) and has shown an increased interest in puzzles and coloring (ArtHub for Kids).

Rex has maintained his previous improvements with the behavior of elopement and other threats to safety. Rex demonstrates the ability to be safe and appropriate when walking next to an adult in the community. There continues to be instances where Rex will engage in avoidance and elopement behavior from an adult for both escape and attention-seeking functions; however, the frequency has decreased significantly and he does not typically leave an area. Rex may attempt elopement as a means to obtain attention from an adult, but demonstrates much higher safety awareness than he had in the past. Additionally, Rex has shown significant improvement in appropriately responding when he is called by name to "Come here," "Come back," or "Stop," but occasionally requires additional prompting.

Rex is targeting the skills of waiting (for attention and/or requested items/actions), transitioning away from a highly preferred activity or item and demonstrating compliance without exhibiting protest behavior, and accepting "no" without exhibiting protest behavior.

Rex continues to make significant gains in his daily living skills and his ability to follow the specific routines independently. He washes his hands without prompting beyond a verbal instruction and brushes his teeth independently with occasional assistance. Following a visual aide and a verbal countdown, Rex has learned to tolerate getting his hair washed in the shower without exhibiting protest behavior. He has also made significant progress in getting dressed, as he now puts on pants, a shirt and socks independently. Occasionally, he puts pants or a shirt on backwards because he did not attend to the tag.

Rex's parents and therapists continue to implement key antecedent strategies that have proven to be highly effective for Rex, including: a daily visual schedule for routines and therapy sessions, token systems, priming preceding opportunities for maladaptive behavior, behavioral momentum, response cost and positive reinforcement. When given clear expectations (e.g., "When I say, 'Stop,' you stop, okay?") and contingencies (e.g., "If we don't stop, all done

PE102

Received Office of State Review
01/09/2024

P - E 5 of 19



PE103

scooter."), Rex is able to follow instructions and maintain appropriate behavior, with the addition of plenty of positive praise and adult proximity. Rex has also been very eager to be independent throughout his daily activities and is very proud when he is able to complete a task on his own (e.g., homework, coloring, cleaning up). During sessions, we are starting to introduce an independent activity schedule that Rex fills out and completes. Rex has displayed an interest in is and is very excited when he completes his schedule on his own. This is a useful skill for Rex to learn as it can be used outside of sessions during other downtime periods.

During sessions, Rex is learning about various social curricula that target socio-emotional regulation and social boundaries: Size of the Problem, Zones of Regulation, and Circle of Friends. Once mastered, these curricula provide strategies and tools that Rex can use to help navigate various social situations when it comes to his emotions and interacting with others. Learning Size of the Problem will teach Rex how to identify the severity of his problem, what the appropriate reaction is, and provide him with common language that he can use to describe the problems/reactions in order to identify the solution. Zones of Regulation is a curriculum that helps foster self-regulation and emotional control which will provide Rex with the skill to identify his emotion and how to feel better (if needed). Circle of Friends is intended to help Rex understand social boundaries and which actions are appropriate/inappropriate across settings and individuals that he will come into contact with.

**Functional behavior assessment:**
Observation and indirect assessment were used to determine target behaviors and their functions. Rex's target behaviors continue to consist of maladaptive/off-task behavior to seek attention and/or escape or avoid a non-preferred demand; protest behavior in response to denied/restricted access to a tangible item/activity/action. Please see attached behavior protocol.

**Preference Assessment:**
Preferences were assessed via observation and parent interview. Rex is highly interested in videos and shows (e.g., Go Noodle, Bluey, Moana, and Toy Story), songs, books, playing with his brother and social praise.

**Risk Assessment:**
There are no known risks for treatment at this time.

**Plan Implementation and Family Involvement:**
Rex's parents, Halia and Cliff, continue to be very involved in their son's developmental progress. They are committed to participate in parent coaching/training and are prepared to follow through with implementing any and all behavior plans. Goals are targeted every session, as well as by parents outside of therapy sessions. Data is collected on targeted skills as well as behaviors targeted for decrease. Opportunities with successes, prompts or incorrect responses are noted per session. Data analysis will continue to reflect the efficacy of the current behavior plan and teaching strategies.

PE103

PE104

**Goals:**

Expressive Language

1. During naturalistic opportunities, Rex will **politely (e.g., "please," "Can you," etc.) request using 5-7 word utterances in an age-appropriate voice/tone, addressing the person, paired with eye contact,** 10+ times per session, for three consecutive sessions, with two or more adults across two settings.

2. During naturalistic opportunities, Rex will **independently describe/retell a story or an event using 8+ words (e.g., "I went to the park and rode my scooter!") with varied language (adjectives, adverbs, and prepositions) and correct use of tense (past, present, and future)**, 5+ times per session, with two or more adults, for three consecutive sessions.

Receptive Language

1. During naturalistic opportunities, Rex will **independently follow through with routines-based various multi-step instructions (e.g., "Take your shoes off and put line them up," "Take your pants off and put them in the hamper," "Wash your hands and dry them," "Take your lunchbox out put it on the counter," etc.),** in 4/5 opportunities, with two or more adults, for three consecutive sessions.

2. During naturalistic opportunities, Rex will **correctly identify items based on 3-4 descriptors (e.g., "It's a brown animal. It has paws and growls. It lives in a cave."),** in 4/5 opportunities, for three consecutive sessions, with two or more adults.

Social Interaction

1. During naturalistic opportunities, Rex will **make requests to a peer (e.g., "I need the glue," "Can I have one?" "Can I play?"), paired with eye contact,** in 4/5 opportunities, for three consecutive sessions, with two or more peers.

2. When a peer initiates social interaction (verbally or nonverbally) (e.g., gesture, verbal), Rex will **independently respond appropriately (verbally or nonverbally) (e.g., follows peer, gestures, verbal)**, in 4/5 opportunities, for three consecutive sessions, with two or more peers.

3. During naturalistic opportunities, Rex will **independently initiate social interaction with a peer and maintain engagement for 5+ minutes**, in 4/5 opportunities, for three consecutive sessions, with two or more different peers.

4. During naturalistic opportunities, Rex will **maintain conversations of others' topics of interest for 5+ back-and-forth exchanges**, in 4/5 opportunities, for three consecutive sessions, with two or more adults.

5. During naturalistic opportunities, Rex will **independently identify the circle of friends that an individual belongs in and/or actions that are appropriate/inappropriate for that circle of friends**, in 4/5 opportunities, for three consecutive sessions, with two or more adults.

Play

PE104

PE105



1. During play, Rex will **independently accept and accommodate others' differing ideas**, in 4/5 opportunities per session, with 10+ different play activities and two or more peers.
2. During play, Rex will **spontaneously initiate pretend play (e.g., animals going grocery shopping, acting out a story, dinosaurs walk to the nest and go to sleep, etc.)** in 5+ opportunities per session, with 3+ different play activities and two or more adults.

Behavior
1. When outside in public (e.g., park, beach), Rex will **appropriately respond to being called by name to "Come here," "Come back," etc.**, in 4/5 opportunities, with two or more adults, for three consecutive sessions.
2. During naturalistic opportunities, Rex will **accept "no" (I.e., restriction, denied access) without exhibiting protest behavior,** in 4/5 opportunities, with two or more adults, for three consecutive sessions.
3. When told to "Wait" following a request, Rex will **independently wait for the desired item/action without exhibiting maladaptive behaviors/protest behaviors**, in 4/5 opportunities, with two or more adults, for three consecutive sessions.
4. During naturalistic opportunities, Rex will **independently identify the size of the problem and emit the appropriate reaction/solution to the problem,** in 4/5 opportunities, with two or more adults, for three consecutive sessions.

**Maintenance and Generalization Training:**
Treatment goals and, if applicable, behavior plans will be shared and implemented by all members of Rex's therapeutic team, including parents, teachers, and therapist(s). Short-term objectives will be targeted in sequence, progressing to the next benchmark pending success across three consecutive sessions, two or more people and two or more settings. Once mastered, Rex will continue to be given daily opportunities to continue to practice those skills for maintenance.

**Parent Training Goals:**
1. Rex's parents will **implement antecedent strategies** (including visual schedule, transition warnings, priming, stating clear rules and contingencies, etc.) in order to decrease protest behavior to non-preferred demands and restricted access to desired items/activities by 80%.

2. Rex's parents will **implement an extinction procedure in response to protest and/or attention-seeking behavior,** including following through with demands/restrictions, without providing inadvertent reinforcement/attention, in order to decrease protest behavior to non-preferred demands and restricted access to desired items/activities by 80%.

**Data Collection and Progress Reporting:**



PE106

Data collection in the home program is taken per session; analysis of data is used to make treatment decisions. Collaboration with the therapeutic team including related service providers, school staff and others occurs either directly or via parents as liaison quarterly at minimum, to assess performance progress and generalization in the various settings. Additionally, a criterion-referenced assessment (e.g., VB-MAPP, ESDM Checklist, ABLLS, etc.) is administered every six months to track progress.

**Recommendations:**

Based on this evaluation, the following recommendations are made:

1. It is recommended that Rex be placed in a small school-based program where he will receive 1:1 instruction and small group instruction using an applied behavior analysis (ABA) approach daily.

2. There should be multiple opportunities available for Rex to engage in meaningful social interactions and play with his peers throughout the day in school.

3. After school, he should receive at least 10 hours a week of ABA direct service in the home and community to work on community-based programs, independent play, social play with peers/siblings, and generalizing skills in the natural environment (e.g. restaurants, grocery store, etc.).

4. Two hours per week of supervision by a BCBA at home.

5. Parent training should be conducted at least 2 hours weekly with the parent trainer in order to ensure generalization and maintenance of learned skills outside the therapy session. These parent training hours are in addition to his therapy hours.

6. It is recommended that services and programs be provided for a 52-week period to avoid regression. Gaps in services are detrimental to Rex' learning. We have seen his skills regress considerably and an increase in problem behaviors following illness or breaks in service.

7. Continuation of the following related services: speech language therapy, OT and PT.

8. Monthly interdisciplinary meetings should be held with Rex's therapists, teachers, and parents to review his progress and modify his programs. These meetings are in addition to his therapy hours.

**Parent Signature:** _____   **Date** _____

**Signature of BCBA** _____   **Date** _____

Received Office of State Review
01/09/2024

PE106

PE107



Please feel free to contact Stephanie with any questions via email or phone: 310-428-6102.

Stephanie Koh (Benson), MA, BCBA, LBA

PE107

Received Office of State Review
01/09/2024

PE108

SPEECH/LANGUAGE PROGRESS REPORT

Name:    Rex Francis                                    Date of Birth: April 14, 2014
Address: 359 West 11th Street, #6A                     Date(s) of Note: December 14, 2022
             New York, New York 10014                  Chronological Age: 8 years, 8 months

Diagnoses (ICD-10): R48.8 Other Symbolic Dysfunctions
                              F84.0 Autism Spectrum Disorder

_____

Rex Francis is an 8 year, 8 month old male with a diagnosis of Autism Spectrum Disorder. He started an intensive regimen of therapy including ABA; speech, language, and feeding therapy; occupational therapy; and physical therapy at approximately 2 years of age.

At present, Rex is scheduled for one 60-minute speech/language therapy session at Happy Talk Speech and Language Therapy PC per week. Rex did not attend sessions throughout July and August 2022. Therapy objectives continue to address deficits in the domain areas of pragmatic, receptive, and expressive language. Hour-long sessions are structured to consist of clinician-directed tasks in conjunction with child-led play in order to explicitly teach new skills while generalizing them into unstructured reciprocal back-and-forth interaction.

Rex continues to demonstrate steady progress given 1:1 therapy with team collaboration. Team collaboration facilitates generalization of newly acquired skills across diverse communication partners and environments. Collaboration further facilitates consistency of goal development and cueing hierarchies across disciplines.

## PROGRESS

**Goal 1: Rex will improve play and pragmatic language skills.**

| Objective 1a | Rex will utilize language to inform and report on past experiences given minimal (1-3) verbal, visual, and/or tactile cues in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 1b | Rex will combine 3 to 4+ pretend ideas on a **novel** specific theme in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
| Objective 1c | Rex will utilize language to take initiative in **novel** play schemas (e.g., the child takes a dinosaur and says "I'm going to attack triceratops.") in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
| Objective 1d | Rex will utilize visual-spatial, motor planning, and auditory-verbal capacities to elaborate on a **novel** pretend play schema with a play partner in 80% of opportunities across 3 consecutive sessions. | **In Progress** |

PE108

PE109

Notes: Rex continues to make gains in the areas of engagement and play. At present, he engages in continuous back-and-forth reciprocal interaction in the context of pretend play for 10-15 minute durations. Of note, session time devoted to child-led play is limited to these 10-to-15 minute durations to accommodate opportunities for clinician-directed tasks, so therefore, he engages in continuous back-and-forth reciprocal interaction for as long as his play partner is available. Positively, Rex's ability to shift set between child-led play and clinician-directed tasks is improving, as at times, he only requires minimal (1-3) cues to transition. Moreover, in the context of play schemas, Rex only requires minimal (1-3) to moderate (4-6) cues to increase flexibility to modify play sequences and vary play outcomes. Scaffolding and cueing levels are impacted by Rex's engagement, motivation, and overall zone of regulation.

Throughout play (and conversation), Rex initiates requests, asks questions, and answers questions to share ideas, generate solutions, and build logical bridges between ideas. Rex utilizes language to narrate play actions and speak dialogue for the characters. While he continues to utilize whole gestalts from books and television shows to communicate, he is receptive to models to mitigate and/or isolate/combine words or phrases from gestalts to formulate novel phrases and sentences, resulting in increased organization and formulation of novel utterances.

Rex continues to demonstrate limited topic maintenance when conversations reference events outside of the "here and now," as he does not consistently reliably inform, report, or elaborate about the past. While he continues to inform, report, and/or comment about the imminent future, he does not maintain three or more exchanges to extend new information. Rex is increasingly self-aware of communication breakdowns, and his ability to self-advocate and "repair" the situation to make communication more efficient and effective continues to improve.

**Goal 2. Rex will improve receptive language skills.**

| Objective 2a | Rex will sustain attention to auditory information in the absence of corresponding visual cues as demonstrated by responses to concrete WH-questions while joint book reading with 80% accuracy over 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 2b | Rex will follow 1-step directions embedded with more complex spatial concepts (e.g., "through," "below/under," "top," "middle," "behind," "next to," "front," "back") in the absence of visual cues with 80% accuracy over 3 consecutive sessions. | **Goal Met** |
| Objective 2c | Rex will independently follow one-step directions embedded with conjunctions (e.g., "until," "while") in the context of play with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2d | Rex will demonstrate understanding of sequential and temporal concepts "first," "last," "in the middle," "after," and "before" in the context of play given minimal (1-3) verbal and/or visual cues with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2e | Rex will follow a two-step direction with five critical elements (e.g., "Put the doll in the car and give me a spoon and a hat") in the context of play given minimal (1-3) verbal and/or visual cues with 80% accuracy over 3 consecutive sessions. | **In Progress** |

PE109

PE110

| Objective 2f | Rex will independently demonstrate understanding of superlatives and comparatives (e.g., big/bigger/biggest, faster/slower) in the context of play with 80% accuracy over 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 2g | Rex will respond to abstract WH questions (e.g., Why? How?) in obligatory contexts with 80% accuracy over 3 consecutive sessions. | **In Progress** |

Notes: Rex's ability to respond to forced choice, yes/no, and concrete WH- questions in the absence of visual cues during both structured and unstructured tasks continues to be impacted by his regulation and availability to attend to auditory information while inhibiting internal/external distractors. Progress is noted in the context of play, as Rex now requires minimal (1-3) cues, if any, to follow directions embedded with spatial/locative concepts. Comprehension and execution of conditional directions continues to improve.

**Goal 3. Rex will improve oral expressive language skills.**

| Objective 3a | Rex will utilize sequential concepts (e.g. "first", "then") to organize and increase the specificity of his utterances in 80% of opportunities across 3 consecutive sessions. | **Goal Met** |
|---|---|---|
| Objective 3b | Rex will utilize prepositional phrases to increase the grammaticality and complexity of his utterances (e.g. SVOPP sentence structures) in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
| Objective 3c | Rex will utilize conjunctions (e.g.: "so", "if", "or", and "because") to increase the grammaticality and complexity of his utterances in 80% of obligatory contexts across 3 consecutive sessions. | **In Progress** |
| Objective 3d | Rex will formulate morphosyntactically-correct utterances in 85% of opportunities across 3 consecutive sessions. | **In Progress** |

Notes: Rex independently organizes and formulates utterances embedded with temporal concepts "before"/"after" or sequential concepts "first"/"then" for routines ("I need to go to the bathroom before I go to Jessica. I will see Jessica after I play pop the pig."). He demonstrates an increase in spontaneously-generated novel utterances with fewer gestalts. He benefits from bombardment and repetition throughout highly motivating and preferred activities to 1) be available for exposure to novel sentence structures, vocabulary, and word relationships; 2) practice sentence formulation via verbatim repetition; 3) practice via delayed imitation given cues, as necessary; and 4) demonstrate independent organization/formulation of target structures.

## RECOMMENDATIONS
Rex continues to require his current level of supplementary 1:1 speech/language sessions in addition to the speech/language supports that he is receiving at school. It is strongly recommended that individualized child-led therapy targets the following skills: explore and expand upon Rex's ideas; encourage logical thinking, creativity, and spontaneity; and build upon Rex's individual strengths and interests. A speech/language pathologist with training in language development is necessary to develop

PE110

PE111

treatment plans and goals targeting developmental social-pragmatic and relationship-based goals. Sessions should continue to address acquisition and generalization of skills across domains of receptive/expressive language to support Rex's ability to effectively communicate his needs, wants, thoughts, and ideas with others.

_____

**KAITLYN SIMON, MA, CCC-SLP**

PE111

PE112



37 Greenpoint Ave Brooklyn, NY 11222

P:631-353-5210 E: grow@bloomoccupationaltherapy.com

Client's name: Rex Francis

Date of Birth: 4/14/14

Related Service: Occupational Therapy

Therapist : Jessica Zambito, OTR/L

Date of Report: 1/4/23

Rex is a friendly and energetic 8.8 year old male who receives occupational therapy once a week for 60 minutes 1:1 at a sensory gym Occupational therapy sessions currently address fine motor and visual motor skill development, self-regulation, overall strength, coordination, self-help skills and sensory processing. Rex attends second grade full time at Titus School. Rex resides with his parents and his older brother in NYC. Rex is a related boy who enjoys singing, acting, climbing, and playing. Rex presents with a diagnosis of ASD. He demonstrates consistent progress in his OT sessions. Rex engages in therapy sessions and is motivated. At times his challenges with self-regulation and behavior impacts his performance in therapy sessions. Rex has an extremely collaborative team approach and supportive family who ensures consistent attendance and carryover of his OT sessions.

The PDMS-2 and clinical observations were also utilized to assess sensory processing and fine motor & visual motor skill development.

PE112

PE113

Fine Motor Skills:

Rex presents with decreased visual motor and motor coordination skills. During testing, Rex required multiple prompts to follow therapist given directions and redirect attention to given task. This is consistent with his OT sessions as table work and fine motor activities tend to be a non-preferred activity. It has been observed that Rex is able to complete some of the tasks during therapy sessions, but during testing he refused or required more cues to follow therapist directions. Visual demonstrations, verbal directions and breaking up testing with sensory breaks were required.

Rex demonstrates below average visual motor integration skills. Rex's OT sessions are addressing visual motor skills such as tracing, coloring, cutting, puzzles and block design. Rex was able to imitate block designs, tower of 10 cubes, wall of 4 cubes and bridge of 3 cubes, train of 4 cubes and stairs of 6 cubes. Rex is able to draw a vertical line, horizontal line, cross and circle and square. Rex can now draw diagonal lines and a triangle. Rex was able to color, however lacked control staying within 1/4-1/2" of the lines. Rex attempts to trace on a given line but lacks fine motor control and in turn he deviates from the given line. Rex can write his first name independently specifically for letter x He is able to write 90% of the uppercase alphabet with correct formation independently. He is able to write 75% of lowercase letters with appropriate formation with minimal verbal cues and visual model. He requires assistance for appropriate placement on lines and on paper. Rex can draw and build a person using Mat Man songs and cues to draw with appropriate visual spatial relations. Rex can grasp scissors in a thumbs up position independently with appropriate safety awareness. He is able to cut across paper and a square, circle within 1/2" of line independently. Rex can place pegs in holes, insert correct shapes into shape sorter and lace two holes on a lacing board.

Rex presents with below average grasping skills. During testing Rex utilized a static quadruped grasp with HE in his thumb PIP and DIP joints. He requires physical and visual prompts to sustain a modified static tripod grasp. At times he will use the EGG grip and slant board. Rex was able to bead 10 beads on a string independently. Rex was able to grasp pellets and drop into a container utilizing a lateral pincer grasp. Rex was able to

PE113

PE114

open and close the lid of a container independently. Rex was able to unbutton three buttons within 75 seconds independently. Rex was able to button 3 buttons within 75 seconds independently. A small thick pencil, egg or grotto pencil grip and writing on vertical surfaces (easel, slant board) is recommended to build grasping skills and endurance.

Self-help skills

Rex presents with below average self-help skills. Rex can independently doff clothing and socks and shoes. He requires minimum assistance to don socks with appropriate orientation. He requires min A to don shoes with correct shoe left/right placement. Rex can complete lower body dressing with minimal verbal cues and requires minimum assistance /set up assist for orientation upper body dressing. Rex requires minimum assistance for clothing management skills such as fasteners, zippers, and snaps. Rex uses the toilet independently, although he has demonstrated regression in toileting skills regarding bowel movements. He requires assistance for toilet hygiene. He requires minimum assistance for other daily hygiene activities such as brushing teeth, combing hair, washing hands. Rex requires min A for cutting food and using utensils neatly. These skills are beginning to be addressed in OT sessions in the home environment to ensure carryover.

Sensory Processing:

Sensory processing is the ability to take in information from our environment, interpret and organize it. Self-regulation is the ability to take this sensory information and adjust according to task demands and environments. Rex presents with moderate sensory processing differences regarding auditory, oral, vestibular (movement), tactile (touch), visual, and body position (proprioceptive) processing. Rex presents with sensory modulation challenges and will fluctuate from sensory seeking to sensory under responsiveness. Rex presents with a hypo-responsive proprioceptive system. He often seeks out deep pressure input, he enjoys crashing his body, walks heavily and loudly and falls often. Rex was unable to complete finger to nose opposition with eyes open and eyes occluded indicating proprioceptive processing differences. Rex presents with poor body awareness. Safety awareness is poor. Rex presents with a hypo- responsive vestibular system. He is in constant motion and has

PE114

PE115

difficulty sitting still for long periods of time. He often seeks out movement by running, spinning, twirling, or moving his body. Rex presents with poor spatial awareness, delayed motor planning and poor balance. Rex engages in most tactile experiences including sand, water beads, Thera putty, bean and rice buckets. He does not tolerate unexpected touch or messy play for long periods of time, indicating tactile processing differences. Rex presents with oral sensory processing differences that impact his daily diet. At times he will seek out oral sensory input when chewing or mouthing nonfood items or licking, moving tongue often. A feeding therapist trained in SOS approach is currently addressing his sensory feeding differences Rex presents with hypersensitivity to visual stimuli. He notices almost all visual stimuli in his environment and becomes distracted easily. Rex is hypo sensitive to auditory input and presents with auditory processing challenges. He tends to sing, shout and demonstrate difficulty with voice modulation and will often seek out auditory input to help regulate. He will have difficulty attending in loud noisy environments and inconsistently respond to his name. Rex is extremely responsive to sensory input to improve regulation, attention and overall participation in therapy sessions. He benefits and responds tremendously to a sensory integrative approach in his sessions.

Neuromuscular:

Rex presents with low muscle tone globally. He presents with moderate overall weakness which impacts his overall strength & coordination. Rex was able to sustain core flexion for 10-12 seconds (norm 20-25 seconds) and prone extension for 8-10 seconds (norm 15-20 seconds), indicating core and upper body weakness in the flexor an extensor muscle groups. Rex demonstrates difficulty maintaining adequate postural control and will often lean his body for external support while seated. He often leans his head or trunk on the table while seated. He demonstrates weakness in his hands which contributes to his difficulty with fine motor and self- help skills. Rex had difficulty with one legged balance and dynamic balance activities. He can jump with two footed takeoffs. Rex requires assurance to hop on one foot, and skip. Rex requires assistance for motor planning activities such as imitating animal poses and yoga positions, demonstrating challenges with motor planning. He demonstrated immature overhand and underhand ball skills.

PE115

PE116

Summary & Recommendations:

Rex is a motivated and eager boy who continues to demonstrate progress in his OT sessions. He can be easily engaged in a sensory gym and demonstrates appropriate participation in his sessions. Safety and body awareness continue to be addressed. Occupational therapy should continue to address sensory processing, overall strength, motor planning & coordination, fine motor and visual motor skills, self- help skills and self-regulation for greater success & independence in daily routines. Rex responds to 1:1 support in a collaborative and sensory integrative approach to address occupational therapy goals.

It is strongly recommended that Rex continues to receive occupational therapy services to address fine motor skill delays and improve independence in daily life across all environments.

Please feel free to contact me with any further questions via email or phone.


_____

Date: 1/4/2023

Jessica Zambito OTR/L

License: 017860

PE116

PE117

**From:**
**To:**
**Subject:**
**Date:**

---

**From:** Halia Francis <halia.francis@outlook.com>
**Sent:** Monday, July 10, 2023 1:39 PM
**To:** gyates@schools.nyc.org <gyates@schools.nyc.org>
**Cc:** Cliff Francis <cliff-francis@outlook.com>
**Subject:** School Tour

Good afternoon,

I am the mother of Rex Francis, a child with autism who was recommended placement at the Mickey Mantle School. I would like to set up a tour of the school in order to get an understanding of the school's program and to ask a few questions about the school itself. Rex is currently in a 6:1:1 classroom and receiving additional services outside of the school he currently attends (OT, PT, Speech, ABA). Please let me know when you are available for me to come in for this visit. Thank you.

Sincerely,
Halia Francis

PE117

Received Office of State Review
01/09/2024

PE118

 THE Titus School

## ENROLLMENT CONTRACT
2023-2024 School Year

| Rex | Francis | 04/14/2014 | 05/01/2023 |
|-----|---------|------------|------------|
| Child's Name: First | Last | DOB | Date |

**This is a contract between The Titus School ("Titus") Halia and Cliff. Francis (Parent") for the enrollment of Rex Francis ("Student") for the 2023 - 2024 school year ("School Year"). The parties hereby agree to the following terms:**

1.     **Enrollment; Academic Year.** Titus offers enrollment to Student for the School Year, starting on July 17, 2023, and ending on June 21, 2024, on the terms and conditions set forth below. Parent understands this agreement ("Enrollment Contract") is for the full academic year and is valid only for the 2023-24 academic year and does not entitle Student to any future enrollment. No Student will be eligible for re-enrollment in any subsequent year unless all payments due for any previous year have been paid in full, or other arrangements for their payment have been made. The determination of whether the Student is eligible for re-enrollment will be made by Titus, at its sole discretion.

2.     **Tuition Fees.** Tuition for the Titus School is program specific. Titus operates on a rolling admissions basis, so tuition is prorated to reflect Student's start date. Student's education program is designed to meet the unique, individual, and specific needs of Student. In designing Student's program, Titus takes into consideration Student's educational record, including, but not limited to, instructional history, academic, therapeutic, and behavioral reports and data, parent interviews, and program recommendations by teachers and related services providers.

**Student's tuition for the 2023-2024 school year is:** $132,000.00

3.     **Payment Options.** Tuition may be paid in any one of the following ways:

    **A. Biannual Payment.**
        **i.**    12-Month Program. Parent shall pay one-half the total annual tuition amount no later than June 15, 2023, and the remaining balance on or before January 15, 2024.

        **ii.**   10-Month Program. Parent shall pay one-half the total annual tuition amount no later than August 15, 2023, and the remaining balance on or before January 15, 2024.

---

Received Office of State Review
01/09/2024

PE118

PE119

 THE **Titus School**

    i.    Rolling admissions. Parent shall pay one-half of the total annual tuition amount on or before the enrollment date and the remaining balance on or before May 1, 2024.

**B. Quarterly Payments.**

    i.    12-Month Program.  Parent shall make four equal payments of 25% of the total tuition cost beginning July 1, 2023. The remaining three payments are due October 1, 2023, January 1, 2024, and April 1, 2024.

**C. 10 Payments.**

    i.    12-Month Program.  Parents shall make 10 equal payments totaling the annual tuition cost beginning June 1, 2023. The remaining nine payments are due July 1, 2023, August 1, 2023, September 1, 2023, October 1, 2023, November 1, 2023, December 1, 2023, January 1, 2024, February 1, 2024, and March 1, 2024.

    ii.    10-Month Program. Parents shall make 10 equal payments totaling the annual tuition cost beginning August 1, 2023. The remaining nine payments are due September 1, 2023,  October 1, 2023, November 1, 2023, December 1, 2023, January 1, 2024, February 1, 2024, March 1, 2024, April 1, 2024, and May 1, 2024.

4.    **Payment Condition of Enrollment.** Payment of tuition in accordance with the schedule contained herein is a condition of continued enrollment. If payment is not received in accordance with the schedule set forth in Paragraph "3" above, Titus may, at its sole discretion, terminate the Enrollment Contract and demand immediate payment of the total outstanding amount due and owing. Titus's termination of this Enrollment Contract does not relieve Parent of any of Parent's obligations set forth herein.

5.    **Deposit.**  Upon signing and submitting this Enrollment Contract, Parent agrees to pay an initial, nonrefundable deposit of $1,000 ("Deposit") made payable to "The Titus School," to secure Student's seat at Titus for the 2023-2024 school year. The Deposit will be applied against the tuition fees.

6.    **Payment Obligation.**  It is understood and agreed that Student will be enrolled in Titus up through the end of the academic year, and the obligation to pay tuition is unconditional and cannot be apportioned or mitigated except as expressly provided for herein. Titus will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension, or for any other reason, except as outlined in Paragraph "11".

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4*PE119
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com
Received Office of State Review        P - G 2 of 17
01/09/2024

PE120



**THE Titus School**

7.    **Related Services/Mental Health Services.**   Related services will be provided as needed and determined by Titus, in consultation with applicable related services providers and Parent, in accordance with Student's evaluations. Up to three separate related services or mental health services, each provided three times per week, for thirty-minute session, are included within the cost of Student's tuition.

It is understood that any related services/mental health services mandates provided in addition to the three related services/mental services included in the cost of tuition will be billed in addition to the cost of tuition. Any related services/mental heart services mandates provided for a duration of more than thirty-minutes will also be billed in addition to the cost of tuition.

Titus will work with families regarding each child's unique and individual needs for specific services. The list of available related services/mental health services offered by Titus and their cost can be found in "Schedule A," below.

8.    **Failure to Secure Tuition and/or Related Services Funding.**   It is understood that Parent may seek public funding from Student's school district to pay for Student's tuition and related services due to Titus for the School Year by asserting Student's due process rights. If Parent has secured funding from Student's school district for the cost of tuition and/or related services, in whole or in part, Parent acknowledges and hereby agrees that he or she shall use such funds to pay immediately any and all outstanding tuition and related services balances owed by Parent to Titus. Parent further understands and acknowledges that in the event of a school district's delay or failure to disburse such funds to Parent, or to Titus on Parent's behalf, Parent is not relieved from his or her obligation to make timely payment for tuition in accordance with the schedule outlined in Paragraph "3" above, and the failure to make such timely payment is a breach of the Enrollment Contract. In such event Titus may, at its sole discretion, terminate the Enrollment Contract.

In the event Parent is denied all or part of the tuition and/or related services funding from the local school district by a final administrative or judicial decision resolving the claim for such funding, Parent understands that Parent remains responsible to pay the remaining tuition and fees due and owing to Titus and/or related services providers, if any, under this Enrollment Contract as outlined in Paragraphs "2" through "6".

9.    **Extended School Day Services.** In order to better support the Student's appropriate educational progress and global development a student may require Extended School Day Services. Extended School Day Services are services provided to students by Titus, at school and in the community, before or after the regular school day hours. The focus of these services is to facilitate independence in activities of daily living, executive functioning, academics, social skills, fine and gross motor development, and to improve functional life skills.

 **THE Titus School**

PE121

a.    **Extended School Day Services Schedule.** Extended School Day Services are available daily Monday through Friday. The Afternoon Extended School Day Services begin at 3:00 p.m. and end between 4:00 p.m. and 5:00 p.m. The Morning Extended School Day Services begin at 8:00 a.m. Student may participate in the Extended School Day Services in semesters Summer, Fall, Winter, and Spring. These semesters run on the following dates:

Semester 1, Summer: July 10, 2023 through August 10, 2023

Semester 2, Fall: September 18, 2023 through December 15, 2023

Semester 3, Winter: January 8, 2024 through March 28, 2024

Semester 4, Spring: TBA April, 2024 through June 14, 2024

b.    **Group Setting.** Extended School Day Services are offered in a group setting. Groups are established based on age, developmental level, skills, and targeted goals. The groups will vary in size, age, and ratio of support. The minimum staff to child ratio is 3:1, but 1:1 support is available at an additional cost. During the Extended School Day Services program Students will have the opportunity to work with familiar and new adults and will work with peers on social-emotional skills in a group setting during structured and self-directed activities, as well as traditional teacher led activities. The Titus School Extended School Day Services offers a carefully planned and developmentally appropriate curriculum that provides each child the opportunity to be and feel successful while learning new skills. The children will be provided with the opportunity to participate in all programs listed above. Your child will develop and use their social awareness to communicate and collaborate with peers and adults, to problem-solve, and to respect the individual differences of others.

c.    **Term of Extended School Day Services.** Extended School Day Services are valid only for the 2023-2024 academic year and do not entitle Student to participation in the program in future years. Extended School Day Services are provided as needed in order to support the appropriateness of a Student's placement at Titus, and are a charge in addition to the cost of tuition pursuant to the terms in this Paragraph "9" and in accordance with "Schedule B" of this Agreement. No Student will be eligible for participation in the Extended School Day Services in any subsequent year unless all payments due for any previous year have been paid in full, or other arrangements for payment satisfactory to Titus have been made. The determination of whether the Student is eligible for future participation will be made by Titus, at its sole discretion.

d.    **Cost and Fees for Extended School Day Services.** Cost and fees for Extended School Day Services is program specific, and established at "Schedule B," below.

PE122

 THE **Titus School**

10.    **Supplemental Educational Services.** If the Student has limited access to the community, struggles to generalize skills across settings, or regresses during school breaks, Supplemental Educational Services are required to prevent regression and to promote appropriate educational and global developmental progress. Supplemental Educational Services are available evenings, weekends, and during extended school breaks/holidays. Titus offers all families two (2) home visits included within the Tuition Fees.

a.    **Term of Supplemental Educational Services.** Supplemental Educational Services are valid only for the 2023-2024 academic year and do not entitle Student to participation in the program in future years. Supplemental Educational Services are provided as needed in order to support the appropriateness of a Student's placement at Titus, and are a charge in addition to the cost of tuition pursuant to the terms in this Paragraph "10" and in accordance with "Schedule C" of this Agreement. No Student will be eligible for participation in the Supplemental Educational Services in any subsequent year unless all payments due for any previous year have been paid in full, or other arrangements for payment satisfactory to Titus have been made. The determination of whether the Student is eligible for future participation will be made by Titus, at its sole discretion.

b.    **Cost and Fees for Supplemental Education Services.** Cost and fees for Supplemental Education Services are program specific, and established at "Schedule C," below.

<u>**Contract Release and Termination**</u>

11.    **Release.**    Parent acknowledges that Parent will be released from this Enrollment Contract without financial penalty or continuing responsibility for tuition payments outlined in Paragraph "2" of this Enrollment Contract if Student's school district offers Student enrollment in a public school, or in a state-approved nonpublic school, and Student enrolls in such school on or before August 1, 2023 for 12-month students, and on or before September 30, 2023, for 10-month students. Parent shall, however, remain responsible for the pro-rated portion of tuition and related services payments up through the student's last date of attendance at Titus. In addition, to be released from Parent's obligations herein, Parent shall provide written notice of termination pursuant to Paragraph "12" herein and provide to Titus a copy of the school district's enrollment offer, a copy of Parent's acceptance of same, and evidence of Student's enrollment in the offered program. Moreover, if Parent withdraws Student from the offered program within 60 days after enrolling Student therein and enrolls Student in another unapproved private school placement thereafter, Titus shall not be obligated to refund any portion of tuition and fees described herein at Paragraph "2", and may, at its sole discretion, choose to enforce the Enrollment Contract in its entirety.

 **THE Titus School**

12.    **Termination.**    (A) Parent may terminate this Enrollment Contract by submitting a written Termination Notice to Natalie Brandefine, Titus's Executive Director. The Termination Notice must (a) be dated, (b) state Student's name and (c) provide Parent's reasons for terminating the Enrollment Contract. The Termination Notice may be submitted through the U.S. Postal Service or by overnight courier. If submitted through the U.S. Postal Service by a method other than next day delivery service, the Termination Notice shall be deemed received by Titus five days after the date that the Termination Notice is postmarked if the actual date received is not known.

(B) If Parent terminates this Enrollment Agreement, Parent will forfeit Student's non-refundable Tuition Deposit set forth in Paragraph "5" in its entirety. Moreover, applicable tuition and related services refunds, if any, shall be at the sole discretion of Titus and determined as follows:

(i)  Tuition and additional services fees established herein will be refunded *if and only if* the written Termination Notice in the form stated above was **received** on or before the first day of school.

(ii) If written Termination Notice is received after the first day of school, except as provided for in Paragraph "11" above, and the conditions established therein, Parent will be responsible to Titus for paying all tuition and applicable fees for the entire School Year.

13.    **Parent Cooperation with Titus and School District.** In the event Parent decides to seek funding from the local school district for Student's placement at Titus, Parent agrees to take all necessary steps to secure funding and to cooperate fully in the process required to secure such funding. This cooperation includes, but is not limited to, the following: making the child available for evaluations by the local school district; participating in IEP meetings; participating in impartial hearings; promptly executing any stipulations and/or authorization forms;  promptly providing all current assessments and diagnostic reports pertaining to Student, and any other documents specifically requested by Titus or Student's Committee on Special Education ("CSE"); keeping Titus informed of the status of Student's CSE meetings and impartial hearing and appeals or other due process proceedings; and authorizing your attorney to speak with Titus regarding the status of any such due process proceedings, appeals, and, in particular, the status of the implementation and/or payment of pendency and final orders, and payments resulting from settlement agreements, provided, however, that such authorization is not intended as, and shall not be, a waiver of the attorney-client privilege.

In addition, irrespective of whether Parent seeks funding from the local school district for Student's placement at Titus, as a condition of continued enrollment Parent shall participate in

PE124

 THE **Titus School**

all required school meetings and conferences relating to Student's education and treatment plan.

14.    In the event that Parent does not cooperate with the process described in Paragraph "13" above, Titus may elect upon 60 days' notice to terminate Student's enrollment at Titus. Moreover, as a mandated member of Student's CSE, upon request by the CSE Titus will provide all relevant student records to the CSE in connection with Student's annual review, reevaluation, or any other CSE meeting that is convened for Student, and will also attend any such meetings for which Titus's attendance is required as a mandated member, or any meeting where Titus's attendance may not be required by law, but where its presence is requested by either the CSE or Parent.

15.    **Student and Parent Compliance with School Rules and Regulations.**  By executing this Enrollment Contract, Parent(s) agree that they and Student will abide by the rules and regulations issued by Titus, as may be adopted or amended from time to time. Parents acknowledge that Titus reserves the right, in its sole and exclusive discretion, to discipline Student, including, but not limited to, suspend, or expel Student, if Student violates any rules and regulations, does not meet the behavioral standards of Titus, or engages in conduct or behavior that create a risk to the health, welfare, or safety of the Titus community. Such reasons further include, without limitation: (a) a Parent's failure to abide by the rules and regulations of Titus; (b) conduct on the part of the Parent(s) that demonstrates an unwillingness or inability to be productive members of the Titus community; and/or (c) Titus' determination that the continued attendance of the Student in Titus is not in the best interests of the Student or Titus. Titus shall not refund any tuition costs or any applicable additional costs where such enforced withdrawal occurs, and any unpaid balance shall be payable in full according to the payment schedule. Titus also reserves the right to withdraw an offer of enrollment or re-enrollment and nullify the executed contract if it deems it in its best interest.

16.    **Medical Records Releases.**    At Titus's request, Parent agrees to promptly sign a Health Insurance Portability and Accountability Act ("HIPAA") release form for the purpose of allowing Titus to communicate with Student's healthcare providers and share Student's medical and health records with Student's related services and healthcare providers, as determined necessary by Titus, in its sole discretion, if and to the extent a HIPAA release is required by law for such communications and disclosures to occur. Parent agrees to inform Titus if there are any changes to Student's medical conditions and/or changes to Student's medication regimen.

17.    **Joint and Several Liability.** Parents agree that each must sign this Enrollment Contract and that each is jointly and severally liable for the tuition and related services obligations defined herein, as well as any extended school day services or supplemental educational services obligations as provided for in Paragraphs "7" through "10" herein, except

PE124



 THE **Titus School**

where a valid and enforceable court order, custody agreement or other agreement or legal order requires one parent to undertake full responsibility for the costs associated with Student's education, in which case such legally responsible parent shall sign this agreement and be solely responsible for the costs established herein.

18.    **General Release and Holds Harmless.** Parent hereby releases and holds harmless Titus, its Board of Trustees, officers, employees, agents, representatives, successors and assigns, from any and all claims, damages, causes of action, or other liability of any kind for any injury to Student or for loss or damage of property occurring either on or off school property, where such claims, damages, causes of action, or other liability may are not the result of gross negligence by Titus, its Board of Trustees, officers, employees, agents, representatives, successors or assigns.

19.    **Costs to Enforce this Contract.** If Titus takes any action to enforce this Enrollment Contract, shall be entitled to recover from Parent reasonable costs, including, but not limited to, reasonable attorneys' fees, in connection with same.

**COVID-19 and Other Disease Outbreaks, Epidemics or Pandemics**

20.    Parent understands and acknowledges that Titus must comply with all applicable federal, state, and local laws, regulations, and executive orders, and, at its sole discretion, also complies with federal, state, and local guidance and directives, pertaining to the COVID-19 pandemic, or any other disease outbreaks, epidemics, or pandemics which may arise, including, but not limited to, laws, regulations, executive orders, guidance and directives pertaining to school closures, and in-person, hybrid, and remote learning. In addition, Parent understands and acknowledges that Titus, in carrying out its policies, protocols and responses to the COVID-19 pandemic or any other disease outbreaks, epidemics, or pandemics, reserves the right, in its sole discretion, to open or close its physical premises and to alternate between remote, hybrid and in-person learning, as it deems appropriate and consistent with applicable law.

21.    Parent understands and acknowledges that regardless of whether in-person, hybrid, or remote learning is being provided at any given time during the course of the School Year, the cost of tuition, related services, and any other services provided by Titus shall remain at the respective rates stated in this Enrollment Contract unless Titus determines, in its sole discretion, to modify such rates, in which case, Titus will send written notice to Parent of any revised tuition and/or costs. In the event Titus determines to modify the amount payable for the cost of tuition, related services and any other services provided for herein, Parent agrees to be held responsible for and to pay such modified amounts.

---

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*                              www.thetitusschool.com
Received Office of State Review
01/09/2024
PE125

P - G 8 of 17



PE126

## Miscellaneous Terms

22.    **Use of Image.** Parent grants permission for use by Titus of Student's work, portrait, or likeness in connection with Titus's activities, in publicizing Titus, or for internal professional development purposes; provided, however, Parent reserves the right to revoke such permission at any time, at Parent's sole discretion. Such revocation must be done in writing and in accordance with the notice provision in Paragraph "26" herein.

23.    **Assignment.**  Parent agrees this Enrollment Contract may be assigned by Titus and it will be binding upon and inure to the benefit of the successors, subsidiaries, affiliates and assigns of Titus.

24.    **Severability.**  Titus and Parent agree that in the event any provision of this Enrollment Contract shall be deemed invalid or unenforceable in whole or in part for any reason whatsoever, the remaining provisions shall, nevertheless, be valid and binding as if such invalid or unenforceable provision had not been contained in this Enrollment Contract.

25.    **Governing Law.**  This Enrollment Contract shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. New York State shall be the jurisdiction and venue for any dispute involving this Enrollment Contract. The Enrollment Contract may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

26.    **Notice.**  By executing this Enrollment Contract, each party hereto agrees to the terms set forth above and all notices required under this Enrollment Contract shall be delivered via certified mail, return receipt, or by Federal Express delivery service, to Natalie Brandefine, as set forth below:

Natalie Brandefine
The Titus School
90 John Street
New York, NY 10038

27.    **Merger.**  This Enrollment Contract contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral, or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof. This Enrollment Contract may not be modified or amended other than by an

PE126

PE127

 **THE Titus School**

agreement in writing, duly signed by all parties.

28.    By signing below, Parent(s)/Guardians acknowledges that he/she/they has read this contract, understand(s) the terms and conditions, and agree(s) to the conditions outlined in this contract.   It is further understood that any questions concerning these policies have been discussed. Parent signature below signifies that they/he/she have read and understand all aspects of this agreement and recognize the legal responsibilities in regard to this contract.

THE TITUS SCHOOL

By: Natalie Brandefine
Executive Director

Date: 7/5/2023

PARENT(S)/GUARDIAN(S)

Signature: _____

Name: _Italia Francis_

Date: _6/22/23_

Signature: _____

Name: _CLIFF FRANCIS_

Date: _6/22/23_

*The Titus School*          *90 John Street*     *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com

P - G 10 of 17

Received Office of State Review
01/09/2024

PE127

PE128

 THE **Titus School**

## SCHEDULE A
### Related Services/Mental Health Services

| Related Services and Mental Health Services | Number of Additional Sessions per Week | Duration of Session | Ratio | Additional Cost |
|---|---|---|---|---|
| *Speech Language Therapy* | | | | |
| *Occupation Therapy* | | | | |
| *Physical Therapy* | | | | |
| *Mental Health Counseling* | | | | |
| *Certified Nurse's Assistant* | | | | |
| *Registered Nurse* | | | | |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com
Received Office of State Review
01/09/2024

P - G 11 of 17

PE128



PE129

## SCHEDULE B
Extended School Day Services

**PLEASE CHECK BOX & INITIAL IF ENROLLING IN EXTENDED SCHOOL DAY SERVICES (The following additional terms apply):** _____

### Extended School Day Services Registration Form

*Please check the □ to select the extended school day services*

**Morning Extended Day:**
Monday through Friday—**Activities of Daily Living** 8:00 a.m.-8:30 a.m.
Tuition for 3:1 ratio $50.00 per session; 1:1 support available for an additional $20 per session
□ Monday     □ Tuesday     □Wednesday     □Thursday     □Friday

**Afternoon Extended Day:**
**Executive Functioning & Physical Development: Swim** 3:00 p.m.-4:30 p.m.
Tuition for 3:1, $175 per session; *1:1 support available for an additional $60 per session
□ Monday     □ Tuesday

**PM Extended School Day Activities—*Schedules vary*** 3:00 p.m.- 4:00 p.m.
Tuition for 3:1, $100.00 per session, *1:1 support available for an additional $40 per session
□ Monday     □ Tuesday     □Wednesday     □Thursday     □Friday

Extended School Day Program and Payment Options.

   A.  **Extended School Day Services Monthly Payment.**

      i.    Summer Semester—5-Week Program, July 10, 2023 through August 10, 2023. Parent shall pay a twenty percent deposit no later than **June 15, 2023** to secure Student's enrollment. The Deposit will be applied against the tuition fees. The remaining balance will be due in equal monthly installments each due on the 1st of every month –July 1, 2023 and August 1, 2023. Acceptable forms of payment are

---

*The Titus School*      *90 John Street*     *New York, NY 10038*    *646-756-4103*
info@thetitusschool.com     *Fax 212-656-1426*    www.thetitusschool.com
Received Office of State Review
01/09/2024          P - G 12 of 17        PE129

PE130

 THE **Titus School**

cash or checks made payable to The Titus School LLC. A receipt will be provided for all payments.

ii.   Fall Semester—4-Month Program, September 18, 2023 through December 15, 2023. Parent shall pay a twenty percent deposit no later than **September 11, 2023** to secure Student's enrollment. The Deposit will be applied against the tuition fees. The remaining balance will be due in equal monthly installments each due on the 1st of every month – October 1, 2023, November 1, 2023, and December 1, 2023. Acceptable forms of payment are cash or checks made payable to The Titus School LLC. A receipt will be provided for all payments.

iii.  Winter Semester—4-Month Program, January 8, 2024 through March 28, 2024. Parent shall pay a twenty percent deposit no later than **January 2, 2024** to secure Student's enrollment. The Deposit will be applied against the tuition fees. The remaining balance will be due in equal monthly installments each due on the 1st of every month – February 1, 2024, March 1, 2024, and April 1, 2024. Acceptable forms of payment are cash or checks made payable to The Titus School LLC. A receipt will be provided for all payments.

iv.   Spring Semester—3-Month Program, April TBA, 2024 through June 14, 2024. Parent shall pay a twenty percent deposit no later than **April 1, 2024** to secure Student's enrollment. The Deposit will be applied against the tuition fees. The remaining balance will be due in equal monthly installments each due on the 1st of every month – May 1, 2024 and June 1, 2024. Acceptable forms of payment are cash or checks made payable to The Titus School. A receipt will be provided for all payments.

**Extended School Day Services Attendance/Make-up/Cancellations:** Titus requires prior written notification if you plan to miss or cancel a session. Notify Colin Cowan-DeWitt via email at CDewitt@thetitusschool.com or Jerri Harrison JHarrison@thetitusschool.com at least 24 hours prior to cancellation. There are no make-ups for Extended School Day Services, unless The Titus School has to cancel the scheduled session. Cancellations exclude holidays and emergency closures due to inclement weather. The Titus School reserves the right to charge for late cancellations.

**THE TITUS SCHOOL**                          **PARENT(S)/GUARDIAN(S)**

Signature: _____

PE131

 THE **Titus School**

By: Natalie Brandefine
Executive Director

Date: 7/5/2023

Name: _Haliey Francis_

Date: 6/20/23

Signature: _____

Name: _Cliff Francis_

Date: 6/22/23



PE132

 THE Titus School

## SCHEDULE C
Supplemental Educational Services

PLEASE CHECK BOX & INITIAL IF ENROLLING IN SUPPLEMENTAL EDUCATIONAL SERVICES (The following additional terms apply): _

Titus offers two (2) home visits to all families at no cost. Please contact the School to arrange these visits. Any additional home or outside visits/services are billed as indicated below:

*Please check the □ to select the supplemental educational services*

**1:1 Behavior Therapy**: 1:1 behavior therapy at school, in the community and Student's home, to promote acquisition, retention, and generalization across settings.

□ Weekday Services, $250.00 per hour (minimum 2 hours per week, maximum of 10 hours per week) ___ hours per week
□ Weekend Services, $300.00 per hour (minimum of 2 hours per weekend, maximum of 4 hours per weekend) ___ hours per week

**Family Training:** In the moment support for Families to learn how to manage the Student's challenging behaviors, developmental differences, and or to promote acquisition, retention, and generalization across settings.

□ Weekday Services, $300.00 per hour (minimum 2 hours per month, maximum of 10 hours per month) ___ hours per month
□ Weekend Services, $350.00 per hour (minimum of 2 hours per month, maximum of 4 hours per month) ___ hours per month

**1:1 Academic Services** 1:1 academic services provided at Titus, from 3 p.m. to 4 p.m. or 4 p.m. to 5 p.m.
□ 1:1 with a NYS Certified Special Education Teacher, $175.00 per hour (minimum 1 hour per week, maximum of 5 hours per week) ___ hours per week
□ 1:1 with a teaching assistant at Titus, $100.00 per hour (minimum of 1 hour per week, maximum of 5 hours per week) ___ hours per week

PE133



# THE Titus School

□ **Saturday School:** Community exposure and small group instruction to promote social skills, activities of daily living, appropriate educational progress, as well as
to promote acquisition, retention, and generalization across settings.
Dates to be announced.
Tuition $250 per session
*1:1 support available for an additional $50 per hour*

□ **December 2023 School Break Services:** Community exposure and small group instruction to promote social skills, activities of daily living, appropriate educational progress, as well as
to promote acquisition, retention, and generalization across settings.
Tuition for 2:1, $450 per session: Dates to be announced *1:1 support available for an additional $40 per hour*

□ **February 2024 School Break Services:** Community exposure and small group instruction to promote social skills, activities of daily living, appropriate educational progress, as well as
to promote acquisition, retention, and generalization across settings.
Tuition for 2:1, $450 per session: Dates to be announced *1:1 support available for an additional $40 per hour*

□ **TBA March/April 2024 School Break Services:** Community exposure and small group instruction to promote social skills, activities of daily living, appropriate educational progress, as well as to promote acquisition, retention, and generalization across settings.
Tuition for 2:1, $450 per session: Dates to be announced *1:1 support available for an additional $40 per hour*

**Supplemental Educational Services Payment.**  Parent/guardians will be provided with an invoice after supplemental educational services are rendered. Payment is due by the date indicated on the invoice. Acceptable forms of payment are cash or checks made payable to The Titus School LLC. A receipt will be provided for all payments. Late payments will result in suspension or termination of services.

**Supplemental Educational Services Attendance/Make-up/Cancellations:** Titus requires prior written notification if you plan to miss or cancel a session. Please contact your service provider at least 24 hours prior to cancellation. Supplemental Educational Services may be rescheduled at the provider's discretion. Cancellations exclude holidays and emergency closures due to inclement weather. The Titus School reserves the right to charge for late cancellations.

PE134

 THE Titus School

**THE TITUS SCHOOL**

By: Natalie Brandefine
Executive Director

Date: 7/5/2023

**PARENT(S)/GUARDIAN(S)**

Signature: _____

Name: _____ Natalie Francis _____

Date: _____ 6/20/23. _____

Signature: _____ C Francis _____

Name: _____ CLIFF FRANCIS _____

Date: _____ 6/20/23 _____

PE135

 THE **Titus School**

I, Natalie Brandefine being duly sworn, state:

1. I am employed by **The Titus School**, a nonapproved private special education school in New York City, with consent from the New York State Education Department for the provision of special education services.
2. My current position title: Executive Director
3. I am familiar with the program fees paid by **Cliff Francis and Halia Francis**, parent(s) of **Rex Francis** relative to the student's attendance at the program from July 5, 2023 through June 21, 2024.
4. The total contracted annual rate, including any scholarship, financial aid or any reduced amount, is $138,000.00. Attached is a copy of the entire program fee agreement signed by the parent(s).
5. No adjustments have been made to the tuition for the 23/24 school year.
6. The Titus School is providing in-person, hybrid, and remote instruction and services to all students. This student attends school in-person. If Titus transitions to remote learning, in accordance with NYS Governor Hochul's Executive Orders or NY DOH Guidelines, this student will attend remotely.
7. This student participates and attends school regularly.
8. The parent(s) made the following payments:

| Date | Form | Amount |
|------|------|--------|
| 05/22/23 | Parent Payment Check#201 | $1,000.00 |
| 06/22/23 | Parent Payment Check#209 | $6,600.00 |

Total Amount received: $7,600.00
Total Amount Due: $130,400.00

Attached is a copy of the student's official original attendance record.

Sworn to me this

day of July 2023

PE136

 THE **Titus School**

_____
(Notary Public)

_____
(Program Official)

TAMIKO VAUGHAN
Notary Public, State of New York
Registration No. 01VA6209053
Qualified in Kings County
Commission Expires March 12, 2026

# The Titus School

PE137

## Program Description

The Titus School offers 1:1 and 2:1 support, in a group setting. Group sizes vary, with most groups ranging from 6-8 students. Cohorts are established based on age and social skills. Each student is assessed to identify his/her grade level for reading, writing, and math. Students are then grouped with academic peers for math, English language arts (ELA), science, and history/social studies to facilitate targeted learning in small groups, dyads, and or 1:1 instruction based on learning style and needs. Our academic curriculum adheres to the NYS Common Core and is modified as needed. Each student has the opportunity to work with a NYS certified special education teacher that can modify work to meet his/her learning needs and style while still challenging and supporting intellectual and cognitive development. In addition to reading, writing, math, science, social studies/history, current events, art, music, STEAM, and adaptive physical education, Titus offers daily social skills groups. Utilizing programs like *Social Thinking Curriculum* and *Everyday Speech* lessons target: executive functioning, theory of mind, organization, emotional vocabulary, self-advocacy, transitioning, accepting no, listening and following directions the first time, relationships, etc.

Every classroom team is a co-leading model, one NYS certified special education teacher and one lead behavior therapist. Our lead behavior therapists are professionals that are working toward licensure and board certification in Applied Behavior Analysis (ABA) under the guidance and supervision of our BCBA/LBAs. At Titus, in addition to the classroom staff we have a full-time school nurse, mental health services, occupational therapy, speech and language therapy, and physical therapy. We feel an important component of teaching and treating the whole student is meeting all physical, developmental, and social emotional needs. Therefore, our related services and mental health services include individual and group sessions, in and out of the classroom, with our NYS certified and licensed providers.

As needed, Titus is prepared to offer in-person, hybrid, and remote learning programs available to all students. Hybrid and remote instruction and related services correspond to the individualized in-person schedules. A student engaging in distance learning will continue to receive all mental health and related services, as well as academic and social skills instruction via a HIPAA compliant video conferencing platform for synchronous learning and treatment. Asynchronous learning and treatment will be facilitated by teachers and therapists consulting with and coaching parents, as well as assignments designed specifically to facilitate progress towards the student's goals.

---

Received Office of State Review
01/09/2024

P - I 1 of 1

PE138

# THE Titus School

**Rex Francis' Room 8 2023-2024 Summer Schedule**

|  | Monday | Tuesday | Wednesday | Thursday | Friday |  |
|---|---|---|---|---|---|---|
| 8:30am-9am | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | 8:30am-9am |
| 9am-9:45am | Math | Math | Math | Math | Math | 9am-9:45am |
|  |  |  | Music Therapy (9-9:30am) |  |  |  |
| 9:45am-10:45 am | ELA | ELA | ELA | ELA | ELA | 9:45am-10:45 am |
| 10:45am-11:30am | History/ Science | History/ Science | History/ Science | History/ Science | Small Group Instruction | 10:45am-11:30am |
|  |  |  |  |  | Occupational Therapy (11-11:30am) |  |
| 11:30am-12pm | Writing/ Reading | Writing/ Reading | Writing/ Reading | Writing/ Reading | Art Therapy | 11:30am-12pm |
| 12pm-12:30pm | Lunch | Lunch | Lunch | Lunch | Lunch | 12pm-12:30pm |
| 12:30pm-1pm | Counseling Therapy | Speech Therapy | Speech Therapy | Leisure Skills |  | 12:30pm-1pm |
| 1pm-1:30pm | Leisure Skills | Art | Leisure Skills | Physical Therapy |  | 1pm-1:30pm |
| 1:30pm-2pm | Speech Therapy | Physical Therapy | Physical Therapy | Occupational Therapy |  | 1:30pm-2pm |
| 2pm-2:30pm | Small group instruction/ centers | Music | Small group instruction/ centers | Music |  | 2pm-2:30pm |
| 2:30pm-3pm | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal |  | 2:30pm-3pm |
|  | Monday | Tuesday | Wednesday | Thursday | Friday |  |

*The Titus School*        *90 John Street*        New York, NY 10038        *646-756-4103*
info@thetitusschool.com                *Fax 212-656-1426*                www.thetitusschool.com

PE138

Received Office of State Review
01/09/2024

PE139

# THE Titus School

**Rex Francis' Room 8 2023-2024 Summer Schedule**

| Rex Francis' Team | | | |
|---|---|---|---|
| Teresa Ambery M.S., BCBA, LBA-NY<br>tambery@thetitusschool.com | Russell Sage College Master's Degree in Applied Behavior Analysis and Autism | Board Certified Behavior Analyst Licensed Behavior Analyst-NY | Classroom Supervisor |
| Liam Clancy, MS Ed<br>lclancy@thetitusschool.com | University of St. Andrews, MLitt International Political Theory (M.A. equivalent) | | Math Teacher |
| Sarah Morris, MS ED<br>smorris@thetitusschool.com | Hunter College Masters in Special Education, study of behavior disorders | NYS Certified Teacher: Students with Disabilities (Grades 1-6) | ELA, Science, and History Teacher |
| Mariah Alvarado, MS ED, RBT<br>malvarado@thetitusschool.com | Russell Sage College Master's Degree in Applied Behavior Analysis | Registered Behavior Technician | Lead Behavior Therapist |
| Gregory Sanniez, B.S.<br>Gsanniez@thetitusschool.com | Penn State University B.S. bio-behavioral health | | Behavior Therapist |
| Brian Rodriguez, B.A, RBT (in progress)<br>brodriguez@thetitusschool.com | Hunter College Bachelor's Degree in Clinical Psychology | Registered Behavior Technician | Behavior Therapist |

PE140

# THE Titus School

**Rex Francis' Room 8 2023-2024 Summer Schedule**

| | | | |
|---|---|---|---|
| Avital Akman, PT, DPT<br>Aakman@thetitusschool.com | Touro College, Doctor of Physical Therapy | Physical Therapist NYS License no. 043949 | 2x30x1 |
| Caitlin McDonagh, M.S. CF-SLP, TSSLD<br>cmcdonagh@thetitusschool.com | Adelphi University, Master of Science in Communication Sciences and Disorders | Speech Therapist NYS Initial Teacher of Students with Speech and Language Disabilities | 3x30x1 |
| Melissa Sobrevega, MA, OTR/L<br>msobrevega@thetitusschool.com<br><br>Marissa Bernstein, MS, OTR/L<br>mbernstein@thetitusschool.com | New York University Master of Arts in Occupational Therapy<br><br>Ithaca College Masters in Occupational Therapy | Occupational Therapist NYS License no. 025630<br><br>Occupational Therapist NYS License no. 023287 | 3x30x1 |
| Meghan Keenan, LMSW<br>mkeenan@thetitusschool.com | Monmouth University Masters of Social Work | Counselor LMSW NYS License no. 085842-1 | 1x30 |
| Michelle Geisler, MA, MT-BC, LCAT-LP<br>mgeisler@thetitusschool.com | New York University Master of Music Therapy | Music Therapist MT-BC Board Certification Number: 16853 NYS LCAT Limited Permit: P114789 | 1x30 |
| Christopher Beirne  ATR-BC, LCAT, MFA<br>CBeirne@thetitusschool.com | Yale University, Master of Fine Arts<br>Pratt Institute, Master of Professional Studies/ Art Therapy | Art Therapist LCAT # 0001996 ATR-BC # 14-118 | 1x30 |

PE141

# The Titus School

**Rex Francis' Room 8 2023-2024 Summer Schedule**

**Glossary**:

1. **Arrival/Unpack**—activities of daily living & functional life skills: monitor and properly stowing belongings, gathering appropriate/necessities for the day, and preparing for work
2. **Centers**—small group and 1:1 developmental and academic play-based activities targeting executive functioning, symbolic representation, sequencing, logic/reason, transitioning, etc.
3. **Writing Prompt**—daily writing activity based on an assigned topic, completed independently or with minimal support as needed.
4. **AM Homeroom/Morning Warmup/Morning Meeting—**daily activities designed to facilitate executive functioning, self-management, organization, etc.; students learn to sequence their schedule for the day, calendar skills, weather and seasons, and gather the materials they will need to be successful, etc.
5. **Direct Instruction (DI) 1:1 Instruction/Discrete Trial Learning**—1:1 instruction targeting the student's individual learning style/need, preacademic skills, language/communication skills, and beyond. These sessions often utilize Applied Behavior Analysis (ABA) methodology, such as: Discrete Trial Teaching (DTT), Direct Instruction (DI), as well as other research-based approaches (see descriptions below for academic content covered during 1:1 instruction)
6. **Math**—small group and or 1:1 instruction utilizing a variety of curricula: Engage NY, Eureka Math, Connecting Math Concepts, IXL, Distar Arithmetic, TERC Investigations, Unique Learning Systems, and more.
7. **English Language Arts**—small group or 1:1 instruction utilizing a variety of curricula: Engage NY, Wit and Wisdom, SRA Reading Mastery, SRA Spelling Mastery, Edmark, Fountas and Pinnell, IXL, Reading A to Z, Just Write, Keyboarding Without Tears, Being a Writer, Handwriting Without Tears, Unique Systems and more.
8. **Art**—academic activities designed to explore art history, art appreciation, cultural diversity, and foster artistic expression lead by a licensed and certified art therapist and/or classroom teacher
9. **Lunch**—activities of daily, functional life skills, and social skills. Focus on nutrition, healthy eating habits/food choices, age appropriate conversation, and independently preparing and clean up at mealtime.
10. **History & Social Studies, Current Events, & Geography**—an academic study of US and World History, current events, global cultures, starting with the neighborhoods we live in and extending to the state, the country, and the world, utilizing a variety of curricula: Engage NY, IXL, Unique Learning Systems, The Alexandria Plan, News2You, People and Places, and more.

PE142



**Rex Francis' Room 8 2023-2024 Summer Schedule**

11. **Science—**an academic study of science and scientific theories utilizing a variety of curricula and incorporating STEAM: Engage NY, Unique Leaning Systems, PHD Science, IXL, and more

12. **A.P.E./Movement—**Adaptive Physical Education, or gross motor movement activities designed to promote physical development, knowledge of sports, teamwork, problem solving, regulation, etc.

13. **Independent & Individualized Academics—**unique academic and instructional targets students engage in independently or with 1:1 support, can be based on electives or assigned topics

14. **Public Speaking—**presenting skills, special interests, or personal items from home to classmates to facilitate appropriate conversational skills and develop better relationships with peers around shared interests.

15. **Small Group Instruction & Natural Environment Teaching/Learning—**teaching with an emphasis on independent learning, self-monitoring, and self-advocacy, through a wide variety of topics and subject matter, like money management, appropriate behavior, transportation, safety awareness

16. **Health & Hygiene—**learning healthy habits and routines, body/self-awareness and safety, nutrition, oral hygiene, bathing, etc.

17. **Social Skills Group & Everyday Speech—**academic activities and curricula used to facilitate language development, communication skills, executive functioning, and more

18. **OT—**individual and group occupational therapy sessions with OTR/L, location is therapist discretion, classroom, sensory gym, community, office, etc.

19. **PT—**individual and group physical therapy sessions with DPT, location is therapist discretion, classroom, sensory gym, community, office, etc.

20. **SLP—**individual and group speech language pathology with CCC-SLP, location is therapist discretion, classroom, sensory gym, community, office, etc.

21. **Counseling/Art Therapy/Music Therapy—**Individual, small group, or dyads for counseling to facilitate social emotional development

**22. Pre-vocational Skills—**activities aimed at developing job skills that are not job specific, focusing on the student's work habits, ethics and 'people skills' to prepare them for internships and employment

23. **Music & Performing Arts—**creative and performing arts activities and lessons to introduce drama, theater, music, and movement, as part of self and cultural diversity, and expression

24. **Leisure skills—**designed to help students learn the social and functional life skills that are needed to safely manage a finite period, independently. Students are encouraged to explore and or establish personal interests, hobbies and activities they can safely engage in without adult support.

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com                    *Fax 212-656-1426*                    www.thetitusschool.com

PE142
Received Office of State Review
01/09/2024

PE143



**Rex Francis' Room 8 2023-2024 Summer Schedule**

25. **PM Homeroom/Afternoon Wrap-up/Goodbye Meeting/Pack up—**Recap of the day and preparation for after school and or tomorrow, activities of daily living & functional life skills: monitor and properly retrieving belongings, gathering appropriate/necessities for the day, and preparing for work

*The Titus School*                *90 John Street*                *New York, NY 10038*                *646-756-4103*
info@thetitusschool.com                        *Fax 212-656-1426*                        www.thetitusschool.com

PE143

Received Office of State Review
01/09/2024

PE144

# THE Titus School

**Rex Francis' Room 8 2023-2024 Fall Schedule**

|  | Monday | Tuesday | Wednesday | Thursday | Friday |  |
|---|---|---|---|---|---|---|
| 8:30am-9am | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | Arrival/ Unpack/ Writing prompts | 8:30am-9am |
| 9am-9:45am | Math | Math | Math | Math | Math | 9am-9:45am |
|  |  |  | Music Therapy (9-9:30am) |  |  |  |
| 9:45am-11:15 am | ELA | ELA | ELA | ELA | ELA | 9:45am-11:15 am |
|  |  |  |  |  | Occupational Therapy (11-11:30am) |  |
| 11:15-12pm | History/ Science | History/ Science | History/ Science | History/ Science | Small Group Instruction | 11:15-12pm |
|  |  |  |  |  | Art Therapy (11:30-12pm) |  |
| 12pm-12:30pm | Lunch | Lunch | Lunch | Lunch | Lunch | 12pm-12:30pm |
| 12:30pm-1pm | Counseling Therapy | Speech Therapy | Speech Therapy | Leisure Skills | Leisure Skills | 12:30pm-1pm |
| 1pm-1:30pm | Recess | Art | Leisure Skills | Physical Therapy | Art | 1pm-1:30pm |
| 1:30pm-2pm | Speech Therapy | Physical Therapy | Physical Therapy | Occupational Therapy | Public Speaking | 1:30pm-2pm |
| 2pm-2:30pm | Small group instruction/ centers | Social Skills | Music | Small group instruction/ Centers | Music | 2pm-2:30pm |
| 2:30pm-3pm | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | Reflection Pack up/ Dismissal | 2:30pm-3pm |
|  | Monday | Tuesday | Wednesday | Thursday | Friday |  |

*The Titus School*      *90 John Street*      *New York, NY 10038*      *646-756-4103*
info@thetitusschool.com      *Fax 212-656-1426*      www.thetitusschool.com

PE144

Received Office of State Review
01/09/2024

P - K 1 of 6

PE145

# The Titus School

**Rex Francis' Room 8 2023-2024 Fall Schedule**

| Rex Francis' Team | | | |
|---|---|---|---|
| Teresa Ambery M.S., BCBA, LBA-NY | Russell Sage College Master's Degree in Applied Behavior Analysis and Autism | Board Certified Behavior Analyst | Classroom Supervisor |
| Liam Clancy, MS Ed lclancy@thetitusschool.com | University of St. Andrews, MLitt International Political Theory (M.A. equivalent) | | Math Teacher |
| Sarah Morris, MS ED smorris@thetitusschool.com | Hunter College Masters in Special Education, study of behavior disorders | NYS Certified Teacher: Students with Disabilities (Grades 1-6) | ELA, Science, and History Teacher |
| Mariah Alvarado, MS ED, RBT malvarado@thetitusschool.com | Russell Sage College Master's Degree in Applied Behavior Analysis | Registered Behavior Technician | Lead Behavior Therapist |
| Gregory Sanniez, B.S. | Penn State University B.S. bio-behavioral health | | Behavior Therapist |
| Brian Rodriguez, B.A, RBT (in progress) brodriguez@thetitusschool.com | Hunter College Bachelor's Degree in Clinical Psychology | Registered Behavior Technician | Behavior Therapist |
| Avital Akman, PT, DPT Aakman@thetitusschool.com | Touro College, Doctor of Physical Therapy | Physical Therapist NYS License no. 043949 | 2x30x1 |

PE146



**Rex Francis' Room 8 2023-2024 Fall Schedule**

| Caitlin McDonagh, M.S. CF-SLP, TSSLD<br>cmcdonagh@thetitusschool.com | Adelphi University, Master of Science in Communication Sciences and Disorders | Speech Therapist NYS Initial Teacher of Students with Speech and Language Disabilities | 3x30x1 |
|---|---|---|---|
| Melissa Sobrevega, MA, OTR/L<br>msobrevega@thetitusschool.com | New York University Master of Arts in Occupational Therapy | Occupational Therapist NYS License no. 025630 | 3x30x1 |
| Marissa Bernstein, MS, OTR/L<br>mbernstein@thetitusschool.com | Ithaca College Masters in Occupational Therapy | Occupational Therapist NYS License no. 023287 | |
| Meghan Keenan, LMSW<br>mkeenan@thetitusschool.com | Monmouth University Masters of Social Work | Counselor LMSW NYS License no. 085842-1 | 1x30 |
| Michelle Geisler, MA, MT-BC, LCAT-LP<br>mgeisler@thetitusschool.com | New York University Master of Music Therapy | Music Therapist MT-BC Board Certification Number: 16853 NYS LCAT Limited Permit: P114789 | 1x30 |
| Christopher Beirne  ATR-BC, LCAT, MFA<br>CBeirne@thetitusschool.com | Yale University, Master of Fine Arts Pratt Institute, Master of Professional Studies/ Art Therapy | Art Therapist LCAT # 0001996 ATR-BC # 14-118 | 1x30 |

PE147

# The Titus School

**Rex Francis' Room 8 2023-2024 Fall Schedule**

**Glossary**:

1. **Arrival/Unpack**—activities of daily living & functional life skills: monitor and properly stowing belongings, gathering appropriate/necessities for the day, and preparing for work
2. **Centers**—small group and 1:1 developmental and academic play-based activities targeting executive functioning, symbolic representation, sequencing, logic/reason, transitioning, etc.
3. **Writing Prompt**—daily writing activity based on an assigned topic, completed independently or with minimal support as needed.
4. **AM Homeroom/Morning Warmup/Morning Meeting—**daily activities designed to facilitate executive functioning, self-management, organization, etc.; students learn to sequence their schedule for the day, calendar skills, weather and seasons, and gather the materials they will need to be successful, etc.
5. **Direct Instruction (DI) 1:1 Instruction/Discrete Trial Learning**—1:1 instruction targeting the student's individual learning style/need, preacademic skills, language/communication skills, and beyond. These sessions often utilize Applied Behavior Analysis (ABA) methodology, such as: Discrete Trial Teaching (DTT), Direct Instruction (DI), as well as other research-based approaches (see descriptions below for academic content covered during 1:1 instruction)
6. **Math**—small group and or 1:1 instruction utilizing a variety of curricula: Engage NY, Eureka Math, Connecting Math Concepts, IXL, Distar Arithmetic, TERC Investigations, Unique Learning Systems, and more.
7. **English Language Arts**—small group or 1:1 instruction utilizing a variety of curricula: Engage NY, Wit and Wisdom, SRA Reading Mastery, SRA Spelling Mastery, Edmark, Fountas and Pinnell, IXL, Reading A to Z, Just Write, Keyboarding Without Tears, Being a Writer, Handwriting Without Tears, Unique Systems and more.
8. **Art**—academic activities designed to explore art history, art appreciation, cultural diversity, and foster artistic expression lead by a licensed and certified art therapist and/or classroom teacher
9. **Lunch**—activities of daily, functional life skills, and social skills. Focus on nutrition, healthy eating habits/food choices, age appropriate conversation, and independently preparing and clean up at mealtime.
10. **History & Social Studies, Current Events, & Geography**—an academic study of US and World History, current events, global cultures, starting with the neighborhoods we live in and extending to the state, the country, and the world, utilizing a variety of curricula: Engage NY, IXL, Unique Learning Systems, The Alexandria Plan, News2You, People and Places, and more.

*The Titus School*      *90 John Street*      *New York, NY 10038*      *646-756-4103*
info@thetitusschool.com                      *Fax 212-656-1426*      www.thetitusschool.com

PE147

Received Office of State Review
01/09/2024                              P - K 4 of 6

PE148

# тне Titus School

**Rex Francis' Room 8 2023-2024 Fall Schedule**

11. **Science—**an academic study of science and scientific theories utilizing a variety of curricula and incorporating STEAM: Engage NY, Unique Leaning Systems, PHD Science, IXL, and more

12. **A.P.E./Movement—**Adaptive Physical Education, or gross motor movement activities designed to promote physical development, knowledge of sports, teamwork, problem solving, regulation, etc.

13. **Independent & Individualized Academics**—unique academic and instructional targets students engage in independently or with 1:1 support, can be based on electives or assigned topics

14. **Public Speaking**—presenting skills, special interests, or personal items from home to classmates to facilitate appropriate conversational skills and develop better relationships with peers around shared interests.

15. **Small Group Instruction & Natural Environment Teaching/Learning—**teaching with an emphasis on independent learning, self-monitoring, and self-advocacy, through a wide variety of topics and subject matter, like money management, appropriate behavior, transportation, safety awareness

16. **Health & Hygiene—**learning healthy habits and routines, body/self-awareness and safety, nutrition, oral hygiene, bathing, etc.

17. **Social Skills Group & Everyday Speech—**academic activities and curricula used to facilitate language development, communication skills, executive functioning, and more

18. **OT—**individual and group occupational therapy sessions with OTR/L, location is therapist discretion, classroom, sensory gym, community, office, etc.

19. **PT—**individual and group physical therapy sessions with DPT, location is therapist discretion, classroom, sensory gym, community, office, etc.

20. **SLP—**individual and group speech language pathology with CCC-SLP, location is therapist discretion, classroom, sensory gym, community, office, etc.

21. **Counseling/Art Therapy/Music Therapy—**Individual, small group, or dyads for counseling to facilitate social emotional development

**22. Pre-vocational Skills—**activities aimed at developing job skills that are not job specific, focusing on the student's work habits, ethics and 'people skills' to prepare them for internships and employment

23. **Music & Performing Arts**—creative and performing arts activities and lessons to introduce drama, theater, music, and movement, as part of self and cultural diversity, and expression

24. **Leisure skills**—designed to help students learn the social and functional life skills that are needed to safely manage a finite period, independently. Students are encouraged to explore and or establish personal interests, hobbies and activities they can safely engage in without adult support.

Received Office of State Review
01/09/2024

P - K 5 of 6

PE149



**Rex Francis' Room 8 2023-2024 Fall Schedule**

25. **PM Homeroom/Afternoon Wrap-up/Goodbye Meeting/Pack up—**Recap of the day and preparation for after school and or tomorrow, activities of daily living & functional life skills: monitor and properly retrieving belongings, gathering appropriate/necessities for the day, and preparing for work

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com                    *Fax 212-656-1426*                              www.thetitusschool.com

Received Office of State Review
01/09/2024

PE149



PE150

The Titus School

90 John Street

New York, NY 10038

(646)-756-4103

# Attendance Record                                    2023-2024

| Name of Student | | Student ID # | Gender | Birth Date | |
|---|---|---|---|---|---|
| Rex Francis | | 243-995-479 | M | 04/14/14 | |

| Month/Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total Excused |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-23 | | | | | | | | | | | | | | | | | P | P | P | P | E | | | P | P | P | P | E | | E | | 3 |
| Aug-23 | P | P | P | P | | | P | P | P | P | E | | | | | | | | | | | | | | | | | | | | | 1 |
| Sep-23 | | | | | | | P | P | | P | P | P | P | P | | | P | P | P | P | P | | | | P | P | P | P | | | | 0 |
| Oct-23 | | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Nov-23 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dec-23 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Jan-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Feb-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Mar-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Apr-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| May-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Jun-24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Month/Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total Excused |

E = Excused; P = Present

Total: 4

PE150

Received Office of State Review
01/09/2024

P - L 1 of 1

PE151



# The Titus School

**Progress Report**

Child: Rex Francis                                         Date of Birth: 04/14/2014
Dates Covered: February 2023- June 2023                   Date of Report: 06/16/2023

**Treatment Team**

| Classroom Team: | Lead Teacher: Angela Merino, M.S.Ed<br>Lead Behavior Therapist: Brianna Dapolito, M.S., RBT<br>Behavior Therapist: Meghan Grigston, BA, RBT<br>Behavior Therapist: Brian Rodriguez, BA<br>Behavior Therapist: Rosemarie Marabella, BA, RBT<br>Classroom Supervisor: Tomiko Lyons, MA, MSW, BCBA-LBA/NY |
|---|---|
| Math Teacher: | Angela Merino, M.S.Ed |
| ELA Teacher: | Angela Merino, M.S.Ed |
| Science/Social Studies Teacher: | Angela Merino, M.S.Ed |
| Speech-Language Pathologist: | Caitlin McDonagh MS, CF-SLP, TSSLD<br>Sara Hannah, MS Ed, CCC-SLP, TSSLD |
| Occupational Therapist: | Marissa Bernstein, MS, OTR/L, RBT |
| Physical Therapist: | Avital Akman, PT, DPT |
| Counselor: | Meghan Keenan, LMSW |
| Music Therapist: | Michelle Geisler, MA, MT-BC, LCAT-LP |
| Art Therapist: | Christopher Beirne, ATR-BC, LCAT, MFA |

**Student Profile**

Rex Francis is a 9.2 year old student that has been enrolled at The Titus School (Titus) since July 2021. Titus is an ungraded special education school serving children ages 5.0 through 21.11 years old and their families. Students present with a variety of disabilities and diagnoses. In order to accommodate each student's needs, Titus offers individualized academics, social-emotional learning, targeted behavioral interventions, and therapeutic support within a group setting. Students are grouped with social peers for the majority of the day. Based on instructional history and assessments, students are assigned academic groups for math, reading, writing, social studies, and science. The academic cohorts are designed to facilitate targeted learning in small groups, dyads, and/or 1:1 instruction based on learning style and needs. Our academic curriculum adheres to the NYS Common Core and is modified as needed. Each student has the opportunity to work with a NYS-certified special education teacher that can differentiate work to meet their learning needs and style while still challenging and supporting intellectual and cognitive development. Rex's current homeroom consists of 7 other students, with a 8:5 student to teacher ratio.

Received Office of State Review
01/09/2024

PE152



### Social/Emotional Profile

Rex is diagnosed with Autism. Rex exhibits delays in social/emotional development and adaptive behavior. Rex has a history of engaging in high rates of off-task behavior; emotional dysregulation and physical dysregulation. Rex presents as self-directed and engages in behavior that requires consistent support to access the curriculum in both 1:1 and group activities. Due to his complex medical diagnosis, he requires significant support to navigate his environment and demonstrate executive functioning skills. These behaviors have greatly hindered Rex's ability to form relationships with his peers, independently navigate his environment, or participate in a less restrictive academic setting. Rex requires a small class size with a low student to staff ratio to participate in instruction.

| Scoring Key |
|---|
| LTG-Long Term Goal |
| STO-Short Term Objective |
| MP-Marking Period |
| Avg-Average |
| R-Range |

### Behavior Intervention Goals

Behavior goals are derived from formal and informal assessments, functional behavior assessments, observation, interviews, and data analysis. Data is recorded and analyzed daily. Behavior progress is monitored by the classroom supervisor and Board Certified Behavior Analysts/Licensed Behavior Analysts (BCBA/LBA-NY) at The Titus School.

| Behavior Interventions | | |
|---|---|---|
| Antecedent Interventions | Consequence Interventions | Data Collection Methods |
| ☑ Functional Communication Training | ☐ DRO/DRA/DRI | ☐ Frequency |
| ☑ Visual Schedule | ☐ Verbal Prompting | ☐ Rate |
| ☐ Priming | ☑ Token Economy/Point system | ☐ Duration |
| ☑ Concurrent Operant | ☐ Group contingencies | ☑ Partial Interval Data |
| ☐ Behavioral Momentum | ☑ Self-Monitoring Plan | ☐ Whole Interval Recording |
| ☑ Premack Principle | ☑ Pivotal Praise | ☐ Momentary Time Sampling |
| ☐ Visual Modeling | ☑ Response Interruption/ Redirection | ☐ Intensity Scale Rating |
| ☐ Chaining / Task Analysis | ☑ Response Blocking | ☐ Latency Recording |
| ☐ Coping Skill Task Analysis | ☐ Response Cost/Bonus | |
| ☑ Non-Contingent Reinforcement | ☐ Planned Ignoring/Escape | |
| ☐ Other: | ☑ Extinction | |
| | ☑ Other: Differential reinforcement | |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com     PE152

MP2–Francis, R Page 2

P - M 2 of 29

Received Office of State Review
01/09/2024



PE153

|  | of alternative behaviors, differential reinforcement of incompatible behaviors |  |
|---|---|---|

| Lead Behavior Therapist: Brianna Dapolito, M.S., RBT |
|---|
| Classroom Supervisor: Tomiko Lyons, MA, MSW, BCBA-LBA/NY |

| Goal 1 | **LTG: With support from an adult, utilizing ABA methodology and other therapeutic approaches (e.g. token economy, differential reinforcement procedures), Rex will follow instructions provided by staff to comply with classroom routines, complete non-preferred tasks and/or engage in non-preferred activities within 10 seconds of the initial demand across an average of 90% of the school day for 10 consecutive days. Goal met** | **Intervention Progress** | | |
|---|---|---|---|---|
|  |  | **MP1** | **MP2** | **MP3** |
|  |  | Avg: 78% R: 61-88% | Avg: 88% R: 70-97% | Avg: 94% R: 63-100% |
|  | STO 1:  Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 60% of the school day for 10 consecutive days. **Objective met** | | | |
|  | STO 2: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 10 consecutive days. **Objective met** | | | |
|  | STO 3: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 10 consecutive days with two prompts or less. **Objective met** | | | |
|  | STO 4: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 85% of the school day for 10 consecutive days with two prompts or less. **Objective met** | | | |
|  | STO 5: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 60% of the school day for 10 consecutive days with one prompts or less. **Objective met** | | | |
|  | STO 6: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 10 consecutive days with one prompts or | | | |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com          PE153

MP2–Francis, R Page 3

P - M 3 of 29

Received Office of State Review
01/09/2024



PE154

| | less. **Objective met** |
|---|---|
| | STO 7: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 85% of the school day for 10 consecutive days with one prompts or less. **Objective met** |
| | STO 8: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 60% of the school day for 10 consecutive days independently. **Objective met** |
| | STO 9: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 10 consecutive days independently. **Objective met** |
| | STO 10: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 85% of the school day for 10 consecutive days independently. **Objective met** |

| Goal 2 | **LTG: Utilizing ABA methodology and therapeutic approaches (e.g., differential reinforcement, visual cues, and response blocking), Rex will engage safe behavior and maintain physical regulation (i.e. remaining in his seat or in the designated area) across on average 90% of the school day for 10 consecutive days.** | **Intervention Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | Avg: 93% R: 72-100% | Goal Mastered in MP1 | |
| | STO 1: With fading support, Rex will engage safe behavior and remain regulated (i.e. remaining in his seat or in the designated area) across 60% of the school day for 10 consecutive days. **Objective met** | | | |
| | STO 2: With fading support, Rex will engage safe behavior and remain regulated (i.e. remaining in his seat or in the designated area) across 75% of the school day for 10 consecutive days. **Objective met** | | | |

| NEW Goal 2 | **LTG: With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (such as functional communication training, differential reinforcement, frequent opportunities for breaks, non-contingent attention, and visual schedules) Rex will remain on-task (i.e., eyes on speaker, task initiation, and task completion) on an average of 90% of the school day over the course of a 1-month** | **Intervention Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | - | Avg: 94% R: | Avg: 95% R: |

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com              *Fax 212-656-1426*              www.thetitusschool.com    PE154
MP2–Francis, R Page 4

Received Office of State Review
01/09/2024

P - M 4 of 29

PE155



THE Titus School

| | | | 82-100% | 67-100% |
|---|---|---|---|---|
| | period. **Goal met** | | | |
| | STO 1: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 60% of  school day for 10 consecutive days with two prompts or less. **Objective met** | | | |
| | STO 2: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 75% of  the school day for 10 consecutive days with two prompts or less. **Objective met** | | | |
| | STO 3: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 85% of  the school day for 10 consecutive days with two prompts or less. **Objective met** | | | |
| | STO 4: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 60% of  the school day for 10 consecutive days with one prompts or less. **Objective met** | | | |
| | STO 5: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 75% of  the school day for 10 consecutive days with one prompts or less. **Objective met** | | | |
| | STO 6: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 85% of  the school day for 10 consecutive days with one prompts or less. **Objective met** | | | |
| | STO 7: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 60% of  the school day for 10 consecutive days independently. **Objective met** | | | |
| | STO 8: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 75% of  the school day for 10 consecutive days independently. **Objective met** | | | |
| | STO 9: Rex will remain on task (i.e., eyes on  speaker, task initiation, and task completion) across an average 85% of  the school day for 10 consecutive days independently. **Objective met** | | | |

| Goal 3 | **LTG:** With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (e.g., positive reinforcement system, visual cues), Rex will independently engage with peers and staff by using appropriate language (e.g., using "kind" words), appropriate tone (e.g., phrasing requests as a question), appropriate volume (e.g., speaking at conversational volume), while also maintaining appropriate personal space across an average of 85% of the school day for 10 consecutive days. **Goal met** | **Intervention Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | Avg: 72% R: 48-83% | Avg: 93% R: 79-100% | Avg: 86% R: 73-100% |
| | STO 1: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average of 60% of the school day, for 10 consecutive days. **Objective met** | | | |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com          PE155
MP2–Francis, R Page 5

Received Office of State Review
01/09/2024                                        P - M 5 of 29

PE156

# тне Titus School

| |
|---|
| STO 2: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the school day, for 10 consecutive days with two prompts or less. **Objective met** |
| STO 3: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 85% of the school day, for 10 consecutive days with two prompts or less. **Objective met** |
| STO 4: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 60% of the school day, for 10 consecutive days with one prompts or less. **Objective met** |
| STO 5: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the school day, for 10 consecutive days with one prompts or less. **Objective met** |
| STO 6: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 85% of the school day, for 10 consecutive days with one prompts or less. **Objective met** |
| STO 7: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 60% of the school day, for 10 consecutive days independently. **Objective met** |
| STO 8: With fading 1:1 support, Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the school day, for 10 consecutive days independently. **Objective met** |

**NEW Goal 1: LTG: With support from an adult, utilizing ABA methodology and other therapeutic approaches (e.g. token economy, differential reinforcement procedures), Rex will follow instructions provided by staff to comply with classroom routines, complete non-preferred tasks and/or engage in non-preferred activities within 10 seconds of the initial demand across an average of 85% of the school day for a 1-month period per 30 minute interval independently.**

STO 1: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 15 consecutive days with two prompts or less per 15 minute interval.

STO 2: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 80% of the school day for 15 consecutive days with one prompts or less per 15 minute interval.

STO 3: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 15 consecutive days with two prompts or less per 30 minute interval

STO 4: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished

---

*The Titus School*     *90 John Street*     *New York, NY 10038*     *646-756-4103*
info@thetitusschool.com     *Fax 212-656-1426*     www.thetitusschool.com     PE156
MP2–Francis, R Page 6

Received Office of State Review
01/09/2024

P - M 6 of 29

PE157



across an average 80% of the school day for 15 consecutive days with one prompts or less per 30 minute interval.
STO 5: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 75% of the school day for 15 consecutive days independently per 30 minute interval.
STO 6: Rex will follow instructions to comply with tasks within 10 seconds of the initial demand and/or remain on task during independent work and/or group activities until the work is completed or the group activity has finished across an average 80% of the school day for 15 consecutive days independently per 30 minute interval.

**NEW Goal 2: LTG: With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (such as functional communication training, differential reinforcement, frequent opportunities for breaks, non-contingent attention, and visual schedules) Rex will remain on-task (i.e., eyes on speaker, task initiation, and task completion) on an average of 85% of the school day over the course of a 1-month period per 30 minute interval independently.**
STO 1: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 75% of the school day for 15 consecutive days with two prompts or less per 15 minute interval.
STO 2: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 80% of the school day for 15 consecutive days with one prompts or less per 15 minute interval.
STO 3: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 75% of the school day for 15 consecutive days with two prompts or less per 30 minute interval.
STO 4: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 80% of the school day for 15 consecutive days with one prompts or less per 30 minute interval.
STO 5: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 75% of the school day for 15 consecutive days independently per 30 minute interval.
STO 6: Rex will remain on task (i.e., eyes on speaker, task initiation, and task completion) across an average 80% of the school day for 15 consecutive days independently per 30 minute interval.

**NEW Goal 3: LTG: With fading 1:1 support, utilizing ABA methodology and therapeutic approaches (e.g., positive reinforcement system, visual cues), Rex will independently engage with peers and staff by using appropriate language (e.g., using "kind" words), appropriate tone (e.g., phrasing requests as a question), appropriate volume (e.g., speaking at conversational volume), while also maintaining appropriate personal space across an average of 85% of the school day over a 1-month period per 30 minute interval independently.**
STO 1: Rex will engage in appropriate language and communication to communicate his wants and needs across an average of 75% of the school day, for 15 consecutive days with two prompts or less per 15 minute interval.
STO 2: Rex will engage in appropriate language and communication to communicate his wants and needs across an average 80% of the school day, for 15 consecutive days with one prompts or less per 15 minute interval.
STO 3: Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the school day, for 15 consecutive days with two prompts or less per 30 minute interval.
STO 4: Rex will engage in appropriate language and communication to communicate his wants and needs across an average 80% of the school day, for 15 consecutive days with one prompts or less per 30 minute interval.
STO 5: Rex will engage in appropriate language and communication to communicate his wants and needs across an average 75% of the school day, for 15 consecutive days independently per 30 minute interval.
STO 6: Rex will engage in appropriate language and communication to communicate his wants and needs across an average 80% of the school day, for 15 consecutive days independently per 30 minute interval.

*The Titus School*          *90 John Street*       *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*              www.thetitusschool.com

PE157

Received Office of State Review
01/09/2024

PE158

# тне Titus School

**Comments:**
Due to behavior progress, therapists modified data collection procedures to more accurately capture behavior observed throughout the school day. Rex continues to make progress on maintaining compliance, emotional regulation, and physical regulation, as defined above. Rex benefits from fading 1:1 support across the school day, and the use of a Behavior Intervention Plan. Therapists are currently providing Rex with 1 verbal prompt per behavior goal, per 15-minute interval. Effective antecedent and consequence strategies and interventions will continue to be utilized to facilitate progress towards behavioral goals. Rex benefits from functional communication training, premack principle, different reinforcement of alternative behaviors, pivotal praise, a points system, and several other antecedent and consequence interventions listed above to successfully meet his target behavior. Currently Rex is able to comply with classroom instructions across an average of 94% of the school day, maintain emotional regulation across an average of 86% of the school day, and maintain on task behavior across an average of 95% of the school day.

## Academics

Academic placement and goals are determined by formal and informal assessment, teacher observation, and permanent product data. Teachers record and analyze data weekly.

| Supports Used in Classroom | |
|---|---|
| ☑ Use of Behavior Intervention Plan | ☑ On task focusing prompts |
| ☑ Small groups | ☑ Preferential seating |
| ☑ Kinesthetic learning | ☐ Separate location |
| ☐ Highlight key words | ☑ Extended time |
| ☑ Modify pace of instruction | ☑ Movement |
| ☑ Increased opportunities to respond | ☑ Breaks /Brain breaks |
| ☑ Multi-modal instruction | ☑ Checklists/Task lists |
| ☑ Anchor charts/visual aids | ☑ Scaffolding |
| ☑ Daily review of previously taught material | ☑ Visual aids at desk |
| ☑ Posted agenda | ☐ Annotation strategies |
| ☑ Repeated opportunities to practice skills | ☐ Access to assistive technology |
| ☑ Teacher/peer modeling | ☐ Calculator |
| ☑ Manipulatives | ☐ Scribe |
| ☐ Graphic organizers | ☑ Directions read aloud and reread |
| ☐ Guided Notes | ☐ Informal Criterion Referenced Assessment |
| ☑ Teacher made materials | ☐ Other: |
| ☐ 1:1 Instruction | |
| ☑ Other: Verbal, visual, and gestural cues | |

***The Titus School***          ***90 John Street***          ***New York, NY 10038***          ***646-756-4103***
info@thetitusschool.com          ***Fax 212-656-1426***                    www.thetitusschool.com   PE158
MP2–Francis, R Page 8

Received Office of State Review
01/09/2024          P - M 8 of 29

PE159



THE Titus School

| Math Instructor: Angela Merino M.S.Ed<br>Grade Level: 1st Grade | | | | |
|---|---|---|---|---|

| Goal 1 | LTG 1: With fading support, Rex will be demonstrate ability to identify numbers from 11 to 20 into one ten and some further ones, e.g., by using objects or drawings, and record each composition or decomposition by a drawing or equation (e.g., 18 = 10 + 8); understand that these numbers are composed of one ten and one, two, three, four, five, six, seven, eight, or nine ones with 80% accuracy. (K.MATH.2) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | STO 1:<br>40%<br>STO 2:<br>40%<br>STO 3:<br>30% | STO 1:<br>60%<br>STO 2:<br>60%<br>STO 3:<br>60% | STO 1:<br>80%<br>STO 2:<br>80%<br>STO 3:<br>80% |

| STO 1: With fading support, Rex will demonstrate understanding of composing numbers 11–20, and count to answer "how many?" questions in varied configurations with 80% accuracy. **Objective met** |
|---|
| STO 2: With fading support, Rex will demonstrate understanding of decomposing numbers 11-20, and count to answer "how many?" questions in varied configurations with 80% accuracy. **Objective met** |
| STO 3: With fading support, Rex will represent and write teen numbers (e.g.17 is 10 ones and 7 ones) and up to 20 in a correct number formation with 80% accuracy. **Objective met** |

| Goal 2 | LTG 2: With fading support, Rex will be able to identify and compare numbers with measurable attributes between 0 and 100 with an 80% accuracy. (K.MATH.11) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | STO 1:<br>40%<br>STO 2:<br>40%<br>STO 3:<br>50% | STO 1:<br>60%<br>STO 2:<br>60%<br>STO 3:<br>60% | STO 1:<br>70%<br>STO 2:<br>70%<br>STO 3:<br>70% |

| STO 1: With fading support, Rex will directly identify whether the number of objects in one group is greater than the number of objects from another group, e.g. by using matching and counting strategies with 80% accuracy. **In progress** |
|---|
| STO 2: With fading support, Rex will directly identify whether the number of objects in one group is less than the number of objects from another group. e.g by using matching and counting strategies with 80% accuracy. **In progress** |

*The Titus School*     *90 John Street*     *New York, NY 10038*     *646-756-4103*
info@thetitusschool.com     *Fax 212-656-1426*     www.thetitusschool.com     PE159
MP2–Francis, R Page 9

Received Office of State Review
01/09/2024     P - M 9 of 29

PE160


The Titus School

| | STO 3: With fading support, Rex will directly identify whether the number of objects in one group is equal to the number of objects from another group, e.g by using matching and counting strategies with 80% accuracy. **In progress** |
|---|---|

| | LTG 3: With fading supports, Rex will be able to add and subtract within 10, understanding that addition is putting together and adding to, and subtraction is taking apart and taking from, with 80% accuracy. (K.MATH.13) | **Grade Average** | | |
|---|---|---|---|---|
| **Goal 3** | | **MP1** | **MP2** | **MP3** |
| | | **STO 1:** 40% **STO 2:** 40% **STO 3:** 50% | **STO 1:** 60% **STO 2:** 60% **STO 3:** 60% | **STO 1:** 70% **STO 2:** 70% **STO 3:** 70% |

| STO 1: With fading support, Rex will represent addition as "putting together" utilizing objects, fingers, mental images, drawings, sounds (e.g., claps), acting out situations, verbal explanations, expressions, or equations with 80% accuracy. **In progress** |
|---|
| STO 2: With fading support, Rex will represent subtraction as "taking away" utilizing objects, finger counting, mental images, drawing, sounds (e.g. claps), acting out situations, verbal explanations, expressions or equations with 80% accuracy. **In progress** |
| STO 3: With fading support, for any number from 1 to 9, Rex will find the number that makes 10 when added or subtracted to the given number, e.g., by using objects or drawings, and record the answer with a drawing or equation with 80% accuracy. **In progress** |

**Comments:**
Rex benefits from a small structured group learning utilizing the *Eureka Math* curriculum. Rex's Math average for MP3 is composed of both summative and informal assessment (teacher observations) covering the content of the short term objective and long term goals. Rex demonstrates mastery in identifying number names in the standard order from 0 to 20, pairing each object with one and only one number when counting using manipulatives such as counting cubes, and the Rekenrek. Rex shows understanding that one tens, and some ones equal a teen number. For example, Rex is able to identify 10 ones, and 5 ones as 15.

Rex has shown significant progress towards his ability to identify and compare numbers with measurable attributes between 0 to 100. With consistent explicit instructions, Rex's ability to identify double digit numbers is emerging. For example, using the 100 charts visual chart, Rex is able to point to double digit numbers both in sequential order, and non-sequential order.

Rex continues to target addition and subtraction within 10, using the appropriate symbols (e.g. =,+,-). Rex is able to decompose numbers 1-10 using a number bond to show parts and the whole when given visuals and/or manipulatives.

*The Titus School*     90 John Street     New York, NY 10038     646-756-4103
info@thetitusschool.com     Fax 212-656-1426     www.thetitusschool.com     PE160
MP2–Francis, R Page 10

Received Office of State Review
01/09/2024



When given a teacher-made visual for the number sentence (__+__=__) Rex is able to use the number bond to create a completed addition sentence. For example, if Rex completes a number bond decomposing 5 into 3 and 2 Rex is able to fill in the blanks of the number bond visual aide to construct the addition sentence 3+2=5. Rex will continue to work on this skill through the use of anchor charts, kinesthetic movements, musical songs and various manipulatives.

Rex receives the class-wide supports of scaffolded learning targets, slow paced learning and frequent movement breaks throughout class.  New information is presented in a variety of ways using multiple modalities (e.g. kinesthetic movements, musical songs, hands-on activities, and visual aids). Rex requires check-ins with the teacher throughout class to ensure understanding and attention to the content being taught. When given independent work Rex is eager to participate, however often becomes anxious and benefits from a teacher " check-in" to ensure understanding of the directions, and confirmation of completing his task more efficiently. Rex benefits from support and prompting throughout class from a behavior therapist. Rex benefits from  multiple opportunities and extended time for informal and formal assessments such as project based assessments, verbal assessments, and written assessments. Written assessments are read aloud with a scribe as needed to ensure that it is a true measure of his understanding.

---

ELA Instructor: Angela Merino M.S.Ed
Grade Level: Kindergarten

| Goal 1 | LTG: With fading support, Rex will identify and answer questions related to key ideas and details related to a text read aloud with 80% accuracy. (K.EL AL.7) | Grade Average | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | STO 1: 60% STO 2: 60% STO 3: 50% | STO 1: 65% STO 2: 65% STO 3: 65% | STO 1: 70% STO 2: 70% STO 3: 70% |

| | STO 1.1 With fading support, Rex will demonstrate ability to retell and sequence events from the beginning, middle, and end of familiar stories verbally and completing teacher made materials with 80% accuracy. **In progress** |
|---|---|
| | STO 1.2 With fading support, Rex will identify characters, settings, and major events in the read aloud story with 80% accuracy. **In progress** |
| | STO 1.3: With fading support, Rex will create and/or utilize existing visual supports from the book to answer "wh" questions related to the key details dung group read-aloud with 80% accuracy. **In progress** |

| Goal 2 | LTG: With fading support, Rex will demonstrate knowledge and apply phonic and word analysis skills in decoding words with 80% accuracy. (K.ELAL.3) | Intervention Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |

---

***The Titus School***      *90 John Street*      *New York, NY 10038*      *646-756-4103*
info@thetitusschool.com      *Fax 212-656-1426*      www.thetitusschool.com      PE161

Received Office of State Review
01/09/2024

PE162



THE Titus School

| | | STO 1: 70% STO 2: 60% STO 3: 60% | STO 1: 80% STO 2: 80% STO 3: 80% | Goal Mastered in MP2 |
|---|---|---|---|---|
| | STO 1: With fading support, Rex will demonstrate basic knowledge of one-to-one letter-sound correspondences by producing the primary sound or many of the most frequent sounds for each consonant with 80 % accuracy with 80% accuracy. **Objective met** | | | |
| | STO 2: With fading support, Rex will demonstrate ability to differentiate between consonant and vowel letters, as well as identifying short vowel sounds with 80% accuracy. **Objective met** | | | |
| | STO 3: With fading support, Rex will recognize and produce spoken rhyming words by identifying key ending sounds to establish fluency with 80% accuracy. **Objective met** | | | |

| NEW Goal 2 | LTG: With fading support, Rex will demonstrate an emerging understanding of spoken words, syllables and sounds (phonemes) (K. EL AL.2) and apply phonics and word analysis skills in decoding words with 80% accuracy. K.ELAL. 3 | Intervention Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | - | | STO 1: 60% STO 2: 60% STO 3: 60% |
| | STO 1: With fading support, Rex will demonstrate ability to blend and segment onsets (beginning) and rimes (ending) of spoken words with 80% accuracy.  **In progress.** | | | |
| | STO 2: With fading support, Rex will demonstrate ability to decode short vowel sounds with common spellings with 80% accuracy. **In progress.** | | | |
| | STO 3: With fading support, Rex will demonstrate ability to decode some regularly spelled one-syllable words with 80% accuracy. **In progress.** | | | |
| | STO 4: With fading support, Rex will read common high-frequency/"trick" words by sight with 80% accuracy. **In progress.** | | | |

| Goal 3 | LTG: With support as needed, Rex will write one complete simple sentence using appropriate punctuation, proper | Intervention Progress | | |
|---|---|---|---|---|

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com

PE162

MP2–Francis, R Page 12

Received Office of State Review
01/09/2024

PE163



| capitalization, and grade level phonemic awareness and spelling conventions with 80% accuracy. (K.ELAL.14) | MP1 | MP2 | MP3 |
|---|---|---|---|
| | **STO 1**: 60% **STO 2**: 50% **STO 3**: 40% | **STO 1**: 65% **STO 2**: 65% **STO 3**: 60% | **STO 1**: 70% **STO 2**: 70% **STO 3**: 70% |

STO 1: With support as needed, Rex will encode familiar and unfamiliar CVC, CCVC, and CVCC words with and without digraphs, in isolation, using grade level phonemic awareness with 80% accuracy. **In progress**

STO 2: With support as needed, Rex will differentiate the function of punctuation including a period, exclamation mark and question mark with 80% accuracy. **In progress**

STO 3: With support as needed, Rex will be able to create one simple sentence, with proper capitalization, punctuation and grade level phonemic awareness and spelling conventions with 80% accuracy. **In progress**

**Comments:**

Rex benefits from a small structured group learning utilizing the *Wilson Fundations* curriculum. Rex's ELA goals are composed of phonic instruction, comprehension and early writing. Rex's grade average for MP3 includes data from both summative, formative and informal assessments (i.e. teacher observations) with materials covered meeting his short term and long term goals. Rex  benefits from extended response time, and repeated opportunities given to him. Rex demonstrates an increased ability to identify key details of the story such as characters, setting, and problem-solution concept. He shows ability to answer open questions in the form of "wh" questions related to the story being read. Rex's ability to engage in class discussion during read-aloud has increased, however he still benefits from multiple teacher reminders to engage in the story.

Rex benefits from repeated instruction, visual schedules, and small group instruction meeting this goal. Rex has improved his ability to recognize onset and rimes in a sentence. Rex is able to identify the beginning single syllable word before the vowel, and the rime is a part of a word that contains the vowel and letter that follows. For example, in a three letter word /p/ /a/ /n/, Rex is able to distinguish the onset being /p/, and rime being /an/. Rex shows ability to decode words with short vowel sounds of similar spelling more consistently. For example, Rex developed fluency in his ability to read the following words:  mat, cat, sat, bat, pat, duck, quick, quack, shop, chop, and thin. Lastly, Rex has improved his ability to read high frequency/trick words with accuracy in spelling and writing. The list of trick words/high frequency words in the Unit are as follows: and, the, they, as, has, is, his, you, are, to, we, he, she, be, me.

Rex' encoding skills of CVC words has tremendously improved. He shows confidence in writing the lowercase and uppercase letters. Rex continued to benefit from repeated reminders to follow the correct formation of both capital and lowercase letters. Rex is beginning to understand the functions of punctuation but has not shown accuracy in using them in a sentence. He shows some understanding that a period is used for statement sentences, a question mark for sentences with questions, and an exclamation mark for sentences requiring expressions/emotions. Lastly, Rex shows

Received Office of State Review
01/09/2024

PE164



improvement in writing one complete sentence following with the beginning capital letter and spelling accuracy. Rex will continue to work on his target ELA skills over the next marking period utilizing differentiated instruction and academic support in order to help him meet his learning goals.

History/Science Instructor: Angela Merino M.S.Ed
Grade Level: 1st Grade

| History | LTG: With fading support, Rex will demonstrate an understanding of topics, such as civic participation, chronological awareness, and interpreting evidence with an 80% accuracy. (K.SOC.14) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | 50% | 60% | 65% |
| | STO 1: With fading support, Rex will use prior knowledge to gain understanding and make meaningful connections with personal experience to topics such as geography and community. **In progress** | | | |
| | STO 2: With fading support, Rex will use prior knowledge to gain understanding and develop a shared sense of history, community, and culture through the study of American symbols, American Heroes, holidays, and celebrations. **In progress** | | | |
| | STO 3: With fading support, Rex will demonstrate an understanding of civic participation. **In progress.** | | | |

| Science | LTG: With fading support, Rex will be able to develop "WH" questions and conduct investigations on the following topics with an 80% accuracy. (K.SCI.5) | Grade Average | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | | 50% | 60% | 65% |
| | STO 1: With fading support, Rex will be able to develop "WH" questions and conduct investigations of the different types of energy such as Light energy, Sound energy, and Heat energy. **In progress** | | | |
| | STO 2: With fading support, Rex will be able to develop "WH" questions, and conduct investigations of Animals, Plants and their environment. **In progress** | | | |
| | STO 3: With fading support, Rex will be able to develop "WH" questions and conduct investigations of Sky/Earth, Weather and Climate. **In progress** | | | |

**History comment:**
Rex's social studies instruction is being provided in the form of thematic units, as well as through the *My World Interactive (Savvas Learning Company)*. Rex has made progress in the understanding of social studies topics. He is expanding his specialty vocabulary words that directly relate to social studies. Rex is currently learning about the American symbols, American heroes, traditions, cultures and holidays celebrated in the country. With teacher support, his ability to participate during class discussion is emerging. Currently, Rex demonstrates his understanding through representational drawings, and verbally answering "WH " questions after new information is presented to him and

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com              *Fax 212-656-1426*              www.thetitusschool.com        PE164
                                                                        MP2–Francis, R Page 14

Received Office of State Review
01/09/2024                              P - M 14 of 29

PE165



while completing an in-class worksheet. Rex will continue to work towards this goal utilizing multiple modalities such as visual aides, kinesthetic movements, musical songs, and hands-on activities to deepen his understanding. Additional educational support and strategies will also be put in place to help Rex attend to the material in class.

**Science comment:**

Rex's science instruction is being provided in the form of thematic units, as well as through the *Elevate Science (Savvas Learning Company)* curricula. Rex has made moderate progress in his understanding of science topics. Rex is currently learning scientific vocabulary related to the following topics: Sounds, Light, Change of Season/Weather, Living and Non-Living things. Rex demonstrates an understanding of these science concepts by correctly answering "WH" questions related to the topic. He is able to show his understanding through drawing, completing in-class worksheets, and participating in a class discussion related to the topic. Rex's ability to actively participate is emerging, he continues to require significant support from teacher/therapist to attend to and interact with the lesson and materials presented to him. It is noted that Rex benefits from hands-on activities and project-based learning to support a multimodal learning opportunity.

## Assessment Results

| Math Assessment Results | | | ELA Assessment Results | | |
|---|---|---|---|---|---|
| *Date of assessment* | *Assessment Type* | *Score Breakdown* | *Date of assessment* | *Assessment Type* | *Score Breakdown* |
| 09/30/2022<br><br>10/26/2022<br><br>11/09/2022<br><br>11/14/2022 | Eureka Math: Kindergarten Module 5 | Topic A: Count 10 Ones and Some Ones Lesson 4 and 5 Exit Ticket: 2/4= 50%<br><br><br>Topic B: Compose Numbers 11-20 from 10 ones and Some ones: Represent and Write Teen numbers. Lesson 8 Exit Ticket: 2/4= 50%<br><br>Topic C: Compose Numbers 11-20 from 10 ones and Some ones; Represent and Write Teen numbers. | 10/18/2022 | Wilson Fundations Intervention Placement Inventory | Names Letters: 100% Sound to Letter Correspondence: 90% Write Letters/Words: 65% Read Words: 12% |

**The Titus School**        90 John Street        New York, NY 10038        646-756-4103
info@thetitusschool.com        Fax 212-656-1426        www.thetitusschool.com

PE165

MP2–Francis, R Page 15

Received Office of State Review
01/09/2024

PE166



| | | | | | |
|---|---|---|---|---|---|
| | | Lesson 12 Exit Ticket 2/5 40%<br><br>Topic D: Extend the Say Ten and Regular Count Sequence to 100. Lesson 15 Exit Ticket 2/5 40% | | | |
| 01/12/2023 | Eureka Math End of Module 5 Assessment | Topic D: Extend the Say Ten and Regular Count Sequence to 100. Score: 8/14 (60%)<br><br>Topic E: Represent and Apply Compositions and Decomposing of Teen Numbers Score: 9/14 (60%) | 9/19/22-9/21/2022 | ReadyGen Kindergarten Baseline Assessment | Readiness: 4/8<br>Letter Recognition: 12/12<br>Phonemic Awareness: 9/12<br>Comprehension: 3/6<br>Vocabulary: 4/6<br>Writing: 0/2 |
| | | | 01/11/2023 | Wilson Fundations Unit 2, Level K | Blend Sounds to Form Word Score: 5/5<br>Read CVC Words Score: 9/10<br>Correctly Forms Upper-Case letters Score: 10/10<br>Correctly Names Letters in Alphabet Order Score: 100% |
| 04/10/2023 | Grade 1: Readiness Test | Score: 22/24 91.6% | 05/05/2023 | Wilson Fundations Unit 4 Test, Level K. | Sounds for Vowels and Digraphs Score: 10/10<br>Correctly Taps and Reads Words Score: 2/ 5<br>Identifies Trick Words Score: 10/10 |

**The Titus School**     **90 John Street**     **New York, NY 10038**     **646-756-4103**
info@thetitusschool.com     **Fax 212-656-1426**     www.thetitusschool.com

PE166

MP2–Francis, R Page 16

Received Office of State Review
01/09/2024



PE167

| | | | | | Correctly Taps and Spells Words: Score: 3/5 |
|---|---|---|---|---|---|
| | | | 04/04/2023 | Reading A-Z (Decoding Skills) | Level D: Accuracy Rate: 98% Level E Accuracy Rate: 96% |
| | | | 04/05/2023 | Reading A-Z (Comprehension Skills) | Level C Comprehension: % or 80% Level D Comprehension: % or 60% |

**Related Services**

Related services long term goals and short term objectives are determined by formal and informal assessment, dynamic assessment, observation, and clinical expertise. Related services providers record and analyze data as needed.

> **Key**
> **1 -0-10% accuracy or proficiency**
> **2 -11-20% accuracy or proficiency**
> **3 -21-30% accuracy or proficiency**
> **4 -31-40% accuracy or proficiency**
> **5 -41-50% accuracy or proficiency**
> **6 -51-60% accuracy or proficiency**
> **7 -61-70% accuracy or proficiency**
> **8 -71-80% accuracy or proficiency**
> **9 -81-90% accuracy or proficiency**
> **10-Skill Mastered**

**Speech and Language Therapy Goals:**

| |
|---|
| **Provider:** Caitlin McDonagh M.S., CF-SLP, TSSLD; Sara Hannah, M.S. Ed, CCC-SLP, TSSLD **# of Sessions x Duration x Ratio:** 3x30x1:1 |
| Rex's long term goals, short term objectives, and noted progress were determined based on informal assessments, dynamic assessment, observation, and clinical expertise in addition to collaboration with other team members. In April 2023, Rex was informally assessed utilizing the following: |

***The Titus School***      ***90 John Street***      ***New York, NY 10038***      ***646-756-4103***
info@thetitusschool.com      ***Fax 212-656-1426***      www.thetitusschool.com      PE167
MP2–Francis, R Page 17

Received Office of State Review
01/09/2024                    P - M 17 of 29

PE168

# The Titus School

**Expressive Vocabulary Test, Third Edition (EVT-3)** The EVT-3 is used to assess expressive vocabulary and word retrieval. Additionally, it provides information relating to strengths and weaknesses in specific domains of semantics and general language development. Rex's score indicated a mild delay.

**Peabody Picture Vocabulary Test, Fifth Edition (PPVT-5)** The PPVT-5 is used to assess receptive vocabulary. Additionally, it provides information relating to strengths and weaknesses in specific domains of semantics and general language development. Rex's score indicated a moderate delay.

| LTG 1: | Rex will improve his receptive language skills. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will follow simple two-step commands in structured settings and activities with no more than one repetition and one gestural prompt with 80% accuracy over two consecutive sessions. | 9 | STO 1 met in MP2 | |
| | **STO 2:** Rex will follow one-step directions that include the basic simple spatial concept, *in* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities. | - | STO 2 met in MP2 | |
| | **STO 3:** Rex will follow one-step directions that include the basic simple spatial concept, *on* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities. | - | STO 3 met in MP2 | |
| | **NEW STO 4:** Rex will follow one-step directions that contain the advanced spatial concept, *next-to* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities. | - | - | 10 |
| | **NEW STO 5:** Rex will follow one-step directions that contain the advanced spatial concept, *in front of* by manipulating different objects with no more than one verbal cue per trial in 80% of opportunities. | - | - | 10 |

**New Goal:**
**New STO:** When given scenarios of social conflicts, Rex will demonstrate problem-solving skills by identifying the problem and generating one solution appropriate to the situation in 3/5 trials when provided 2 verbal cues per trial.

**Comments:** Rex has made great progress as it pertains to his receptive language skills. Rex has met his objectives relating to following directives that contain basic and advanced level prepositions. Therefore, a new receptive language goal to target problem solving skills and inferencing has been added to target new skills.

| LTG 2: | Rex will improve his expressive language skills. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** After sorting items into different categories, Rex will identify different categories that objects belong to (i.e., desserts, water | 7 | 8 | 10 |

*The Titus School*        *90 John Street        New York, NY 10038*        *646-756-4103*
info@thetitusschool.com              *Fax 212-656-1426*              www.thetitusschool.com    PE168
MP2–Francis, R Page 18

Received Office of State Review
01/09/2024                                    P - M 18 of 29

PE169



| | | | |
|---|---|---|---|
| animals) given no less than three choices in 80% of opportunities across three sessions. | | | |
| **STO 2:** To increase Rex's vocabulary, during sessions, Rex will use strategies (e.g. phonemic cues, semantic cues, etc.) to facilitate word retrieval from his personal lexicon given therapist support and prompting in 80% of opportunities. | 7 | 7 | 8 |
| **STO 3:** Rex will retell a story using pictures (either sequencing pictures or pictures in a book) including at least one detail per picture in 80% of trials with no more than 2 verbal cues per trial over two consecutive sessions. | 6 | 7 | 8 |
| **STO 4:** Rex will answer *who* questions given visual choices with no more than one repetition in 80% of opportunities. | - | 7 | 10 |
| **STO 5:** Rex will answer *where* questions given visual choices with no more than one repetition in 80% of opportunities. | - | 6 | 10 |
| **STO 6:** Rex will use the appropriate third person subjective pronoun (i.e., he, she, they) in phrases and sentences when describing a picture or video given no more than one verbal cue per trial in 4 out of 5 opportunities over three consecutive sessions. | 7 | 8 | 8 |

**New/Amended Goals:**
**Amended STO 2:** When given a semantic cue, Rex will retrieve the word from his personal lexicon to facilitate word retrieval in approximately 80% of opportunities as measured by therapist observation.
**New STO 7:** Rex will answer *who* questions given no more than 1 repetition in 80% of opportunities across 3 separate sessions.
**New STO 8 :** Rex will answer *where* questions given no more than 1 repetition in 80% of opportunities across 3 separate sessions.
**NEW STO 9:** Rex will answer *why* questions the key word "because" given visual choices and no more than 1 repetition in 80% of opportunities across 3 separate sessions.

**Comments:** Rex has made great progress as it pertains to his expressive language skills. Rex is making good progress on increasing his vocabulary through different cues, however, the goal was amended to reflect the level of scaffolding provided to Rex to increase word retrieval. This particular goal yields slower progression due to attention, motivation, and generalization of vocabulary across sessions/settings. Additionally, Rex is working on retelling a story through the use of sequenced picture cards when provided minimal verbal cueing to approximately 70-80% accuracy. Rex benefits from verbal prompting to add salient details to his sentences such as adjectives, verbs and novel vocabulary. When provided with less prompting, Rex uses basic vocabulary (e.g., happy/sad, big/little) and excludes novel information (i.e., details pertaining to pictures or task in question). Lastly, Rex is making steady progress with using the appropriate third person pronoun (i.e., he, she, they) in phrases and sentences when describing sentences and picture scenes to approximately 3 or 4 out of 5 trials with 1-2 semantic cues to indicate a *girl = she* & *a boy = he.*

***The Titus School***      *90 John Street*      *New York, NY 10038*      *646-756-4103*
info@thetitusschool.com      *Fax 212-656-1426*      www.thetitusschool.com      PE169
MP2–Francis, R Page 19

Received Office of State Review
01/09/2024

PE170


The Titus School

| LTG 3: | Rex will improve his pragmatic social skills. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will self-advocate (i.e. "I need help?" Can I take a break") given no more than one verbal prompt two times per session across three sessions | 8 | STO 1 met in MP2 | |
| | **STO 2:** Rex will participate in turn taking by requesting a turn appropriately (i.e. my turn, your turn) five times in an activity with no more than one verbal prompt per activity in 80% of opportunities during structured activities given over three consecutive sessions. | 6 | 8 | 10 |
| | **STO 3:** Rex will engage in three appropriate conversational exchanges with no more than one verbal prompt per conversational exchange across three sessions. | - | 7 | 10 |

**New Goals:**
**New STO:** Rex will recall 2 events from his weekend or earlier in his day when given no more than one verbal or visual prompt or cue per opportunity across three sessions.
**New STO:** Rex will ask his communication partner two different questions (i.e., How are you? What did you do over the weekend?) when provided with a visual and a verbal cue two times throughout a 30-minute session.
**New STO:** Rex will independently engage in three appropriate conversational exchanges with a communication partner (i..e, therapist).

**Comments:** Rex has been making tremendous progress in the area of pragmatic language skills. Recently, Rex has been observed to use language more spontaneously to comment throughout his day or during speech sessions, therefore, new objectives have been added to start working on independence and specificity during conversational exchanges.

**Recommendations:** *It is recommended that Rex continues to receive speech and language therapy services at a rate of three times a week for thirty minutes, individually.*

**Occupational Therapy Goals:**

| **Provider:** Marissa Bernstein, MS, OTR/L, RBT | | | | |
|---|---|---|---|---|
| **# of Sessions x Duration x Ratio:** 3x30x1:1 | | | | |

| LTG 1: | Rex will improve fine motor, visual motor, and bilateral coordination skills for increased independence, completing age-appropriate academic and self-care tasks. | Level of Progress | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will assume and maintain a static tripod grasp with minimal cues during a 3-minute fine motor activity across 3 OT sessions. | 4 | 9 | 9 |

*The Titus School*          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com     PE170
MP2–Francis, R Page 20

Received Office of State Review
01/09/2024                                    P - M 20 of 29



| | | | | |
|---|---|---|---|---|
| **STO 2:** Rex will demonstrate the ability to assume an optimal sitting posture at a desk during fine motor tasks for 7-10 minutes with minimal cues in 2 out of 3 opportunities over 3 consecutive sessions. | 5 | 10 | STO 2 mastered in MP2 |
| **STO 3:** Rex will demonstrate the ability to successfully manipulate clothing and fasteners (i.e., tie and untie shoelaces, fasten and unfasten small sized/small buttons, join both sides of coat to zip and unzip, buckle and unbuckle) with minimal verbal cues in across 3 OT sessions. | 6 | 8 | 8 |
| **STO 4:** Rex will independently write upper and lowercase letters on 3-lined paper demonstrating 90% accuracy with letter formation, letter size, and line orientation in 3 out of 4 trials. | 3 | 5 | 6 |

**New Goals:**

**New STO:** After writing 5 to 8-word sentences, Rex will read over his written work and correct errors with regard to spacing, line orientation, and punctuation utilizing a visual checklist with minimal verbal prompts to utilize the checklist and bring his errors to his attention in 3 out of 4 trials.

**New STO:** Rex will identify 10 differences between two similar images with no more than 3 verbal or visual cues in 2 out of 3 trials.

**New STO:** Rex will demonstrate the ability to tie his robe into a simple knot with minimal verbal and tactile cues in 2 out of 3 trials.

**Amended STO 3:** Rex will demonstrate the ability to tie his shoes with minimal verbal and tactile cues in 2 out of 3 trials.

**Comments:** Rex has made progress in his ability to manipulate clothing. At this time, the goal is being amended to work on his ability to tie his shoes and tie a robe as these goals are most important to Rex. At this time, Rex is able to tie a robe with moderate assistance. Rex is still working on tying shoes; he is able to make the "X" and tuck one lace in the hole with minimal to moderate assistance for tucking the lace in the correct hole and pulling both laces to complete step one. Following step one of tying shoes, Rex requires hand-over-hand assistance to execute the remaining steps. Rex is able to write upper and lowercase letters on 3-lined paper with 50-60% accuracy for line orientation, letter sizing, and letter formation in 3 out of 4 trials. Although Rex does not utilize a tripod grasp pattern during a 3-minute handwriting activity, his current preferred grasp is functional, as demonstrated by improved writing legibility, accuracy, and endurance. Therefore, STO 1 will be discontinued, though sessions will continue to target Rex's intrinsic hand strength and fine motor control for greater success and independence in academic tasks.

| **LTG 2:** | **Rex will demonstrate improved sensory processing, motor planning, and self-regulation skills in order to increase participation and independence in activities of daily living, academic learning, play, and peer interactions.** | **Level of Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |

***The Titus School***          *90 John Street*          *New York, NY 10038*          *646-756-4103*
info@thetitusschool.com          *Fax 212-656-1426*          www.thetitusschool.com  PE171
MP2–Francis, R Page 21

Received Office of State Review
01/09/2024

PE172



| | | | | |
|---|---|---|---|---|
| | **STO 1:** Rex will demonstrate improved regulation following sensory input as demonstrated by the ability to sustain attention to a therapist directed fine motor task for 4-6 minutes with minimal verbal cueing on 2 out of 3 occasions. | 10 | STO 1 mastered in MP1 | |
| | **STO 2:** Rex will safely navigate a 3-4 step obstacle course with minimal cues for redirection across 3 OT sessions. | 10 | STO 2 mastered in MP1 | |
| | **STO 3:** When becoming upset, frustrated, or angry within an OT session, Rex will request a break or calming sensory strategy with minimal prompting on 2 out of 3 occasions. | 6 | 8 | 10 |
| | **STO 4:** Rex will demonstrate improved regulation following sensory input as evidenced by sustained attention to a therapist directed task for 10 minutes with no more than 3 verbal cues in 4 out of 5 trials. | - | 9 | 9 |
| | **STO 5:** Rex will follow a simple 3-step direction in a distracting environment with less than 2 repetitions by therapist in 3 out of 4 trials across 3 occupational therapy sessions. | - | 5 | 6 |

**New Goals:**

**New STO:** Rex will complete showering routine (washing hair and body) using visual sequencing cards with no more than 3 verbal cues for increased functional independence in daily life in 2 out of 3 trials.

**New STO:** With movement breaks as needed (e.g., bear walk 20 feet) and the use of self-regulation strategies (i.e., bear walk, jumping up and down, running), Rex will continuously engage in a tabletop academic task for 15 minutes with no more than 3 cues for redirection in 2 out of 3 trials to demonstrate improved ability to self-calm and inhibit off task behavior.

**Comments:** Following sensory input, Rex has demonstrated improvements in his self-regulation skills, noted by his ability to sustain his attention to a therapist-directed task for 10 minutes with an average of 3-5 cues for redirection depending on the environment and his arousal level in 4 out of 5 trials. Rex is able to follow a simple 3-step direction in a distracting environment with continuous verbal and visual cues to complete all the directions from start to finish in 3 out of 4 trials during occupational therapy.

| LTG 3: | **Rex will demonstrate increased independence with activities of daily living.** | **Level of Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | **STO 1:** Rex will effectively use a knife to cut his food, spear the food with a fork and place it in his mouth without spillage independently in 3 out of 4 trials. | 3 | 10 | STO 1 mastered in MP2 |
| | **STO 2:** Rex will demonstrate the ability to manipulate and orient clothing (i.e. tags in the back, turning clothes inside out etc.) with | 8 | 10 | STO 2 mastered in |

***The Titus School***          **90 John Street**          ***New York, NY 10038***          **646-756-4103**
info@thetitusschool.com          **Fax 212-656-1426**          www.thetitusschool.com   PE172

Received Office of State Review
01/09/2024

PE173



| | | MP1 | MP2 | MP3 |
|---|---|---|---|---|
| | minimal assistance in 3 out of 4 opportunities across 4 occupational therapy sessions. | | | MP2 |
| | **STO 3:** Rex will display age-appropriate grasp patterns on eating utensils, and feed himself with horizontal hand-to-mouth motion and correct postural alignment while seated at table, with minimal prompts in 4 out of 5 trials. | 7 | 10 | STO 3 mastered in MP2 |

**Comments:** At this time, Rex has made improvements in his success at completing activities of daily living. He continues to work on his fine motor skills, visual motor skills, and bilateral coordination skills needed for completing more specific tasks in his daily routine.

**Recommendations:** *It is recommended that Rex continues to receive occupational therapy services at a rate of three times per week for 30 minutes individually.*

**Physical Therapy Goals:**

**Provider:** Avital Akman, PT, DPT
**# of Sessions x Duration x Ratio:** 2x30x1:1

| LTG 1: | Rex will demonstrate increased strength to promote improvements in posture and the ease and efficiency of functional mobility. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will independently utilize the mature half-kneel pattern when moving from the floor to a standing position without upper extremity support and without loss of balance in 4/5 trials. | 6 | 10 | STO 1 mastered in MP2 |
| | **STO 2:** Rex will be able to jump over an object or hurdle with a height of 6 inches independently using the proper two-footed take off and landing pattern and maintain his balance upon landing in 4/5 trials. | 10 | STO 2 mastered in MP1 | |
| | **STO 3:** Rex will be able to jump over an object or hurdle with a height of 10 inches independently using the proper two-footed take off and landing pattern and maintain his balance upon landing in 4/5 trials. | - | 6 | 10 |
| | **STO 4:** Rex will be able to independently hop forward 4 times consecutively on each foot with control, as established by accurately landing on floor targets positioned in a straight line 3 inches apart from one another 80% of the time in 4/5 trials. | 3 | 10 | STO 4 mastered in MP2 |
| | **New STO 5:** Rex will assume and sustain a plank position, maintaining adequate hip extension and proximal stability, for 6 seconds in 4/5 trials. | - | - | 4 |

Received Office of State Review
01/09/2024

PE174



| | New STO 6: Rex will be able to independently hop forward 5 times consecutively on each foot with control, as established by accurately landing on floor targets positioned in a straight line 3 inches apart 80% of the time in 4/5 trials. | - | - | 9 |
|---|---|---|---|---|

**New Goals:**
**New STO:** Rex will be able to perform 10 consecutive sit-ups when provided with bilateral ankle support and no more than one verbal prompt, without demonstrating any compensatory strategies in 4/5 trials.

**Comments:** At this time, Rex is able to assume the proper body position for a high plank when provided with moderate to maximal visual, verbal, and tactile prompts. Once in position, he is able to maintain a neutral trunk and proper upper/lower extremity alignment for 6 seconds when provided with moderate verbal/tactile prompts, in 2 out of 5 attempts. Without the aforementioned support, he quickly reverts to a pose resembling downward dog or cobra, secondary to decreased proximal muscle strength/endurance. Rex continues to make good progress with his hopping skills, as evidenced by his ability to perform 5 consecutive hops across spot markers positioned 3 inches apart, on each leg, in 3 out of 5 attempts. This marking period, a new goal is being added to further target core strength and facilitate continued progress towards his physical therapy objectives.

| LTG 2: | Rex will demonstrate improved body awareness and balance for increased safety during environmental negotiation and gross motor activity. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | Amended STO 1: Rex will be able to safely descend 2 flights of stairs using a reciprocal pattern while holding an object(s) in both hands, without upper extremity support and without relying on visual input in 4/5 trials. | - | - | 9 |
| | STO 2: Rex will be able to maintain his balance in single-limb stance on each leg for 10 seconds without upper extremity support and with no more than minimal postural sway in 4/5 trials. | 4 | 5 | 5 |
| | STO 3: Rex will be able to ambulate across a 3-inch-wide, 8-foot-long stable balance beam without upper extremity support and without stepping off or demonstrating loss of balance in 4/5 trials. | 6 | 6 | 10 |

**New Goals:**
**New STO:** Rex will bounce and catch a playground-sized ball while standing on an unsteady surface (e.g., BOSU ball) 10 times consecutively, without stepping off and without external support, following a single model in 4/5 trials.

**Amended STO 2:** Rex will be able to maintain his balance in single-limb stance on each leg for 6 seconds without upper extremity support and with minimal cues for proper sequencing in 4/5 trials.

**Comments:** While carrying a heavy object (3.5 Lb. weighted sandbag), Rex is able to descend 2 flights of stairs using a consistent reciprocal pattern without external support with good consistency. He continues to demonstrate mild



PE175

dependence on visual input to assist with proprioception, as he occasionally moves the object outside his field of vision to look down at the stairs and avoid losing his balance. When assuming a single-limb stance, Rex continues to be able to maintain his balance on his right lower extremity for 10 seconds in 3 out of 5 trials and his left lower extremity for 10 seconds in 1 out of 5 trials. He requires moderate visual and verbal cues for proper sequencing and benefits from an environment with minimal distractions. For this reason, his goal is being amended to allow increased assistance in order to better support progress in this skill.

| LTG 3: | Rex will demonstrate improved coordination and motor planning skills allowing greater independence in various activities throughout the day. | Level of Progress | | |
|---|---|---|---|---|
| | | MP1 | MP2 | MP3 |
| | **STO 1:** Rex will be able to perform 6 jumping jacks with fair upper and lower extremity synchronization, rhythm, and fluidity with minimal verbal cues in 4/5 trials. | - | 3 | 4 |
| | **STO 2:** Rex will be able to throw a small ball (tennis ball-sized) using underhand mechanics so it travels across a distance of 5 feet to an eye-level target with fair accuracy, reaching the target 80% of the time with minimal cues for form and motor gradation in 4/5 trials. | - | 10 | STO 2 mastered in MP2 |
| | **STO 3:** Rex will demonstrate improved running form, as established by the emergence of mature components including increased trunk rotation, a forward truncal lean, and increased push-off, allowing him to complete a 50 foot shuttle run in 13 seconds in 4/5 trials. | - | 4 | 5 |
| | **New STO 4:** Rex will be able to throw a small ball (tennis ball-sized) using underhand mechanics so it travels across a distance of 5 feet to an eye-level target with fair accuracy with minimal cues for form and motor gradation in 4/5 trials. | - | - | 7 |

**Comments:** Rex is able to perform 4 consecutive jumping jacks before demonstrating a loss of upper/lower extremity synchronization when provided with minimal visual prompts and moderate to maximal verbal prompts for "open, close." He continues to benefit from initially practicing this task at a reduced pace and in part-task components before putting the movements together as one cohesive motor task. Rex is able to complete a 50-foot shuttle run in less than 13 seconds in 2 out of 5 trials. He benefits from minimal to moderate visual and verbal prompts to include a reciprocal arm swing to help improve his running speed and efficiency. Lastly, Rex is able to throw a small ball underhand to hit a target positioned 5 feet away with 70 accuracy. He benefits from minimal to moderate visual and verbal prompts to take a reciprocal step forward before releasing the ball and minimal verbal prompts to grossly grade his motor output to adjust the distance the ball will travel in accordance with the position of the target.

**Recommendations:** *It is recommended that Rex continues to receive physical therapy services at a rate of two times per week for 30 minutes individually.*

**Mental Health Services**

**The Titus School**      90 John Street      New York, NY 10038      646-756-4103
info@thetitusschool.com      Fax 212-656-1426      www.thetitusschool.com   PE175
MP2–Francis, R Page 25

Received Office of State Review
01/09/2024

P - M 25 of 29

PE176



Mental Health services long term goals and short term objectives are determined by formal and informal assessment, dynamic assessment, observation, and clinical expertise. Mental Health providers record and analyze data as needed.

> **Key**
> 1 - Requires significant prompting
> 2 - Requires moderate prompting
> 3 - Requires minimal prompting
> 4 - Occasionally performs skill independently
> 5 - Regularly performs skill independently

**Counseling Goals:**

| Provider: Meghan Keenan LMSW | | | |
|---|---|---|---|
| **# of Sessions x Duration: 1x30 per week individually** | | | |
| Rex's long term goals, short term objectives, and noted progress were determined based on assessments, observation, clinical expertise in addition to collaboration with other team members. | | | |

| Goal 1 | **LTG: Rex will build therapeutic rapport with the social worker to create a safe and trusting environment for him. This will be evidenced by his willingness to attend counseling sessions and participate in conversation along with a variety of therapeutic activities.** | **Level of Progress** | | |
|---|---|---|---|---|
| | | **MP1** | **MP2** | **MP3** |
| | | 2 | 3 | 3 |
| | STO 1: Rex will transition to and from counseling sessions with verbal prompting. | 3 | 3 | 3 |
| | STO 2: Rex will engage in counseling activities/directives of the Social Worker's choosing and remain on topic with verbal prompting. | 2 | 3 | 4 |
| | STO 3: Rex will actively participate in counseling activities/directives of the Social Worker's choosing and remain on topic with verbal prompting. | 2 | 2 | 3 |
| Goal 2 | **LTG: Rex will be able to identify and express a variety of feelings as they relate to his environment across a multitude of settings, as evidenced by verbally labeling his emotions accurately while maintaining physical and emotional regulation.** | **Level of Progress** | | |
| | | **MP1** | **MP2** | **MP3** |
| | | 2 | 3 | 3 |
| | STO 1: Rex will be able to accurately label feelings (e.g 'upset', 'Frustrated', 'excited' etc). | 2 | 3 | 4 |
| | STO 3: Rex will identify effective coping skills and relaxation techniques that may assist him in regulating his emotions while | 2 | 2 | 3 |

**The Titus School**          90 John Street          New York, NY 10038          646-756-4103
info@thetitusschool.com          Fax 212-656-1426          www.thetitusschool.com          PE176
MP2–Francis, R Page 26

Received Office of State Review
01/09/2024                                   P - M 26 of 29

PE177


The Titus School

| | distressed. | | | |
|---|---|---|---|---|

**Comments:** Rex and the social worker have continued to maintain a strong therapeutic rapport as evidenced by his eagerness to attend counseling when verbally reminded of his session time as well as his willingness to engage in presented activities chosen by the social worker. He responds well to the use of a first/then contract where he gets to choose a preferred activity after successfully completing the presented activity. He benefits from minimal verbal and visual prompting throughout the activity to remain actively engaged as he does demonstrate off task behavior such as making comments unrelated to the task at hand or repeating the statements/questions the social worker verbalizes rather than responding in his own words or stating that he doesn't understand. However, he is responsive to minimal prompts to re-engage and works diligently to complete his task to the best of his ability. Through the use of role play and modeling, Rex has demonstrated progression in his ability to identify and practice coping skills to maintain physical and emotional regulation. However, he continues to struggle with bridging the gap between the coping skills he has learned and practiced during sessions, and utilizing them during moments of distress. The social worker and Rex will continue to work on pairing a labeled emotion with a coping skill to increase his recognition of when to utilize coping skills and appropriately manage his negative feelings. In addition, the social worker and Rex will continue to work on rapport building in order to provide him with a safe space to express his thoughts and feelings.

**Recommendations:** *It is recommended that Rex continue to receive counseling services at a rate of one time a week for 30 minutes individually.*

**Music Therapy Goals:**

| Provider: Michelle Geisler, MA, MT-BC, LCAT-LP | | | | |
|---|---|---|---|---|
| Session Ratio: 1x30 minutes individual session per week | | | | |
| Goal 1 | **LTG: Rex will build therapeutic rapport with the music therapist in order to establish a safe and trusting therapeutic environment, as evidenced by a willingness to attend music therapy sessions and engage in music-based interventions.** | **Level of Progress** | | |
| | | **MP1** | **MP2** | **MP3** |
| | | **4** | **4** | **4** |
| | STO 1: Rex will transition to and from music therapy sessions with fading verbal prompts | **4** | **5** | **5** |
| | STO 2: Rex will engage musically and conversationally with the music therapist | **4** | **4** | **4** |
| | STO 3: Rex will maintain physical and emotional regulation while engaging with the music therapist | **4** | **4** | **5** |
| | STO 4: Rex will engage in musical experiences of the music therapist's choosing and remain engaged with fading verbal prompts | **2** | **4** | **4** |
| Goal 2 | **LTG: Rex will improve his ability to express himself verbally and non-verbally while exploring different instruments and music mediums during music therapy.** | **Level of Progress** | | |
| | | **MP1** | **MP2** | **MP3** |

*The Titus School*    *90 John Street*    *New York, NY 10038*    *646-756-4103*
info@thetitusschool.com    *Fax 212-656-1426*    www.thetitusschool.com    PE177
MP2–Francis, R Page 27

Received Office of State Review
01/09/2024                    P - M 27 of 29

PE178



| | | 3 | 3 | 3 |
|---|---|---|---|---|
| | STO 1: Rex will identify and express at least 2 emotions during music therapy sessions. | 2 | 2 | 3 |
| | STO 2: Rex will engage musically using at least two different music mediums (i.e. singing, playing piano, songwriting) | 4 | 3 | 3 |

**Comments:** Rex began working with this music therapist in September 2022 and continued to build rapport with the music therapist over the course of the marking period.  He transitioned smoothly to and from sessions, and he was highly engaged with the therapist both during sessions and throughout the school week.  Though Rex's affinity for Moana remained apparent, he continued to broaden his musical horizons by requesting songs from other movies/artists and allowing the music therapist to choose songs each session. Rex was initially resistant to singing preferred familiar songs with guitar accompaniment (without the recording or video) but became more engaged in this over time.  By the end of the marking period, he consistently sang along, both solo and with the music therapist.  When provided with percussion instruments, Rex was able to keep a steady beat. He appeared to enjoy drumming to the music and sometimes requested to do so.  Rex's emotional vocabulary seems to have expanded this marking period.  Though he still consistently said "happy" when asked how he was feeling, he acknowledged feelings of frustration and nervousness, both with and without prompting.  Going forward, the music therapist will continue to build rapport with Rex, support him in deepening his relationship with music, and encourage him to utilize music as a means of emotional expression.

**Recommendations:** *It is recommended that Rex continue to receive music therapy services at a rate of 1x30 minutes individual session weekly.*

**Art Therapy Goals:**

| **Provider: Chris Beirne LCAT, ATR-BC** | | | | |
|---|---|---|---|---|
| **# of Sessions x Duration: 1 x 30 individual session per week** | | | | |
| Rex's long term goals, short term objectives, and noted progress were determined based on assessments, observation, clinical expertise in addition to collaboration with other team members. | | | | |
| Goal 1 | Rex will build the therapeutic rapport with the art therapist to ensure that trust and safety can occur, as evidenced by a willingness to attend art therapy sessions, and willingness to engage in making art with a variety of materials. | **Level of Progress** | | |
| | | **MP1** | **MP2** | **MP3** |
| | | - | - | 3 |
| | STO 1: Rex will transition smoothly to and from art therapy sessions. | - | - | 3 |
| | STO 2: Rex will willingly engage in art making activities for 15-20 minutes while maintaining physical regulation (staying in seat, refraining from eloping). | - | - | 3 |
| Goal 2 | **Rex will utilize his art therapy sessions by identifying and expressing a variety experienced/felt of emotions .** | **Level of Progress** | | |

Received Office of State Review
01/09/2024



PE179

|  |  | MP1 | MP2 | MP3 |
|---|---|---|---|---|
|  |  | - | - | 2 |
|  | STO 1: Rex will be able to accurately label feelings (e.g 'upset', 'Frustrated', 'excited' etc) and determine the intensity of said feeling by utilizing paint colors as a measuring tool or thermometer (e.g red = angry / blue = cool). | - | - | 3 |
|  | STO 2: Rex will verbally express experienced/felt emotions and use them appropriately in context during the art making process. | - | - | 2 |

**Comments:** Rex commenced working with the art therapist in mid-April, 2023. Since then, Rex has willingly attended art therapy sessions and presents open to work with the art therapist. The primary focus of Rex's work with the art therapist at this early juncture has been building a therapeutic rapport in order to create a safe and supportive environment. Rex and the art therapist are doing this while working with and exploring different art media and directives in order to locate the most appropriate means for Rex's creative expression and artistic growth. Moving forward, the art therapist will continue to build rapport and support Rex in strengthening his connection with the process of creative expression. Additionally, Rex and the art therapist will begin to explore ways for him to express his thoughts and feelings while utilizing different art media during the art making process.

**Recommendations:** *It is recommended that Rex continue to receive art therapy services at a rate of one 30 minute individual session per week.*

**Comments:**
Rex significantly benefits from learning in a small group setting with frequent kinesthetic breaks, visual aids, and trained behavior staff to support him during class. Rex has made continuous progress in his academic classes when material is presented at a slow pace, and new material is presented in a variety of multi-sensory ways so that he can retain the information and generalize skills across other settings. It is recommended that Rex continue within a small classroom setting, with 8:5 staff to student ratio, where he can receive support across instructional sessions, classroom routines, and lessons in order to acquire, maintain and generalize skills.

---

*The Titus School*        *90 John Street*        *New York, NY 10038*        *646-756-4103*
info@thetitusschool.com        *Fax 212-656-1426*        www.thetitusschool.com
PE179

Received Office of State Review
01/09/2024

## Search Results

PE180

| Select | First Name | MI | Last Name | City | State | Registration Status |
|--------|-----------|-----|-----------|------|-------|---------------------|
| ● | NATALIE | | BRANDEFINE | CLOSTER | NJ | Registered Inactive |

**View Details**

## Search Results

| Certificate Title | Issue / Effective Date | Expiration Date | Status |
|-------------------|------------------------|-----------------|--------|
| Students With Disabilities (Birth-Grade 2) Professional Certificate | 08/28/2014 | | Issued |
| Early Childhood Education (Birth-Grade 2) Professional Certificate | 11/17/2016 | | Issued |
| Students With Disabilities (Birth-Grade 2) Initial Certificate | 12/24/2013 | 01/31/2019 | Expired |
| Early Childhood Education (Birth-Grade 2) Initial Certificate | 09/01/2012 | 08/31/2017 | Expired |

PE180

**Certified by the State of New York solely for purposes of employment by the City School District of the City of New York and the operation of the School District.**

Received Office of State Review
01/09/2024

P - N 1 of 1

PE181

**Rex Francis Progress Report May 2023**
**Little Green Tugboat, LLC**

| | |
|---|---|
| Child's Name: | Rex Francis |
| Child's Age: | 9.1 years old |
| Child's DOB: | 4/14/2014 |
| Date of report: | 5/28/2023 |

| | |
|---|---|
| Supervisor: | Stephanie Koh, M.A., BCBA, LBA |
| BCBA Certification: | 1-12-12458 |
| NYS License: | 00538-1 |
| NPI: | 1902229107 |
| Tax ID: | 811687096 |
| Email: | steph@littlegreentugboat.com |
| Phone: | 310-428-6102 |

| | |
|---|---|
| Evaluator: | Maren Jacobson, M.A., BCBA, LBA |
| BCBA Certification: | 1-22-62457 |
| NYS License: | 002894 |
| Email: | maren@littlegreentugboat.com |
| Phone: | 262-506-8061 |

**Background Information:**

Rex is a charming, funny, and expressive 9-year old boy who lives in Manhattan, New York with his parents, Halia and Cliff, and older brother, Freddie. Rex has no known allergies nor significant medical history, and tested normal on a hearing assessment. Rex's early development and motor milestones were all within normal range.

Rex's parents had concerns when Rex had stopped talking and sought an evaluation. In June 2016, Rex received a diagnosis of autism spectrum disorder from Dr. Jennifer Cross, MB at Weill-Cornell Medical Center. He then began speech, occupational therapy and in-home ABA therapy through the NYS Early Intervention Program shortly thereafter.

Rex currently attends a self-contained class at The Titus School in New York City for five full days per week. His classroom consists of seven students, one lead teacher, one lead behavior therapist, three behavior therapists and one BCBA classroom supervisor (8:6). During school, he receives individual speech therapy (3x30), individual occupational therapy (3x30), group occupational therapy (2x30), physical therapy (2x30) and group art therapy (1x30). At home, Rex receives up to 10 hours of applied behavior analysis therapy to target independence, social skills, adaptive skills, communication and behavior. The home ABA program includes direct behavioral therapy, parent training and supervision. He also receives private speech therapy once per week as well as private occupational therapy twice per week.

PE181

PE182



**Current level of functioning:**
The Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) arranges skills by levels corresponding to typical performance in three age ranges: Level 1 (0 – 18 months), Level 2 (18 – 30 months) and Level 3 (30 – 48 months). Rex scored a composite score of 162, compared to his December 2022 assessment score of 145, with most of his skills falling in Level 3. Rex has made gains across the tact, visual perceptual skills and matching-to-sample (VP-MTS), social, writing, and listener responding by feature function, class (LRFFC) domains. Rex was also assessed using the VB-MAPP Barriers Assessment which is a tool designed to identify learning and language acquisition barriers that have the potential to impede a child's progress. Rex's current barriers score is 21 compared to his December 2022 barriers assessment score of 34. The decrease in his barriers score indicates that there are less barriers impeding Rex's progress in his treatment although he continues to demonstrate barriers across a variety of domains.

The Social Responsiveness Scale, Second Edition (SRS-2) is a norm-referenced assessment tool consisting of a questionnaire of 65 items measuring social awareness, social cognition, social communication, social motivation and restricted interests and repetitive behavior and was utilized as an aid in Rex's progress report and development of new goals. Rex's SRS-2 results exemplify his core social deficits, which impact his ability to access meaningful social interactions and relationships. His total raw score was 102 with a T-score of 73, sitting on the high end of the moderate range and low end of the severe range. His restricted interests and repetitive behavior raw score was 22 with a T-score of 80, which is in the severe range. Individuals who score in similar ranges demonstrate deficiencies in reciprocal social behavior that are clinically significant and lead to severe interference with everyday social interactions. Scores in this range are strongly associated with a clinical diagnosis of autism spectrum disorder.

**Treatment Observations and Update:**
Rex's applied behavior analysis (ABA) treatment began in August 2020. Since the previous reporting period (December 2022), Rex continues to make improvements in all domains, namely in his social skills, conversational skills, play skills, and academics (reading, writing, and math skills). The spontaneity of Rex's pragmatic and functional language continues to improve and he continues to display an increase in expressive communication through comments, questions, and requests using longer phrases spontaneously and appropriately with various adults and peers across various settings (e.g., home, school, community, camp, etc.).

Rex's utterances have continued to increase in length, frequency, spontaneity and complexity. He expresses himself functionally to obtain wants and needs (e.g., "I want to look first and then go get snacks…Never mind, let's just go get snacks," "I need some space…Excuse me, can I have some space?"). Rex also spontaneously comments on others' conversations when he overhears them (e.g., "But I saw the Blue Man group too." "Mom's going to the store to buy chicken.") and asks questions appropriately (e.g., "Stephanie, when are you going?" "Mom, are

PE182

PE183



we having tacos?"). Rex is able to recall events from his day or even from another day if the event was significant enough (e.g., trip to see the Blue Man Group). He is able to provide multiple statements about the event without prompts (e.g., "I saw the Blue Man Group. They ate marbles and played the drums!" "I went to jump on the trampolines! I jumped so high!" "I just saw (peer). He was at the trampoline park."). For events without significance, Rex requires prompts or cues to help lead him to an answer. A prompt helps lead Rex directly to the answer (e.g., "I heard you had a special treat after school! It was a very cold treat. Can you tell me what it was?"). A cue will help "cue" Rex into the question to help him answer (e.g., "I heard you went to the grocery store today! What did you buy?").

Rex's ability to discriminate between questions continues to improve. Rex's initial assessment showed that he required prompts to attend to the discriminative stimulus when asked a question. His previous assessment showed that he is able to correctly respond to several consecutive and different questions regarding the same topic (e.g., "What did you make?" "Who helped you?" "Where did you make it?" "What colors did you use?").

When using pronouns, Rex occasionally requires minimal prompting, but is able to self-correct and use the correct pronoun when he is stopped and asked indirectly (e.g., "Wait — who is working for 'Go Noodle?'" "Huh? Can you say that better?"). Rex continues to make errors when using "he" vs. "she" however, the level of prompting has faded. Pronouns are continuously targeted to maintain success. Receptively, Rex continues to make improvements and is currently targeting following multi-step instructions with travel and prepositions (e.g., "Go get the cup from your room and put it on the kitchen counter," "Put the book on your desk, push in your chair, and bring the microphone.").

Rex's performance in his academic skills has meaningfully improved and he continues to demonstrate independence in beginning his homework tasks with occasionally prompting or reminders. Rex has demonstrated proficiency with writing all capital and lowercase letters of the alphabet as well as numbers. He requires verbal and some physical prompting, for a more effective grasp, as his default is to use a palmar grasp or a light grasp with all five fingertips. Rex also uses a thicker pencil or pencil grip, as recommended by OT, to allow for a more effective grasp when writing. Another recommended strategy is to practice his writing on a slanted board, which helps with his pressure. The duration in which Rex is able to write continues to increase and he will often request to be in charge of writing when it comes to making a list or schedule.

In addition to the progress that Rex has demonstrating with writing, he has also demonstrated significant progress with his reading skills. He can sight read various three-letter to four-letter words (e.g., "can," "too," "and," "cat," etc.). Rex is now able to identify each phoneme of a word and blend it together to form the whole word. If Rex blends the word and it does not sound correct, he is occasionally able to guess the word using context clues when available. Rex's math skills have also shown improvement. According to recent homework, Rex is currently working

PE183

Received Office of State Review
01/09/2024

PE184



on fluency counting up to 100 and identifying double digit numbers up to 100. He is also learning about numbers bonds and identifying the parts that equal to a whole number.

Rex continues to make progress in his social skills, as he engages in functional engagement with small groups (2-4) of peers. He looks forward to play dates with familiar peers and spontaneously initiates interaction by imitating them or following them. Rex has spontaneously greeted peers as well as strangers (e.g., "Hello" with eye contact) and has spontaneously initiated a conversation. During naturalistic opportunities, Rex's ability to engage in a conversation with 4+ back and forth exchanges is increasing. His current social goals target appropriate initiations and responses when interacting with peers and conversational exchanges. His play skills also continue to improve. Rex is very animated when he engages in pretend play (e.g., character toys) and he will personify the character and act out parts in detail. We are currently targeting more age-appropriate dramatic and imaginative through activities and games such as charades, puppet show, mirror mirror, character challenge, etc. He also plays familiar turn-taking games (e.g., Connect 4, Candyland, Memory, etc.) and has shown an increased interest in puzzles and coloring (ArtHub for Kids).

Rex has maintained his previous improvements with the behavior of elopement and other threats to safety. Rex demonstrates the ability to be safe and appropriate when walking next to an adult in the community. There continues to be instances where Rex will engage in avoidance and elopement behavior from an adult for both escape and attention-seeking functions; however, the frequency has decreased significantly and he does not typically leave an area. Rex may attempt elopement as a means to obtain attention from an adult, but demonstrates much higher safety awareness than he had in the past. Additionally, Rex has mastered his previous safety goal of appropriately responding when he is called by name to "Come here," "Come back," or "Stop." He is currently working on additional safety skills in both the home and community settings. These include the following skills: address, mom's phone number, dad's phone number, situations in which he might have to call 9-1-1 and how to do that. Rex is also targeting the skills of waiting (for attention and/or requested items/actions), transitioning away from a highly preferred activity or item and demonstrating compliance without exhibiting protest behavior, and accepting "no" without exhibiting protest behavior.

Rex continues to make meaningful gains in his daily living skills and his ability to follow the specific routines independently. He washes his hands without prompting beyond a verbal instruction and brushes his teeth independently with occasional assistance. Following a visual aide and a verbal countdown, Rex has learned to tolerate getting his hair washed in the shower. He has also made progress in getting dressed, as he now puts on pants, a shirt and socks independently. Occasionally, he puts pants or a shirt on backwards because he did not attend to the tag.

Rex's parents and therapists continue to implement key antecedent strategies that have proven to be highly effective for Rex, including: a daily visual schedule for routines and therapy sessions, token systems, priming preceding opportunities for maladaptive behavior, behavioral

PE184

PE185



momentum, response cost and positive reinforcement. When given clear expectations (e.g., "When I say, 'Stop,' you stop, okay?") and contingencies (e.g., "If we don't stop, all done scooter."), Rex is able to follow instructions and maintain appropriate behavior, with the addition of plenty of positive praise and adult proximity. Rex has also been very eager to be independent throughout his daily activities and is very proud when he is able to complete a task on his own (e.g., homework, coloring, cleaning up). During sessions, we are starting to introduce an independent activity schedule that Rex fills out and completes. Rex has displayed an interest in is and is very excited when he completes his schedule on his own. This is a useful skill for Rex to learn as it can be used outside of sessions during other downtime periods.

During sessions, Rex is learning about various social curricula that target socio-emotional regulation and social boundaries: Size of the Problem, Zones of Regulation, and Circle of Friends. Once mastered, these curricula provide strategies and tools that Rex can use to help navigate various social situations when it comes to his emotions and interacting with others. Learning Size of the Problem will teach Rex how to identify the severity of his problem, what the appropriate reaction is, and provide him with common language that he can use to describe the problems/reactions in order to identify the solution. Zones of Regulation is a curriculum that helps foster self-regulation and emotional control which will provide Rex with the skill to identify his emotion and how to feel better (if needed). Circle of Friends is intended to help Rex understand social boundaries and which actions are appropriate/inappropriate across settings and individuals (e.g., family, friends, teachers and therapists, community helpers, and strangers) that he will come into contact with.

**Functional behavior assessment:**
Observation and indirect assessment were used to determine target behaviors and their functions. Rex's target behaviors consist of attention-seeking, escape/avoidance-maintained, and sensory-seeking. Please see his attached behavior protocol below.

| Function | Behavior topography | Consequence | Antecedent strategies |
|----------|---------------------|-------------|----------------------|

PE185

PE186



| **Attention-seeking** (R. wants a reaction from the adult: non-verbal/verbal/eye contact/facial expression) | **"Silly" behavior** (repetitive vocalizations, running around classroom, off-task behaviors, disruptive behaviors)<br><br>**Protest behavior** (verbal protest, yell, scream, property destruction, push, hit, kick)<br><br>**Elopement behavior** (running or walking away from the designated area) | • Use extinction/planned ignoring (i.e., avoid eye contact, refrain from verbal responding)<br>• If behavior maintains or escalates, give clear contingency: "We have to do this before we can go to (next activity)"<br>• Remind him of upcoming preferred activities<br>• Response cost protocol (see below) | • Provide replacement item or activity or choices<br>• Positive social praise<br>• Clear priming of rules/expectations<br>• Preferential seating |
| **Escape/avoidance-maintained** (R. wants to escape or avoid the present demand or transition) | **Escape/avoidance behavior** (refusal, verbal protest, cry, scream, run away, aggressive behaviors, destructiveness, off-task behaviors) | • Extinction + F/T with demand (may require physical prompting); prevent escape; if R. has escaped, lead back to original demand; reduce demands (reduce field size, difficulty, etc.) to maximize successful completion of task; | • Visual schedule (start from home)<br>• Transition warnings<br>• Presentation of preferred activities with non-preferred transitions ("It's time to go outside! We need to clean up!")<br>• Give verbal demands only when able to follow through in the moment (e.g., close proximity)<br>• Clear priming of rules/expectations<br>• Preferential seating |

PE186

Received Office of State Review<br>01/09/2024

PE187



| Sensory-seeking (R. seeks proprioceptive input) | Sensory behavior (jumping, flapping, spinning, etc.) | • Remind R. of upcoming preferred item/activity *indirectly* (e.g., "I hope we're going to have time for ___," "After ___, we're going to do ___. I hope you finish ___ so we can do it.") <br> • Redirect to appropriate activity | • Provide intermittent non-contingent attention to R. when his behavior is appropriate |

**Preference Assessment:**
Preferences were assessed via observation and parent interview. Rex is highly interested in videos and shows (e.g., Go Noodle, Bluey, Moana, and Toy Story), songs, books, playing with his brother and social praise.

**Risk Assessment:**
There are no known risks for treatment at this time.

**Plan Implementation and Family Involvement:**
Rex's parents, Halia and Cliff, continue to be very involved in their son's developmental progress. They are committed to participate in parent coaching/training and are prepared to follow through with implementing any and all behavior plans. Goals are targeted every session, as well as by parents outside of therapy sessions. Data is collected on targeted skills as well as behaviors targeted for decrease. Opportunities with successes, prompts or incorrect responses are noted per session. Data analysis will continue to reflect the efficacy of the current behavior plan and teaching strategies.

**Goals:**
Expressive Language
1. During naturalistic opportunities, Rex will **politely (e.g., "please," "Can you," etc.) request using 5-7 word utterances in an age-appropriate voice/tone, addressing the person, paired with eye contact,** 10+ times per session, for three consecutive sessions, with two or more adults across two settings.

PE187

PE188

2. During naturalistic opportunities, Rex will ***independently describe/retell a story or an event using 8+ words (e.g., "I went to the park and rode my scooter!") with varied language (adjectives, adverbs, and prepositions) and correct use of tense (past, present, and future)***, 5+ times per session, with two or more adults, for three consecutive sessions.

Receptive Language

1. During naturalistic opportunities, Rex will ***independently follow through with routines-based various multi-step instructions (e.g., "Take your shoes off and put line them up,"  "Take your pants off and put them in the hamper," "Wash your hands and dry them," "Take your lunchbox out put it on the counter," etc.),*** in 4/5 opportunities, with two or more adults, for three consecutive sessions.
2. During naturalistic opportunities, Rex will ***correctly identify items based on 3-4 descriptors (e.g., "It's a brown animal. It has paws and growls. It lives in a cave."),*** in 4/5 opportunities, for three consecutive sessions, with two or more adults.

Social Interaction

1. During naturalistic opportunities, Rex will ***make requests to a peer (e.g., "I need the glue," "Can I have one?" "Can I play?"), paired with eye contact,*** in 4/5 opportunities, for three consecutive sessions, with two or more peers.
2. When a peer initiates social interaction (verbally or nonverbally) (e.g., gesture, verbal), Rex will ***independently respond appropriately (verbally or nonverbally) (e.g., follows peer, gestures, verbal)***, in 4/5 opportunities, for three consecutive sessions, with two or more peers.
3. During naturalistic opportunities, Rex will ***independently initiate social interaction with a peer and maintain engagement for 5+ minutes***, in 4/5 opportunities, for three consecutive sessions, with two or more different peers.
4. During naturalistic opportunities, Rex will ***maintain conversations of others' topics of interest for 5+ back-and-forth exchanges***, in 4/5 opportunities, for three consecutive sessions, with two or more adults.
5. During naturalistic opportunities, Rex will ***independently identify the circle of friends that an individual belongs in and/or actions that are appropriate/inappropriate for that circle of friends***, in 4/5 opportunities, for three consecutive sessions, with two or more adults.

Play

1. During play, Rex will ***independently accept and accommodate others' differing ideas***, in 4/5 opportunities per session, with 10+ different play activities and two or more peers.
2. During play, Rex will ***spontaneously initiate or join an dramatic/imaginative play activity and maintain engagement with 1 or less prompt for 5+ minutes pretend play (e.g., charades, puppet show, mirror mirror, character challenge, etc.)*** in 5+ opportunities per session, with 3+ different play activities and two or more adults.

PE188

PE189

Little
Green
tugboat

Behavior

1. When asked personal safety information questions (e.g., What is your address? What is mom's phone number? What is dad's phone number?), Rex will ***independently and correctly respond to the question***, *with two or more adults, for three consecutive sessions.*

2. During naturalistic opportunities, Rex will ***accept "no" (I.e., restriction, denied access) without exhibiting protest behavior,*** in 4/5 opportunities, with two or more adults, for three consecutive sessions.

3. When told to "Wait" following a request, Rex will ***independently wait for the desired item/action without exhibiting maladaptive behaviors/protest behaviors***, in 4/5 opportunities, with two or more adults, for three consecutive sessions.

4. During naturalistic opportunities, Rex will ***independently identify the size of the problem and emit the appropriate reaction/solution to the problem,*** in 4/5 opportunities, with two or more adults, for three consecutive sessions.

**Maintenance Training:**

Treatment goals and, if applicable, behavior plans will be shared and implemented by all members of Rex's therapeutic team, including parents, teachers, and therapist(s). Short-term objectives will be targeted in sequence, progressing to the next benchmark pending success across three consecutive sessions, two or more people and two or more settings. Once mastered, Rex will continue to be given daily opportunities to continue to practice those skills for maintenance.

**Parent Training Goals:**

1. Rex's parents will ***implement antecedent strategies*** (including visual schedule, transition warnings, priming, stating clear rules and contingencies, etc.) in order to decrease protest behavior to non-preferred demands and restricted access to desired items/activities by 80%.

2. Rex's parents will ***implement an extinction procedure in response to protest and/or attention-seeking behavior,*** including following through with demands/restrictions, without providing inadvertent reinforcement/attention, in order to decrease protest behavior to non-preferred demands and restricted access to desired items/activities by 80%.

**Data Collection and Progress Reporting:**

Data collection in the home program is taken per session; analysis of data is used to make treatment decisions. Collaboration with the therapeutic team including related service providers, school staff and others occurs either directly or via parents as liaison quarterly at minimum, to assess performance progress and generalization in the various settings. Additionally, a criterion-referenced assessment (e.g., VB-MAPP, ESDM Checklist, ABLLS, etc.) is administered every six months to track progress.

**Recommendations:**

PE189

PE190



Based on this evaluation, the following recommendations are made:

1. It is recommended that Rex be placed in a small school-based program where he will receive 1:1 instruction and small group instruction using an applied behavior analysis (ABA) approach daily.

2. There should be multiple opportunities available for Rex to engage in meaningful social interactions and play with his peers throughout the day in school.

3. After school, he should receive at least 10 hours a week of ABA direct service in the home and community to work on community-based programs, independent play, social play with peers/siblings, and generalizing skills in the natural environment (e.g. restaurants, grocery store, etc.).

4. Two hours per week of supervision by a BCBA at home.

5. Parent training should be conducted at least 2 hours weekly with the parent trainer in order to ensure generalization and maintenance of learned skills outside the therapy session. These parent training hours are in addition to his therapy hours.

6. It is recommended that services and programs be provided for a 52-week period to avoid regression. Gaps in services are detrimental to Rex' learning. We have seen his skills regress considerably and an increase in problem behaviors following illness or breaks in service.

7. Continuation of the following related services: speech language therapy, OT and PT.

8. Monthly interdisciplinary meetings should be held with Rex's therapists, teachers, and parents to review his progress and modify his programs. These meetings are in addition to his therapy hours.

9. Two sessions per week of a social skills group to promote socialization and target social-emotional goals.

**Parent Signature:** _____ Date_____

**Signature of LBA**_____ Date_____ 5/28/23

**Signature of LBA**_____ Date_____ 5/28/23

*Please feel free to contact Stephanie with any questions via email or phone: 310-428-6102.*
*Stephanie Koh (Benson), MA, BCBA, LBA*

PE191



## BENSON STEPHANIE KOH                                    x

**LICENSEE INFO**

| | |
|---|---|
| Address | ASTORIA NY |
| Profession | Licensed Behavior Analyst (071) |
| License Number | 000538 |
| Date of Licensure | December 01, 2014 |
| Additional Qualifications | Not applicable in this profession |
| Status | Registered |
| Registered through Date | April 30, 2023 |

January 20, 2023 12:15 PM (ET)

https://www.op.nysed.gov/verification-search?licenseNumber=000538&professionCode=071

Received Office of State Review

https://www.op.nysed.gov/verification-search?licenseNumber=000538&professionCode=071

1/1

PE191

PE192

Happy Talk Speech and Language Therapy PC
39 West 14th Street STE 505
New York, NY 10011
(732) 547-2768

SPEECH/LANGUAGE PROGRESS REPORT

Name:    Rex Francis                          Date of Birth: April 14, 2014
Address: 359 West 11th Street, #6A            Date(s) of Note: August 9, 2023
         New York, New York 10014             Chronological Age: 9 years, 3 months

Diagnoses (ICD-10): R48.8 Other Symbolic Dysfunctions
                    F84.0 Autism Spectrum Disorder

---

Rex Francis is a 9 year, 3 month old male with a diagnosis of Autism Spectrum Disorder. He started an intensive regimen of therapy including ABA; speech, language, and feeding therapy; occupational therapy; and physical therapy at approximately 2 years of age.

At present, Rex is scheduled for one 60-minute speech/language therapy session at Happy Talk Speech and Language Therapy PC per week. Rex did not attend sessions throughout July 2023, and he attended one session in August 2023 prior to resuming his once weekly schedule for the 2023-2024 academic year in September. Therapy objectives continue to address deficits in the domain areas of pragmatic, receptive, and expressive language. Hour-long sessions are structured to consist of clinician-directed tasks in conjunction with child-led play in order to explicitly teach new skills while generalizing them into unstructured reciprocal back-and-forth interaction.

Rex continues to demonstrate steady progress given 1:1 therapy with team collaboration. Team collaboration facilitates generalization of newly acquired skills across diverse communication partners and environments. Collaboration further facilitates consistency of goal development and cueing hierarchies across disciplines.

## PROGRESS

**Goal 1: Rex will improve play and pragmatic language skills.**

| Objective 1a | Rex will utilize language to inform and report on past experiences given minimal (1-3) verbal, visual, and/or tactile cues in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 1b | Rex will combine 3 to 4+ pretend ideas on a **novel** specific theme in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
| Objective 1c | Rex will utilize language to take initiative in **novel** play schemas (e.g., the child takes a dinosaur and says "I'm going to attack triceratops.") in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
| Objective 1d | Rex will utilize visual-spatial, motor planning, and auditory-verbal capacities to elaborate on a **novel** pretend play schema with a play partner in 80% of opportunities across 3 consecutive sessions. | **In Progress** |

PE192

PE193

Happy Talk Speech and Language Therapy PC
39 West 14th Street STE 505
New York, NY 10011
(732) 547-2768

Notes: Rex continues to make gains in the areas of engagement and play. At present, he engages in continuous back-and-forth reciprocal interaction in the context of pretend play for as long as his play partner is available. In the context of play schemas, Rex requires minimal (1-3) cues to increase flexibility to modify play sequences and vary play outcomes. Scaffolding and cueing levels are impacted by Rex's engagement, motivation, and overall zone of regulation. Lately, other skills have been prioritized over the play skill goals due to improvement.

Sessions have focused on Rex's ability to share about past experiences. One example is from the first time the activity of writing about his weekend was introduced on 1/23/23, Rex produced "1. I play Nintendo. 2. On iPad. 3. iPod. 4. Tv. 5. Cookies with Pina." Most recently, on 6/12/23, Rex produced "1. I ran with Kathleen. In Central Park. 2. I went horseback riding with dad. 3. I went to Baba's house. Baba made me baba chicken. 4. I went outside with Uncle Mike, Freddie, and mom. 5. I played Nintendo with Freddie. 6. I played Roadblocks with Freddie. 7. I played Bay Blades with Freddie. 8. I played a Bluey puzzle on my iPad. 9. I listened to Moana songs. 10. I listened to a lot of songs on my iPod." Rex is continuing to work on retelling stories from books or movies.

Rex requires minimal to moderate prompting to report about upcoming events and to maintain three or more exchanges to extend new information. Rex is increasingly self-aware of communication breakdowns, and his ability to self-advocate and "repair" the situation to make communication more efficient and effective continues to improve.

**Goal 2. Rex will improve receptive language skills.**

| Objective 2a | Rex will sustain attention to auditory information in the absence of corresponding visual cues as demonstrated by responses to concrete WH-questions while joint book reading with 80% accuracy over 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 2b | Rex will independently follow one-step directions embedded with conjunctions (e.g., "until," "while") in the context of play with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2c | Rex will demonstrate understanding of sequential and temporal concepts "first," "last," "in the middle," "after," and "before" in the context of play given minimal (1-3) verbal and/or visual cues with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2d | Rex will follow a two-step direction with five critical elements (e.g., "Put the doll in the car and give me a spoon and a hat") in the context of play given minimal (1-3) verbal and/or visual cues with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2e | Rex will independently demonstrate understanding of superlatives and comparatives (e.g., big/bigger/biggest, faster/slower) in the context of play with 80% accuracy over 3 consecutive sessions. | **In Progress** |
| Objective 2f | Rex will respond to abstract WH questions (e.g., Why? How?) in obligatory contexts with 80% accuracy over 3 consecutive sessions. | **In Progress** |

PE193

PE194

Happy Talk Speech and Language Therapy PC
39 West 14th Street STE 505
New York, NY 10011
(732) 547-2768

Notes: Rex's ability to respond to forced choice, yes/no, and concrete WH- questions in the absence of visual cues has improved during structured and unstructured tasks. Rex is also working on maintaining his auditory attention while listening to books to be able to answer WH questions throughout or at the end. His progress includes being able to answer concrete who, what, and where questions; abstract WH questions, including "how does a character feel?", have not been addressed.

Rex follows one and two step directions embedded with 3 critical elements with 59% accuracy. Rex is beginning to follow directions with temporal concepts before/after. Rex can sequence pictures in the correct order, but he has difficulty identifying if an event transpired at the beginning, middle, or end.

When conjunctions or sequential concepts are targeted in following directions tasks, Rex benefits from repetition and wait time and has started to ask independently for a repetition or clarification.

**Goal 3. Rex will improve oral expressive language skills.**

| Objective 3a | Rex will utilize prepositional phrases to increase the grammaticality and complexity of his utterances (e.g. SVOPP sentence structures) in 80% of opportunities across 3 consecutive sessions. | **In Progress** |
|---|---|---|
| Objective 3b | Rex will utilize conjunctions (e.g.: "so", "if", "or", and "because") to increase the grammaticality and complexity of his utterances in 80% of obligatory contexts across 3 consecutive sessions. | **In Progress** |
| Objective 3c | Rex will formulate morphosyntactically-correct utterances in 85% of opportunities across 3 consecutive sessions. | **In Progress** |

Notes: Rex often organizes and formulates utterances embedded with prepositional phrases (mostly "in, on, under, at") with minimal (1-3) to moderate (4-6) cues, increasing independence as the activity continues. Rex does not often combine independent clauses into sentences (e.g., I need to pack a swimsuit so I can go swimming. I need to pack a tent because I am going camping.), but when prompted with "why" questions, he formulates responses embedded with target conjunctions.

Rex continues to demonstrate an increase in spontaneously-generated novel utterances with few gestalts. Rex benefits from bombardment and repetition throughout highly motivating and preferred activities to 1) be available for exposure to novel sentence structures, vocabulary, and word relationships; 2) practice sentence formulation via verbatim repetition; 3) practice via delayed imitation given cues, as necessary; and 4) demonstrate independent organization/formulation of target structures.

**RECOMMENDATIONS**
Rex continues to require supplementary child-directed intervention to facilitate exploration and expansion of his ideas; encourage logical thinking, creativity, and spontaneity; and build upon his individual strengths and interests. A speech/language pathologist with training in language development is necessary to develop treatment plans and goals targeting developmental social-pragmatic and relationship-based goals. Sessions should continue to address acquisition and generalization of skills across domains of receptive/expressive language to support Rex's ability to effectively communicate his needs, wants, thoughts, and ideas with others.

PE194

PE195

Happy Talk Speech and Language Therapy PC
39 West 14th Street STE 505
New York, NY 10011
(732) 547-2768

_____

Kaitlyn Simon, MA, CCC-SLP
Speech-Language Pathologist

PE195

# Kaitlyn E. Simon

*PROFESSIONAL EXPERIENCE:*

Ohio Valley Voices- Listening and Spoken Language Provider                 August 2017-May 2022
* Worked exclusively with children with hearing loss in an auditory verbal educational program using model and imitation techniques and listening and spoken language strategies for child instruction and parent coaching.
* Gained experience with children ages 3-6 using hearing aids, bone anchored hearing aids, and cochlear implants due to a variety of etiologies.
* Built a relationship with 4-6 students each year, providing each student with a customized therapy plan and prompting techniques in 2.5 hours of daily group therapy.
* Planned and implemented sessions directly teaching vocabulary, syntax, auditory training, articulation and phonological processes, pragmatics, listening comprehension, and early literacy skills.
* Set up and facilitated child led sessions indirectly targeting carryover of vocabulary and syntax.
* Collaborated with other speech language pathologists, teachers of the deaf, audiologists, occupational therapists, physical therapists, and registered behavior technicians.
* Connected with families in parent education sessions to support carryover of speech and language strategies at home and in the community.
* Collected highly organized data to write annual IEP goals, quarterly progress reports, and parent conference reports.
* Performed Medicaid billing duties.
* Progressed to working with students with more complex speech and language delays- including cleft palate and atypical learning styles.
* Discovered a passion for speech sound disorders and increasing a child's intelligibility.
* Dedicated to learning through continuing education exceeding the yearly requirement.
* Created individual therapy materials to support student engagement and functional targets.
* Navigated seamless transitions between in person services and teletherapy.
* Mentored and supervised a graduate student clinician.
* Joined the Employee Engagement Committee to help foster community and morale in the work place environment.
* Working towards Listening and Spoken Language Specialist (LSLS) certification in Auditory Verbal Education.

*LICENSURE:*

New York Speech Language Pathology License                          anticipated August 2022
ASHA Certificate of Clinical Competence                                June 2018-present
Ohio Board of Speech-Language Pathology License                        June 2018-present
Ohio Board of Speech-Language Pathology Conditional License            June 2017-June 2018
Ohio Department of Education Pupil Services License                     June 2017-June 2022

New York, NY 10028
gilfertke@gmail.com   513-910-2648   LinkedIn profile

PE196

Simon                                                                                                          PE197

*EDUCATION:*

Miami University
  * Master of Arts- Speech Language Pathology      May 2017
  * Bachelor of Science- Speech Language Pathology and Audiology  May 2015
    * Graduated cum laude

University of Cincinnati
  * Deaf Studies Certificate          August 2013

*PEDIATRIC EXPERIENCE:*

St. Rita School for the Deaf           Jan-May 2017
  * Assessed and treated Apraxia of Speech, receptive and expressive language disorders
  secondary to hearing loss and Autism Spectrum Disorder.  Treatment included spoken
  language, American Sign language, use of alternative and augmentative communication
  devices, and total communication.
  * Assisted in writing progress reports, ETR and IEP documents, and Medicaid billing.

Cincinnati Children's Hospital Medical Center- Outpatient Setting  Sept- Dec 2016
  * Assessed and treated articulation disorders, receptive and expressive language disorders,
  Apraxia of Speech, Autism Spectrum Disorders, and Down Syndrome. Treatment included
  spoken language and use of alternative and augmentative communication devices.
  * Collaborated in co-treatment sessions with occupational therapy.
  * Assisted writing session notes, evaluation reports, and treatment plans.

Miami University Speech and Hearing Clinic      Feb 2015- June 2016
  * Assessed and treated two children with articulation disorder and expressive language delay.
  * Assessed and treated one child with expressive and receptive language disorder secondary to
  hearing loss and Down Syndrome.

*RESEARCH EXPERIENCE:*

  Dr. Amber Franklin's English Language Learning Pronunciation Lab at Miami University

Graduate Research Assistant        May 2016-May 2017
  Project: "The Directionality of English Vowel Substitution Errors in /hVt/ Context"
  * Thesis poster presented at the Ohio Speech-Language Hearing Association convention in
  March 2017.
  * Thesis project was completed in May 2017 discussing vowel reciprocity based on listener
  perception using goodness ratings and functional load measures.

Undergraduate Research Assistant      May 2014-May 2015
  Project: "Goodness and Accentedness Ratings of /hVt/ Tokens by Aware and Naïve Listeners"
  * Published in the American Journal of Speech-Language Pathology in November 2016.
  * Poster presented at the American Speech-Language Hearing Association convention in
  November 2016 and was awarded the first place student poster presentation at the Ohio Speech-
  Language Hearing Association Conference in March 2015.
  * Wrote computer program, collected and analyzed data, and assisted with manuscript
  preparation.

New York, NY 10028
gilfertke@gmail.com   513-910-2648   LinkedIn profile

PE197

Received Office of State Review
01/09/2024

PE198

To: Licensee/Registrant

♦ Please review the Registration Certificate below to be sure the information on it is correct.

♦ If any of the information is not correct, please contact us at OPREGFEE@mail.nysed.gov or (518) 474-3817, Ext. 410.

♦ If the information is correct, sign above the Licensee/Registrant block and please destroy any previous Registration Certificates you may have, as certificates with incorrect information are not valid and should not be kept.

♦ Should your address or name change, please notify us as described on the reverse and a new certificate will be issued.

**UPON RECEIPT OF THIS REGISTRATION CERTIFICATE YOUR PREVIOUSLY ISSUED REGISTRATION CERTIFICATE IS NULL AND VOID. PLEASE DESTROY THE PREVIOUSLY ISSUED REGISTRATION CERTIFICATE.**

SEE BACK FOR IMPORTANT INFORMATION

*The University of the State of New York*
**Education Department**
**Office of the Professions**
**REGISTRATION CERTIFICATE**
*Do not accept a copy of this certificate*

License Number:   032385-01          Certificate Number: 2109553UPD

SIMON KAITLYN EMILY
131 E 83RD ST
APT 2F
NEW YORK          NY  10028-0000

is registered to practice in New York State through 08/31/2025 as a(n)
SPEECH - LANGUAGE PATHOLOGIST

LICENSEE/REGISTRANT

EXECUTIVE SECRETARY

COMMISSIONER OF EDUCATION

DEPUTY COMMISSIONER
FOR THE PROFESSIONS

PE198

*This document is valid only if it has not expired, name and address are correct, it has not been tampered with and is an original - not a copy. To verify that this registration certificate is valid or for more information please visit www.op.nysed.gov*

Received Office of State Review

P - R 3 of 3

PE199



P:631-353-5210
E:grow@bloomoccupationaltherapy.com

Client's name: Rex Francis

Date of Birth: 4/14/14

Therapist : Jessica Zambito, OTR/L

Date of Report: 9/4/23

## Occupational Therapy Progress Report

Rex is a friendly and energetic 9.5 year old male who receives occupational therapy once a week for 60 minutes 1:1 at a sensory gym Occupational therapy sessions currently address fine motor and visual motor skill development, self-regulation, executive function, overall strength, coordination, self-help skills and sensory processing. Rex attends third grade full time at Titus School. Rex resides with his parents and his older brother in NYC. Rex is a related boy who enjoys singing, acting, climbing, animals and playing. Rex presents with a diagnosis of ASD. He demonstrates consistent progress in his OT sessions. Rex engages in therapy sessions and is motivated. At times his challenges with self-regulation and behavior impacts his performance in therapy sessions. Rex has an extremely collaborative team approach and supportive family who ensures consistent attendance and carryover of his OT sessions.

The Beery VMI-6th Edition and clinical observations were utilized to assess sensory processing, regulation  and fine motor & visual motor skill development.

Neuromuscular:

Rex presents with low muscle tone globally. He presents with moderate overall weakness which impacts his overall strength & coordination. Rex was able to sustain core flexion for 10-12 seconds (norm 20-25 seconds) and prone extension for 8-10 seconds (norm 15-20 seconds), indicating core and upper body weakness in the flexor an extensor muscle groups. Rex demonstrates difficulty maintaining adequate postural control and will often lean his body for external support while seated. He often leans his head or trunk on the table while seated. He demonstrates weakness in his

PE199

PE200

hands which contributes to his difficulty with fine motor and self- help skills. Rex had difficulty with one legged balance and dynamic balance activities. He can jump with two footed takeoffs. Rex requires assurance to hop on one foot, and skip. Rex requires assistance for motor planning activities such as imitating animal poses and yoga positions, demonstrating challenges with motor planning. He demonstrated immature overhand and underhand ball skills. Rex also receives PT services to address strength and gross motor skills. Rex's decreased stamina and muscle tone impact his ability to be independent with self-help, play and school-based activities such as writing and copying from the board.

Fine & Visual Motor Skills:

Rex presents with below average grasping skills. During testing Rex utilized a static quadruped grasp with HE in his thumb PIP and DIP joints secondary to joint laxity, hypermobility, and weakness in the hands. He has poor stamina, decreased manual dexterity, grasping and in hand manipulation skills that impact his daily independence with activities. Such activities include shoe tying, typing a robe, small snaps, using a fork and knife and opening/closing containers. He requires physical and visual prompts to sustain a modified static tripod grasp during writing activities. At times he will use the EGG grip and slant board. Rex was able to button 3 buttons within 75 seconds independently. A small thick pencil, egg or grotto pencil grip and writing on vertical surfaces (easel, slant board) is recommended to build grasping skills and endurance.

The Beery VMI =6th edition, which is a standardized assessment that measures visual motor integration, visual perception, and motor coordination was administered to reassess progress. Rex scored in the poor range in his visual motor integration, visual perception and motor coordination skills.

|  | Visual motor integration | Visual Perception | Motor coordination |
|---|---|---|---|
| Raw Score | 16 | 18 | 15 |
| Standard Scores | 74 | 77 | 58 |
| Scaled Scores | 5 | 5 | 2 |
| Percentile | 4% | 6% | <1% |
|  | Poor | Poor | Poor |

Self-help skills

Rex presents with below average self-help skills. Rex can independently doff clothing and socks and shoes. He requires minimum assistance to don socks with appropriate orientation. He requires min A to don shoes with correct shoe left/right placement. Rex can complete lower body dressing with minimal verbal cues and requires minimum assistance /set up assist for orientation upper body dressing. Rex requires minimum assistance for clothing management skills such as fasteners, tying, belts. zippers, and snaps. Rex uses the toilet independently, although he has demonstrated regression in toileting skills regarding bowel movements. He requires assistance for toilet hygiene and clothing placement after toileting. He requires minimum assistance for other daily hygiene

PE200

Received Office of State Review
01/09/2024

PE201

activities such as brushing teeth, combing hair, washing hands. These skills are beginning to be addressed in OT sessions to carry over to the home environment to ensure carryover. Direct parent education and training is provided at sessions.

Sensory Processing:

Sensory processing is the ability to take in information from our environment, interpret and organize it. Self-regulation is the ability to take this sensory information and adjust according to task demands and environments. Rex presents with moderate sensory processing differences regarding auditory, oral, vestibular (movement), tactile (touch), visual, and body position (proprioceptive) processing. Rex presents with sensory modulation challenges and will fluctuate from sensory seeking to sensory under responsiveness. Rex presents with a hypo-responsive proprioceptive system. He often seeks out deep pressure input, he enjoys crashing his body, walks heavily and loudly and falls often. Rex was unable to complete finger to nose opposition with eyes open and eyes occluded indicating proprioceptive processing differences. Rex presents with poor body awareness. Safety awareness is poor. Rex presents with a hypo- responsive vestibular system. He is in constant motion and has difficulty sitting still for long periods of time. He often seeks out movement by running, spinning, twirling, or moving his body. Rex presents with poor spatial awareness, delayed motor planning and poor balance. He does not tolerate unexpected touch or messy play for long periods of time, indicating tactile processing differences. Rex presents with oral sensory processing differences that impact his daily diet. At times he will seek out oral sensory input when chewing or mouthing nonfood items or licking, moving tongue often with decreased safety awareness. He notices almost all visual stimuli in his environment and becomes distracted easily. Rex is hypo sensitive to auditory input and presents with auditory processing challenges. He tends to sing, shout and demonstrate difficulty with voice modulation and will often seek out auditory input to help regulate. He will have difficulty attending in loud noisy environments and inconsistently respond to his name. Rex is extremely responsive to sensory input to improve regulation, attention and overall participation in therapy sessions. He benefits and responds tremendously to a sensory integrative approach in his sessions.

Summary & Recommendations:

Rex is a motivated and engaged boy who continues to demonstrate progress in his OT sessions. He can be easily engaged and requires a sensory gym and skilled services to address sensory integration and motor skill delays. He demonstrates appropriate participation in his sessions. Safety and body awareness continue to be addressed. Occupational therapy should continue to address sensory processing, overall strength, motor planning & coordination, fine motor and visual motor skills, self- help skills and self-regulation for greater success & independence in daily routines. Rex responds to 1:1 support in a collaborative and sensory integrative approach to address occupational therapy goals.

It is strongly recommended that Rex continues to receive occupational therapy services to address sensory processing, executive function, motor planning, coordination, strength, stamina and  fine & visual motor skill delays and improve independence in daily life across all environments.

PE201

Please feel free to contact me with any further questions via email or phone.

_____

Date: 9/4/2023

Jessica Zambito OTR/L

Pediatric Occupational Therapist/Owner Director

License: 017860

 

# Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

## License Information *

### 12/01/2022

**Name :** ZAMBITO JESSICA LEE
**Address :** BROOKLYN NY
**Profession :** OCCUPATIONAL THERAPY
**License No:** 017860
**Date of Licensure :** 02/08/2013
**Additional Qualification :** Not applicable in this profession
**Status :** REGISTERED
**Registered through last day of :** 11/24

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants,* or *specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.

Seal of the State Education Department

Received Office of State Review

PE203

P - T 1 of 1

PE204

NEW YORK CITY DEPARTMENT OF EDUCATION
IMPARTIAL HEARING

In the Matter of

Rex Francis
Student ID: 243-995-479

v.                                              **IHO Case No.** No. 249622
                                                **IHO:** Michelle Babbitt, Esq.

**New York City Department of Education**       **AFFIDAVIT OF NATALIE**
                                                **BRANDEFINE**

STATE OF NEW YORK              }
                              }     ss.
COUNTY OF NEW YORK            }

Natalie Brandefine, being duly sworn, deposes and says:

1.  Do you have a license/certification to teach in New York? Yes, my license/certification is in evidence as Exhibit N.

2.  Can you describe your current position and employment? I am the Founder and Executive Director of The Titus School ("Titus"), a private special education school located at 90 John Street, New York, New York.

3.  How long have you been in this position? I have been in this position since Titus's founding in July 2019.

4.  Are you familiar with a student named Rex Francis? Yes, he is a student at Titus.

5.  Where did you work before Titus? Between 2014 and 2019, I served as the Program Director at Happy Hour 4 Kids, a 1:1 alternative education program, from 2014 through 2019.

PE204

PE205

6. Can you describe your past work in the fields of early childhood education and special education? I began my career in the field of Early Childhood Education and Special Education while attending high school in Staten Island, New York working at The Village Preschool, a program established by my mother in 1991. Since that time, I have held various educational positions as a head teacher, program director, adjunct lecturer, and educational consultant in Albany, Staten Island, Brooklyn, and Manhattan.

7. What are your responsibilities at Titus? At Titus, I am responsible for its day-to-day programming and operations, including but not limited to, hiring, and managing staff, overseeing curriculum and professional development, providing direct services to students and families, and attending school district meetings. I also conduct home visits (visiting a student's home to facilitate family training and to bridge the gap between home and school) with staff, substitute teach in classrooms, support students in crisis, attend IEP meetings, impartial hearings, school visits, and more. I also supervise all the staff and instructors.

8. Can you briefly describe Titus? The Titus School is a mission-driven school that aims to individually assist students based on their unique needs to foster appropriate progress. Each student receives an individualized treatment plan to focus on specific areas of need. The Titus School provides its students with the personalized attention that they require to make educational progress due to its 1:1 and 2:1 support in group settings and cohorts that are created based on similar academic assessments.

PE205

PE206

9.  What are the class sizes and composition at Titus? Class sizes range from 6-8 students. Each classroom team is comprised of one NYS-certified special education teacher and one lead behavior therapist.

10. How long is the school day at Titus? The school day begins at 8:30 a.m. and concludes at 3:00 p.m. each day.

11. What methodology, if any, does Titus utilize? The Titus School utilizes an Applied Behavioral Analysis (ABA) approach as its core teaching methodology. The school also utilizes discrete trial methodology, when appropriate, in combination with incidental teaching. All teachers, assistants, therapists, and staff members receive ABA training and supervision at School.

12. How does Titus work with students who have behavioral needs? Students with behavioral needs receive a Functional Behavior Assessment in which maladaptive behaviors are analyzed by a Behavior Specialist, and a behavior intervention plan (BIP) is made for the student.

13. What is the process of making a BIP? The process of creating the BIP is described in the document. Ex. D. Baseline data is collected, and target behaviors such as noncompliance/work avoidance, self-injurious behavior, emotional dysregulation, and property destruction are identified. The data analysis revealed the function of the behavior, and identified and defined replacement behaviors, antecedent interventions, and consequent interventions. Included in the BIP are baseline data, intervention data, and detailed explanations for procedures and protocols.

PE206

PE207

14. How does the Titus staff collaborate with one another when instructing a student? The Titus School utilizes a team approach regarding the education of its students. Rex's team is comprised of his parents, the Classroom Supervisor, a Lead Behavior Therapist, a Lead Teacher; a School Behavior Specialist, a Speech/Language Therapist, an Occupational Therapist, a Physical Therapist, a Music Therapist/Licensed Creative Art Therapist, and Licensed Master Social Worker. Additionally, Titus employs six licensed Behavioral Analysts on staff.

15. How do Titus's teachers work with the student's parents? Our teachers work collaboratively with the students and their families to ensure consistency and facilitate generalization skills and regularly utilize input from students and families to design the strategies that will most effectively motivate them to complete their tasks. There is frequent communication between parents and the classroom team to ensure continuity between home and school. Parent(s)/guardian(s) must be accessible during the school day and be open to modifying the student's schedule when necessary.

16. Does Titus provide any sort of parent training? Yes, Titus provides on-site support/training groups to the parents of each Student to learn about the approaches/methodology that is being used to address their children's needs. The school strongly encourages parent(s)/guardian(s) to attend these sessions at least twice per month. In these sessions, parents also learn how to implement the ABA approach at home.

17. Does Titus offer any related services such as occupational therapy ("OT"), speech-language therapy ("SLT"), or physical therapy ("PT")? Yes.

Received Office of State Review
01/09/2024

PE207

PE208

18. What are the qualifications of Titus's related service providers? All related service providers and staff are certified and/or licensed in their practice area. All members of the staff are required to participate in weekly training sessions and receive intensive training on autism spectrum disorders and Applied Behavioral Analysis.

19. Can you describe the training and supervision Titus staff members receive? All staff are supervised by senior members of the team and licensed and or certified providers in their field. Supervision is provided weekly in 1:1 and group sessions. In addition to supervision, all staff receive training in Nonviolent Crisis Prevention Intervention strategies. All teachers receive curriculum training from the developers and senior staff, and regular staff development and training are offered throughout the year. All mental health providers and related service providers receive training in their areas of expertise. All staff are encouraged to attend professional conferences and to lead pieces of training in their area of expertise to build collaboration and a transdisciplinary approach across settings. Titus provides ongoing staff development and training to all teachers, behavior therapists, and related and mental health service providers. Staff members attend seminars, workshops, and conferences, participate in training programs, and maintain continuing education requirements associated with their license and certification.

20. How long have you known Rex Francis? I have known Rex since 2021 when he began attending The Titus School, located at 90 John Street, New York, NY 10038.

21. What assessments, if any, were conducted when Rex first started attending Titus? Academic assessments were conducted to determine Rex's then-present levels of performance and to place him in academic instructional groups for reading, writing, math,

PE209

science, and social studies. Additionally, an FBA and BIP were developed to target Rex's targeted behaviors.

22. How would you describe Rex's levels of performance when he first enrolled at Titus? Upon arriving at Titus, Rex exhibited delays in social/emotional development and adaptive behavior. Rex had a history of engaging in high rates of off-task behavior; emotional dysregulation and physical dysregulation. Rex presented as self-directed and engaged in behavior that required consistent support to access the curriculum in both 1:1 and group activities. These behaviors greatly hindered Rex's ability to form relationships with his peers, independently navigate his environment, or participate in a less restrictive academic setting. Rex required a small class size with a low student-to-staff ratio to participate in instruction. Ex. D. His attention-seeking behavior limited his ability to access curricula and make meaningful academic and developmental progress.

23. Have you ever observed Rex while he was in class? I have observed Rex in the classroom and in the school on multiple occasions. During the 23/24 school year, I have observed Rex on a weekly basis, during academic instructional periods, adaptive physical education, and social skills lessons.

24. Did you speak with Rex's current teachers and related service providers in preparing this affidavit? Yes, in preparation for making this affidavit, I spoke with all of Rex's teachers and service providers about his current curriculum and progress thus far. I also observed Rex in class and during related services.

Received Office of State Review
01/09/2024

PE209

PE210

25. Can you describe Rex's current classroom placement? Rex is in a class with 6 peers (7 students total), with 4-5 instructors. All students present with similar needs and skills and his classmates are appropriate peers for him.

26. Who is a part of Rex's classroom team? For the 2023-2024 school year, Arely Garcia, MS, Ed, Shameka Dantzler, BA, Brian Rodriguez, BA, and Teresa Ambery MS, BCBA, LBA-NY is the classroom's clinical supervisor.

27. Does Titus provide a class schedule for its students? Yes, Rex's class schedule for his summer session at Titus can be found in Exhibit J, and his fall schedule can be found in Exhibit K.

28. Did you work with Rex's instructors in developing his curriculum for the year? I worked closely with Rex's teachers and therapist to develop and monitor his program, including his goals and objectives, services, support, and accommodations.

29. Can you describe how academic goals are made for the school year? Academic goals are created for Rex based on the outcomes of assessments, present levels of performance, grade-level content objectives in the curriculum, and common core learning standards. These goals are adapted to fit Rex's unique learning profile. They are specific, measurable, achievable, relevant, and time-bound. For Rex, academic goals are targeted in small group and 1:1 instructional periods utilizing applied behavior analysis (ABA) (i.e. multiple exemplars, errorless learning, forward and backward chaining [learning a skill from the beginning or learning a skill from the end], and so on) and other special education approaches (i.e. the gradual release model: I do [teacher demonstrated], We do [teacher and students practice together], then You do [student demonstrates the skill

PE210

Received Office of State Review
01/09/2024

PE211

independently]). A criterion for mastery is set based on Rex's skills and ability. A goal, learning objective, or skill is targeted in class during small group instruction, in 1:1 or individualized academic sessions, in extended school services, and at home during ABA, tutoring sessions, and with his parents. Mastery is achieved when Rex can consistently demonstrate the skill independentlyNY and as needed.

30. Can you describe how goals for Rex's related services are made? Related services, such as physical therapy, occupational therapy, speech and language therapy, and mental health counseling goals function similarly to academic goals with minor variations. For example, a long-term goal for speech and language for Rex is to improve expressive language. Due to Rex's complex comorbidity of diagnoses, this is an ongoing goal that will be a yearly target on his treatment plan. Long-term goals have many short-term objectives that feed them. The short-term objectives target the specific, measurable, achievable, relevant, and time-bound elements for mastery. The long-term goal is "achieved" through the short-term objectives; which are worked on in treatment sessions, in his classroom, during extended school day services, and at home during ABA, tutoring sessions, and with his parents. Mastery is achieved when Rex can consistently demonstrate the skill independently and as needed.

31. Who is Rex's main academic teacher? Rex's lead teacher is Arely Garcia, MS Ed, who instructs his English Language Art (ELA), History, Math, and Science classes.

32. Can you describe Rex's ELA curriculum? Rex's ELA class is taught using the Wilson Foundations curriculum, EngageNY ELA curriculum, and ReadyGen. Wilson's curriculum uses the Orton Gillingham (OG) approach to increasing literacy skills. Rex is

PE211

PE212

currently on Level 2 of Wilson which targets strategies for decoding and encoding words, consonant blends, phonemic awareness, and fluency. Rex learns strategies such as marking up words, scooping/marking syllables, and learning phonograms in a specific sequence. Rex receives approximately 30 minutes of explicit Wilson instruction each day along with concepts including comprehension and writing. For greater mastery of phonics, identifying key ideas in reading prompts, and answering related questions, Rex is developing his understanding of spoken words, syllables, and sounds, and writing one complete, simple sentence. He is currently focusing on improving his reading comprehension skills, particularly in identifying story characters and sequencing events. Rex requires visual aids and kinesthetic activities. For instance, he often uses pictures as a tool to better grasp the story's context and is more willing to participate in activities that involve movement. Rex is making steady progress.

33. Can you describe Rex's History curriculum? Rex's History class focuses on understanding his surroundings, how to look at a map, chronological awareness, interpreting evidence, and civic participation. Rex continues to make progress in the understanding of social studies topics. He has expanded his specialty vocabulary words that directly relate to social studies. Rex demonstrates his understanding through representational drawings and verbally answering "WH " questions after new information is presented to him and while completing an in-class worksheet.

34. Can you describe his science curriculum? Rex's science class is working on understanding the phases of matter and concepts like solid, liquid, and gas. Rex has made moderate progress in his understanding of science topics. He has been able to

PE212

Received Office of State Review
01/09/2024

PE213

demonstrate a baseline understanding through project based learning and hands-on lessons, activities, and experiments.

35. Can you describe Rex's Math curriculum? Rex's Math class currently working on adding numbers using tools like number bonds, ten frames, and 10+ facts. He requires visual aids, auditory repetition, kinesthetic activities, and other exemplars/modalities to achieve mastery. For example, Rex often uses linking cubes and drawings to solve math problems. Rex also improved in his ability to subtract. However, he still relies heavily on teacher prompting and redirection to focus his attention.

36. Does Rex receive any related services at Titus? As part of Rex's individualized education program at Titus, he receives occupational therapy (OT), speech and language therapy (SLT), physical therapy (PT), and mental health counseling with a social worker and music therapist. Ex. J, K.

37. How often does Rex receive SLT? Rex receives speech-language therapy (SLT) three times a week for 30 minutes individually.

38. Who is his SLT provider? SLT is provided by Caitlin McDonagh MS, CCC-SLP.

39. What does Rex work on during his SLT sessions? Rex has been working on receptive, expressive, and pragmatic language. For receptive language, he is working on problems and solutions within social scenarios and picture scenes. Utilizing multiple choice answers and re-reading the social scenario twice Rex can demonstrate that he understands the scene/problem/situation best. When he is targeting expressive language, Rex has been working on sequencing and retelling a story (via picture cards/sequencing cards) and including a salient detail within the retelling (i.e., characters, location, descriptive words like colors and size). After the therapist model's

PE213

PE214

retelling of the story, Rex requires minimal to moderate verbal cues to increase the length of his utterances in his retelling. Rex is working on increasing his natural reciprocal communication and recall to enhance pragmatic language skills. This includes him generating a follow-up question to a peer or clinician and recalling events from his weekend. Rex can recall details about his weekend when provided with visuals and verbal cues to assist with word retrieval.

40. How often does Rex receive OT at Titus? Rex receives OT three times a week for 30 minutes individually.

41. Who is his OT provider? OT is provided by Marissa Bernstein, MS, OTR/L.

42. What is Rex working on during his OT sessions? During OT sessions, Rex is working on bike riding skills, his ability to independently shower, tying a knot, and his handwriting skills. He is practicing independent activities of daily living, personal hygiene, and self-care to increase his independence. When practicing taking a shower, Rex has visual sequencing cards to increase he continues to require minimal-moderate verbal cues throughout to redirect his attention and improve his task persistence. Additionally, Rex is working on tying a knot with the goal of independently tying his robe after showering. Currently, Rex has shown steady progress evident by independently making the "x" and then requiring support to complete the following steps of tying a knot. Rex is working on handwriting by writing/copying a paragraph with five simple sentences and then using a visual checklist to edit his written work. At this time, Rex can copy the sentences with moderate assistance to find where he is on the page he is copying from and to redirect his attention. When editing his

PE214

PE215

work, Rex requires maximum assistance to identify and edit his letter spacing and letter orientation to the line when using three-lined paper.

43. How often does Rex receive PT at Titus? Rex receives PT two times per week for 30 minutes individually.

44. Who is his PT provider? PT is provided by Avital Akman, PT, DPT.

45. What is Rex working on during his PT session? During PT sessions, Rex works on increasing his strength to promote improved posture, and further improve his body awareness and balance. Rex is also working on bilateral coordination, core strength, and bike riding. Continued improvements in his balance and body awareness have led to increased safety during environmental negotiation and gross motor play. Furthermore, Rex can hop multiple times on each leg but demonstrates decreased ground clearance and motor control/coordination.

46. How often does Rex receive counseling at Titus? Rex receives counseling once a week for 30 minutes individually.

47. Who is his counselor? Leyla Fonseca LMHC.

48. What is Rex working on during his counseling session? During counseling sessions, Rex continues to build a rapport with his counselor, while working on his emotional identification and expression. Counseling has helped Rex develop his ability to identify his emotions and related situations. Rex willingly attends his counseling and has become more cooperative and engaged as he builds a rapport with his counselor. During times of emotional dysregulation, Rex requires verbal prompting, reassurance, and modeling from his counselor to utilize effective coping skills and appropriately manage his

PE215

PE216

feelings. Rex still struggles to bridge the gap between the skills he is learning and practicing within his counseling sessions and utilizing them during times of distress.

49. How often does Rex receive music therapy? Rex receives music therapy once a week for 30 minutes individually and once a week in a group.

50. Who provides his music therapy? Michelle Geisler, MA, MT-BC, LCAT-LP.

51. Can you describe his work and progress in music therapy? In individual sessions, Rex is building on his ability to identify emotions in others by identifying his own emotions, both in the moment and by reflecting on/processing past emotions and experiences. In group sessions, he is working on developing group rapport and building appropriate peer relationships through group music-making, sharing, and listening. Rex has made progress in both individual and group sessions.

52. Does Rex have any interfering behaviors? Rex displays multiple, interfering behaviors that inhibit his ability to engage in the classroom, stay on task for assignments, follow his instructor's directions, and with his peers.

53. Can you describe these behaviors? Rex's interfering behaviors include maladaptive, inappropriate physical contact, and protest behaviors, such as elopement, non-contextual vocalization, and task refusal. Ex. D. Additionally, Rex would engage in loud vocalizations to gain access to preferred items, activities, attention, and other behaviors listed in his FBA/BIP.

54. Does Rex have a BIP? Yes, the Titus staff is still in the process of collecting data and updating Rex's BIP for the 2023/2024 school year. Until then, Rex's team is utilizing his 2022-2023 FBA/BIP which can be found in Exhibit D.

Received Office of State Review
01/09/2024

PE216

PE217

55. Was a Functional Behavioral Analysis used in making the BIPs? Yes, a functional analysis of targeted behaviors was conducted, data was collected, and an initial behavior intervention plan was created for his 2022-2023 school. This plan was designed to decrease maladaptive, interfering, and unsafe behavior. The goal of the plan is to improve functional communication, compliance, and frustration tolerance to facilitate learning, safety, and global development across all domains and settings. This same process is being utilized for his 2023-2024 school year BIP.

56. How would you describe Rex's progress at Titus thus far? For the 2023-2024 school year, Rex continues to make steady progress in all domains. He has demonstrated improvements in his ability to attend and focus, effectively communicate, comply with directions, follow classroom routines, and maintain emotional and physical regulation throughout the day.

57. Does Titus send home progress reports? Yes. However, Titus does not send home progress reports until November of the school year. Please find Rex's most recent progress report from June 2023, Exhibit M, to further evidence the significant progress he has made at Titus.

58. What opinion, if any, do have regarding the type of instruction Rex needs to make meaningful progress? Based on my professional experience, Rex requires intensive in-school and after-school ABA therapy for him to acquire new skills and maintain learned skills. He presents with significant deficits across all developmental domains, but he can make progress. If I suspect that Rex could make meaningful and sustainable educational progress without afterschool ABA therapy, or if I believe that Rex was ready for a less

PE217

PE218

restrictive environment (or any different environment), I would have no problem
communicating and supporting that recommendation.

59. Can you describe Titus's communications with Rex's parents regarding his progress?
Rex's parents received daily communication, three comprehensive progress reports a
year, weekly emails with pictures and a detailed overview of the week, and monthly
team meetings to track progress. The progress report is completed by Rex's entire team
and discusses his progress across all domains. It also incorporates the goals that Rex is
working on across all his areas of need. Data is collected daily via observation,
assessments, and work samples to track and monitor progress across all domains. This
information is analyzed and graphed to help modify our approach and instructional
targets and ensure that Rex is making progress toward goals. Examples of weekly update
emails sent to Rex's parents can be found at Exhibit Z.

60. Are you familiar with the DOE's recommended program for Rex's 2023-2024 year?
Yes, for the 2023-2024 school year, the DOE recommended a 12 month school year
with an 8:1:1 classroom placement.

61. What is your opinion about this program and placement? I do not believe this program is
supportive enough for Rex.

62. Can you explain why? Rex requires ABA instruction and support under the direct
supervision of a BCBA/LBA-NY to make meaningful and appropriate educational
progress. A behavior intervention plan developed by a BCBA/LBA-NY and
implemented by RBTs, teachers, and related service providers, is required for Rex to
access the curriculum, participate in 1:1 and small group instruction, and make
meaningful and measurable progress across all domains. Rex needs access to age-

PE218

PE219

appropriate social peers and peer models, differentiated academic instruction, and a sensory gym. He has demonstrated difficulty managing sensory input and would not be able to maintain emotional and physical regulation in a large school environment.

63. In your opinion, how would the DOE's recommended program affect Rex? The DOE's recommendations on the IEP do not adequately address Rex's needs and would lead to significant regression across all academic and developmental domains.

64. How does Titus' program for Rex ensure a meaningful education benefit for him? For the 2023-2024 school year, Rex's class schedule is designed to foster development across all domains without interfering with classroom activities and to promote generalization across settings. Related services and mental health counseling sessions are scheduled in collaboration with the classroom team to promote regulation and provide in-class support during activities related to each domain (i.e. OT when writing). Rex receives 1:1 instruction as needed, making sure to foster independence when possible and appropriate, but meeting his needs to ensure progress. A BIP is being developed by a BCBA/LBA-NY utilizing ABA methodology and was implemented daily, in all academic classes and related services. Data is collected, graphed, and analyzed to monitor progress and adjust as needed. This level of support is necessary to support Rex's unique learning style and needs.

65. How do Titus's teacher/student ratio and classroom composition ratio play into Rex's overall progress? Rex requires this teacher-to-student ratio and the support of this highly skilled and trained team of professionals with expertise in the areas of special education and ABA. He can socialize with his peers and engage in 1:1 and small group instruction *because* of the support and services that he receives. Moreover, Rex's classes arc

PE219

PE220

developmentally, socially, and academically appropriate for him. The students in his class are age-appropriate peers who have similar learning profiles to Rex.

66. Why does Rex continue to need the level of support offered by Titus? Even now, Rex continues to demonstrate significant delays within all areas of development. He has only made gains with teaching that is done in highly structured, 1:1 settings, with continuous high rates of reinforcement and repetition of tasks. It is because of the 1:1 instruction and the application of the principles and tactics used in ABA therapy that Rex has made steady progress.

67. How would not having the type of instruction and support offered by Titus affect Rex? Based on my experience and knowledge of Rex, if he does not have access to 1:1 instruction using ABA during the 2023-2024 school year, he will not make meaningful progress, and it is quite likely that he will regress, even if he was in a small class setting with other special education supports and related services. He requires access to 1:1 instruction at all times.

68. Can you describe why Rex needs to be enrolled in Titus's 12-month program? Based on my professional opinion, experience, and interactions with Rex, I believe he required a 12-month program, which Titus provided, to prevent substantial regression and to promote appropriate educational and developmental progress. Based on Rex's unique learning style and complex developmental profile, he requires 12 months of service with carryover from school to home utilizing ABA methodology and other instructional approaches that offer many opportunities for practice and repetition. The approach needs to be consistent, and the services need to have little to no disruption for Rex to make

Received Office of State Review
01/09/2024

PE220

appropriate educational progress. Titus provides Rex with the highly skilled and highly trained expert intervention and instruction he needs to learn.

69. How would Titus respond if Rex continues to progress to the point where he needs fewer services? If at any point in time, I believe that Rex would be able to continue making meaningful progress with *fewer services*, I would have no problem communicating that belief to Rex's family and team members, and I would do so. I am hopeful that we will be able to fade back some of his support in the coming years, and I am hopeful that he will be able to make progress in the future in a class where he does not need 1:1 instruction. We are not at that point currently, however.

Natalie Brandefine

Sworn to (or affirmed) and subscribed before me on this 5 day of October, 2023.

NOTARY PUBLIC

TAMIKO VAUGHAN
Notary Public, State of New York
Registration No. 01VA6209053
Qualified in Kings County
Commission Expires March 12, 2026

P - U 18 of 18

PE222

NEW YORK CITY DEPARTMENT  OF EDUCATION
IMPARTIAL  HEARING

---

In the Matter of

Rex Francis
Student ID: 243-995-479

**v.**

**New York  City Department  of Education**

**IHO Case No.** 249622
**IHO:** Michelle  Babbitt,  Esq.

**AFFIDAVIT  OF STEPHANIE
KOH**

---

STATE  OF NEW YORK              }
                                }        ss.
COUNTY OF NEW  YORK             }

I, Stephanie  Koh, hereby swear and affirm:

1.  What  is  your  current  position  and  employment?  My  current  position  is  being  a
    BCBA/LBA, as well as being the Founder and Director of Little  Green  Tugboat ("LGT"),
    PLLC.

2.  Do you have  a license  to practice in New York State? Yes, my license/certification  is in
    evidence   as Exhibit   P.

3.  How long  have  you had this position?  I have been in this position  since  May 2016.

4.  How long  have  you been working  in the field of special education? I have worked  in the
    field  of special education  since  1999.

5.  What  is your professional background and training? I began my formal ABA training in
    1999 under the direct instruction of Dr.  O. Ivar Lovaas at UCLA.  I worked as a therapist
    and senior  therapist for the Lovaas Institute  for Early Intervention  intermittently  for a total

PE222

PE223

of six years and during my Master's program at San Francisco State University, where I received an MA in Special Education with a concentration in Early Childhood, as well as a Teaching Certificate in early childhood special education in 2004. I then completed formal coursework at Florida Institute of Technology, I completed 1600 hours of supervised fieldwork and passed the exam to become a Board Certified Behavior Analyst by the BACB in 2012. I completed 34 continuing education units in the field of behavior analysis for each two-year cycle, to maintain my certification status.

6. Where did you work before the founding of LGT? Over the past 24 years, I have worked as: an early childhood special education teacher, a clinic- and home-based ABA therapist and supervisor, a behavior analyst in a children's hospital setting as well as in self-contained schools ranging from preschool through high school, a school consultant, parent trainer/coach and presenter. I have completed formal training in Pivotal Response Training, Early Start Denver Model, Hanen Program, the TEACCH model and Acceptance and Commitment Therapy.

7. What are your responsibilities in your role? My current roles and responsibilities include : supervising staff, conducting assessments, writing treatment plans, developing goals and behavior intervention plans, developing therapeutic and educational programming, and conducting school trainings.

8. How much do you charge for your services? My hourly rate for sessions with Rex for the 23/24 School Year is $285. This rate is within New York City's market value for someone of my training and experience, and most similarly experienced, and I would note that qualified providers charge similar or higher rates in the NYC metropolitan area.

PE223

PE224

9. Are you familiar with the student Rex Francis? Yes, he is one of my clients.

10. Are you compensated for the services you provide for Rex and his family? Yes, there is an agreement between myself and Rex's parents, Halia and Cliff Francis, that LGT will be compensated for all the services provided for Rex's 1:1 instruction, Parent Training/Counseling, ABA monthly meetings, and Interdisciplinary meetings.

11. How long has Rex been receiving service from LGT? He has been receiving ABA supplemental services from Little Green Tugboat since August 2020.

12. What methodology, if any, is used in your practice? LGT uses Applied Behavior Analysis ("ABA") methodology.

13. Can you describe what ABA is? ABA is a scientifically validated approach for young children and students with autism. Many scientific studies have established that long-term and intensive therapy, using ABA principles with young children with autism significantly improves the outcome for those children. While each child is different, this usually means that children should receive between 25-40 hours per week of ABA instruction during their early years.

14. What practices do ABA typically employ? ABA therapy may include discrete trial teaching (DTT) and natural environment teaching (NET). ABA uses positive reinforcement and rewards to elicit appropriate or desired behaviors and decrease undesired behaviors. ABA also may use ABC data – Antecedent, Behavior, and Consequence to determine what happens immediately before a behavior occurs and what happens after the behavior. ABA programs are individualized to each unique child.

PE224

PE225

15. How are therapy goals implemented using ABA methodology? The goals and objectives (or "programs") have been designed to address and target a Student's, in this case Rex's, specific areas of need. As a part of ABA therapy, goals and programs are broken down into smaller, concrete steps. The instructor teaches each step of a skill one by one.

16. How do you measure progress during your therapy sessions with Rex? Data collection and analysis is an imperative component of our ABA program. I measure progress by data collection during each session. Each goal or program (or smaller step within a goal) has a specific mastery criteria. Once the Student has reached that mastery criteria over a period of 2-3 days that specific skill is considered "mastered" and can be moved into a "maintenance" program. The team can then move on to teaching and targeting the next skill or incorporating the learned skill into a larger sequence of skills. The team will likely also continue to probe the mastered skill at various waypoints in the future. This is to ensure that the skill is actually maintained (i.e., that the Student can substantively provide the appropriate response to demonstrate the skill even when the systematic ABA procedures have been removed).

17. How is data collected during your sessions with Rex? Little Green Tugboat collects data during sessions via GoLotus, a software that provides data input and graphing. All therapists involved in Rex's treatment record data and provide session notes, which are shared with Rex's parents and therapy team. Rex's parents also share session notes between the school and home programs. Data analysis consists of the BCBA supervisor to track mastery of a goal across three consecutive sessions. If the goal has met mastery over three consecutive sessions, the goal is marked mastered and the next learning objective is targeted. Goals are continuously monitored, introducing new targets as they

PE225

PE226

become relevant to Rex's programming and are socially valid and functional skills to target.

18. Do you provide progress reports for Rex's ABA session? Yes. However, as it is still early in the school year, I have provided Rex's progress report from May 2023 to further evidence his need for supplement ABA services, and the progress he has made over the years receiving these services. Ex. O.

19. How often does Rex receive ABA therapy from LGT? For the 2023/2024 School Year, Rex receives approximately 10 hours per week of after-school, 1:1 instruction/ ABA therapy.

20. Can you describe a typical ABA session with Rex? A typical home session consists of creating a visual schedule with Rex, embedding his independence and choices. The visual schedule guides the structure of the session, which includes targeting his goals, including but not limited to: home routines, adaptive skills, executive functioning skills, emotional and behavioral regulation, psychological flexibility, independence, and social skills. Sessions may include activities within the community settings, including the park or group classes in order to target social skills and generalization of skills into the community settings.

21. What have you been working on with Rex so far this school year? Rex's current targets include: independently following multi-step instructions and routines, adaptive living skills, pragmatic language skills (e.g., initiating and maintaining conversation), executive functioning skills, emotional regulation (e.g., accepting "no," waiting for desired request), behavioral regulation (e.g., decreasing escape/avoidance behavior, decreasing attention-

PE226

PE227

seeking behavior, decreasing tangible-seeking behavior), psychological flexibility and perspective-taking (e.g., assessing problems and demonstrating tolerance and appropriate coping skills, adjusting volume and tone of voice in response to others and environmental context), social skills (e.g., initiating and maintaining interactions with peers, making good peer choices, conversational exchanges with peers, responding to peers) and personal safety information and protocols (e.g., parents' phone numbers, address).

22. Why does Rex need this supplemental ABA therapy? The amount of supplemental ABA instruction Rex receives is not only an appropriate level of intervention for Rex, he needs this level of instruction in order to make meaningful progress. Many students with autism, including Rex, have tremendous difficulty maintaining learned skills without ongoing maintenance programs. It should also be noted that many students with autism do not independently transfer skills that they have learned and mastered in one environment with one provider to other environments or working with other people. Accordingly, for Rex, skills need to be directly taught in different environments and/or with different people so that the skill is actually "learned" and Rex has the skill in his general repertoire. Moreover, Rex continues to demonstrate significant delays within all areas of development. He has only made gains with teaching that is done in highly structured, 1:1 settings, with continuous high rates of reinforcement and repetition of tasks. It is because of the 1:1 instruction and the application of the principles and tactics used in ABA therapy that Rex has made steady progress.

23. How is the ABA therapy Rex receives from you and LGT different from the ABA methodology used at his school, Titus? The ABA that Rex receives at school is highly focused on his academic and school performance, which includes cognitive skills,

PE227

PE228

following instructions and school routines, observational learning, as well as social interactions with peers. The ABA that LGT provides in the home and community settings is complementary and compatible with the program targets of Titus. However, LGT primarily focuses on independence, adaptive living skills, psychological flexibility, adaptation to various environments and settings, and generalization and practical application of Rex's skills in all settings. LGT has and continues to target Rex's behavioral and emotional regulation within his family, as he exhibits a strong behavioral contrast between teachers, school staff and therapists, and his parents and brother. LGT focuses on implementing ABA treatment strategies through heavy parent training, generalizing, and adapting skills within Rex's natural environment. This type of imperative skills building is not possible within the school environment only, considering Rex's learning style and needs. He requires ample exposure and opportunities for practice within the natural contexts and situations within his daily life.

24. What opinion, if any, do have regarding Rex's need for 1:1, ABA instruction? Based on my experience and knowledge of Rex, if he did not receive 1:1 instruction using ABA during the 2023/2024 school year, he will not meaningful progress, and he will likely regress, even if he was in a small class setting with other special education supports and related services. Rex needs 1:1 instruction and support at all times.

25. How would respond if Rex progresses to the point where he needs fewer ABA services? If at any point in time, I suspect that Rex would be able to continue making meaningful progress with *fewer services*, I will have no problem communicating that belief to Rex's family and team members, and I would do so. Indeed reduction of support is the goal. I am hopeful that we will be able to fade back some of his support in the coming years, and

PE228

PE229

I am hopeful that he will be able to make progress in the future in a class where he does not need 1:1 instruction and support. We are not at that point currently, however. The data we collect will inform us when it is appropriate to reduce Rex's services.

*Stephanie Koh*

Signed by: Stephanie Koh
Date & Time: Oct 06, 2023 15:30:59 EDT

Stephanie Koh

Sworn to (or affirmed) and subscribed before me on this 6th day of October, 2023.

Date & Time: Oct 06, 2023 15:31:39 EDT
NOTARY PUBLIC

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual communication technology

PE229

PE230

NEW YORK CITY DEPARTMENT OF EDUCATION
IMPARTIAL HEARING

_____

**In the Matter of**

**Rex Francis**
**Student ID: 243-995-479**

**v.**                                               **IHO Case No. 24622**
                                                     **IHO: Michelle Babbitt, Esq.**

**New York City Department of Education**            **AFFIDAVIT OF KAITLYN**
                                                     **SIMMON**

_____

STATE OF NEW YORK          }
                           }        ss.
COUNTY OF NEW YORK         }

Kaitlyn Simon, being duly sworn, hereby swear and affirm:

1. Do you have a resume detailing your work experience? Yes, my resume and license/certification are in evidence as Exhibit R.

2. What is your current position and employment? My current position is Speech Language Pathologist at Happy Talk Speech and Language Therapy PC.

3. Are you familiar with the student Rex Francis? Yes, he is one of my clients.

4. How long have you had this position? I have been in my current position since September 2022.

5. How long have you been working as a speech pathologist? I have worked in the field of speech-language pathology since 2017.

PE230

PE231

6. What are your responsibilities in your position? My current roles and responsibilities include providing speech and language therapy, connecting with parents and teachers, and collaborating with other professionals.

7. How much do you charge for your services? The hourly rate for sessions at Happy Talk Speech and Language Therapy PC is currently $260 per 60-minute session. In 2024, this rate will likely increase to $280 per 60-minute session. These rates are within New York City's market value for someone of my experience and training, and I would note most similarly experienced, and qualified providers in the private sector charge similar or higher rates in the NYC metropolitan area.

8. Are you compensated for the services you provide Rex Francis? Yes, there is an agreement between myself and Rex's parents, Halia and Cliff Francis, that Happy Talk will be compensated for all the services provided for Rex's 1:1 SLT.

9. How long have you been working with Rex? I met Rex in September 2022 when he was 8 years 5 months old. I have been working with Rex in private practice speech and language therapy at Happy Talk Speech and Language Therapy PC.

10. How often do you see Rex for after-school speech therapy? I see Rex for one 60-minute session each week with the exception of illnesses and holidays. This schedule has been consistent for Rex since April 2022.

11. What are Rex's current speech deficits? At present, Rex presents with delays in the domain areas of pragmatic language (e.g., maintaining reciprocal, back-and-forth communication interactions), receptive language (e.g., attending to/processing/storing auditory information to follow multicomponent directions and comprehending/responding contingently to discourse-level narratives and conversation),

Received Office of State Review
01/09/2024

PE231

PE232

and expressive language (e.g., organizing and formulating utterances with varied vocabulary and morphosyntactic structures).

12. Are you aware of Rex's other related services he receives outside of school? Yes outside of Happy Talk Speech and Language Therapy PC, Rex participates in occupational therapy sessions with Jessica Zambito OTR/L and ABA behavioral therapy with Stephanie Koh and her team.

13. Do you know where Rex currently attends school? Rex is enrolled at The Titus School.

14. What collaboration, if any, do have with Rex's family and other service providers? I consistently collaborate with Jessica Zambito OTR/L given our long-standing professional relationship, shared office space, and communication regarding strategies to address sensory processing and receptive/expressive language development to facilitate Rex's availability for learning and generalizing new skills. Additionally, Rex's mother regularly forwards email updates from The Titus School to keep us informed of Rex's goals and progress.

15. Where does Rex receive his SLT services? Sessions are held in a sensory gym in an office suite. There are a maximum of 3 sessions scheduled in our suite simultaneously.

16. What programs or scholarly literature, if any, is used in formulating Rex's SLT goals and sessions? The Checklists of The Affect-Based Language Curriculum – Second Edition (ABLC-2) are consistently referenced when evaluating Rex's communication and language skills and capacities. Diagnostic therapy has utilized additional tools, such as Westby's Play Scale, Brown's Stages of Syntactic and Morphological Development Assessment, Prutting and Kirchner's Pragmatic Protocol, and Glenn and Stein's Story Structure Levels to develop goal areas and modify treatment plans, as necessary.

Received Office of State Review
01/09/2024

PE232

PE233

Additionally, checklists are utilized to determine Rex's use of functional and meaningful language. Goals are primarily rooted in the use of engagement and affective/emotional interactions (e.g., wishes and feelings) to teach Rex to use language functionally; to think logically, creatively, and reflectively; and to be a confident, efficient, and effective communicator and learner across both social and academic contexts.

17. How do you measure Rex's progress? Depending on the skill being addressed, progress is determined by qualitative analysis of language sampling, by identifying cueing hierarchies (minimal/moderate/maximal), or by calculating percentages of #correct/#trials.

18. Do you provide reports to detail Rex's progress? Yes, the August 2023 Progress Report, which can be found at Parent's Exhibit Q,  provides an overview of the goals being targeted for Rex during the 2023-2024 school year.  Nationally certified and state-licensed pediatric SLPs employed by Happy Talk Speech and Language Therapy PC conduct the treatment sessions and determine how goals are implemented.

19. What methodology, if any, do you use in your sessions with Rex? I use child-led therapy with Rex. As we are not bound to drill specific academic curriculum targets, we have more flexibility. We are able to extend an activity he is engaged with to increase complexity, introduce/relate/teach new information, etc. We do all of this in a naturalistic way because we use what is motivating to him; we use personally relevant and meaningful topics to Rex. We address the ability to attend to other communication partners, build logical bridges between his ideas and their ideas, think flexibly to perspective-take, and understand others' wants, ideas, etc. We focus on functional communication skills at the discourse level in both the oral and written modalities (i.e.,

PE233

PE234

maintaining conversations and understanding/generating narrative productions). Ultimately, I follow his lead to let him show me what is interested in and engaged with each session, and then structure the session around those preferred topics instead of following a predetermined agenda.

20. Can you give an example of an SLT session with Rex? Utilizing child-led play, depending on Rex's needs, 2023-2024 sessions are often initiated with movement in the sensory gym to facilitate calming (as per OT collaboration) and reciprocal back-and-forth interaction, followed by formulating a "plan." Rex requests this familiar routine but is accepting of modifications to the expected "plan" (i.e. different or non-preferred activities).

21. How are Rex's SLT sessions structured for the 2023-2024? For the 2023-2024 academic year, sessions utilize personally relevant and motivating topics to Rex, preferred play schemas, and joint book reading, as well as movement and sensory activities, to increase motivation, engagement/reciprocal interactions, and availability for learning. As Rex sustains a continuous flow of back-and-forth exchanges, receptive and expressive language goals are targeted. Receptive language targets are paired with visuals to strengthen the connection between phonological sequences (e.g., vocabulary words) and semantic concepts; then visuals are removed to strengthen auditory attention, auditory memory, and auditory comprehension. Target expressive language skills are bombarded, imitated (immediate), cued (e.g. cloze sentence), imitated (delayed), and ultimately, spontaneous.

22. What is Rex currently working on in his SLT sessions? Rex continues to work on improving his auditory attention while reading books to be able to hold information in memory to process and answer concrete WH- questions (e.g., who, what, where)

PE234

PE235

throughout the story (i.e., immediate recall) or at the end (i.e., delayed recall). In structured tasks, Rex has increased his understanding of temporal concepts, as he is following directions consistent with sentence structures "Before you ___, ___" and "___ after you ____." Overall, he follows one- and two-step directions embedded with three critical elements with 50% accuracy or greater. When following directions, Rex continues to benefit from wait time, as he has started to independently request repetition or clarification. During play, Rex continues to work on expanding play schemas and modifying outcomes to represent novel ideas. He is also using language to narrate actions. For example, as he plays with figurines on a playground, Rex might identify a problem of a baby crying and generate a multistep sequential solution of giving the baby milk, helping the baby slide down the slide, and then giving the baby an ice cream treat.

23. How else do you address Rex's auditory needs during your SLT sessions with him? To address auditory attention, auditory memory, and auditory comprehension, Rex will select a story; attend to 1-to-2 lines at a time WITHOUT corresponding visuals; respond to explicit WH- questions (given scaffolding) regarding the information presented; and then listen to the lines again WHILE looking at corresponding visuals. Upon completion, Rex will attempt to retell the story using sequential concepts as transitional phrases (e.g., First, Then, Last, Next) and/or other target morphosyntactic structures (e.g., conjunctions). Again, this is only a sample session, but pragmatic, receptive, and expressive language goals are always simultaneously targeted in the context of preferred play and/or joint book-reading activities.

24. Can you describe Rex's progress so far this year? Rex has most notably progressed in his capacity to report about past experiences with increased morphosyntactic complexity

Received Office of State Review
01/09/2024

PE236

(e.g., regular past tense -ed and irregular past tense verbs), utterance length (e.g., SVOPP sentence structures), and specificity. For example, on 1/23/23, Rex organized and formulated the following descriptive sequence to retell personally experienced events from his weekend: "1. I play Nintendo. 2. On ipad. 3. Ipod. 4. Tv. 5. Cookies with Pina." In contrast, on 9/18/23, Rex expressed the following given minimal (1-3) to moderate (4-6) cues for scaffolding: "1. I had a play date with Ryan at my house. 2. I read the Fred book. 3. I played Mario Odyssey on my Nintendo. 4. I played Incredibles with Freddie on the Xbox. 5. I got up early on Monday. I ate yogurt for breakfast. 6. I went horseback riding with dad. It was at a farm. 7. I went to Emack and Bolio with mom. I got vanilla ice cream in a cone. 8. I watched Mario Odyssey on Baba's phone. 9. Baba was on the phone with Uncle Mike. 10. I read a Tiny T-rex book to Baba. 11. Freddie went rock climbing with mom. 12. I listened to songs on my iPod." Expressively, Rex utilizes sequential concepts to organize his plan, as in "First, I go to the bathroom; then, I go to Jessica (OT)." At the moment, Rex does not routinely use SVOPP sentences and conjunctions in his spontaneous language output.

25. Why does Rex need 1:1 SLT instruction? Rex requires this supplemental 1:1 instruction to learn and maintain new skills. Without this 1:1 instruction, therapy would not be individualized and scaffolded to meet him at his current level of functioning. Therefore, Rex would ultimately be less available to learn, generalize, and maintain newly acquired skills that facilitate his ability to attend, interact, and communicate in the real-world environment. Rex has made commendable progress, and I anticipate he will one day be able to transition into a less restrictive environment. However, he is not there yet.

PE236

PE237

26. Why does Rex need SLT sessions with you in addition to the services he receives at Titus? Rex continues to require his current level of supplementary 1:1 speech/language sessions in addition to the speech/language supports that he is receiving at school. It is strongly recommended that individualized child-led therapy targets the following skills: explore and expand upon Rex's ideas; encourage logical thinking, creativity, and spontaneity; and build upon Rex's individual strengths and interests. A speech/language pathologist with training in language development is necessary to develop treatment plans and goals targeting developmental social-pragmatic and relationship-based goals. Sessions should continue to address the acquisition and generalization of skills across domains of receptive/expressive language to support Rex's ability to effectively communicate his needs, wants, thoughts, and ideas with others. Rex's appropriate education program includes Happy Talk Speech and Language Therapy PC because we follow Rex's lead to meet him at his current level of functioning and flexibly address our goals by switching set to more engaging/motivating/preferred tasks, increasing/decreasing task complexity as appropriate, and more.

27. Can you describe Rex's parents' participation in his services? Halia and Cliff Francis have been incredibly supportive parents who celebrate all of Rex's successes, acknowledge his strengths and interests, and address his vulnerabilities by asking questions, encouraging communication amongst team members, and sharing updates from the school with outside providers. They are eager and open to hearing our thoughts, feedback, and recommendations. It is a pleasure working with Rex and his family.

PE237

Kaitlyn Simon PE238

Signed by: Kaitlyn Simon
Date & Time: Oct 03, 2023 16:00:13 EDT

_____

Kaitlyn Simon

Sworn to (or affirmed) and subscribed before me
on this ___ᵗʰ day of October 2023.

Date & Time: Oct 03, 2023 16:00:30 EDT
NOTARY PUBLIC

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual
communication technology

PE239

NEW YORK CITY DEPARTMENT OF EDUCATION
IMPARTIAL HEARING

_____

In the Matter of

Rex Francis
Student ID: 243-995-479

**v.**                                           **IHO Case No.** 249622
                                                 **IHO:** Michelle Babbitt, Esq.

**New York City Department of Education**        **AFFIDAVIT OF JESSICA
                                                 ZAMBITO**

_____

STATE OF NEW YORK              }
                               }          ss.
COUNTY OF NEW YORK             }

Jessica Zambito, being duly sworn, deposes and says:

1.  Do you have a resume and/or license and certification detailing your experience? My
    resume and license/certification are in evidence as Exhibit T.

2.  What is current employment? My current position is senior occupational therapist, clinical
    director, and owner of Bloom OT and Spring Ahead OT PLLC.

3.  How long have you been in this position? I have been in this position since 2012.

4.  How long have you worked in the field of special education? I have worked in the field
    of special education since 2010.

5.  Are you familiar with the student Rex Francis? I am familiar with Rex Francis.

PE239

Received Office of State Review
01/09/2024

PE240

6.  How long have you known Rex? I began working with Rex in 2017 when he was 4 years old.

7.  Can you briefly describe your working history with Rex? I have worked with Rex individually for 60-minute occupational therapy ("OT") sessions at a sensory gym and in his home since 2017.

8.  How often to you see Rex for OT sessions? Session frequency has ranged from 2-3 times a week. There have been changes in the number of hours Rex receives over the years. From 2017-2020 he received OT at a minimum of two hours per week and from 2021-2022 onward, 1-2 hours per week.

9.  What is your hourly rate for therapy sessions? Therapy sessions are billed at $225-$250 per 60-minute session. This rate is within New York City's market value for someone of my training and experience, and most similarly experienced, and I would note that qualified providers charge similar or higher rates in the NYC metropolitan area.

10. Are you compensated for your services? Yes, there is an agreement between myself and Rex's parents, Halia and Cliff Francis, that Bloom will be compensated for all the services provided for Rex's 1:1 OT.

11. Can you describe Rex's deficits in regard to his OT needs? Rex presents with delays in fine, gross, and visual motor skills, sensory processing and regulation, strength, motor planning and coordination, as well as self-help skills including, but not limited to: using utensils, clothing management skills (buttons, shoe tying, utensil use, dressing, hygiene/grooming tasks). Rex's writing is below average and he is now able to write in

PE240

Received Office of State Review
01/09/2024

PE241

uppercase letters and numbers with prompting, however, he is not yet writing lowercase letters consistently. Rex presents with global hypotonia (low muscle tone) and that impacts his stamina with fine and gross motor skills. Rex also presents with decreased gross motor skills including eye-hand coordination, body coordination, and motor planning skills. Additionally, he receives PT to support his gross motor skill development.

12. Does Rex have any additional sensory deficits? Rex presents with sensory modulation differences that impact his regulation, safety stamina, and attention.

13. Can you describe his sensory deficits? He demonstrates sensitivity to noise and visual stimuli. He demonstrates sensory-seeking behavior and under-responsiveness to proprioception, tactile, and vestibular input. Rex can often seek out input unsafely or flee due to sensitivity which impacts his safety awareness and need for supervision. Rex demonstrates decreased interoceptive awareness that impacts his body temperature, hunger/thirst, toileting needs, and emotional regulation. He often overheats and needs prompting to use the bathroom and to determine thirst/hunger cues, satiety, and emotional regulation needs. He demonstrates significant safety and body awareness challenges and as noted above, can engage in unsafe behaviors and requires close supervision and skilled sensory integrative therapy support,

14. Do you communicate with Rex's parents and teaching staff regarding his OT needs and progress? I regularly speak with Rex's parents, Halia and Cliff, as well as the rest of Rex's team of related service providers and instructors at the Titus School, to discuss goals and gather clinical information from testing and therapist observations.

PE241

PE242

15. What are you currently working with Rex on during OT sessions? Rex's occupational therapy continues to address fine and visual motor, executive function, sensory processing, self-regulation, self-help, and motor skill development goals to support independence in daily routines across environments and provide parent education.

16. What are some of Rex's OT Goals for this school year? The goals that we targeted for the 2023/2024 School Year include: Improving independence with self-help skills (using a fork and knife, buttoning, tying a knot, donning/doffing socks and shoes, dressing/undressing, toileting hygiene independently, washing hands/bathing self); Improving fine & visual motor skills for greater stamina and independence with handwriting skills; Improving letter formation specifically for lowercase; Improving self-regulation and safety awareness using sensory diet/unlimited access to sensory supports and regulation program (zones of regulation). Additionally, this year we are focusing on improving Rex's overall safety awareness

17. Can you describe how these goals are implemented? All of Rex's goals were implemented with therapist and parent/team collaboration. This includes long-term and short-term goals (i.e.: Rex will write uppercase letters with 90% accuracy in ¾ trials, Rex will button and unbutton 3 buttons in 4/5 consecutive trials) to measure specific progress.

18. Can you describe Rex's progress thus far? As a baseline at the beginning of 2023, Rex was writing 50% of uppercase letters. Rex is now able to write his first and last name and 100% uppercase letters. He now can write and copy near and far point 1-2 sentences. Moreover, he is beginning to write lowercase letters. He can button and unbutton 3 large

PE242

Received Office of State Review
01/09/2024

PE243

buttons and begins to work on 3 small-medium buttons. He can don/doff socks and shoes independently. Rex continues to make gradual progress toward his OT goals.

19. Where do Rex's OT sessions take place? Each OT session is conducted at Bloom and Spring Ahead Pediatric Sensory Gym. Fine and gross motor skills, sensory processing, and self-help skills are worked on. We have a fully supportive sensory gym with therapeutic equipment including swings, climbing equipment, and fine and gross motor activities.

20. Can you describe a typical OT session with Rex? Rex's OT sessions typically consist of a 15-20 minute warm-up to regulate his nervous system using a sensory integrative approach. This may consist of deep pressure, swinging, or an obstacle course. Once Rex is regulated, we will move on to a self-help activity such as practicing doing/undoing buttons, tying knots, zippers, and cutting with a fork and knife. Next, we will go back into the sensory gym to address upper body and core strength, stamina, and motor planning in the sensory gym with exercise and therapeutic activities. We will transition to the table for the last 20-30 minutes to engage in fine and visual motor skills including writing, copying lyrics from a board, or reviewing letter formation. At the end of the session, we will work on independence with self-help skills including donning socks and shoes, using the bathroom, donning outerwear, and packing up belongings.

18. When was the last time you retested Rex to determine his progress? On October 10, 2023, I retested Rex to further inform his progress toward our set OT goals.

PE244

19. Do you provide progress reports? Yes, an OT progress note is labeled as Parent Exhibit S. This note goes into detail about Rex's slow and steady progress, his most recent OT re-evaluation, and any meaningful updates.

20. Based on your experience working with Rex, what is your recommendation, if any, for his supplemental OT services? My recommendation for Occupational Therapy services for Rex is 2-3 sessions per week at school and 2 sessions per week outside of school. This recommendation is based on past testimonials/reports.

21. Do you communicate with Rex's other related service providers? Rex's team remains in contact to discuss Rex's program through email exchanges and calls with the school's Occupational Therapist. I remain in communication with Happy Talk PLLC for speech and Little Green Tugboat/ABA

22. How involved are Rex's parents in his OT treatment? Rex's parents consistently bring Rex to therapy. They are always at pick up and drop off and have constant email and in-person communication with me.

PE244

*Jess Zambito*

Signed by: Jess Zambito
Date & Time: Oct 04, 2023 09:04:31 EDT

Jessica Zambito

Sworn to me on this ___ th day of October, 2023

Date & Time: Oct 04, 2023 09:05:15 EDT

Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6110701
Qualified in New York County
Commission Expires November 02, 2024

This remote online notarization involved the use of audio/visual communication technology

Received Office of State Review
01/09/2024

P - X 7 of 7

PE246

NEW YORK CITY DEPARTMENT OF EDUCATION
IMPARTIAL HEARING
───────────────────────────────────────

In the Matter of


**Rex Francis NYC ID:**    **243-995-479**
**v.**                                          **IHO Case No. 249622**
                                                **IHO: Michelle Babbitt**

**New York City Department of Education**    **AFFIDAVIT OF HALIA FRANCIS**
───────────────────────────────────────

STATE OF NEW YORK              }
                               }    ss.
COUNTY OF New York             }

I, Halia Francis, hereby swear and affirm:

## BACKGROUND

1. Can you describe your relationship with Rex Francis? I am Rex's Mother. Rex is 9 years old, and lives with me, his father, and his older brother Freddie.

2. What, if anything, is Rex diagnosed with? Rex is diagnosed with Autism Spectrum Disorder

3. When was he diagnosed? He was diagnosed in June 2016 by Dr. Jennifer Cross, MB at Weill-Cornell Medical Center.

4. Does Rex have any other diagnoses? More recently, Rex has been diagnosed with a PTEN Genetic Mutation.

5. Where does Rex go to school? For the 2023-2024 school year, Rex attends The Titus School ("Titus"), a private school for children with disabilities, including autism spectrum disorder, that implements ABA methodology in its curriculum.

6. How long has Rex been attending Titus? The 2023-2024 school year is Rex's third year attending the Titus School.

1

PE246

PE247

## REX'S NEEDS

7.  What led to Rex's ASD diagnosis in 2016? In 2016, when Rex was 2 years old, he stopped communicating verbally. Additionally, he also could not eat properly and began exhibiting severe behavioral issues. Ultimately, Rex was not meeting his developmental milestones.

8.  Did Rex receive any service after his diagnosis? After receiving an official Autism diagnosis in 2016, Rex began Speech Language Therapy (SLT), Occupational Therapy (OT), Physical Therapy (PT), Feeding Therapy, and in-home ABA therapy through NYS Early Intervention Program shortly thereafter.

9.  Does Rex still struggle with communicating? Rex continues to struggle with verbal communication but has made meaningful progress and improvements across all fields with the help of Titus's programming, and his supplemental SLT, OT, Social Skills programming, and ABA services.

10. What are Rex's biggest challenges with communicating? Mainly, Rex has difficulty with both expressing himself and understanding others. While Rex will initiate conversations, he still struggles to do so, especially with kids his own age. Rex also struggles with maintaining a conversation. For example, Rex will get stuck in a loop where he'll ask the same question, or go over the same topic, over and over again. Additionally, Rex struggles with understanding when it is appropriate to have certain conversations or say what is on his mind. Essentially, Rex still has a hard time understanding social cues/situations and how they should inform the conversation or what he wants to say. In connection with this, Rex will still have non-contextual vocalizations, although these have become less frequent.

11. Does Rex also struggle with understanding language? Yes, Rex also struggles to understand and process what is being asked of him. For example, Rex struggles to independently follow

PE247

Received Office of State Review
01/09/2024

PE248

through on instruction-based routines (e.g. "Take off your shoes and put them away", "Wash your hands and dry them") and generally struggles to follow instructions.

12. Can you describe other facets of communication Rex struggles with? Rex still struggles with recollecting and describing past events. While this has improved greatly over the years, it's still a struggle for him to consistently and accurately retell past events.

13. How do Rex's language deficits affect other areas of his life? Rex's challenges with language also affect his behavior. Generally, Rex struggles to maintain focus on non-preferred activities in and out of school. And while less frequently now, Rex will still display non-compliant behaviors. Additionally, and as previously mentioned, Rex will engage in loud vocalizations in order to gain access to preferred items, activities, or attention. While these behaviors have reduced over the years, Rex still engages in these behaviors.

14. How, if at all, do these deficits affect Rex's social life? Rex's challenges with language make it very difficult for him to engage with kids his own age. Rex is aware that he communicates differently, and is aware that other kids are aware of this difference. As such, he is often discouraged from engaging with kids his own age and doesn't get enjoyment in attending social events or other opportunities to engage with his peers.

15. How would you describe Rex's ability to understand emotions? Rex has difficulty identifying emotions. While he can generally tell if someone is happy or mad, and can communicate when he's feeling those emotions, he struggles to identify more complex and nuanced emotions like shame, frustration, embarrassment, etc. Moreover, Rex struggles with generalizing emotions in real-life scenarios. For example, Rex can be given a hypothetical where someone falls down and scrapes their knee. In this hypothetical, Rex will understand that the person will be in pain and knows to respond with "getting help" or "getting them a band-aid". However, when Rex

PE248

Received Office of State Review
01/09/2024

PE249

sees a classmate get hurt on the playground or in class, he struggles with identifying how his classmate may feel, and how to appropriately respond.

16. How would you describe Rex's motor skills? Rex still has poor motor skills. He requires visual cues, and additional prompts to help complete a task and help him maintain attention. By the end of the 2022-2023 school year, while he could write his name with verbal and visual cues, he struggled to independently write all numbers and letters. Rex also struggles to maintain a sustained grasp of items.

17. How would describe Rex's ability to perform daily living/self-help tasks? Rex needs support with everyday, self-help skills. For example, While Rex's ability to fasten buttons improved while at Titus, he still needs assistance in unfastening buttons, tying his shoes laces, putting his shoes and socks on, tying his bathrobe, etc. Moreover, when Rex is in an anxious or unregulated mood, he will put his clothes on inside out and needs assistance to put his clothes back on correctly.

18. Does Rex need support in maintaining his hygiene? Yes, Rex requires moderate assistance for other daily hygiene activities such as brushing his teeth, combing his hair, toilet hygiene, and washing his hands. When it comes to showering, Rex essentially needs 1:1 assistance. We use pictures in the shower for visual cues on proper showering techniques, but Rex still struggles with effectively scrubbing his head and washing across his body. Rex's struggles with showering are exacerbated by his hypersensitivity (i.e. certain portions of his body are harder for him to wash/scrub due to his touch sensitivity).

19. Can you describe any other sensory challenges Rex has, if any? Rex generally struggles with sensory issues and fluctuates between sensory seeking and under-responsiveness. Specifically, Rex seeks out deep pressure input, he enjoys crashing his body into objects, walks

Received Office of State Review
01/09/2024

PE249

PE250

heavily/loudly, and often falls. He is in constant motion and has difficulty sitting still for long periods of time. He often seeks out movement by running, spinning, twirling, or moving his body. Rex also has poor spatial awareness, delayed motor planning, and poor balance.

### Rex's 2023-2024 SCHOOL YEAR

20. Did you attend an IEP meeting for Rex's 2023-2024 school year? Yes.

21. When was it? On January 17, 2023, the DOE held an IEP meeting, to develop an educational program for Rex for the 2023-2024 school year.

22. Did you share any of Rex's school or medical reports for the IEP meeting? Yes, prior to the IEP meeting, I shared Rex's most recent progress reports from Titus, as well as the most recent progress reports from his ABA, SLT, and OT providers. I had previously shared Rex's 2021 Neuropsychological Evaluation. Ex. D, E.

23. In sum, what did those reports recommend for Rex? Rex's reports recommended that he be placed in a small, school-based program where he could receive 1:1 instruction using an ABA approach daily. Ex. D, E.

24. Did anyone at the IEP contest these reports or recommendations? No one at the meeting disputed the contents or recommendations of the reports we shared or that Rex has been making meaningful progress with his ABA program at Titus.

25. What was the DOE's proposed program for Rex? At the meeting, the DOE again recommended an 8:1:1 special class placement class, related services, and one session of group parent counseling and training per month.

26. Did you have any concerns with their recommendation? Yes, the DOE's recommendations were not consistent with the professionals who know and work with Rex on a daily basis. I,

PE250

Received Office of State Review
01/09/2024

PE251

and the professionals from Titus, had serious concerns that this proposed program did not provide Rex with the 1:1 ABA instruction he needed in order for him to make meaningful progress. We informed the DOE of the progress Rex has made under ABA instruction and informed them that such instruction needs to continue for Rex to be able to break down learning and behavior skills in a systematic way.

27. After the IEP meeting, did you communicate these concerns to the DOE? On June 15, 2023, I wrote the CSE team to reiterate my concerns that came up during the January 2023 IEP meeting, and to inform them that I still had not received a copy of the School Location Letter ("SLL"). Ex. C.

28. Did you ever receive a SLL for Rex's 2023-2024 school year? I received an SLL for Rex's 2023-2024 school year on June 22, 2023, just days before the start of the 23-24 twelve-month school year.

29. Did you contact the recommended school? Yes, I called the placement school shortly after I received the SLL to schedule a tour. I was told to email the school's parent coordinator to set up the tour.

30. Did you email the school parent's coordinator? Yes, I emailed them on July 10, 2023, to request a tour. To date, I have not received a response from the placement school. Ex. F.

31. Where does Rex currently attend school? Rex is attending the Titus school for the 2023-2024 school year.

32. Can you describe his classroom size? This year, Rex's classroom at Titus currently consists of 7 students, one lead teacher, one lead behavior therapist, two behavior therapists, and one BCBA classroom supervisor (7:4-5). The ratio provides ample opportunity for 1:1 instruction when Rex needs it.

PE251

Received Office of State Review
01/09/2024

PE252

33. Can you describe Rex's schedule? During Rex's summer session at Titus, he received SLT (3x per week for 30 minutes), Leisure Skills (3x per week for 30 minutes), individual OT (2x per week for 30 minutes), Physical Therapy (3x per week for 30 minutes), individual counseling (1x per week for 30 minutes), and individual music therapy (1x per week for 30 minutes), in addition to his academic instruction.  Ex. J.

34. What is his fall schedule? For the fall semester, Rex receives individual SLT (3x per week for 30 minutes), Social Skills (1x per week for 30 minutes), Leisure Skills (3x per week for 30 minutes), individual OT (1x per week for 30 minutes), physical therapy (3x per week for 30 minutes), individual counseling (1x per week for 30 minutes), and individual music therapy (1x per week for 30 minutes)  in addition to his academic instruction.  Ex. K.

35. What is the Titus School's tuition and cost for this year? The Titus School tuition and costs for the 2023-2024 school year from July 17, 2023, to June 21, 2024, is $138,000. Ex. H.

36. Does Rex receive any services outside of Titus? Rex receives supplemental services at home and in the local community. He receives OT through Bloom's Sensory Gym ("Bloom") for up to two hours per week. Rex also receives SLT through Happy Talk SLT ("Happy Talk") for up to two hours a week. Rex receives additional physical therapy from Leaps and Bounds, but we are not seeking reimbursement  for that.

37. Does Rex receive any supplemental ABA services? Yes, for the 2023-2024 school year, Rex receives ABA Behavioral Therapy instruction from Stephanie Koh and her staff through Little Green Tugboat ("LGT"). Specifically, he receives up to 10 hours per week of home-based ABA instruction.

38. What other ABA services, if any, does LGT provide? LGT also provides up to 2 hours per week of ABA supervision.  Rex's father and I also receive parent training  on ABA-based

Received Office of State Review
01/09/2024

PE252

PE253

systems and strategies (up to 2 hours per week), monthly interdisciplinary meetings (up to 1 hour per service provider), and monthly ABA Team Meetings (up to 1 hour per therapist) (i.e. meetings and correspondence between Rex's providers to ensure consistency across his services).

39. Does Rex participate in any social programming outside of Titus? Yes, Rex participates in after-school, social group programming through Recess once a week for 1 hour. So far, Rex has been participating in Recess's Improv Class. Around December 2023, he will switch to Recess's Connections program.

40. Can you describe these social programs? Both programs focus on improving Rex's ability to socialize and communicate in various contexts and situations, particularly with kids his own age. A description of the Recess program is included as Exhibit AA.

41. Does the Titus enrollment contract have any provision that allows you to withdraw Rex so he can attend a public school placement? Yes, the enrollment agreement that I and my husband signed contains a provision stating that we could be released from the remainder of the contract obligation if we notified the school in writing of a withdrawal prior to August 1, 2023. Ex. G.

42. What, if anything, did you understand from this provision? I knew, for the 2023-2024 school year, that if the DOE offered Rex an appropriate program and placement before August 1, 2023, I was not obligated to have Rex continue to attend the Titus school for the remainder of the school year, and was not on the hook financially for the remainder of the school year.

43. From what you've observed has Rex made meaningful progress while attending Titus? For the 2023-2024 school year, Titus continues to provide Rex with an appropriate program and placement and he continues to make meaningful progress.

PE253

Received Office of State Review
01/09/2024

PE254

44. Would you say the same for his supplemental service? Yes, Rex's supplemental services are necessary for Rex to make meaningful progress in his academic and social development.

45. Can you provide examples of Rex's progress thus far? Yes, For example: 1) Rex continues to make academic progress across all fields, 2) his ability to listen and follow instructions continues to improve, 3) his reading and writing skills continue to improve, 4) his expressive communication continues to improve, specifically in that he can maintain conversations for a longer period of time and that he initiates conversation more frequently, 5) Rex's ability to perform daily living skills/activities continues to improve, and 6) Rex's elopement and other interfering behaviors continue to decrease in frequency.

46. Where you open to Rex attending a public school? Yes, at all times, we were very open to considering a public school program provided that such a -program was appropriate and met Rex's needs. Unfortunately, the DOE never gave my husband and me a reason to cancel the Titus School contract.

47. How would you describe your cooperation with the DOE in putting together Rex's program for the 2023-204 school year? We have cooperated with the DOE in every instance. We have provided consent and made Rex available for any and all reasonable evaluations. We have participated in IEP meetings and complied with all DOE requests. In advance of any IEP or other meetings with the DOE, we have always shared as much information (both reports and oral accounts) about Rex, his program, his needs, and his strengths. We have always tried to contribute as much as possible to provide the IEP team with as much relevant information as possible so that the team can recommend an appropriate program for Rex. We have always been open-minded to considering a DOE placement and program for Rex.

Received Office of State Review
01/09/2024

PE254

PE255

48. What relief are seeking from this hearing? We are seeking reimbursement of the tuition and costs for Rex's 2023-2024 school year at Titus, the cost of ABA services (including Parent Training/Counseling, ABA supervision, monthly ABA team meetings, and monthly interdisciplinary meetings), OT cost, SLT cost, reimbursement/funding for an updated Neuropsychological Evaluation, Social Skills group costs, as well as continued DOE transportation/bussing.

PE255

Received Office of State Review
01/09/2024

PE256

*Halia Francis*

Signed by: Halia Francis
Date & Time: Oct 05, 2023 16:52:28 EDT

Halia  Francis

Sworn to me on this 5th day of October, 2023

Notary Public

SAMANTHA HARTMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6410701
Qualified in New York County
Commission Expires  November 02, 2024

This remote online notarization involved the use of audio/visual
communication technology

P - Y 11 of 11

PE256

Received Office of State Review
01/09/2024

 Gmail

Mariah Alvarado <malvarado@thetitusschool.com>

## Friday Weekly Email
1 message

Mariah Alvarado <malvarado@thetitusschool.com>                                      Fri, Jul 21, 2023 at 3:13 PM
To: Halia Francis <halia.francis@outlook.com>, Cliff Francis <cliff-francis@outlook.com>
Cc: Teresa Ambery <tambery@thetitusschool.com>, Tomiko Lyons <tlyons@thetitusschool.com>, Brian Rodriguez
<brodriguez@thetitusschool.com>, Gregory Sanniez <gsanniez@thetitusschool.com>, Meghan Keenan
<mkeenan@thetitusschool.com>, Caitlin McDonagh <cmcdonagh@thetitusschool.com>, Michelle Geisler
<mgeisler@thetitusschool.com>, Avital Akman <aakman@thetitusschool.com>, Marissa Bernstein
<mbernstein@thetitusschool.com>

Hi Halia and Cliff,

I hope all is well with you and that you had a great week thus far. Rex had a great first week back to school! This week
the students had some fun activities planned during homeroom! For cooking they made smoothies which Rex really
enjoyed and participated well! For current events, the students did a news2you in which they read about the hottest day
of the summer and answered questions about them after. We had two art activities this week, one freestyle painting about
summer and the second one the students decorated ice cream and wrote down their favorite one. We also had some
creative writing activities one about animals and the other about being in a park. Rex had some difficulty with this task, but
once he received help he was able to complete it.

Overall, Rex did great during all his academic blocks. There were instances of calling out and being off topic, but were
easily redirected. He is adjusting well in his new class with the other students and always willing to play with them. He
was so happy to show us his scrapbook btw! Hope you guys have a great weekend.

Math
This week in math we started module 2 of the Eureka curriculum! The students worked all year to make it this far and I'm
super proud of them. We began the module by learning how to do addition problems with three addends where two of
them make 10, for example "8+2+3" or "6+4+5". We practiced making 10 with just two numbers first, then we began work
on the three addend problems, including word problems. The students did a great job in our first lesson of module 2.

ELA
This week in ELA the students worked on fine-tuning skills we have worked on previously such as spelling words with
initial and ending consonant blends (i.e;PRiNT, SLip, fiLM). It can be challenging to isolate and identify these sounds
when spelling and we will continue to work on strategies to help with this. Throughout the week we also began to focus
more on the author's purpose behind writing a story. The students learned that there are 3 main purposes for a text; to
persuade, to entertain, and to inform. We practiced reading short articles and identifying what the author's purpose of
each was. This is a skill we will continue to strengthen and focus on throughout the summer.

Science
In science this week we continued our study on data collection and organization. The class practiced comparing
information with the visual help of a bar graph and learned how to create a bar graph using different intervals (by 1, 2, or
10). Students participated in a yummy version of data collection by organizing food based on flavor and identifying how
many of each flavor there was. Next week we are moving into a study of solids, liquids and gasses and will be
incorporating data collection into the topic.

Best regards,
Mariah Alvarado

**2 attachments**

3994C289-ED57-4104-92C0-8C101A2F4760.jpeg
3357K

Received Office of State Review
01/09/2024

P - Z 1 of 3

PE258

# Gmail

Mariah Alvarado <malvarado@thetitusschool.com>

---

## Friday Home Note
1 message

**Mariah Alvarado** <malvarado@thetitusschool.com>                          Fri, Jul 28, 2023 at 1:59 PM
To: Halia Francis <halia.francis@outlook.com>, Cliff Francis <cliff-francis@outlook.com>
Cc: Teresa Ambery <tambery@thetitusschool.com>, Tomiko Lyons <tlyons@thetitusschool.com>, Brian Rodriguez
<brodriguez@thetitusschool.com>, Avital Akman <aakman@thetitusschool.com>, Caitlin McDonagh
<cmcdonagh@thetitusschool.com>, Gregory Sanniez <gsanniez@thetitusschool.com>, Marissa Bernstein
<mbernstein@thetitusschool.com>, Michelle Geisler <mgeisler@thetitusschool.com>, Meghan Keenan
<mkeenan@thetitusschool.com>

Hi Halia and Cliff,

I hope all is well with you guys. Rex is continuing to adjust in the new room with the new staff and students. This week we
continued with the theme of summer. The students read an article this week for current events about the world's fastest
rowing group and answered questions about it. For cooking this week, the students made popsicle sticks in
which Rex was super excited about. We have one saved for him for when he feels better! The students also worked
together to make a kiwi kit to make a colored spin art project for stem and will continue to work on it next week. Lastly, we
were able to go out this week which Rex really enjoyed. He played in the sand with his peer and enjoyed the slide.

Rex had a great week during his academic blocks. He's always super willing to try new things although he started later
than his peers. We also have been working on having him raise a quiet hand instead of calling out, which he has been
doing really well with. He has been getting a little distracted by one of his peers so we're working on remaining focused
and finding strong reinforcers to keep him on task. Overall, he has been adjusting well and hope to continue to see
progress with Rex.

I will get back to you guys on meeting times for next week. I hope you guys have a great weekend and hope Rex feels
better!

Math
In Math this week, we continued working on solving problems by making 10 with three addends (for example, 8+2+3 = 13
--> 10 + 3 = 13). As part of this, we drilled all of our partners to 10, such as 8+2, 5+5, and so on, and also drilled single
digit numbers plus 10, such as 10 + 5, 10 + 2, et cetera. We built a lot of automaticity over the week, and by the end, a
few students could add to 10 without much thinking, and all of them had measurably improved.

ELA
This week in ELA we focused on writing and reading words that have initial and ending blends. This is still a challenging
concept for students as it can be difficult to hear each individual sound and identify the correct spelling. Throughout the
week we talk about why it is important to include each sound in the word because it can change the meaning. For
example in the word BLEND if you miss various letters it can change to LEND or BLED which have different meanings.
This activity was helpful for the students and the spelling improved throughout the week!

Science
This week we dove right into our new topic of various types of matter. The students learned about the properties of solids,
liquids and gasses and enjoyed several hand-on projects to see and feel the differences in matter. On monday students
learned about solids and gasses as we created our own balloon animal hats! Throughout the rest of the week we
explored a substance called OOBLECK. This is a strange and unique substance which quickly alternates between a solid
and liquid. Many students inquired about making this again in their home, if you would like to explore this with your child,
here is the recipe; 2 cups of corn starch, 1C of water, and food coloring as desired.

Best regards,
Mariah Alvarado

PE258

 Gmail

PE259

Mariah Alvarado <malvarado@thetitusschool.com>

---

## Friday Weekly Email
1 message

**Mariah Alvarado** <malvarado@thetitusschool.com>                                    Fri, Aug 4, 2023 at 1:38 PM
To: Cliff Francis <cliff-francis@outlook.com>, Halia Francis <halia.francis@outlook.com>
Cc: Teresa Ambery <tambery@thetitusschool.com>, Tomiko Lyons <tlyons@thetitusschool.com>, Brian Rodriguez
<brodriguez@thetitusschool.com>, Gregory Sanniez <gsanniez@thetitusschool.com>, Avital Akman
<aakman@thetitusschool.com>, Caitlin McDonagh <cmcdonagh@thetitusschool.com>, Marissa Bernstein
<mbernstein@thetitusschool.com>, Michelle Geisler <mgeisler@thetitusschool.com>, Meghan Keenan
<mkeenan@thetitusschool.com>, Arely Garcia <agarcia@thetitusschool.com>

Hi Cliff and Halia,

I hope all is well with you guys. Rex had a great week in Room 8! The students watched a brain pop video on primary and secondary colors. Once finished, they completed a corresponding worksheet that listed the colors of the rainbow, labeled the corresponding colors, listed the primary and secondary colors, and finished off by coloring a color wheel. Later in the week, they practiced mixing primary and secondary paint colors to make different colors and made a painting using the new colors they made. For science, they continued to work on making their spin art machine in which they are almost complete! They will soon be able to make their own spin art activity. For current events the students read an article of ai robots that play soccer and answered quiz question. For social skills, the students also played a game called head bandz with their peers and also had an activity in which the students spoke about their likes and dislikes. The students ended the week with some color war activities in which there were different obstacle courses they had to complete.

Rex had a great week during his academic blocks. He has been remaining on task and making sure to raise a quiet hand before calling out. There were a few instances where he was calling out and we gave a modeling prompt to remind him what he should do before asking a question. In the beginning of the week he was crying when given feedback from adults and would make statements like "I'm not in trouble". We reassured him that he was not in trouble and just needed a small correction and went back to being on task. We have also been trying to provide him with a lot of reinforcement when he is on task and following directions since he is still new to the academic rooms. In the classroom, he's still getting distracted by one of his peers and we're redirecting by changing the topic of the discussion. He has also been really motivated to work for tech time at the end of the day which has also been helpful to keep him on task. Please feel free to contact me with any additional questions! Have a great weekend!

Math:
This week in math we continued to work on solving problems with three addends when two of them make 10. Students have become increasingly comfortable with this skill as we have continued to build automaticity with partners to 10 and adding single digit numbers to 10, drilling these skills daily. This week we focused on building number bonds to help us solve these three addend problems. Students did a great job.

ELA
This week in ela we continued to focus on consonant blends in both reading and writing. I've seen tremendous growth and confidence from the students the past few weeks of this topic and am so proud of them for their hard work! This week we also continued to talk about the author's purpose; specifically when it is to persuade. The students learned more about what it means to persuade someone and wrote a persuasive letter about why they think the class deserves an end of summer school party!

Science
This week in science we continued learning about states of matter. The students enjoyed a tasty experiment in which they turned strawberries from a solid- to a liquid—to a solid- and then back to a liquid! Students helped prep and blend up strawberries to make tasty popsicles and identified properties of the strawberries as they changed. Then we got to eat the strawberries the following day and turn them back into a liquid as they enjoyed the tasty treat!

Best regards,
Mariah Alvarado

---

**4 attachments**

PE259

**761034FA-2491-4853-807F-A8F5B6A48C53.jpeg**
3220K

P - Z 3 of 3

Received Office of Special Review
01/09/2024

PE260



Home

Class
Descriptions

Class
Enrollment
Page

Saturdays at
Recess

Parties at
Recess

Contact Us

FAQs &
Terms &
Conditions

# Class Details

**Click the button at the bottom of the page to register your interest today!**

## FitMotion

A dynamic class to address fitness goals. Class layout, content and delivery designed to meet the participants at their level and create progression. Focusing on core movement patterns to increase coordination and muscle tone, aerobic fitness and flexibility. Builds confidence in an exercise setting.

## Art

In this engaging, creative art class we will seek out projects to utilize various skills and interests such as painting, drawing and other creative mediums. Students will work together to create various projects and explore different forms of art based on their interests. This hands-on class will promote creative thinking and self-expression!

## Cooking

Food preparation and cooking are important life skills for increased independence and autonomy.  In this Cooking class we will practice following step by step instructions to prepare a variety of recipes and then enjoy what we have

## Connections

At Recess we believe that successful interactions are among the most crucial life skills. These skills are important to communicate with others, foster relationships and effectively convey wants and needs.

PE260




Received Office of State Review
01/09/2024

P - AA 1 of 4



PE261

Home

Class
Descriptions

Class
Enrollment
Page

Saturdays at
Recess

Parties at
Recess

Contact Us

FAQs &
Terms &
Conditions

created. We can't wait to see
what delicacies are cooked up!

Throughout the Connections
class, students will engage with
their instructors and with each
other to work on forming
connections and engaging in
problem solving skills through
activities such as puzzles,
board games, Legos and
teamwork challenges.

## Dance

Learn the coolest moves and
grooves in this Dance class.
The class will consist of warm-
up, groove session, play games
and learn choreography,
through the rhythm and beats
of hip-hop and pop music.

## Job Readiness- New in Term 3!

This class caters to young adults
who are interested in developing
and applying workplace readiness
skills such as communication,
resume writing, interview prep,
and volunteer opportunities. We
will also incorporate problem
solving, time management and
decision-making skills.

## Improv- New in Term 3!

This class caters to young adults who are interested in developing
and applying workplace readiness skills such as communication,
resume writing, interview prep, and volunteer opportunities. We
will also incorporate problem solving, time management and
decision-making skills.

The goal of this class is to prepare students to learn improv
comedy while teaching students to challenge their imagination
and build self-confidence through *fun improv*. Students will
explore creativity in a safe and nurturing environment. The class

PE261

PE262



will focus on the following: teaching the basics of improv, creating skits, stage presence, stage direction, theatre activities and more!

# Coming Soon!

Home

Class Descriptions

Class Enrollment Page

Saturdays at Recess

Parties at Recess

Contact Us

FAQs & Terms & Conditions

## Travel Training

Small group excursions to learn and apply the skills needed to move safely and successfully around the city. Trip planning, scheduling, purchasing tickets, navigating queues, where to ask for information/help, managing changes/delays. Applied to bus, subway and ferry travel. Builds independence and confidence.

## City Attractions

For our adventurers, this program includes weekend trips to attractions in Manhattan; museums, exhibitions, movies. Create friendships with people with shared interests, enjoy the city and practice supported independence with spending money management, community engagement and navigating the city.

**Register Your Interest**

© Design by Recess
Font by fontlab.com



Received Office of State Review
01/09/2024

PE262

PE263



CALS Holdings LLC DBA Recess
215 E. 81st St.
NYC, NY 10028
646-454-1446
www.recessues.com

To Whom It May Concern:

Rex Francis is taking Improv Lessons at Recess.

Attendance for SEPT 2023:

| Date | Class | Start Time | End Time | Total Time |
|------|-------|-----------|----------|-----------|
| Sept 13th 2023 | Improv | 4.00 | 5.00 | 1 hour |
| Sept 27th 2023 | Improv | 4.00 | 5.00 | 1 hour |

Unit Price: $ 225
Total Month: $450

Balance: $0.0

Form of Payment:
Check
Credit Card X
Cash
Other: _____

The services were rendered and      REX FRANCIS      present in all the sessions hereby
documented.

Sincerely,
Caron Daly - Director of Recess

PE263

PE264

**Request for Medical Accommodations to be Completed By Treating Physician**

**Physician Instructions:** Please complete this form and return it to your patient's parent or fax to patient's school at _____

If you have questions, please contact ___Hulia___ ___Francis___

___Rex Francis___ is under my care for ___ASD___
(Student's Name)                              (Diagnosis)

What limitations does this diagnosis cause? (e.g. severely limits ambulation)
___peer communication___
___limited self-care___
___Impulsive behavior___

How does this limitation affect the student's ability to attend and participate in class?
(e.g. requires constant medical attention)
___requires small student to teacher ratio___
___requires behavioral therapy___

How does this limitation affect the student's ability to take transportation?
(e.g. increases risk for fractures)
___cannot be confined to small area for extended___
___periods of time; needs constant monitoring___

Expected duration of the limitation ___foreseeable future___

Please provide any recommendations to accommodate the student's needs in the classroom and/or during school transportation (please attach additional sheets as needed): ___short duration of travel not to exceed 45 minutes___
___air conditioned bus___
___one on one supervisor; small student to matron ratio.___

I request transportation accommodations to be provided for ___entire school year___ weeks

I can be reached at: Tel# ___212-585-3329___ and/or Beeper _____ on:
Mon_____ (hrs) Tue_____ (hrs) Wed___/___ (hrs) Thu_____ (hrs) Fri_____ (hrs)

Provider's Original Signature _____ License # ___171051___

Print Name / Degree
___Palmo Pasquariello MD___ Date ___6/22/23___

Palmo J. Pasquariello, MD, FAAP
1559 York Avenue
New York NY 10028
Tel : 212-585-3329
Fax: 212-585-3717
NPI 1487623997, Lic# 171051

PE264

**PE265**

 **NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE**

## AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA

| Patient Name | REX FRANCIS | Date of Birth 4/14/14 | Patient Identification Number 243995 479 |
|---|---|---|---|
| Patient Address | 25 E End Ave, 7E, NYC NY 10028 | | |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form: In accordance with New York State Law and Privacy Rule of the Health Insurance Portability and Accountability of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT, except psychotherapy notes, and CONFIDENTIAL HIV/AIDS* RELATED INFORMATION only if I place my initials on the appropriate line in Item 7. In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 7, I specifically authorize release of such information to the New York City Department of Health and Mental Hygiene ("DOHMH").

2. If I am authorizing the release of HIV/AIDS-related, alcohol or drug treatment, or mental health treatment information, DOHMH is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of the people who may receive or use my HIV/AIDS-related information without authorization. If I experience discrimination because of the release or disclosure of HIV/AIDS-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care providers listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by DOHMH (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. I AUTHORIZE ALL MY HEALTH CARE PROVIDERS TO RELEASE THIS INFORMATION TO, AND DISCUSS THIS INFORMAITON WITH, THE OFFICE OF SCHOOL HEALTH, A JOINT PROGRAM OF THE NEW YORK CITY DEPARTMENT OF EDUCATION AND THE NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

7. Specific Information to be released and discussed:

Entire Medical Record (written and oral) including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records send to my health care providers by other health care providers.

~~If this box is checked, release and discuss only my Medical Record from the range of dates starting from (insert date)_____ and ending on (insert date)_____~~

☐ Other: _____
_____

Include: (Indicate by Initialing)
_____ Alcohol/Drug Treatment Information
_____ Mental Health Information
_____ HIV/AIDS-Related Information

| 8. REASON FOR RELEASE OF INFORMATION: THIS INFORMATION IS RELEASED AT REQUEST OF THE PATIENT OR REPRESENTATIVE UNLESS OTHERWISE SPECIFIED HERE: | 9. THIS AUTHORIZATION EXPIRES ON THE DATE THAT PATIENT IS NO LONGER ENROLLED IN A SCHOOL OR PROGRAM OPERATED BY THE NEW YORK CITY DEPARTMENT OF EDUCATION OR SERVICED BY THE OFFICE OF SCHOOL HEALTH UNLESS OTHERWISE SPECIFIED HERE**: |
|---|---|
| 10. If not the patient, name of person signing form: | 11. THE PERSON SIGNING THIS FORM IS AUTHORIZED BY LAW TO SIGN ON BEHALF OF THE PATIENT AS THE PARENT OR LEGAL GUARDIAN OF THE PATIENT, OR AS SPECIFIED HERE: |

All items on this form have been completed, my questions about this form have been answered and I have been provided a copy of the form.

_____    7/22/23
SIGNATURE OF PATIENT OR REPRESENTATIVE AUTHORIZED BY LAW          DATE

*Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.

**If an expiration date is specified in Item 9 above, the form will expire on that date and a new form must be submitted by the parent or legal guardian of the patient, or other persons authorized by law.

Revised 3/2018

**PE265**

**NEW YORK CITY OFFICE OF ADMINISTRATIVE**
**TRIALS AND HEARINGS (OATH)**                                                              IE1
**SPECIAL EDUCATION HEARINGS DIVISION**
-----------------------------------------------------------------
**REX FRANCIS, a Minor,**
**by and through his/her Parent(s),**

|  |  |
|---|---|
| **PETITIONER** | **PREHEARING CONFERENCE**<br>**SUMMARY AND ORDER** |
| **against** | **Case # 249622** |
| **THE NEW YORK CITY**<br>**DEPARTMENT OF EDUCATION,** | **Michelle S. Babbitt, Esq.**<br>**Impartial Hearing Officer** |
| **RESPONDENT** |  |

-----------------------------------------------------------------

Petitioner is the parent of Rex Francis ("Student"). On 6/30/2023, Petitioner filed a Due Process Complaint ("Complaint" or "DPC") against the New York City Department of Education ("NYC DOE" or "DOE" or "District") pursuant to the Individuals with Disabilities Education Act ("IDEA").

The undersigned Hearing Officer was appointed to preside over this case on 7/7/2023.

On 8/2/2023, a prehearing conference was held in the above matter virtually via WebEx. Participating in the conference were: Impartial Hearing Officer Michelle S. Babbitt; Gary Mayerson, Esq., and John Hobbs, Esq., Petitioner's attorney, and Eli Koppel, Esq., (barred in New York) appearing as a Consultant Impartial hearing Representative for the DOE.

The parties discussed the following matters or were directed to review this Summary and Order for additional information not covered during the Conference:

1.   If either party objects to the undersigned Hearing Officer presiding over this case, the objecting party shall submit a written motion seeking my recusal and indicating their reasons with supporting case law and statutory authority. A decision on the motion will be ruled upon at the scheduled hearing, with the reasoning included within the final written decision.

2.   Each side was provided with a copy of the "Pre-Hearing Conference – Subjects to be Considered" document and shall be expected to follow the directives contained therein and all orders and directives included herein. Please see attached Addendum.

3.   The present compliance date for a hearing decision is 9/13/2023. As the hearing date is just 2 days prior to the scheduled hearing on the merits (9.11.23) the parties requested an adjournment of the hearing date, which request was granted so that an order extending the compliance date will issue closer to the 9.13.23 compliance date.

4.   Mr. Koppel has not yet finished investigating the case. He is to advise Parent's counsel and this tribunal, on or before the close of business (5:00 p.m.) on 8.16.23 as to the DOE's position with respect to the allegations in the DPC. Will this matter be recommended for settlement or will the DOE be proceeding to hearing? If the District will be proceeding to hearing how many witnesses

IE1

Received Office of State Review
01/09/2024                                                        IHO Exhibit 1000001

IE2

will it be presenting and will it do so by affidavit or by direct testimony? Will the DOE be submitting any subpoenas or making any prehearing motions? Will the District need an interpreter or an accommodation? All this information is to be presented in an email on or before 5:00 p.m. on 8.16.23. On or before 8.16.23 before 5:00 p.m. Parent shall state its position with respect to the transportation needs of the Student and what it is seeking as relief in this regard.. Parent represented that pendency is based in an unappealed FOFD dated 6.14.21 which provided for placement at Manhattan Children's Center (MCC) and after school services including ABA, PT, SL, OP, parent training and various meetings between/among providers and parents. The District is not going to sign the pendency form submitted by the Parent as the relief sought (the unilateral placement) is not in accord with the FOFD. Parent argues that Titus, the present unilateral placement, is substantially similar to MCC, and MCC is no longer available as a placement for the Student. On or before 8.25.23 Parent will advise if the prior unilateral placement became unavailable to the Student and if parent will be withdrawing its pendency request. If a pendency hearing is required it will take place at the beginning of the hearing on the merits on 9.11.23 as witnesses necessary for the pendency hearing will also be required to testify at the hearing on the merits. Having the pendency hearing on the same day as the hearing on the merits avoids duplication of testimony and conserves the resources of all parties. Parent anticipates presenting 3-4 witnesses, all by direct testimony. Parent does not anticipate making any prehearing motions, is unsure whether they will submit a subpoena for signature, and does not need any accommodation or translator.

5.   I request that all witnesses appear on video, as I must assess their credibility. It is difficult to do so if a witness appears behind a black rectangle. The attorneys for the parties must appear by video as well. If a witness doesn't have the wherewithal or capability of appearing on video, I am to be notified three business days prior to the hearing.

6.   Adjournments: Any party seeking an adjournment <u>must</u> seek consent of the other party and identify two proposed alternative dates prior to contacting the IHO. If the other party cannot be reached, or consent is not provided, the party seeking an adjournment may make a written motion to reschedule the hearing. Such a motion must include a) the reason an adjournment is sought b) an Affidavit of Unavailability and c) two alternative dates for consideration. Absent extraordinary circumstances, no adjournment will be considered less than 48 hours before the scheduled date. Declination of a WebEx invitation will **<u>not</u>** be considered an adjournment request.  A Party's failure to comply with rules concerning adjournments, or failure to appear, may cause the Hearing Officer to:
   a.   Hold the hearing in the absence of the Party;
   b.   Dismiss the case for failure to prosecute;
   c.   Draw negative inferences; or
   d.   Limit affirmative defenses.

7.   The issuance of an OATH email placing a matter on the calendar is a scheduling order. Nonappearance by a party, without contacting the IHO and copying the other party, may result in dismissal of the DPC (with or without prejudice), an explicit finding that the party has failed to meet their burden, or other such results as due process requires.

8.   Each side is represented by counsel.  Neither side expressed an interest in engaging in mediation. The parties are free to enter into settlement discussions and an agreement at any time and nothing in this order should be interpreted as prohibiting any settlement discussions or resolution.

IE2

Received Office of State Review
01/09/2024

IE3

9.  The parties are expressly directed to use affidavit testimony for your intended witnesses to the extent possible. See 8 NYCRR 200.5(j)(3)(xii)(f). Consistent with the Commissioner's Regulations, any such witness must be available for cross-examination. Please be advised that:

    •   Affidavits must be disclosed no later than 5 business days prior to the hearing;
    •   The opposing party must write to the offering party, copying me, at least 2 business days before the hearing if they wish to have the witness appear for cross examination;
    •   Should I have questions I wish to reserve for the affiant witness, I will notify the parties at least two business days before the hearing;
    •   Otherwise, the affiant witness will **not** be expected to appear for cross examination.

10. Either party must immediately inform the undersigned in writing whether a request to extend the timeline will be made or whether it is anticipated that the complaint will be withdrawn. No further extensions will be given absent extraordinary circumstances.

11. The Parent agrees to be provided the findings of fact, decision, orders, and all correspondences via electronic mail.

12. The Parent consents to the hearing being held via Escribers.

13. The DOE is to file a Due Process Response to the DPC on or before 8.16.23

14. The issues and requested remedies for the Due Process Hearing are limited to those raised in the DPC. This Hearing Officer will only rule on issues contained within the DPC and any possible remedies will be strictly limited to what has been requested within the DPC. Petitioner is to ensure that any remedy being requested is supported by substantial and detailed evidence or testimony which would allow me to craft an appropriate remedy, if I determine one is warranted.

15. The issue(s), requested relief, and defenses being presented for determination are generally described as follows:

    a.  Issues: Deprivation of FAPE for 23-24 school year including failure to conduct triennial, no FBA, no BIP, insufficient related services and inappropriate placement.
    b.  Petitioner seeks the following remedies: Tuition funding at unilateral placement (Titus), after school services consisting of 10 hours of ABA, 2 hours speech, 1 hour PT, 1 to 1 ½ hours of social skills, 2 hours of OT, 2hours of Parent training and 2 hours of ABA supervision, all to be provided on a weekly basis. The Parent also seeks monthly team meetings. Parent seeks transportation costs and is to provide detailed information as to this component of relief on or before 8.16.23. If Parent is seeking any direct funding they must provide independent proof of need (i.e., tax returns or SSI statement). Parent will have to show how the requested afterschool services will be utilized by the Student.
    c.  Respondent raises the following defenses: Respondent will advise of its position on or before 8.16.23 by sending an email with such information to the Parent and this tribunal.

16. Except for objections to this Summary and Order and motions for an extension, as further discussed below, all other motions or requests for orders by either party shall be made in writing, at least five calendar days before the scheduled hearing, and shall include any affidavits or exhibits relied upon. The opposing party will respond in writing within 3 calendar days of receipt and indicate their position. Additional time for the opposing party to respond may be granted upon application of the party responding, at the discretion of the Hearing Officer. If parties offer any motions, other than

3

IE3

IHO Exhibit 1000003

requests for an extension of the timeline, after this deadline, they will be deemed waived, and the undersigned Hearing Officer will not consider them. Parent's representative stated that there are no anticipated motions or submission of subpoenas.

IE4

17.    Disclosure of exhibits and witness lists will occur 5 business days before the scheduled hearing date.    A courtesy copy of each party's exhibits and witness lists shall be provided to the undersigned Hearing Officer no later than 5 business days before the scheduled hearing date.

18.    At least three (3) business days prior to the due process hearing, both parties must exchange in writing all objections to any portion of the opposing party's five-day-disclosures.  At least two (2) business days prior to the due process hearing, the parties must jointly discuss all objections and attempt in good faith to resolve them.  At least one (1) business day prior to the due process hearing, the parties must provide this Hearing Officer a joint list of objections that they were unable to resolve.  A party's failure to provide all objections in writing three (3) business days prior to the hearing may result in a waiver of the objection.  A party's failure to attempt to resolve an objection in advance of the due process hearing may result in the objection being sustained or overruled.

19.    All exhibits must be in PDF format and pre-marked prior to the hearing date.

20.    An exhibit list must also be provided. The exhibit list shall contain the exhibits identification number/letter followed by a description of the exhibit and the total page numbers in the exhibit.
    a.    Parents' exhibits should be identified as ["P" followed by the exhibit letter. Each page of the exhibit should be numbered as well. For example, if the IEP is to be the parents' first exhibit and it consists of seven pages, each page should be marked as follows: P-A-1, P-A-2, P-A-3, etc.
    b.    District's exhibits should be identified as "DOE" followed by the exhibit number. Again, each page of the exhibit should be numbered as in the example above (DOE-1-1, DOE-1-2, DOE-1-3).
    c.    Joint exhibits should be identified as "JE" followed by the exhibit number (JE-1-1, JE-1-2, JE-1-3). Each page of the exhibit should also be numbered. The parties shall prepare joint exhibits where possible.

21.    A witness list shall be provided and must include the name and title of the witness and a brief, but informative, description of the nature of the witness's testimony.
    a.    This Hearing Officer may exclude any irrelevant, immaterial, unreliable, or unduly repetitious testimony during the hearing.

22.    The parties shall send the undersigned Hearing Officer a copy of the Exhibits and Witness List at the time of the Five-Day Disclosure. Any witness affidavits should also be provided to the Hearing Officer in advance of the hearing on the merits.

23.    Should either party anticipate a problem in gaining a witness's participation, the parties are directed to address it by communicating with each other where appropriate or seeking a subpoena.

24.    The parties are required to stipulate to as many facts as can be agreed upon to facilitate and expedite the hearing.  Each party must provide the undersigned Hearing Officer a list of joint stipulations of fact and material admissions three (3) business days prior to the due process hearing.  Each party must stipulate and admit only those facts that are material, i.e., "significant to the issue or matter at hand."

Received Office of State Review
01/09/2024

IE4

IHO Exhibit 1000004

IE5

25.    The parties should be prepared to present oral closing arguments at the conclusion of the hearing. Written summations will only be accepted at the discretion of the undersigned Hearing Officer.

26.    If there is a resolution to this matter, the parties are requested to provide notice to the undersigned Hearing Officer that a resolution has occurred along with a written request by the Petitioner to withdraw the Due Process Complaint, either with or without prejudice.

27.    Parties cannot "reserve rights" to any issue that conflicts with this PHC Summary and Order or conflicts with Federal and State regulations related to Due Process Hearings under the IDEA and Section 504 of the Rehabilitation Act, or any other relevel statue or caselaw. Parties are required to adhere to this Order, and any issue not addressed herein is subject to the three-calendar day timeline to articulate and/or object.

28.    The parties understand that there are to be **no _ex parte_ communication** with the Hearing Officer. Any written communications with the Hearing Officer, whether by mail, electronic mail, or facsimile transmission, must be simultaneously copied/delivered to the other party.

29.    **The parties will be held to the matters agreed upon, ordered, or otherwise set forth in this Summary and Order and to those directives referenced in the "Pre-Hearing Conference – Subjects to be Considered" document (included herein as "ADDENDUM A").  If either party believes the undersigned Hearing Officer has overlooked or misstated any item, the party is directed to advise the undersigned Hearing Officer and all parties of the omission or misstatement within three (3) calendar days of the date of this Order.  Any objection to anything contained within this Summary and Order shall be submitted in a written motion within three (3) calendar days of the date of this Order and the undersigned Hearing Officer will address the party's concerns accordingly.  If either party fails to raise an objection within this mandated timeframe, such objection will be considered waived.**

**SO ORDERED,**

Dated:  8/2/2023

_Michelle S. Babbitt_
Michelle S. Babbitt, IHO

IE5

Received Office of State Review
01/09/2024

IHO Exhibit 1000005

IE6

# ADDENDUM A

**Pre-Hearing Conference – Subjects to be Considered**

The following issues/topics were discussed during the Pre-Hearing Conference or incorporated by reference within the above Summary and Order.   All parties will be expected to comply with the directives contained herein and included within the Summary and Order.

1. Motions/Requests
   a. All motions or requests for orders shall be made in writing, at least five calendar days before the scheduled hearing, and shall include any affidavits or exhibits relied upon. The opposing party will respond in writing within 3 calendar days of receipt and indicate their position. Additional time for the opposing party to respond may be granted at the discretion of the Hearing Officer, upon application by the party responding. The Hearing Officer will then rule on the motion/request.  If parties offer any motions, other than requests for an extension of the timeline, after this deadline, the Hearing Officer will not consider them.

IE6

Received Office of State Review
01/09/2024

IHO Exhibit 1000006

b. If either party objects to my being the Hearing Officer for this case, the objecting party shall submit a written motion seeking my recusal and indicating the reasons with supporting case law and statutory authority. A decision on the motion will be ruled upon at the scheduled hearing with the reasoning included within the final written decision.

2. Testimony by Affidavit
    a. To expedite the hearing process, absent a showing of good cause, all direct testimony of a party's own witness shall be submitted to all parties and the IHO in an affidavit, no less than 5 calendar days prior to the commencement of the hearing, provided, however, (a) that the submission of a direct testimony affidavit from a witness who is not under the control of the party offering the testimony will not be required; (b) the submission of a direct testimony affidavit from a witness who is a non-English speaker and requires the assistance of an interpreter will not be required; and (c) the opposing party shall have the right to object to statements in the direct testimony affidavit, and I will rule on such objections, just as if the statements had been made orally in open court. Where an objection to a portion of a direct testimony affidavit is sustained, I may direct that such portion be stricken. The party offering the statement will have an opportunity to cure any sustained objection via live testimony of their witness.
    b. The submission of direct testimony in affidavit form shall not affect any right of the parties to conduct a full live cross-examination of the witness or re-direct examination of the witness. The party offering the affidavit will also be permitted to make a limited direct inquiry to account for any additional pertinent testimony not contained within the affidavit.
    c. The affidavit shall take the form of numbered questions and answers, as if the questions were being asked and answered on the record and being read off a transcript (i.e., (1) What is your name? Jane Doe; (2) What is your relationship to this case? I am the parent; (3) Where do you reside? Brooklyn, N.Y.). Parties are advised to be mindful to avoid legally impermissible questions and lengthy irrelevant narrative responses that would likely encounter a sustained objection if presented live.
    d. The witness whose testimony is presented via affidavit **must** be available on the day and time of the hearing unless there is a signed stipulation by both parties and the IHO indicating that the witness's affidavit is sufficient and there will be no further questioning of the witness by any party or the IHO.
    e. The affidavit must be signed by the affiant and sworn under penalty of perjury and notarized or, in the alternative, authenticated on the record by the affiant.
    f. If the witness is unavailable to testify live and the opposing party or the IHO seeks to examine that witness, the affidavit will not be accepted for admission into evidence.

3. Time to Present Case
    a. Pursuant to 8 NYCRR §200.5(j)(3)(xiii), each party shall have **up to one day** to present its case, unless the impartial hearing officer determines that additional time is necessary for a full, fair disclosure of the facts required to arrive at a decision. Additional hearing days, if required, shall be scheduled on consecutive days wherever practicable.
    b. Any party anticipating the need for more than one day to present its case shall present a compelling reason and include the specific amount of time anticipated to be needed.

IE7

Received Office of State Review
01/09/2024

IHO Exhibit 1000007

IE8

4.  Remedy
    a.  Petitioner is to ensure that any remedy being requested is supported by substantial and detailed evidence or testimony which would allow the IHO to craft an appropriate remedy, if eligible and so warranted.

5.  Parent Representation
    a.  If the parent is not represented by an attorney and plans to hire an attorney before the due process hearing, the parent must immediately email the IHO and the opposing party with the name and contact information for the attorney.
    b.  If the parent is not represented by an attorney, the District shall provide the parent with a list of sources to contact to get help with understanding the Individuals with Disabilities Education Act (IDEA) and the hearing process.  The District shall also send the parent a copy of the Procedural Safeguards notice.

6.  Settlement/Resolution
    a.  Both parties are encouraged to continue to engage in fruitful settlement discussions and are encouraged to consider mediation as a resolution to this complaint.  If a resolution or settlement is obtained, the parties are to inform the hearing officer immediately and the Petitioner is to submit a motion to withdraw.

7.  Issues for Hearing
    a.  During the Pre-Hearing Conference, the IHO may require the parties to clarify the issues/remedies and provide more detail and explain any defenses.

8.  Response to the Due Process Complaint
    a.  The Respondent shall file a response to the Due Process Complaint and send a copy of the response to the IHO.

9.  Fact Agreements/Stipulations
    a.  The Parties shall stipulate to any facts not in dispute in writing prior to the hearing.

10. Witnesses and Evidence
    a.  Attorneys/parties are expected to give careful thought to their witness/evidence lists before the Pre-Hearing Conference so that the IHO can decide about how much time each party will be given to present their case.

11. Date, Time, and Location of the Hearing
    a.  Hearing dates, times, and length will be decided at the conference. Per 34 CFR § 300.515(d), the hearing will be conducted at a time and place that is reasonably convenient to the parents and child involved.
    b.  The hearing will be held virtually via WebEx unless the Parent objects.

12. The 45-day Deadline
    a.  If the parties need an extension of the 45-day deadline, the parties must be prepared to discuss the factors at 8 NYCRR § 200.5(j)(5).

IE8

13. Five-Day Disclosures (Exhibits and Witnesses)

IE9

    a. The Parties will be expected to comply with the statutory framework pertaining to the disclosure of exhibits and witnesses.

    b. The parties must, before the hearing, discuss any exhibits that are identical to an exhibit of the other party. If the parties disagree about whether an exhibit is identical, the parties must be prepared to explain why the documents are different at the beginning of the hearing.

    c. All exhibits must be in PDF format and pre-marked prior to the hearing date. An exhibit list must also be provided. The exhibit list shall contain the exhibits identification number/letter followed by a description of the exhibit and the total page numbers in the exhibit. Parents' exhibits should be identified as ["P" followed by the exhibit letter. Each page of the exhibit should be numbered as well. For example, if the IEP is to be the parents' first exhibit and it consists of seven pages, each page should be marked as follows: P-A-1, P-A-2, P-A-3, etc. The school district's exhibits should be identified as "DOE" followed by the exhibit number. Again, each page of the exhibit should be numbered as in the example above (DOE-1-1, DOE-1-2, DOE-1-3). Joint exhibits should be identified as "JE" followed by the exhibit number (JE-1-1, JE-1-2, JE-1-3). Each page of the exhibit should also be numbered.

    d. The disclosure must include a Document List with the following information:

        i. The exhibit letter or number (Example: Exhibit P-A-1)

        ii. The name/title of the document (Example: IEP 05/26/2021)

        iii. The page range or number of pages of each exhibit (Examples: "12 pages" or "P-A-1-12).

    e. The Witness Lists must include the following for each witness:

        i. Name

        ii. Role/position

        iii. 1-2 sentence explanation of the general thrust of the witness' testimony

    f. The parties must send the IHO a copy of the Exhibits and/or Witness List at the time of the Five-Day Disclosure.

14. Subpoenas

    a. If either party is having trouble accessing or obtaining witnesses or records, the party may request a subpoena in writing from the IHO.

    b. The party requesting the subpoena should be prepared to explain how the document or witness is relevant to the case. If the other party is preventing access to a witness or a document, that party should be prepared to explain why it will not provide access voluntarily.

    c. If seeking a subpoena will delay the hearing, do not wait until the Pre-Hearing to make a request. You may request a subpoena at any time.

15. Open/Closed Hearing

    a. Unless the Parent requests otherwise, the hearing will be closed to the public.

16. Interpretation and Accommodations

    a. If either party requires an interpreter or reasonable accommodation, they shall inform the IHO in writing at least five business days prior to the hearing.

IE9

Received Office of State Review
01/09/2024

IHO Exhibit 1000009

IE10

17. Closing Arguments
   a. The parties must be prepared to present oral closing arguments at the conclusion of the hearing.  Written summations will only be accepted at the Hearing Officer's discretion.

18. If there is a resolution to this matter, the parties are requested to provide notice to the undersigned Hearing Officer that a resolution has occurred along with a written request by the Petitioner to withdraw the Due Process Complaint, either with or without prejudice.

19. The parties understand that there are to be no ex parte communication with the Hearing Officer. Any written communications with the Hearing Officer, whether by mail, electronic mail, or facsimile transmission, must be simultaneously copied/delivered to the other party.

20. Decision
   a. Unless the Parent requests otherwise, the Parent agrees to be provided the findings of fact, decision, orders, and all correspondences via electronic mail.

IE10

Received Office of State Review
01/09/2024

IHO Exhibit 1000010

IE11

THE NEW YORK CITY
DEPARTMENT OF EDUCATION
IMPARTIAL HEARING OFFICE

-------------------------------------------------x

In the Matter of

IHO Case No. 249622

**REX FRANCIS**

-------------------------------------------------x

# CLOSING BRIEF
# FOR THE DEPARTMENT OF EDUCATION

Eli Koppel, Esq.
Special Education Unit
Office of the General Counsel
New York City Department of Education

IE11

IE12

## PRELIMINARY STATEMENT

The New York City Department of Education ("DOE") respectfully submits this closing brief in response to the parent's request for the DOE to provide:

1. Funding for tuition at the Titus School for the 2023-2024 school year;

2. 10 hours a week of ongoing home-based ABA services;

3. Up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy);

4. 1 hour per week of after school Physical Therapy;

5. Social Skills group one day a week after school;

6. Up to 2 hours per week of after school Occupational Therapy;

7. Up to 2 hours per week of parent training and counseling;

8. Up to 2 hours per week of after school ABA supervision;

9. Monthly ABA meetings;

10. Monthly interdisciplinary team meetings;

11. Funding for an updated Neuropsychological Examination;

12. Costs of transportation to and from the school.

## I.    THE DOE DID NOT PRESENT A PRONG I CASE

The DOE did not present a Prong I case and therefore, the DOE did not provide a free appropriate public education to the student for the 2023-2024 school year. Nonetheless, parents still have the burden to demonstrate that the unilateral placement, the Titus School was an appropriate placement. See Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 115 (2nd Cir. 2007) (parents seeking to have a public-school district pay their private school tuition "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was

IHO Exhibit 2000002

IE13

inappropriate."). The District relies on the hearing record and documentary evidence to establish that the parents failed to meet their burden of showing that the Titus School was an appropriate placement for the 2023-2024 school year.

The District also relies on the hearing record with regard to the parent's request for the DOE to continue to provide the student with specialized door-to-door transportation from his home to the Titus School. It is the District's position that there was not sufficient evidence at the hearing to establish that the student needed this service, the cost of this service, and whether the parent had the means to pay for this service.

## II.    AT-HOME ABA IS UNWARRANTED IN THIS CASE TO GENERALIZE SKILLS

The Second Circuit has emphasized, "school districts are not required to 'maximize the potential' of students with disabilities, but instead must offer only 'a basic floor of opportunity.'" Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 221 (2d Cir. 2014) (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 200 (1982)). Accordingly, a school district must formulate an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207. This means an education "that is likely to produce progress, not regression," and requires more than just "the opportunity for only trivial advancement." Walczak, 142 F.3d at 130 (internal quotation marks and citations omitted).

Under this framework, services that seek only to generalize skills may not be required to provide a FAPE and "[s]everal courts have held that the IDEA does not require school districts as a matter of course to design educational programs to address a student's difficulties in generalizing skills to other environments outside of the school environment." See SRO 14-121. This is

IE13

IE14

particularly true "in cases in which it is determined that the student is otherwise likely to make progress in the classroom." Id.

In P.S. v. New York City Department of Education, for instance, the court upheld the SRO's determination that a student did not require home-based programming because "the primary purpose of [the student's] home-based services appeared to be 'generalization' of behaviors learned in the school setting to the home setting." No. 13-CV-4772 (LGS), 2014 WL 3673603, at *13-14 (S.D.N.Y. July 24, 2014).

Here, parent's witness Stephanie Koh (hereinafter "Koh") testified that in her professional opinion, the student should receive ten hours a week of homebased ABA services and additional parent training (approximately eight hours a month), in addition to the ABA services the student is receiving at Titus (Hearing Transcript, pp: 100-103). Koh testified that her practice helps the student with bathing in attempt to reduce his resistance and tantrums "to just the shower being on – just water hitting his head." (Hearing Transcript: 103). The skill Koh's firm was working with the student to teach him "independence with thorough bathing -- self-bathing in a shower," a skill not taught at Titus (Hearing Transcript: 104-105). Similarly, Koh testified that her practice was also helping the student with the issue of elopement in public. Specifically, Koh stated, "We are working on personal information -- having him know where he lives, what his parents' phone numbers are." (Hearing Transcript: 116). Koh went on to explain the other things her firm was working on with the student:

> We are working -- yeah, we working on community safety skills. I mean, related to that, where he -- we're having Rex identify when it's safe to cross the street, where -- where he needed to stop. The personal information that's for his (audio interference) current skill. The bathing, the -- just self-hygiene adaptive skills, functional daily living skills. Basic home chores that are appropriate.

> [ ]

IE14

> Putting on clothes, just dressing himself, putting his clothes into the hamper, brushing his teeth thoroughly. That's actually been something that, again, just kind of like the bathing where we started with desensitization of just being in the shower years ago. But currently we are working on him completing the steps independently and being more thorough with the brushing of teeth.
>
> [ ]
>
> In terms of chores in the -- in the home, you know, for -- as part of, kind of, like his functioning within the family life and routines, you know, putting his plate in the sink, helping with preparing dinner, helping with setting tables, setting the table. I'm trying to think of some other. Oh, like making his bed, things of that 16 nature.

(Hearing Transcript: 117-119, 120-121).

FAPE does not require programming intended to address a student's difficulties generalizing skills to environments outside of the school. Further, the parent should not have it both ways. The parent should not be able to claim that on one hand Titus is an appropriate placement, but that the student also requires further services to benefit from the school that the Parent unilaterally chose.

It also bears noting that Koh owns her own ABA services company, Little Green Tugboat (Hearing Transcript: 96). To be clear, Koh has every right to use her own expertise and enterprising spirit to start an ABA services company that provides homebased ABA services in the marketplace. However, Koh was not brought as a witness in this hearing merely to give a professional opinion about the recommendation of homebased ABA for this student. Koh has a vested financial interest in an award of homebased ABA and, as the owner of her own homebased ABA agency, Koh would reap substantial financial benefits.

### III.    PARENT'S REQUEST FOR THE FUNDING OF AFTER-SCHOOL SERVICES SHOULD BE DENIED

The parent's amended due process complaint requests, in addition to a tuition award for the Titus School, funding for several after-school services. Specifically, the parent requests funding for up to 2 hours per week of after school Speech and Language Therapy (including feeding therapy), 1 hour per week of after school Physical Therapy,  Social Skills group one day a week after school, up to 2 hours per week of after school Occupational Therapy, up to 2 hours per week of parent training and counseling, and monthly interdisciplinary team meetings.

The District is not entirely clear whether the parent's request for after-school services stems from a compensatory basis and/or whether the parent is contending that an appropriate education can only be achieved by having the District fund the tuition at the Titus School <u>and</u> the aforementioned after-school services.

As is familiar in IDEA practice, a Parent seeking tuition reimbursement due to the school district's alleged denial of FAPE must demonstrate that their unilateral placement must be appropriate to meet the Student's unique needs. <u>Gagliardo v. Arlington Central School District</u>, 489 F.3d at 115. The purpose of compensatory relief is also to provide an appropriate remedy for a deprivation of FAPE. <u>See, e.g.</u>, <u>E.M. v. New Yok City Dep't of Educ.</u>, 758 F.3d 442,451 (2d Cir 2014). It is intended to place a student in the position they would be in had FAPE been provided. <u>See</u> <u>P.</u> v. <u>Newington Bd. of Educ.</u>, 546 F.3d 111, 123 (2d Cir. 1998) (holding that compensatory education is a remedy designed to "make up for" a denial of a FAPE).

Given that both awards are intended to remedy the denial of FAPE in a particular school year, a compensatory remedy should be completely redundant and unnecessary on top of a tuition remedy given the Parent's burden to demonstrate that their chosen school is appropriate. While not explicitly addressed by the Second Circuit, the Third Circuit has ruled that these remedies are

IE17

not simultaneously available for the same school year.  See D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012) (holding that compensatory education is only at issue when tuition reimbursement is not); P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 739 (3d Cir. 2009) (holding that "compensatory education is not an available remedy when a student has been unilaterally enrolled in a private school."). See also Individually M v. Kingston City Sch. Dist. 1:14-CV-0542 (GTS/DJS) at *29 (New York District Court held that compensatory education is a remedy available for students not unilaterally enrolled in a private school).

The Office of State Review has also strongly disfavored combining the two remedies for the same school year.  See e.g., SRO 21-197 at *18 (Nov. 26, 2021) (reversing hearing officer's award of compensatory services to make up for alleged gaps in the student's IEP and the unilateral placement); SRO 21-152 at *8 (Sept. 20, 2021) (declining to award compensatory vision education in addition to a unilateral placement "to make-up for deficiencies in the placement chosen by and arranged for by the parent.  To do so would amount to double relief…"); SRO 21-163 at *12-13 (Aug. 27, 2021) (reversing hearing officer's award of an assistive technology device as comp. education where the Parents had rejected the proposed IEP and unilaterally placed the Student in a private school that did not provide the device); SRO 20-151 at *15 (Dec. 3, 2020) ("However, if permitted, it would be the rare case where a unilateral placement is deemed to provide instruction specially designed to meet the student's unique needs but the student is also deemed entitled to compensatory education to fill gaps in the services provided by such unilateral placement.").As with a unilateral placement, compensatory relief is not intended to maximize a Student's potential, and should not be used to supplement the program provided by the unilateral placement.  Bd. of Educ. v. Rowley, 458 U.S. 176, 192 (1982); See M.C. ex rel. Mrs. C. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 62 (2d Cir. 2000).

IE17

IE18

It is also important to note that awarding tuition for a unilateral placement does not foreclose other unilateral relief that must be measured by an appropriateness standard. Like tuition, this can be viewed as a unilateral placement for which the parent has assumed a financial risk pending the outcome of the hearing (or is receiving the service via pendency). The Parent incurs no risk when seeking a compensatory remedy – presumably, the Student does not receive this remedy unless and until awarded. As such, assuming the unilateral placements and services are deemed appropriate, there should be no need for a compensatory remedy to "make up" for any denial of FAPE.

To the extent that the parent is contending that an appropriate education for the student can only be achieved by the DOE funding of both tuition at the Titus School and after-school programming, the District can only be required to fund services that it would have had to provide a student in order to provide the student with a FAPE. Still v. DeBuono, 101 F.3d 888, 893 (2d Cir. 1996); L.K. v. New York City Dep't of Educ., 2016 WL 899321, 5-8 (S.D.N.Y. 2016); Application of a Student with a Disability, Appeal No. 19-131, 9. A school district does not have to fund services that go above and beyond what is required to provide a student with a FAPE. L.K., 2016 WL 899321 at 8.

Without question, parents are entitled to reimbursement for the cost of an appropriate private placement when a district has failed to offer their child a FAPE, but it does not follow that they may take advantage of deficiencies in the district's offered placement to obtain all those services they might wish to provide for their child at the expense of the public fisc, as such results do not achieve the purpose of the IDEA. Accordingly, while a parent should not be denied reimbursement for an appropriate program due to the fact that the program provides benefits in addition to those required for the student to receive educational benefits, a reduction from full

IE18

IE19

reimbursement may be considered where a unilateral placement provides services beyond those required to address a student's educational needs. As stated by the Supreme Court, "[r]eimbursement merely requires [a district] to belatedly pay expenses that it should have paid all alone, and would have borne in the first instance" had it offered the student a FAPE. As one circuit court recently explained, "[e]quity surely would permit a reduction from full reimbursement if [a unilateral private placement] provides too much (services beyond required educational needs), or if it provides some things that do not meet educational needs at all (such as purely recreational options), or if it is overpriced . . . ." Application of a Student with a Disability, Appeal No. 19-131 at 9-10. "[A]ny segregable services that the Parents provided over and above what the Department would have been required to offer [a Student] to provide a FAPE" may be reduced or denied. L.K., 2016 WL 899321 at 8.

Here, the parent's request for the DOE to fund afterschool programming is without question designed to maximize the potential of this student. But the DOE is not required to meet that standard. See L.K. WL 899321.

## **CONCLUSION**

For the reasons set forth in this closing brief, the DOE respectfully requests that the parent's request for tuition reimbursement and request for homebased ABA, including after-school programming, be denied.

Respectfully submitted,

/S/ ELI KOPPEL, ESQ.

Eli Koppel, Esq.
Consultant Hearing Representative
Date: November 29, 2023

IE19

IE20

NEW YORK CITY DEPARTMENT OF EDUCATION
IMPARTIAL HEARING

---

**In the Matter of**

**Rex Francis**
**Student ID: 243-995-479**

**v.**

**New York City Department of Education**

**IHO Case No. 249622**
**IHO: Michelle Babbitt, Esq.**

---

**PETITIONERS' POST-HEARING BRIEF**

IE20

Received Office of State Review
01/09/2024

IE21

## PRELIMINARY STATEMENT

This post-hearing brief is respectfully submitted on behalf of nine-year-old Rex Francis ("Rex") and his parents, Halia and Cliff Francis, in support of their claims for *Burlington/Carter*[1] reimbursement relief for the 2023-2024 school year. We respectfully submit that, upon a review of all three prongs of the *Burlington/Carter* analysis, the record amply, if not overwhelmingly, supports an adjudication in Rex's favor.

**For Prong I** purposes, the New York City Department of Education ("DOE") failed to provide Rex with a free appropriate public education ("FAPE") for the 2023-2024 school year. The DOE failed to offer an appropriate program and failed to offer Rex an appropriate placement. The DOE conceded this critical point at the hearing by failing to put on a Prong I case. **Tr. 26:16-19.**

**For Prong II** purposes, the evidence showed that the unilateral placement and supplemental services that Rex's parents secured for him for the 2023-2024 school year are appropriate and "reasonably calculated" to provide a meaningful educational benefit.

**For Prong III** purposes, there are no equitable circumstances that would operate to preclude or diminish the reimbursement award being sought. Moreover, the DOE conceded this point at the hearing by admitting it could not identify any equitable considerations against the parents. Tr. 35:1-4.

## STATEMENT OF FACTS

Rex is a nine-year-old boy (D.O.B. 04/14/2014) diagnosed with Autism. Ex. P-Y. He lives with his parents, Halia and Cliff Francis, in New York City. For the 2023-2024 twelve-month

---

[1] *See Sch. Comm. of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359 (1985); *Florence Co. Sch. Dist. IV v. Carter*, 510 U.S. 7 (1993).

IE21

Received Office of State Review
01/09/2024

IHO Exhibit 3000002

IE22

school year, Rex attends The Titus School ("Titus"), coupled with afterschool Applied Behavior Analysis ("ABA") services (including parent training/counseling, ABA supervision, and monthly ABA and interdisciplinary meetings), Occupational Therapy ("OT"), and Speech and Language Therapy ("SLT").

Halia Francis, Rex's mother, provided testimony about her son's challenges, his programming at Titus, and his need for supplemental services. Ms. Francis's affidavit testimony can be found at Parent's Exhibit Y. By way of sworn affidavit testimony, Ms. Francis testified to the extensive nature of her son's deficits; specifically, Rex's significant delays in his ability to perform daily living skills such as maintaining his hygiene, his deficits in speech and language, his underdeveloped motor skills, and his social and emotional development. Ex. P-Y, at para. 7-19. Ms. Francis testified that Rex is enrolled in Titus's 12-month program where he receives a balanced curriculum of related services, therapy, and academic instruction. *See* Ex. P-Y, at para. 33, 34, and 43.

Natalie Brandefine,[2] also provided affidavit testimony speaking the appropriateness of the Titus School for Rex's 2023-2024 school year. Ms. Brandefine's affidavit can be found at Parent's Exhibit U. Stephanie Koh,[3] Kaitlyn Simon,[4] and Jessica Zambito[5] provided affidavit testimony speaking to Rex's need for afterschool services in ABA, SLT, and OT, and the progress he has

---

[2] Ms. Brandefine is the Founder and Executive Director of Titus, Rex's school. **Ex. P-U.** She has a Master's Degree in Early Childhood Education and a Certificate of Advanced Study in ASD. ***Id.*** Her certification can be found at Parents' **Exhibit P-N.**
[3] Stephanie Koh is a BCBA/LBA and was the Founder and Director of Little Green Tugboat, where Rex received ABA therapy. **Ex. P-V.** Her license can be found at Parents' **Exhibit P-P.**
[4] Kaitlyn Simon was Rex's Speech Language Pathologist at Happy Talk SLT. Her license and resume can be found at Parents' **Exhibit P-R.**
[5] Jessica Zambito was Rex's occupational therapist and was the clinical director and owner of Bloom OT and Spring Ahead OT. **Ex. P-X.** Her license can be found at Parents' **Exhibit P-T.**

IE22

Received Office of State Review
01/09/2024

IE23

made thus far.  Ms. Koh, Ms. Simon, and Ms. Zambito's affidavits can be found at Parent's Exhibits P-U, P-V, P-W, and P-X, respectively.

## Rex's Challenges and Demonstrable Needs

Rex was diagnosed with autism in 2016 when he was 2 years old. Rex received this diagnosis after he stopped speaking and was not meeting his developmental milestones. Ex. P-Y. After being diagnosed with autism, Rex began SLT, OT, PT, Feeding Therapy, and in-home ABA through Early Intervention. *Id*. Rex was also diagnosed with a PTEN Genetic Mutation. *Id*; Ex. P-D, at pg. 49.

Rex has a complex profile, as he has areas of typical cognitive potential alongside deficits related to communication, attention, socialization, adaptive skills, and self-regulation. Ex. P-D, at pg. 57-58, P-Y. For the 2023-2024 school year, Rex continues to display multiple, interfering behaviors that inhibit his ability to engage in the classroom, stay on task for assignments, follow his instructors' directions, and interact with his peers. Ex. P-U.

Rex's interfering behaviors include maladaptive, inappropriate physical contact, non-contextual vocalizations, and task refusal. Ex. P-U; Tr. 136:19 – Tr. 137:7. Additionally, Rex engages in loud vocalizations to gain access to preferred items, activities, or attention. Ex. P-Y. Rex also experiences high anxiety that negatively impacts his functioning when asked to complete non-preferred activities or when tasks are perceived as hard. Ex. P-D, at pg. 14-15, 57.

Rex significantly struggles with communication, especially with pragmatic, expressive, and receptive language. Ex. P-W; Tr. 69**.** As such, Rex has difficulty understanding and processing what is being asked of him, as he responds to demands with linguistic errors and has difficulty following instructions. Ex. P-W. He also struggles with social behavior, specifically

IE23

Received Office of State Review
01/09/2024

IHO Exhibit 3000004

with navigating social situations, regulating his attention and energy levels, and functional communication. Ex. P-Y.

Rex also has poor fine motor skills and requires visual cues and prompts to complete tasks and maintain attention. Ex. P-S, P-X. He struggles to independently write all letters and numbers, as well as to maintain a sustained grasp of items. Ex. P-S. Further, Rex needs support with activities of daily living skills, including unfastening buttons, putting on his shoes and socks, brushing his teeth, combing his hair, toileting, and washing his hands. Tr. 117:13; Tr. 118:16-24.

Rex also struggles with sensory issues. Tr. 82:6-12; P-X, at para. 3. For example, Rex demonstrates decreased interoceptive awareness that impacts his body temperature, hunger/thirst, toileting needs, and emotional regulation. He often overheats and needs prompting to use the bathroom and to determine thirst/hunger cues, satiety, and emotional regulation needs. He demonstrates significant safety and body awareness challenges and as noted above, can engage in unsafe behaviors and requires close supervision and skilled sensory integrative therapy support Ex. P-X, at para 3. He also had poor spatial awareness, delayed motor planning, and poor balance. *Id*.

According to Rex's neuropsychological evaluation administered by Dr. David H. Salsberg, due to Rex's complex needs, he requires a small, structured, and supportive class and school setting with one-to-one instructional support throughout the school day. Ex. P-D, at pg. 58. He requires opportunities for direct instruction utilizing ABA to address his difficulties and make him available for learning. *Id*. Rex also needs ABA services at home and in the community to help Rex learn how to carryover skills learned at school, safely navigate his environment, promote independence, and develop his attention, self-regulation, and communication skills. *Id*. In addition, Rex requires supplemental SLT, OT, and small group social interactions to increase

Received Office of State Review
01/09/2024

the generalization of skills. *Id*.

Ms. Francis testified by way of an affidavit to Rex's need for supplemental services in SLT, OT, and ABA to address her son's extensive deficits. Ex. P-Y, at para. 44. As stated by Rex's providers, and Rex's 2019 neuropsychological evaluation, afterschool services are necessary for Rex due to the extent of his deficits. Rex is a student who needs multiple opportunities to learn to reinforce the skills he's taught in school and to ensure those skills can be applied in different settings. He is a student with severe cognitive delays and, as such, he needs each task or skill he is being taught to be broken down into basic steps, with sufficient with sufficient time given to master each step. Ex P-W, at para. 25; Tr. 129-130. In other words, Rex's deficits mean that he needs more time to master basic skills and concepts for his academics, related services, and ADL skills. Ms. Francis further testified that Rex continues to show progress with his Titus program. Tr. 185-186.

### Rex's 2023-2024 School Year

Ms. Francis attended an IEP for Rex meeting on January 17, 2023, along with representatives from the Titus school. Ms. Francis shared Rex's updated progress reports from Titus which covered his academics and related services (ABA, SLT, and OT)**.** Ex. P-D and P-E. During the IEP meeting, no one from the DOE disputed the reports that recommended that Rex receive 1:1 ABA instruction, or that Rex has been making progress with his ABA program.  Ex. P-Y.

During his IEP meeting, Ms. Francis learned that the DOE was recommending an 8:1:1 class for Rex. Ex. P-Y, at para. 5. Ms. Francis and the Titus staff present shared that they were very concerned with the DOE's recommendation, as it did not provide Rex with the 1:1 ABA instruction and supports that he needed in order for him to make meaningful progress. Ex. B and

Received Office of State Review
01/09/2024

IE26

P-Y, at para. 5-6. According to Rex's Titus reports and private neuropsychological evaluation, he needed 1:1 ABA instruction in a small classroom setting tin order to make meaningful and appropriate educational progress. Ex. P-D, at pg. 56-58 and P-E**.** Additionally, the IEP team was informed of Rex's need for robust supplemental services in SLT, OT, and ABA instruction**.**

Ms. Francis received a school location letter for 75M811: P.S. M811 – Mickey Mantle School ("Recommended School"). Ms. Francis contacted the recommended school shortly after receiving the SLL to request a tour and inquire about the school's program. Ex. P-Y, at pg. 6. Mr. Francis then emailed the placement school on July 10, 2023, to again request a tour of the recommended school. *Id.* Ms. Francis did not receive a response to her tour request. *Id.*

Ms. Francis then wrote to the CSE to reiterate her concerns with the program that had been recommended at the IEP meeting, as well as her questions regarding the recommended school. Ex. P-C. Ms. Francis was concerned with the school because Rex needs ABA methodologies to make progress. *Id.* She was concerned that, due to both the student-to-teacher ratio in class and school size, the recommended school would not be able to provide the 1:1 instruction that Rex needed. *Id*.

At all times, Rex's parents cooperated with the DOE, participated in IEP meetings, complied with all DOE requests, and remained open to a DOE placement and program. Ex. P-Y. In the absence of an appropriate recommended placement and program, Rex attended Titus for the 2023-2024 school year on proper notice to the DOE and later filed a Demand for Due Process. **Ex. P-A, P-B, P-C.** Rex's parents remain personally responsible for the Titus tuition of $138,000.00 for Rex's 2023-2024 school year, as well as the costs for supplemental services. Ex. P-G, P-Y.

### **Rex's 2023-2024 Program at Titus**

For the 2023-2024 school year, Rex attends Titus. Titus is a mission-driven school that

IE26

Received Office of State Review
01/09/2024

aims to individually assist and educate students with various developmental and educational challenges based on their needs to foster appropriate progress. Ex. P-I. Each student receives an individual treatment plan to focus on specific areas of need. Ex. P-U**.** Titus provides the personalized attention that students require due to its 1:1 and 2:1 support in group settings that are created based on similar academic assessments. Ex. P-U. Class sizes range from 6-8 students and each classroom team has one NYS-certified special education teacher and one lead behavior therapist. *Id.*

Titus utilizes ABA as its core teaching methodology. Ex. P-U. The school utilizes discrete trial teaching, when appropriate, in combination with incidental teaching. *Id*; Tr. 129:1—130:20. All teachers, assistants, therapists, and staff members receive ABA training and supervision at School. Ex. P-U. All related service providers and staff are certified and/or licensed in their practice area, receive ABA supervision, and are required to participate in weekly training sessions and receive intensive training on ASD and ABA. *Id.*

**S**tudents with behavioral needs undergo a Functional Behavior Assessment (FBA) in which maladaptive behaviors are analyzed by a Behavior Specialist. Ex. P-U, at para. 12**.** The process of creating the behavior intervention plan ("BIP") is described in Ms. Brandefine's affidavit at Exhibit P-U, paragraph 13. Included in the BIP are baseline data, intervention data, and detailed explanations for procedures and protocols. *Id.*

Titus utilizes a team approach with regard to the education of its students. Ex. P-U, at para. 14. Rex's team is comprised of his parents, a Classroom Supervisor, a Lead Behavior Therapist, a Lead Teacher; a School Behavior Specialist, a Speech/Language Therapist, an Occupational Therapist, a Physical Therapist, a Music Therapist/Licensed Creative Art Therapist,

Received Office of State Review
01/09/2024

IHO Exhibit 3000008

IE28

and Licensed Master Social Worker.[6] *Id*. Additionally, Titus employs six licensed Behavioral Analysts. *Id*. Teachers work collaboratively with the students, their families, and outside providers to ensure consistency and facilitate the generalization of skills, and regularly utilize input from students and families to design effective curricula. *Id*. Titus also provides on-site ABA support/training groups to parents. Ex. P-U, at para. 11.

Rex's parents receive daily communication, three comprehensive progress reports during the year, weekly emails with pictures and a detailed overview of the week, and monthly team meetings to track progress. Ex. P-U, at para. 59; Ex. P-Z. Rex will receive three comprehensive progress report a year, which are completed by Rex's entire team and discusses his progress across all domains. Ex. P-U, at para. 59. It also incorporates the goals that Rex is working on across all his areas of need. *Id*. Data is collected daily via observation, assessments, and work samples to track and monitor progress across all domains. *Id*. This information is analyzed and graphed to help modify our approach and instructional targets and ensure that Rex is making progress toward goals. *Id*.

For the 2023-2024 school year, Rex's summer class schedule can be found at Exhibit P-J, and his fall schedule can be found at Exhibit P-K. Rex's class schedules are designed to foster development across all domains without interfering with classroom activities and to promote generalization across settings. Ex. P-U, at para. 64. Related services and mental health counseling sessions are scheduled in collaboration with the classroom team to promote regulation and provide in-class support during activities related to each domain (e.g. OT could be provided

---

[6] Rex's 23/24 school team includes, Arely Garcia, MS, Ed, Shameka Dantzler, BA, Brian Rodriguez, BA, and Teresa Ambery MS, BCBA, LBA-NY is the classroom's clinical supervisor..

IE28

IE29

during Rex's writing assignments). *Id*. At Titus, Rex received OT,[7] SLT,[8] PT,[9] counseling[10] Ex. P-K.

During the 2023-2024 school year, Rex is instructed at the late Kindergarten, early first grade level in all academic classes. Tr. 185:16-20. Rex's class this year has 7 students total with 4-5 instructors setting with developmentally, socially, and academically appropriate students. Ex P-U, at para. 25; Tr. 133:14-23. He receives 1:1 instruction as needed, making sure to foster independence when possible and appropriate, but meeting his needs to ensure progress. Ex. P-U, at para. 64.

To address Rex's interfering behaviors, one of Titus's BCBA/LBA-NYs conducted a functional analysis of targeted behaviors, collected data, and developed a BIP.[11] Ex. P-U; Tr. 157:2-25. The BIP for Rex's 23/24 school year is still being developed, and will be finalized by

---

[7] Rex receives OT three times a week for 30 minutes individually, provided by Marissa Bernstein, MS, OTR/L. **Ex. P-K, Ex. P-U at para. 40-41.** In OT, Rex is working on bike riding skills, his ability to independently shower, tying a knot, and his handwriting skills. Additionally, Rex continues to practice independent activities of daily living, personal hygiene, and self-care to increase his independence. **Ex. P-U at para. 42.**

[8] Rex received SLT three times a week for 30 minutes individually, provided by Caitlin McDonagh MS, CCC-SLP. **Ex. P-K, Ex. P-U at para. 37-38.** So far this school year, Rex has been working on receptive, expressive, and pragmatic language. For receptive language, he is working on problems and solutions within social scenarios and picture scenes. For expressive language, Rex has been working on sequencing and retelling a story (via picture cards/sequencing cards) and including a salient detail within the retelling (i.e., characters, location, descriptive words like colors and size). **Ex. P-U at para. 39.**

[9] Rex received PT two times per week for 30 minutes individually, provided by Heidi Puccio, PT, DPT (PT Supervisor) and Avital Akman, PT, DPT. **Ex. P-U, P-J, P-K.** Rex works on increasing his strength to improve his posture, body awareness, and balance, which led to an increased safety during environmental negotiation and gross motor play. **Ex.P-U.**

[10] Rex received counseling one to two times a week for 30 minutes individually with Avital Akman, PT, DPT. **Ex. P-U at para. 43-44.** During PT sessions, Rex works on increasing his strength to promote improved posture, and further improve his body awareness and balance. Rex is also working on bilateral coordination, core strength, and bike riding. **Ex. P-U at para. 45.**

[11] To create the BIP, baseline data was collected and identified target behaviors to decrease such as noncompliance/work avoidance, self-injurious behavior, emotional dysregulation, and property destruction. **Ex. P-U T para. 13.** The data analysis revealed the function of the behavior, and identified and defined replacement behaviors, antecedent interventions, and consequent interventions. ***Id.*** Included in BIP are baseline data, intervention data, and detailed explanations for procedures and protocols. ***Id.*** Collected data came from the Antecedent-Behavior-Consequence chart, Partial Interval Recordings, assessments of Student preferences, and Interviews with Rex, his parents, and teaching staff. ***Id.***

IE29

Received Office of State Review
01/09/2024

IE30

late October. Tr. 158:8-10. Until then, Titus has been utilizing Rex's BIP from the previous school year. Ex. P-U, at para. 54. Rex's BIP is designed to decrease maladaptive, interfering, and unsafe behaviors while improving Rex's functional communication, compliance, and frustration tolerance and was modified as Rex made progress toward addressing target behaviors. Ex. P-U, at para. 55. This level of support was necessary to support Rex's unique learning style and needs.

For the 2023-2024 school year, while Rex continues to make progress across all domains, he still relies on teacher prompting and redirection to focus his attention and enable him to be available for learning. Ex. P-U, at para. 35. He has demonstrated improvements in his ability to attend and focus in class, effectively communicate, comply with directions, follow classroom routines, and maintain emotional and physical regulation throughout the day. Ex. P-U, at para. 56. Rex requires this 1:1 teacher-to-student ratio and the support of this highly skilled and trained team of professionals with expertise in the areas of special education and ABA. Ex. P-U, at para. 68. He has only made these gains due to being taught in a highly structured, ABA-driven, 1:1 setting, with continuous high rates of reinforcement and repetition of tasks. *Id.*

### Rex's 2023-2024 Supplemental Program

Because of Rex's unique profile and learning needs, he requires supplemental ABA, OT, SLT, and social skills. Ex. P-D, at pg. 58-59; Ex. P-U, at para. 58. He requires multiple opportunities, repetition, and high rates of reinforcement of skills so he can acquire new skills, maintain previously acquired skills, and use those skills functionally across settings. Ex. P-U, at para. 68.

Rex receives supplemental, home-based ABA services from Stephanie Koh from Little Green Tugboat. Ex. P-V. For this school year, Ms. Koh and her office provide Rex with approximately 10 hours of 1:1 ABA instruction per week. This amount of supplemental ABA

IE30

was necessary to ensure Rex made meaningful gains in his cognitive and social development, and to reinforce the instruction he received at Titus to prevent regression. Ex. P-V, at para. 22; Ex. P-D, at pg. 58-59.  Ms. Koh's services focus on addressing Rex's interfering behaviors, developing his safety awareness, strengthening his pragmatic language skills, strengthening Rex's adaptive living skills, and developing his play skills. Ex. P-V, at para. 21.

Ms. Koh also provides Parent Training to Rex's parents for up to two hours per week. Ex. P-Y, at para. 38. The parent training provided by Ms. Koh and her office is necessary to ensure Rex's parents can address his interfering behaviors as they appear in the home, and in new environments. Ex. P-V, at pr. 23; Ex. P-D, at pg. 58-59. Ms. Koh is able to provide a flexible schedule for Rex's parents, which includes multiple phone and Zoom calls throughout the week. These advisory calls are used to inform Ms. Koh of Rex's problem behaviors, and for Ms. Koh to provide protocols and strategies to address Rex's problematic behaviors. Tr. 107:11 – 108:6. The two hours of parent training is necessary for Rex's parents to work with Rex's behavior contrast, and ensure the work that is being done to address his problematic behaviors, is applied even when his ABA therapist is not present. Tr. 108:12 – 110:3.

With Ms. Koh's services and collaborative efforts, Rex continues to make steady progress in addressing his interfering behaviors, improving his safety awareness, improving his ability to maintain his hygiene, and overall social development. Tr. 117:13 – Tr. 118:9. For example, Rex has made significant improvements in his ability to ability to carry out daily living skills (e.g. washing his hands without physical prompting). Tr. 120:19 —121:16. Ms. Koh further testified that due to Rex's deficits, many skills such as bathing and dressing need to be broken down step by step, taking time for Rex to master each step independently. *Id.* Additionally, Rex's safety concerns significantly decreased. *Id.* Moreover, Rex's social skills continue to improve, with him

Received Office of State Review
01/09/2024

IHO Exhibit 3000012

being able to engage in playdates and initiate conversations with familiar peers. *Id.* While Rex has made meaningful progress with Ms. Koh, he still requires intensive, 1:1 supplemental ABA services to reinforce skills he learns at Titus, while providing additional time to further focus on his cognitive and social development. Ex. P-V, at para. 24.

Kaitlyn Simon with Happy Talk Speech and Language Therapy PC provides Rex's supplemental SLT, for 1 hour per week. Ex. P-W. Ms. Simon has known Rex since September 2022, when she began providing Rex's supplemental SLT. Ex. P-W; Tr. 54:8-17. The sessions utilize preferred play schemas and joint book reading, as well as movement and sensory activities, to increase motivation, regulation, engagement/reciprocal interactions, and availability for learning. Ex. P-W, at para. 29. These services focus on strengthening Rex's pragmatic language, receptive language, and expressive language skills. *Id.* The Checklists of the Affect-Based Language Curriculum – Second Edition (ABLC-2) is consistently used when evaluating Rex's communication and language skills. Ex. P-W, at para. 16. Rex's SLT sessions were 1:1 and take place in a sensory gym. Ex. P-W, at para. 15; Tr. 51:20-24.

According to Ms. Simon, Rex continues to make steady progress in the development of his speech and language skills. Ex. P-W, at para. 24. For example, Rex has improved his ability to report past events with increased complexity and specificity in his language. *Id.* The child-led, play-based therapy has allowed Rex to reinforce the skills he acquires through Titus's SLT services while allowing Rex additional time and space to explore and expand on his ideas, encourage his logical thinking and creativity, and build upon his specific interests. Ex. P-W, at para. 25-26.

Rex receives his supplemental OT services from Jessica Zambito with Bloom LLC, for 1 hour per week. Ex. P-X, at para. 8. Ms. Zambito regularly collaborates with Ms. Simon, Rex's

Received Office of State Review
01/09/2024

SLT provider, and with Rex's parents. *Id,* at para. 21. Rex's sessions focus on addressing Rex's fine and visual motor, executive function, sensory processing, self-regulation, self-help, and motor skill development goals to support independence in daily routines across environments Ex. P-X, at para. 15: Ex. P-S.  Specifically, Rex works to improve his independence with self-help skills (e.g. using a fork and knife, buttoning, tying a knot, donning/doffing socks and shoes, dressing/undressing, toileting independently, washing hands/bathing himself); improving his fine and visual motor skills for greater stamina and independence with handwriting skills; improving his letter formation including upper and lowercase; and improving self-regulation and safety awareness using a sensory diet with unlimited access to sensory supports. Ex. P-X, at para. 16.

Rex's OT sessions are 1:1 and take place at Bloom's sensory gym. *Id*., at para. 19.  Ms. Zambito reports that Rex continues to make progress during the 2023-2024 school year. For example, as a baseline at the beginning of 2023, Rex was writing 50% of uppercase letters. Rex is now able to write his first and last name and 100% uppercase letters. Ex. P-X, at para. 18. He now can write and copy near and far point 1-2 sentences. Moreover, Rex is beginning to write lowercase letters. He can button and unbutton 3 large Overall, Rex continued to make steady progress in reaching his OT goals. *Id.*; *see also* Ex. P-S.

## ANALYSIS

The DOE should be required to reimburse Rex's parents for his unilateral placement for the 2023-2024 school year.  The DOE has the burden of production and persuasion at an impartial hearing, except that a Parent  seeking tuition reimbursement for a unilateral placement  has the burden  of production and  persuasion regarding the appropriateness of such placement. *See* Educ. Law § 4404[1][c]. Here,  the DOE conceded that it did not provide Rex with a FAPE. Rex's parents, however, can meet their Prong II burden that Titus and the supplemental services that Rex will

Received Office of State Review
01/09/2024

currently receive for the 2023-2024 school year are reasonably calculated for him to make progress. Therefore, the relief sought by the Parents in this case is appropriate, and equitable considerations support the Parents' claim. *Sch. Comm. Of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

## PRONG I

### The DOE Did Not Meet Its Prong I Burden as It Failed to Produce Any Disclosures for the Record and Failed to Put on a Prong I Case.

The IDEA ensures that students with disabilities are afforded a FAPE. The DOE may be required to reimburse Parents for their expenditures for private educational services obtained for a student, if the services offered by the DOE were inadequate or inappropriate, the services selected by the Parents are appropriate, and equitable considerations support the parent's claim. *Burlington*, 471 U.S. 359; *Florence*, 510 U.S. 7; *Cerra*, 427 F.3d 186.

The DOE has failed to meet its burden of proving that it provided Rex with a FAPE for the 2023-2024 school year, as it failed to disclose any documentary evidence for the record, failed to call any witnesses to testify on its behalf, and conceded Prong I at the hearing. Tr. 26:16-18. As such, the DOE has failed to meet its burden of proof and production that it provided a FAPE for the Rex's 2023-2024 School Year. Accordingly, the only remaining inquiries are whether Rex's unilateral placement and program were reasonably calculated (Prong II) and whether the equities support a funding award in Rex's favor (Prong III).

## PRONG II

### Rex's Program for the 2022-2023 School Year is Appropriate, Meets Rex's Needs, and is "Reasonably Calculated" to Provide Him with a Meaningful Educational Benefit.

Where, as here, the record establishes a Prong I FAPE deprivation, the student's Prong II

Received Office of State Review
01/09/2024

program of services is subject to a somewhat less stringent standard of review. That standard is discussed in Second Circuit authorities such as *R.E* and *Frank G*.*R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 179 (2d Cir. 2012); *Frank G. v. Bd. of Educ.,* 459 F.3d 356, 364 (2d Cir. 2006). As the Second Circuit explained in *Frank G*.:

> *"*An appropriate private placement need not meet state education standards or requirements. *Carter*, 510 U.S. at 14. For example, a private placement need not provide certified special education teachers or an IEP for the disabled student. *Id*. In addition, parents "may not be subject to the same mainstreaming requirements as a school board." *M.S*., 231 F.3d at 105 (citing *Warren G. v. Cumberland County Sch. Dist*., 190 F.3d 80, 84 (3d Cir. 1999) (holding that "the test for the parents' private placement is that it is appropriate, and not that it is perfect")). Subject to the foregoing exceptions, the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement. Ultimately, the issue turns on whether a placement - public or private - is 'reasonably calculated'...*"*

The Prong II standard that a parent must meet certainly is less stringent and is thus, no higher a standard than a school district must meet via "prospective" evidence. Therefore, parents need only demonstrate that the requested services are reasonably calculated to meet the unique needs of the  student. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *Frank G.,* 459 F.3d at 364-65.

A. **Rex's Program at Titus is Reasonably Calculated to Provide a Meaningful Educational Benefit.**

The preponderance of the evidence in this record amply supports a  finding  that  Rex's placement at the Titus School for the  2023-2024  school year constitutes an appropriate special education program and has  provided him with a  meaningful educational benefit. His program was reasonably calculated based on the recommendations of his neuropsychological evaluation. Ex. P-D, pg. 58-60. Rex needs a program that could incorporate ABA therapy, provide related services to address his physical and communication deficits and support his emotional needs that

Received Office of State Review
01/09/2024

were impeding his ability to learn and socialize. *Id*. His program at Titus is individually designed to support his behavioral, academic, social, and emotional needs. Ex. P-I, P-K, and P-U, at para. 8. At the hearing, Natalie Brandefine testified to the small, classroom instruction Rex receives at Titus, as well as how discrete trial training is utilized in Rex's instruction to ensure he receives direct instruction with multiple opportunities of repetition and practice to ensure skills are appropriately taught. Tr. 129-130. Moreover, Titus's utilization of incidental teaching allows Rex to be taught through real-life exposure to situations as opportunities arise. Tr. 131. This teaching method is critical for Rex, who struggles to maintain attention and focus. Tr. 137.

Further, Titus utilizes a behavioral intervention plan ("BIP")[12] to address Rex's problematic behaviors. Ex. P-U, pr. 21; Tr. 157-58. Rex's targeted behaviors include maintaining attention, reducing task non-compliance, strengthening his functional communication, frustration tolerance, and physical and emotional regulation. Ex. P-U, at para. 55 and Ex. P-D, at pg. 13-20.

Ms. Brandefine also testified by affidavit to the appropriateness of Rex's academic and related service goals, how these goals are developed, how progress toward those goals is measured, and how the goals are adjusted if necessary. Ex. P-U, at para. 29-30. For the 2023-2024, 12-month school year, Rex receives daily instruction in Math, ELA, History, Science, Writing and Reading. Ex. P-J and P-K. Rex's academic instructors each have a Master's degree in education and works collaboratively with the rest of Rex's Titus team to ensure he receives a consistent education, and is making progress toward his academic and related services goals. Ex. P-U, para. 14 and 31. For his related services, Ms. Brandefine testified by affidavit that Rex receives individual SLT (3x30 min session a week), OT (3x30 min session a week), PT (2x30 min session a week), and individual counseling (1x30 min session a week). Ex. P-U.

---

[12] The Titus staff is still in the process of collecting data and updating Rex's BIP for the 2023/2024 school year. Until then, Rex's team is utilizing his 2022-2023 FBA/BIP which can be found in Exhibit D. Ex. P-U, at para. 54.

Received Office of State Review
01/09/2024

Overall, the Titus school provides an appropriately challenging education for Rex that balances his need for academic instruction and related services support. Rex's team works diligently to understand his educational and developmental needs, develop an appropriate curriculum to address his global deficits, and communicate and collaborate with his parents to best address Rex's needs. *See* Ex. P-Z. Moreover, while the Parent need not show retrospective evidence proving that Rex made actual progress in his program, Ms. Brandefine's testimony demonstrates that Rex continues to make meaningful progress in his educational program during the 2023-2024 school year. Ex. P-U, at para. 31-51 and 56. As such, the record supports the conclusion that Rex's program at Titus is reasonably calculated to provide him with a meaningful educational benefit.

**B. Rex's Afterschool Services Are Reasonably Calculated to Provide Him a Meaningful Educational Benefit.**

In regard to Rex's afterschool services, the affidavit testimony of Stephanie Koh, Kaitlin Simon, and Jessica Zambito supports the conclusion that Rex's unique learning profile requires him to receive robust after-school services. Ex. P-V, P-W, and P-X. Simply put, if Rex were to receive all the OT, SLT, and ABA services during the school day, he would have little to no time to actually engage with his academic coursework. As such, Rex's parents contracted and paid for supplemental services in ABA, OT, SLT, and after-school skills. Ex. P-Y.

Stephanie Koh and her office, Little Green Tugboat ("LGT") provides Rex's afterschool ABA services. Their services include 1:1 direct ABA therapy, parent training, interdisciplinary meetings with Rex's other provider, ABA supervision for Rex's direct therapist, and team meetings for Rex's therapist. Rex's after school ABA is necessary for him to maintain the skills her learns in school, and ensure those skills are appropriately applied across environments. Ex. P-V, at para. 22. Moreover, Rex's most recent Neuropsychological Evaluation recommended he

Received Office of State Review
01/09/2024

receive supplemental ABA, and that his parent's receive individualized parent training:

> In addition to ABA supports in school, it is imperative that Rex continue receiving ABA services in the home/community to coordinate with his school program. Individual parent training is also a crucial component of this homebased plan. Home based ABA and parent training are essential to help Rex learn to safely navigate his environment, promote independence, and further develop requisite skills like attention, self-regulation, and communication. Further developing these skills will promote greater availability for learning in the classroom and enable him to function appropriately in school, while also promoting carryover of skills across school, home, and community contexts.

Ex. P-D, at pg. 58-59.

Ms. Koh testified at the hearing about how LGT works with Rex's parent's schedule to provide 10 hours of individual ABA therapy for Rex a week at a rate of $285.00 an hour. Tr. 99; Ex. P-V, at para. 8. So far this year, LGT has worked with Rex on developing his adaptive skills, executive functioning skills, following multi-step instruction, initiating and maintain conversation, emotional and behavioral regulation, psychological flexibility, independence, and social skills. Ex P-V at para. 20; Tr. 103-105. Ms. Koh further testified why exactly Rex needs after school ABA in addition to the instruction he receives at Titus:

> [F]or Rex, skills need to be directly taught in different environments and/or with different people so that the skill is actually "learned" and Rex has the skill in his general repertoire. Moreover, Rex continues to demonstrate significant delays within all areas of development. He has only made gains with teaching that is done in highly structured, 1:1 settings, with continuous high rates of reinforcement and repetition of tasks. It is because of the 1:1 instruction and the application of the principles and tactics used in ABA therapy that Rex has made steady progress. Ex. P-V, at para. 22.

As such, the services provided by Ms. Koh's office are essential for Rex to continue to make meaningful progress at school. LGT's services allow Rex multiple opportunities to strengthen his executive functions skills, physical and emotional regulation, and ability to carry out ADL skills, without unnecessarily impeding his academic instruction at Titus.

Rex receives his afterschool SLT once a week for one hour from Kaitlyn Simon with Happy

Received Office of State Review
01/09/2024

Talk. Happy Talk currently charges $260 per 60 minute session, and their rate will likely increase to $280 per 60 minute session in 2024. Ex. P-W, at para 7. Like with afterschool ABA, Rex requires this additional session of SLT to provide further opportunities for individualized and scaffolded speech and language support. Ex. P-W, at para. 25. Ms. Simon works with Rex 1:1 in a sensory gym to ensure the speech and language skills he learns at Titus are reinforced and can be carried over to other environments, ultimately making Rex more available to learn and maintain newly acquired skills. *Id*; Tr. 58-59*.* Moreover, Ms. Simon is well of Rex's speech and language needs, and how to best ensure is available for instruction. At the hearing, Ms. Simon testified how she takes time at the beginning of each session to ensure Rex is physically and emotionally regulated so that he is actually in the mindset to learn. Tr. 52:11-21.

Further, Ms. Simon's affidavit testimony details that sessions work to address Rex's auditory attention/memory/comprehension, functional communication skills, expressive language, and receptive language. Ex. P-W, at para. 21-22. Ms. Simon utilizes "child-led therapy", which promotes Rex's engagement in instruction and allows him to approach new information with increased complexities in a naturalistic, self-motivated way. Ex. P-W, at para. 19. Ms. Simon regularly collaborates with Rex's OT provider, Ms. Jessica Zambito, due to their long-standing professional relationship, shared office space, and communication regarding strategies to address sensory processing and receptive/expressive language development to facilitate Rex's availability for learning and generalizing new skills. Ex. P-W, at para. 14**.** With these additional services, Rex continues to progress in improving his speech and language abilities. Ex. P-Q and Ex. P-W, at para. 24.

Rex's afterschool OT is provided by Jessica Zambito with Bloom Occupational Therapy for 1 hour a week. Ex. P-X. Ms. Zambito's rate is $225-$250 per hour. Ms. Zambito testified by

Received Office of State Review
01/09/2024

affidavit to Rex's need for additional OT outside of Titus. Ex. P-X. Rex has serious delays in his fine, gross, and visual motor skills, sensory processing and regulation, strength, motor planning and coordination, and sensory sensitivity to noise and visual stimuli to name a few. Ex. P-X, at para. 11-13. Moreover, Rex has extensive delays in his self-help skills including using utensils, and clothing management skills (buttons, shoe tying, utensil use, dressing, hygiene/grooming tasks). *Id*. To address these extensive deficits, Ms. Zambito is currently working with Rex on improving his independence with self-help skills (e.g. using utensils, buttoning his clothes, dressing/undressing, toilet and hygiene skills), improving his fine and visual motor skills for greater stamina and independence with handwriting, and improving his safety awareness. *Id*. at para. 16; Tr. 87-88.

Ms. Zambito's hearing and affidavit testimony also show her collaborative efforts with Rex's parents, Titus, and Ms. Simon with Happy Talk. Ex. P-X, at para 21; Tr. 79-80.  Further, she provides Rex's parents with reports throughout the year and regularly communicates with them to keep them up to date on Rex's progress toward his OT goals. Ex. P-X, at para. 19 and 21. With the services and support provided by Ms. Zambito, Rex continues to make progress in addressing his OT deficits. For example, since the beginning of the school year, Rex can now write his first and last name and 100% of his uppercase letters. He now can write and copy near and far point 1-2 sentences. Moreover, he is beginning to write lowercase letters. He can button and unbutton 3 large buttons. *Id*. at pr. 18.

For Rex's afterschool programs, while the Parent need not show retrospective evidence proving that Rex made actual progress in his program, witness testimony and  progress reports unequivocally demonstrate that Rex has in fact made meaningful progress in his  educational program during the 2023-2024  school year. *See* Ex. P-V, P-W, P-X, P-S, and P-Q**.** Furthermore,

Received Office of State Review
01/09/2024

IE41

Rex's neuropsychological evaluation, as well as the testimony of his afterschool providers, support the conclusion that Rex is a child with extensive needs across the board. The additional services he receives in OT, SLT, and ABA serve the purpose of ensuring he can meaningfully engage in school and in his community life.

C. **Rex Needs Both his Program at Titus and His Afterschool Services to Appropriately Address His Extensive Deficits.**

While Titus provides an appropriate education for Rex to the best of its abilities, Titus cannot, and in fact is not required to, provide every single service to the extent that the need for afterschool programming is completely eliminated. Indeed, the standard to determine whether a unilateral placement is appropriate is whether the placement and program are reasonably calculated to provide a meaningful educational benefit to the student:

> [P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential. See M. S., 231 F.3d at 105 ("The test for parents' private placement is not perfection.") (internal quotation marks omitted). They need only demonstrate that the placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Rowley, 458 U.S. at 188–89, 102 S.Ct. 3034 (internal quotation marks omitted).
>
> *Frank G.,* 459 F.3d at 365; *See also T.K.*, .K. v. New York City Dep't of Educ., No. 14-3078-CV, 2016 WL 229842, at, at 12.

Ms. Francis's testimony aligned with this standard at the hearing when cross-examined by the IHO regarding Titus's appropriateness in light of Rex's need for afterschool services. Tr. 197. While the IHO attempted to force Ms. Francis to testify that because Rex needs afterschool services, "Titus is not providing what he needs", Ms. Francis's testimony remained that because of Rex's extensive deficits he needs afterschool OT, SLT, and ABA in addition to his education at Titus to make progress. While the IHO may be of the opinion that the need for after-school services presumes the inappropriateness of a unilateral placement, the court was quite clear in

IE41

Received Office of State Review
01/09/2024

IHO Exhibit 3000022

IE42

*Frank G.* that a unilateral placement is not required to provide every single service to a student, and that a student's needs for afterschool services does not make the unilateral placement inappropriate. *See also*, *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 254 (while "it is appropriate for the hearing officer and the Court to take into consideration the fact that the parents obtained necessary services not offered through the selected school from an outside agency . . . it is not necessarily dispositive . . . [and] the absence of related services at [the unilateral placement] does not require a finding that [it] was inappropriate.") (emphasis in original).

As such, after the DOE failed to offer Rex a FAPE for this school year, Mrs. And Mr. Francis procured after-school services in ABA, SLT, and OT in addition to Rex's placement at Titus to address his global deficits. These services were tailored, and based on Rex's need for additional time to practice the skills that he learned in school while practicing new skills in a different environment. Rex's afterschool providers work closely with his parents and provide a flexible schedule for Rex's additional services. This is seen particularly with Ms. Koh's after-school ABA services and parent training. Rex's parents worked to ensure that Rex received these needed services throughout the twelve-month school year. The only pause his Rex's afterschool SLT and OT took place during July and August when Rex attended Titus during the day, but the Bloom and Happy Talk had limited availability due to their summer schedule. Tr. 190-191.

For the 2023-2024 school, when the DOE failed to provide Rex with a FAPE, Ms. Francis and Mr. Francis put together a program that was reasonably calculated to provide their son an education that addressed his extensive delays and deficits. Rex is enrolled at Titus, a school that specializes in educating students with autism, like Rex. At Titus, Rex receives a well-balanced curriculum of therapy and academic instruction for the 12-month school year, and he continues to make progress. Ex P-J and P-K; Ex. P-U. Due to his extensive needs, Rex also receives after-

IE42

school services for ABA, SLT, and OT. As testified by each of Rex's providers, these services are necessary for Rex to continue to make meaningful progress due to his unique learning profile. **Ex. P-V, at para. 22 and 24; P-W, at para. 25; P-X; Tr. 69-70; Tr. 80:8-25.** As such, the parent has met their lesser burden of showing that the unilateral placement and program are reasonably calculated to provide Rex with a meaningful educational benefit for the 2023-2024 school year.

<u>**PRONG III**</u>

<u>**The Equities Support an Award in Rex's Favor**</u>

Once the fact finder has made a determination in favor of the parents on the first two prongs of the *Burlington/Carter* test for reimbursement, he or she may then determine whether equitable circumstances support the parents' claims pursuant to Prong III, and order "appropriate" relief. *See Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir. 1996); *see also Mrs. C.*, 226 F.3d at 68 (noting that "[e]quitable considerations are relevant to fashioning relief under the IDEA").

In this case, the DOE conceded Prong III at the hearing. Tr. 204:9-23**.** Thus, Prong III must be to be in favor of Rex's parents.

<u>**CONCLUSION**</u>

For all the foregoing reasons, it is respectfully requested that the IHO make the following findings and direct the DOE to fund, via a mixture of reimbursement and direct funding as may be appropriate. We urge that the IHO should:

1. find that the DOE failed to offer Rex a FAPE for the 2023-2024 school year and that the DOE failed to meet its Prong I burden;
2. find that Rex's program for the 2023-2024 school year is reasonably calculated and appropriate to meet his needs and make educational progress;
3. find that the equities support full reimbursement;

Received Office of State Review
01/09/2024

IHO Exhibit 3000024

IE44

a.  tuition and related costs at Titus
b.  up to 10 hours per week of ABA at a rate of $285 per hour.
c.  monthly ABA meetings (1 hour per therapist) at a rate of $285 per hour.
d.  monthly interdisciplinary team meetings (1 hour per service provider) at a rate of $285 per hour.
e.  up to 2 hours per week of parent training and counseling at a rate of $285 per hour
f.  up to 2 hours per week of ABA supervision at a rate of $285 per hour
g.  up to 2 hours per week of SLT at a rate of $260-$280 per hour
h.  up to 2 hours per week of OT at a rate of $225-$250 per hour
k.  continued DOE Transportation/Bussing


Date: November 28, 2023

Respectfully submitted,

*John Hobbs*

_____
 John Hobbs, Esq.
Gary S. Mayerson, Esq.
Christina Mure, Esq.
Mayerson & Associates
Attorneys for Petitioners

IE44

Received Office of State Review
01/09/2024

IHO Exhibit 3000025

T1

```
1                    DEPARTMENT OF EDUCATION
                              of the
2                      CITY OF NEW YORK


3
    ------------------------------X
4
    In the Matter of:
5
         REX FRANCIS                    Case No. 249622
6
    ------------------------------X
7                                  District # 2
                                   NYC Office of Administrative
8                                  Trials and Hearings
                                   100 Church Street
9                                  New York, NY 10007
                                   Remote Hearing
10
                                   Wednesday
11                                 August 2, 2023

12           The above-entitled matter came on for hearing at
    12:26 p.m.
13

14  BEFORE:            MICHELLE BABBITT,
                       Impartial Hearing Officer
15

16  A P P E A R A N C E S:

17  For the Student:
      GARY S. MAYERSON, ESQ., Attorney
18    JOHN HOBBS, ESQ., Attorney

19  For the Department of Education:
      ELI KOPPEL, ESQ., Attorney
20

21

22

23

24

25
```

Received Office of State Review
01/09/2024

T1

T2

2

```
 1                    P R O C E E D I N G S
 2                    HEARING OFFICER MICHELLE BABBITT:  All
 3       right.  Good afternoon.  This is Michelle Babbitt.
 4       I'm the impartial hearing officer assigned to case
 5       number 249622.  The student is Rex Francis.
 6                    Appearing on behalf of the student today
 7       is?
 8                    MR. GARY S. MAYERSON:  Gary Mayerson,
 9       Mayerson Associates, and John Hobbs, my associate.
10                    HEARING OFFICER BABBITT:  All right.
11                    And appearing on behalf of the District?
12                    MR. ELI KOPPEL:  Eli Koppel, attorney for
13       the District.
14                    HEARING OFFICER BABBITT:  Okay.  And so
15       you're an attorney, not a consultant, Mr. Koppel?
16                    MR. KOPPEL:  I am a consultant.  I also
17       am (indiscernible) New York bar.
18                    HEARING OFFICER BABBITT:  Okay.  But are
19       you an agency attorney?  I'm just trying to
20       understand.
21                    MR. KOPPEL:  (Interposing) No, I'm not.
22                    HEARING OFFICER BABBITT:  Your NOA, said
23       that you were a consultant.
24                    MR. KOPPEL:  (Interposing) No, I'm not.
25                    HEARING OFFICER BABBITT:  Okay.  So all
```

T2

Received Office of State Review
01/09/2024

T3<sup>3</sup>

```
 1        right.
 2                  MR. KOPPEL:  (Interposing) Correct.  That
 3        is correct.
 4                  HEARING OFFICER BABBITT:  Trust me, you
 5        will be treated as an attorney.  But I just like
 6        the record to reflect the capacity that everyone is
 7        appearing --
 8                  MR. KOPPEL:  (Interposing) Got it.
 9                  HEARING OFFICER BABBITT:  -- in.  That's
10        all, Mr. Koppel.
11                  MR. KOPPEL:  Absolutely.  Understood.
12                  HEARING OFFICER BABBITT:  All right.  I
13        thank Mr. Hobbs and Mr. Koppel for appearing on
14        video, which I request of all parties.  Mr.
15        Mayerson is appearing by telephone.
16                  The parties had a discussion off the
17        record so I can try to ascertain where the case is
18        at, where it's likely to go.  And at this juncture,
19        the District has not completed its investigation.
20        And so accordingly, I am directing that the
21        District complete its investigation on or before
22        August 16th, 2023.  That's two weeks from now.  And
23        on that date, the District is to send an email to
24        Parent's counsel, and to myself stating their
25        position.
```

Received Office of State Review
01/09/2024

T3

4

T4

1           Specifically, are they recommending it

2      for settlement, or if they're going to go to

3      hearing, they need to tell me the number of

4      witnesses, who they are, how much time they expect

5      they will need to present their case.  Whether they

6      will use affidavits and move direct testimony, or

7      have their witnesses appear by direct testimony,

8      whether any party will need an accommodation or a

9      translator.  And whether the District will be

10     making a pre-hearing motion or subpoenas.

11           In addition, if the District is conceding

12     Prong I, they should so state if there's any Prong

13     III or equity issues, they should let me know if

14     they're going to be affirmatively presenting those

15     issues.

16           Now that being said, Parent has stated

17     that they will probably have three to four

18     witnesses, possibly an additional witness or two,

19     depending upon what the District determines it will

20     do.  The Parent's witnesses will be appearing live.

21     The parties have agreed to a hearing date of

22     September 11th, 2023, from 11 a.m. to 4 p.m.

23           I also note that we discussed pendency.

24           Apparently, the Parent did submit a

25     pendency form to the District.  Mr. Koppel advised

Received Office of State Review
01/09/2024

T4

1    that the pendency form is not being signed and will

2    not be signed because the Parent is asking for

3    tuition to be paid at a private school that is

4    different than that which tuition was awarded for

5    in an FOFD dated 6/14/2021.

6             Mr. Mayerson has indicated that Parent

7    will be raising an argument to pendency that the

8    program at, I believe, was MCC was no longer

9    available.  And the one at the present school,

10   Titus, is substantially similar.

11            We discussed that in fact, because this

12   pendency hearing is not only legal-based, but fact-

13   based that some of the witnesses who would be

14   appearing at the hearing on the merits will also be

15   appearing for a pendency hearing, and testimony

16   will be similar.  It will overlap.

17            So to save all the parties' resources,

18   the pendency hearing will be at the beginning of

19   the hearing on the merits.  And, in fact, some of

20   the testimony that is used for pendency may also be

21   used for the hearing of merits.  Mr. Koppel agreed

22   to that format.  So that's the issues that we have.

23            Mr. Mayerson does not believe that the

24   Parent needs any accommodations or a translator or

25   will be making any pre-hearing motions.  He wasn't

T6

1   certain about subpoenas, but I encourage all

2   parties that if they want to issue a subpoena and

3   have me sign it, submit it as soon as possible.  I

4   afford the other party an opportunity to be heard

5   on the scope of the subpoena, and then I make a

6   ruling either signing it it's entirety or modifying

7   it, or rejecting it outright.

8              I know that was a lot, but to the

9   Parent's recollection was my summary or synopsis of

10  what we discussed correct?

11             Is there anything you'd like to add?

12  Either Mr. Hobbs -- Mr. Mayerson, go ahead.

13             MR. MAYERSON:  Yes, just one facet, which

14  is that we reserve the right to make a

15  determination as to whether or not the initial

16  placement was still available or not.  You

17  mentioned the availability issue, and if it was

18  available, we reserve the right to withdraw our

19  request for a pendency hearing and just go directly

20  to the merits of the case.

21             HEARING OFFICER BABBITT:  Oh, sure.

22  Okay.  Thank you for clarifying that.  That's fine.

23             So Mr. Mayerson, I'm going to direct that

24  you let the District and myself know whether you're

25  going to go forward a pendency on or before August

T6

1    25th.  Okay?  That certainly should afford you

2    enough time to get the information you need so that

3    we know how we're going to proceed on the 11th.

4    And if we need additional time, then we can try to

5    schedule another day before everyone's calendar

6    fills up.  Okay?

7         MR. MAYERSON:  Yes, Hearing Officer.

8         HEARING OFFICER BABBITT:  Okay.  So Mr.

9    Koppel, was the summary that I gave of what we

10    discussed correct?  Anything you want to add?  Any

11    questions or concerns?

12         MR. KOPPEL:  IHO, yes, your

13    characterizations were accurate.  We don't have any

14    questions at this time.  Thank you.

15         HEARING OFFICER BABBITT:  Okay.  So I

16    will state that should this be recommended for

17    settlement, and if the parties are really working

18    towards settlement.  And I don't want to say far

19    along, but if they are along in that process, if

20    there's a representation that the memo is with the

21    comptroller, then I am inclined to grant an

22    adjournment of the hearing date on the merits so

23    the parties can finish a settlement.  But please

24    note the settlement should be rather far along, not

25    that, oh, we're still collecting documents from

Received Office of State Review
01/09/2024

8

T8

1    Parents.  Nothing like that because then you're at

2    the inception.

3        All right.  So the other issue that we'll

4    address just in an abundance of caution, I noted

5    that the compliance date is September 13th.  The

6    hearing is scheduled for two days before the

7    compliance date, but we can address that now.

8        MR. MAYERSON:  Yes, we would make a

9    motion to extend the timeline.

10        HEARING OFFICER BABBITT:  Okay.  Any

11    prejudice to the student?

12        MR. MAYERSON:  None.

13        HEARING OFFICER BABBITT:  All right.

14        Mr. Koppel, does the District have a

15    position on that application?

16        MR. KOPPEL:  Yes, we join in that

17    application.

18        HEARING OFFICER BABBITT:  All right,

19    great.  So that application will be granted and a

20    written order will issue as the September 13th

21    compliance date comes closer.  All right.

22        What I would also just like the record to

23    do so it's complete, I would like the Parent to

24    succinctly tell me what the deprivation of FAPE was

25    for I believe it's a '23/'24 school year, and the

Received Office of State Review
01/09/2024

T8

1          total relief that is being sought.

2                    MR. MAYERSON:  You want that by the

3          August 25th date hearing?

4                    HEARING OFFICER BABBITT:  No, I want that

5          now.  So we're going to put it on the record.  The

6          Parents should know what the deprivations are and

7          what their claim is, and that is really necessary

8          also so that Mr. Koppel can adequately respond as I

9          directed him to do in two weeks as to the DPC.

10                   MR. MAYERSON:  Well, isn't it governed

11         though by the demand for due process and what we

12         say the state deprivation is in that document?

13                   HEARING OFFICER BABBITT:  Mr. Mayerson,

14         you have appeared before me and the pre-hearing

15         conference, I send out subjects to be addressed.

16         It's a very lengthy document, but it lets the

17         parties know what we're going to discuss so we have

18         a productive pre-hearing conference.

19                   So we are narrowing issues.  We are also

20         being very forthright and transparent, so everyone

21         knows what's going to happen at the hearing.

22         There's no surprises.  There's no last-minute, oh,

23         well, we want to include this.

24                   So I'm simply asking, what's the alleged

25         failings by the DOE and what's the relief that

Received Office of State Review
01/09/2024

1    you're seeking?

2              MR. MAYERSON:  Well, we're seeking

3    tuition reimbursement at the new school.  And I

4    just feel a little uncomfortable.  I don't think

5    I'm required to narrow our claims.  Our claims are

6    set forth in our demand for due process.

7    (Indiscernible).

8              HEARING OFFICER BABBITT:  (Interposing)

9    No, Mr. Mayerson, your complaint, as Mr. Koppel

10   stated is very lengthy.  And that's what it is.  I

11   understand that some of the reforms and they're

12   tailored.  I have the right to conduct a proceeding

13   so that it's orderly and complete.  And it's kind

14   of alarming that the Parent just can't tell me.

15   You're not going to be held, oh, Mr. Mayerson, if

16   you don't allege that, oh, I forgot to say there

17   was a lack of Parental cooperation and you prove

18   that at the hearing, you're not going to be

19   limited.

20             But I think that generally, you should be

21   able to speak to what you allege the DOE didn't do.

22   And when you say tuition at the school, it's the

23   Titus School, correct?

24             MR. MAYERSON:  Correct.

25             HEARING OFFICER BABBITT:  Okay.  So if

Received Office of State Review
01/09/2024

1        you don't want to do that, I'm going to note that

2        on the record.  And I do, I find that disconcerting

3        that an attorney can't do it.  And quite frankly,

4        you're the first attorney who has ever raised the

5        issue of that they shouldn't have to do it.  It's

6        in the DPC.  And if my recollection serves me

7        correctly, when you previously appeared before me,

8        you didn't have any problem giving me that

9        information.

10              MR. MAYERSON:  No.  I have no problem

11        (indiscernible).

12              HEARING OFFICER BABBITT:  (Interposing)

13        Mr. Mayerson, just do it or have your colleague,

14        Mr. Hobbs do it.  I think you're making a bigger

15        deal out of it than it should be.

16              MR. MAYERSON:  All right.  John, do you

17        have the due process complaint in front of you?

18              MR. JOHN HOBBS:  I do.  So to succinctly

19        state our claim, starting with the IEP, it's our

20        claim that the IEP was not properly executed as

21        there was no tri-annual evaluation done, nor was

22        there an FBA or BIP conducted for Rex, even though

23        the District did have prior knowledge of his

24        interfering behavior.

25              HEARING OFFICER BABBITT:  Okay.  Mr.

Received Office of State Review
01/09/2024

1    Hobbs, this is not argument, okay?  You succinctly

2    tell me what the failings are.  You will have an

3    opportunity to present evidence and argue at the

4    hearing.  Okay?

5              MR. HOBBS:  Understood, Your Honor.  From

6    that, you're also stating that a FAPE was not

7    provided as the school location.  The recommended

8    placement was not tailored to address our client's

9    needs.  Additionally, once the parents of Rex

10   communicated their concerns with the IEP in the

11   school location letter, the IEP team was not

12   reconvened to address those concerns.

13              As such, Rex's parents' unilaterally

14   place Rex at a private school so they can get the

15   appropriate levels of supplemental related

16   services.

17              HEARING OFFICER BABBITT:  Okay, Mr.

18   Hobbs, I'm going to interrupt you again.  All

19   right?  I don't want to know what was done.  I just

20   want to know what the alleged deprivations were,

21   which contributed to FAPE.  If you're done and

22   you're moving on to relief, just indicates so.

23              MR. HOBBS:  Yes.  One last portion, I

24   just wanted to clarify.

25              HEARING OFFICER BABBITT:  Okay.

Received Office of State Review
01/09/2024

1           MR. HOBBS:  Part of the deprivation of

2       FAPE you're including is not an appropriate amount

3       of related services.  With that, would like to move

4       on to the sought relief.  And the sought relief for

5       this claim is tuition and costs at a high school, I

6       will say to be candid with the IHO, the specific

7       dollar amount, we're waiting to get the enrollment

8       contract from the Parents.  We can give a specific

9       dollar amount for that tuition.

10          HEARING OFFICER BABBITT:  Right.

11          MR. HOBBS:  We are also seeking

12      reimbursement for the supplemental ABA services,

13      social skills --

14          HEARING OFFICER BABBITT:  (Interposing) I

15      don't know what you mean by supplemental.  Are you

16      talking about after-school?

17          MR. HOBBS:  Yes ma'am.

18          HEARING OFFICER BABBITT:  And if so, how

19      many hours?

20          MR. HOBBS:  Up to 10 hours per week of

21      after-school ABA services.

22          HEARING OFFICER BABBITT:  Um-hum.

23          MR. HOBBS:  Up to two hours of after-

24      school speech-language services.  Up to one hour

25      per week of after-school physical therapy.  A

Received Office of State Review
01/09/2024

```
 1          supplementary social skills.  So this is also an
 2          after-school program.
 3                    HEARING OFFICER BABBITT:  I'm sorry, I
 4          didn't understand.  When you say supplemental, I
 5          don't know what you mean.  Are you talking about
 6          after-school?  So say after school.  And what is
 7          it?
 8                    MR. HOBBS:  After-school social skills
 9          group, which occurred --
10                    HEARING OFFICER BABBITT:  (Interposing)
11          Social skills group?
12                    MR. HOBBS:  Social skills, yes.
13                    HEARING OFFICER BABBITT:  Social skills
14          for how long?
15                    MR. HOBBS:  One day a week.
16                    HEARING OFFICER BABBITT:  Well, no, no,
17          it's not one day.  I can't believe that.  Is it one
18          hour, two hours?
19                    MR. HOBBS:  I believe it's up to an hour,
20          hour and a half after-school social skills that
21          occur once a week.
22                    HEARING OFFICER BABBITT:  Okay.
23                    MR. HOBBS:  Up to two hours per week of
24          after-school occupational training.
25                    HEARING OFFICER BABBITT:  Yes.
```

Received Office of State Review
01/09/2024

1          MR. HOBBS:  Two hours per week of parent
2     training and counseling.
3          HEARING OFFICER BABBITT:  Um-hum.
4          MR. HOBBS:  Two hours per week of ABA
5     supervision.
6          HEARING OFFICER BABBITT:  Right.
7          MR. HOBBS:  Monthly ABA meetings for one
8     hour per session.  Monthly interdisciplinary team
9     meetings for one hour per session.  And cost of
10     transportation to and from the Titus School.
11          HEARING OFFICER BABBITT:  Why is the
12     Parent transporting the student?
13          MR. HOBBS:  What was that?
14          HEARING OFFICER BABBITT:  Is the parent
15     transporting the student?
16          MR. HOBBS:  I believe so, Your Honor.
17     But out-of-pocket expenses for that.  Yes.
18          HEARING OFFICER BABBITT:  Does this
19     student have specialized transportation?
20          MR. HOBBS:  I believe -- one moment, Your
21     Honor.  In terms of if he has a DOE route, I'm not
22     sure about that, Your Honor.
23          HEARING OFFICER BABBITT:  All right.
24     Well, you can let me know that on or before August
25     16th.

Received Office of State Review
01/09/2024

1           MR. HOBBS:  Will do.

2           HEARING OFFICER BABBITT:  Okay?  All

3       right.  I just want to make it clear that at first

4       blush, this is a lot of services after school.  I

5       believe the child is -- I think I read that he's

6       nine years old.  So I will have to have information

7       how those services are being used, when, and where.

8       Okay?  So I can make a determination whether the

9       educational program that you're seeking is

10      reasonable.  All right.

11          I also just like to remind the parties

12      that if there's any funding requested that is

13      prospective in nature, then the party has to show

14      independent proof of need by a tax return, social

15      security statement, or some other document that's

16      acceptable.

17          Just to let you know that in advance, as

18      I stated, if we have a hearing, I really do

19      appreciate and I do request that the witnesses

20      appear on video because I have to assess their

21      credibility.  I find it very difficult to do when

22      I'm looking at a black screen.  I also don't know

23      if they're looking at a document, if somebody else

24      is there.  So that's my preference.

25          As I also indicated, I'm accommodating if

Received Office of State Review
01/09/2024

1        you tell me that a Parent lacks the resources,

2        either a phone, an iPad, a computer, or a laptop to

3        be on video.  But I certainly expect professionals

4        to have working equipment and to be able to do so.

5              I'm aware of problems with eScribers and

6        so I know that sometimes during a hearing somebody

7        has to turn off their camera, but we start off

8        hopeful and we all start off on video.  Okay.

9              I do think that I've addressed the issues

10        that need to be addressed, but I will go back and

11        ask the Parent, Mr. Hobbs, Mr. Mayerson, any

12        questions, concerns, or statements you'd like to

13        make?

14              MR. MAYERSON:  Just that I didn't have

15        the video information with me and that's the only

16        reason why I called in on the phone.  So I

17        apologize and I'll be on camera at the hearing.

18              HEARING OFFICER BABBITT:  Okay, Mr.

19        Mayerson, I always like to see you on camera.  Very

20        good.

21              MR. MAYERSON:  Then you'll be seeing me

22        again.

23              HEARING OFFICER BABBITT:  Okay.

24              Mr. Hobbs, is there anything, because you

25        did substantial speaking on behalf of the Parent,

Received Office of State Review
01/09/2024

18

```
 1            anything from your perspective?
 2                    MR. HOBBS:  Nothing further, Your Honor.
 3            In terms of clarifying the transportation, is that
 4            just something again emailed to you by 8/16,
 5            correct?
 6                    HEARING OFFICER BABBITT:  Well, an email
 7            most importantly to the District.  All right?  As
 8            to what the transportation is.  So then again, the
 9            District will be in a position to address that.
10                    MR. HOBBS:  Yes.
11                    HEARING OFFICER BABBITT:  All right.
12                    So Mr. Koppel, I do appreciate that the
13            only thing that you may not be able to address on
14            August 16th is the transportation component if you
15            don't get the information beforehand.  And
16            certainly, I'll allow you to supplement your
17            response once you get that appropriate information.
18            All right?  Just to afford you that opportunity.
19                    But Mr. Koppel, any questions, concerns,
20            or statements on behalf of the District?
21                    MR. KOPPEL:  No, IHO.  Thank you.
22                    HEARING OFFICER BABBITT:  All right.  So
23            Mr. Hobbs, Mr. Mayerson, if one or more of you are
24            going to appear, I know your firm's appearing Mr.
25            Mayerson, but whatever attorney will be appearing
```

Received Office of State Review
01/09/2024

T19

<sup>19</sup>

1          in the future or together, just please file an NOA

2          so I upload that into the record.  I have it

3          uploaded rather into the record.  Okay?

4                    MR. MAYERSON:  Will do.  Thank you.

5                    HEARING OFFICER BABBITT:  All right.  So

6          I thank both of you.

7                    And Ms. Formica, do you want to sign us

8          off?

9

10                    (Whereupon, at 12:47 p.m. the proceeding

11          was adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

T19

Received Office of State Review
01/09/2024

```
1                    C E R T I F I C A T I O N

2

3              I, Efrath Levy, do hereby certify that I

4         typed the transcript in the Matter of Rex Francis

5         taken on August 2, 2023 via video conference by

6         Angela Formica for the NYC Office of Administrative

7         Trials and Hearings, and that to the best of my

8         ability, this is an accurate transcription of what

9         was recorded.  I further certify that I am not

10        connected by blood, marriage, or employment with

11        any of the parties herein nor interested directly

12        or indirectly in the matter transcribed.

13

14

15

16

17        _____

18        EFRATH LEVY

19        August 4, 2023

20

21

22

23

24

25
```

T20

Received Office of State Review
01/09/2024

```
 1                     DEPARTMENT OF EDUCATION
                              of the
 2                       CITY OF NEW YORK


 3
     ------------------------------X
 4
     In the Matter of:
 5
          REX FRANCIS                    Case No. 249622
 6
     ------------------------------X
 7                                 District # 2
                                   NYC Office of Administrative
 8                                 Trials and Hearings
                                   100 Church Street
 9                                 New York, NY 10007
                                   Remote Hearing
10
                                   Friday
11                                 October 13, 2023

12           The above-entitled matter came on for hearing at
     11:00 a.m.
13

14   BEFORE:            MICHELLE BABBITT,
                        Impartial Hearing Officer
15

16   A P P E A R A N C E S:

17   (All present by video or telephone)

18   For the Student:
       JOHN HOBBS, ESQ., Attorney
19     GARY S. MAYERSON, ESQ., Attorney
       HALIA FRANCIS, Parent
20     KAITLYN SIMON, Speech-Language Pathologist
       JESSICA ZAMBITO, Occupational Therapist
21     STEPHANIE KOH, BCBA, Little Green Tugboat
       NATALIE BRANDEFINE, Head of School, The Titus School
22


23   For the Department of Education:
       ELI KOPPEL, ESQ., Attorney
24


25
```

Received Office of State Review
01/09/2024

```
 1                    I N D E X
                      ---------
 2
                                             VOIR
 3   WITNESSES:       DIRECT  CROSS REDIRECT RECROSS DIRE

 4   Kaitlyn Simon                     67

 5   Stephanie Koh                116

 6   Natalie Brandefine          156    155

 7   Halia Francis       166     166    78

 8

 9                  E X H I B I T S

10   STUDENT         DESCRIPTION              I.D.  IN EV.

11   A               Demand for due process   36    37
                     with email
12                   confirmation, 6/30/23,
                     15 pages
13
     B               Amended demand for due   36    37
14                   process, 8/22/23, 12
                     pages
15
     C               Ten-day notice with      36    37
16                   email confirmation,
                     6/15/23, three pages
17
     D               Email to CSE sharing     37    38
18                   reports for I
                     meeting, 1/15/23, 63
19                   pages

20   E               Parent's emails sharing  38    38
                     additional reports for
21                   I meeting, 1/16/23,
                     19 pages
22
     F               Parent's email to        37    38
23                   school placement
                     requesting a tour,
24                   7/10/23, one page

25   G               Titus enrollment         37    38
```

| | | | | |
|---|---|---|---|---|
| 1 | | contract, 5/1/23, 17 pages | | |
| 2 | H | Titus tuition affidavit 7/17/23, two pages | 37 | 38 |
| 3 | | | | |
| 4 | I | Titus program description, '23/'24, one page | 37 | 39 |
| 5 | | | | |
| 6 | J | Titus student summer schedule, '23/'24, six pages | 38 | 39 |
| 7 | | | | |
| 8 | K | Titus student fall schedule, '23/'24, six pages | 38 | 39 |
| 9 | | | | |
| 10 | L | Titus student attendance record, '23/'24, one page | 38 | 39 |
| 11 | | | | |
| 12 | M | Titus school progress report, 6/23, 29 pages | 39 | 41 |
| 13 | N | Natalie Brandefine's certification, undated, one page | 43 | 44 |
| 14 | | | | |
| 15 | O | ABA progress report from Little Green Tugboat, 5/23/23, ten pages | 43 | 44 |
| 16 | | | | |
| 17 | | | | |
| 18 | P | Stephanie Koh license, undated, unspecified number of pages | 43 | 44 |
| 19 | | | | |
| 20 | Q | Speech progress report by Happy Talk, 8/23, unspecified number of pages | 43 | 44 |
| 21 | | | | |
| 22 | R | Kaitlyn Simon license and resume, unidentified date, unspecified number of pages | 46 | 46 |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

Received Office of State Review
01/09/2024

| | | | | |
|---|---|---|---|---|
| 1 | S | Occupational therapy progress report by Bloom Therapy, 9/4/23, four pages | 46 | 46 |
| 2 | | | | |
| 3 | | | | |
| 4 | T | Jessica Zambito license, unidentified date, one page | 46 | 46 |
| 5 | | | | |
| 6 | U | Affidavit testimony of Natalie Brandefine, 10/5/23, 18 pages | 46 | 46 |
| 7 | | | | |
| 8 | V | Affidavit testimony of Stephanie Koh, 10/5/23, eight pages | 46 | 46 |
| 9 | | | | |
| 10 | W | Affidavit testimony of Kaitlyn Simon, 10/4/23, unspecified number of pages | 46 | 46 |
| 11 | | | | |
| 12 | X | Affidavit testimony of Jessica Zambito, 10/4/23, seven pages | 46 | 46 |
| 13 | | | | |
| 14 | Y | Affidavit testimony of Halia Francis, 10/5/23, 11 pages | 46 | 46 |
| 15 | | | | |
| 16 | Z | Titus weekly email updates to parent, 7/23, three pages | 46 | 46 |
| 17 | | | | |
| 18 | I | Recess after school social program description, '23/'24, four pages | 46 | 46 |
| 19 | | | | |
| 20 | I | Rex Francis medical accommodation form, 6/22/23, two pages | 46 | 46 |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

Received Office of State Review
01/09/2024

```
 1                    P R O C E E D I N G S
 2                    HEARING OFFICER MICHELLE BABBITT:  Good
 3          morning.  This is Michelle Babbitt.  I'm the
 4          impartial hearing officer assigned to case number
 5          249622.  The student is Rex Francis.
 6                    Appearing today on behalf of the student
 7          and parents is?
 8                    MR. JOHN HOBBS:  Good morning.  This is
 9          John Hobbs.  My name is spelled J-O-H-N H-O-B-B-S,
10          attorney for the Parent, with Mayerson &
11          Associates.  I'm also joined by Gary Mayerson, who
12          is here for observation purposes.
13                    HEARING OFFICER BABBITT:  All right.
14          Very well.  So Mr. Hobbs, you will be conducting
15          this proceeding, correct?
16                    MR. HOBBS:  Yes, IHO.
17                    HEARING OFFICER BABBITT:  All right.  I
18          also see that you're joined here today by the
19          parent.  So the parent should state her name on the
20          record.
21                    MS. HALIA FRANCIS:  Hello.  Good morning.
22          I'm Halia Francis, H-A-L-I-A, last name
23          F-R-A-N-C-I-S.
24                    HEARING OFFICER BABBITT:  And your
25          relationship to the student?
```

Received Office of State Review
01/09/2024

26

```
 1                      MS. FRANCIS:  I'm his mother.

 2                      HEARING OFFICER BABBITT:  All right.

 3          Good morning.

 4                      MS. FRANCIS:  Good morning.

 5                      HEARING OFFICER BABBITT:  And appearing

 6          on behalf of the District?

 7                      MR. ELI KOPPEL:  Good morning.  Eli

 8          Koppel, E-L-I K-O-P-P-E-L, attorney for the

 9          District.

10                      HEARING OFFICER BABBITT:  All right.  So

11          good morning to everyone again.  I'm just going to

12          recap because this is where I believe we're at.

13          And if we're not, just chime in and let me know.

14                      On August 15th, 2023, Mr. Koppel sent an

15          email stating that there would be no Prong I.

16                      So Mr. Koppel, am I correct that the

17          District is conceding Prong I, correct?

18                      MR. KOPPEL:  That's correct, IHO.

19                      HEARING OFFICER BABBITT:  All right.

20          Very well.  And then on September 11, 2023, the

21          District sent an email stating that it was -- it

22          felt that the unilateral placement was not

23          appropriate, correct?

24                      MR. KOPPEL:  That's correct, IHO.

25                      HEARING OFFICER BABBITT:  And so the
```

Received Office of State Review
01/09/2024

```
 1              District will be contesting the Prong II burden,

 2              which is on the Parent, correct?

 3                      MR. KOPPEL:  That's our position, IHO.

 4                      HEARING OFFICER BABBITT:  All right.

 5              Very well.  And am I also correct that the District

 6              has not disclosed any documents, correct?

 7                      MR. KOPPEL:  That's correct.  We have not

 8              provided any documents.  That's correct.

 9                      HEARING OFFICER BABBITT:  All right.  And

10              I just -- I'm going to ask everyone to mute

11              themselves if they're not speaking so I don't hear

12              your pinging.  All right.  Thank you.

13                      And am I also correct that although I

14              signed a subpoena on August 8th, which was

15              submitted by the District, and I believe it was

16              served and documents were sent pursuant to that

17              subpoena.  I believe they were sent via Mr.

18              Mayerson's office from the school.  But none of

19              those documents are being admitted into evidence.

20                      Is that correct, Mr. Koppel?

21                      MR. KOPPEL:  That's correct, IHO.

22                      HEARING OFFICER BABBITT:  All right.  I

23              just wanted to get those administrative

24              housekeeping issues in.

25                      So let's be clear, Mr. Hobbs, since the
```

Received Office of State Review
01/09/2024

1        District's conceding Prong I, please don't spend

2        time on that because it's conceded.  All right?

3        You have that.  They're conceding FAPE.  It's on

4        the record.

5              Okay.  So now let's go to opening --

6        before I go further, are there any questions,

7        concerns, or housekeeping items from any of the

8        parties that were not already discussed?

9              Mr. Hobbs, anything from the Parent?

10              MR. HOBBS:  Yes, IHO.  I just wanted to

11       confirm that we have not received notice from the

12       District pursuant to your August 2nd pre-hearing

13       conference order notifying us of any cross-

14       examination.  So it's our position that they will

15       not be conducting any cross-examination of our

16       affidavit witnesses today.

17              HEARING OFFICER BABBITT:  All right.  Mr.

18       Koppel, will you like to be heard on that?

19              MR. KOPPEL:  I do.  I would like to

20       cross-examine two witnesses, Ms. Brandefine and Ms.

21       Koh.  But obviously, if you indicate that I can't

22       cross-examine them, we'll accept that.  And the

23       affidavits and all the other evidence is fairly

24       detailed.  So I obviously leave that to you.

25              HEARING OFFICER BABBITT:  All right.

```
 1              Well, Mr. Koppel, was there a reason that you

 2         didn't advise by email that this was the course

 3         that you were selecting?  I'm just curious, because

 4         once I received the affidavits, I did tell the

 5         Parents that I would have questions -- completion,

 6         and clarification.  And I did say, Mr. Koppel, if

 7         you have any questions, you should let us know if

 8         you want to cross-examine them.  So I'm just

 9         curious as to why that email wasn't sent.

10              MR. KOPPEL:  I don't have any reasonable

11         explanation for that, IHO, that would be

12         acceptable.  So I won't even bring it up.

13              HEARING OFFICER BABBITT:  Okay.  Well,

14         Mr. Koppel, I appreciate your honesty and candor.

15         In fairness to all, I cannot let you do cross-

16         examination when you didn't send any notification

17         and even though you had a reminder.  But I will say

18         this.  I do intend -- I have my questions for

19         clarification and completion.  Should there be any

20         questions that the District has that emanate solely

21         from that limited subject matter, you'll be

22         permitted to ask questions.  But it's very limited

23         and solely from those questions.  Okay?  So it

24         won't be cross-examination per se.  All right?

25              MR. KOPPEL:  Completely understand.
```

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  Okay.  But I
 2          think that's just fair and equitable.
 3                    All right.  Anything further, Mr. Hobbs?
 4                    MR. HOBBS:  One last thing, IHO.  I
 5          wanted to confirm that the IHO and Mr. Koppel
 6          received the updated disclosure package with the
 7          notarized affidavits for Stephanie Koh and Halia
 8          Francis.  It was sent last Friday when I notified
 9          the IHO that I would be putting on the case today.
10                    HEARING OFFICER BABBITT:  Right.  I
11          did -- I received them.  Yes.
12                    Mr. Koppel, did you receive it?
13                    MR. KOPPEL:  I received them also,
14          Counsel.
15                    MR. HOBBS:  Then that's all from the
16          Parent's side.
17                    HEARING OFFICER BABBITT:  All right.
18          Very good.  Okay.
19                    Mr. Koppel, do you have any questions,
20          concerns, or housekeeping items?
21                    MR. KOPPEL:  No, IHO.
22                    HEARING OFFICER BABBITT:  All right.
23          Very well.  Okay.
24                    So Mr. Koppel, would you like to make an
25          opening statement on behalf of the District?
```

Received Office of State Review
01/09/2024

1           MR. KOPPEL:  I'm going to waive my

2    opening.  I'm going to reserve for closing, IHO, if

3    that's okay?

4           HEARING OFFICER BABBITT:  Yes, very well.

5           Okay.  Mr. Hobbs, can you proceed with

6    your opening statement?

7           MR. HOBBS:  Yes, IHO.  Good morning.

8    This matter involves a nine-year-old boy named Rex

9    Francis and the 2023/2024 school year.  His date of

10   birth is April 14th, 2014, and Rex is diagnosed

11   with autism.  Rex is a funny, affectionate child

12   who can learn under the right conditions.  He has

13   an array of deficits that affect his behavior,

14   cognitive ability, mobility, speech, and overall

15   availability to learn.  Today, the record will show

16   that in recent years, Rex has been able to make

17   steady progress with the help of intensive one-to-

18   one ABA instruction and robust supplemental

19   services.

20          For Prong I, the burden is placed on the

21   DOE, and for this matter, the DOE has conceded that

22   it failed to offer a FAPE for Rex's '23/'24 school

23   year.

24          As to Prong II, which provides a more

25   relaxed standard for the Parents seeking

Received Office of State Review
01/09/2024

T32

```
 1              reimbursement, the evidence will establish that

 2              Rex's 12-month program and placement at The Titus

 3              School, combined with the supplemental services in

 4              ABA, speech-language therapy, occupational therapy,

 5              and afterschool social skills programming are

 6              reasonably calculated to enable him to make

 7              meaningful progress.

 8                      The record will also show that the Titus

 9              staff are all well trained to provide an

10              appropriate curriculum, which includes appropriate

11              academics and related services for Rex.

12              Additionally, the record will show how the school

13              staff takes the appropriate steps to formulate a

14              behavioral intervention plan for Rex and

15              consistently communicates with his family and

16              related service providers to ensure he receives a

17              consistent and well-rounded education.

18                      Additionally, the record will also show

19              that due to Rex's extensive deficits, supplemental

20              afterschool services in SLT, OT, ABA, and social

21              skills programming were appropriate and necessary

22              for him to make meaningful progress.  The testimony

23              and progress reports provided by Rex's school and

24              service providers all account for the meaningful

25              progress that he continues to make receiving these
```

T32

```
1        services and why they remain critical components of

2        an appropriate program for Rex.

3                As to Prong III, there is nothing in the

4        record that would operate to preclude or diminish

5        an award in Rex's favor as parents cooperated with

6        the DOE at all times.  They shared his updated

7        reports prior to the IEP meeting and reached out to

8        the DOE when they had concerns with the DOE's

9        proposed program.  The record will also show that

10       Rex's parents cooperated with the DOE in reaching

11       out to the recommended placement school in

12       attempting to schedule a tour.

13               If anything, the record will show that

14       each time Halia and Cliff Francis communicated

15       their concerns for their son's education, they were

16       ultimately left with the DOE's silence and forced

17       to put together an appropriate program for their

18       son.  They have done nothing that would warrant a

19       reduction in their relief.

20               Rex is a unique child and has made

21       commendable progress over the years in his

22       educational, social, and overall development.

23       However, he has only made this progress with the

24       help of intensive one-to-one ABA instruction and

25       extensive supplemental services that he's been
```

Received Office of State Review
01/09/2024

1    receiving over the past few years.  As such, we are
2    respectfully seeking reimbursement and/or funding
3    for the following cost expenses for his '23/'24
4    school year:  Tuition and costs for Rex's '23/'24
5    school year at The Titus School; the cost of his
6    ABA services -- afterschool ABA services, excuse
7    me, including one-to-one ABA therapy, parent
8    training and counseling, ABA supervision, monthly
9    ABA meetings, monthly interdisciplinary meetings;
10   his afterschool OT services; his afterschool SLT
11   services; the cost of his afterschool social skills
12   programming; and continued DOE bussing.  Thank you.
13          HEARING OFFICER BABBITT:  All right.  So
14   you kept saying the record.  So when you say the
15   record, that's meaningless to me.  And it's your
16   job on Prong II to show me how this educational
17   program, which, as you said, is robust, enables
18   this -- is appropriate and that he's made
19   meaningful progress.  When you use summary
20   statements without showing me the underlying
21   reasons, it's not helpful.  I'm just telling you
22   that beforehand.  All right?
23          Let me ask you, Mr. Koppel, are there any
24   affirmative Prong III burden -- Prong III issues
25   that the District's going to raise?

Received Office of State Review
01/09/2024

1           MR. KOPPEL:  No, IHO.  We couldn't

2      identify any.  We reviewed the record and at this

3      time we are not going to be raising any Prong III

4      arguments.

5           HEARING OFFICER BABBITT:  Okay.  Very

6      good.  So let's go now to the -- and again, Mr.

7      Hobbs, there's a lot of services here.  I'm going

8      to want monetary amounts, okay?  Because I saw a

9      lot of holes in the record, quite frankly, okay,

10     with an initial look.

11          So again, just to be clear, Mr. Koppel,

12     any disclosure on the part of the District?

13          MR. KOPPEL:  No, IHO.

14          HEARING OFFICER BABBITT:  Okay.  So is

15     the District objecting to any of the disclosure

16     that was sent by the Parent?

17          MR. KOPPEL:  We are not making any

18     objection to any of the exhibits.

19          HEARING OFFICER BABBITT:  Okay.  Well, I

20     have some questions about some of the exhibits and

21     why they are germane to this proceeding.  This is

22     for the '23/'24 school year.  So it appears that a

23     lot of these exhibits are for the prior school year

24     and I'm not sure -- and they're referenced to

25     showing progress.  But I'm not here to decide the

```
 1            prior school year.  I'm here to decide '23/'24.  So
 2            I will have questions about that.
 3                    So Mr. Hobbs, why don't you go through
 4            the disclosure?  And the District said they have no
 5            objections, but this tribunal will not accept
 6            evidence if it's not germane to this year, so.
 7                    MR. HOBBS:  Yes, IHO.
 8                    HEARING OFFICER BABBITT:  Okay.
 9                    MR. HOBBS:  So Parent's Exhibit A, demand
10            for due process with email confirmation, dated
11            6/30/2023, 15 pages.
12                    Parent's Exhibit B, amended demand for
13            due process, dated 8/22/23, 12 pages.
14                    Parent's Exhibit C, ten-day notice with
15            email confirmation, dated 6/15/23, three pages.
16                    (Whereupon Student's Exhibits A through C
17            were marked for identification.)
18                    HEARING OFFICER BABBITT:  Okay.  Let's
19            stop there.
20                    So Mr. Koppel, do you have any objection
21            to Exhibits A, B, C being admitted into evidence?
22                    MR. KOPPEL:  No, IHO.
23                    HEARING OFFICER BABBITT:  Okay.  There
24            being no objection from the District, those
25            Exhibits A, B, C are marked into evidence.
```

Received Office of State Review
01/09/2024

```
 1              (Whereupon Student's Exhibits A through C
 2         were marked and admitted into evidence.)
 3              HEARING OFFICER BABBITT:  Okay.
 4         Continue.
 5              MR. HOBBS:  Parent's Exhibit D, email to
 6         the CSE sharing reports for IEP meeting, dated
 7         1/15/23, 63 pages.
 8              Parent's Exhibit E, Parent's emails
 9         sharing additional reports for IEP meeting, dated
10         1/16/2023, 19 pages.
11              Exhibit P-F, Parent's F, Parent's email
12         to school placement requesting a tour, dated
13         7/10/23, one page.
14              Exhibit P-G, Titus enrollment contract,
15         dated May 1st, '23, 17 pages.
16              Parent's Exhibit H, Titus tuition
17         affidavit, dated 7/17/23, two pages.
18              Parent's Exhibit I, Titus program
19         description, dated '23/'24, one page.
20              HEARING OFFICER BABBITT:  Okay.  All
21         right.  So stop there.
22              Any objection, Mr. Koppel, to Exhibits D
23         through I inclusive being admitted into evidence?
24              MR. KOPPEL:  No, IHO.  No objection.
25              HEARING OFFICER BABBITT:  Okay.  There
```

Received Office of State Review
01/09/2024

38

```
 1          being no objection, those exhibits are marked into

 2          evidence.

 3                    (Whereupon Student's Exhibits D through I

 4          were marked and admitted into evidence.)

 5                    HEARING OFFICER BABBITT:  All right.

 6          Let's continue.

 7                    MR. HOBBS:  We left off at the Parent's

 8          Exhibit I, correct, IHO?

 9                    HEARING OFFICER BABBITT:  Yes, I believe

10          so.  Go ahead.

11                    MR. HOBBS:  Parent's Exhibit I, Titus

12          program description, dated '23/'24, one page.

13                    Parent's Exhibit J, Titus student summer

14          schedule, dated '23/'24, six pages.

15                    Parent's Exhibit K, Titus student fall

16          schedule, dated '23/'24, six pages.

17                    Parent's Exhibit L, Titus student

18          attendance record, dated '23/'24, one page.

19                    HEARING OFFICER BABBITT:  All right.

20          Let's stop there.

21                    So Exhibit I through L, any objection to

22          those exhibits, Mr. Koppel?

23                    MR. KOPPEL:  No objection, IHO.

24                    HEARING OFFICER BABBITT:  All right.

25          Very good.  All right.
```

Received Office of State Review
01/09/2024

```
 1                    (Whereupon Student's Exhibits J through L
 2           were marked and admitted into evidence.)
 3                    HEARING OFFICER BABBITT:  So let's
 4           continue.  Exhibit M.
 5                    MR. HOBBS:  Parent's Exhibit M, Titus
 6           school progress report, dated 6/23, 29 pages.
 7                    HEARING OFFICER BABBITT:  Okay.  So I
 8           have a question.  How is this relevant?  This
 9           progress report is obviously for the prior school
10           year; isn't that correct?
11                    MR. HOBBS:  Yes, IHO.
12                    HEARING OFFICER BABBITT:  So how can
13           witnesses -- how is it germane to the '23/'24
14           school year in showing that it's appropriate and he
15           made progress?
16                    MR. HOBBS:  IHO, because it's so early
17           this school year, a Titus progress report for this
18           reason isn't yet available.  We provided this
19           progress report as it is the most recent and
20           provided a baseline in which Natalie Brandefine
21           could testify in an affidavit as to the progress
22           he's made since that last progress report was given
23           to the parents.
24                    HEARING OFFICER BABBITT:  Well, my
25           recollection is that some of these affidavits talk
```

Received Office of State Review
01/09/2024

1    about the progress that was shown in this and

2    that's just not before me.  I mean, I take it you

3    had a decision from last year.  So I just don't see

4    how it is relevant for this school year.

5              MR. HOBBS:  Again, IHO, it's our position

6    that because this is the most recent progress

7    report, it's close enough in time to the present

8    hearing.  It provides a --

9              HEARING OFFICER BABBITT:  Okay.  Wait.

10   You got to stop there.  Think of what you're

11   saying.  Your position is that it's close enough in

12   time, so it's going to show his progress.  No, it's

13   not.  That progress report talks about last year.

14   It doesn't talk about his progress from July

15   forward.  So that's been July, August, September,

16   and we're in October.  So that progress report

17   talks about the prior school year.  It doesn't talk

18   about the student's progress for this year, but yet

19   somehow that's what you're claiming.  So I don't

20   understand that.

21             MR. HOBBS:  Again, IHO, it's used as a

22   basis of comparison with Ms. Brandefine's affidavit

23   testimony and acts as a -- we would argue it acts

24   as a baseline to show his continued progress since

25   then.

Received Office of State Review
01/09/2024

1          HEARING OFFICER BABBITT:  So you will

2     show -- you will show in your written summation how

3     it acts as a baseline.  Because I am -- I will

4     admit it into evidence subject to connection, but I

5     don't see it.  I reviewed her affidavit and I don't

6     see that either.  Okay.  So that's your job, not

7     mine, to ferret through it to see how it's

8     relevant, because I don't believe that it is.

9          (Whereupon Student's Exhibit M was marked

10    and admitted into evidence.)

11          MR. HOBBS:  Understood, IHO.

12          HEARING OFFICER BABBITT:  Okay.  Very

13    well.  Continue.

14          MR. HOBBS:  Parent's Exhibit N, Natalie

15    Brandefine's certification, undated, one page.

16          ABA progress report from the Little Green

17    Tugboat, dated 5/28/23, ten pages.

18          HEARING OFFICER BABBITT:  Okay.  Now I'm

19    going to stop you here also.  This is from -- it's

20    dated 5/2023.  It's the prior school year when it

21    talks about progress.  So here we've had even more

22    time.  Are you telling me there's no updated

23    progress report from this entity?

24          MR. HOBBS:  Yes, IHO.  That's what

25    we've -- that's our information from this ABA

1           provider.

2                   HEARING OFFICER BABBITT:  Well, but this
3           is not relevant for this school year.  I'm sorry.
4           It's telling me about the progress from the
5           student's prior year, not this year.  You just
6           can't throw documents in and expect me to sort it
7           out and make sense of it and things aren't updated.
8           I mean, there is more than adequate time to update.

9                   MR. HOBBS:  Yes, IHO.  The ABA providers
10          in Titus, they have a schedule in which they
11          release these progress reports.  They don't do it
12          every single time a student goes to a hearing, they
13          provide what's most recent, which is what Ms. --

14                  HEARING OFFICER BABBITT:  (Interposing)
15          Okay.  Well, okay.  Just be careful.  You can't
16          testify.  That's not your job.  You're the
17          advocate.  So I'm just asking you how this progress
18          report is relevant or germane to the '23/'24 school
19          year when it talks about the prior school year,
20          '22/'23?  That's the question.

21                  MR. HOBBS:  Yes, IHO.  Again, it's our
22          position that acts as a base of comparison with
23          Stephanie Koh's affidavit testimony in which she
24          talks about the progress he's made since this last
25          report card was provided to the Parent.

Received Office of State Review
01/09/2024

```
1                      HEARING OFFICER BABBITT:  I, quite
2          frankly, don't feel that it's germane and I will
3          disregard it unless it's connected by you.  But I
4          don't see it.  All right.  It's for a prior school
5          year and I don't really think it's sufficient to
6          say, oh, well, they haven't updated it so we're
7          using this.  Okay, continue.
8                      MR. HOBBS:  Parent's Exhibit P, Stephanie
9          Koh license, undated.
10                     Parent's Exhibit Q, speech progress
11         report by Happy Talk, dated August 2023;
12                     Parent's Exhibit --
13                     (Whereupon Student's Exhibits N through Q
14         were marked for identification.)
15                     HEARING OFFICER BABBITT:  (Interposing)
16         Okay.  I want to stop you there as well.  So this
17         progress report is only for about one month of this
18         school year, correct?
19                     MR. HOBBS:  Yes.
20                     HEARING OFFICER BABBITT:  Okay.  So is
21         this going to be updated or this is what I should
22         rely on?
23                     MR. HOBBS:  You would rely on this, IHO,
24         as well as the affidavit testimony by Kaitlyn Simon
25         that talks further about his more recent progress
```

Received Office of State Review
01/09/2024

```
 1              since this progress report was made.
 2                        HEARING OFFICER BABBITT:  Okay.  I'm not
 3              sure -- let's just go back.  I'm not sure that -- I
 4              know that I admitted M subject to connection.
 5                        Mr. Koppel, any objections to N, O, P,
 6              and Q?
 7                        MR. KOPPEL:  No, IHO.  We don't have an
 8              objection.
 9                        HEARING OFFICER BABBITT:  Okay.  All
10              right.  So those exhibits are admitted.  O is only
11              admitted subject to connection.  If it's not
12              connected, then I'm going to disregard it when I
13              issue my decision.
14                        (Whereupon Student's Exhibits N through Q
15              were admitted into evidence.)
16                        MR. HOBBS:  Understood, IHO.
17                        HEARING OFFICER BABBITT:  Okay.  Thank
18              you.
19                        MR. HOBBS:  May I continue?
20                        HEARING OFFICER BABBITT:  Yeah.
21                        MR. HOBBS:  Next is Parent's Exhibit S,
22              occupational therapy progress report by Bloom
23              Therapy, dated 9/4/23.
24                        HEARING OFFICER BABBITT:  Now, I think --
25              I don't think you put in R.  I don't think you said
```

Received Office of State Review
01/09/2024

1      anything about R.

2                      MR. HOBBS:  Apologies.  Parent's Exhibit

3      R, Kaitlyn Simon license and resume, undated.

4                      Parent's Exhibit S, occupational therapy

5      progress report by Bloom Therapy, dated 9/4/23,

6      four pages.

7                      Parent's Exhibit T, Jessica Zambito

8      license, undated, one page.

9                      Parent's Exhibit U, affidavit testimony

10      of Natalie Brandefine, dated 10/5/23, 18 pages.

11                      Parent's Exhibit V, affidavit testimony

12      of Stephanie Koh, dated 10/5/23, eight pages.

13                      Parent's Exhibit W, affidavit testimony

14      of Kaitlyn Simon, dated 10/4/23.

15                      Affidavit -- excuse me, Parent's Exhibit

16      X, affidavit testimony of Jessica Zambito, dated

17      10/4/23, seven pages.

18                      Parent's Exhibit Y, affidavit testimony

19      of Halia Francis, dated 10/5/23, 11 pages.

20                      Parent's Exhibit Z, Titus weekly email

21      updates to parent, dated 7/23, three pages.

22                      Parent's Exhibit AA, Recess After School

23      social program description, dated '23/'24, four

24      pages.

25                      Parent's Exhibit BB, Rex Francis' medical

Received Office of State Review
01/09/2024

```
 1          accommodation form, dated 6/22/23, two pages.
 2                     (Whereupon Student's Exhibits R through
 3          BB were marked for identification.)
 4                     HEARING OFFICER BABBITT:  Okay.  Mr.
 5          Koppel, any objections to Exhibits R through BB
 6          inclusive being admitted into evidence?
 7                     MR. KOPPEL:  I have no objection, IHO.
 8                     HEARING OFFICER BABBITT:  Okay.  And I'm
 9          just going to state again, I do not accept when
10          either party just gives me a lot of documents and
11          they're not connected through testimony or
12          otherwise.  So I don't know how they're important
13          or germane to this proceeding.
14                     Specifically, M and O are only taken
15          subject to connection because I don't believe -- I
16          know they're not -- they don't speak to the '23/'24
17          school year which is before me.
18                     (Whereupon Student's Exhibits R through
19          BB were admitted into evidence.)
20                     HEARING OFFICER BABBITT:  Okay.  Mr.
21          Koppel, is the District going to present a case-in-
22          chief?
23                     MR. KOPPEL:  The District is not, IHO.
24                     HEARING OFFICER BABBITT:  All right.
25          Very well.
```

Received Office of State Review
01/09/2024

```
1                    MR. KOPPEL:  And we rest.
2                    HEARING OFFICER BABBITT:  And so they
3           rest.  Okay.
4                    Mr. Hobbs, please call your first
5           witness.
6                    MR. HOBBS:  We will first call Kaitlyn
7           Simon, who is Rex Francis's speech-language
8           pathologist with Happy Talk.
9                    May I go off camera so I can call and
10          inform her to come on to the call?
11                   HEARING OFFICER BABBITT:  Yes.
12                   (Pause)
13                   MR. HOBBS:  She's calling in now, IHO.
14                   HEARING OFFICER BABBITT:  Okay.
15                   MS. KAITLYN SIMON:  Hello.
16                   HEARING OFFICER BABBITT:  Okay.  Can you
17          please state your name and spell it?  Okay.
18          Everyone has to mute themselves because we're
19          getting really bad feedback.  It may be from Ms.
20          Simon.
21                   MS. SIMON:  Sorry.  So my name is Kaitlyn
22          Simon, K-A-I-T-L-Y-N last name S-I-M-O-N.  And I'm
23          a speech-language pathologist with Happy Talk
24          Speech and Language.
25                   HEARING OFFICER BABBITT:  Okay.  Please
```

Received Office of State Review
01/09/2024

```
1     raise your right hand.  Do you swear or affirm that
2     the testimony that you will give here today will be
3     completely truthful?
4               MS. SIMON:  Yes.
5               HEARING OFFICER BABBITT:  Court reporter,
6     are you getting that bad echo?
7               THE COURT REPORTER:  It's a little --
8     yeah.  I think Ms. Simon's volume might be a little
9     too loud.
10              MS. SIMON:  Is that better?
11              THE COURT REPORTER:  It sounds better on
12    my end.
13              HEARING OFFICER BABBITT:  We'll have to
14    see.  Okay.  You can put down your hand.  Ms.
15    Simon, you should not look at any documents unless
16    you're asked to do so.  Are you in a room by
17    yourself?  Because I think I see someone behind
18    you.
19              MS. SIMON:  I'm in my living room due to
20    (indiscernible) everything today, we decided to
21    work from home.  But yeah, I'm by myself.
22              HEARING OFFICER BABBITT:  Okay.  Very
23    good.  All right.
24              So I tender the witness to Mr. Hobbs.
25              THE COURT REPORTER:  Mr. Hobbs, you're on
```

Received Office of State Review
01/09/2024

```
 1          mute.
 2                    MR. HOBBS:  IHO, if you can go ahead and
 3          ask your clarifying questions first?  At this
 4          point, we don't have any further questions for Ms.
 5          Simon.
 6                    HEARING OFFICER BABBITT:  All right.
 7          Very good.
 8                    MR. HOBBS:  We reserve the right to ask
 9          any further clarifying questions based off of the
10          IHO's questions, if that's permissible.
11                    HEARING OFFICER BABBITT:  Okay.  Ms.
12          Simon, when did you graduate school and what degree
13          do you have?
14                    MS. SIMON:  I graduated in 2017 and I
15          have a master's of arts in speech-language
16          pathology.
17                    HEARING OFFICER BABBITT:  And where did
18          you graduate from?
19                    MS. SIMON:  Miami University in Ohio.
20                    HEARING OFFICER BABBITT:  All right.
21          Now, in your affidavit you said that your rate is
22          $280 for someone of your experience.  So I'm
23          correct that your experience is six years, correct?
24                    MS. SIMON:  Yes.
25                    HEARING OFFICER BABBITT:  All right.  So
```

Received Office of State Review
01/09/2024

50

1    what do you base your statements on that people

2    with six years' experience are charging $280 per

3    hour for speech and language therapy?

4              MS. SIMON:  I actually do not make up

5    that rate.  I don't have anything to do, you know,

6    with any of our -- our billing or any of that.

7    That would be handled by my boss.

8              HEARING OFFICER BABBITT:  Okay.  But you

9    made a statement that it's really reasonable for

10   the market.  So is that statement -- is that based

11   on anything?  Or someone else put that statement

12   and then you just signed it?  Your affidavit?

13             MS. SIMON:  For people who are, you know,

14   just out of school, even, like, one year

15   experience, they're charging, like, 150 an hour.

16   So I think given the fact that I have six years of

17   experience and I've done additional trainings

18   beyond, you know, my graduate program to get, you

19   know, kind of, some specialization in different

20   skills that that would be appropriate.

21             HEARING OFFICER BABBITT:  Well, do you

22   know or you're just really guessing?  I mean, and

23   your rate increased to 280.  So when you say

24   they're within New York City's market, then I just

25   want to know who you spoke to or how you make that

Received Office of State Review
01/09/2024

51

T51

1          statement.

2                    MS. SIMON:  You know, I spoke with my

3          boss.  She has worked in the city for 15 years.  A

4          lot of clinicians either charge, you know, like 250

5          an hour up to 300 or so.  So we find that, you

6          know, being in the middle ground would be

7          appropriate.

8                    HEARING OFFICER BABBITT:  Okay.  But you

9          don't have any personal knowledge of these other

10         people's experience.  You're saying that somebody

11         else set this rate?

12                   MS. SIMON:  Yes.

13                   HEARING OFFICER BABBITT:  Okay.  Where do

14         you meet with the student?

15                   MS. SIMON:  I see him at our office,

16         which is located on 14th Street.

17                   HEARING OFFICER BABBITT:  Okay.  Now, is

18         it an office situation or is it a sensory gym?

19         What is it?

20                   MS. SIMON:  It's a sensory gym.  So you

21         know, we collaborate with the OTs.  We have a great

22         relationship with them.  So we come in, there's the

23         sensory gym, and there's also, like, a seated table

24         area.

25                   HEARING OFFICER BABBITT:  So that means

Received Office of State Review
01/09/2024

T51

1    there's other people in the sensory gym when you're

2    providing the student with his lesson?

3            MS. SIMON:  Yes.  So there can be a

4    maximum of three, you know, sessions going on at a

5    time.  There's, like, the sensory gym area, there's

6    the table area in the back that has, like, a

7    partial wall.  And then there's, like, a fully

8    enclosed little room is what we call it.

9            HEARING OFFICER BABBITT:  Well, how much

10   time does this student spend in the little room?

11           MS. SIMON:  We typically don't go in the

12   little room.  He -- he works, you know -- Well, we

13   start our session in the gym to do a little bit of,

14   kind of, just, like, regulation, get him ready to

15   attend to the session.  And those are things that

16   we've collaborated with OT.  You know, they say he

17   likes swinging.  That's really calming for him.

18   And then we usually go back to the little more like

19   The open table area.  But just so, you know, three

20   sessions, like one would be in the gym, one would

21   be at the table, one would be in the little room.

22           HEARING OFFICER BABBITT:  But he doesn't

23   go in the little room, is what you're telling me.

24           MS. SIMON:  He doesn't but you were

25   asking --

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  (Interposing)
 2          I'm -- I'm --
 3                    MS. SIMON:  -- about other people.
 4                    HEARING OFFICER BABBITT:  I'm just asking
 5          now about him.  So he doesn't go in the little
 6          room?
 7                    MS. SIMON:  No.
 8                    HEARING OFFICER BABBITT:  And when you
 9          say you collaborate with OT, is the OT provider
10          there when you're doing your work?
11                    MS. SIMON:  They -- they're in the other
12          office.  Yes.
13                    HEARING OFFICER BABBITT:  But are they
14          there for this student?
15                    MS. SIMON:  They're not there for Rex.
16          They might have another session either in our
17          sensory gym or their larger gym down the hall.  But
18          we see them every day and I can ask them.
19                    HEARING OFFICER BABBITT:  Okay.  So you
20          share an office with the student's occupational
21          therapist, correct?
22                    MS. SIMON:  Yes.
23                    HEARING OFFICER BABBITT:  Okay.  And so
24          the other students who are in the sensory gym have
25          their individual providers working with them at the
```

Received Office of State Review
01/09/2024

```
 1          same time?

 2                    MS. SIMON:  Yes.  So they're all, like,

 3          one-on-one sessions.

 4                    HEARING OFFICER BABBITT:  You do speech,

 5          so I don't quite understand how whether he's on a

 6          swing or doing other physical activities, how

 7          that's related to his speech therapy.

 8                    MS. SIMON:  So by getting -- by starting

 9          our sessions with some kind of movement that is

10          kind of, like, calming and regulating for him, that

11          gets his body, you know, ready so that he can

12          listen to all of the speech, like, the language

13          that I'm trying to teach him and the skills that

14          we're trying to use.  Once his body, you know, is

15          regulated, he's better able to attend and focus,

16          and you know, absorb all of what I'm trying to

17          teach him.

18                    HEARING OFFICER BABBITT:  And how long

19          does that regulation take?

20                    MS. SIMON:  That usually takes about two

21          to three minutes.  It's -- it's very brief.

22                    HEARING OFFICER BABBITT:  Okay.  And then

23          after two or three minutes, what do you do?

24                    MS. SIMON:  Then we go to the table.  We

25          make our plan for the session.  That would include
```

Received Office of State Review
01/09/2024

55

1        all of our -- our language goals and pragmatics.

2                    HEARING OFFICER BABBITT:  So then you're

3        saying that this student sits at the table for

4        approximately 57 minutes?

5                    MS. SIMON:  Yes.  If -- if he needs a

6        break, we will go back to the gym, do another,

7        like, two minutes to, you know, reregulate and then

8        come back to our -- our task.

9                    HEARING OFFICER BABBITT:  Well, how often

10       does he need breaks?  How frequently?

11                   MS. SIMON:  It's not very often.  I feel

12       like we've had a few breaks at the beginning of the

13       year, but he's also been getting used to, like, his

14       new school schedule and, like, then back into the

15       routine of therapy, you know, after the summer

16       break.  But like, towards the end of last year, we

17       weren't needing any breaks throughout our session.

18       It's just been the first few weeks for

19       (indiscernible).

20                   HEARING OFFICER BABBITT:  (Interposing)

21       Well, this student is in a 12-month program,

22       correct?

23                   MS. SIMON:  Yes.

24                   HEARING OFFICER BABBITT:  He goes to

25       school 12 months of the year.  So what do you mean

```
 1          by break for the summer?
 2                    MS. SIMON:  Well, you know, like, he went
 3          out to --
 4                    HEARING OFFICER BABBITT:  (Interposing)
 5          (Indiscernible).
 6                    MS. SIMON:  -- like, you know, he was
 7          doing camps.  Every family during the summer, they
 8          have, like, a little bit of a different schedule.
 9                    HEARING OFFICER BABBITT:  Oh, so this
10          student was not in school --
11                    MS. SIMON:  No.
12                    HEARING OFFICER BABBITT:  -- during the
13          summer?  That's your understanding?
14                    MS. SIMON:  He was at school, but he was
15          also doing summer camps and --
16                    HEARING OFFICER BABBITT:  What's your
17          understanding of when he was doing summer camp?
18          When he would do that?
19                    MS. SIMON:  I don't know if that was,
20          like, a weekend activity.  My goal of just asking
21          about summer camp was that he could retell the --
22          like, what -- what kind of activities he did there.
23          That was my goal for his language.
24                    HEARING OFFICER BABBITT:  And when do you
25          see the student?
```

Received Office of State Review
01/09/2024

57
T57

```
 1                    MS. SIMON:  I see him on Mondays at 3:45.
 2                    HEARING OFFICER BABBITT:  Just one
 3         session a week for one hour?
 4                    MS. SIMON:  Correct.
 5                    HEARING OFFICER BABBITT:  And does he
 6         come to you straight from school?
 7                    MS. SIMON:  I believe so.
 8                    HEARING OFFICER BABBITT:  Okay.  So he
 9         comes -- he doesn't, like, get a snack break or
10         anything.  He just continues working?
11                    MS. SIMON:  That I'm -- I'm not aware of.
12                    HEARING OFFICER BABBITT:  Okay.  Well, do
13         you speak with the speech and language therapist at
14         his school?
15                    MS. SIMON:  Yes, I actually just spoke to
16         Caitlin (phonetic), the Caitlin with a C, last
17         week.
18                    HEARING OFFICER BABBITT:  Okay.  So you
19         don't know if he comes straight from his school,
20         though, to you or if he has a snack or --
21                    MS. SIMON:  I don't know.  I know he
22         shows up at my door at 3:45 and is ready --
23                    HEARING OFFICER BABBITT:  (Interposing)
24         Okay.
25                    MS. SIMON:  -- to begin with me.
```

Received Office of State Review
01/09/2024

58

1          HEARING OFFICER BABBITT:  And what things

2     are different that you're working on that he's not

3     getting at The Titus School?  What's the

4     deficiencies there that you're working on?

5          MS. SIMON:  Yes.  So we -- you know, he

6     has deficits in his pragmatic language, his play

7     skills, his expressive and receptive language.  And

8     so we -- because --

9          HEARING OFFICER BABBITT:  (Interposing)

10    But isn't he working on that at The Titus School?

11         MS. SIMON:  Yes.  So --

12         HEARING OFFICER BABBITT:  (Interposing)

13    So how is your -- how is your therapy different?

14    Isn't it just more and doesn't it extend his school

15    day?

16         MS. SIMON:  Because we -- we aren't

17    really bound due to, like, the academic demands

18    that a school has, like, we can -- we can do

19    everything in a much more naturalistic way, which

20    is, you know, more functional to be able to

21    practice these skills that are in a way that's,

22    like, motivating and personally relevant to him.

23    And all of this, you know, we -- we can reinforce

24    things that are taught at school.  We can teach new

25    skills still.  And all of that, you know, extra

Received Office of State Review
01/09/2024

1    language helps him be successful in school, as well

2    as his, you know, community life with all of his

3    social skills.

4                    HEARING OFFICER BABBITT:  Well, how is

5    that so?  I mean, this is a nine-year-old child.  I

6    mean, how much can one child sustain for one day?

7    Do you know what -- do you know what his hours are

8    in school?

9                    MS. SIMON:  I do not know.

10                   HEARING OFFICER BABBITT:  Okay.  And this

11   child has no attention deficit issues?

12                   MS. SIMON:  Not that I'm aware of.

13                   HEARING OFFICER BABBITT:  You're saying

14   he just stays -- so he stays regulated the entire

15   time that he's with you?

16                   MS. SIMON:  Except for the, you know --

17   the very first few sessions this -- this school

18   year.  Yes.

19                   HEARING OFFICER BABBITT:  But when he

20   comes, you have to regulate him, correct?

21                   MS. SIMON:  That's part of our routine.

22   So like, when we come into the office, that has

23   been his, you know, consistent routine for the

24   years that he's been at Happy Talk Speech and

25   Language.  So we do part of that.  We have a little

Received Office of State Review
01/09/2024

1    dialogue while that's happening, and then we go and

2    make our -- our plan for the session.

3              HEARING OFFICER BABBITT:  All right.

4    Well, are you aware of the methodology used at The

5    Titus School for speech and language?

6              MS. SIMON:  No.

7              MR. HOBBS:  I don't think she heard your

8    question, IHO.

9              HEARING OFFICER BABBITT:  Ms. Simon, can

10   you hear me?

11             MS. SIMON:  Yes.  I answered no.

12             HEARING OFFICER BABBITT:  Oh, you're not

13   aware.  Okay.  Thank you.  All right.  You say that

14   you read with the student; is that correct?

15             MS. SIMON:  Yes.

16             HEARING OFFICER BABBITT:  What level

17   reading is he on?

18             MS. SIMON:  I -- I don't do anything

19   with, like, reading instruction.  It's usually I

20   read the book, like, we -- we joint -- we read -- I

21   read to him and we discuss what is happening.  It's

22   all language based.  It's not literacy.

23             HEARING OFFICER BABBITT:  Okay.  So you

24   read to him.  He doesn't read --

25             MS. SIMON:  (Interposing) Correct.

Received Office of State Review
01/09/2024

```
1              HEARING OFFICER BABBITT:  -- to you?

2              MS. SIMON:  Correct.

3              HEARING OFFICER BABBITT:  Okay.  And how

4    long have you provided speech and language therapy

5    to the student?

6              MS. SIMON:  Since last September, so

7    2022.

8              HEARING OFFICER BABBITT:  Okay.  So

9    you've provided therapy to him for over one year.

10   So since July of 2023, what progress has the

11   student made with speech and language?

12             MS. SIMON:  So he did not come for

13   sessions during July.  I saw him once in August.

14   I've only seen him a few times in September.  But

15   since then, you know, we've, kind of, kept up

16   our -- our regular routine.  If we come in, one

17   thing that we've been working on is his retell of

18   past events and so I believe that was -- an example

19   was included in the progress note in the affidavit.

20   But he is now -- that's something he's familiar

21   with but we're able to extend it to he can tell me

22   a who, what, and where for each activity that he's

23   talking about in his weekend.

24             He requires less prompting.  We're now

25   including -- like, expanded to including some why
```

Received Office of State Review
01/09/2024

1    questions to answer and include conjunctions.  So

2    we've taken that same activity, reduced the level

3    of prompting -- you know, meaning he's doing more

4    independently and we're able to expand it to

5    include more language targets.

6                HEARING OFFICER BABBITT:  All right.  I

7    just want to be clear I understood you.  So he

8    didn't have speech and language therapy in July and

9    August you said?  From you?

10               MS. SIMON:  Not from me.  He was not here

11   in July.  He had one session when he was back in

12   the city in August.

13               HEARING OFFICER BABBITT:  Okay.  One

14   session.  Okay.  Thanks for that clarification.

15   Now, I just want to ask you a question about the

16   affidavit, paragraph 21, because -- okay.  So if

17   you could go to your affidavit?  Were you given

18   exhibits?

19               MS. SIMON:  I believe so.

20               HEARING OFFICER BABBITT:  Okay.

21               MS. SIMON:  Do you want me to pull it up

22   on the computer or --

23               HEARING OFFICER BABBITT:  So yeah, no, on

24   the computer.  So if you could go to Exhibit W,

25   page 5, and when you're there, just let me know.

Received Office of State Review
01/09/2024

1               MS. SIMON:  All right.  Yes.

2               HEARING OFFICER BABBITT:  Okay.  So can

3       you explain to me what that last sentence means?

4       It reads, "Target expressive language skills are

5       bombarded, imitated, immediate, cued, e.g. closed

6       sentence, imitated, delayed, and ultimately

7       spontaneous."  What does that sentence mean?

8               MS. SIMON:  Right.  So basically, in the

9       hierarchy of when we're teaching a new skill, first

10      you just provide a lot of modeling -- so

11      bombardment.  You just provide a lot of examples

12      of, you know, the boy is running, the girl is

13      running.  So like, teaching the is and ing, you

14      know, verb tense.  Then you would start to have the

15      student imitate it.  So you know, I would say the

16      boy is running.  He would say the boy is running.

17      Then I might say like the boy is.  He would say the

18      boy is running.  You know, he would fill -- fill

19      in, like, that's the closed sentence, kind of, the

20      fill in the blank.  And I could even, like, raise

21      the complexity of that just saying, like, the boy

22      and he would fill in is running.

23              Or I could say, like, I might, you know,

24      talk about the boy is running, go talk about

25      something else.  I'm like, oh, you know, tell me

Received Office of State Review
01/09/2024

1        about the boy again.  And he could tell me, you

2        know, the boy is running.  He would imitate that

3        same sentence just after we already talked about

4        something else instead of repeating directly after

5        me.  And then ultimately it would be -- I would

6        just be like, oh, you know, Rex, we'd look at a

7        book.  Like, what is happening in the book?  And he

8        could say, you know, the girl is sliding on the

9        slide, the boy is running on the grass.

10               You know, that's kind of our hierarchy of

11        bombard with giving lots of models, imitate, say it

12        after me, fill in the blank.  Say it after a little

13        bit of a delay but you've already been exposed to

14        that model or, like, the expected answer, and then

15        independent spontaneously.

16               HEARING OFFICER BABBITT:  So isn't the

17        one hour of speech and language therapy that you

18        provide to the student -- isn't that to maximize

19        his speech and language?

20               MS. SIMON:  Yes.

21               HEARING OFFICER BABBITT:  Okay.  And

22        what's the basis for you saying that this one hour

23        of supplemental speech and language is necessary

24        for him to make meaningful progress at The Titus

25        School?

Received Office of State Review
01/09/2024

1           MS. SIMON:  I think that the main

2     difference between us and school is that we can use

3     a more child-led -- you know, we aren't really --

4     I'm going to say, bound by any, like, we have to

5     make X, Y, and Z progress or, like, this is our

6     curriculum.  We can just follow his lead.  And yes,

7     we have our own, you know, goals that we have set

8     for him based off all the checklists and things

9     that we do for what would be, like, age appropriate

10    and developmentally appropriate.

11          But we find that the, you know, one-on-

12    one instruction is appropriate for Rex as well as

13    using a more naturalistic way to -- instead of

14    saying this is what we're going to do on this time

15    line and we can follow his lead and because it's

16    more, you know, meaningful to him, that's

17    ultimately going to be more functional to help him

18    attain and then use this language which, you know,

19    supports academics.  You need language to

20    understand academics and --

21          HEARING OFFICER BABBITT:  (Interposing)

22    So I'm confused.

23          MS. SIMON:  -- participate in the

24    community.

25          HEARING OFFICER BABBITT:  And so is it

Received Office of State Review
01/09/2024

1    your testimony that the speech and language therapy

2    that you provide to the student is more meaningful

3    than the speech and language therapy that he gets

4    at The Titus School?  I think that's what you just

5    testified to; is that correct?

6            MS. SIMON:  It's all meaningful.  We use

7    a more child-directed approach.

8            HEARING OFFICER BABBITT:  I understand.

9    But my question -- I'm going to go back to my

10   question.  If you can't answer it, that's fine.  So

11   what's the basis for your saying that without your

12   one hour of afterschool speech therapy, that this

13   student couldn't make meaningful progress at The

14   Titus School?

15           MS. SIMON:  Can you repeat the question?

16           HEARING OFFICER BABBITT:  Sure.  What's

17   the basis for your statement that the student would

18   not make meaningful progress at The Titus School

19   without the one hour speech and language that you

20   provide for him?

21           MS. SIMON:  I think due to the

22   differences of how we provide the therapy, it's

23   just another way to supplement his learning and --

24   and try to meet him where his needs are at the

25   moment.

Received Office of State Review
01/09/2024

1           HEARING OFFICER BABBITT:  Okay.  I don't
2     think that's responsive to my question but I will
3     take that as your answer.  Okay.
4           I think I have a thing about paragraph
5     22, so just let me scroll up to that.
6           Okay.  All right.  Well, I thank you for
7     clarifying those issues that I have and now I'm
8     going to go back and ask Mr. Hobbs if he has any
9     questions for you.
10           MR. HOBBS:  I do, IHO.  May I proceed,
11     IHO?
12           HEARING OFFICER BABBITT:  Yeah.
13           MR. HOBBS:  Ms. Simon, to clarify in
14     regards to Rex's supplemental services, would you
15     agree that it's not based off of any deficits with
16     The Titus program, right?
17           MS. SIMON:  Correct.
18           MR. HOBBS:  It's supplemental services he
19     receives --
20           HEARING OFFICER BABBITT:  (Interposing)
21     Excuse me, Mr. Hobbs?
22           MR. HOBBS:  Yes.
23           HEARING OFFICER BABBITT:  You can't
24     cross-examine your own witness.  All right.  You're
25     asking leading questions.

1            MR. HOBBS:  IHO, leading questions are

2       permitted at impartial hearings both from counsel

3       and --

4            HEARING OFFICER BABBITT:  (Interposing)

5       No.  No.  You have to ask -- this is your witness,

6       so you can ask direct questions.  You don't feed

7       the answers to the witness because I need to know

8       what she knows, not what you know.

9            MR. HOBBS:  Ms. Simon, based off of your

10      information with Rex, what is his -- what is his

11      need for supplemental services based on?

12            MS. FRANCIS:  (Audio inference) --

13            MR. HOBBS:  Ms. Francis, we'll get to you

14      in a second, please let's --

15            HEARING OFFICER BABBITT:  No, wait a

16      second.  If someone's not testifying, we shouldn't

17      be speaking.  That's not how we do the proceedings.

18            So Ms. Francis, I'm sorry if you have a

19      question, it's inappropriate.  Okay?

20            MS. FRANCIS:  (Audio interference) I

21      can't hear anything.  (Indiscernible).

22            HEARING OFFICER BABBITT:  All right.

23      There is something going on here where I have a lot

24      of feedback.  I don't know if the court reporter

25      has that as well, but I have a lot of feedback.

Received Office of State Review
01/09/2024

```
 1                    THE COURT REPORTER:  I'm getting a lot.
 2           Everybody needs to mute who's not speaking.
 3                    MS. FRANCIS:  Can I log back in or is
 4           that not acceptable?
 5                    HEARING OFFICER BABBITT:  If you need to,
 6           then please do so.
 7                    MS. FRANCIS:  Okay.
 8                    MR. HOBBS:  IHO, may I proceed?
 9                    HEARING OFFICER BABBITT:  Sure.  I mean,
10           I don't know if you want the parent here or not.
11           If you don't, that's fine.  It's up to you.  It's
12           your client.
13                    MR. HOBBS:  I'll proceed.  She's back on.
14           All right.  So Ms. Simon, I'll ask again,
15           based off of your information and experience with
16           Rex, what is his need for this supplemental
17           afterschool speech-language therapy based on?
18                    MS. SIMON:  It would be based on still
19           supporting his -- his deficits in pragmatic
20           language, expressive and receptive language, and
21           just doing it in a -- just taking another approach,
22           and you know, giving additional services to, you
23           know, give him that exposure and bombardment in
24           just a different type of environment.
25                    MR. HOBBS:  Would you say that his
```

Received Office of State Review
01/09/2024

1    deficits are extensive?  Or how would you describe

2    the extent of his deficits when it comes to speech

3    language?

4              MS. SIMON:  Yes.  You know, compared to

5    same-age peers, he has significant deficits.

6              MR. HOBBS:  And with that information,

7    would you say this supplemental service is

8    necessary for him to make meaningful progress in

9    addition to the services he receives at Titus?

10             MS. SIMON:  Yes.

11             MR. HOBBS:  And would you say that that

12   has nothing to do with any deficiencies with the

13   Titus program?

14             HEARING OFFICER BABBITT:  Mr. Hobbs, are

15   you testifying again?  And you're asking her to

16   agree with you?  I'm not going to permit that.  I

17   mean, you could make your argument, you could make

18   your summation, but you don't do it by asking

19   directed questions that you're asking her to agree

20   with.

21             MR. HOBBS:  Understood, IHO.  I'll move

22   on.

23             The IHO asked you, Ms. Simon, about Rex's

24   dysregulation.  Would you -- excuse me.  Can you

25   explain why it is necessary to address this

Received Office of State Review
01/09/2024

1    regulation before you engage with speech-language

2    services for Rex?

3              HEARING OFFICER BABBITT:  That was asked

4    and answered.  In order for him to access what

5    she's saying.  But go ahead.  She could say it

6    again.  She testified to this.

7              Go ahead.  Ms. Simon, you could repeat

8    your testimony.  I listened to you.

9              MS. SIMON:  Yeah.  So you know, basically

10   for -- for anyone to be able to take in the

11   information that's, you know, being presented to

12   them, first you, like, need to have a ready, calm

13   body so that you are regulated so that you can

14   attend to that incoming information.

15             MR. HOBBS:  Thank you, Ms. Simon.  No

16   further questions.

17             HEARING OFFICER BABBITT:  Okay.  So Mr.

18   Koppel, I'm going to ask you, based on my questions

19   and those of Mr. Hobbs on his redirect, do you have

20   any questions for this witness?

21             MR. KOPPEL:  I do not have any questions

22   for this witness, IHO.

23             HEARING OFFICER BABBITT:  Okay.  Thank

24   you.

25             So thank you, Ms. Simon, for appearing

Received Office of State Review
01/09/2024

```
 1              today.  You're free to leave the hearing.  Thank
 2              you very much.
 3                        MS. SIMON:  Thank you.
 4                        HEARING OFFICER BABBITT:  Okay.  Mr.
 5              Hobbs, can you call your next witness?
 6                        MR. HOBBS:  Yes, we'll called Jessica
 7              Zambito, Rex's afterschool OT provider.
 8                        HEARING OFFICER BABBITT:  Okay.
 9                        (Pause)
10                        MR. HOBBS:  She's calling in now.
11                        HEARING OFFICER BABBITT:  Okay.
12                        (Pause)
13                        HEARING OFFICER BABBITT:  Okay.  Can you
14              please state your name and spell it?
15                        MS. JESSICA ZAMBITO:  Hi, my name is
16              Jessica Zambito, J-E-S-S-I-C-A Z-A-M-B-I-T-O.
17                        HEARING OFFICER BABBITT:  All right.
18              Will you raise your right hand, please?  Ms.
19              Zambito, do you swear or affirm that the testimony
20              that you will give here today will be completely
21              truthful?
22                        MS. ZAMBITO:  Yes.
23                        HEARING OFFICER BABBITT:  Okay.  Are you
24              in -- you can put your hand down.
25                        MS. ZAMBITO:  Thank you.
```

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  Are you in a
 2          room by yourself?
 3                    MS. ZAMBITO:  I'm at my office right now
 4          and there is another therapist working with a
 5          child.  Would you like me to step out?
 6                    HEARING OFFICER BABBITT:  Well, you have
 7          to be in a private room.
 8                    MS. ZAMBITO:  Okay.  No problem.  I will
 9          move.  Give me one sec.
10                    HEARING OFFICER BABBITT:  Sure.
11                    Mr. Hobbs, you should tell that to all
12          your witnesses that they have to be in a private
13          room.  The proceedings are closed and it's private.
14                    MS. ZAMBITO:  Okay.  I'm here.
15                    HEARING OFFICER BABBITT:  Okay.  Very
16          good.  So please don't look at any documents until
17          you are instructed to do so either by an attorney
18          or myself.  Okay?  We have that understanding.
19                    MS. ZAMBITO:  Okay.  Yes.
20                    HEARING OFFICER BABBITT:  All right.
21          Very good.  Okay.
22                    Mr. Hobbs, do you have any questions for
23          this witness?
24                    MR. HOBBS:  I will allow the IHO to ask
25          her clarifying questions first.
```

Received Office of State Review
01/09/2024

1              HEARING OFFICER BABBITT:  Okay.  So Ms.

2       Zambito, what's the name of your agency?

3              MS. ZAMBITO:  I have two -- Bloom

4       Occupational Therapy and Spring Ahead Occupational

5       Therapy.

6              HEARING OFFICER BABBITT:  Okay.  And are

7       you the owner of Bloom Occupational Therapy or one

8       of the owners?

9              MS. ZAMBITO:  I am.  Yes.

10             HEARING OFFICER BABBITT:  Are you the

11      sole owner or --

12             MS. ZAMBITO:  I'm the sole owner.

13             HEARING OFFICER BABBITT:  Okay.  And

14      Bloom Occupational Therapy is the entity that

15      administers services to this student, correct?

16             MS. ZAMBITO:  Yes.

17             HEARING OFFICER BABBITT:  And am I

18      correct that -- well, can you just tell me your

19      educational background?  When you graduated?

20             MS. ZAMBITO:  Sure.  I graduated in 2009

21      and I'm an occupational therapist and I've been

22      practicing in pediatrics since then.

23             HEARING OFFICER BABBITT:  Okay.  So 2009,

24      you graduated with what kind of degree?

25             MS. ZAMBITO:  A master's.

Received Office of State Review
01/09/2024

1           HEARING OFFICER BABBITT:  Okay.  A
2       master's in?
3           MS. ZAMBITO:  Occupational therapy.
4           HEARING OFFICER BABBITT:  And you
5       received your master's from where?
6           MS. ZAMBITO:  Sacred Heart University.
7           HEARING OFFICER BABBITT:  Okay.  Now, you
8       said that the rate is between 225 and 250.  Can I
9       just ask why there's a range and why it's not
10      uniform?
11          MS. ZAMBITO:  It would depend sometimes
12      on the time.  Sometimes sessions would be 45
13      minutes or 60 minutes, as well as sometimes --
14      there were some times I would do a parent meeting
15      or a home visit, as well.
16          HEARING OFFICER BABBITT:  All right.  So
17      do you charge different rates for a home visit
18      versus if the student comes to you?
19          MS. ZAMBITO:  Yes, I will depending on
20      the travel time.
21          HEARING OFFICER BABBITT:  So you charge
22      for travel time?
23          MS. ZAMBITO:  Yeah.  For a home-based
24      session, it's very common in therapy services that
25      there's an increase in rate for home-based

Received Office of State Review
01/09/2024

1      services.  However, Rex primarily came to the

2      therapy center.  It doesn't matter really on the --

3      on the length of the session.

4                  HEARING OFFICER BABBITT:  Okay.  And are

5      you -- do you speak with the occupational -- well,

6      withdrawn.

7                  When do you see the student?

8                  MS. ZAMBITO:  Currently like this year or

9      last year --

10                 HEARING OFFICER BABBITT:  (Interposing)

11     No, no, no.

12                 MS. ZAMBITO:  -- we're talking about

13     right now?

14                 HEARING OFFICER BABBITT:  We're only

15     talking about the '23/'24 school year.

16                 MS. ZAMBITO:  Okay.  Thank you for

17     clarifying.  On Mondays --

18                 HEARING OFFICER BABBITT:  (Interposing)

19     Well, thanks for asking.

20                 MS. ZAMBITO:  -- after school.  On

21     Mondays.

22                 HEARING OFFICER BABBITT:  So you see him

23     only once a week?

24                 MS. ZAMBITO:  Yes.

25                 HEARING OFFICER BABBITT:  Okay.  And what

Received Office of State Review
01/09/2024

```
 1              time is the session?
 2                      MS. ZAMBITO:  His session?  4:45.
 3                      HEARING OFFICER BABBITT:  4:45 to 5:45?
 4                      MS. ZAMBITO:  Yes.
 5                      HEARING OFFICER BABBITT:  Does the
 6              student have any sort of therapy before your
 7              session?
 8                      MS. ZAMBITO:  I'm unsure.  I think
 9              sometimes he has speech therapy.
10                      HEARING OFFICER BABBITT:  Okay.  So that
11              speech therapy, you share an office with the speech
12              therapist, correct?
13                      MS. ZAMBITO:  The speech therapist has
14              their own practice.  Yes.
15                      HEARING OFFICER BABBITT:  But you share a
16              physical office, correct?
17                      MS. ZAMBITO:  Yes.
18                      HEARING OFFICER BABBITT:  And you share
19              the sensory gym with this speech therapist,
20              correct?
21                      MS. ZAMBITO:  Yes.
22                      HEARING OFFICER BABBITT:  All right.  So
23              you're saying that on Mondays the student goes to
24              school a whole day, then goes for an hour of speech
25              therapy, and then he comes to you for occupational
```

T77

Received Office of State Review
01/09/2024

78

```
 1              therapy, correct?
 2                        MS. ZAMBITO:  Yes.
 3                        HEARING OFFICER BABBITT:  And how's the
 4              student's energy level?
 5                        MS. ZAMBITO:  His energy level -- you
 6              know, Rex is always, you know, motivated in the
 7              sessions and he responds to his therapy sessions.
 8                        HEARING OFFICER BABBITT:  All right.  How
 9              is his energy level?  Can you answer that question?
10                        MS. ZAMBITO:  His energy level is
11              adequate during our session.
12                        HEARING OFFICER BABBITT:  Okay.  And this
13              student's nine years old, correct?
14                        MS. ZAMBITO:  Yes.
15                        HEARING OFFICER BABBITT:  And how long
16              have you been working with this particular student?
17                        MS. ZAMBITO:  I've known Rex for several
18              years.  I don't know the exact number off the top
19              of my head, but I have been working with him for
20              some time.
21                        HEARING OFFICER BABBITT:  Well, you don't
22              know how long, though?  What some time means?
23                        MS. ZAMBITO:  I would have -- I would
24              have to look at -- I'd have to think about it and
25              maybe refer back to affidavit what I put.  But it's
```

Received Office of State Review
01/09/2024

79
T79

1    been some -- it's been a few years that we've been

2    working together.

3                HEARING OFFICER BABBITT:  Okay.  Well,

4    would it jog your memory if I told you that you've

5    been working with this student since he was four

6    years old?

7                MS. ZAMBITO:  Yeah.

8                HEARING OFFICER BABBITT:  Back to 2017?

9                MS. ZAMBITO:  Yes.

10               HEARING OFFICER BABBITT:  Okay.  So I

11   would think that would be pretty memorable, right?

12   If you've been working with him for six years?

13               MS. ZAMBITO:  Yes, I've -- I've been

14   working with a lot of -- I work with many families

15   for many years.

16               HEARING OFFICER BABBITT:  Okay.  So

17   that's a long time to be working with the student.

18   But tell me, why -- do you speak with the

19   occupational therapist at The Titus School?

20               MS. ZAMBITO:  Yes, there has been

21   communication via email.

22               HEARING OFFICER BABBITT:  Okay.  Well,

23   how often do you communicate with that individual?

24   And do you know his or her name?

25               MS. ZAMBITO:  For this school year, I do

Received Office of State Review
01/09/2024

1     not know their name.  I don't recall their name.

2     It typically will be quarterly, I would say, via

3     email.

4               HEARING OFFICER BABBITT:  Okay.  So did

5     you know how often the student receives OT at The

6     Titus School?

7               MS. ZAMBITO:  I do not.

8               HEARING OFFICER BABBITT:  Okay.  So

9     wouldn't you say that the -- your provision of

10    occupational therapy to the student is to maximize

11    his skills, correct?

12              MS. ZAMBITO:  No, I disagree.

13              HEARING OFFICER BABBITT:  Well --

14              MS. ZAMBITO:  I believe that Rex requires

15    this intervention for carryover of his skills to

16    make meaningful progress.

17              HEARING OFFICER BABBITT:  All right.

18    Well, you're going to have to tell me what that

19    means because I don't really know what that means.

20              MS. ZAMBITO:  Um-hum.

21              HEARING OFFICER BABBITT:  I mean, are you

22    saying that if the student didn't come to you one

23    time a week for 60 minutes, he would not make

24    meaningful progress at the school?  That they

25    couldn't meet his needs?

Received Office of State Review
01/09/2024

1           MS. ZAMBITO:  I believe that Rex requires

2       the one-on-one time also in a sensory gym working

3       with an experienced therapist to have access to a

4       sensory gym for home and parent education, as well.

5       I think that's very important for Rex.  He does

6       require significant -- because of his delays, he

7       does require significant therapy services and I

8       don't believe that at school there is enough OT

9       services.  I don't.  He has significant and global

10      delays.

11          HEARING OFFICER BABBITT:  Okay.  So you

12      think that he should actually get more physical --

13      I'm sorry.  He should get more OT from the school,

14      correct?  That they're not providing enough is what

15      you just said?

16          MS. ZAMBITO:  No, I didn't -- I didn't

17      say that.  I think that he requires more OT.  I

18      don't know what is provided at Titus, as I said.  I

19      do believe he requires the aspect of having parent

20      education.  He has significant safety -- poor

21      safety awareness, delays in cognition, speech and

22      language, gross and fine motor skills, and safety

23      awareness.

24          HEARING OFFICER BABBITT:  But you don't

25      deal with all that.  You don't deal with that,

Received Office of State Review
01/09/2024

1              correct?

2                        MS. ZAMBITO:  Yes.

3                        HEARING OFFICER BABBITT:  You don't deal

4              with speech and language, do you?

5                        MS. ZAMBITO:  No, I don't.  But as an

6              occupational therapist, we do -- of course, we're

7              working with the student and talking to them and I

8              am collaborating with other providers.  Of course,

9              we're working on speech.  We're not working on

10             speech and language skills, but we are targeting

11             sensory processing, his fine and gross motor

12             skills, his self-help skills, his safety awareness.

13                       I mean, Rex is a child that requires

14             supervision at all times, going to the bathroom,

15             crossing the street, opening into a door.  He

16             requires -- I really do feel that he requires this

17             external support at this time because he has

18             significant delays.

19                       HEARING OFFICER BABBITT:  Right.  But I

20             mean, providing supervision to a student is not the

21             same as providing therapy to the student, correct?

22                       MS. ZAMBITO:  No.

23                       HEARING OFFICER BABBITT:  I'm not

24             correct?  You're saying supervision and therapy are

25             the same skills?

1              MS. ZAMBITO:  Well, the goal is for --

2         for -- for Rex to eventually be independent.  And

3         we are working always on safety awareness.  We're

4         always working with him on body awareness, on

5         processing.  Just there's so much that is happening

6         with Rex.  The goal for him is to, you know,

7         hopefully achieve that maximum level of

8         independence, but he does require a lot of support

9         at this time.

10             HEARING OFFICER BABBITT:  Okay.  But Ms.

11        Zambito, you've been working with the student for

12        six years.  All right?  So how has he become more

13        independent?  Because it sounds like if he needs

14        supervision all the time, how has --

15             MS. ZAMBITO:  (Interposing) I did not --

16             HEARING OFFICER BABBITT:  -- how has he

17        become more independent with your services?

18             MS. ZAMBITO:  To clarify, I did not say

19        that I need to supervise him.  My role as an

20        occupational therapist is to improve his motor

21        skills, his sensory processing skills, his safety

22        awareness, his strength, his endurance.  For

23        example, when I began with Rex, he was not able to

24        (indiscernible).

25             HEARING OFFICER BABBITT:  (Interposing)

Received Office of State Review
01/09/2024

1         No, no, no, no.  Okay.  I have to stop you there.

2              MS. ZAMBITO:  Okay.

3              HEARING OFFICER BABBITT:  I have to stop

4         you because I'm not -- unfortunately, I don't go

5         back six years, so it doesn't matter.

6              MR. HOBBS:  IHO, I'm sorry.  The question

7         was how has he improved since she's been working

8         with him.

9              HEARING OFFICER BABBITT:  Okay.  So one

10        moment, Mr. Hobbs.  Okay?  Because it's my

11        questions and I'm the IHO.  This is for the '23/'24

12        school year.  So for this --

13             MS. ZAMBITO:  (Interposing) Right.

14             HEARING OFFICER BABBITT:  -- school year,

15        did you -- well, let me ask you, did you provide

16        the student with OT in July and August?

17             MS. ZAMBITO:  No, I did not see him in

18        July and August.

19             HEARING OFFICER BABBITT:  Okay.  So you

20        just started providing services to the student in

21        September, correct?

22             MS. ZAMBITO:  Correct.  We just resumed

23        services after his summer break.

24             HEARING OFFICER BABBITT:  Okay.  Well,

25        are you aware -- are you saying that he didn't go

1        to school over the summer?

2                    MS. ZAMBITO:  I do not know what -- Rex

3        did not come to OT during the summer.  I believe,

4        yes, he did go to school.

5                    HEARING OFFICER BABBITT:  Okay.  Well, I

6        mean, if OT is necessary for him not to regress,

7        then why didn't he receive OT services in the

8        summer?  If you know.  If you don't know --

9                    MS. ZAMBITO:  I -- I don't know.  I don't

10       know.

11                   HEARING OFFICER BABBITT:  Okay.  All

12       right.  Well, did you find that there was

13       substantial regression by him not getting services

14       for those two months?

15                   MS. ZAMBITO:  Yes.  And I do feel that, I

16       would say, across the board with many students that

17       I work with, they do tend -- all children,

18       neurotypical and neurodiverse, do tend to regress

19       over the summer slightly.  However, Rex and I have

20       a very strong rapport and therapeutic relationship.

21       We were able to pick up back in therapy and, you

22       know, start to target his goals.

23                   HEARING OFFICER BABBITT:  All right.  So

24       again, I'm just really concerned about this

25       student.  So what was this student's regression and

1       how long did it take you to make up for that?

2                   MS. ZAMBITO:  It's a regression and just

3       maybe being able to transition to the gym or

4       sustain his attention to an activity --

5                   THE COURT REPORTER:  (Interposing) I'm

6       sorry to interrupt.  It's the court reporter.

7                   MS. ZAMBITO:  -- but it's nothing that

8       there was substantial.

9                   THE COURT REPORTER:  We lost the DOE.

10                  HEARING OFFICER BABBITT:  Whoops.  Thank

11      you for raising that.

12                  I'm sorry, Ms. Zambito.  Let's just give

13      a moment to see if the attorney comes back on.

14      Okay.  He's back on.

15                  Okay.  So you were saying that the

16      regression is in him transitioning?

17                  MS. ZAMBITO:  Yes.  And that's typical,

18      like I said, for many students.  But in terms of,

19      you know, his therapy sessions, he was able to --

20      he required some, you know, in terms of like his

21      handwriting and holding his pencil, being able to

22      complete zippers and ties.  He just needed some,

23      you know, at once towards the end of the summer --

24      end of the school year, excuse me.  He was maybe

25      at, like, a minimal assistance level and then he

1    come back and he needs more of a mid-mod assistance

2    level.  So just a little bit more prompting and

3    instruction.  However, you know, he -- he is

4    responsive to his therapy sessions and he continues

5    to make progress.

6              HEARING OFFICER BABBITT:  All right.  So

7    tell me what progress he has made since the

8    beginning of this school year --

9              MS. ZAMBITO:  (Interposing) Since the

10   beginning of this --

11             HEARING OFFICER BABBITT:  -- since

12   September.  Yeah.  You didn't see him over the

13   summer, so since September.

14             MS. ZAMBITO:  Sure.  Since the beginning

15   of that when -- when he started back in terms of

16   being able to -- for fine motor skills and

17   handwriting, being able to write the alphabet in

18   uppercase.  He's starting to do that with less --

19   minimal assistance.  Now, we're beginning to

20   working on writing lowercase letters.

21             What else I can say?  Tying a knot, being

22   able to button and zipper.  When he started in the

23   beginning of the school year, again, you know, kind

24   of at mid-mod assistance level and now he's at --

25   back at minimum assistance.  So however, he has

Received Office of State Review
01/09/2024

| | |
|---|---|
| 1 | still not achieved independence with a lot of those |
| 2 | basic fine motor and self-help skills. |
| 3 | HEARING OFFICER BABBITT:  Okay.  So |
| 4 | you're saying that last year he was not able to tie |
| 5 | a knot or to button a button or zip a zipper? |
| 6 | MS. ZAMBITO:  Yes. |
| 7 | HEARING OFFICER BABBITT:  Okay.  So do |
| 8 | you know the methodology used by The Titus School |
| 9 | for OT? |
| 10 | MS. ZAMBITO:  I -- I do not. |
| 11 | HEARING OFFICER BABBITT:  Okay. |
| 12 | MS. ZAMBITO:  I also have -- I just |
| 13 | wanted to excuse and interrupt.  I did explain I |
| 14 | have a cut -- I had a time.  I don't know.  I -- I |
| 15 | have to go into a therapy session. |
| 16 | HEARING OFFICER BABBITT:  I'm sorry.  Mr. |
| 17 | Hobbs -- Mr. Hobbs didn't advise us.  What's your |
| 18 | cutoff? |
| 19 | MS. ZAMBITO:  12:15. |
| 20 | HEARING OFFICER BABBITT:  Oh, I'm sorry. |
| 21 | He didn't advise us. |
| 22 | MS. ZAMBITO:  Okay. |
| 23 | HEARING OFFICER BABBITT:  I'll try to |
| 24 | wrap it up.  That's really the attorney's job to |
| 25 | do. |

Received Office of State Review
01/09/2024

```
1              Now, let me ask you do you -- you work
2        with the student in your sensory gym; is that
3        correct?
4              MS. ZAMBITO:  Yes.
5              HEARING OFFICER BABBITT:  And the sensory
6        gym, while you're there, there's other students in
7        the sensory gym working with --
8              MS. ZAMBITO:  (Interposing) Yes.
9              HEARING OFFICER BABBITT:  -- other
10       providers.
11             MS. ZAMBITO:  Yes.
12             HEARING OFFICER BABBITT:  And how many
13       other people would there be?
14             MS. ZAMBITO:  It changes week to week,
15       usually with maybe three to four other OTs working
16       with -- with children with one-on-one sessions.
17             HEARING OFFICER BABBITT:  Okay.  All
18       right.  Well, I'm mindful of the time that you have
19       to go.  Unfortunately, I didn't know in advance.
20             Mr. Hobbs, do you have any questions for
21       this witness?
22             MR. HOBBS:  No further questions, but
23       IHO, with all due respect, I would like to --
24             HEARING OFFICER BABBITT:  (Interposing)
25       Okay.  One moment.
```

Received Office of State Review
01/09/2024

```
 1                    Mr. Koppel, do you have any questions?
 2                    MR. KOPPEL:  I do not, IHO.  Thank you.
 3                    HEARING OFFICER BABBITT:  Okay.  All
 4          right.  So I'm mindful of the witness's time.
 5          Thank you very much for appearing, Ms. Zambito.
 6                    MS. ZAMBITO:  Thank you.
 7                    HEARING OFFICER BABBITT:  Mr. Hobbs, it's
 8          your job to tell me if someone has a time
 9          restriction.  Okay?  Because I try to accommodate
10          all witnesses.
11                    MR. HOBBS:  Apologies, IHO.  And before I
12          proceed to the next witness, I would like to, with
13          all due respect, make the record that some of the
14          IHO's questions are veering into the lane of the
15          DOE's job to cross-examine the witnesses.  You're
16          stepping over simple clarifying and completion
17          questions and are, in fact, cross-examining our
18          witnesses when it is not the --
19                    HEARING OFFICER BABBITT:  (Interposing)
20          So Mr. Hobbs, your job is not after to make a
21          speech.  Your job is then, if you feel that I'm
22          doing that, your job is to object for the question,
23          not make a speech afterwards.  You're going to have
24          an opportunity in your written summation, but
25          you're here to do your job.  Okay?
```

Received Office of State Review
01/09/2024

```
 1                    MR. HOBBS:  Understood.  So I will take

 2          it --

 3                    HEARING OFFICER BABBITT:  (Interposing) I

 4          looked at her affidavit.  And these are clarifying

 5          questions that I had from her affidavit.  So you

 6          can make any argument you want, but you can timely

 7          object to my question and you didn't object.

 8                    MR. HOBBS:  Understood, IHO.  I'll call

 9          the next witness.

10                    HEARING OFFICER BABBITT:  All right.  And

11          who's that?

12                    MR. HOBBS:  Stephanie Koh.

13                    HEARING OFFICER BABBITT:  Okay.  And does

14          she have any time restriction?

15                    MR. HOBBS:  No.  She informed that she

16          was rescheduling some of her other sessions to make

17          time for this.

18                    (Pause)

19                    MR. HOBBS:  She's calling in now, IHO.

20                    (Pause)

21                    MS. STEPHANIE KOH:  Hello.  Oh, wait, is

22          my camera not on?

23                    HEARING OFFICER BABBITT:  No, it is not.

24          Okay.  Please state your name for the record and

25          spell it.
```

Received Office of State Review
01/09/2024

1                    MS. KOH:  Stephanie Koh, K-O-H.

2                    HEARING OFFICER BABBITT:  Okay.  Please

3          raise your right hand.  Do you swear or affirm that

4          the testimony that you will give here today will be

5          completely truthful?

6                    MS. KOH:  Yes.

7                    HEARING OFFICER BABBITT:  Okay.  You can

8          put down your hand.  Ms. Koh, please don't -- are

9          you in a room by yourself?

10                   MS. KOH:  Yes.

11                   HEARING OFFICER BABBITT:  Okay.

12                   THE COURT REPORTER:  I'm sorry to

13         interrupt.  It's the reporter again and we lost Mr.

14         Mayerson this time.  I don't know if that matters.

15                   HEARING OFFICER BABBITT:  Thank you.  No,

16         but Mr. Hobbs will go forward.  He's the attorney

17         who's doing the questioning.  If Mr. Mayerson wants

18         to come back on, he will.

19                   THE COURT REPORTER:  Okay.

20                   HEARING OFFICER BABBITT:  But thank you.

21                   Ms. Koh, please do not look at any

22         documents unless you're specifically asked to do

23         so.  Okay?

24                   MS. KOH:  Okay.

25                   HEARING OFFICER BABBITT:  All right.

Received Office of State Review
01/09/2024

1          Thank you.  Go ahead.

2                    MR. HOBBS:  IHO, I'll save my questions

3          for after your clarifying questions.

4                    HEARING OFFICER BABBITT:  Well, no, you

5          don't save your questions.  If you have any direct

6          than you ask it of this witness.  You don't save

7          questions.

8                    MR. HOBBS:  I have no further direct, but

9          I reserve the right for redirect.

10                   HEARING OFFICER BABBITT:  Okay.  Well,

11         you always have that, right.  You don't have to

12         reserve it.  That's your right.  Okay?

13                   Ms. Koh?

14                   MS. KOH:  Yes?

15                   HEARING OFFICER BABBITT:  You state that

16         your rate is $285 an hour, correct?

17                   MS. KOH:  Yes.

18                   HEARING OFFICER BABBITT:  Okay.  What is

19         that based on?

20                   MS. KOH:  Based on experience and my

21         credentials and what the -- it's a comparable rate

22         to my -- commensurate with my experience and

23         credentials in Manhattan.

24                   HEARING OFFICER BABBITT:  Well, you're

25         saying that, but how do you know that to be so?  I

1       mean, it's a conclusion, but like, what are you --

2       you know, what's that based on?

3               MS. KOH:  Other providers with my

4       comparable experience and credentials charge about

5       that.  Some more.  Some less.

6               HEARING OFFICER BABBITT:  And some lower;

7       is that correct?

8               MS. KOH:  Some.

9               HEARING OFFICER BABBITT:  Okay.  But you

10      don't have any chart or schedule that shows rates

11      of other providers, correct?

12              MS. KOH:  I don't have a chart.

13              HEARING OFFICER BABBITT:  Okay.  Or any

14      schedule that shows that.  When did you receive --

15      what kind of certification or licenses do you have?

16              MR. HOBBS:  Objection.  With all due

17      respect, IHO, objection.  This is asked and

18      answered in Ms. Koh's affidavit.

19              HEARING OFFICER BABBITT:  Okay.  Well, I

20      can ask her.  I note your -- I note your exception.

21      All right?  Can I ask your license -- what you're

22      licensed in?

23              MS. KOH:  Behavior analysis.

24              HEARING OFFICER BABBITT:  Okay.  And

25      you've been licensed since 2014?

95

```
1                    MS. KOH:  Yes, in the State of New York.

2                    HEARING OFFICER BABBITT:  Okay.  So that

3           would be approximately eight years, correct?

4                    MS. KOH:  For the license.  I had the

5           certification since 2012.

6                    HEARING OFFICER BABBITT:  Okay.  But what

7           does the license afford you that the certification

8           doesn't then?

9                    MS. KOH:  The ability to -- the ability

10          to provide the services in the State of New York

11          and bill for them.

12                   HEARING OFFICER BABBITT:  Okay.  So you

13          wouldn't have been able to do that up -- except

14          starting in 2014, correct, when you got licensed?

15                   MS. KOH:  There was a law, I don't

16          remember what year it was, that passed allowing

17          BCBAs to obtain -- I don't remember if it was --

18          I'm not sure exactly what the law stated, but prior

19          to -- but I remember getting the license because it

20          was the only way to provide the services and bill

21          for them in the State of New York.

22                   HEARING OFFICER BABBITT:  Okay.  All

23          right.  So yeah, that's what you testified to.

24          Now, how long have you worked with the student?

25                   MS. KOH:  I don't remember exactly but I
```

Received Office of State Review
01/09/2024

1          believe he was six.

2                    HEARING OFFICER BABBITT:  Now, what's

3          your position?  Are you an owner?  You are the

4          founder and owner of this entity, Little Green

5          Tugboat, the agency that provides the services,

6          correct?

7                    MS. KOH:  Correct.

8                    HEARING OFFICER BABBITT:  And do you

9          personally provide these services directly to the

10         student?

11                   MS. KOH:  Yes.  In -- in -- well,

12         directly -- can you clarify directly?

13                   HEARING OFFICER BABBITT:  Well, who's

14         providing the services for ABA to the student?

15                   MS. KOH:  The -- they're -- the behavior

16         therapists who -- who work under me.

17                   HEARING OFFICER BABBITT:  So it's not you

18         who provides the services, correct?

19                   MS. KOH:  Well, I'm asking you to clarify

20         which services, direct ABA just to Rex that's not

21         inclusive of parent training or supervision.

22                   HEARING OFFICER BABBITT:  All right.  So

23         then let's go back.  We'll take each of those.

24                   MS. KOH:  Okay.

25                   HEARING OFFICER BABBITT:  Who provides

Received Office of State Review
01/09/2024

1    direct services to the student for ABA?

2              MS. KOH:  Currently two different --

3         actually currently three different therapists.

4              HEARING OFFICER BABBITT:  Okay.  And --

5              MS. KOH:  (Interposing) Including one

6         licensed BCBA, so including an LBA.

7              HEARING OFFICER BABBITT:  So one's

8         licensed and the other two are not?

9              MS. KOH:  One's licensed, one is a BCBA

10        who is obtaining her license, and then the other is

11        a registered behavior technician who is not

12        licensed.

13             HEARING OFFICER BABBITT:  Okay.  Now, so

14        you supervise them.  Would that be correct to say?

15             MS. KOH:  Yes.

16             HEARING OFFICER BABBITT:  Okay.  And you

17        said that there were other services that are being

18        provided by your agency.  What are those services?

19             MS. KOH:  You mean outside of direct ABA

20        therapy?

21             HEARING OFFICER BABBITT:  Yes.

22             MS. KOH:  Parent training.

23             HEARING OFFICER BABBITT:  Okay.  And how

24        often --

25             MS. KOH:  (Interposing) (Audio

```
 1                 interference).
 2                         HEARING OFFICER BABBITT:  How often is
 3                 that provided?
 4                         MS. KOH:  The parent training?
 5                         HEARING OFFICER BABBITT:  Yes.
 6                         MS. KOH:  Approximately eight hours a
 7                 month.
 8                         HEARING OFFICER BABBITT:  So two hours
 9                 each week?
10                         MS. KOH:  Yes.  It's not exactly, like,
11                 two hours.  We're not on a regular two-hour-a-week
12                 schedule, but it amounts to roughly that.
13                         HEARING OFFICER BABBITT:  Now, who
14                 provides the parent training?
15                         MS. KOH:  I do.
16                         HEARING OFFICER BABBITT:  Okay.  And is
17                 there any other service provided by your agency?
18                         MS. KOH:  Other than parent training, ABA
19                 supervision, and direct therapy?
20                         HEARING OFFICER BABBITT:  Right.  Okay.
21                 So I'm just a little confused.  There's three
22                 different therapists who provide direct therapy to
23                 the student, correct?
24                         MS. KOH:  Correct.
25                         HEARING OFFICER BABBITT:  And how is that
```

Received Office of State Review
01/09/2024

```
 1          divided up?  Because the student receives ten hours
 2          of therapy from your agency?
 3                    MS. KOH:  Yes.
 4                    HEARING OFFICER BABBITT:  Okay.  So how
 5          is that divided up?
 6                    MS. KOH:  Can I look at my schedule for
 7          this child so that I can give you a --
 8                    HEARING OFFICER BABBITT:  (Interposing)
 9          No, I'm sorry.  If the document is not in evidence,
10          you can't look at anything that's not in evidence.
11          But I'll ask the attorney.
12                    Is that document in evidence, Mr. Hobbs?
13                    MR. HOBBS:  Ms. Koh's personal schedule?
14          No, it's not.
15                    HEARING OFFICER BABBITT:  Okay.  So I'm
16          sorry, but no, you can't look at it.
17                    MS. KOH:  Okay.  That's okay.  I'll
18          try -- I'll try to remember.  Because we've had
19          some scheduling changes because he's been, you
20          know -- he -- he started a class that changed
21          times, days.  So I believe he's got sessions
22          Tuesday, Wednesday, Friday, and then Saturday and
23          Sundays are -- are changeable.  I mean, they're a
24          little bit flexible based on the -- on the family's
25          needs and schedules and our -- their need for our
```

Received Office of State Review
01/09/2024

1    services.

2                    HEARING OFFICER BABBITT:  So I have to

3    stop you.  So I don't understand that.  So he comes

4    during the week three days:  Tuesday, Wednesday,

5    Friday, correct?

6                    MS. KOH:  We go to him.

7                    HEARING OFFICER BABBITT:  Oh, okay.  So

8    I'm glad that I made that statement which is

9    incorrect.  Okay.  So three days a week:  Tuesday,

10   Wednesday, Friday you go to where?  The student's

11   house?

12                   MS. KOH:  Yes.

13                   HEARING OFFICER BABBITT:  Okay.  And then

14   you go to the student's house on weekends, too?

15                   MS. KOH:  Yes.

16                   HEARING OFFICER BABBITT:  And both days?

17                   MS. KOH:  Not -- like I said, it's -- it

18   varies.  Sometimes the family is out of town.

19   Sometimes the family has events that they need

20   support for the -- the student.  Sometimes there's,

21   you know, specific events.  Other times there are

22   play dates where we focus on social skills.

23   There's a lot of -- a lot of skills that are worked

24   on during those -- during those sessions, as well

25   as during the week.

Received Office of State Review
01/09/2024

1          HEARING OFFICER BABBITT:  Okay.  So let

2     me try to understand something.  All right.  Help

3     me out here.  So you said that events.  So would

4     you actually go to an event with the family and the

5     student?

6          MS. KOH:  By event, like -- so can I give

7     you an example of one -- of one -- of these

8     sessions?

9          HEARING OFFICER BABBITT:  Please do.

10    Yeah.  Please do.

11         MS. KOH:  Okay.  So a therapist may start

12    with Rex at his home on, like, a Saturday.  There

13    might be, like, let's say 10 to 1 where, I mean, we

14    stay within the hours allotted.  So let's say

15    there's a three-hour session.  And so maybe from 10

16    to 11:30 there may be, you know, working on his

17    goals at home.  And then he has to go to a school

18    event.  Let's say, like, it's a book fair at his

19    school, so then he'll go with the therapist because

20    he needs the support to the book fair.  And they

21    may spend half an hour, maybe an hour there, and

22    then return home for the rest of the session.  So

23    that's, like, one example.  But you know, so I mean

24    it can change.  So that's just, like, an example of

25    one book fair event.  Another one could be a

|   |   |
|---|---|
| 1 | birthday party where he needs the support at a |
| 2 | birthday party. |
| 3 | HEARING OFFICER BABBITT:  Okay.  So let |
| 4 | me ask you this.  During the week, is it pretty |
| 5 | steady that the amount of ABA therapy's three |
| 6 | hours?  Is it one hour each day on Tuesday, |
| 7 | Wednesday, Friday? |
| 8 | MS. KOH:  It's typically two to two-and- |
| 9 | a-half hours and then allows for us to have weekend |
| 10 | time -- weekend sessions. |
| 11 | HEARING OFFICER BABBITT:  Okay.  So when |
| 12 | you say two to two-and-a-half hours, not each day |
| 13 | for the three days you're saying? |
| 14 | MS. KOH:  I think.  That -- that's why |
| 15 | I'm -- I'm not 100 percent sure because I'm not |
| 16 | looking at his schedule.  I believe his Tuesday |
| 17 | schedule is 4 to 6 p.m.  I believe his Wednesday |
| 18 | schedule is 3 to 5:30 or 3:15 to 5:45.  I believe |
| 19 | Friday's schedule is two hours.  I think it's 4 to |
| 20 | 6.  But like I said, we make sure to stay -- and |
| 21 | the family, make sure to stay within the -- the |
| 22 | hours allotted. |
| 23 | So like, if there isn't a weekend |
| 24 | scheduled, a weekend session that week, we may stay |
| 25 | later, also because we target some -- we target |

Received Office of State Review
01/09/2024

```
 1          goals within the home for, like, adaptive skills,
 2          which for some -- I mean, depending on what we're
 3          working on.  So we may have a session start later
 4          or we may just extend it later into more hours --
 5          later hours into the session to specifically work
 6          on something like bathing, or you know, adaptive
 7          skills like feeding, bathing.
 8                    HEARING OFFICER BABBITT:  Okay.  So what
 9          is the total amount of hours per week that the
10          student receives for ABA?
11                    MS. KOH:  Ten.
12                    HEARING OFFICER BABBITT:  I'm sorry.  Did
13          you answer and I missed it.
14                    MS. KOH:  Oh, I'm sorry.  Yeah, I did.
15          Ten.
16                    HEARING OFFICER BABBITT:  Okay.  So then
17          the ten hours per week may -- they're divided
18          appropriately so that you don't go over and it
19          really depends of the schedule of the student and
20          the family of how those hours are administered?
21                    MS. KOH:  Yes, the -- the Tuesday,
22          Wednesday, Friday is pretty -- is consistent.  Like
23          I said, we might, you know, like, if the family is
24          away for the weekend, then we may extend some
25          hours, we may extend some sessions to, you know,
```

Received Office of State Review
01/09/2024

1    cover those hours.  And I mean, like I said, it's

2    an -- it's a really good opportunity to work on

3    some of those adaptive and independent skills.  But

4    yes, those -- those sessions are consistent.

5             HEARING OFFICER BABBITT:  Okay.  So how

6    long have you been working on the bathing skills

7    with the student?

8             MS. KOH:  Well, we started -- the goals

9    have changed.  We've started working on bathing

10   probably -- probably we actually first started

11   desensitizing him to the bathing routine early on.

12   Like, I would say maybe a year and a half, two

13   years ago.

14            HEARING OFFICER BABBITT:  So you're

15   working on the same skill --

16            MS. KOH:  It's not the same skill.

17            HEARING OFFICER BABBITT:  -- over this

18   period?

19            MS. KOH:  It's not the same skill.

20   Initially, he -- he presented with very strong

21   resistance and tantrums to just the shower being

22   on -- just water hitting his head.  That was the

23   first skill was to tolerate the shower routine.

24   And there are many steps in between that and what

25   we're doing currently.  Currently, the skill is

1    independence and independence with thorough

2    bathing -- self-bathing in a shower.

3              HEARING OFFICER BABBITT:  Are you aware

4    of whether or not this skill is being worked on by

5    The Titus School?

6              MS. KOH:  They are not.  They don't do

7    bathing at the school.

8              HEARING OFFICER BABBITT:  Okay.  Do you

9    coordinate -- withdrawn.  But The Titus School

10   utilizes ABA methodology as well, don't they?

11             MS. KOH:  Yes.

12             HEARING OFFICER BABBITT:  Okay.  Do you

13   coordinate your efforts with The Titus School?

14             MS. KOH:  Yes.

15             HEARING OFFICER BABBITT:  And how do you

16   do that?

17             MS. KOH:  We have periodic team meetings

18   with the teachers, therapists, the, like, speech

19   therapists, I think OT as well.  I can't remember

20   everybody.  I remember the last meeting that we had

21   there were a lot of folks on that meeting.  Also,

22   we share our session notes with -- with The Titus

23   School staff.  If -- through via the parents, but

24   also sometimes directly, if they've reached out to

25   us directly about something or Mom may have

Received Office of State Review
01/09/2024

1            forwarded an email or a question and we may respond
2            directly.  And the parents are always cc'd on those
3            emails.
4                       HEARING OFFICER BABBITT:  Okay.  So where
5            do you -- you said that you do parent training?
6                       MS. KOH:  Yes.
7                       HEARING OFFICER BABBITT:  Approximately
8            two hours each week with the parents?
9                       MS. KOH:  Yes.
10                      HEARING OFFICER BABBITT:  And you go to
11           their home also?
12                      MS. KOH:  Sometimes it's in person at
13           home.  Sometimes it's a Zoom meeting.  Some it's
14           phone calls.  There might be a week with multiple
15           phone calls.  So it's not that -- that -- the
16           parent training is not a set schedule, but it is a
17           set amount per -- per month that I make sure that
18           we are coordinating and communicating and training.
19                      HEARING OFFICER BABBITT:  Well, with
20           these phone calls, are they, like, phone calls from
21           the parent to deal with, like, an emergent
22           situation?
23                      MS. KOH:  I can't think of a time that
24           that has happened because we -- we communicate a
25           lot.  But no, the -- the phone calls are, you know,

1    coordinating both Dad's and Mom's schedules and

2    scheduling a phone call and usually

3    (indiscernible) --

4              HEARING OFFICER BABBITT:  (Interposing)

5    Why is it -- why is it necessary -- and so these

6    two hours are in addition to the ten hours of

7    therapy that student's receiving, correct?

8              MS. KOH:  Yes.

9              HEARING OFFICER BABBITT:  So during the

10   parent training, is the student present at all?

11             MS. KOH:  Sometimes.  With Rex's

12   development, he's -- he's very aware at this point

13   of when we are talking about him.  So we try to

14   schedule their training and discussions about him

15   when he's not present.  If it entails implementing

16   a protocol like, for example, you know, just within

17   his family's life functioning, like, one of the --

18   one of the skills -- one of the issues or

19   problematic behaviors that was presenting pretty

20   consistently with the family but not with us was

21   when if the family were to sit down and watch a

22   show together on TV, he would incessantly scream or

23   be disruptive so that it couldn't happen.

24             And so that's an example of when I went

25   in person and created a protocol with a visual --

Received Office of State Review
01/09/2024

108

1    with a visual schedule for him and we implemented

2    the visual together with the family.  And then I

3    believe it was two weeks later, I followed up with

4    another in-person visit to further that training

5    with the parents, coaching them, making sure and --

6    you know, and it was successful.

7            HEARING OFFICER BABBITT:  I guess I'm not

8    clear.  Why would the parents require consistent

9    parent training of two hours every week when the

10   student's only getting ten hours of services a

11   week?  I mean, why so much hours with the parents?

12           MS. KOH:  There are a lot of skills that

13   we're working on, parent skills that are not the

14   student's skills, right.  So the student has his

15   list of goals and we've got parent goals that we're

16   specifically targeting.  And they -- while they

17   have made a lot of progress in many areas, they're

18   you know, he -- so the student presents with pretty

19   high behavior contrast where -- when the therapist

20   is there and they are working, you know,

21   successfully on the goals that we've written for

22   him that we're working on.  They are not

23   automatically -- they're not automatically

24   generalized with the parents.  And so there is

25   typically  a period of training the parents,

1      coaching the parents to implement this protocol.

2                HEARING OFFICER BABBITT:  Well, so I'm

3      confused.  Do you have set training that you give

4      to the parents?  Or it's responsive to the parents'

5      questions about behavioral issues with the student?

6                MS. KOH:  Both.  And with all of our

7      families, there's, you know, it depends on what

8      the -- what the -- what the needs just like our

9      program is designed for, you know, to target the

10     individual needs of every individual student, the

11     parent's needs and learning styles are also taken

12     into account.

13               And so with this particular student,

14     there is some -- there's a mix.  There's a --

15     there's -- sometimes there's didactic training.

16     There's, like, even a PowerPoint discussing

17     functions of behaviors, discussing (audio

18     interference) proactive strategies, and then -- so

19     that -- that's one method or one kind of style.

20               And there is, you know, the parent may

21     email me with a list of issues or questions and

22     then we schedule a phone call or a Zoom meeting, or

23     you know, I might be there while the -- the -- the

24     student is having a session and I will go into a

25     different area of the house or the apartment and

Received Office of State Review
01/09/2024

1        meet with the parent and discuss their concerns and

2        discuss protocols.  And you know, so it's -- it's a

3        mix.

4                    HEARING OFFICER BABBITT:  All right.  So

5        there's no consistency like every week you have two

6        one-hour sessions or one two-hour session?

7                    MS. KOH:  No, it's not consistent like

8        that.  It's not scheduled like that.

9                    HEARING OFFICER BABBITT:  Okay.  So are

10       the sessions usually, though, eight one-hour

11       sessions over a month?

12                    MS. KOH:  No.  Like I said, it's not

13       scheduled like that.  So we might have a two-hour

14       in-person meeting.  We might, three days later,

15       have a follow-up, you know, phone call that goes an

16       hour and a half.  We might then have another

17       meeting the following week for one hour only.  It's

18       not -- we have consistent --

19                    HEARING OFFICER BABBITT:  (Interposing)

20       Okay.

21                    MS. KOH:  -- communication and meetings.

22                    HEARING OFFICER BABBITT:  So you have

23       communication that's really responsive to the

24       parent's needs and it's no more than, whatever,

25       eight hours a month you're saying?

Received Office of State Review
01/09/2024

1                    MS. KOH:  Yes.

2                    HEARING OFFICER BABBITT:  Okay.  Now, so

3         is there this third component?  You talked about

4         supervision.  Is that yet additional hours on top

5         of the 18 hours we've already discussed?  I'm

6         sorry, the 12 hours per week we've discussed.  Are

7         there additional hours that you supervise?

8                    MS. KOH:  Yes.  The supervision --

9                    HEARING OFFICER BABBITT:  (Interposing)

10        And what is --

11                   MS. KOH:  -- is to supervise the

12        therapists.

13                   HEARING OFFICER BABBITT:  Okay.  And how

14        much time is that a week?

15                   MR. HOBBS:  IHO, objection.  This is

16        already asked and answered in her affidavit

17        testimony.

18                   HEARING OFFICER BABBITT:  Okay.  Well, I

19        need to clarify.  Thank you, Mr. Hobbs.  If you

20        want to point out, we can read from her affidavit,

21        but I'm trying to be expedient here.

22                   So help me out here.  So that is

23        supervising the three different therapists,

24        correct, you're saying?

25                   MS. KOH:  So we've had a change in

```
 1          therapists.  And currently two of the therapists do
 2          not require supervision.  We do require team
 3          meetings.  But the -- there's one therapist who
 4          requires supervision because she's not a BCBA.  And
 5          I believe --
 6                    HEARING OFFICER BABBITT:  Is that the
 7          registered behavior technician?  Is that the person
 8          you're talking about?
 9                    MS. KOH:  Yes.
10                    HEARING OFFICER BABBITT:  Okay.  So
11          because of her -- she doesn't have the same skill
12          set or training as the other ones.  So she requires
13          supervision, right?
14                    MS. KOH:  Right.  Yes.
15                    HEARING OFFICER BABBITT:  Okay.  So --
16                    MS. KOH:  Like, I wouldn't supervise
17          another BCBA on the case.
18                    HEARING OFFICER BABBITT:  Okay.  So it's
19          basically based on the staff that you have
20          available to service this student.  So one of
21          the -- person who administers direct ABA needs the
22          supervision.  And how much supervision a week?
23                    MS. KOH:  I think it's two hours, but I'm
24          not -- I think it's actually -- it's -- it's
25          proportionate to -- I'm not actually sure
```

Received Office of State Review
01/09/2024

1      exactly --

2                      THE COURT REPORTER:  (Interposing) I'm

3      sorry to interrupt.  The witness is coming in

4      choppy.  I think if you turn your camera off, it

5      might be better.  Your bandwidth is low.

6                      HEARING OFFICER BABBITT:  I know, but

7      I -- I appreciate you giving the witness direction.

8      But for me, I have to assess their credibility.  So

9      it's important they remain on camera.

10                     THE COURT REPORTER:  Okay.  Well, she

11     froze up.

12                     HEARING OFFICER BABBITT:  Okay.

13                     THE COURT REPORTER:  So that's why I'm

14     just saying the transcript will come in choppy.

15                     HEARING OFFICER BABBITT:  Right.  It's

16     your platform, which is very unstable, which is

17     problematic.  But please don't direct any of my

18     witnesses -- not my witnesses, but any witness in

19     my hearing to go off camera.  If you want to make

20     the request to me, that's fine, but there's

21     ramifications of that.

22                     THE COURT REPORTER:  It's just a

23     suggestion so the transcript is cleaner.

24                     HEARING OFFICER BABBITT:  Well, I'd like

25     to suggest the platform be more stable.  That would

|   |   |
|---|---|
| 1 | be better.  We didn't have this with the prior |
| 2 | platform that we used. |
| 3 | All right.  Let's try to go forward and |
| 4 | go on. |
| 5 | MS. KOH:  I apologize. |
| 6 | HEARING OFFICER BABBITT:  No, it's not |
| 7 | your fault.  I mean, it is what it is. |
| 8 | MS. KOH:  I'm not normally here.  There's |
| 9 | another person in the -- in -- I'm at home and I'm |
| 10 | in -- I'm in a private space.  But the -- the |
| 11 | person who works from this -- on the same internet |
| 12 | is on Zoom meetings all day.  So that's probably |
| 13 | why -- and it's fine usually for a little while and |
| 14 | then -- |
| 15 | HEARING OFFICER BABBITT:  Okay. |
| 16 | MS. KOH:  But I -- I rearranged my |
| 17 | schedule so that I could do this from home because |
| 18 | it needed to be a private space. |
| 19 | HEARING OFFICER BABBITT:  And so am I |
| 20 | correct that you have not issued a progress report |
| 21 | for this student for this school year, correct? |
| 22 | MS. KOH:  Correct.  We don't do it by |
| 23 | school year.  I mean, the last one I think, was in |
| 24 | May. |
| 25 | HEARING OFFICER BABBITT:  Right. |

Received Office of State Review
01/09/2024

```
1                   MS. KOH:  If I'm correct.

2                   HEARING OFFICER BABBITT:  (Interposing)

3          (Indiscernible) --

4                   MS. KOH:  I'm not the one who writes

5          them.  The other BCBA on the case writes them, so I

6          can --

7                   HEARING OFFICER BABBITT:  (Interposing)

8          But you said that you have session notes, correct?

9                   MS. KOH:  Yes.

10                  HEARING OFFICER BABBITT:  So session

11         notes are right after each session, correct?

12                  MS. KOH:  Yes.

13                  HEARING OFFICER BABBITT:  Okay.

14                  MS. KOH:  Mostly we enter data into our

15         data system.  And so session notes are -- are

16         inputted into that system.  Typically, we also copy

17         and paste and send to the parents after every

18         session.

19                  HEARING OFFICER BABBITT:  Okay.  And I'm

20         correct, Mr. Hobbs, that none of those session

21         notes are in evidence, or are they?

22                  MR. HOBBS:  No, IHO.

23                  HEARING OFFICER BABBITT:  Okay.  Just

24         checking.

25                  All right.  I thank you very much for
```

Received Office of State Review
01/09/2024

1    appearing.  I don't have any further questions for

2    clarification or completion.  I'll give you back to

3    Mr. Hobbs to see if he has any questions, just

4    based on questions or the areas that I asked you

5    about.

6              Mr. Hobbs?

7              MR. HOBBS:  I believe Ms. Koh answered

8    the questions I would have asked.  So no further

9    questions from me.

10             HEARING OFFICER BABBITT:  Okay.  So Mr.

11   Koppel, do you have any questions based upon what I

12   asked?

13             MR. KOPPEL:  Very, very briefly.

14             Ms. Koh, you did discuss teaching the

15   student bathing skills.  Are there any other skills

16   that you are working on with the student that the

17   student wasn't working on at Titus?

18             MS. KOH:  Yes.  Elopement -- not eloping

19   in public.  That's -- that was a major one.  That

20   one was actually one of our first major ones for

21   obvious reasons, for safety.  We are working on

22   personal information -- having him know where he

23   lives, what his parents' phone numbers are.

24             HEARING OFFICER BABBITT:  I just want

25   to -- I have to stop you.  Are you talking about

1     what you've been working on for years or this year?
2     Because we need to be clear on that --
3              MS. KOH:  (Interposing) No, this year.
4              HEARING OFFICER BABBITT:  -- because
5     we're really discussing --
6              MS. KOH:  (Interposing) Okay
7     (indiscernible).
8              HEARING OFFICER BABBITT:  -- we're here
9     for the '22/'23 -- I know.  I just want to be clear
10    with you.  We're here for the '23/'24 school year.
11    So the skills that you would be working on this
12    year that The Titus School's not working on.
13             MS. KOH:  Okay.  I understand.  Yes.
14    Thank you for that clarification.  Elopement was a
15    long time ago.  We are working -- yeah, we working
16    on community safety skills.  I mean, related to
17    that, where he -- we're having Rex identify when
18    it's safe to cross the street, where -- where he
19    needed to stop.  The personal information that's
20    for his (audio interference) current skill.  The
21    bathing, the -- just self-hygiene adaptive skills,
22    functional daily living skills.  Basic home chores
23    that are appropriate.  I'm trying to think of
24    other.  We do a lot of peer social skills(audio
25    interference).  And then also the behavioral

Received Office of State Review
01/09/2024

1      regulation, like I described earlier with the

2      behavior contrast that he is now displaying, even

3      with therapists that a lot of that is worked on

4      through the parent training.  And I don't believe

5      there is -- there are some behaviors that come up

6      at school.  I don't believe it's to the degree that

7      he displays behaviors at home with his family.

8      That's not a comprehensive list.  I'm sure there

9      are more that I can't think of right now.

10          MR. KOPPEL:  And just a very quick follow

11     up to that, specifically with some of the adaptive

12     living skills.  I know one of those was bathing.

13     You did say something about chores.  Was there

14     anything else such as, like, learning to put on

15     clothes or brushing teeth, things of that nature?

16          MS. KOH:  Exactly those, actually.

17     Putting on clothes, just dressing himself, putting

18     his clothes into the hamper, brushing his teeth

19     thoroughly.  That's actually been something that,

20     again, just kind of like the bathing where we

21     started with desensitization of just being in the

22     shower years ago.  But currently we are working on

23     him completing the steps independently and being

24     more thorough with the brushing of teeth.

25          THE COURT REPORTER:  (Interposing) I'm

Received Office of State Review
01/09/2024

1          sorry to cut in.  This is the court reporter.  I'm

2          only getting every other word.  The record's not

3          going to be clear.

4                    MS. KOH:  Okay.  Can you hear me?  Can

5          you hear me now?

6                    HEARING OFFICER BABBITT:  All right.  Ms.

7          Koh, you can try -- you can try turning off your

8          camera.  Let's see if it helps.  If it doesn't

9          help, then that's for naught.

10                    MS. KOH:  Okay.  Okay.  Can you hear me?

11          Is this better?

12                    HEARING OFFICER BABBITT:  Well, it's hard

13          to tell.

14                    MS. KOH:  Can you hear me?

15                    THE COURT REPORTER:  Keep talking.  It's

16          the bandwidth.  It's terrible.

17                    MS. KOH:  I'm (audio interference)

18          window.  Is it better right now or no?

19                    THE COURT REPORTER:  Try talking some

20          more and let me see.

21                    MS. KOH:  Okay.  Let me know if it's --

22          if it's better, if you can hear.

23                    HEARING OFFICER BABBITT:  All right.

24          Okay.  Let Mr. Koppel ask his next question and you

25          can answer it and let's see.  Okay?

Received Office of State Review
01/09/2024

```
 1                    MS. KOH:  Okay.  Okay.
 2                    HEARING OFFICER BABBITT:  Go ahead, Mr.
 3          Koppel.  Or if you didn't get an answer --
 4                    MR. KOPPEL:  (Interposing) Sure.  Did --
 5                    HEARING OFFICER BABBITT:  -- to the last
 6          question --
 7                    MR. KOPPEL:  Should I repeat the last
 8          question?
 9                    HEARING OFFICER BABBITT:  Let's do that.
10          Go ahead.
11                    MR. KOPPEL:  Maybe I'll just repeat it
12          because I think that the answer didn't come
13          through.  So again, just to follow up about
14          adaptive living skills, you talked about bathing
15          and some of the home chores.  I was asking whether,
16          as part of your work, you are working with the
17          student on brushing his teeth, changing his
18          clothes, things of that nature?
19                    MS. KOH:  Yes.  Yeah.  I mean, so self --
20          self-hygiene, adaptive, independent skills, right?
21          So brushing teeth, you know, washing his face,
22          bathing, getting dressed, getting undressed,
23          putting his clothes in the hamper.  Also, we've
24          been working on the -- the -- a -- a circle of
25          friends curriculum where he has made a lot of great
```

Received Office of State Review
01/09/2024

1      progress with identifying what's appropriate in

2      terms of the people around you.

3              So you know, whereas he may have you

4      know -- before we started the program or started

5      targeting this skill, he would just get undressed

6      in front of anyone, you know.  And now he

7      recognizes and he'll ask the therapist could you

8      leave the room.  You know, so things like that.

9              In terms of chores in the -- in the home,

10     you know, for -- as part of, kind of, like his

11     functioning within the family life and routines,

12     you know, putting his plate in the sink, helping

13     with preparing dinner, helping with setting tables,

14     setting the table.  I'm trying to think of some

15     other.  Oh, like making his bed, things of that

16     nature.

17             MR. KOPPEL:  And one last one.  Did it at

18     all include going to the bathroom as well?

19             MS. KOH:  This year?

20             HEARING OFFICER BABBITT:  Yes.

21             MR. KOPPEL:  Yes.

22             MS. KOH:  Going to the bathroom.  What do

23     you mean?  Like, independence with going to the

24     bathroom?  Is that what you mean?

25             MR. KOPPEL:  Yeah.  Did the student need

Received Office of State Review
01/09/2024

1    any help or -- yeah, did the student need any help

2    or assistance in learning to go to the bathroom on

3    his own?

4            MS. KOH:  So he -- he goes to the

5    bathroom on his own, but he may need assistance

6    with thoroughness of wiping for bowel movements and

7    he might need prompting to wash his hands -- verbal

8    prompting.  But we try to provide prompts

9    indirectly currently.

10            MR. KOPPEL:  Thank you.  I have no

11    further questions, IHO.

12            HEARING OFFICER BABBITT:  Okay.  Thank

13    you.

14            Mr. Hobbs, do you have anything else?

15            MR. HOBBS:  No, IHO.

16            HEARING OFFICER BABBITT:  All right.  So

17    I thank the witness for -- one question I want to

18    know.

19            Did you provide the student with ABA

20    direct services and parent training in July and

21    August over the summer?

22            MS. KOH:  Yes.

23            HEARING OFFICER BABBITT:  And for both

24    months for July and August?

25            MS. KOH:  Yes.  For parent training, yes

Received Office of State Review
01/09/2024

1          in July.  I'm just trying to think of the dates.

2          Let me -- give me a second.  Yes, in July and

3          parent training in August.

4                    HEARING OFFICER BABBITT:  So parent

5          training was both July and August you're saying?

6                    MS. KOH:  Yes.

7                    HEARING OFFICER BABBITT:  And direct ABA

8          services were in July and August as well?

9                    MS. KOH:  Are you talking about my agency

10         or me personally?

11                   HEARING OFFICER BABBITT:  Well, you told

12         me you don't provide direct ABA, so I'm talking

13         about your agency.  If the services were provided

14         by your agency.

15                   MS. KOH:  Yes, they were provided.  Yes.

16         Direct ABA --

17                   HEARING OFFICER BABBITT:  (Interposing)

18         Okay.

19                   MS. KOH:  -- and parent training July and

20         August.

21                   HEARING OFFICER BABBITT:  All right.

22         Thank you.  That's it.  So I appreciate your coming

23         to testify here today.  You're free to leave the

24         hearing.  Thank you.

25                   MS. KOH:  Okay.  Thank you.

Received Office of State Review
01/09/2024

```
1                      HEARING OFFICER BABBITT:  Okay.  And so
2           Mr. Hobbs, am I correct that you have two more
3           witnesses?
4                      MR. HOBBS:  Yes.
5                      HEARING OFFICER BABBITT:  All right.  So
6           I'm going to suggest that we just take a ten-minute
7           break at this juncture.  We've been on the record
8           for two hours -- a little over two hours.  So is a
9           ten-minute break suitable for everyone?  Or 15
10          minutes?  And then we'll resume with the two more
11          witnesses?
12                     MR. HOBBS:  That's fine with Parent.
13                     HEARING OFFICER BABBITT:  Okay.
14                     So Mr. Koppel, is that okay with you?
15          Yes?
16                     MR. KOPPEL:  Yes, IHO.
17                     HEARING OFFICER BABBITT:  Okay.  So I'm
18          going -- it's 1:07.  So let's come back at 1:20.  I
19          don't know.  Do we just pause the record or go off?
20          I leave that up to you.  I'm not quite sure how
21          that works.
22                     THE COURT REPORTER:  We just go off the
23          record for now.  But don't leave the conference.
24          You can just hit --
25                     HEARING OFFICER BABBITT:  Right.
```

Received Office of State Review
01/09/2024

```
 1                      THE COURT REPORTER:  -- your video off.
 2                      HEARING OFFICER BABBITT:  Okay.  All
 3            right.  So 1:20, please come back on.  All right?
 4            Don't disconnect.  All right.  Thank you.
 5                          (OFF THE RECORD)
 6                          (ON THE RECORD)
 7                      HEARING OFFICER BABBITT:  Okay.  Good
 8            afternoon.  Mr. Hobbs, call your next witness,
 9            please.
10                      MR. HOBBS:  Parent calls Natalie
11            Brandefine, head and founder of The Titus School.
12                      HEARING OFFICER BABBITT:  Ms. Brandefine,
13            please state and spell your name for the record.
14                      MS. BRANDEFINE:  Hello.  My name is
15            Natalie, N-A-T-A-L-I-E, Brandefine, B as in boy, R-
16            A-N as in Nancy, D as in David, E as in Edward, F
17            as in Frank, I-N as in Nancy, E as in Edward.
18                      HEARING OFFICER BABBITT:  Okay.  And your
19            relationship to the student?
20                      MS. BRANDEFINE:  I am the -- the head of
21            school at The Titus School, where Rex is a student.
22                      HEARING OFFICER BABBITT:  All right.  If
23            you can please just raise your right hand.  And do
24            you swear or affirm that the testimony that you
25            will give here today will be completely truthful?
```

Received Office of State Review
01/09/2024

1           MS. BRANDEFINE:  Yes, I do.

2           HEARING OFFICER BABBITT:  All right.

3    Thank you.  You can put down your hand.  The only

4    other thing I'd say is please don't look at any

5    documents unless you're instructed to do so by

6    counsel, okay?

7           MS. BRANDEFINE:  Yes.

8           HEARING OFFICER BABBITT:  Mr. Hobbs, you

9    have any questions for this witness?

10          MR. HOBBS:  No further direct testimony,

11   direct questioning.

12          HEARING OFFICER BABBITT:  All right.  Ms.

13   Brandefine, is it so that your certification is

14   just in birth to grade 2?

15          MS. BRANDEFINE:  Yes.

16          HEARING OFFICER BABBITT:  Okay.  And The

17   Titus School has how many students?

18          MS. BRANDEFINE:  This year, 86.

19          HEARING OFFICER BABBITT:  And what grades

20   are they in?

21          MS. BRANDEFINE:  The school is ungraded.

22   We have students that range in age from 5 through

23   19 at this time.

24          HEARING OFFICER BABBITT:  Okay.  And what

25   is -- when did you graduate?  What's your

Received Office of State Review
01/09/2024

1          educational background?

2                    MS. BRANDEFINE:  I graduated -- I can't

3          remember.  In -- I graduated a few times with a

4          couple of different certificates and degrees.  So I

5          think the last one was in 2012 or 2011 or

6          something.  I'm not sure.  And I have a --

7                    HEARING OFFICER BABBITT:  (Interposing)

8          Okay.  So where did you graduate from?

9                    MS. BRANDEFINE:  (Interposing) From

10         Brooklyn College with a degree in early childhood

11         education and special education and a certificate

12         of advanced studies in autism spectrum disorders.

13                   HEARING OFFICER BABBITT:  The certificate

14         was from where?

15                   MS. BRANDEFINE:  From Brooklyn College.

16         It's in autism spectrum disorders.

17                   HEARING OFFICER BABBITT:  Okay.  And are

18         you a founder and owner of The Titus School?

19                   MS. BRANDEFINE:  Yes, I am.

20                   HEARING OFFICER BABBITT:  Okay.  Are you

21         the sole owner, or are there are other owners?

22                   MS. BRANDEFINE:  It's me.

23                   HEARING OFFICER BABBITT:  So you're the

24         sole owner?

25                   MS. BRANDEFINE:  Yes.

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  Okay.  So.

 2          paragraph 7 --

 3                    We're getting bad echo feedback.  So

 4          again, I'm just going to ask everyone who's not

 5          speaking to just please mute themselves.  Let's try

 6          to see if that works.  Okay.

 7                    So your affidavit, which is exhibit --

 8          were you sent the exhibits by Mr. Hobbs?

 9                    MS. BRANDEFINE:  Yes.

10                    HEARING OFFICER BABBITT:  Okay.  So if

11          you could turn to your affidavit, it's Exhibit U.

12                    MS. BRANDEFINE:  Okay.

13                    HEARING OFFICER BABBITT:  And does

14          paragraph 7 of the affidavit -- take a moment to

15          read it.  Does that fully describe everything that

16          you're responsible for at the school?

17                    MS. BRANDEFINE:  There -- it summarizes

18          it.  If I were to fully describe everything that I

19          am responsible for at the school, it would be

20          thousands of pages.

21                    HEARING OFFICER BABBITT:  Okay.  And on

22          paragraph 11, what do you mean by -- it says here,

23          the school also utilizes Discrete Trial methodology

24          when appropriate in combination with incidental

25          teaching.  So can you describe to me what is
```

Received Office of State Review
01/09/2024

1      Discrete Trial methodology and then what's

2      incidental teaching?  What do you mean by that?

3                MS. BRANDEFINE:  Sure.  So Discrete Trial

4      methodology or Discrete Trial learning or Discrete

5      Trial teaching or Discrete Trial Training is how

6      it's referred to.  It has many, you know, different

7      names, or when shorthand, DTT.  It is a direct

8      instruction model where you are engaging in

9      multiple trials of repetition, and there's

10     different ways to present content.

11               So if I were working with a student and I

12     were trying to teach them colors, I may sit down

13     with them and have them identify a color out of --

14     out of the field of one because I want to do

15     errorless learning.  So if I want them to master

16     red and understanding what red is, I'd present a

17     bunch of different red objects, red items, red

18     images, and I'd ask them to identify red.

19               Then I would expand the field, and I

20     would include more options.  And I may start with

21     one color and one neutral, so like a red and a

22     white or a red and a black.  And I would ask them

23     to identify red.  And then -- and that is sort of

24     the -- the one-to-one nature of Discrete Trial

25     learning, where you present trials and you -- you

Received Office of State Review
01/09/2024

1    check, you know, you -- so if the student answers

2    the question correctly or identifies the -- the

3    image or the item correctly, you would mark it on

4    the data sheet.

5         If they don't do it, you would also note

6    that on the data sheet, and you'd set a criteria

7    for mastery, you know, anywhere from 80 to 100

8    percent accuracy for you to move on to the next

9    phase of that instruction.  And then incidental

10   learning would be, like, if I were playing on the

11   rug with that same student, and I would say -- we

12   were building with Legos or we were building with

13   blocks -- I would say, can you hand me the red

14   block?  Or here, you, you know, take the red car,

15   and making sure that they can identify it through

16   the incidental exposure of that interaction.

17        HEARING OFFICER BABBITT:  I guess you'll

18   have to give me a better definition of the last

19   one.  Incidental teaching, what is it?  I mean, if

20   you say incidental --

21        MS. BRANDEFINE:  (Interposing) It's

22   opportunities that present themselves in real life,

23   functional application of a skill, functional

24   exploration of a skill, real life learning.

25   Incidental learning is how you and I learn things

Received Office of State Review
01/09/2024

131

T131

1    through exposure, through opportunities, through

2    observing other people engage in that same

3    activity, being exposed to it through classroom

4    teaching.  It's something that is divergent from

5    that Discrete Trial learning.

6              HEARING OFFICER BABBITT:  Okay.  So in

7    paragraph 23 of your affidavit -- did you prepare

8    this affidavit?

9              MS. BRANDEFINE:  Yes.

10              HEARING OFFICER BABBITT:  So you're the

11    one who actually drafted it?

12              MS. BRANDEFINE:  I drafted the responses,

13    yes, to the questions.

14              HEARING OFFICER BABBITT:  Okay.  So you

15    were asked the questions, and you actually wrote

16    what the verbiage that's in here?

17              MS. BRANDEFINE:  Yes.

18              HEARING OFFICER BABBITT:  Okay.  So you

19    said that you observed the student.  How long and

20    was the observation together with other students?

21              MS. BRANDEFINE:  I observed Rex in his

22    classroom in instruction.  I observed Rex during

23    related services.  Sometimes the period of time was

24    an hour.  Sometimes it was 30 minutes.  Sometimes

25    it was shorter.  I observed him during various

T131

132

1      activities throughout the school day, throughout

2      the school year.

3              HEARING OFFICER BABBITT:  Yeah, but how

4      often do you do this?  I mean, I'm just trying to

5      find out because number 7, you list all these

6      things that you do --

7              MS. BRANDEFINE:  Uh-huh.

8              HEARING OFFICER BABBITT:  -- whether it's

9      a home visit, whether it's an IEP meeting, whether

10     it's testifying at hearings.  So when you say you

11     observed the student, how long and how often did

12     you observe the student when he was in class?

13             MS. BRANDEFINE:  I try to observe at

14     least once a week, sometimes more often.  It

15     depends on my flexibility and my schedule.  And a

16     lot of the things that I do don't occur within the

17     eight to four hours of a workday.  You know, I'm up

18     at 5 and working from, essentially, the minute my

19     feet hit the floor until the minute my head hits

20     the pillow.  So a lot of the things that I do occur

21     outside of the 9 to 5 or 8 to 4 hours.

22             HEARING OFFICER BABBITT:  Let me go back

23     to my question again.  See if you could answer it.

24     So when you would go in the classroom, you'd be

25     observing this student and other students, correct?

1          MS. BRANDEFINE:  Yes.

2          HEARING OFFICER BABBITT:  And how long a

3     period, approximately, would you spend in a

4     classroom?

5          MS. BRANDEFINE:  As I said, it would be

6     anywhere from ten minutes to an hour.

7          HEARING OFFICER BABBITT:  Okay.  Now,

8     paragraph 25, can you describe -- I don't want any

9     personal identifying information, but can you

10    describe the students who you say are his peers who

11    are in his classroom?

12         MS. BRANDEFINE:  Yes.

13         HEARING OFFICER BABBITT:  Go ahead.

14         MS. BRANDEFINE:  They're both boy and

15    girl students, male and female students, similar

16    age range with similar developmental profiles.

17    There are a group of students that offer Rex an

18    opportunity to be the peer model, but also have

19    peer models to look up to for social skills, as

20    well as other functional life skills and activities

21    of daily living.  And they're all, like, age and

22    socially appropriate peers for him to be in a

23    classroom with.

24         HEARING OFFICER BABBITT:  So those are

25    just general.  So you have to be specific.  What's

```
 1              the age range of the students that are in his
 2              class?  There are six other people apart from him,
 3              correct?
 4                        MS. BRANDEFINE:  Uh-huh.  Yes.
 5                        HEARING OFFICER BABBITT:  So --
 6                        MS. BRANDEFINE:  Everybody is within 18
 7              months of each other, so there is an age gap that
 8              spans 18 months between the oldest and the youngest
 9              student in the classroom.  And then every --
10              everyone else falls in the middle.
11                        HEARING OFFICER BABBITT:  Okay.  So do
12              you know the ages of the students in that class?
13                        MS. BRANDEFINE:  They're all within 18
14              months of Rex, so.
15                        HEARING OFFICER BABBITT:  Do you know the
16              ages of the students in the class?
17                        MS. BRANDEFINE:  I don't know.
18                        MR. HOBBS:  Objection.  Asked and
19              answered.  She testified that the students in the
20              class are within 18 months of age of Rex Francis.
21                        HEARING OFFICER BABBITT:  Sir, I'm asking
22              her for an age.  An age is one, two, three.  It's
23              not within 18 months.  If she can't tell me what
24              the age is, that's fine.  But she didn't answer it.
25              So if you can't tell me the age, that's fine.  You
```

Received Office of State Review
01/09/2024

```
 1        can say, I can't tell you the age.
 2                MS. BRANDEFINE:  I would -- yeah.  I
 3        would have to refer to other documents and other
 4        data to give you exact numbers.
 5                HEARING OFFICER BABBITT:  Okay.  No,
 6        that's fine.  I don't want you to do that.  You
 7        know, as you said, you drafted this affidavit, so.
 8        All right.  So what are the similar needs of his
 9        peers?  How are the needs similar to the student in
10        issue here?
11                MS. BRANDEFINE:  So similar to Rex, the
12        students are working on physical regulation and
13        sensory processing.  They're working on attention
14        and focus.  They are working on expressive
15        language, pragmatic language, receptive language,
16        and learning needs.  They have unique learning
17        needs that are similar to Rex but not the same.
18        They --
19                HEARING OFFICER BABBITT:  (Interposing)
20        Well, what are they?  Instead of just saying --
21        what is it?  Are these students -- there's six
22        other students.  Are they all classified with
23        autism who are in his class?
24                MS. BRANDEFINE:  Not all of them, no.
25                HEARING OFFICER BABBITT:  Okay.
```

Received Office of State Review
01/09/2024

1              MS. BRANDEFINE:  Some of them have

2    autism.  Some of them have speech and language

3    impairments.  Some of them have a history of

4    epilepsy or seizure disorders.  Some of them have

5    genetic disorders.  Some of them have anxiety.

6    Some of them have a history of trauma.  So

7    everybody has a unique diagnosis for their profile,

8    but -- but have similar needs to --

9              HEARING OFFICER BABBITT:  (Interposing)

10    Are there students with behavioral issues in his

11    class?

12              MS. BRANDEFINE:  There are students that

13    have a history of problem behavior who are really

14    well managed under the support of the system that

15    we have in place for them.

16              HEARING OFFICER BABBITT:  All right.  So

17    how many students in this class have behavioral

18    needs or BIPs?

19              MS. BRANDEFINE:  Well, we have behavioral

20    intervention plans for students for a variety of

21    different reasons.  So some of our students have

22    behavior intervention plans to promote functional

23    communication.  So everybody has a behavior

24    intervention plan.  Some of those behavior

25    intervention plans are targeting skill deficits,

1    and some of them are targeting challenging and

2    interfering behaviors or trying to build skills

3    like attention and focus.

4              HEARING OFFICER BABBITT:  Does this

5    particular student have attention deficit issues or

6    focus issues?

7              MS. BRANDEFINE:  Yes.

8              HEARING OFFICER BABBITT:  And well, you

9    told me there -- it's an ungraded school.

10             MS. BRANDEFINE:  Uh-huh.

11             HEARING OFFICER BABBITT:  But

12   functionally, would they all be performing on the

13   same skill level?

14             MS. BRANDEFINE:  So --

15             HEARING OFFICER BABBITT:  (Interposing)

16   Academic level.  I'm going to say academic level,

17   without it being graded.  I understand there's no

18   grade.

19             MS. BRANDEFINE:  Uh-huh.  Absolutely.  So

20   Rex's homeroom class is not the same as his math

21   class, and it's not the same as his English

22   Language Arts class.  His homeroom class is -- are

23   the group of students that we've identified to be

24   the age appropriate social peers that would be the

25   best social peer group for him to work on, you

1        know, functional communication, executive

2        functioning, activities of daily living, pragmatic

3        expressive language, self-regulation, self-

4        advocacy.

5              So -- so his homeroom class are the peers

6        that he will target those skills with.  He has a

7        math class of students that are, again, in his age

8        range who are all working at on the same grade

9        level of math.  His homeroom teacher happens to be

10       his -- his teacher for everything.  But other

11       students come into that classroom for math.

12             So if -- if his homeroom teacher didn't

13       teach the grade level of math that he was learning

14       at, he would leave to go to a different classroom

15       like he did over the summer.  Now he stays in his

16       homeroom class for his academic instruction with --

17       with his homeroom teacher, who's teaching the grade

18       level content that is appropriate for Rex, which at

19       this time is 1st grade content, and the group of

20       students that come in.  There are some -- some of

21       it is overlapped with his homeroom class, and some

22       of it are peers from other classes.

23             HEARING OFFICER BABBITT:  Okay.  Now, can

24       you explain to me -- so am I correct that the

25       academic portion of the school day is from 9 to 12?

Received Office of State Review
01/09/2024

```
 1              MS. BRANDEFINE:  We do academic
 2         instruction in the afternoon.  It's just, like,
 3         less rigorous and less of the core academic
 4         content.  So it's not math, it's not English
 5         Language Arts, it's not -- it's not the science and
 6         history.  It's more art, or sometimes there's
 7         social skills, sometimes there's other activities.
 8              I'd have to look at Rex's individual
 9         schedule to see what's on his schedule.  We also do
10         our best to try to limit the amount of related
11         services that are done during academic periods so
12         that he's not missing too much academic
13         instruction.  However, when that can't be avoided,
14         we have individualized instructional periods in the
15         schedule so that anything he missed -- if he had
16         speech during math one day, he has a period in his
17         day, like a study hall, where he can then cover the
18         content that was missed during the speech session.
19              HEARING OFFICER BABBITT:  All right.
20         Well, if we take a look at his schedule, which --
21              MR. HOBBS:  Objection.  IHO, objection.
22              HEARING OFFICER BABBITT:  Yeah.  What --
23              MR. HOBBS:  Could you let them finish --
24         let the witness finish the question?
25              HEARING OFFICER BABBITT:  Oh, I'm sorry.
```

1          Go ahead.  You were answering me another question?

2          I'm sorry.

3                    MS. BRANDEFINE:  I think -- I think I'm

4          okay.

5                    HEARING OFFICER BABBITT:  Yeah.  I

6          thought she was done.  So if we look -- I believe J

7          and K.  Do you have the -- you have the exhibits,

8          correct?

9                    MS. BRANDEFINE:  I'm going to go through

10         to see -- you said J and K?

11                   HEARING OFFICER BABBITT:  Yeah.  I

12         believe that's the summer and fall schedule.  So

13         once you're there, once you get to it, just let me

14         know.

15                   MS. BRANDEFINE:  Sure.  Okay.  I'm here.

16                   HEARING OFFICER BABBITT:  Okay.  All

17         right.  So I believe J -- well, it says -- oh, the

18         summer schedule is J.  Sorry, I'm just scrolling

19         to -- okay.  So it appears -- and correct me if I'm

20         wrong -- it appears that the school day after they

21         unpack begins at 9:00 p.m. [sic] and there's math,

22         ELA, history, science, writing, reading up until

23         lunch, correct?

24                   MS. BRANDEFINE:  I mean, yes, the

25         students arrive at 8:30, and after they unpack,

Received Office of State Review
01/09/2024

1          they do academic --

2                    HEARING OFFICER BABBITT:  Okay.  So in

3          the afternoon, for this particular student, he

4          receives all his therapies, and then it's just at

5          the end of the day, a reflection and pack up and

6          dismissal, correct?  Except for music, right?  The

7          afternoon is devoted to therapy?

8                    Is that correct or -- I can't hear you,

9          so I'm not sure -- is it just me who can't hear?  I

10         still don't hear you, and one moment.  I don't see

11         the court reporter.

12                   Court reporter, are you on the line?

13                   Ms. Brandefine, I see that you're muted.

14         So maybe unmute yourself.  You can't.  Okay.

15         Yikes.

16                   Everyone seems to be muted, I guess,

17         except for me.  But the bigger problem is that we

18         don't have the court reporter on the line, so I

19         don't know if we're being recorded.  I can try to

20         troubleshoot.  I'm sorry.  I mean, I don't run the

21         recording service here.  So I'm not quite sure what

22         happened.  All right.  I will try to call to get

23         assistance.  I just ask your indulgence for five or

24         two minutes to see if I can figure this out.  I

25         don't want to have to make people come back, but --

Received Office of State Review
01/09/2024

142

```
1              I mean, if people could shake their heads, they
2         don't see the court reporter on here either,
3         correct?
4                   Right.  She's not here.  So it's not just
5         me.  Okay.  Let me try to get assistance.  One
6         moment.
7                   (Pause)
8                   THE COURT REPORTER:  Good afternoon.
9         This is your court reporter.
10                  HEARING OFFICER BABBITT:  You disappeared
11        on us.  I think you're a different court reporter.
12        Do you know what happened?
13                  THE COURT REPORTER:  Can you hear me now?
14                  HEARING OFFICER BABBITT:  Yes, I can hear
15        you.  But you are not the same court reporter we
16        had, correct?
17                  THE COURT REPORTER:  No.  I didn't
18        realize that you -- were you in a hearing already?
19                  HEARING OFFICER BABBITT:  Since 11:00
20        a.m.
21                  THE COURT REPORTER:  Okay.
22                  HEARING OFFICER BABBITT:  And then it
23        went dark or blank or whatever.  I don't know what
24        the last thing was that was recorded.  I mean, I
25        have no way of knowing that, obviously.
```

143

T143

1         THE COURT REPORTER:  Okay.  That's okay.

2    I just got an email with all of your information.

3         HEARING OFFICER BABBITT:  All right.  I

4    don't know what to do except to go forward.  I know

5    that we are in the middle of Ms. Brandefine's

6    testimony.  I don't know what the last thing was.

7         MR. MAYERSON:  Hearing Officer, can you

8    make sure that John Hobbs's microphone is working

9    so he can communicate?

10        MR. HOBBS:  I'm here, Gary.

11        And IHO, the last question was involving

12   Exhibit K, the student schedule.

13        HEARING OFFICER BABBITT:  Oh, okay.

14   Thank you.  Okay.  All right.  So let's try to go

15   forward.  So now I remember.  Thank you for

16   refreshing my recollection.

17        The question was that for this particular

18   student, the summer schedule shows that in the

19   afternoon, apart from, like, music therapy, it's

20   largely his individual therapies.  Would that be

21   correct?

22        MS. BRANDEFINE:  I would disagree.  There

23   are other instructional periods that are happening

24   throughout the day.  So there's leisure skills,

25   there's art, there is small group instruction,

T143

```
1        there's end of the day reflection, and other

2        activities.  So a lot of the services happen in the

3        afternoon to avoid pulling him from academics and

4        to accommodate all of his needs.  But a lot of

5        instruction still goes on throughout the day.

6                    HEARING OFFICER BABBITT:  Okay.  Great.

7        So if you can just --

8                    MR. HOBBS:  (Interposing) Objection.  I

9        would ask that you let the witness finish the

10       question.

11                   HEARING OFFICER BABBITT:  She did.  So if

12       you --

13                   MR. HOBBS:  (Interposing) She was in the

14       middle of answering the question when you asked the

15       next.  And I apologize, I just want to make sure

16       the record is clear as -- and that the answer is

17       clear.

18                   HEARING OFFICER BABBITT:  (Interposing)

19       Okay.  All right.  Do you have anything further to

20       say?  I'm sorry if you did.

21                   MS. BRANDEFINE:  I was just going to say

22       that, you know, there -- there's work that goes on

23       throughout the whole day.  It's not just up until

24       lunch time.  All of the things that he does

25       throughout his school day are -- are both academic
```

Received Office of State Review
01/09/2024

1          and developmentally appropriate and necessary.

2                    HEARING OFFICER BABBITT:  Okay.  But

3          that's not my question.  But you've got that on the

4          record, so that's fine.  So 12:30 school --

5          12:30 -- on Friday, school ends right after lunch,

6          correct, at 12:30?

7                    MS. BRANDEFINE:  Only in the summertime.

8                    HEARING OFFICER BABBITT:  Oh, okay.  So

9          can you just give short -- well, actually, I think

10         that there's definitions of what everything is on

11         the actual document, so I'm not going to have you

12         testify to what that is.

13                   So Exhibit K, is the schedule currently,

14         correct?

15                   MS. BRANDEFINE:  Yes.

16                   HEARING OFFICER BABBITT:  All right.  And

17         so can you just tell me what is reflection though?

18                   MS. BRANDEFINE:  I'm sorry.  Say that one

19         more time?

20                   HEARING OFFICER BABBITT:  What is

21         reflection?

22                   MS. BRANDEFINE:  End -- like, for end of

23         the day reflection, where it says --

24                   HEARING OFFICER BABBITT:  (Interposing)

25         That's -- yeah.

Received Office of State Review
01/09/2024

146

T146

1          MS. BRANDEFINE:  -- so they'll go -- yep.

2     The students will go through their day.  And so in

3     the morning, they may set a goal for themselves,

4     and they'll -- they'll check in with staff and the

5     group at the end of the day to review if they had

6     made progress toward that goal.  They will review

7     their behavior.

8          So if we're checking in with Rex every 30

9     minutes, we'll review his behavior with him to see

10     how he behaved throughout the school day and to see

11     what areas where he really shined and areas where

12     he could improve.  For Rex, his ability to, like,

13     recall parts of the day, or like, previous

14     activities or things or -- or actions are something

15     that is a learning target for him.

16          And so reviewing his day and reflecting

17     with him help him work on his short-term memory and

18     his recall and his language skills.  That's also a

19     way to prepare for the next coming day.  So if you

20     have homework to do, if you have something exciting

21     that's happening after school, or if there are

22     things that you need to bring to school the next

23     day, those are things that are also discussed

24     during the end of the day reflection.

25          HEARING OFFICER BABBITT:  Okay.  And so

T146

1        in -- at Titus, how do you determine how long a

2        therapy session should be?

3                MS. BRANDEFINE:  We use assessments and

4        therapeutic -- the provider's discretion.  So for

5        the most part, we break our day into 30-minute

6        blocks of time.  Academic instruction for math is

7        45 minutes.  Academic instruction for English --

8        English Language Arts is 90 minutes.  And then

9        science and history, I believe, is another 45 or

10       30, no, 45.  And we try to do 30-minute sessions

11       for related services.

12               HEARING OFFICER BABBITT:  Okay.  Is that

13       because the school has determined that that's the

14       best amount of time for the student to remain

15       focused and to absorb what he's getting?

16               MS. BRANDEFINE:  Yeah, it's pretty

17       standard.  I mean, some of our students have longer

18       sessions.  There are students who have 60-minute

19       sessions and there are students that have 45-minute

20       sessions.  But based on Rex's profile, we -- we --

21       his therapists and his parents and his classroom

22       team determined that 30 minutes would be an

23       appropriate interval.

24               HEARING OFFICER BABBITT:  Okay.  Thank

25       you.  And so I was just curious, paragraph 42, it

Received Office of State Review
01/09/2024

148

1        states that the student is working on his ability

2        to independently shower.  Is there an actual shower

3        at Titus that he works on, or can you explain what

4        that is?

5                    MS. BRANDEFINE:  There is an actual

6        shower at Titus, and it is something that we're

7        building up to being able to use with Rex

8        independently.  But he also will work on skills

9        that feed that skill.  But we do have a shower here

10       for this particular skill.  For many of our

11       students, it's a learning target, and it is an

12       adaptive shower that we have in one of our ADA

13       accessible bathrooms.

14                   HEARING OFFICER BABBITT:  Okay.  And what

15       precisely is music therapy?  That's referenced in

16       paragraph 51.

17                   MS. BRANDEFINE:  Uh-huh.

18                   HEARING OFFICER BABBITT:  What is music

19       therapy?

20                   MS. BRANDEFINE:  It is a mental health

21       service.

22                   HEARING OFFICER BABBITT:  Okay.  It's not

23       counseling, though, right?  Or how -- I mean, so --

24                   MS. BRANDEFINE:  (Interposing) So it can

25       be considered counseling, especially for students

1    who have expressive language impairments, who

2    cannot functionally communicate their emotions.

3    It's a -- it's a great way to work on emotional ID

4    and emotion processing with students.  It's a great

5    way to build social skills and to teach students

6    how to open and close communication circles, how to

7    really listen to a communication partner, to hear

8    what their emotions are and -- and how to match or

9    meet somebody where they are or how to slow

10   something down.  You know, so cadence and rhythm

11   are really important.  But -- but it's provided by

12   a licensed creative art therapist who is a mental

13   health counselor.

14           HEARING OFFICER BABBITT:  All right.  So

15   can you give specific examples of how the student

16   has made progress for this school year?  Not since

17   he's been at Titus, but for this school year.

18           MS. BRANDEFINE:  Uh-huh.  Yeah.  I mean,

19   I wrote a little bit about it in my affidavit.  I

20   know that in his math class -- so I was able to go

21   in and observe recently him able to participate in

22   a game of number identification bingo.  And for

23   Rex, it's huge to see that he had the ability to

24   self-regulate, to listen to the numbers being

25   called, to then independently identify where the

Received Office of State Review
01/09/2024

1    numbers were on his card, to remain regulated and

2    engaged, and to understand the directions.

3        You know, so there's a lot of language

4    executive functioning, receptive, express --

5    auditory processing that goes into a game like

6    that.  And I was able to watch him make -- play

7    that game where he filled his whole bingo card and

8    identified all the numbers correctly and stayed on

9    task.  And I know that those are things that are

10   being targeted in his math class and in his

11   academic instructional periods.

12       I've also seen his work in English

13   Language Arts improve dramatically where he's -- he

14   went -- he was able to move up a grade level in

15   instruction to the second part of the Wilson's

16   Curriculum, which is working on more robust blends

17   of sounds.  So using, like, digraphs in the

18   beginning of a word.  So knowing that S-H makes the

19   sh sound and T-H makes the th sound, and he -- I

20   was in there while they were taking a test

21   actually.

22       They were taking a test and the teacher

23   was making the sounds, and they had a write down of

24   the pair of letters that match the sound that she

25   was making.  And so he -- and I would say even

1     in -- in May of last year, he wasn't able to do

2     those things.  And over the summer, he really

3     worked hard to master the skills that were required

4     to achieve this goal.  And -- and as a couple of

5     weeks ago, I was able to see him successfully

6     execute those things.

7          His reading comprehension is -- his

8     listening comprehension is improving based on the

9     reading skills that we're working on with him.

10    Also, sequencing events is something that is worked

11    on in -- in speech and language therapy and in

12    academics and in ABA.  And so those are all things

13    that are important for Rex because he has a hard

14    time recalling events and understanding time and

15    how it impacts him in his life.

16         And so we've been working on, like, a

17    scrapbook with him where he brings in photographs

18    of his life from outside of school and is able to

19    sequence those events.  And that's really important

20    for him for self-expression.  But we're also

21    reading stories and having him sequence the events

22    in the stories because those are reading

23    comprehension skills.

24         And in science and history, he's working

25    on, like, phases of matter and understanding

Received Office of State Review
01/09/2024

1    different phases of matter.  And his teachers said

2    that, you know, when they implemented, like,

3    project-based approaches to this content where he

4    was able to really get his hands in, like, on ice

5    and on water and things like that, that helped him

6    understand those concepts much more in depth and

7    gave him a little bit more of a, you know, a

8    concrete representation of what they were learning

9    about.

10           And social studies, they were learning

11   about, like, their environment and roles and things

12   that people play in the environment and how things

13   work.  And he's -- he -- when he can identify with

14   something, when he can internalize or personalize

15   it, he's -- he's able to make connections.  And so

16   we're seeing a lot more of those connections for

17   him academically.

18           HEARING OFFICER BABBITT:  Are there any

19   assessments or any objective testing to measure the

20   student's progress?

21           MS. BRANDEFINE:  Yes.

22           HEARING OFFICER BABBITT:  Okay.  And what

23   are they and how -- where are they reported out?

24           MS. BRANDEFINE:  So in his November

25   progress report, you'll be able to see some of

Received Office of State Review
01/09/2024

1    those assessments will be posted on there.  We use

2    EngageNY, Common Core curricula-based material to

3    do assessments.  We use Wilson's Foundations, which

4    is a phonemic awareness literacy-based curriculum.

5    We use their assessments.  We use Reading A-Z and

6    Fountas and Pinnell to test grade levels for

7    reading and fluency, reading comprehension, and

8    decoding.

9        And we use, like, whatever curriculum-

10    based assessments are included for the other

11    material that we're learning.  And the related

12    service providers conduct assessments regularly

13    based on the interval.  So a lot of the assessments

14    that they use are time-bound and can't be repeated

15    within a certain period of time or they invalidate

16    the scores.  And so they collaborate with outside

17    providers to make sure that they're not overlapping

18    on any of those tests and assessments.

19        HEARING OFFICER BABBITT:  And what's the

20    teacher-student ratio for this student's class?

21        MS. BRANDEFINE:  His homeroom class has a

22    lead teacher, a lead behavior therapist, two

23    additional behavior support staff, and a clinical

24    supervisor.  So there are seven students with four

25    adults, plus a clinical supervisor.  And then Rex,

Received Office of State Review
01/09/2024

1        whenever he's doing any academic instruction,

2        always has access to one-to-one support to help him

3        remain engaged, regulated, and on task.

4                HEARING OFFICER BABBITT:  Well, when you

5        say he has access, so what is it?  There's one

6        teacher, and there's an assistant who's there for

7        all the students?

8                MS. BRANDEFINE:  So no.  He -- there will

9        be one teacher and probably, like, three or four

10       behavior therapists in the classroom helping to

11       support the students in their regulation and

12       engagement.  And for Rex, his -- his ability to

13       make educational progress is highly contingent on

14       having that person there.

15               So when he can functionally engage

16       independently, the person does not have to give him

17       any verbal prompts, redirection, or support.

18       However, when he is struggling to maintain

19       regulation or attention and focus, that is when

20       that support is needed.  And so that person is very

21       close by, if not directly next to him.

22               HEARING OFFICER BABBITT:  Okay.  Those

23       are my questions that I had for completion and

24       clarification.  I appreciate your time.

25               So let me -- Mr. Hobbs, do you have any

Received Office of State Review
01/09/2024

1    questions based upon what I asked?

2                    MR. HOBBS:  I do, IHO.

3                    HEARING OFFICER BABBITT:  Well, then

4        proceed please.

5                    MR. HOBBS:  And I'm getting a lot of

6        feedback.  So Ms. Brandefine, if you can't hear my

7        question, please just let me know, okay?  All

8        right.

9                    Ms. Brandefine, are you aware if Rex

10       receives any supplemental services outside of

11       school?

12                   MS. BRANDEFINE:  Yes.

13                   MR. HOBBS:  What are those services then

14       to your knowledge?

15                   HEARING OFFICER BABBITT:  I'm sorry.

16       That was not anything that I asked about, so that's

17       inappropriate.  You had an opportunity to ask her

18       any questions on direct.  I didn't ask about

19       supplemental program.  So now you're going far

20       afield.  That's not the purpose.

21                   MR. HOBBS:  Understood, IHO.  Then in

22       that case, I have no further questions for Ms.

23       Brandefine.

24                   HEARING OFFICER BABBITT:  Right.  I'm

25       sure Ms. Brandefine is appreciative of that.

Received Office of State Review
01/09/2024

```
 1                    Mr. Koppel, based only on the questions I
 2          asked, do you have any questions for this witness?
 3                    MR. KOPPEL:  I just have just a couple of
 4          clarifying questions, IHO.
 5                    HEARING OFFICER BABBITT:  Okay, fine.
 6          I'm going to try to mute myself to see --
 7                    MR. KOPPEL:  (Interposing) Directing your
 8          attention to -- sure.
 9                    Directing your attention to paragraph 11
10          of your affidavit, I know the IHO asked you about
11          Discrete Trial methodology and incidental teaching.
12          And just for clarification, both Discrete Trial
13          methodology, or DTT, and incidental teaching, these
14          are teaching methods that use the principles of
15          ABA; is that right?
16                    MS. BRANDEFINE:  Yes.
17                    MR. KOPPEL:  Okay.  And so then going
18          down to paragraph 54, which talks about the
19          behavior intervention plan, the BIP, you state,
20          "the Titus staff is still in the process of
21          collecting data and updating Rex's BIP for the
22          2023/2024 school year.  Until then, Rex's team is
23          utilizing his 2022/2023 FBA/BIP, which can be found
24          in Exhibit D".  What data are you currently
25          collecting or that you will need to complete the
```

Received Office of State Review
01/09/2024

1          BIP for the current school year?

2                    MS. BRANDEFINE:  So in -- in July, we --

3          Rex -- Rex's peer group changed a little bit, like,

4          some of the students in the classroom changed.

5          Some of the teachers in the classroom changed.  The

6          length and duration of some of the academic

7          instructional periods changed to be longer to

8          reflect the progress that he's making.  And so all

9          of those things influence his behavior and an

10         environment, and they influence the environment

11         that the behavior is occurring in.

12                   So when you write a behavior intervention

13         plan, the behavior intervention plan is -- is

14         written to reflect the environment.  This requires

15         us to take data for several weeks of observing Rex

16         in the environment to see if the same behaviors are

17         present or any new behaviors are present, what the

18         function of those behaviors are, and what an

19         appropriate response or antecedent strategy would

20         be to help decrease the behavior that is

21         interfering with his ability to function

22         independently or to increase a behavior that we

23         want to see more of.

24                   So I would say, you know, the time line

25         would be similar to what's written on the --

Received Office of State Review
01/09/2024

```
 1                    MR. KOPPEL:  (Interposing) And with
 2          regard to -- sorry.
 3                    MS. BRANDEFINE:  There might be a delay.
 4          I would say that the time line, you know, for this
 5          year's BIP would be --
 6                    MR. KOPPEL:  (Interposing) And with
 7          regard to --
 8                    MS. BRANDEFINE:  -- October 20 -- you
 9          know, mid-October until late October it would be
10          finalized.
11                    MR. KOPPEL:  And just one really kind of
12          very quick follow-up question with regard to the
13          BIP.  You were talking about, I guess, how the BIP,
14          for lack of a better term, is trying to manipulate
15          certain behaviors of -- or maladaptive behaviors of
16          the student.  If you can briefly discuss to what
17          extent is Titus able to differentiate between --
18          for example, masking behavior of the student versus
19          behavior that shows he is coping or learning coping
20          mechanisms with regard to certain behaviors or
21          stimuli?
22                    MS. BRANDEFINE:  Can you rephrase the
23          question?  I'm not sure what you're asking.
24                    MR. KOPPEL:  Sure.  Well, is it fair to
25          say that part of ABA therapy, as it's defined and
```

Received Office of State Review
01/09/2024

1    used in the BIP, is attempting to manipulate

2    behavior?  Is that fair to say?

3              MS. BRANDEFINE:  No.  No.  I wouldn't use

4    the word manipulate when referring to our students

5    and how we approach --

6              MR. KOPPEL:  (Interposing) There's no

7    manipulation -- I don't use manipulation in a

8    pejorative way.

9              MS. BRANDEFINE:  Yeah, I'm not -- I would

10    never use that word in any sense of what -- unless

11    we're, like, manipulating a body part to be in a

12    different position.  I wouldn't use that term.  So

13    to me, it's hard to answer the question that you're

14    asking.

15              MR. KOPPEL:  Right.

16              MS. BRANDEFINE:  So I don't want to -- I

17    don't want to assume I understand the question that

18    you're asking.

19              MR. KOPPEL:  So understood.  Let me

20    rephrase it.  So if there is a behavior that you

21    want to change, for instance, as it describes in

22    the BIP, you could, for instance, ignore it.  You

23    could do some sort of reinforcement.  Is that fair

24    to say?  Those are some of the things you can do to

25    change a behavior?

Received Office of State Review
01/09/2024

```
 1                    MS. BRANDEFINE:  There are lots of
 2           different things you can do to change a behavior.
 3           It's -- it's important to understand what the
 4           function of the behavior is.  Is it attention
 5           seeking, if it's a sensory need, if it is a skill
 6           deficit.  You know, there are lots of different
 7           functions of behavior.  And so understanding why a
 8           student is engaging in a behavior at a particular
 9           time, what they're trying -- because it's a form of
10           communication, right?  And so sometimes that means
11           we have to introduce functional communication
12           training.
13                    If I'm targeting, for instance, calling
14           out in a classroom, I'm going to redirect and
15           remind the student to raise their hand, or I'm
16           going to ignore the behavior and wait for a quiet
17           hand to be raised, or I'm going to pivot -- pivotal
18           praise and ask the student who's quietly raising
19           their hand and ignore the student who's calling
20           out.  So there are lots of different strategies and
21           techniques that are used based on the research and
22           the data, and you know, the scientific approach
23           that is ABA to -- to either decrease a maladaptive,
24           nonfunctional, interfering behavior or to increase
25           a more appropriate functional behavior.
```

Received Office of State Review
01/09/2024

1              MR. KOPPEL:  Got it.

2              Nothing further.  Thank you.

3              HEARING OFFICER BABBITT:  Okay.  Mr.

4      Hobbs?  Oh, sorry.  Mr. Hobbs, anything further

5      from you?

6              MR. HOBBS:  Nothing further for this

7      witness.

8              HEARING OFFICER BABBITT:  Okay.

9              Ms. Brandefine, I just had one question

10     regarding tuition.  What's the base tuition at The

11     Titus School?

12             MS. BRANDEFINE:  It would depend on the

13     level of support that a student needs throughout

14     the day.  So a 12-month program at one-to-one

15     support is 158,000, and that's full-time one-to-one

16     support all day.  If we step down from that full-

17     time one-to-one support, but still need one-to-one

18     support for -- for crisis moments or for a medical

19     need or for academic instruction, then that becomes

20     a 150 range.

21             And if the student can manage themselves

22     independently in a classroom of eight adult --

23     eight students with four adults, then we would

24     charge 138 for the 12-months.  And then all tuition

25     is -- is set on the 46-week schedule of a 12-month

Received Office of State Review
01/09/2024

```
1         school year.  If the school year is shorter, for

2         instance, if the student starts later, we prorate

3         the tuition to reflect the start date based on one

4         of those three base tuitions.

5                     HEARING OFFICER BABBITT:  Okay.  So I

6         guess I had a question because the tuition

7         affidavit and --

8                     MR. HOBBS:  Apologies, IHO.  I'm having

9         really bad connectivity and getting, like, a really

10        bad lag.  Is it okay if we pause the question, and

11        I log back off -- log off and look back on to see

12        that solves it?  Because I'm getting, like, a five

13        second delay.

14                    HEARING OFFICER BABBITT:  You want to log

15        off at this time?  Go ahead.

16                    MR. HOBBS:  Yes.

17                    (Pause)

18                    MR. HOBBS:  All right.  I'm back.  Thank

19        you.

20                    HEARING OFFICER BABBITT:  All right.

21        Sure.  Okay.  So I believe that Exhibit G is the

22        enrollment contract.  Okay.

23                    MS. BRANDEFINE:  Sorry.  Exhibit G?

24                    HEARING OFFICER BABBITT:  Exhibit G says

25        the student's tuition for the '23/'24 school year
```

Received Office of State Review
01/09/2024

1         is $132,000.  That's on page G-1.  Do you see that?

2                   MS. BRANDEFINE:  Uh-huh.

3                   HEARING OFFICER BABBITT:  And this is for

4         the 12-month school year.

5                   MS. BRANDEFINE:  Yes.

6                   HEARING OFFICER BABBITT:  Then I believe

7         that the affidavit of payment, which I think was

8         the next document, said that the parent owes $138,

9         so -- 138,000.  So I was trying to understand the

10        discrepancy.

11                  MS. BRANDEFINE:  It's a clerical error on

12        the affidavit.  Yeah.  So the contract is correct

13        and the affidavit is wrong.

14                  HEARING OFFICER BABBITT:  Okay.  I

15        just --

16                  MS. BRANDEFINE:  (Interposing) It's

17        probably just an overgeneralization of making the

18        same document over and over again.

19                  HEARING OFFICER BABBITT:  No, I hear you.

20        So Exhibit H-1 where it says 138, it should be 132

21        is what you're saying?

22                  MS. BRANDEFINE:  Correct.  Correct.

23                  HEARING OFFICER BABBITT:  Oh, okay.  All

24        right.  I appreciate that clarification.  Nothing

25        further.

Received Office of State Review
01/09/2024

164

```
 1                    Mr. Hobbs, do you have anything?  I'll
 2           give you one last shot.  It was just that tuition
 3           affidavit.  I saw the discrepancy, so I wanted to
 4           clear that up.
 5                    MR. HOBBS:  Nothing further, IHO.
 6                    HEARING OFFICER BABBITT:  Do you have
 7           anything on that?
 8                    MR. HOBBS:  No, nothing further for Ms.
 9   Brandefine.
10                    HEARING OFFICER BABBITT:  All right.
11                    Mr. Koppel, anything on that from you?
12                    HEARING OFFICER BABBITT:  You're on mute.
13                    MR. KOPPEL:  No, IHO.  Thank you.
14                    HEARING OFFICER BABBITT:  All right.  So
15   I thank you very much for appearing today.  Ms.
16   Brandefine.  You are free to leave.  Thank you.
17                    MS. BRANDEFINE:  Thank you, guys.  Have a
18           great weekend.  Stay safe.  Bye.
19                    HEARING OFFICER BABBITT:  Okay.  So I
20   believe, Mr. Hobbs, you have one final witness, the
21           parent?
22                    MR. HOBBS:  That's correct, IHO.
23                    HEARING OFFICER BABBITT:  Okay.  And the
24   parent is here.
25                    So Mrs. Francis, if you can just raise
```

| | |
|---|---|
| 1 | your right hand.  Do you swear or affirm that the |
| 2 | testimony that you will give here today will be |
| 3 | completely honest? |
| 4 | MS. HALIA FRANCIS:  Yes, I do. |
| 5 | HEARING OFFICER BABBITT:  Okay.  All |
| 6 | right.  You can put down your hand.  I assume |
| 7 | you're in a room by yourself? |
| 8 | MS. FRANCIS:  I am.  But I do need to |
| 9 | reconnect because my -- my connection is failing |
| 10 | again. |
| 11 | HEARING OFFICER BABBITT:  Okay.  Just -- |
| 12 | okay, just try to do it.  It worked for Mr. Hobbs. |
| 13 | Hopefully it'll work for you.  Go ahead.  Sure. |
| 14 | MS. FRANCIS:  Thank you. |
| 15 | MR. KOPPEL:  I'm going to do the same |
| 16 | thing, IHO.  I'm getting the same message. |
| 17 | HEARING OFFICER BABBITT:  Okay. |
| 18 | MR. KOPPEL:  I'll be back. |
| 19 | HEARING OFFICER BABBITT:  Yeah. |
| 20 | Sometimes you get the message, you just have to |
| 21 | ignore it. |
| 22 | MR. HOBBS:  Then that message actually |
| 23 | just popped up for me too, IHO.  I'm going to try |
| 24 | logging off and logging back on again. |
| 25 | MS. FRANCIS:  Okay.  I am back. |

Received Office of State Review
01/09/2024

1           HEARING OFFICER BABBITT:  All right.

2      Well, we have to wait for your attorney who's not

3      back.

4           MS. FRANCIS:  Okay.

5           HEARING OFFICER BABBITT:  Okay.  It seems

6      that everyone's back.

7           So the witness is sworn in, Mr. Hobbs.

8           MR. HOBBS:  Yes.  A few direct questions,

9      IHO.

10          HEARING OFFICER BABBITT:  Go ahead.

11          MR. HOBBS:  Ms. Francis, do you ever take

12     your son to his after school supplemental services?

13     Are you the one who drops him off?

14          MS. FRANCIS:  Yes.  Either me or --

15     either me or my husband or -- or one of our

16     therapists, if that's what we have arranged ahead

17     of time.  It depends on the class.

18          MR. HOBBS:  Now, are there times where

19     those services take place after -- close in the

20     time when Rex finishes school?

21          MS. FRANCIS:  Yes.

22          MR. HOBBS:  And if Rex is hungry, do you

23     feed him before those services?

24          MS. FRANCIS:  Yes, I always bring him

25     snacks and anything else he wants.  I, you know, we

Received Office of State Review
01/09/2024

```
1              have a routine.
2                        MR. HOBBS:  Thank you, Ms. Francis.  No
3              further questions for now.
4                        HEARING OFFICER BABBITT:  All right.
5                        MS. FRANCIS:  Thank you.
6                        HEARING OFFICER BABBITT:  So can you tell
7              me what the student's schedule is every day of the
8              week?
9                        MS. FRANCIS:  Sure, starting with school
10             or just the afterschool services?
11                       HEARING OFFICER BABBITT:  Starting with
12             school.
13                       MS. FRANCIS:  Okay.  So he gets on a bus
14             at about 8:00 in the morning.  It takes him to
15             school.  If there are any issues with the bus, my
16             husband or I take him ourselves.  He is typically
17             out of school, I guess he gets on -- if we're not
18             picking him up and -- oh, I'm sorry, I should go
19             day-by-day, right?  Because they're all different.
20             Do you want me to do that?
21                       HEARING OFFICER BABBITT:  Yes, yes.
22                       MS. FRANCIS:  Okay.  Okay.
23                       HEARING OFFICER BABBITT:  So if there is
24             something that is the same that he goes to school
25             from 8:30 to 3:30 Monday through Friday, you could
```

Received Office of State Review
01/09/2024

1        state that, okay?

2                    MS. FRANCIS:  Yes.  No, they're all

3        different, and I'll take you through it.  So Monday

4        he gets on the bus at 8.  He goes to school.  He

5        spends the day at school and after --

6                    HEARING OFFICER BABBITT:  Okay.  Can you

7        tell me the times?  I'm asking you for times, okay?

8                    MS. FRANCIS:  Okay.  So he's at school --

9        he leaves the house at 8, and we pick him up

10       between 2:30 and 3, depending on traffic and --

11                    HEARING OFFICER BABBITT:  (Interposing)

12       All right.  So wait.  Okay.  I'm going to go back.

13       What is the school day, from when to when?

14                    MS. FRANCIS:  It's 8 until 2:30 or 3,

15       depending on when he gets on the bus and depending

16       on the traffic on John Street.  So they'll wait --

17       they'll wait in the lobby.  So I think, you know,

18       his day ends at 2:30.

19                    HEARING OFFICER BABBITT:  Okay.

20                    MS. FRANCIS:  Okay.  I think you're

21       frozen.  Are you there?

22                    HEARING OFFICER BABBITT:  Yeah, I'm here.

23       I'm just asking -- I mean, I'm waiting for you to

24       give me information.

25                    MR. FRANCIS:  Okay.

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  So every day
 2          you're saying his school --
 3                    MS. FRANCIS:  (Interposing) Yes.  On
 4          Monday, my husband or I pick him up and we
 5          transport him to 14th Street, where he has speech
 6          and OT.  Speech with Happy Talk and OT with Bloom.
 7          That starts at 3:45.  On the way there, he gets
 8          snacks.  Sometimes we have a little bit of time to
 9          kill, so we take a walk around the neighborhood,
10          and then he goes to speech and OT, and then we
11          bring him home right after it ends at 5:45 or
12          something.  On --
13                    HEARING OFFICER BABBITT:  (Interposing)
14          I'm sorry.  You broke up.  What did you -- he ends
15          at what time?
16                    MS. FRANCIS:  He ends OT at 5:45.
17                    HEARING OFFICER BABBITT:  Right.  Okay.
18                    MS. FRANCIS:  On Tuesday, he gets on the
19          bus at 8:00.  He gets -- he then gets on the bus
20          home between 2:30 and 3, and he is home by about
21          3:30.
22                    HEARING OFFICER BABBITT:  All right.  So
23          I don't understand something.  When you say between
24          2:30 and 3, so he leaves school at different times
25          every day?
```

Received Office of State Review
01/09/2024

1           MS. FRANCIS:  They wait.  They wait to be

2      let out of school.  It's a -- it's a very crowded

3      street.  Typically, there are about five different

4      busses waiting and parents in cars.  And so they're

5      packed and ready to go and in the lobby by about

6      2:30.  But it all depends on how traffic is moving

7      and at what point their bus gets to the front of

8      the door.  So typically, I will chat with the

9      person who's in charge of busses at Titus to get an

10     idea of when he got on the bus.  And then I'll also

11     text the matron, to get an idea when he will be

12     home, because it can vary depending on traffic.

13          HEARING OFFICER BABBITT:  I just want to

14     be clear.  It's your testimony that school is over

15     at 2:30.  They're ready to board busses at that

16     time, correct?

17          MS. FRANCIS:  That's my understanding.

18          HEARING OFFICER BABBITT:  Well, you're

19     the mom, so I trust your testimony.  Okay.

20          MS. FRANCIS:  Okay.  So then on Tuesday

21     at 4 to 6, he has his ABA therapist comes to the

22     house and either takes him outside to work on goals

23     or works at home.

24          On Wednesday, he gets on the bus at 8:00

25     in the morning, and we pick him -- no.  And then

Received Office of State Review
01/09/2024

1    Wednesday afternoon, things have been changing.

2    Wednesday afternoon, he gets on the bus again from

3    Titus.  He comes home.  He gets here at about 3:30.

4    He is picked up by his ABA therapist who walks him

5    to one of his classes.  She supports him at this

6    class, and then she brings him --

7         HEARING OFFICER BABBITT:  (Interposing)

8    What type of class?  I mean, I'm not familiar with

9    when you --

10        MS. FRANCIS:  It's an improv -- improv

11   class, so it's teaching improv skills and some

12   acting.  He just started it.  It's also considered

13   a social skills class because they have an

14   opportunity to engage with peers, and that's the

15   focus of the class too.

16        HEARING OFFICER BABBITT:  And where is

17   that class?  I mean, are you seeking reimbursement

18   for that class?

19        MS. FRANCIS:  I am not.

20        HEARING OFFICER BABBITT:  Okay.  So

21   that's a private afterschool activity that you're

22   providing the student with.  And you're saying that

23   one of the ABA providers goes with the student to

24   that class, correct?

25        MS. FRANCIS:  Right.  She walks and she

Received Office of State Review
01/09/2024

1    works on what you had heard earlier, which is

2    safety in the street, understanding your street

3    where you live, understanding the different

4    avenues, understanding your body as you walk

5    through the streets.  Then she supports him

6    throughout the class.  Yes.

7              HEARING OFFICER BABBITT:  Oh, is this

8    class for students with disabilities, or it's a

9    general class?

10              MS. FRANCIS:  It's open to everyone, but

11    it is pretty much, I think, the three or four kids

12    that are in there now are -- all have a need.

13              HEARING OFFICER BABBITT:  They're all

14    special needs students?

15              MS. FRANCIS:  Actually, I couldn't attest

16    to that because I'm not sure.  I don't know.

17              HEARING OFFICER BABBITT:  But is the

18    student -- so the ABA provider -- how long is this

19    class at --

20              MS. FRANCIS:  It's an hour.

21              HEARING OFFICER BABBITT:  Okay.  All

22    right.

23              MS. FRANCIS:  Okay.  And then she brings

24    him home.  And depending on what they do on the way

25    back, you know, some days they may stop for ice

Received Office of State Review
01/09/2024

173

```
1            cream and work on -- on goals that they have with

2            restaurants, speaking to people, community helpers,

3            you know, understanding who to speak to, you know,

4            when you're out in public, who not to speak to.

5            You know, if they should come home earlier and

6            there's a little bit more time, then the ABA will

7            work on some things at home, helping him organize

8            himself.

9                        HEARING OFFICER BABBITT:  So you said on

10           Tuesdays, 4 to 6.  On Wednesday, what's the hours

11           for the ABA provider?

12                        MS. FRANCIS:  She picks him up at 3:30,

13           and they're done by 5:30.

14                        HEARING OFFICER BABBITT:  Okay.  Thank

15           you.

16                        MS. FRANCIS:  Okay.  On Thursday, he gets

17           on the bus at around 8.  He goes to school, and we

18           pick him up at 2:30, 2:45 to get him to his singing

19           class.  And then from --

20                        HEARING OFFICER BABBITT:  (Interposing)

21           I'm sorry, to get him to his?

22                        MS. FRANCIS:  Yeah.  He has a singing

23           class.  He loves to sing.

24                        HEARING OFFICER BABBITT:  Okay.

25                        MS. FRANCIS:  And it's, again, that's
```

Received Office of State Review
01/09/2024

| | |
|---|---|
| 1 | private, the singing class.  And then from there, |
| 2 | we bring him to Recess (phonetic) where he has a |
| 3 | cooking class.  And after that, he has a FIT |
| 4 | (phonetic) motion class. |
| 5 | HEARING OFFICER BABBITT:  All right.  So |
| 6 | the three classes on Thursday are all private |
| 7 | classes that you provide for your son, correct? |
| 8 | MS. FRANCIS:  That's right. |
| 9 | HEARING OFFICER BABBITT:  And is there an |
| 10 | ABA provider on those days? |
| 11 | MS. FRANCIS:  No. |
| 12 | HEARING OFFICER BABBITT:  Okay.  All |
| 13 | right. |
| 14 | MS. FRANCIS:  Then on -- |
| 15 | HEARING OFFICER BABBITT:  (Interposing) |
| 16 | What time does he finish on Thursday? |
| 17 | MS. FRANCIS:  He's -- 5:30. |
| 18 | HEARING OFFICER BABBITT:  Okay.  And |
| 19 | during this time, either you or your husband stay |
| 20 | with your son during these particular classes? |
| 21 | MS. FRANCIS:  Sometimes we do.  It |
| 22 | depends on his mood.  I mean, usually in -- in the |
| 23 | waiting area.  You know, we don't have to be inside |
| 24 | with him. |
| 25 | HEARING OFFICER BABBITT:  Right.  But he |

Received Office of State Review
01/09/2024

175

```
1        doesn't require the support in the particular
2        class?
3              MS. FRANCIS:  In the cooking class they
4        do have people specially there to support the --
5              HEARING OFFICER BABBITT:  (Interposing)
6        Let me ask you, in the singing class, does he have
7        any support in the singing class?
8              MS. FRANCIS:  He used to, but he's
9        graduated from that.  And the singing teacher was
10       taught several ABA methods on how to deal with him
11       and how to work with him.  We're constantly
12       monitoring it because singing is such a passion of
13       his, and we would love for him to, you know, get
14       the most that he can out of it.  So at any point in
15       time, I am open to switching my ABAs to put them
16       where the help is needed.  But our goal is --
17             HEARING OFFICER BABBITT:  (Interposing)
18       One moment.  One moment.  One moment.  You say
19       singing class, is it one-to-one instruction?
20             MS. FRANCIS:  Yes.  Yes.
21             HEARING OFFICER BABBITT:  Okay.  All
22       right.  And the Recess, you said it's a cooking
23       class?  Is that is that one-to-one or more?
24             MS. FRANCIS:  There's around three kids
25       there.
```

Received Office of State Review
01/09/2024

```
 1                    HEARING OFFICER BABBITT:  Okay.  And so
 2          he can go to that class unassisted as well,
 3          correct?
 4                    MS. FRANCIS:  Well, they have people
 5          there who -- they do have people who, you know, do
 6          know behavior therapy because it is -- I mean, it's
 7          open to the general public, and it's been open only
 8          a short period of time.  But you know, so there's a
 9          limited amount of students, and you know, a few
10          support staff.
11                    HEARING OFFICER BABBITT:  This program,
12          this Recess program is not for children with
13          special needs, is it?
14                    MS. FRANCIS:  It's open to everybody,
15          special needs and neurotypical.
16                    HEARING OFFICER BABBITT:  Right.  So it's
17          not specifically designed for special needs.  It's
18          a cooking class.
19                    MS. FRANCIS:  Right.  It's open to
20          everybody.  But so far, it's the -- the families
21          I've seen are mainly not neurotypical.
22                    HEARING OFFICER BABBITT:  Okay.  And then
23          the next one is a FIT class, a fitness class?
24                    MS. FRANCIS:  Right.  I mean, it's, you
25          know, trampoline and movement.
```

Received Office of State Review
01/09/2024

```
 1                      HEARING OFFICER BABBITT:  And is that a
 2            class also or it's one-to-one?
 3                      MS. FRANCIS:  No, there's other kids in
 4            there and they move them along into different --
 5            into different buckets.
 6                      HEARING OFFICER BABBITT:  All right.  And
 7            so the student attends that class independently as
 8            well, correct?
 9                      MS. FRANCIS:  So far.  Let me just
10            clarify that he has been attending independently
11            just in the last few weeks.  You know, until --
12            until then -- up until then, he had support in his
13            music class.  He had support in the cooking class
14            as well.  FIT, he didn't need so much support
15            because he just loves to jump around.  But so like
16            I said, we are constantly reevaluating where to
17            best -- you know, where he best needs that ABA
18            support.
19                      HEARING OFFICER BABBITT:  And so are you
20            saying that the ABA provider previously went with
21            him to his singing -- to his cooking class?
22                      MS. FRANCIS:  Yes.  We had an ABA
23            provider at singing and she, like I said, I think
24            the singing teacher, you know, caught on to a lot
25            of the --
```

Received Office of State Review
01/09/2024

1           HEARING OFFICER BABBITT:  (Interposing)

2      Okay.

3               MR. FRANCIS:  -- ABA points that were

4      made, and you know, tried to manage it on her own.

5      And again, it's, you know, it's something that he

6      loves.  And with Rex, you know, it's much easier,

7      obviously, as with anybody, if he's in a class that

8      he loves, he's much more cooperative.  But if it's

9      a class that, you know, we're just trying to get

10     him out of his comfort zone, to socialize more, to

11     be around different kids, he needs a lot more

12     support because that's where the elopement and

13     behaviors begin.

14               HEARING OFFICER BABBITT:  Okay.  So

15     preferred activities versus unpreferred activities.

16     All right.  So Friday, what's his schedule?  We're

17     moving onto Friday.

18               MS. FRANCIS:  Friday he goes to school at

19     8 o'clock.  He comes home on the bus.  He's usually

20     home by about 3:30.  And he has an ABA therapist

21     come to the house from 4 to 6.

22               HEARING OFFICER BABBITT:  Okay.  And then

23     on Saturday and Sunday, depending upon the weekend

24     and the family schedule, does he also have ABA

25     therapy?

Received Office of State Review
01/09/2024

1            MS. FRANCIS:  Yes.  It's not -- it's --

2    it's -- we're trying to make it more consistent.

3    But the month starting out school, you know, things

4    vary and change.  But it's -- again, as Stephanie

5    has said, if -- if there is an event where we see a

6    social opportunity for him, where we think he may

7    need support or where we know he may need support,

8    like, reading support, like an older son's school

9    book fair, which is a group of neurotypical kids,

10   you know, Rex will need support at an event like

11   that and also learns a lot from that, on how to

12   behave, on how to control his body.  So we'll

13   usually, we'll try to (indiscernible) an event like

14   that or birthday parties --

15            HEARING OFFICER BABBITT:  You're breaking

16   up.  One moment.  You're breaking up so much that I

17   can't hear you.  Just try turning off your camera.

18   Let's see if that helps, because I'm not getting

19   your testimony.

20            MS. FRANCIS:  Okay.  Okay.  I'll try and

21   can you let me know?

22            HEARING OFFICER BABBITT:  Okay.  We'll

23   let you know.  Thank you.  Go ahead.

24            MS. FRANCIS:  So you know, oftentimes we

25   try to have a playdate scheduled for a Saturday or

1    a Sunday so that he can learn.  You know, he's not

2    a kid who -- he seems to be more comfortable with

3    adults, less comfortable with kids.  And so we're

4    really trying hard to get him engaged with other

5    kids.  And so the weekends are the best time to do

6    that normally with other families, with us -- I see

7    everybody's video has gone off.  Is -- is there --

8    is that okay?

9              HEARING OFFICER BABBITT:  Well, my video

10    is on.

11              MS. FRANCIS:  Okay.  It's on.  Okay.

12              HEARING OFFICER BABBITT:  So I mean, if

13    somebody is not speaking, they can turn -- oh,

14    everyone's video is on except for yours now.

15              MS. FRANCIS:  Oh, okay.  I'm seeing

16    something a little different, but as long as you

17    can hear me.

18              HEARING OFFICER BABBITT:  Yes.

19              MR. FRANCIS:  Or you know, we'll just

20    work on things that, you know, we continue to work

21    on.  Goals like self-help, tying his shoes, tying

22    his bathrobe, reading.  You know, we try to

23    encourage reading, you know, throughout the week,

24    seven days, and retelling of a story, retelling of

25    the work of his, you know, school week, a variety

```
 1              of things -- of different things.
 2                        HEARING OFFICER BABBITT:  Okay.  So am I
 3              correct that your family resides on the Upper East
 4              Side and the school where the student attends is in
 5              Lower Manhattan?
 6                        MS. FRANCIS:  That's correct.
 7                        HEARING OFFICER BABBITT:  And also the
 8              student's therapies are -- they're on 14th Street?
 9                        MS. FRANCIS:  The speech and OT are on
10              14th Street.  Yes.
11                        HEARING OFFICER BABBITT:  Right.  Well,
12              is there any other therapy that I missed?  I
13              mean --
14                        MS. FRANCIS:  Nope.
15                        HEARING OFFICER BABBITT:  Okay.  I'm just
16              curious.  You said that the student needs social
17              engagement and interaction with peers and
18              parameters of how to do that.  Why isn't the
19              student in some sort of play therapy as opposed to
20              something else?
21                        MS. FRANCIS:  Well, the ABAs do play
22              therapy when we have the playdates, when they take
23              him to the park, when they take him to certain
24              classes.  I mean, you know, all these classes are
25              designed to be playful.
```

Received Office of State Review
01/09/2024

1      HEARING OFFICER BABBITT:  Yeah, but play
2      therapy is something different.  Okay.  But I hear
3      you.
4           MS. FRANCIS:  It's not -- is that like
5      floor --
6           MR. HOBBS:  I am going to object.  I
7      would ask that you allow Ms. Francis to finish her
8      questions.
9           HEARING OFFICER BABBITT:  Mr. Hobbs, she
10     is finishing the questions.  Is that your only --
11          MR. HOBBS:  (Interposing) I'm not sure --
12     I'm not sure if there's a lag, but it sounds like
13     you were interrupting her mid-sentence.
14          HEARING OFFICER BABBITT:  Well, then --
15     all right, then you know what?  Then you can go
16     back and you ask her any questions if you feel
17     that's the case.
18          MS. FRANCIS:  Are you referring to floor
19     time?
20          HEARING OFFICER BABBITT:  So --
21          MS. FRANCIS:  (Interposing) That type of
22     therapy?
23          HEARING OFFICER BABBITT:  I really don't
24     answer questions.  That's not my job.  But I think
25     I've gotten the information I wanted for that

Received Office of State Review
01/09/2024

1      question.

2                    MS. FRANCIS:  Okay.

3                    HEARING OFFICER BABBITT:  So in paragraph

4      9 of your affidavit, you state that he's made

5      meaningful progress.  So tell me specifically what

6      you mean by that.

7                    MS. FRANCIS:  Are -- okay.  You're

8      talking specifically about communication?

9                    HEARING OFFICER BABBITT:  Wait.  I should

10     say it has to be for this school year, '23/'24

11     school year, because that's the only school year

12     that's before me.  So I can't go back two, three,

13     four years, just this school year.

14                   MS. FRANCIS:  Okay.  And are you

15     referring to communication only or across all

16     areas?

17                   HEARING OFFICER BABBITT:  You're the one

18     who wrote in your affidavit, and I could get it,

19     that he's made meaningful progress.  So I'm trying

20     to explore what you mean.

21                   MS. FRANCIS:  Yes, sure.  No, I

22     understand.  It's just the question started as does

23     Rex still struggle with communicating?  Yeah.  I

24     mean, he -- he has his ups and downs and you know,

25     Rex with, you know, with a hard, you know, and a

Received Office of State Review
01/09/2024

```
 1          packed schedule that he has, he -- he gets into it.
 2          You know, he's a child that really throws his heart
 3          into it.  And he does, you know, we -- we see
 4          things I wouldn't say consistently, you know, it's
 5          hard to see it day-to-day because we're with him,
 6          but he's continually making small progress in these
 7          different areas.
 8               You know, one week we might notice
 9          something that he's done, which is, you know, OT
10          based, or -- or behavior that has really subsided
11          for a while, or something that he's communicated
12          that is -- is a little bit different.  And I think
13          the key is to -- trying to keep that going and not
14          make it a fleeting thing.  And that's how he's come
15          to where he is, I think.
16               HEARING OFFICER BABBITT:  Well, how has
17          he made meaningful academic progress?
18               MR. FRANCIS:  In the last couple months?
19               HEARING OFFICER BABBITT:  This is your
20          case.  It's for the '23/'24 school year.  So that's
21          the only thing before me.  That's the only thing
22          before me.
23               MS. FRANCIS:  Well, he comes home with
24          homework, and I see that the homework is changing.
25          And I see, you know, when -- before the summer, he
```

Received Office of State Review
01/09/2024

185

T185

```
 1        couldn't put one and one equals two together.  And

 2        you know, he's -- he's more interested in one and

 3        one equals two now.  And he's starting to think

 4        about it, and he's starting to manipulate the

 5        objects that we give him so that he can understand

 6        one plus one, so he can understand seven plus three

 7        equals six plus four.

 8               You know, his reading is becoming -- he's

 9        understanding and comprehending his reading more

10        than I saw before the summer.  So yeah, I mean,

11        it's --it's happening.  It's there.

12               HEARING OFFICER BABBITT:  Well, when you

13        say reading, does the student actually pick up a

14        book and read?  And if so, what grade level would

15        you say it's on?

16               MS. FRANCIS:  He's late kindergarten,

17        early 1st grade.  He won't pick up a book on his

18        own.  I have to ask him to read, and he will read

19        the most basic books.  But he is starting to retell

20        the stories a bit better.

21               HEARING OFFICER BABBITT:  Does he read

22        out loud to you?

23               MS. FRANCIS:  Yes, he does.

24               HEARING OFFICER BABBITT:  Okay.

25        That's --
```

T185

1                    MS. FRANCIS:  We read together.

2                    HEARING OFFICER BABBITT:  All right.  So

3       you said the student has homework.  I mean, how

4       much homework a day, on average, does he have?

5                    MS. FRANCIS:  He has a page of math and a

6       page of ELA every day.

7                    HEARING OFFICER BABBITT:  So how long,

8       approximately, does that take?

9                    MS. FRANCIS:  It depends on his mood and

10      on the complexity of, usually, the math.  We could

11      sit there for an hour.  You know, we could sit

12      there for half an hour.  Again, there's so many

13      factors involved in him completing his homework.

14                   HEARING OFFICER BABBITT:  Okay.  So when

15      does he do his homework if he has therapies just

16      about, I think, every single day -- therapies or

17      classes?  So when does he do his homework, like 6,

18      7, 8 o'clock at night?

19                   MS. FRANCIS:  He sometimes does, and

20      sometimes he comes home and he says to us, I'm

21      going to do my homework after dinner.  And dinner's

22      always at 7 o'clock, and he's fine with that.

23      Sometimes, depending on what they're doing with him

24      that day, the ABA therapist will sit with him and

25      review some homework with him.  You know, stuff

Received Office of State Review
01/09/2024

1          that -- and do it in a -- in a play-based, you
2          know, you talked about that earlier, but it'll be a
3          play-based methodology where, you know, we have
4          several different types of math board games, and
5          they can use that to help him with his homework
6          assignment.  You know, very infrequently he will
7          miss a day of homework because he's not at school
8          or he has a doctor's appointment and they forgot to
9          put his homework packet in it.  He's capable of
10          getting through, you know, a page and a half
11          sometimes depending on mood and content.
12                    HEARING OFFICER BABBITT:  Okay.  And let
13          me see.  Does the student have difficulty
14          maintaining attention?
15                    MS. FRANCIS:  Yes, he does.
16                    HEARING OFFICER BABBITT:  Okay.  Sorry,
17          I'm just scrolling through your affidavit.
18          That's --
19                    MS. FRANCIS:  Okay.
20                    HEARING OFFICER BABBITT:  I have my
21          notes, and I have to scroll down to the actual
22          paragraph.
23                    So when you attended the CSE meeting for
24          the IEP for '23/'24, were you told that the
25          District couldn't recommend a program with ABA

Received Office of State Review
01/09/2024

```
 1          instruction?
 2                    MS. FRANCIS:  That's correct.
 3                    HEARING OFFICER BABBITT:  But you're
 4          aware that the District does offer some programs
 5          that utilize ABA instruction.  Are you aware of
 6          that?
 7                    MS. FRANCIS:  They did not inform me of
 8          that.
 9                    HEARING OFFICER BABBITT:  So you weren't
10          aware of that.  All right.  Okay.  All right, so
11          from your perspective, can you tell me why you
12          require approximately two hours of parent training
13          each week from the -- regarding ABA?
14                    MS. FRANCIS:  It -- you know, there's --
15          there's behaviors at home that are different from
16          school, that are different from when he's at his
17          classes, that are different from when he's actually
18          in his therapies that a lot of people don't see
19          firsthand.  And you know, a lot of times I -- I
20          need support.  I need to know the tools on how to
21          deal with his either developing behaviors or his
22          regressive behaviors.
23                    You know, it has a lot to do with how I
24          as a parent can help him maneuver his life in my
25          house, you know, without disrupting the general
```

Received Office of State Review
01/09/2024

1    household.  How to, you know, deal with things --

2    inappropriate comments he makes to strangers.  It

3    adds up because these things will happen as -- as

4    we're walking down the street.  And rather than

5    forget about them, or you know, address them at,

6    you know, one solid meeting, I will write to

7    Stephanie and say -- you know, usually, you know, a

8    few behaviors accumulate or a few questions

9    accumulate.

10          And I feel like if we don't address these

11    behaviors head-on, immediately, they'll just get

12    worse.  Because I know Rex, and you know, we've --

13    we've worked with him since he was diagnosed.  I've

14    been there with him, and you know, I try to give

15    him the support I can.  And I try to understand how

16    best to do it, because, you know, parents

17    oftentimes, even with neurotypical kids, you know,

18    kids act different at home (audio interference)

19    different around therapists, parents are different

20    from teachers and we need to be consistent.  Kids

21    who are on the autism spectrum need consistency.

22    If he sees a break, a weakness in how I'm handling

23    things, you know, we lose -- we lose the progress

24    and then he regresses.

25          HEARING OFFICER BABBITT:  It's accurate

Received Office of State Review
01/09/2024

1    that you decided not to provide OT and speech to

2    the student during the summer; isn't that correct?

3              MS. FRANCIS:  Well, I didn't decide.  No.

4    I try to get him his -- his therapies as much as I

5    possibly can, but the schedules were so different

6    that I would have had to pull him out of school to

7    do it.  And I didn't want to do that.

8              HEARING OFFICER BABBITT:  I'm not clear

9    on that.  One moment.  He's been working with the

10   same therapist for years, and he just didn't go and

11   see them in July and August.  You were here.  That

12   was the testimony.

13             MS. FRANCIS:  That's right.  That's

14   right.  They didn't have open hours to accommodate

15   him after school because their summers get very,

16   very full.  I've been working with these providers

17   since the beginning, and it's always -- we have one

18   schedule that is September to June.  Then the

19   schedule for July and August changes dramatically.

20   And then when we start up again the next September,

21   we're back, usually, to -- to the same place we

22   were the year before, rejiggering the schedules.

23             So in the summertime, they didn't have a

24   time slot open that would have worked for his

25   school schedule.  We did get a couple of speech

Received Office of State Review
01/09/2024

1    sessions in, and you know, that was just me and

2    them constantly communicating, saying, did you have

3    a cancellation, or can you see him?

4            HEARING OFFICER BABBITT:  But when I

5    asked why, the therapist said that there were other

6    things.  There was camp and other things.  They

7    didn't say they didn't have time for the student.

8    That was not the testimony.  And I believe you were

9    here.  You were present during the whole hearing.

10           MS. FRANCIS:  He had camp for the weeks

11   he was off of school.  That is correct.  And he did

12   not (indiscernible) services during the weeks that

13   he's off from school.  Number one, they're not

14   covered.  And number two, he was at camp.

15           HEARING OFFICER BABBITT:  All right.  So

16   but you didn't provide -- the student didn't have

17   OT and speech during July and August, as per the

18   testimony of the therapist, correct?

19           MS. FRANCIS:  I'm sorry.  Say that again.

20           HEARING OFFICER BABBITT:  Sure.  As per

21   the testimony of the two therapists today, the

22   student did not attend speech nor OT for July and

23   August.

24           MR. HOBBS:  Objection, IHO.  This has

25   been asked and answered, and Mr. Francis has

1    provided a reason for why those services were not

2    provided during July and August for OT and speech.

3              HEARING OFFICER BABBITT:  Well, Mr.

4    Hobbs, I note your objection, but I want this

5    witness to answer it because I don't think that it

6    has been.  Okay?  Thank you.  Can the witness

7    answer my question?

8              MS. FRANCIS:  So yeah, it's Kaitlyn, the

9    speech therapist, told you that we did not have

10   speech in July and August except for a couple of

11   sessions, and that's --

12             HEARING OFFICER BABBITT:  (Interposing)

13   She didn't say -- okay.  If you can't answer my

14   question, I don't want you to restate someone

15   else's testimony.  It's on the record, all right?

16   You didn't have any other provider for speech or

17   OT; is that correct?

18             MS. FRANCIS:  I did not.

19             HEARING OFFICER BABBITT:  All right.

20   Thank you.  Okay.  And what is the basis for your

21   statement that -- are you saying that without

22   afterschool speech and language that the student

23   could not make meaningful progress at Titus?  Is

24   that your testimony?

25             MS. FRANCIS:  Can you repeat that,

Received Office of State Review
01/09/2024

193

1          please?

2                    HEARING OFFICER BABBITT:  Yes.  Is it

3          your testimony that the student could not make

4          meaningful progress at Titus without him having

5          afterschool speech and language therapy?

6                    MS. FRANCIS:  Yes.  It helps him

7          generalize things, and it helps support what he's

8          learning at school.

9                    HEARING OFFICER BABBITT:  That's not my

10         question.  Are you saying he couldn't make

11         meaningful progress?  That he needs this in order

12         to make meaningful progress?

13                   MS. FRANCIS:  No.  Not specifically

14         speech and OT.

15                   HEARING OFFICER BABBITT:  But this

16         maximizes the student's potential --

17                   MR. HOBBS:  (Interposing) Objection, IHO.

18         She's already asked and answered.  She testified --

19                   HEARING OFFICER BABBITT:  Mr. Hobbs, you

20         keep saying asked and answered.  That's not

21         appropriate.

22                   MR. HOBBS:  I believe it is because I

23         understood --

24                   HEARING OFFICER BABBITT:  (Interposing)

25         And this is a different question.  You're --

Received Office of State Review
01/09/2024

```
1              MR. HOBBS:  -- and this is crossing the
2       line from what an IHO is supposed to be doing --
3              HEARING OFFICER BABBITT:  (Interposing)
4       Crossing the line?  Mr. Hobbs --
5              MR. HOBBS:  (Indiscernible)
6              HEARING OFFICER BABBITT:  Mr. Hobbs, you
7       should speak very carefully when you're accusing me
8       of something.  Crossing the line?
9              MR. HOBBS:  With all due respect, IHO,
10      these questions are veering into the territory of a
11      cross-examination.
12             HEARING OFFICER BABBITT:  No, they're
13      not.  They're her affidavit, okay?
14             And you could go to her affidavit, which,
15      by the way, did you draft your affidavit?
16             MS. FRANCIS:  Yes.
17             HEARING OFFICER BABBITT:  You're the one
18      who actually drafted it?  You wrote all these
19      answers?
20             MS. FRANCIS:  It was all my input, and I
21      did it on the phone with John.
22             HEARING OFFICER BABBITT:  Oh, so you
23      didn't draft it.  You provided information to --
24             MS. FRANCIS:  (Interposing) No, no, no.
25      I emailed him all these responses, and we reviewed
```

Received Office of State Review
01/09/2024

1        it together.  These are all my responses.

2                    HEARING OFFICER BABBITT:  So you drafted

3        this affidavit.  That's your testimony?

4                    MS. FRANCIS:  Yes.

5                    HEARING OFFICER BABBITT:  Okay.  So are

6        you testifying that it is necessary for the student

7        to have afterschool occupational therapy to make

8        meaningful progress at The Titus School?

9                    MS. FRANCIS:  What point are you looking

10       at?  I mean, I'm confused now.

11                   HEARING OFFICER BABBITT:  Well, you're

12       confused -- I'm just asking you a question.  If you

13       don't answer my -- if you don't understand my

14       question, I'm happy to rephrase it.

15                   MS. FRANCIS:  Well, I don't think it's

16       just the speech and the OT that he needs to make

17       meaningful progress.  I think it helps in him

18       making meaningful progress.

19                   HEARING OFFICER BABBITT:  Well, that's

20       not my question.

21                   MR. HOBBS:  Again, IHO, I would just

22       object that this has been asked and answered in

23       affidavit testimony.

24                   HEARING OFFICER BABBITT:  Okay, Mr.

25       Hobbs.  Thank you.  Your objection is noted.

Received Office of State Review
01/09/2024

```
 1          You're trying to get the witness not to answer.

 2          Your objection is noted.  It's a standing

 3          objection.  I'm asking a very simple question,

 4          okay?  It really is yes or no.

 5                    Is it your testimony that this student

 6          needs after school OT to make meaningful progress

 7          at Titus?

 8                    MS. FRANCIS:  Yes.  (Indiscernible).

 9                    HEARING OFFICER BABBITT:  So he could not

10          make meaningful progress at the school with the

11          therapy that they're providing, correct?

12                    MS. FRANCIS:  No, I don't think I would

13          agree with that.

14                    HEARING OFFICER BABBITT:  Well, you can't

15          have it both ways.

16                    MS. FRANCIS:  (Interposing) Because it's

17          a bigger issue, and you're trying to corner me into

18          saying something that isn't true.

19                    HEARING OFFICER BABBITT:  (Interposing)

20          No, no, no, no.

21                    MS. FRANCIS:  It's a bigger issue.  You

22          can't look at it as so black and white, you know?

23                    HEARING OFFICER BABBITT:  Well, that's

24          your testimony and that's your feeling, okay?  And

25          you're entitled to your testimony.  I'm listening
```

197

T197

```
 1              to you very carefully.
 2                       MS. FRANCIS:  Okay.
 3                       HEARING OFFICER BABBITT:  Okay.  If you
 4              feel that the student must have these sessions in
 5              order to make progress, then Titus is not providing
 6              what he needs, correct?
 7                       MS. FRANCIS:  No, that's not correct.
 8                       MR. HOBBS:  Objection.  That's
 9              misconstruing the testimony.
10                       HEARING OFFICER BABBITT:  But are you
11              trying to --
12                       MS. FRANCIS:  No, I think you're
13              nitpicking that.
14                       HEARING OFFICER BABBITT:  But in order to
15              make meaningful progress is one thing.  And another
16              thing is maximizing the student's potential.
17                       MR. HOBBS:  And this witness has
18              testified sufficiently, IHO (indiscernible).
19                       HEARING OFFICER BABBITT:  (Interposing) I
20              can't hear you at all.  Mr. Hobbs.  Mr. Hobbs, I
21              can't hear you at all.  You're just coming in
22              blurry, underwater.
23                       MR. HOBBS:  Yes, IHO, again, this has all
24              been testified to in an affidavit where she states
25              that her 12-month program at Titus --
```

Received Office of State Review
01/09/2024

T197

| | |
|---|---|
| 1 | HEARING OFFICER BABBITT:  (Interposing) I |
| 2 | can't hear you, Mr. Hobbs.  Mr. Hobbs, I can't hear |
| 3 | you.  I can't hear you.  Your connection is really |
| 4 | bad.  I can't hear you. |
| 5 | MR. HOBBS:  Can you hear me now? |
| 6 | HEARING OFFICER BABBITT:  Better. |
| 7 | MR. HOBBS:  Yes, this has all been |
| 8 | addressed in Ms. Francis's  testimony in which she |
| 9 | states that the Titus 12-month school program does |
| 10 | services in addition -- |
| 11 | HEARING OFFICER BABBITT:  (Interposing) |
| 12 | Excuse me, Mr. Hobbs -- Mr. Hobbs -- Mr. Hobbs, I |
| 13 | can't hear you and you cannot testify.  That's what |
| 14 | you're trying to do where you say she states. |
| 15 | MR. HOBBS:  No.  IHO, with all due |
| 16 | respect (indiscernible). |
| 17 | HEARING OFFICER BABBITT:  (Interposing) |
| 18 | Okay.  Mr. Hobbs, I'm going to move on.  The record |
| 19 | is clear.  You though, I cannot understand anything |
| 20 | you're saying, so maybe you have to reconnect.  But |
| 21 | I can't understand you.  And I think that the |
| 22 | testimony is clear, and I see what her affidavit |
| 23 | says. |
| 24 | MS. FRANCIS:  What does maximizing mean? |
| 25 | I don't understand that. |

Received Office of State Review
01/09/2024

1              HEARING OFFICER BABBITT:  Okay.  So

2         excuse me.

3              MS. FRANCIS:  Yeah.  I asked what does

4         maximizing --

5              HEARING OFFICER BABBITT:  (Interposing)

6         No, no, I understand what you ask me, but you're

7         not the one here to ask questions.  You're to

8         answer questions to the best of your --

9              MS. FRANCIS:  (Interposing) No, but u

10        said.  That's why I'm trying to understand it.

11              MR. HOBBS:  (Indiscernible).

12              HEARING OFFICER BABBITT:  To the best

13        that you can answer questions, I ask you to do so.

14        If you can't, all you have to say is, I can't

15        answer that question, all right?

16              MS. FRANCIS:  Let me just put on record

17        that Titus program (indiscernible).

18              HEARING OFFICER BABBITT:  (Interposing)

19        Ms. Francis, there's no question to you.  That's

20        not the way the hearing works where you just speak

21        and say what you want, okay?  You have an attorney

22        who can ask you whatever questions he wants.

23              Okay.  So then turning to paragraph 48 of

24        your affidavit, okay?  I would like to know the

25        monetary amounts of the relief you are seeking.

Received Office of State Review
01/09/2024

1          What is the amount that you're seeking for tuition
2          from Titus?
3                    MS. FRANCIS:  $132,000.
4                    HEARING OFFICER BABBITT:  Okay.  What is
5          the amount that you are seeking for direct ABA
6          therapy?
7                    MS. FRANCIS:  I don't have that amount
8          yet.  It's a monthly amount and it varies.
9                    HEARING OFFICER BABBITT:  I'm sorry.  I
10         don't have -- I don't believe I have any invoices,
11         so I don't know.  And you don't know.
12                   MS. FRANCIS:  I do.  It ranges between 4
13         and $5,000 a month.
14                   HEARING OFFICER BABBITT:  I know, but I
15         can't -- that's not sufficient for an order.  I
16         mean, Mr. Hobbs, have you provided invoices?
17                   MR. HOBBS:  No, because there's barely
18         any invoices yet as it's the beginning of the
19         school year.
20                   HEARING OFFICER BABBITT:  I'm sorry, Mr.
21         Hobbs.  I can't understand you.  Maybe sign off and
22         sign in.  I just can't understand you at all.  I'm
23         going to do the same.  I'm not leaving the record,
24         but maybe if I sign off and in, it will help as
25         well.  I'm just trying.

Received Office of State Review
01/09/2024

```
 1                    MR. HOBBS:  Can you hear me now?
 2                    HEARING OFFICER BABBITT:  Yes, better.
 3          Thank you.
 4                    MR. HOBBS:  Yes, IHO, we don't have
 5          invoices as it's still early on in the school year,
 6          but we provided the rates of each of the
 7          afterschool service providers, and additionally, we
 8          can provide invoices Ms. Francis has accrued as
 9          supplemental disclosures along with our closing.
10                    HEARING OFFICER BABBITT:  No, no, I'm
11          sorry.  Whatever is in the record is in the record.
12          So I was looking -- I mean, I don't see any
13          affidavits or contracts for any of the afterschool
14          services.  Am I wrong with that?
15                    MR. HOBBS:  You're not wrong, but they've
16          (indiscernible) with the rate.
17                    HEARING OFFICER BABBITT:  Okay.  I think
18          that's all -- Mr. Hobbs, that's all I asked.  That
19          was my question.  I just wanted to know.  I was
20          trying to get the information directly from the
21          parent because there's nothing in the record about
22          that, okay?  So okay, so the costs are not
23          (indiscernible).
24                    All right so based upon my questions, Mr.
25          Hobbs, do you have anything further that you'd like
```

Received Office of State Review
01/09/2024

1          to ask this witness?

2                    MR. HOBBS:  A few questions, IHO.

3                    Ms. Francis, you were asked on -- during

4          the IHO's questioning about the parent training

5          provided by Little Green Tugboat.  Do you remember

6          that testimony?

7                    MS. FRANCIS:  Yes.

8                    MR. HOBBS:  Specifically, can you explain

9          if Ms. Koh or her therapist provides any sort of

10         proactive models or planning --

11                   HEARING OFFICER BABBITT:  (Interposing)

12         Excuse me.  Mr. Hobbs, you keep doing this.  You

13         keep putting your answer in the question.  Do you

14         want to ask her what Ms. Koh does?  Fine.  I think

15         Ms. Koh explained what she does.  It's fine if the

16         parent wants to do that, but please don't put

17         information in your question because that doesn't

18         help me know what the parent understands.

19                   MR. HOBBS:  Ms. Francis, can you

20         describe, outside of what you testified to from Ms.

21         Babbitt's question, the type of parent training you

22         received from Ms. Koh and her staff?

23                   MS. FRANCIS:  It's a variety of things.

24         You know, it's visuals, visual schedules to use

25         with Rex, depending on what we're targeting and

Received Office of State Review
01/09/2024

```
 1              what behavior we're trying to appease.  It is
 2              verbal.  It's in the form of a report.  It's a
 3              telephone call.  Is that the kind of information
 4              you're looking for?
 5                        MR. HOBBS:  Yes.
 6                        HEARING OFFICER BABBITT:  Again, Ms.
 7              Francis -- I'm sorry, Ms. Francis --
 8                        MR. FRANCIS:  (Interposing) Yes.
 9                        HEARING OFFICER BABBITT:  This is not for
10              you to ask questions.
11                        MS. FRANCIS:  Okay.  Sorry.
12                        HEARING OFFICER BABBITT:  If the
13              attorney --
14                        MS. FRANCIS:  (Interposing) I apologize.
15                        HEARING OFFICER BABBITT:  If the attorney
16              hasn't gotten what he needs, he should ask the
17              question.
18                        MS. FRANCIS:  Okay.  I'm sorry.
19                        HEARING OFFICER BABBITT:  Okay?  No,
20              that's -- I just.  Okay.
21                        MR. HOBBS:  Yes, that's what I was
22              looking for Ms. Francis, thank you.  No further
23              questions.
24                        HEARING OFFICER BABBITT:  Okay.  Mr.
25              Koppel, do you have any questions based upon my
```

Received Office of State Review
01/09/2024

204

T204

1       questions and just the very brief one question that

2       Mr. Hobbs asked?

3               MR. KOPPEL:  No, IHO.  I do not have

4       questions.

5               HEARING OFFICER BABBITT:  Okay.  Very

6       well.  So Mr. Hobbs, does this conclude the

7       Parent's case?

8               MR. HOBBS:  Yes.

9               HEARING OFFICER BABBITT:  All right.  Mr.

10      Koppel, does the District have any rebuttal

11      testimony that they want to offer?

12              MR. KOPPEL:  We do not, IHO.

13              HEARING OFFICER BABBITT:  Okay.  Very

14      well.  So then I will be requiring written

15      summations and briefs.  So please, I want to be

16      clear.  I do not want you to brief Prong I.  The

17      District has conceded Prong I.

18              Mr. Koppel, am I correct that you said

19      that the District was not raising any equitable

20      issues, any Prong III issues, correct?  Are there

21      any after hearing all the witnesses?

22              MR. KOPPEL:  That's correct, IHO.  We are

23      not raising either Prong I or Prong III issues.

24              HEARING OFFICER BABBITT:  Okay.

25      Terrific.  Okay.  So the only issue here is Prong

1       II, which is the Parent's burden, okay, of showing

2       why the educational program is appropriate.  The

3       District has said it's not.  And the District will

4       tell me why they feel it's not appropriate.  The

5       Parent will tell me why he feels it is appropriate.

6             So that means, and Mr. Hobbs, what I

7       stated at the beginning of the hearing, I believe

8       it was Exhibits M and O, and correct me if I'm

9       wrong.  I don't know that they were connected by

10      any of the testimony.  But you'll tell me in your

11      summation if they were.  I do recognize that you

12      will need the transcript to write your summations

13      so you can incorporate the testimony with the

14      exhibits to show me how a particular exhibit is

15      relevant or germane to the Prong II issue.

16             Okay.  So how much time would you like?

17             MR. HOBBS:  We request two weeks from

18      when we get the transcript.  Actually, I'm sorry,

19      IHO, three weeks from when we get the transcript.

20             HEARING OFFICER BABBITT:  Okay.  It's

21      fine.  I'm not going to bind you on time here.  We

22      have to pick a date, so I can't do it amorphous

23      like that.  I find that transcripts come in in a

24      week to ten days.  I don't know if your experience

25      is different.  If it is, tell me and I'll go with

1          your experience, because I don't track it.  But I

2          see with my different cases, but --

3                    MR. HOBBS:  My experience is closer to

4          two weeks.

5                    HEARING OFFICER BABBITT:  That's okay.

6          How about if I give you five weeks to submit the

7          brief?

8                    MR. HOBBS:  Thank you, IHO.

9                    HEARING OFFICER BABBITT:  Or six weeks,

10         whatever you want.  Whatever you want, you're going

11         to get to submit the brief -- this closing

12         summation.

13                   MR. HOBBS:  Can we do five weeks?

14                   HEARING OFFICER BABBITT:  So today's the

15         13th.  So one, two, three, four -- do you want the

16         six weeks?

17                   MR. HOBBS:  Let's do the six weeks then,

18         IHO.  What is that for this?

19                   HEARING OFFICER BABBITT:  The six weeks,

20         I think, goes to November 24th.

21                   MR. HOBBS:  That's Thanksgiving.  Can we

22         do -- I know that's the week of Thanksgiving.  I

23         think I'll be traveling.  In an abundance of

24         caution, can we do the 17th?

25                   HEARING OFFICER BABBITT:  Yeah.  That

Received Office of State Review
01/09/2024

1    gives you less time, but it's a --

2              MR. HOBBS:  I mean, if the IHO is willing

3    to go into that week after Thanksgiving, I'll take

4    it.

5              HEARING OFFICER BABBITT:  I'll give it to

6    you because, Mr. Hobbs, I don't want you to not

7    have ample time.  And also, it's -- I find that

8    more often than not, and even I think with your

9    firm, the last case we did, then it's, like, four

10   days before and you ask for more time.  And I'm

11   always amenable to giving more time.  But then,

12   basically, the other side probably has rushed to

13   get it done.  So if you want for the following

14   week, that's fine.  Do you want to pick the

15   Tuesday, the Wednesday of the following week?

16             MR. HOBBS:  Yeah.  Can we do the Tuesday

17   11/28?

18             HEARING OFFICER BABBITT:  That's fine.

19   Okay.

20             So Mr. Koppel, I'll go back to you and

21   ask you if that's okay with you?

22             MR. KOPPEL:  That's fine, IHO.

23             HEARING OFFICER BABBITT:  Okay.  So close

24   of business, 5 p.m. for closing summations,

25   November 28th.  All right.

Received Office of State Review
01/09/2024

1          So now we have to address the compliance

2     date because the compliance date is November 11th.

3     So that's before you're going to give me your

4     closing statements.

5          MR. HOBBS:  Yes.  Parent respectfully

6     requests an extension of the time line so we could

7     submit our closing briefs for this matter.  There'd

8     be no harm to the student as they're already in a

9     placement for this school year.

10          HEARING OFFICER BABBITT:  Okay.  And this

11     student has pendency, correct?

12          MR. HOBBS:  Yes.

13          HEARING OFFICER BABBITT:  Okay.  Mr.

14     Koppel, what's the District's position on the

15     extending the compliance date?

16          MR. KOPPEL:  We join in that request.

17          HEARING OFFICER BABBITT:  Okay.  Very

18     good.  So a written order extending the compliance

19     date will issue closer to the present compliance

20     date of November 11.

21          All right.  So before we go off the

22     record, any questions, concerns or statements from

23     the Parent, Mr. Hobbs?

24          MR. HOBBS:  None.

25          MS. FRANCIS:  No.

Received Office of State Review
01/09/2024

```
 1              HEARING OFFICER BABBITT:  Okay.

 2              MS. FRANCIS:  No, thank you.

 3              HEARING OFFICER BABBITT:  Mr. Koppel,

 4    anything from the District?

 5              MR. KOPPEL:  Nothing from the District.

 6    Thank you.

 7              HEARING OFFICER BABBITT:  Okay.  So that

 8    being said, can the court reporter sign us off the

 9    record?  I don't close the record, but we're signed

10    off the record for today.

11              (Whereupon, at 3:05 p.m. the proceeding

12    was adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Received Office of State Review
01/09/2024

1                    C E R T I F I C A T I O N

2

3              I, Christine James, do hereby certify

4      that I typed the transcript in the Matter of

5      Tristan Hinds taken on October 16, 2023 via video

6      conference by Toni Clarke for the NYC Office of

7      Administrative Trials and Hearings, and that to the

8      best of my ability, this is an accurate

9      transcription of what was recorded.  I further

10     certify that I am not connected by blood, marriage,

11     or employment with any of the parties herein nor

12     interested directly or indirectly in the matter

13     transcribed.

14

15

16                         *Christine James*

17     _____

18                         CHRISTINE JAMES

19                         October 25, 2023

20

21

22

23

24

25

Received Office of State Review
01/09/2024



**MAYERSON & ASSOCIATES**

Phone:(212) 265-7200
Fax: (917) 210-3075
gary@mayerslaw.com

200 W 41st Street 17th Floor
NEW YORK, NY 10036

CO1

January 16, 2024

**By NYSED Portal Submission**

Office of State Review
New York State Education Department
80 Wolf Road, Suite 203
Albany, NY 12205

**Re: In the Matter of R.F., A Student with a Disability
IHO Case No. 249622**

Dear Sir/Madam:

Enclosed please find papers associated with Petitioners' Request for Review of the Impartial Hearing Officer's decision in the above-referenced matter. Specifically, enclosed are:

1. Notice of Intention to Seek Review and CIS, dated December 27, 2023
2. Affidavit of Service of Notice of Intention to Seek Review and CIS with Corporation Counsel's 12/27/23 email service receipt, dated December 27, 2023
3. Notice of Request for Review, dated January 16, 2024
4. Request for Review, dated January 16, 2024
   a. Exhibit P-1: IHO McKeever's 08/15/23 Decision
   b. Exhibit P-2: Emails with IHO Babbitt 11/28/23 through 12/01/23
5. Affidavit of Verification of Halia Chudyk-Francis, sworn to on January 16, 2024
6. Affidavit of Verification of Cliff Francis, sworn to on January 16, 2024
7. Memorandum of Law, dated January 16, 2024
8. Affidavit of Service of Items #3 through #7, with Corporation Counsel's 01//24 email service receipt, dated January 16, 2024

Sincerely,

Gary S. Mayerson

CO1

CO2

**Request for Extension of Time**

January 22, 2024

Office of State Review
80 Wolf Road Suite 203
Albany, NY 12205

      **Re:    IHO Case No. 249622**

Dear State Review Officer:

My Answer is currently due to be served on January 23, 2024.  I am writing to request an extension of time to serve and/or file the Answer in this matter until February 6, 2024.

The reason(s) for the extension are as follows: The DOE needs additional time to review the record and prepare its Answer. Additionally, I was out of the office on 1/19/24 and could not work on this matter.

I have contacted Gary S. Mayerson, who consents to my request for an extension.

The student is currently: attending a nonpublic school at parental expense.  The student IS currently receiving services pursuant to a pendency (stay-put) placement.

In submitting this request, I have agreed to conditions extending the decision due date.

Sincerely,

/s/
Toni L. Mincieli
Agency Attorney, Special Education Unit
Office of the General Counsel
New York City Department of Education
415 89th Street
Brooklyn, NY 11209
Phone: (718) 238-6240

cc: Gary S. Mayerson (gary@mayerslaw.com)

CO2

Received Office of State Review
01/22/2024



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK     <span style="color:red">CO3</span>

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

**VIA ELECTRONIC TRANSMISSION**

January 22, 2024

Toni L. Mincieli, Esq.
Agency Attorney, Special Education Unit
Office of the General Counsel
New York City Department of Education
415 89th Street
Brooklyn, NY 11209

**Re:     H.C. & C.F. o/b/o R.F. v. New York City Department of Education
             Appeal No. 24-011; IHO Case No. 249622**

Dear Counselor:

On behalf of the State Review Officer, this letter will acknowledge receipt of your request for a specific extension of time from January 23, 2024 to February 6, 2024 to serve and/or file the Answer in this matter.

The current due date for the SRO to render a decision in this matter is February 15, 2024.  Having considered the reasons in your request for an extension of time, your request for an extension to serve and/or file the Answer is GRANTED by the SRO subject to the following conditions:

The Decision Due Date for the State Review Officer's decision is extended to 30 days from receipt of the Answer, provided that if such date falls on a Saturday, Sunday, or legal holiday, the decision shall be due the following business day.

In the event that the Answer is not received by the Office of State Review, then the decision due date shall be 30 days from the date of your request and acknowledgement that you agree to the conditions in this order, provided that if such date falls on a Saturday, Sunday, or legal holiday, the decision shall be due the following business day.

Upon submission of your request for an extension, you indicated your agreement with the above conditions, accordingly they will apply immediately.

<span style="color:red">CO3</span>

CO4

Sincerely,

/s/
Alan Fitzpatrick
Associate Attorney

cc: Gary S. Mayerson, Esq.

CO4



CO5

**Phone:(212) 265-7200**
**Fax: (917) 210-3075**
**Gary@mayerslaw.com**

200 W 41st Street 17th Floor
NEW YORK, NY 10036

February 6, 2024

<u>**VIA E-File**</u>

Office of State Review
80 Wolf Road, Suite 203
Albany, NY 12205-2643

<u>**Re: H.C.F. and C.F., individually and o/b/o R.F. v. New York City Department of Education**</u>
IHO Case No. 249622, SRO Appeal No. 24-011

Dear State Review Officer:

I represent the Petitioners (the "Parent") in the matter referenced above. Petitioners' response to the Respondent's Verified Answer is currently due on February 8, 2024. Petitioners request a two-week extension until February 22, 2024. This is Petitioners' first request for an extension.

The good cause basis for Petitioners request is that I am going out of the country for a period and the Petitioners require additional time to review the Answer. The Respondent's attorney, Toni Mincieli, Esq., consented to this request for an extension.

Petitioners' are appealing the decision of the impartial hearing officer, which denied Petitioners' requested relief for after school services and the cost of an evaluation. The claims in this appeal concern the 2023-24 school year.

Respectfully submitted,

/s/

Gary S. Mayerson, Esq.
Mayerson & Associates

cc. Toni Mincieli, Esq., Agency Attorney (via email)

CO5



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

CO6

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

### VIA ELECTRONIC TRANSMISSION

February 6, 2024

Gary S. Mayerson, Esq.
Mayerson & Associates
200 W 41st Street 17th Floor
New York, NY 10036
Mailing Address: P.O. Box 230068 New York, NY 10023

> **Re:    H.C. & C.F. o/b/o R.F. v. New York City Department of Education**
> **Appeal No. 24-011; IHO Case No. 249622**

Dear Counselor:

On behalf of the State Review Officer, this letter will acknowledge receipt of your request for a specific extension of time from February 8, 2024 to February 22, 2024 to serve and/or file the Reply in this matter.

The current due date for the SRO to render a decision in this matter is March 7, 2024.  Having considered the reasons in your request for an extension of time, your request for an extension to serve and/or file the Reply is GRANTED by the SRO subject to the following conditions:

The Decision Due Date for the State Review Officer's decision is extended to 30 days from receipt of the Reply, provided that if such date falls on a Saturday, Sunday, or legal holiday, the decision shall be due the following business day.

In the event that the Reply is not received by the Office of State Review, then the decision due date shall be 30 days from the date of your request and acknowledgement that you agree to the conditions in this order, provided that if such date falls on a Saturday, Sunday, or legal holiday, the decision shall be due the following business day.

Upon submission of your request for an extension, you indicated your agreement with the above conditions, accordingly they will apply immediately.

Sincerely,

/s/
Alan Fitzpatrick
Associate Attorney

cc: Toni Mincieli, Esq.

CO6

THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK        CO7

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

March 25, 2024

Gary S. Mayerson, Esq.
Mayerson & Associates
200 W 41st Street, 17th Floor
New York, New York 10036

Toni L. Mincieli, Esq.
New York City Department of Education
415 89th Street
Brooklyn, NY 11219

Re:    **H.C. & C.F. o/b/o R.F. v. New York City Department of Education**
       **Appeal No 24-011; IHO Case No. 249622**

Dear Parties:

Enclosed is a copy of Decision No. 24-011 of the State Review Officer in the above-entitled matter.

The original has been sent today directly to the New York City Department of Education to the attention of Liz Vladeck, General Counsel.

Please note that in accordance with Federal and State law, a decision of the State Review Officer is final, unless a Federal or State court reviews it. In order to obtain judicial review, a parent or board of education must begin a Federal action in the appropriate United States District Court or an Article 4 proceeding of the Civil Practice Law and Rules in local State Supreme Court. The courts have held that unless a party is challenging the validity of a State statute or regulation, it is not necessary or appropriate to name the State Review Officer or the Commissioner of Education as a party in such lawsuits. When such lawsuits have commenced, the Office of State Review would appreciate receiving notification and a courtesy copy of the moving papers by the parties.

Sincerely,

/s/

Cynthia DiVirgilio
Legal Assistant 2

Enclosure

cc:    Liz Vladeck, Esq.

CO7

 **THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

**CO8**

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

March 25, 2024

Farah-Lise Rousseau, Esq.
Interim Acting Senior Executive Director
Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, New York, 11201

Re:    **H.C. & C.F. o/b/o R.F. v. New York City Department of Education**
       **Appeal No 24-011; IHO Case No. 249622**

Dear Ms. Rousseau:

Enclosed is a copy of Decision No. 24-011 of the State Review Officer in the above-entitled matter.

The original has been sent today directly to the New York City Department of Education to the attention of of Liz Vladeck, General Counsel.

Thank you.

Sincerely,

Cynthia DiVirgilio
Legal Assistant 2

Enclosure

**CO8**

**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

CO9

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

March 27, 2024

Michelle S Babbitt, Esq.
NYC Office of Administrative Trials & Hearings (OATH)
Special Education Hearings Division
66 John Street, 11 Floor
New York, NY   10038

Re:   **H.C. & C.F. o/b/o R.F. v. New York City Department of Education**
      **Appeal No 24-011; IHO Case No. 249622**

Dear Hearing Officer:

Your decision in the above-referenced matter was appealed to this office.

Enclosed is a copy of the State Review Officer's decision in that appeal.

Sincerely,

/s/
Cynthia DiVirgilio
Legal Assistant 2

Enclosure

CO9

CO10

## REQUEST FOR CERTIFIED COPY OF ADMINISTRATIVE RECORD

An action has been filed seeking judicial review of the State Review Officer's Decision issued in Office of State Review Appeal Number: **24-011**

The caption of the court proceeding is as follows:

**Halia Chudyk-Francis and Cliff Francis on behalf of Rex Francis, a student with a disability, Plaintiff(s)** *vs.*

**New York City Department of Education, Defendant(s).**

The case was filed in the Southern District of New York.

The index or docket number of the court proceeding is: 1:24-CV-03117.

The judicial complaint was filed on April 24, 2024.

The Judge assigned to preside over the case is Mary Kay Vyskocil.  Magistrate Judge Jennifer Willis is also assigned to the case.

I am requesting a copy of the certified hearing record.

The address of the requesting party to whom the certified record should be sent is:

Mayerson & Associates
John Hobbs
1452 Carroll Street Apt 3G
Brooklyn New York 11213
212-265-7200

The address of the other party to whom the certified record should be sent is:

Bryn M. Ritchie
Asst. Corp. Counsel, General Litigation
NYC Law Department
100 Church St. 2-303a
(212) 356-0885

Request submitted by:

Gary S. Mayerson

CO10